## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>          Plaintiffs,<br><br>    v.<br><br>NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC,<br><br>        Defendants. | Civil Action No. 1:19-cv-00150-DLF |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GREGORY HOWARD'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Charles S. Fax
RIFKIN WEINER LIVINGSTON, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Tel.: (301) 951-0150
Email: cfax@rwllaw.com

Jeffrey A. Udell (*admitted pro hac vice*)
Adam P. Cohen (*admitted pro hac vice*)
Kraig Ahalt (*admitted pro hac vice*)
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, New York 10004
Tel.: (212) 335-2030
judell@wmhlaw.com
acohen@wmhlaw.com
kahalt@wmhlaw.com

*Attorneys for Defendant Gregory Howard*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................4

I.      Procedural background—the prior actions ........................................................4

II.     The First Amended Complaint..........................................................................6

        A.     The Parties .........................................................................................6

        B.     "Hacking" by the "Qatari Enterprise"...............................................7

        C.     Defendants' lack of any role in the hacking .......................................8

        D.     The publication of news reports about Broidy.....................................8

        E.     Muzin's meetings with Joel Mowbray...............................................10

        F.     The (few) allegations about the Defendants .....................................11

        G.     The supposed injury to Broidy's "public standing"...........................11

        H.     The extraneous matters in the Complaint ..........................................12

        I.     The Complaint's Thirteen Purported Claims ....................................12

STANDARD OF REVIEW ...........................................................................................13

ARGUMENT ...............................................................................................................14

I.      Count I Fails to State a RICO Claim Against Any Defendant. ........................14

        A.     The Complaint does not (and cannot) allege that Defendants operated or managed a Qatari Enterprise. ...................................................15

        B.     The Complaint fails as to each Defendant because it does not plead that any of them committed even one actionable predicate act, let alone two. ..................19

             1.     The Complaint fails to plead wire fraud as to any Defendant. .................20

             2.     The Complaint fails to plead extortion by Muzin.....................................21

             3.     The claims of a Travel Act violation do not establish a predicate act. ...................................................................................23

             4.     The Complaint fails to plead a violation of the Defend Trade Secrets Act............................................................................................23

             5.     The Complaint fails to plead economic espionage. ..................................25

             6.     The Complaint fails to plead criminal copyright infringement. ...............26

        C.     The Complaint fails to allege a "continuous" pattern of "related" racketeering acts...............................................................................27

# TABLE OF CONTENTS

**Page**

D.    The Complaint does not allege actionable injury that was proximately caused by the RICO violations. ...............................................................30

       1.    The Complaint alleges unrecoverable reputational injuries.....................30

       2.    The Complaint does not establish proximate cause. ...............................31

       3.    The Complaint does not adequately allege any other injuries. .................32

II.    Count II Fails to State a RICO Conspiracy Claim Against Any Defendant.....................33

III.    The Remaining Counts Fail to State a Claim...................................................................36

    A.    Count Three fails to state a claim under the Stored Communications Act...........39

    B.    Count Four fails to state a claim under the Computer Fraud and Abuse Act. ...............................................................................................................41

    C.    Count Five fails to state a claim under the Defend Trade Secrets Act. ................41

    D.    Count Six fails to state a claim under the California UTSA.................................43

    E.    Count Seven fails to state a claim for violation of California's Receipt and Possession of Stolen Property Law (or the D.C. analog).....................................44

    F.    Count Eight fails to state a claim under California's Comprehensive Computer Data Access and Fraud Act.................................................................48

    G.    Count Nine fails to state a claim for Public Disclosure of Private Facts..............49

    H.    Count Ten fails to state a claim for intrusion upon seclusion..............................51

    I.    Count Eleven fails to state a claim for conversion. .............................................51

    J.    Count Twelve fails to state a claim for tortious interference...............................54

    K.    Count Thirteen fails to state a claim for civil conspiracy. ...................................54

IV.    The Allegations Against Howard Must Fail Because They Seek to Punish Speech Protected Under the First Amendment. ..........................................................................55

CONCLUSION.....................................................................................................................60

## TABLE OF AUTHORITIES

**Cases**

*3D Glob. Sols., Inc. v. MVM, Inc.*,

    552 F. Supp. 2d 1 (D.D.C. 2008) ........................................................... 52

*Anza v. Ideal Steel Supply Corp.*,

    547 U.S. 451 (2006) ................................................................... 21, 32

*\*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009) ............................................................. 13, 17, 40

*Aston v. Johnson & Johnson*,

    248 F. Supp. 3d 43 (D.D.C. 2017) ......................................................... 13

*ATS Prod. v. Champion Fiberglass, Inc.*,

    No. 13-CV-2403, 2015 WL 224815 (N.D. Cal. Jan. 15, 2015) ............................... 44

*\*Bartnicki v. Vopper*,

    532 U.S. 514 (2001) ............................................................. 56, 57, 58

*Bates v. Nw. Human Servs., Inc.*,

    466 F. Supp. 2d 69 (D.D.C. 2006) ......................................................... 18

*Bates v. United States*,

    522 U.S. 23, 29–30 (1997) ................................................................ 46

*Beck v. Prupis*,

    529 U.S 494 (2000) .................................................................... 33, 36

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,

    No. 18-CV-933, 2018 WL 2298500 (N.D. Cal. May 21, 2018) ............................... 43

*\*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544 (2007) ................................................................ *passim*

*Benz v. Wash. Newspaper Publ'g Co.*,

    No. 05-CV-1760, 2006 WL 2844896 (D.D.C. Sept. 29, 2006) ............................... 51

*Bridge v. Phoenix Bond & Indem. Co.*,

    553 U.S. 639 (2008) ..................................................................... 36

*Bridges v. Lezell Law, PC*,

    842 F. Supp. 2d 261 (D.D.C. 2012) ....................................................... 28

*Bryant v. Taylor*,

    244 F. Supp. 3d 209 (D.D.C. 2017) ....................................................... 34

## TABLE OF AUTHORITIES

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003) .................................................................. 30, 31

*Cheeks v. Fort Myer Constr. Corp.*,
  216 F. Supp. 3d 146 (D.D.C. 2016) ........................................................... 14, 20, 31

*Choate v. County of Orange*,
  103 Cal. Rptr. 2d 339 (Cal. Ct. App. 2000) ............................................................ 55

*City of Industry v. City of Fillmore*,
  198 Cal. App. 4th 191 (Cal. Ct. App. 2011) ........................................................... 55

*City of New York v. Smokes-Spirits.com*,
  541 F.3d 425 (2d Cir. 2008) ................................................................................... 16

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz ("Gaubatz I")*,
  891 F. Supp. 2d 13 (D.D.C. 2012) .......................................................................... 40

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz ("Gaubatz II")*,
  793 F. Supp. 2d 311 (D.D.C. 2011) ........................................................................ 52

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz ("Gaubatz III")*,
  82 F. Supp. 3d 344 (D.D.C. 2015) .......................................................................... 44

*Dooley v. United Techs. Corp.*,
  803 F. Supp. 428 (D.D.C. 1992) ....................................................................... 14, 19

*Dooley v. United Techs. Corp.*,
  No. 91-CV-2499, 1992 WL 167053 (D.D.C. June 17, 1992) .................................. 15

*Dresbach v. Doubleday & Co., Inc.*,
  518 F. Supp. 1285 (D.D.C. 1981) ........................................................................... 50

*DSMC, Inc. v. Convera Corp.*,
  479 F. Supp. 2d 68 (D.D.C. 2007) ..................................................................... 43, 51

*E. Sav. Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014) ..................................................................... 21, 29, 33

*Econ. Research Servs. v. Resolution Econ., LLC*,
  208 F. Supp. 3d 219 (D.D.C. 2016) ................................................................... 25, 43

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
  48 F.3d 1260 (D.C. Cir. 1995) ........................................................................... 29, 30

## TABLE OF AUTHORITIES

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*,

749 A. 2d 724 (D.C. 2000) ........................................................................................ 40

*Farah v. Esquire Magazine*,

736 F.3d 528 (D.C. Cir. 2013) .................................................................................. 56

*Feld Entm't Inc. v. Am. Soc. for the Prevention of Cruelty to Animals*,

873 F. Supp. 2d 288 (D.D.C. 2012) .......................................................................... 18

*Ficken v. AMR Corp.*,

578 F. Supp. 2d 134 (D.D.C. 2008) .................................................................... 33, 52

*Findlay v. CitiMortgage, Inc.*,

813 F. Supp. 2d 108 (D.D.C. 2011) .......................................................................... 40

*Friends Christian High Sch. v. Geneva Fin. Consultants*,

39 F. Supp. 3d 58 (D.D.C. 2014) .............................................................................. 55

*Furash & Co. v. McClave*,

130 F. Supp. 2d 48 (D.D.C. 2001) ............................................................................ 52

*Genentech, Inc. v. JHL Biotech, Inc.*,

No. 18-CV-6582, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) .............................. 42

*Goren v. New Vision Int'l*,

156 F.3d 721 (7th Cir. 1998) .................................................................................... 16

*Greenpeace, Inc. v. Dow Chem. Co.*,

808 F. Supp. 2d 262 (D.D.C. 2011) .......................................................................... 31

*Greenpeace, Inc. v. Dow Chem. Co.*,

97 A.3d 1053 (D.C. 2014) ........................................................................................ 52

*Gross. v. Waywell*,

628 F. Supp. 2d 475 (S.D.N.Y. 2009)........................................................................ 14

*H.J. Inc. v. Nw. Bell Tel. Co.*,

492 U.S. 229 (1989)........................................................................................ 14, 27, 28

*Hamm v. Rhone-Poulenc Rorer Pharm.*,

187 F.3d 941 (8th Cir. 1999) .................................................................................... 31

*Harpole Architects, P.C. v. Barlow*,

668 F. Supp. 2d 68 (D.D.C. 2009) ............................................................................ 17

## TABLE OF AUTHORITIES

*Hawkins v. Wash. Metro. Area Transit Auth.*,
　311 F. Supp. 3d 94 (D.D.C. 2018) ........................................................... 45, 46

*Hedgeye Risk Mgm't, LLC v. Heldman*,
　271 F. Supp. 3d 181 (D.D.C. 2017) ................................................................ 48

*Hemi Group, LLC v. City of New York*,
　559 U.S. 1 (2010) ........................................................................................ 16, 21

*Hettinga v. United States*,
　677 F.3d 471 (D.C. Cir. 2012) ........................................................................ 13

*Hollander v. Flash Dancers Topless Club*,
　340 F. Supp. 2d 453 (S.D.N.Y. 2004) ............................................................. 32

*Holmes v. Sec. Investor Prot. Corp.*,
　503 U.S. 258 (1992) ......................................................................................... 13

*Hourani v. Mirtchev*,
　796 F.3d 1 (D.C. Cir. 2015) ............................................................................ 30

*Hughes v. Consol-Pa. Coal Co.*,
　945 F.2d 594 (3d Cir. 1991) ............................................................................ 29

*\*In re APA Assessment Fee Litig.*,
　766 F.3d 39 (D.C. Cir. 2014) ..................................................... 45, 46, 47, 48

*In re iPhone App. Litig.*,
　844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......................................................... 53

*Klayman v. Obama*,
　125 F. Supp. 3d 67 (D.D.C. 2015) ............................................................. 13, 31

*Kremen v. Cohen*,
　337 F.3d 1024 (9th Cir. 2003) ........................................................................ 52

*Kwikset Corp. v. Superior Court*,
　246 P.3d 877 (Cal. 2011) ................................................................................ 51

*Lopez v. Council on Am.-Islamic Relations Action Network*,
　657 F. Supp. 2d 104 (D.D.C. 2009) ........................................................... 13, 31

*Low v. LinkedIn Corp.*,
　900 F. Supp. 2d 1010 (N.D. Cal. 2012) .......................................................... 53

# TABLE OF AUTHORITIES

*Lu v. Lezell*,
  45 F. Supp. 3d 86 (D.D.C. 2014) ............................................................... 27

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993) ..................................................................... 26

*Mattel, Inc. v. MGA Entm't, Inc.*,
  782 F. Supp. 2d 911 (C.D. Cal. 2011) ........................................................ 45

*Menasco, Inc. v. Wasserman*,
  886 F.2d 681 (4th Cir. 1989) ..................................................................... 28

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ....................................................................... 14

*Mktg. Info. Masters, Inc. v. Bd. of Trustees of Cal. State Univ. Sys.*,
  552 F. Supp. 2d 1088 (S.D. Cal. 2008) ....................................................... 51

*NetApp, Inc. v. Nimble Storage, Inc.*,
  41 F. Supp. 3d 816 (N.D. Cal. 2014) .......................................................... 41

*New Show Studios LLC v. Needle*,
  No. 2:14-CV-1250, 2014 WL 2988271 (C.D. Cal. June 30, 2014) ............. 45

*Newmyer v. Sidwell Friends Sch.*,
  128 A.3d 1023 (D.C. 2015) ........................................................................ 54

*Nichols v. Club for Growth Action*,
  235 F. Supp. 3d 289 (D.D.C. 2017) ........................................................... 27

*Nix v. Hoke*,
  139 F. Supp. 2d 125 (D.D.C. 2001) ........................................................... 51

*Opperman v. Path, Inc.*,
  84 F. Supp. 3d 962 (N.D. Cal. 2015) .......................................................... 53

*Owens v. BNP Paribas S.A.*,
  235 F. Supp. 3d 85 (D.D.C. 2017) ........................................................ 13, 40

*Packaging Sys. v. PRC-Desoto Int'l, Inc.*,
  268 F. Supp. 3d 1071 (C.D. Cal. 2017) ...................................................... 54

*Phoenix Ancient Art, S.A. v. J. Paul Getty Trust*,
  No. 17-CV-241, 2018 WL 1605985 (S.D.N.Y. Mar. 29, 2018) ................. 42

## TABLE OF AUTHORITIES

*Prostar Wireless Grp., LLC v. Domino's Pizza*,

    360 F. Supp. 3d 994 (N.D. Cal. 2018) ................................................................. 54

*Pyramid Sec. Ltd. V. Int'l Bank*,

    726 F. Supp. 1377 (D.D.C. 1989) ................................................................. 28, 29

*Reich v. Lopez*,

    38 F. Supp. 3d 436 (S.D.N.Y. 2014) ................................................................. 23

*Republic of Kazakhstan v. Does 1-100*,

    No. 15-CV-1900, 2015 WL 6473016 (S.D.N.Y. Oct. 27, 2015) ............................ 58

*Reves v. Ernst & Young*,

    507 U.S. 170 (1993) ................................................................. 15, 17

*Roe v. Bernabei & Wachtel PLLC*,

    85 F. Supp. 3d 89 (D.D.C. 2015) ................................................................. 27, 29

*\*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,

    682 F.3d 1043 (D.C. Cir. 2012) ................................................................. *passim*

*Salinas v. United States*,

    522 U.S. 52 (1997) ................................................................. 14, 33

*Sandza v. Barclays Bank PLC*,

    151 F. Supp. 3d 94 (D.D.C. 2015) ................................................................. 20

*Scheidler v. Nat'l Org. for Women, Inc.*,

    537 U.S. 393 (2003) ................................................................. 21, 22

*Sedima, S.P.R.L. v. Imrex Co.*,

    473 U.S. 479 (1985) ................................................................. 13, 30

*Sekhar v. United States*,

    570 U.S. 729 (2013) ................................................................. 21, 22

*Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc.*,

    636 F. Supp. 49 (D.D.C. 1985) ................................................................. 46

*Sharpe v. Am. Acad. of Actuaries*,

    285 F. Supp. 3d 285 (D.D.C. 2018) ................................................................. 54

*Shulman v. Grp. W Prods., Inc.*,

    955 P.2d 469 (Cal. 1998) ................................................................. 49

## TABLE OF AUTHORITIES

*Silvaco Data Sys. v. Intel Corp.*,

    184 Cal. App. 4th 210 (Cal. Ct. App. 2010) ........................................................ 51

*Smith v. Daily Mail Publ'g Co.*,

    443 U.S. 97 (1979) ..................................................................................................... 58

*Son Ly v. Solin, Inc.*,

    910 F. Supp. 2d 22 (D.D.C. 2012) ........................................................................ 33

*Space Sys./Loral, LLC v. Orbital ATK, Inc.*,

    306 F. Supp. 3d 845 (E.D. Va. 2018) .................................................................. 24

*Speelman v. United States*,

    461 F. Supp. 2d 71 (D.D.C. 2006) ........................................................................ 14

*State Analysis, Inc. v. Am. Fin. Servs. Ass'n*,

    621 F. Supp. 2d 309 (E.D. Va. 2009) .................................................................. 25

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,

    271 F. Supp. 3d 835 (E.D. Va. 2017) .................................................................. 42

*Stewart v. Nat'l Educ. Ass'n*,

    471 F.3d 169 (D.C. Cir. 2006) ................................................................................ 56

*Sturdza v. United Arab Emirates*,

    281 F.3d 1287 (D.C. Cir. 2002) .............................................................................. 27

*Sundberg v. TTR Realty, LLC*,

    109 A.3d 1123 (D.C. 2015) ..................................................................................... 40

*SunPower Corp. v. SolarCity Corp.*,

    No. 12-CV-694, 2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ...................... 45

*Sweigert v. Perez*,

    334 F. Supp. 3d 36 (D.D.C. 2018) ................................................................. 13, 14

*Taus v. Loftus*,

    151 P. 3d 1185, 1208 (Cal. 2007) ........................................................................... 50

*Times-Mirror Co v. Super. Ct.*,

    244 Cal. Rptr. 556 (Cal. Ct. App. 1988) .............................................................. 50

*Trandes Corp. v. Guy F. Atkinson Co.*,

    996 F.2d 655 (4th Cir. 1993) .................................................................................. 26

## TABLE OF AUTHORITIES

*Tryco, Inc. v. U.S. Med. Source, LLC,*

    80 Va. Cir. 619 (Va. Cir. 2010) ......................................................................... 24

*U.S. Airline Pilots Ass'n v. Awappa, LLC,*

    615 F.3d 312 (4th Cir. 2010) ............................................................................. 29

*United States v. Chung,*

    659 F.3d 815 (9th Cir. 2011) ............................................................................. 26

*United States v. Hsu,*

    155 F.3d 189 (3d Cir. 1998) ............................................................................... 26

*United States v. Johnson,*

    911 F.2d 1394 (10th Cir. 1990) ......................................................................... 23

*United States v. Lan Lee,*

    No. 06-CR-0424, 2010 WL 8696087 (N.D. Cal. May 21, 2010) ........................... 26

*United States v. Liew,*

    856 F.3d 585 (9th Cir. 2017) ............................................................................. 26

*United States v. Persico,*

    832 F.2d 705 (2d Cir. 1987) ............................................................................... 14

*United States v. Philip Morris USA Inc.,*

    566 F.3d 1095 (D.C. Cir. 2009) ......................................................................... 20

*United States v. Philip Morris USA, Inc.,*

    449 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................... 15

*United States v. Swiderski,*

    593 F.2d 1246 (D.C. Cir. 1978) ......................................................................... 19

*Veronica Foods Co. v. Ecklin,*

    No. 16-CV-7223, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ........................... 43

*Vicom, Inc. v. Harbridge Merch. Servs. Inc.,*

    20 F.3d 771 (7th Cir. 1994) ............................................................................... 29

*W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. V. Mkt. Square Assocs.,*

    235 F.3d 629 (D.C. Cir. 2001) ........................................................................... 29

*Xereas v. Heiss,*

    933 F. Supp. 2d 1 (D.D.C. 2013) ....................................................................... 52

<u>**TABLE OF AUTHORITIES**</u>

*Youst v. Longo*,

    729 P.2d 728 (Cal. 1987) ................................................................ 54

**Statutes**

17 U.S.C. § 506(a)(1) ....................................................................... 27

18 U.S.C. § 1030 .............................................................................. 41

18 U.S.C. § 1343 .............................................................................. 20

18 U.S.C. § 1831(a) .......................................................................... 25

18 U.S.C. § 1832(a)(1) ..................................................................... 24

18 U.S.C. § 1836(b) .......................................................................... 41

18 U.S.C. § 1839(3) .......................................................................... 26

18 U.S.C. § 1951(b)(2) ..................................................................... 21

18 U.S.C. § 1961(1) .......................................................................... 14

18 U.S.C. § 1962 ...................................................................... *passim*

18 U.S.C. § 1964 ......................................................................... 2, 31

18 U.S.C. § 2701(a)(1) ..................................................................... 40

Cal. Civ. Code § 3426.7 ................................................................... 44

Cal. Pen. Code § 502 ................................................................. 48, 49

Cal. Pen. Code § 496 ........................................................................ 46

D.C Code § 22-3232 ......................................................................... 46

D.C Code § 22-3704 ......................................................................... 46

D.C Code § 22-3218.04 .................................................................... 46

**Legislative History**

142 Cong. Rec. S12 (daily ed. Oct. 2, 1996) (Managers' Statement for H.R. 3723) ................... 26

**Federal Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................. 1, 13

Fed. R. Civ. P. 12(b)(6) ................................................................. 1, 13

Defendant Gregory Howard respectfully moves to dismiss the First Amended Complaint ("Complaint" or "FAC"), Dkt. 18-2, filed by Plaintiffs Broidy Capital Management LLC ("BCM") and Elliott Broidy, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *First*, as this Court lacks subject matter jurisdiction over the case on the grounds of derivative sovereign immunity, the Complaint should be dismissed *with prejudice*, pursuant to Rule 12(b)(1), for the reasons set forth in the separate Memorandum of Law filed by Defendants Nicolas Muzin and Stonington Strategies LLC ("Stonington" and, collectively with Muzin, the "Stonington Defendants"), Dkt. 40-1, which Howard incorporates by reference and joins in its entirety. *Second*, each of the thirteen separate counts in the Complaint should be dismissed pursuant to Rule 12(b)(6) for their failure to state a claim upon which relief may be granted.[1] *Third*, and independently, the Complaint should be dismissed against Howard, pursuant to Rule 12(b)(6), as it seeks to punish speech protected under the First Amendment. This memorandum, filed by Howard, addresses the allegations against each Defendant and is joined in its entirety by the Stonington Defendants and Joseph Allaham.

## PRELIMINARY STATEMENT

This Complaint is the third by Broidy and BCM (collectively, "Broidy") making virtually identical allegations. The first two were dismissed on sovereign and diplomatic immunity and jurisdictional grounds by other federal courts.[2] Each version tries to pin blame on various defendants for harms that Broidy claims to have suffered to his "public standing" when independent news outlets published articles about him—the details of which he omits from the

---

[1] Additionally, as discussed below, Counts One and Two should be dismissed pursuant to Rule 12(b)(1) for failure to allege RICO standing.

[2] *Broidy Capital Mgmt., LLC et al. v. Qatar et al*, 2:18-CV-02421 (C.D. Cal. Mar. 26, 2018), *appeal docketed*, No. 18-56256 (9th Cir. Sept. 24, 2018); *Broidy Capital Mgmt. LLC v. Benomar*, 7:18-CV-06615 (S.D.N.Y. 2018), *appeal docketed*, No. 19-236 (2d Cir. Jan. 22, 2019).

Complaint but the truth of which he does not contest.  He attributes his harm not to the outlets that published the articles, but to a supposed "enterprise" consisting of the State of Qatar and its agents, who allegedly hacked Broidy's computers and obtained from them unspecified information.  As these claims are squarely directed at a foreign nation and its alleged agents—including each of the Defendants named in the Complaint—the claims are deficient on grounds of sovereign immunity, as set forth in the Memorandum of Law filed by the Stonington Defendants ("Stonington Mem."). Dkt. 40-1.  The Complaint must be dismissed for this reason alone.

Separately, and independently, each of this latest Complaint's thirteen claims fails, for differing reasons, to state a claim.  Fatally, the Complaint fails to plausibly allege, consistent with requisite pleading standards, that any of the Defendants *personally* engaged in wrongful conduct. Nowhere does the Complaint allege that the Defendants personally participated in, had prior knowledge of, or agreed in any way to support any computer hacking or other wrongful conduct directed against Plaintiffs.

For that same reason, Plaintiffs fall woefully short of alleging a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and § 1964. This latest Complaint tries to circumvent the sovereign immunity obstacle by recasting the prior allegations as racketeering claims, dropping Qatar as a named defendant, and asserting that Qatar and its agents—including the Stonington Defendants, Allaham and Howard—formed a "Qatari Enterprise" under RICO, on whose behalf the Defendants were acting and the conduct of which was designed to "silence" Broidy.  FAC ¶ 2.  As before, this Complaint alleges that BCM's computers were hacked, unspecified information was obtained, and then news outlets published that information in articles that harmed Broidy's reputation in some undefined way.

The Complaint fails to state a RICO claim for multiple reasons, each of which is a separate basis to dismiss.  It likewise fails to state a claim under any of the additional eleven counts repeated here from the California Litigation.  And with respect to Howard, the Complaint violates the First Amendment of the U.S. Constitution.  As more fully detailed below:

*First*, the Complaint fails to sufficiently plead a claim under RICO for at least four independent reasons:

(1)  *It does not plead that any of the Defendants "operated" or "managed" a RICO enterprise*.  In a transparent effort to dodge the prior immunity rulings, while still maintaining a "Qatari Enterprise," the Complaint rests on the absurd premise that the named Defendants were operating or managing a RICO enterprise that consisted of an entire foreign sovereign.[3]

(2)  *It fails to plead two predicate acts of racketeering as to any Defendant, let alone each one*.  The Complaint does not allege that any of the Stonington Defendants, Allaham, or Howard committed the hacking (or any actions related to it) that forms the basis of the claims.  Nor does it properly allege that any of them committed any other "predicate act of racketeering."  It tries to assert six types of predicate acts, but fails to tie the purported predicate acts to any named Defendant.

(3)  *It fails to plead a "continuous" and "related" pattern of racketeering*.  The Complaint alleges a one-time, closed-ended, scheme targeting a single person over a very short time-period, which is legally insufficient to state a RICO pattern.

(4)  *It alleges non-actionable reputational injury and fails to allege proximate cause*.  The Complaint alleges personal injury in the form of reputational harm to Broidy's "public standing,"

---

[3] Indeed, the allegations that these four United States citizens were acting at Qatar's direction only reinforces why the Court should grant the motion to dismiss on grounds of derivative sovereign immunity.  *See* Stonington Mem. at 11–25.

which is not an actionable "racketeering injury."  Further, by the Complaint's very allegations, the proximate cause of any "injury" was the separate publication of articles by independent news organizations, not anything done by the Defendants.

*Second*, the Complaint fails to sufficiently plead that the Defendants conspired to violate RICO and thus does not state a claim under 18 U.S.C. § 1962(d).  It fails to allege any substantive RICO violation in the first place, and it falls far short of plausibly alleging the existence of any conspiratorial agreement (under RICO or the separate conspiracy claim in Count Thirteen).

*Third*, each claim in the hodgepodge of eleven other counts likewise fails.  The Complaint tacks on a litany of other claims based on the same insufficient factual allegations.  Those claims fail for many of the same reasons as those set forth above, and more.  As with the RICO counts, the claims consistently fail to state any actionable conduct by any of the four Defendants.

*Fourth*, the claims against Howard cannot stand because they violate his rights under the First Amendment to the United States Constitution.  The only conduct that the Complaint attributes to Howard—by way of *factual* allegation and not conclusory summary—is that he was a media placement consultant for Qatar and that he spoke via phone on multiple occasions with several reporters, among the many, who subsequently wrote articles about Broidy and his hacked emails.  Speaking with reporters about issues of profound public concern, such as those implicated in the Broidy emails, is conduct that is squarely protected by the First Amendment and Supreme Court precedent.

Accordingly, the Complaint should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS

### I.     Procedural Background—The Prior Actions

For a complete recitation of the long and tortured procedural history of this case, we refer the Court to the memoranda submitted by the Stonington Defendants in support of their motion to

dismiss and in opposition to Plaintiffs' Motion to Expedite Discovery.  *See* Stonington Mem. at 2–6; Dkt. 31 at 2–11.  As described therein, Broidy has alleged in each of his previous complaints, as here, that a group of hackers—unnamed and unknown, but purportedly working at the behest of the State of Qatar—perpetrated a cyberattack against Broidy and his associates, stealing his emails (the "Broidy emails") in the process.  In the first action, filed in the Central District of California and styled *Broidy Capital Management LLC v. Qatar*, No. 2:18-CV-2421 Dkt. 1 (C.D. Cal. Mar. 26, 2018) (the "*California Litigation*"), Broidy alleged that the State of Qatar, together with the Stonington Defendants, two Qatari nationals, Global Risk Advisors ("GRA"), and certain of GRA's employees, conspired with the hackers to disseminate the Broidy emails in an effort to publicly discredit Broidy.  Upon motions by Qatar and the Stonington Defendants, the court dismissed the *California Litigation* on jurisdictional grounds, noting the scarcity of allegations connecting the defendants to the alleged hacking.  *See California Litigation*, Dkt. 198 (Aug. 8, 2018); *id.*, Dkt. 209 (Aug. 16, 2018).[4]

While the *California Litigation* was still pending, Broidy filed another lawsuit, this time in the Southern District of New York, against Jamal Benomar, a career Moroccan diplomat and former United Nations official whom Broidy claimed had participated in the alleged hacking conspiracy.  *Broidy Capital Mgmt. LLC v. Benomar*, No. 7:18-CV-6615, Dkt. 1 (S.D.N.Y. July

---

[4] *See id.*, Dkt. 209 at 3 ("[w]ith respect to [Stonington and Muzin], the First Amended Complaint contains no allegations that they unlawfully accessed or 'hacked' Plaintiffs' computer systems and accounts"); *id.* at 8 n.4 ("although it is clear that Muzin was aware that various members of the press were investigating and planning to publish stories regarding Plaintiffs, these types of allegations in no way implicate [Stonington or Muzin] in the hack of Plaintiffs' computer systems and accounts or the dissemination of Plaintiffs' private and confidential information"); *id.* at 10 ("[p]laintiffs do not allege that [Stonington or Muzin] hacked Plaintiffs' computer systems and accounts and have conceded that it is 'unclear' if [Stonington or Muzin] participated in the dissemination of information").

23, 2018) (the "*New York Litigation*").  That case was also dismissed on jurisdictional grounds.  *Id.*, Dkt. 56 (Dec. 21, 2018).

## II.      The First Amended Complaint

The factual allegations in Broidy's current Complaint are assumed true for now.  But many of the "facts" alleged in the Complaint are either not directed at any named Defendant or are innocuous and unrelated to any cause of action, as set forth below.

### A.      The Parties

According to the Complaint, Broidy is a businessman from California who says he speaks out about countries that he believes fund terrorists.  FAC ¶ 1.  He began criticizing the State of Qatar because of his belief in its alleged role in international affairs, dubbing himself a "major thorn in Qatar's side."  *Id.*  BCM is an investment firm of which he is the sole member.  FAC ¶ 11.

Stonington is a registered public relations and lobbying firm that contracted with Qatar to provide "government relations" services, working at Qatar's direction, during the period at issue in the Complaint.  FAC ¶¶ 13–15.  Muzin was the founder and CEO of Stonington and worked as a lobbyist and registered foreign agent of Qatar pursuant to Stonington's contract until August 2018.  FAC ¶ 13.  Allaham is alleged to have been a co-founder of Stonington[5] and also has worked for Qatar as its registered foreign agent.  FAC ¶ 16.  Howard is a media strategist who likewise worked as a registered foreign agent for Qatar until January 2018.  FAC ¶ 17.

---

[5] The Complaint's allegation that Allaham is the co-founder of Stonington is false, although the Defendants do not rely upon or reference this error as a basis for any part of their motions to dismiss.

B.      "Hacking" by the "Qatari Enterprise"

The Complaint is based almost entirely on the same allegations that were dismissed by the California court—now, transparently designed to plead around the ultimately fatal dismissal of Qatar.  In particular, the Complaint attempts to circumvent immunity issues by recasting the allegations about a discrete hack of BCM's computers between December 2017 and January 2018 into a multi-victim, criminal racketeering scheme subject to liability under RICO.  FAC ¶¶ 2, 4, 9.

The Complaint now claims that Qatar and its alleged agents formed a criminal RICO enterprise, which it calls the "Qatari Enterprise" (or "Enterprise").  As alleged, the Enterprise consisted mainly of Qatar itself, with the assistance of various individuals and entities that supposedly provided services on its behalf.  FAC ¶ 2 (the Enterprise is an "international criminal racketeering enterprise and tortious conspiracy, funded by Qatar and orchestrated by a high-ranking, former U.N. diplomat and his highly paid U.S. co-conspirators," including the Defendants, plus individuals named as defendants in prior litigations).  The alleged goal of the Enterprise was to silence Broidy for speaking out about Qatar's alleged policies and lobbying against the Qatar.  FAC ¶¶ 32–49.

The principal "illegal" act undertaken to "silence" Broidy was the purported hacking of BCM's computer servers, followed by dissemination of certain hacked information to the media. FAC ¶¶ 78–114.  As in California, this Complaint alleges that non-party GRA, an "international strategic consultancy and cyber security firm" engaged by the Enterprise in December 2017, opened a Doha-based subsidiary two months before the attack on BCM's computers, and that GRA coordinated the hack at Qatar's direction.  FAC ¶¶ 79–85.  GRA purportedly accomplished the hacking by means of "spear-phishing" emails sent to Broidy's wife and his administrative assistant on December 27, 2017, and January 14, 2018.  FAC ¶¶ 87, 92.  These emails were allegedly devices used to fool Broidy's wife and assistant into taking steps that enabled the hackers to access

7

BCM's systems and information, and then to maintain such access for a little over a month.  FAC ¶ 106.

GRA's access to Broidy's systems is alleged to have ended on February 25, 2018—meaning the hacking activity, in its entirety, spanned less than eight weeks.  FAC ¶¶ 79–110.  The Complaint offers no specifics about the information allegedly obtained from Broidy's servers.  It only says such information consists of "private communications, emails, documents, and intellectual property," and it makes vague references to "proposals," "contracts," "trade secrets" and "copyright" materials.  FAC ¶¶ 112, 151, 231, 243, 249.  The Complaint also fails to allege what content from Broidy's servers was published in the press, and it does not provide the content of any relevant articles.

### C.      Defendants' lack of any role in the hacking

The Complaint does not allege that *any* of the Defendants played any role whatsoever in the hacking.  It does not allege that any of them prepared, reviewed, authorized, sent, or otherwise had anything to do with the "phishing" emails that purportedly enabled the infiltration of the Gmail accounts of Broidy's associates and of BCM's servers.  It includes no allegation that any of the Defendants is or was affiliated with GRA.  And it does not allege that any of them played any role in planning the hacking, or that any of them even *knew* about it, before it took place.  The Complaint merely accuses the Defendants of "identifying" Broidy as a "target" for speaking out against Qatar, and of eventually "knowingly receiving" unspecified information from the hack.  FAC ¶ 34.

### D.      The publication of news reports about Broidy

The Complaint alleges that after the hacking (in which no Defendant is claimed to have taken part) the Defendants "received and were knowingly using" emails stolen from Broidy.  FAC ¶ 159.  The Complaint identifies ten news articles that were eventually published, based on the

8

hacked Broidy emails, between March 1, 2018 and May 21, 2018 in seven media sources: the Wall Street Journal, the Huffington Post, the New York Times, the BBC, Bloomberg, the Associated Press, and McClatchy.  FAC ¶¶ 121-52.  The Complaint does not provide the content of *any* of these articles.  It does not state what information in them came from the Broidy emails, versus other sources.  It does not state what, if any, information in them was false.  Nor does it identify anything in the articles that actually harmed Broidy.

As for the Defendants' purported connection to the articles, the Complaint alleges that Howard's "phone records show that he orchestrated a sophisticated media and distribution campaign" to place information from the Broidy emails in the hands of the press, as evinced by a pattern of calls around the time that stories about the emails were published.  FAC ¶¶ 116–17, 119.  During this same period, the Complaint alleges, "Howard closely communicated with public relations experts, research groups, and registered agents of Qatar to coordinate the media disinformation campaign against Broidy."  FAC ¶ 117.  As support for this conclusory allegation, the Complaint states that, Howard—a "media placement expert," FAC ¶ 17—"participated in more than two hundred phone calls with reporters who contributed to stories regarding Broidy and Qatar or regularly covered Qatari-related issues."  FAC ¶ 119.  But the Complaint says virtually nothing about who initiated the calls (*e.g.*, whether the reporters called him in his role as a media relations contact or whether he called them), the content of these calls, what actual information from the Broidy emails was supplied (if any), or what substance from these calls ended up in published articles.  Nonetheless, the Complaint asserts in conclusory fashion that Howard must have joined the charged conspiracy because "[t]he volume and timing of these contacts show that Howard was

acting in concert with Defendants and the Qatari Enterprise"—albeit in ways unspecified by the Complaint—"during this period."  FAC ¶ 115.

The Complaint contains no factual allegations linking Muzin to the distribution of allegedly hacked materials and instead implies that he must have been involved because he purportedly had advance knowledge that articles would be published about Broidy, though the only alleged contact between a reporter and Muzin came when a McClatchy reporter reached out to *him* (not the other way around), FAC ¶ 141, and who wrote an article unrelated to the hacked emails in February. *See* Stonington Mem. at 8–9, 27.  Although the Complaint mentions certain messages from Muzin to Allaham that reference media coverage of Broidy, it does not allege any other contacts by Muzin with reporters or that he provided any hacked information.  FAC ¶¶ 143–50, 156.  The Complaint makes no allegation that Allaham or Stonington had interactions with anyone who published any information about Broidy.

### E.   Muzin's meetings with Joel Mowbray

Apart from the supposed dealings with news outlets, the Complaint references three meetings between Muzin and a person named Joel Mowbray (who is alleged to be an associate of both Muzin and Broidy).  The Complaint states that Muzin tried to engage Mowbray to work on Qatar's behalf.  FAC ¶¶ 173, 181.  Muzin supposedly told Mowbray on February 27, 2018, that the New York Times was investigating issues relating to Broidy, FAC ¶ 174, and later that Muzin "did not cause the Broidy stuff" and did not "know all the details" about the purported hack, FAC ¶ 177.  Muzin also allegedly informed Mowbray that Broidy was of interest to the Qatari government, that Broidy was "somebody who … didn't like [Qatar] too much," FAC ¶ 184, and that Mowbray could be subjected to an extensive legal battle due to his association with Broidy, FAC ¶ 185.  In the California Litigation, Broidy cited these conversations as evidence that Muzin had inside knowledge of the hack, and the California Court found the allegations lacking.  *See*

Stonington Mem. at 3–4, 28–30.  Now, the Complaint baldly asserts that Muzin was trying to "extort" Mowbray.

### F.      The (few) allegations about the Defendants

The Complaint overall contains few allegations specific to the four named Defendants.  For example, Howard's name appears in just 28 of the Complaint's 377 paragraphs.  The Complaint has no factual allegations connecting him to any conspiracy or the alleged Enterprise.  He is not mentioned in the section of the Complaint entitled "Defendants Join the Qatari Enterprise" or the section describing how the supposed Enterprise hacked Broidy.  FAC ¶¶ 50–77, 78–110.  He is not alleged to have "celebrated" the conspiracy, to have played any role in the scheme, or to have been implicated in it by any statements made by others.  FAC ¶¶ 138–87.  The primary allegations concerning Howard are that he was acting as a media consultant for Qatar.  The Complaint then makes a factually unsubstantiated leap to assert that the "volume and timing" of his contacts with reporters "show that Howard was acting in concert with" the other Defendants and the Enterprise.  FAC ¶ 115.

The Complaint's primary allegations about Muzin are the meetings with Mowbray.  As to him (and Stonington) and Allaham, the Complaint reiterates the same litany of allegations that the California court already found wanting, to the effect that they were aware that news outlets were investigating and planning to publish information about Broidy.  As to Allaham, the Complaint also adds the (unremarkable) allegations that he tried to help Qatar's relationship with the Jewish community in the United States, including by making charitable donations and purchasing a table at an annual fundraising gala.  FAC ¶¶ 67–68.

### G.      The supposed injury to Broidy's "public standing"

The Complaint repeats the words "harm" or "injury" multiple times to describe how the foregoing events impacted Broidy, but offers no detail.  The purported "harm" is described almost

exclusively with general statements that the news reports caused personal injury to Broidy's "standing in the community" or "business and public standing."  *See*, *e.g.*, FAC ¶¶ 8, 27, 52, 263, 345, 353, 370.  The Complaint makes a brief reference to other "financial damage."  FAC ¶ 258.

      **H.**     **The extraneous matters in the Complaint**

Other parts of the Complaint veer off into matters wholly unrelated to the asserted claims in an apparent effort to use this Court (like the other two) as a venue for policy debates.  It meanders on about international disputes between Qatar and other Middle Eastern countries and accuses Qatar of corruption and "dirty" practices.  *See*, *e.g.,* FAC ¶¶ 36–43, 57–72.  It also adds a bald allegation with no details in an isolated paragraph that "approximately 1,400 email addresses" have been cyber-hacked by Qataris in the past.  FAC ¶ 9.  It ties none of those generalized statements about extraneous matters to any specific allegations connected to Broidy or the Defendants, nor does it explain how any of this conduct related to the purpose of the Enterprise, which allegedly was to target and silence Broidy.

      **I.**     **The Complaint's Thirteen Purported Claims**

The Complaint asserts thirteen counts, each against all four Defendants.  Count One is for a violation of RICO under § 1962(c).  Count Two is for conspiracy to violate RICO under § 1962(d).  Count Three is for violation of the Stored Communications Act.  Count Four is for violation of the Computer Fraud and Abuse Act.  Count Five is for misappropriation of trade secrets under 18 U.S.C. §§ 1831, 1832, 1836.  Count Six is for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("UTSA").  Count Seven is for Receipt and Possession of Stolen Property in violation of California Penal Code § 496.  Count Eight is for violation of the California Comprehensive Computer Data Access and Fraud Act.  Count Nine is for public disclosure of private facts.  Count Ten is for intrusion upon seclusion.  Count Eleven is for conversion.  Count Twelve is for tortious interference.  Count Thirteen is for civil conspiracy.

**STANDARD OF REVIEW**

Rule 12(b)(6) requires that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Klayman v. Obama*, 125 F. Supp. 3d 67, 76 (D.D.C. 2015) (quoting *Iqbal*, 556 U.S. at 678). "[T]he facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level[.]'" *Id.* (quoting *Twombly*, 550 U.S. at 555–56). "'[L]abels and conclusions,' 'a formulaic recitation of the elements of a cause of action,' or 'naked assertion[s] devoid of further factual enhancement,' do not satisfy the pleading standard." *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 89 (D.D.C. 2017) (quoting *Iqbal*, 556 U.S. at 678), *aff'd,* 897 F.3d 266 (D.C. Cir. 2018). A court need not "accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint." *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 49 (D.D.C. 2017) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam)).

The Complaint's failure to allege proper RICO standing due to its lack of cognizable RICO injury could be deemed to trigger Rule 12(b)(1). *Lopez v. Council on Am.-Islamic Relations Action Network*, 657 F. Supp. 2d 104, 109 & n.4 (D.D.C. 2009), *aff'd,* 383 F. App'x 1 (D.C. Cir. 2010). "Injury to a person's business or property is required for a civil plaintiff to demonstrate standing [and] . . . a plaintiff . . . must demonstrate that a defendant's predicate acts were the proximate cause of his injury." *Id.* at 110 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)); *see also Sweigert v. Perez*, 334 F. Supp. 3d 36, 39–40 (D.D.C. 2018) (lack of standing implicates subject matter jurisdiction). Under Rule

12(b)(1), the court "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Sweigert*, 334 F. Supp. 3d at 40 (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).

## **ARGUMENT**

None of the thirteen counts states a claim upon which relief can be granted.

## I.      **Count I Fails to State a RICO Claim Against Any Defendant.**

"The elements of a civil RICO violation are '(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity,'" where the statute defines the type of conduct that can constitute "predicate acts" or "racketeering." *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 153 (D.D.C. 2016) (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)), *aff'd,* 728 F. App'x 12 (D.C. Cir. 2018); *see also* 18 U.S.C. § 1961(1). "Group pleading" is impermissible—meaning that a complaint invoking RICO must "indicate individually which of the . . . defendants actually engaged in the particular predicate act." *Gross. v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009). Otherwise, "lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually, as required." *Id.* (citations omitted). The focus of § 1962(c) is "on the *individual* patterns of racketeering engaged in by [each] defendant, rather than the collective activities of the members of the enterprise." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) (emphasis added); *see Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

A complaint under 18 U.S.C. § 1962(c) thus must satisfactorily plead the elements of the claim against *each* defendant. *Dooley v. United Techs. Corp.*, 803 F. Supp. 428, 440 (D.D.C. 1992) (complaint "must allege that the individual . . . defendants *each* committed *two* RICO predicate acts" (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989)) (emphasis added)).

"[T]he RICO plaintiff must show that *each* defendant committed at least *two* predicate acts to establish a violation of section 1962(c), or agreed to join a RICO conspiracy and committed some overt act in furtherance of the conspiracy, to establish a violation of section 1962(d)." *Dooley v. United Techs. Corp.*, No. 91-CV-2499, 1992 WL 167053, at *8 (D.D.C. June 17, 1992) (citing additional cases) (emphasis added).

Count One fails under RICO for multiple reasons, each of which independently requires dismissal. It does not adequately plead that: (a) any Defendant operated or managed a RICO enterprise; (b) any Defendant committed any actionable predicate act, let alone the required two for each Defendant; (c) there was a "continuous" pattern of "related" racketeering acts; or (d) the plaintiffs suffered any *actionable* injury that was proximately caused by any Defendant.

### A.   The Complaint does not (and cannot) allege that Defendants operated or managed a Qatari Enterprise.

A RICO complaint must plead facts sufficient to demonstrate that each defendant "conduct[ed] or participate[d]" in the affairs of an enterprise. 18 U.S.C. § 1962(c). This means that each defendant must participate in the "operation or management" of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

"Operating or managing" an enterprise is not a small hurdle to clear at the pleadings stage. It requires more than just associating with the enterprise or acting on the instruction of others. "[O]ne must have some part in *directing* those affairs." *Id.* at 179 (emphasis added). While a defendant may not be in the literal "control group," the defendant must be involved in the "intentional and deliberate performance of acts, functions, or duties which are related to the operation or management of the enterprise." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 876 (D.D.C. 2006). "[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO

liability." *Goren v. New Vision Int'l*, 156 F.3d 721, 728 (7th Cir. 1998). As the Second Circuit put it, "alleging that certain entities provide services which are helpful to an enterprise without any allegations that those entities exert any control over the enterprise does not sufficiently allege a claim under RICO against those entities." *City of New York v. Smokes-Spirits.com*, 541 F.3d 425, 449 (2d Cir. 2008), *rev'd on other grounds sub nom.*, *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010).

Broidy's Complaint does not remotely satisfy this requirement. There is no plausible way that any of the Defendants can be deemed to have "operated" or "managed" the "Qatari Enterprise." The Complaint alleges that the supposed enterprise is, for all intents and purposes, the State of Qatar (as ambitious and implausible as those allegations may be). It includes diatribes about Broidy's campaign against Qatar for its supposed policies, his alleged targeting by Qatar for his efforts in speaking out against it, and the alleged public relations efforts to silence him. The fundamental theory of the Complaint is that *Qatar* is directing the conduct that supposedly injured Broidy.[6]

The Complaint alleges that the four Defendants were acting at Qatar's alleged direction in certain tasks—which reinforces why derivative sovereign immunity applies. *See* Stonington Mem. at 11–25. But it does *not* allege that the Enterprise (*i.e.*, Qatar) was in any way acting at *their direction*, which would be implausible. There are no allegations that the Defendants were in any decision-making role, no allegations that they conducted any of the hacking (as alleged by Broidy, it was done by GRA), no allegations that they planned or even knew of the operations (they are

---

[6] Broidy's recent Motion for Expedited Discovery confirms the allegations are of "an electronic hacking and media smear campaign sponsored by the State of Qatar," not by the Defendants. Dkt. 19 at 1; *see also id.* at 2 (describing "Qatar's electronic hacking scheme," "a RICO conspiracy sponsored by Qatar," and claiming that "Qatar, with the support and participation of defendants, targeted Broidy"); *id.* at 3 (noting "Qatar's involvement and responsibility for the scheme").

merely alleged in a group pleading to have vaguely "received" information obtained from the hack, FAC ¶ 34), and no allegations that they had top-level, mid-level, or really *any* decision-making functions whatsoever.  These were three individuals and one corporate entity alleged to have been United States citizens, acting under contractual arrangements at the direction of and as agents of Qatar.  The Complaint offers no factual allegations—nor could it—to sustain the implausible notion that these four Defendants were "exerting control" over a RICO enterprise where the purported enterprise is *a foreign nation*.

The sole allegations set forth in the Complaint that purport to connect the Defendants with the Enterprise are the following:  (i) Howard talked with some reporters before a few articles were published (perfectly legal and entirely consistent with his job as a media strategist, as explained below); (ii) Muzin talked with Joel Mowbray about Broidy in general terms (also perfectly legal); (iii) Muzin and Allaham "celebrated" articles about Broidy that appeared to have painted him in a bad light (same); and (iv) the Defendants were paid by Qatar (same, and *not* illustrative of their "directing" the supposed Enterprise).  *See* FAC ¶¶ 115–59.  "[A]ssistance rendered by words, acts, encouragement, support, or presence" falls short of the requirement that a defendant play "*some* part in directing the enterprise's affairs."  *Reves*, 507 U.S. at 179 (emphasis in original).  That type of deficient pleading cannot be remedied by vague and conclusory statements that the Defendants "operated and managed the affairs of the Qatari Enterprise and in particular implemented its media disinformation campaign against Plaintiffs."  FAC ¶ 256.  "Naked allegations" about operating or managing enterprises without "further factual enhancement" cannot support a RICO claim.  *Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 75–76 (D.D.C. 2009) (quoting *Iqbal*, 556 U.S. at 678).

Further, the alleged activity that forms the basis of a RICO claim cannot plead "operation or management" of an enterprise unless the activity actually implicates the enterprise's conduct and not merely the defendants' own affairs. *See*, *e.g.*, *Reves*, 507 U.S. at 185 ("liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs" (emphasis added); *Feld Entm't Inc. v. Am. Soc. for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 314 (D.D.C. 2012) (same); *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 84 (D.D.C. 2006) (same). A defendant must do more than provide, through its regular course of business, goods and services that benefit the enterprise. *See*, *e.g.*, *Bates*, 466 F. Supp. 2d at 86.

The Complaint fails to allege any conduct beyond the ordinary provision of services by the Defendants as contracted by the government of Qatar. For example, Howard's alleged conduct is limited to contacts with the media and contacts with Qatar, all of which would be required to support his legitimate business as a "media placement expert" acting on behalf of Qatar. FAC ¶ 17. The allegations against Muzin and Allaham only suggest they were in touch with each other and third parties, and that Muzin had some knowledge of upcoming stories relating to Qatar and Broidy. None of that is surprising, given that the Complaint pleads that they were engaged by Qatar to provide lobbying services. FAC ¶¶ 13–16.[7] *See*, *e.g.*, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1047 (D.C. Cir. 2012) (rejecting RICO claim against attorneys who provided legal services). In the end, the RICO claim falls far short of pleading that any of the Defendants were operating or managing a RICO enterprise. For this reason alone, the RICO claims should be dismissed.

---

[7] As discussed below in Section III, *see* 37-40, *infra*, the fact that the Complaint alleges merely that the Defendants were acting consistently with their ordinary job descriptions is yet another independent basis for dismissing the Complaint in its entirety.

**B.      The Complaint fails as to each Defendant because it does not plead that any of them committed even one actionable predicate act, let alone two.**

The Plaintiffs must allege that each specific Defendant committed at least two predicate acts of racketeering.  *Dooley*, 803 F. Supp. at 438; *see United States v. Swiderski*, 593 F.2d 1246, 1249 (D.C. Cir. 1978).  A single predicate act is not enough.  *Dooley*, 803 F. Supp. at 438.  This Complaint tries to plead predicate acts of wire fraud, extortion, violation of the Travel Act, theft of trade secrets, economic espionage, and criminal copyright infringement—but falls far short in every respect.  It fails to plead the required legal or factual elements of *any* of those alleged predicate acts and fails to plead that any Defendant actually committed any of those acts, much less that any Defendant committed *two* such acts.  The following table summarizes these shortcomings.

| Predicate act | Defendant | Elements pleaded in the Complaint | Number of instances |
|---|---|---|---|
| (1) Wire Fraud (phishing emails) | None identified | None | None |
| (2) Extortion | Muzin | None, and not directed at Plaintiffs | None established |
| (3) Travel Act | Muzin | None, and not directed at Plaintiffs | None |
| (4) Defend Trade Secrets Act | None identified | None (no trade secrets pleaded, no misappropriation, no profiting) | None |
| (5) Economic Espionage | None identified | None (no trade secrets pleaded, no misappropriation, no profiting) | None |
| (6) Criminal Copyright Infringement | None identified | None (no copyrighted work pleaded, no infringement alleged, no exploitation) | None |

19

### 1.    The Complaint fails to plead wire fraud as to any Defendant.

The Complaint first attempts to allege a set of predicate acts comprising wire fraud in the form of the phishing emails sent to Broidy's wife and administrative assistant in January 2018. FAC ¶¶ 204–14.  Predicate acts of fraud must meet the Rule 9(b) heightened standard.  *Cheeks*, 216 F. Supp. 3d at 157 (*citing Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 108 (D.D.C. 2015)).  The Complaint must "stat[e] the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud."  *Id.* (quoting *Sandza*, 151 F. Supp. 3d at 108).  A complaint alleging wire fraud as a predicate act must plead:  (1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme with the specific intent to defraud; and (3) the use of the United States mail or of wire communications in furtherance of the fraudulent scheme.  *See* 18 U.S.C. § 1343.

But the phishing emails and the hacking in general cannot be considered predicate acts of wire fraud attributable to any of the Defendants.  Allegations of wire fraud must attribute *specific* fraudulent acts to the conduct of *specific* defendants.  *Cheeks*, 216 F. Supp. 3d at 157; *see Sandza*, 151 F. Supp. 3d at 108 (RICO claim dismissed where bank and employees allegedly committed 114 acts of wire fraud because complaint omitted time and place of the frauds, and failed to attribute them to individual defendants).  The Complaint has no allegations that any of the Defendants committed, engaged in, directed, supervised, or otherwise had any involvement in the alleged hacking events.  The Complaint thus does not and cannot plead that any Defendant participated in the particular scheme with the "specific intent to defraud" as would be required to state wire fraud.  *See*, *e.g.*, *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009).

20

## 2.      The Complaint fails to plead extortion by Muzin.

The Complaint claims that Muzin (but none of the other Defendants) committed a predicate act of "extortion" in violation of the Hobbs Act, 18 U.S.C. § 1951(a), in his alleged discussions with Mowbray.  FAC ¶¶ 215–24.  These allegations fail, as they do not adequately plead extortion, and in any event, the alleged predicate acts were directed at a third party—Mowbray—not at Broidy or BCM.

Extortion requires the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Extortion does not regulate the "mere coercion to act, or to refrain from acting"; for conduct to constitute extortion, the charged party must attain *something of value* from the aggrieved party that it could then "exercise, transfer, or sell" for its own benefit.  *Sekhar v. United States*, 570 U.S. 729, 733, 736 (2013). The defendant further must actually "obtain" the subject property.  Mere interference in the use of property is not enough—a plaintiff seeking to plead extortion as a predicate act must establish both the actual deprivation and acquisition of the property.  *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404–05 (2003).

Moreover, a complaint must allege harm *to the plaintiff* as a result of the predicate acts committed in furtherance of the enterprise.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  The RICO injury "alleged must involve a 'direct causal connection between the predicate offense and the alleged harm.'"  *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C. 2014) (citing *Hemi Grp., LLC*, 559 U.S. at 10–11), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).  The complaint thus must draw a straight line between the alleged extortion and the purported harm suffered from the RICO violation.  *See id.*

The Complaint fails to satisfy any of these elements.  It does not plead that Muzin made any threatening statements to Mowbray (much less to Broidy).  In light of Broidy's brewing legal

21

problems,[8] it was not unreasonable—and certainly not threatening—for Mowbray's "friend" to advise him to "be a little bit concerned" and "have a lawyer," or to inquire whether Broidy would cover Mowbray's legal fees if Mowbray were subpoenaed.  FAC ¶¶ 182, 185; *see* FAC ¶ 74 ("Mowbray and Muzin were professional colleagues and friends").  The Complaint does not plead that Muzin had any intent to threaten Mowbray (or Broidy).  It does not plead that Muzin acquired or even attempted to acquire any property from Mowbray (let alone Broidy).  While the Complaint alleges "Muzin's purpose in talking to Mowbray was . . . to obtain his *intangible* property—*i.e.*, Mowbray's services and cooperation with the Qatari Enterprise," FAC ¶ 220, that is not enough to meet the requirements.  *See Scheidler*, 537 U.S. at 410–11 (reversing RICO violation premised on extortion because "petitioners did not obtain or attempt to obtain respondents' property"); *Sekhar*, 570 U.S. at 738 (reversing conviction for attempted extortion based on attempt to acquire "the general counsel's 'intangible property right to give disinterested legal advice'").  At most, these allegations suggest that Muzin informed Mowbray that "Broidy's name comes up in [Qatari] Embassy meetings often," and that the Qatari government had "assembled an enemies list of individuals who were considered 'hurdles' to Qatar's interests" and was "after [Mowbray] and

---

[8] *See, e.g.*, FAC ¶ 121 (referencing Mark Mazzetti, David D. Kirkpatrick & Maggie Haberman, *Mueller's Focus on Adviser to Emirates Suggests Broader Investigation*, N.Y. Times, Mar. 3, 2018, https://www.nytimes.com/2018/03/03/us/politics/george-nader-mueller-investigation-united-arab-emirates.html (reporting that recent developments could "prompt an examination of how money from multiple countries has flowed through and influenced Washington during the Trump era," with a focus on Broidy's lobbying efforts) (attached as Ex. 1 to the Udell Decl.)); FAC ¶ 144 (quoting Maxwell Strachan & Jessica Schulberg, *Leaked Emails Appear To Show A Top Trump Fundraiser Abusing His Power*, Huffington Post, Mar. 2, 2018, https://www.huffpost.com/entry/elliott-broidy-trump-malaysia-doj_n_5a988471e4b0a0ba4ad18d65 (describing efforts by Broidy "to use his influence with the Trump administration to help" "scuttle a Department of Justice investigation" involving 1Malaysia Development Berhad and Malaysian businessman Low Take Jho) (attached as Ex. 5 to the Udell Decl.)).

Broidy." FAC ¶¶ 184, 218.  These statements that are not even threats fall far short of attempts to acquire property.

The Complaint also does not allege that any harm to Broidy arose from the alleged threats to Mowbray, but only adds a conclusory allegation that the Plaintiffs had to expend "considerable resources" to "defend themselves against further extortionate threats," whatever that means.  FAC ¶ 224.  Those allegations do not plead extortion of Mowbray—let alone *Broidy*—under any reading of the law, and thus do not state a predicate act (and are only alleged, weak as they are, as to Muzin).

### 3.    The claims of a Travel Act violation do not establish a predicate act.

The Complaint's attempt to allege a violation of the Travel Act under 18 U.S.C. § 1952 as a separate predicate act fails for the same reasons.  To invoke the Travel Act, the Complaint merely repeats the extortion allegations.  FAC ¶¶ 225–28.  Bootstrapping or "double-count[ing]" predicate acts—even viable ones—cannot satisfy a plaintiff's RICO pleading obligations.  *Reich v. Lopez*, 38 F. Supp. 3d 436, 446 (S.D.N.Y. 2014), *aff'd*, 858 F.3d 55 (2d Cir. 2017).  "[I]t is not proper under RICO to charge two predicate acts where one action [allegedly] violates two statutes."  *Id.* (internal alteration marks omitted).  A "pattern of racketeering activity requires 'at least two *acts* of racketeering,' not 'at least two statutory offenses.'"  *Id.* (citations omitted); *accord United States v. Johnson*, 911 F.2d 1394, 1404 (10th Cir. 1990).  Otherwise, every solitary action that might amount to more than one criminal violation would inherently be a "pattern" of racketeering.

### 4.    The Complaint fails to plead a violation of the Defend Trade Secrets Act.

The Complaint next tries to plead a violation of the Defend Trade Secrets Act ("DTSA") as a predicate act.  FAC ¶¶ 229–40.  The DTSA imposes criminal penalties against anyone who "with intent to convert a trade secret, that is related to a product or service used in or intended for

use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . . steals, or without authorization appropriates . . . such information." 18 U.S.C. § 1832(a)(1). It is elementary that any trade secrets claim must identify the trade secret at stake. *See*, *e.g.*, *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018). To constitute a trade secret, the information also must "derive[] independent economic value . . . from not being generally known." *Id.*

This Complaint satisfies none of the above elements. It alleges that the "Defendants and other members of the Qatari Enterprise" violated the DTSA, and that the "Qatari Enterprise's misappropriation of Plaintiffs' trade secrets began in January 2018 and is ongoing." FAC ¶¶ 231, 239. But it altogether fails to identify anything at all about the supposed trade secrets at stake. It only announces that the "BCM servers" had "trade secrets" in the form of generic terms like "highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships." FAC ¶ 231.

Further, as with the other predicate acts, the Complaint fails to allege which Defendant(s) in fact misappropriated the purported trade secrets. The closest the Complaint comes to describing any misappropriation with the requisite specificity is where it alleges that the hackers (*not* the Defendants) acquired login credentials from Broidy's wife and administrative assistant. But login passwords are typically not recognized as trade secrets, as they tend to be unique to the individual and are not the type of information with independent economic value necessary to constitute a trade secret. *See*, *e.g.*, *Tryco, Inc. v. U.S. Med. Source, LLC*, 80 Va. Cir. 619, at *1 (Va. Cir. 2010) (noting, in state-law trade secrets case, that "[c]ourts have repeatedly held that collections of

24

numbers and/or letters, whose only value is to access other potentially valuable information, do not by themselves have independent economic value"); *State Analysis, Inc. v. Am. Fin. Servs. Ass'n*, 621 F. Supp. 2d 309, 321 (E.D. Va. 2009) (noting, in state-law trade secrets case, that passwords are not trade secrets).  In any event, the Complaint does not allege that the *Defendants* acquired those credentials.  Neither the Stonington Defendants, Allaham, nor Howard is alleged to have engaged in activity that could have violated the DTSA.

The Complaint also fails to allege how Plaintiffs suffered from the purported misappropriation.  It has no allegations identifying what was taken, what was disclosed to the public, or how the Plaintiffs were injured by the theft of the "plans, proposals, research" or the like.  Absent these details, Plaintiffs' "assertion that the allegedly misappropriated information constitutes a trade secret is nothing more than a 'legal conclusion cast in the form of [a] factual allegation[].'"  *Econ. Research Servs. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016) (citation omitted).

### 5.    The Complaint fails to plead economic espionage.

The Complaint's assertion of "economic espionage" under 18 U.S.C. § 1831 fails for the same reasons.  It alleges that the Defendants committed economic espionage by "unlawfully conspire[ing] to take, appropriate, and obtain Plaintiffs' trade secrets without authorization," that they "improperly disclosed and misappropriated Plaintiffs' trade secrets without consent or authorization," that they "misappropriated" the trade secrets intentionally to benefit the government of Qatar, and that in doing so they caused damage to the Broidy.  FAC ¶¶ 300–02. But a violation under § 1831 arises when the defendant, acting with the intent to "benefit any foreign government, foreign instrumentality, or foreign agent, knowingly … without authorization . . . downloads, uploads, . . . transmits, . . . or conveys *a trade secret*."  18 U.S.C. § 1831(a) ("Economic Espionage Act" or "EEA") (emphasis added).  The EEA defines a trade secret as

including "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by [the public.]"  18 U.S.C. § 1839(3).

To determine whether information "derives independent economic value," courts examine the degree to which the secret information "confers a competitive advantage on its owner." *United States v. Chung*, 659 F.3d 815, 826 (9th Cir. 2011); *see MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 663 (4th Cir. 1993).  As courts have observed, § 1831 is designed to apply where there is "evidence of foreign government sponsored or coordinated intelligence activity." *United States v. Hsu*, 155 F.3d 189, 195 (3d Cir. 1998) (citing 142 Cong. Rec. S12,212 (daily ed. Oct. 2, 1996) (Managers' Statement for H.R. 3723)); *see United States v. Liew*, 856 F.3d 585, 597 (9th Cir. 2017); *United States v. Lan Lee*, No. 06-CR-0424, 2010 WL 8696087, at *5 (N.D. Cal. May 21, 2010).

As demonstrated above, the Complaint does not identify a trade secret, does not allege that any of the information on the BCM servers provided independent economic value, and does not allege that any Defendant gained a competitive advantage from the "misappropriation."  It also fails to establish that these alleged violations were the result of foreign intelligence activities. Further, the Complaint does not allege that the *Defendants* committed the actions.  Again, there is nothing specific as to the Stonington Defendants, Allaham, or Howard.

### 6.     The Complaint fails to plead criminal copyright infringement.

The Complaint's efforts to plead "criminal copyright infringement" are equally unavailing. FAC ¶¶ 247–54.

A criminal copyright infringement is willful civil copyright infringement with the additional element that the defendant had the intent to profit. *Roe v. Bernabei & Wachtel PLLC*, 85 F. Supp. 3d 89, 99 n.9 (D.D.C. 2015) (citing 17 U.S.C. § 506(a)(1)).  To establish a civil copyright infringement, a plaintiff must allege:  (i) ownership of a valid copyright; and (ii) copying of the original or protectable aspects of the work.  *Id.* at 98; *see also Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002), *certified question answered*, 11 A. 3d 251 (D.C. App. 2011); *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 293 (D.D.C. 2017).  The alleged "copyrighted" material must have been registered in accordance with copyright law.  *See*, *e.g.*, *Roe*, 85 F. Supp. 3d at 99.  A RICO complaint citing copyright infringement as a predicate act must offer a "concrete example" of how the plaintiff "would have exploited" the "exclusive possession" of the intellectual property if it had not been infringed.  *Id.* at 99–100.

Just as with the trade secret allegations, the Complaint fails to identify any copyrighted materials or what Broidy would have done with them absent the "infringement."  It merely states that Broidy's intellectual property rights were violated "by [someone] indiscriminately copying them, and reproducing some of them in PDF form, and distributing them to media organizations and journalists," and that "eas[ing] sanctions" against Qatar was part of the objective.  FAC ¶¶ 249, 252.  There are again no facts linking the Defendants to the hacking, no facts stating how Broidy was going to exploit his lawfully exclusive possession of whatever material was actually at stake, no facts identifying what was copyrighted, and no facts stating how the supposed infringers stood to make a profit from the copyrighted materials.

### C.     The Complaint fails to allege a "continuous" pattern of "related" racketeering acts.

RICO aims to target activity extended over a substantial period. *H.J. Inc.*, 492 U.S. at 242; *Lu v. Lezell*, 45 F. Supp. 3d 86, 97–98 (D.D.C. 2014).  To plead a "pattern" of racketeering activity,

a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239 (emphasis in original); *see E. Sav. Bank, FSB*, 31 F. Supp. At 12. The "continuity" requirement can be satisfied by pleading either closed-ended or open-ended schemes. A closed-ended scheme looks to the past and requires the plaintiff to plead "a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242. Open-ended schemes require the plaintiff to plead a future threat. *Id.* at 241.

The Complaint tries to plead a "closed-ended" scheme about completed activity that targeted Broidy. But when it comes to past schemes, a period of under a year is legally insufficient to plead the requisite continuity. *See, e.g.*, *Bridges v. Lezell Law, PC*, 842 F. Supp. 2d 261, 266 (D.D.C. 2012) (five months insufficient); *Pyramid Sec. Ltd. V. Int'l Bank*, 726 F. Supp. 1377, 1382 (D.D.C. 1989) (three months insufficient). "[P]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683–84 (4th Cir. 1989) (quoting *H.J., Inc.*, 492 U.S. at 242).

The alleged hacking scheme here lasted less than two months. The hackers supposedly targeted the email accounts beginning on December 27, 2017, with access to BCM's servers terminating on February 25, 2018. FAC ¶¶ 87–99. Even if Muzin's meetings with Mowbray in Washington, D.C. and the subsequent publication of articles were considered, those events spanned a period lasting only an additional three months (until May 22, 2018). FAC ¶¶ 172, 118–33. But five months is still well below the minimum requirements.

To be sure, the Complaint adds one sensationalistic yet spectacularly vague claim that there was hacking of "more than 1,400 email addresses" by some unknown actors at some unstated point in the past. FAC ¶ 9. But racketeering acts cannot be "continuous" unless "related" to each other

28

(not to mention well-pleaded).  There is no credible argument that one catchall reference to other events could be "related" to the allegations here for pleading purposes.  The Complaint contains no facts about those other events—nothing about the perpetrators, victims, purposes of the prior hacking, nor the circumstances, timing, or anything that connects any of those events to the Defendants or the scheme alleged here.  Nor could there be, as these Defendants are alleged to have been engaged by Qatar at later points in time, and this scheme is alleged to have been designed to target Broidy individually.  FAC ¶¶ 6–7, 13–18, 32–44.

In a similar vein, any response by Plaintiffs that they have tried to plead "open-ended" continuity would be without merit.  Open-ended continuity refers to a scheme posing a continuing threat of misconduct.  "[F]ar more than a hypothetical possibility of further predicate acts" is required to plead open-ended community.  *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (quoting *Pyramid Sec. Ltd. V. IB Resolution, Inc.*, 924 F.2d 1114, 1119 (D.C. Cir. 1991)).  A "one time racket" is not enough to plead a pattern.  *Hughes v. Consol-Pa. Coal Co.*, 945 F.2d 594, 610–11 (3d Cir. 1991).

Courts in this Circuit therefore dismiss RICO claims where the allegations consist of a "single scheme" entailing "a single discrete injury" suffered by a limited number of victims—as is the case here.  *See Edmondson & Gallagher*, 48 F.3d at 1265; *Roe*, 85 F. Supp. 3d at 100; *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. V. Mkt. Square Assocs.*, 235 F.3d 629, 634–35 (D.C. Cir. 2001); *E. Sav. Bank, FSB*, 31 F. Supp. 3d at 12–13.  "[A] plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a built-in ending point."  *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (citation omitted).  "[S]chemes which have a clear and terminable goal have a natural ending point."  *Vicom, Inc. v. Harbridge Merch. Servs. Inc.*, 20 F.3d 771, 782 (7th Cir. 1994).  Further, there is no "pattern" of racketeering under RICO

where the alleged conduct was in furtherance of accomplishing a "single discrete goal."  *See*, *e.g.*, *Edmondson*, 48 F.3d at 1265; *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990); *Menasco*, 886 F.2d at 684.

The alleged scheme here features such an endpoint and singular goal.  The alleged hacking and distribution of information has already occurred and the stories have been published.  The vague allegation that "[m]edia organizations are still relying on information stolen from Mr. Broidy's computer systems and email servers to publish stories to damage his image" does not come close to stating a *future* threat of criminal conduct.  FAC ¶ 255.  The Complaint alleges that the Defendants engaged in a single scheme to access the Broidy's private information and disseminate it to the public in order to harm Broidy's standing and neutralize him as a critic of Qatar, FAC ¶¶ 50–52; a single purported injury resulting from the publications, FAC ¶¶ 148, 152, 188; a single ultimate goal to "silence" Broidy, FAC ¶¶ 9, 51; and conduct that occurred over a short, legally insufficient, five-month period.  The Complaint thus fails to state RICO claims.

### D. The Complaint does not allege actionable injury that was proximately caused by the RICO violations.

The RICO claims should be dismissed for additional independent reasons.  The Complaint alleges personal injury to Broidy's reputation, which is not actionable under RICO, and fails to allege facts sufficient to state that such injury was proximately caused by the Defendants.

### 1. The Complaint alleges unrecoverable reputational injuries.

To have standing under RICO, a plaintiff must claim to have been "injured in his business or property by the conduct constituting the violation."  *Sedima, S.P.R.L.*, 473 U.S. at 496; *Hourani v. Mirtchev*, 796 F.3d 1, 11 (D.C. Cir. 2015). Other types of injuries are insufficient.  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 101–02 (D.D.C. 2003) ("[t]he overwhelming weight of authority discussing the RICO standing issue holds that the 'business or property'

language of Section 1964(c) does not encompass personal injuries" (citations omitted)). "Allegations of personal injury do not suffice" to confer standing. *Klayman*, 125 F. Supp. 3d at 88; *see id.* (holding harm to plaintiff's law practice did not confer RICO standing).

Courts in this Circuit have held that reputational harm is a form of *personal* injury that does not constitute the requisite "RICO injury." *See Burnett*, 274 F. Supp. 2d at 101. Other circuit courts have agreed. *See, e.g., Hamm v. Rhone-Poulenc Rorer Pharm.*, 187 F.3d 941, 954 (8th Cir. 1999) ("[d]amage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)").

The Complaint should be dismissed because the primary injury alleged is only an injury to Broidy's reputation. It claims the Defendants "harmed [Broidy's] standing and business relationships in Washington, D.C.," that the publicity from the articles—the truth of which the Complaint does not contest—has caused him "damage resulting from loss of consumer goodwill and business relationships," and that Defendants were "retained specifically as part of an effort to ruin Mr. Broidy's public standing." FAC ¶¶ 27, 265, 345. But these are reputational injuries for which RICO does not provide recourse.

## 2. The Complaint does not establish proximate cause.

A RICO complaint must also plead facts evincing "some direct relation between the injury asserted and the injurious conduct alleged"—a "link that is too remote, purely contingent, or indirec[t] is insufficient." *Cheeks*, 216 F. Supp. 3d at 153 (citation omitted). A complaint therefore must plead—as to *each* defendant—that any damages suffered were *proximately caused* by that defendant's wrongful actions. *See Lopez*, 657 F. Supp. 2d at 112.

Moreover, the injury to the plaintiffs' business or property must flow from the *predicate acts* that the defendants allegedly committed, not just any type of conduct. *Greenpeace, Inc. v. Dow Chem. Co.*, 808 F. Supp. 2d 262, 268–69 (D.D.C. 2011); *Hollander v. Flash Dancers Topless*

*Club*, 340 F. Supp. 2d 453, 458–59 (S.D.N.Y. 2004), *aff'd*, 173 F. App'x 15 (2d Cir. 2006).  As the Supreme Court has ruled, "the compensable injury flowing from a violation of [§ 1962] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'"  *Anza*, 547 U.S. at 457 (citation omitted).

The Complaint fails on all points.  As explained, it fails to identify *any* predicate acts carried out by *any* of the Defendants.  If the Defendants did not commit the predicate acts of racketeering, they cannot be said to have proximately caused Broidy's alleged RICO injuries.

In fact, the Complaint alleges on its face that other entities—*not* the Defendants— proximately caused the so-called "injury" about which it complains.  The central theory of the Complaint is that Broidy was injured by the publication of unspecified news articles.  But the press made its own independent decisions to publish the Broidy-related materials it received.  The Complaint does not allege that the articles were published by accident or under duress, without the journalists or authors having researched their subject matter.  Any chain of causation from the hacking to those publications was thus broken by the independent decisions of the separate news organizations to publish their stories.

### 3. The Complaint does not adequately allege any other injuries.

Finally, the Complaint's remaining allegations of injury lack any detail and suffer from all the same pleading problems on injury and causation.  The Complaint gives a summary list of other supposed injuries in the form of "loss of consumer goodwill, an increased risk of further theft, and an increased risk of harassment," "injury to Plaintiffs' privacy," "monetary damages" and injury to "computers" as well as the supposed loss of unstated "trade secrets, confidential business information, and other intellectual property."  FAC ¶¶ 273, 288, 306, 320, 329, 340, 349, 355–67, 374–75.  But as with the rest of the Complaint, these allegations are deficient.  They are boilerplate

categories of alleged harm with no detail and no connection to any conduct by the Defendants that could have proximately caused Plaintiffs any harm.

## II.      Count II Fails to State a RICO Conspiracy Claim Against Any Defendant.

To state a claim of RICO conspiracy under 18 U.S.C. § 1962(d), a complaint must allege that two or more people agreed to commit a substantive RICO offense and that a defendant agreed to further that endeavor. *RSM Prod. Corp.*, 682 F.3d at 1048.  The plaintiff also must have been injured by an "overt act" of racketeering done by the defendant in furtherance of the conspiracy. *Beck v. Prupis*, 529 U.S 494, 507 (2000).  Count II fails under each of these elements.

*First*, as set forth above, the underlying § 1962(c) claim against each of the Defendants fails.  Where a complaint fails to plead a substantive RICO violation, its RICO conspiracy claim also must fail "because there was no violation in which the defendant could have conspired." *E. Sav. Bank, FSB*, 31 F. Supp. 3d at 15 ("[s]ince the plaintiff has failed to plead a RICO violation under 18 U.S.C. § 1962(a)–(c), its claim under § 1962(d) must fail"); *Son Ly v. Solin, Inc*., 910 F. Supp. 2d 22, 28 (D.D.C. 2012) (same); *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 141–42 (D.D.C. 2008) (same).  The Complaint does not plead that any Defendant violated § 1962(c), and therefore it cannot plead any of them "intend[ed] to further an endeavor" to violate RICO. *Salinas*, 522 U.S. at 65.

*Second*, the Complaint has not alleged a conspiratorial agreement with anywhere near the requisite specificity.  A § 1962(d) complaint must plausibly allege a conscious agreement among all defendants to commit at least two predicate acts. *RSM Prod. Corp.*, 682 F.3d at 1052. Conclusory allegations of a conspiracy are insufficient. *Son Ly*, 910 F. Supp. 2d at 28.  Further, allegations "that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do 'not suffice to show illegality.'" *RSM Prod. Corp.*, 682 F.3d at 1051–52 (quoting *Twombly*, 550 U.S. at 556–57).  Stated another

way, "where the defendants' allegedly unlawful conduct has 'an obvious alternative explanation,' the complaint must allege facts that 'plausibly suggest[]'—and are 'not merely consistent with'—the defendants' liability." *Bryant v. Taylor*, 244 F. Supp. 3d 209, 212 (D.D.C. 2017) (quoting *Twombly*, 550 U.S. at 557, 567). Here the Complaint fails to plead a plausible allegation of conscious agreement as to any of the Defendants.

As to Howard, the Complaint merely alleges he worked for Qatar as a "media placement strategist," FAC ¶ 17, and, as explained above, does nothing but allege contacts with reporters entirely consistent with that type of engagement. It asserts that his "phone records show that he orchestrated a sophisticated media and distribution campaign" to place information from the Broidy emails into the hands of the press. FAC ¶¶ 116–17, 119. But the only *facts* the Complaint alleges are that he had a number of conversations with reporters at times, sometimes near when articles were published that referenced Broidy. Even taking those allegations in the light most favorable to Plaintiffs, they support *at most* the inference that Howard (a media relations professional who makes his living by building relationships with journalists) communicated with reporters regarding the Broidy emails. The Complaint does *not* allege that Howard initiated any of these press contacts, nor does it allege that he was in any way involved in the hacking. It thus allows for the equally—indeed, *more*—plausible inference that journalists sought out *Howard's* expertise. The fact that Howard allegedly had communications with his then-current employer (Conover), his future employer (Mercury), and other professional colleagues about unspecified subjects is not supportive of any inference that he participated in the misconduct alleged in the Complaint. Nothing else in the Complaint suggests any wrongdoing by Howard, rendering implausible any notion that the Complaint sufficiently pleads his entrance into a conspiratorial agreement.

As to the Stonington Defendants, the Complaint merely alleges that Muzin and other "agents of Qatar" "had regular meetings at the Qatari Embassy, during which they discussed 'hurdles' to Qatar's goals of easing sanctions and improving its diplomatic standing" and that Muzin identified Broidy as one such "hurdle."  FAC ¶ 262.  Consistent with these meetings, the Complaint acknowledges that Muzin "is a high-level Republican political operative" who was "retained by Qatar for consulting services."  FAC ¶ 14.  As to Allaham, the Complaint alleges that he was engaged to work for Qatar and, it says, was the co-founder of defendant Stonington.  FAC ¶¶ 16, 18.[9]  Stonington is a public relations and lobbying firm that provided "strategic communications" for Qatar.  FAC ¶ 18.  Given that the Complaint pleads that Broidy was "a vocal critic" of the Defendants' client (Qatar), FAC ¶ 46, it is far more plausible that they discussed Broidy as an opponent of their lobbying efforts.  FAC ¶¶ 45–49.  Nothing in these allegations nudges the claim that the Defendants "agreed to conspire" in a racketeering scheme "from conceivable to plausible."  *Twombly*, 550 U.S. at 556–57.  The allegations are far more consistent with the conclusion that the Defendants were acting pursuant to their legitimate business engagements with the State of Qatar.  *See RSM Prod. Corp.*, 682 F.3d at 1048.  In any event, nothing in the Complaint suggests that the Defendants "targeted" Broidy for hacking and disclosure of stolen information.

The alleged Mowbray conversations and Allaham texts likewise do not adequately plead that the Defendants conspired.  The Complaint actually states that Muzin *denied* any participation in the alleged hack during the Mowbray conversations.  FAC ¶ 177.  And Allaham's alleged texts simply reflect his and Muzin's reactions to widely published information.  FAC ¶¶ 143, 147.

---

[9] *See* note 5, *supra*.

*Third*, the Complaint does not plead that any Defendant committed any "overt act" of racketeering in furtherance of the alleged conspiracy that could have injured the Plaintiffs as required to state a § 1962(d) violation under *Beck*, 529 U.S. at 507.  The requisite "overt act" that each Defendant must commit to plead participation in the conspiracy has to be an act of racketeering—meaning, a predicate act.  *Id.*; *accord Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 651 (2008).  As demonstrated above, the Complaint does not plead that any Defendant committed even a single predicate act of racketeering.

## III.    The Remaining Counts Fail to State a Claim.

Before analyzing each claim in turn, we note that *all* the counts suffer from the same defect: that is, the Complaint fails to plausibly allege that the Defendants acted wrongfully.  As noted above, the Complaint does not allege that any of the Defendants played any role whatsoever in the hacking.  For that reason, the Complaint acknowledges at the outset that, at its core, "[t]his case is about a criminal conspiracy."  FAC ¶ 2.  Each cause of action is ultimately grounded in the alleged claim that the Defendants *conspired* to hack Broidy's private emails and disseminate them to the public.

But the Complaint's specific factual allegations fall well short of the *Twombly* standard for stating a claim because they do not rule out "an obvious alternative explanation," which is necessary in order to "nudge [the] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 567, 570.  Instead, the Complaint only alleges facts that are "consistent with a normal business practice" for (in Allaham and the Stonington Defendants' case) lobbyists, or (in Howard's case) a media relations professional, and therefore they "fail to establish the requisite link" between the defendant and a purported conspiracy.  *RSM Prod. Corp.* at 1049.

Specifically, the Complaint alleges that: Muzin is a "political lobbyist," "political operative," and "political consultant," Stonington is a "consulting firm," and the Stonington

Defendants performed paid work for Qatar, FAC ¶¶ 13-15; Allaham is a partner of Stonington, where he worked as a "foreign agent" for Qatar, FAC ¶ 16; and Howard is a "media placement expert" who "worked as a media placement strategist for Qatar," FAC ¶ 17.  The Complaint then alleges that the Defendants engaged in activities consistent with their respective roles.   For example: (i) the Defendants were paid by Qatar; (ii) Muzin had meetings at the Qatari Embassy where they discussed that Broidy was impeding their lobbying efforts; (iii) Muzin and Allaham "celebrated" articles about Broidy that appeared to have painted him in a bad light; (iv) Howard talked with some reporters before a few articles were published; and (v) Muzin talked with Joel Mowbray about Broidy concerning matters that were the subject of Muzin's efforts as a political consultant.  *See* FAC ¶¶ 73, 115–59.

These are the sole substantive allegations set forth in the Complaint that purport to show that the Defendants committed, or conspired to commit, wrongful acts.  But taking them all as true, none of them is surprising:  the Defendants would naturally have been paid by Qatar, Muzin would have had meetings at the Embassy, Muzin and Allaham would be happy to see negative stories about their adversary, and Muzin would have reason to speak with Mowbray.  All of this is plainly insufficient as a matter of law to state a claim.  *See Twombly*, 550 U.S. at 566 ("no reason to infer that the [Defendants] had agreed among themselves to do what was only natural anyway").  As to Howard, it would similarly be unsurprising if, as a media consultant, he spoke to reporters about the Broidy emails at or about the time the stories were published.  The "volume and timing" of these calls—which the Complaint for the most part does not identify as incoming (*i.e.*, from reporters) or outgoing (*i.e.*, from Howard)—are Broidy's *sole* basis for alleging that Howard was part of the Qatari Enterprise conspiracy.  FAC ¶ 115.

In *RSM Production Corp.*, quoted above, the Court refused to credit similarly insufficient allegations. The plaintiff in that case (RSM) brought an arbitration proceeding against Grenada, alleging that after RSM refused to make bribe payments solicited by Grenada's prime minister, the minister blocked RSM from getting an oil drilling license. 682 F.3d at 1046–47. Grenada hired Freshfields as its counsel, and RSM's competitor, Global Petroleum (GP), paid Freshfields's legal fees. *Id.* While the case was pending, Grenada awarded the license to GP. *Id.* RSM then alleged that GP's payment of the Freshfields legal fees was essentially a bribe of Grenada, that Freshfields understood as much, and that on those facts Freshfields had conspired with Grenada and GP. *Id.*

The D.C. Circuit dismissed the claim because the allegations failed to support a plausible inference that Freshfields was party to any ongoing bribery or conspiracy between Grenada and GP. The court instead found that the alternative explanation was more likely: "To the contrary, such facts are consistent with a normal business practice in which an interested party—such as [GP]—funds another entity's legal representation." *Id.* at 1049. The allegations as to Freshfields (analogous to those against the Defendants here) were "more likely explained by" the firm's normal business practice of providing legal services to clients. *Id.* at 1051 ("In sum, the allegations of the complaint target [defendant's] services as attorneys, nothing more."). It was too far a leap to assume, based on nothing more than Freshfields's perfectly typical conduct, that it was party to a conspiracy with GP and Grenada. *Id.* at 1050–51. The Court concluded: "[U]nsupported conclusory allegations are not entitled to be assumed true, and dismissal is proper when a conspiracy allegation does not plausibly suggest an illicit accord because it is not only compatible with, but indeed is more likely explained by, lawful . . . behavior." *Id.* at 1051–52 (internal quotation marks and citations omitted).

Similarly here, the allegations regarding the Defendants' conduct are "more likely explained by" their careers as "political operatives," "agents," and "media placement experts." FAC ¶¶ 14–18.  The *factual* allegations of the Complaint state only that they acted consistently with those roles.  This is insufficient to allege a conspiracy, no matter how many *conclusory* allegations—most of which are group-pleaded—are strewn among these innocuous facts.  For this overarching reason, the Complaint must be dismissed as to all Defendants, apart from the additional reasons set forth below with respect to each remaining count.

Each of the remaining federal law claims (Counts Three through Five) should be dismissed because, among other reasons discussed below: the Complaint fails to allege a direct violation of the relevant statutes and common law conspiracy theories cannot be used to attach liability; the statutes do not confer a private right of action for the specific claims asserted; and the Complaint fails to allege one or more essential elements of their claims.  Additionally, the Complaint's three state-law statutory claims (Counts Six through Eight) and five state common law causes of action (Counts Nine through Thirteen) should all be dismissed because, among other reasons described below: they are preempted by the alleged claim under California's UTSA; the Complaint fails to allege one or more essential elements of their claims; and, with respect to some claims, the law of the District of Columbia governs and there is no cognizable claim under D.C. law.[10]

### A.    Count Three fails to state a claim under the Stored Communications Act.

To state a claim under the Stored Communications Act ("SCA") for the hack of BCM's computers, a complaint must state facts that plausibly allege the Defendants:  (i) intentionally;

---

[10] There are a few counts where the Complaint either seeks to apply California law or does not specify what law applies.  To the extent that, with respect to any particular count, there is a substantive difference between California and D.C. law, we undertake a choice-of-law analysis to determine which jurisdiction's law to apply.

(ii) accessed without authorization; (iii) a facility through which an electronic communication service is provided; (iv) and thereby obtained, altered, or prevented authorized access to a wire or electronic communication while it was in "electronic storage." 18 U.S.C. § 2701(a)(1). But as demonstrated, the Complaint does not allege that any of the Defendants unlawfully accessed Broidy's computers. It therefore does not state a claim.

The Complaint cannot avoid this deficiency by alleging a conspiracy (even if its allegations were sufficient to plead conspiracy, which they are not), as there is no "secondary liability" under the SCA. *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz ("Gaubatz I")*, 891 F. Supp. 2d 13, 26–27 (D.D.C. 2012) (no liability under the SCA for a defendant who "conspired with" persons who intentionally accessed plaintiffs' computers). "Critically, in delineating the boundaries of criminal liability under Section 2701(a) and civil liability under Section 2707(a), Congress made no mention of conspiracy, aiding and abetting, or any other form of secondary liability." *Id.* at 27. The SCA therefore only created a private cause of action for primary, and not secondary, liability. *Id.* (collecting cases).[11]

Even if the SCA permitted secondary liability, the Complaint fails to plausibly allege that any of the Defendants conspired with the unknown individuals that purportedly hacked BCM's computers and servers. There are only the typical "labels and conclusions," "formulaic recitations," and "naked assertion[s] devoid of further factual enhancements" that do not meet pleading standards. *Owens*, 235 F. Supp. 3d at 89 (quoting *Iqbal*, 556 U.S. at 678). In the

---

[11] To the extent the Plaintiffs seek to enlarge the scope of the statute through their common law claim of civil conspiracy (Count Thirteen), this argument also fails. Common law civil conspiracy cannot be used to establish liability under a *statutory* claim where the statute does not itself provide for conspiracy liability. *See, e.g.*, *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015); *Findlay v. CitiMortgage, Inc.*, 813 F. Supp. 2d 108, 122-23 (D.D.C. 2011); *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A. 2d 724, 739 (D.C. 2000).

paragraphs describing the hacking, the Complaint relies solely on conclusory allegations to support the notion that the Defendants conspired with others, claiming that "the Qatari Enterprise, based, in part, on the *efforts of Defendants*, agreed to engage in, and did in fact coordinate, a series of cyberattacks" and that "*[e]ach Defendant acted* in furtherance of the goal of the conspiracy and criminal enterprise." FAC ¶ 78 (emphasis added); *see* FAC ¶ 263 (similarly vague). Such empty assertions without any factual substantiation do not state a claim.

### B.     Count Four fails to state a claim under the Computer Fraud and Abuse Act.

The Complaint also cites the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2), (a)(5) ("CFAA"), alleging that the Defendants "conspired with others to intentionally, unlawfully and without authorization access [BCM's] computer systems and email servers thousands of times over a period of almost two months, in a sustained cyberattack." FAC ¶ 280. But a claim for "conspiracy" to violate the CFAA requires "specific allegations of an agreement and common activities" and pleadings must contain "sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement." *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835–36 (N.D. Cal. 2014) (quotations and citations omitted). For the reasons demonstrated above, the Complaint fails to plausibly allege that any of the Defendants even had contact with the unknown hackers, let alone formed such an agreement to hack Broidy's servers.

### C.     Count Five fails to state a claim under the Defend Trade Secrets Act.

The Complaint tries to assert a cause of action under 18 U.S.C. § 1836(b)(1) for violations of the criminal provisions of DTSA, which are located at 18 U.S.C. §§ 1831 and 1832. But there is no private cause of action under Section 1836(b)(1) for violations of Sections 1831 or 1832. Section 1836 only provides a *limited* private cause of action, solely to obtain "an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action." 18 U.S.C. § 1836(b) (1)–(2); *Steves & Sons, Inc. v. JELD-WEN,*

*Inc.*, 271 F. Supp. 3d 835, 842–43 (E.D. Va. 2017) ("[t]he civil action permitted is the 'Civil seizure' identified in Section 1836(b)(2)"). Rather than seek a civil seizure, the Complaint impermissibly invokes the *criminal* provisions found at Sections 1831 and 1832. *See Genentech, Inc. v. JHL Biotech, Inc.*, No. 18-CV-6582, 2019 WL 1045911, at *13 (N.D. Cal. Mar. 5, 2019) ("Genentech cites no authority suggesting that Section 1836(b) of the DTSA provides for a stand-alone private action for conspiracy to misappropriate trade secrets (nor does Genentech attempt to make any serious argument for such in its briefing)."); *Phoenix Ancient Art, S.A. v. J. Paul Getty Trust*, No. 17-CV-241, 2018 WL 1605985, at *9 (S.D.N.Y. Mar. 29, 2018) ("courts outside this Circuit have held that private citizens do not have the right to enforce the DTSA's criminal provision"). Under Section 1836(a), only the Attorney General can bring a civil action that might seek to remedy violations of Sections 1831 and 1832. *See* 18 U.S.C. § 1836 (a), (b)(1). "Where, as here, Congress has made such a clear demarcation [between the scopes of subsections 1836(a) and 1836(b)], it is not for the courts to change that line by implying what Congress did not see fit to provide." *Steves & Sons, Inc.*, 271 F. Supp. 3d at 843.

Even if Section 1836(b) *did* create a private right of action for violations of Sections 1831 and 1832, the Complaint would still fail to state a claim. It does not identify in even general terms the trade secret(s) that were supposedly misappropriated, *see also* Section I.B.4–5, *supra*, let alone comply with any of the statutory prerequisites. For the types of claims that the DTSA does permit (seizure of property), the civil action must be "[b]ased on an affidavit or verified complaint satisfying the requirements of this paragraph," which establishes that "the applicant is likely to succeed in showing that" "the information is a trade secret," and "the person against whom seizure would be ordered" either "misappropriated the trade secret of the applicant by improper means" or "conspired to use improper means to misappropriate the trade secret of the applicant." 18 U.S.C.

§ 1836(b)(2)(A)(i)-(ii).  This Complaint does not include the required affidavit or verification or provide any other support for Broidy's misappropriation claim.

### D.   Count Six fails to state a claim under the California UTSA.

The Complaint invokes California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*, alleging that the Defendants "improperly disclosed and misappropriated Plaintiffs' trade secrets [by] disseminat[ing] those trade secrets to fellow members of the Qatari Enterprise and to media organizations for publication."  FAC ¶ 316.  But the Complaint does not allege that the Defendants possessed any trade secrets belonging to Broidy, nor does it allege that any of the Defendants themselves disclosed any trade secrets to anyone.[12]

Bedrock trade secrets law requires a complaint alleging a trade secrets violation to allege the existence and the disclosure of a trade secret.  *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007).  "To qualify as a trade secret, '(1) the information must be secret; (2) its value must derive from its secrecy; and (3) its owner must use reasonable efforts to safeguard its secrecy.'"  *Econ. Research Servs., Inc.*, 208 F. Supp. 3d at 232 (quoting *DSMC, Inc.*, 479 F. Supp. 2d at 78).  Generic descriptions cannot suffice.  *See Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, No. 18-CV-933, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018) (finding "design review templates," "fluidics design files," and "source code files" "too broadly stated to identify the trade secrets on which Becton's claims are based"); *Veronica Foods Co. v. Ecklin*, No. 16-CV-7223, 2017 WL 2806706, at *2, 14 (N.D. Cal. June 29, 2017) ("confidential business information," or "extensive, confidential, information relating to its business and customers" too broad to state a

---

[12] The only allegations relating to transfer of the hacked materials are: (i) that Muzin messaged Allaham that Jamal Benomar went to Qatar "to get the emails," FAC ¶ 111; and (ii) that an Associated Press reporter sent some of the Broidy emails to Broidy's associates, FAC ¶¶ 123, 130–32.  At most, these allegations suggest that Benomar, an Associated Press reporter, and Broidy's associates possessed the hacked emails, and not any of the Defendants.

trade secret claim); *Council on Am.-Islamic Relations v. Gaubatz ("Gaubatz III")*, 82 F. Supp. 3d 344, 361 (D.D.C. 2015) (similar).

This Complaint does not meet these standards.  It states in very generalized terms that BCM's servers stored "highly confidential business plans and proposals, research supporting those plans and proposals including costs and service projections, information concerning business strategies and opportunities, and contacts for important business relationships," and that "Plaintiffs' trade secrets derive independent actual and potential economic value from not being generally known or available to the public or other persons who can obtain economic value from their disclosure or use."  FAC ¶¶ 311, 313.  The Complaint thus provides nothing that would enable a court to analyze whether such materials could possibly qualify as trade secrets under the law.  Even if the court could somehow conclude they *did* constitute trade secrets, the Complaint does not plausibly allege that any of the Defendants actually disclosed them to anyone.[13]

### E.    Count Seven fails to state a claim for violation of California's Receipt and Possession of Stolen Property Law (or the D.C. analog).

The Complaint tries to state a claim for receipt and possession of stolen property in violation of California Penal Code Section 496.  This claim cannot proceed, for several reasons.

*First*, the claim is barred by the effort to proceed under California's UTSA in Count Six, which preempts all other claims invoking misappropriation of a trade secret.  Cal. Civ. Code § 3426.7; *ATS Prod. v. Champion Fiberglass, Inc.*, No. 13-CV-2403, 2015 WL 224815, at *1 (N.D. Cal. Jan. 15, 2015).  This preemption applies even where a complaint fails (as here) to establish that the information at issue was a trade secret.  *See*, *e.g.*, *Mattel, Inc. v. MGA Entm't,*

---

[13] The Complaint alleges in conclusory fashion that, *e.g.*, the "Defendants were deeply involved in . . . knowingly disseminating emails and documents," FAC ¶ 52, but there are no factual allegations supporting this conclusion or the conclusion that such emails contained trade secrets.

*Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("[California's UTSA] supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret"); *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-694, 2012 WL 6160472, at *6 (N.D. Cal. Dec. 11, 2012); *New Show Studios LLC v. Needle*, No. 2:14-CV-1250, 2014 WL 2988271, at *9–10 (C.D. Cal. June 30, 2014).

*Second*, even if the claim were not precluded, the claim should be dismissed because D.C. law governs and because D.C. does not provide a private cause of action for receipt and possession of stolen property.

Where, as here, a complaint asserts state law claims in federal court, the court must first determine which jurisdiction's laws govern the claims. "In determining which law to apply, the Court uses District of Columbia choice-of-law rules." *Hawkins v. Wash. Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 104 (D.D.C. 2018) (Friedrich, J.); *see also In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014) (analyzing whether California or D.C. statutes applied to plaintiffs' claims). As an initial matter, the court must first "determine whether a true conflict exists between the laws of the two jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." *Id.* 51–52 (citation and internal quotation marks omitted). Where a claim is based on statute, a court seeks to identify the "most relevant statute" of the competing jurisdictions. *Id.* at 52. And where a conflict is identified:

> [t]he District of Columbia employs a "governmental interests" analysis to determine the appropriate law to apply and consider these four factors: a) the place where the injury occurred; b) the place where the conduct causing the injury occurred; c) the domicile, residence[,] nationality, place of incorporation and place of business of the parties; and d) the place where the relationship is centered.

45

*Hawkins*, 311 F. Supp. 3d at 104.  The purpose of this analysis is to "identify the jurisdiction with the most significant relationship to the dispute."  *In re APA*, 766 F.3d at 51.  After weighing the relevant factors, the court should apply the law of the jurisdiction that has the greater interest. However, where the factors do not weigh strongly in either jurisdiction, then law of the forum venue (here, D.C.) governs.  *Id.* at 55.

The analogous D.C. provision to California Penal Code Section 496 is D.C. Code Section 22–3232.[14]  And while the California statute provides for a private cause of action for victims of the crime, the D.C. statute does *not*, thus presenting a true conflict of laws.[15]  *See In re APA*, 766 F.3d at 52.  Where the laws of the two jurisdictions conflict, the court must weigh the four factors in the governmental analysis test.

As for the place of injury, the Complaint alleges that Broidy was injured in D.C.  FAC ¶¶ 26–27.  This factor thus favors D.C.  As for place of conduct, the supposedly stolen property was

---

[14]  *See* Cal. Pen. Code § 496 ("[e]very person who . . . receives any property that has been stolen . . . knowing the property to be so stolen or obtained . . . shall be punished"); D.C. Code § 22–3232 ("[a] person commits the offense of receiving stolen property if that person buys, receives, possesses, or obtains control of stolen property, knowing or having reason to believe that the property was stolen").

[15]  Note that "the District of Columbia's failure to provide a statutory cause of action does not necessarily demonstrate that it has no underlying interest at stake."  *In re APA*, 766 F.3d at 52. This is because "a rule which exempts the actor from liability for harmful conduct may embody an interest in protecting defendants against being harassed by such actions."  *Id.* (quotations omitted).  Here, the D.C. Council's decision *not* to include civil liability in Section 22-3232 evinces a decision by the Council to bar private causes of action, particularly when viewed against its decision to *create* civil liability for violations of other crimes in Title 22 of the D.C. Code.  *See, e.g.*, D.C. Code § 22–3704 (civil liability for hate crimes); *id.* § 22–3218.04 (civil liabilities for theft of utility services); *see generally Bates v. United States*, 522 U.S. 23 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and brackets omitted)); *Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc.*, 636 F. Supp. 49, 52-53 (D.D.C. 1985) ("Several provisions in the [statute] explicitly provide for private causes of action, raising the inference that those not containing such provisions were not intended to contain them.").

received in D.C. (not California) and the Complaint confirms that D.C. was the place where the conduct causing injury took place.  *See* FAC ¶¶ 26 (lawsuit "arises out of Defendants' business transacted in this judicial district" and "Defendants committed several tortious acts in Washington D.C."); 27 ("Defendants conspired in Washington D.C. to disseminate carefully selected stolen information").  As for the third factor, the residences of the parties do not weigh for or against any particular jurisdiction, because Plaintiffs are based in California, Muzin is a resident of Maryland, Allaham of New York, Howard of Maine, Stonington is a Delaware corporation, and Plaintiffs allege D.C. was a place of business for the Defendants.  FAC ¶¶ 11–18, 23–25.  The last factor, where the parties' relationship is centered, is not relevant because there is no relationship between Broidy and Defendants.  With the first two factors weighing in favor of D.C., and the third and fourth factors inconclusive, D.C. has the greatest interest in having its laws applied.

By the Complaint's own theory then, D.C. law should govern this claim—and D.C. does not provide a private cause of action for receipt and possession of stolen property.  Count Seven therefore fails for this reason.  *See In re APA*, 766 F.3d at 55 (dismissing California statutory claim after concluding that D.C. law governed same).[16]

*Third*, and in any event, the claim is meritless even under California law because the Complaint lacks any plausible allegations that the Defendants possessed any of the supposedly stolen materials (whatever they were).  The single conclusory allegation that the Defendants each "knowingly received property," FAC ¶ 325, appears based on the equally infirm and vague

---

[16]   Additionally, D.C.'s Uniform Trade Secrets Act provides that it "supersedes conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation of a trade secret."  D.C. Code § 36-407; *see also DSMC, Inc.*, 479 F. Supp. 2d at 83–84 & n.13 (dismissing common law conspiracy claim as preempted).

allegation that the "Defendants conspired with others to hack into Plaintiffs' computer systems," FAC ¶ 324.

### F.    Count Eight fails to state a claim under California's Comprehensive Computer Data Access and Fraud Act.

The Complaint also tries but fails to state a claim under California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502 ("CCDAFA").  This statute is inapplicable in the District of Columbia, requiring dismissal of the claim for that reason alone.

There does not appear to be any analogous D.C. law governing the same conduct.  Instead, cases involving computer hacking in the District of Columbia usually involve claims brought under the federal CFAA.  *See, e.g.*, *Hedgeye Risk Mgm't, LLC v. Heldman*, 271 F. Supp. 3d 181, 192 (D.D.C. 2017) (describing the scope of the federal law as covering "effectively all computers with internet access").  Because there is no analogous D.C. law and due to reliance on enforcement of the federal statute in this jurisdiction, it may be inferred that the D.C. Council intended *not* to impose civil liability relating to computer hacking separate and distinct from the federal prohibitions and existing tort laws.  A conflict thus exists between D.C.'s rule of non-liability and California's rule of liability.  *See In re APA*, 766 F.3d at 52.

Applying the four-factor governmental interest test, D.C. has the greater interest in having its laws applied.  Again, as to the place of injury, Broidy himself alleges that they were injured in the District of Columbia.  FAC ¶¶ 26–27.  As for place of conduct, Broidy again alleges that D.C. was where the Defendants' wrongful conduct occurred.  FAC ¶¶ 26, 27.  As before, neither the third factor on the domiciles of the parties, nor the fourth factor on the parties' relationship, weigh for or against either jurisdiction.  Accordingly, D.C. law should apply.  As the District of Columbia has no law analogous to the CCDAFA, Count Eight should be dismissed.

Even if California law applied, Broidy's claim would still require dismissal.  The CCDAFA enumerates fourteen possible violations in Section 502(c) but only permits a plaintiff to "bring a civil action *against the violator*."  Cal. Pen. Code § 502(e)(1) (emphasis added).  None of the fourteen enumerated acts involves conduct by secondary actors such as conspirators.  *Id.* § 502(c).  Yet the Complaint's basis for bringing this claim rests solely on the allegation that the Defendants "*conspired* with others to access computers, computer systems or computer networks at Plaintiff BCM and Google."  FAC ¶ 337 (emphasis added).  Under the terms of the CCDAFA, there is no conspiracy liability and thus Count Eight should be dismissed.

### G.    Count Nine fails to state a claim for Public Disclosure of Private Facts.

The Complaint cannot state a claim for public disclosure of private facts because that claim rests on the same allegations as the UTSA claim, and it is therefore preempted.  Moreover, the claim would fail even if it weren't preempted outright.  To state a claim for public disclosure of private facts, a complaint must establish:  "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern."  *Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 478 (Cal. 1998), *as modified on denial of reh'g* (July 29, 1998).  The Complaint here does not allege facts that would support any of these elements.  It does not state which "facts" were disclosed, which were "private," or which were not of legitimate public concern.  It says nothing at all about the content of the information published by the news outlets (or how that content injured Broidy).

Further, the limited information the Complaint *does* contain about the publications strongly suggests that the information *was* of public concern, and Broidy cannot seriously dispute the newsworthiness of the materials actually publicized by the media.  "[T]he evaluation of newsworthiness depends on the degree of intrusion and the extent to which the plaintiff played an important role in public events."  *Id.* at 484.  The Complaint alleges that Broidy is a "prominent

49

business and civic leader who has actively served in leadership roles in U.S. government advisory groups, Jewish organizations, and the Republican Party for decades." FAC ¶ 45. It alleges that his "advocacy against terrorism and extremism is well known," and that he has "directly interacted with the President of the United States" on issues relevant to Middle East affairs. FAC ¶¶ 45–49. The Complaint suggests that articles relating to his work in public affairs were published in the Wall Street Journal, the New York Times (including two front-page stories), on the BBC, Huffington Post, and McClatchy. FAC ¶¶ 142, 144, 148, 151, 152, 175.[17] It is implausible to contend that this information was not newsworthy, and it is well-established that newsworthy facts "cannot properly be the basis of such a tort action." *Taus v. Loftus*, 151 P. 3d 1185, 1208 (Cal. 2007).

The claims asserted against Howard merit an additional note. The Complaint's primary allegations are that he spoke with reporters, who subsequently wrote articles reporting on Broidy. The Complaint implies that these conversations concerned information obtained from the hacking. If so, the sequence of alleged events is that the news outlets made the independent editorial decisions to publish those articles—meaning that there should be no reasonable question that they were newsworthy and therefore of public concern.

---

[17]  The articles tend to show that Broidy engaged in criminal or unethical practices in conducting those affairs. *See, e.g.,* FAC ¶ 126 (referencing Desmond Butler, Tom LoBianco, & Bradley Klapper *Mueller probe witness secretly backed UAE agenda in Congress*, Associated Press, Mar. 25, 2018, https://apnews.com/e2a2ae7f178e4daf9202be7ef3232628 (reporting that an advisor to the UAE wired Broidy $2.5 million in foreign funds which Broidy used to pay for U.S. political activity, including campaign contributions, in potential violation of federal law) (attached as Ex. 2 to the Udell Decl.)). Disclosure of information about criminal activity is almost universally regarded to be a matter of public interest. *See, e.g., Dresbach v. Doubleday & Co., Inc.*, 518 F. Supp. 1285, 1289–90 (D.D.C. 1981); *Times-Mirror Co v. Super. Ct.*, 244 Cal. Rptr. 556, 561–62 (Cal. Ct. App. 1988).

**H.      Count Ten fails to state a claim for intrusion upon seclusion.**

Count Ten, asserting a claim for intrusion upon seclusion, is likewise preempted by the California's UTSA claim, and it also fails on the merits.  The tort has three elements:  "(1) an invasion or interference by physical intrusion by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination (2) into a place where the plaintiff has secluded herself or into her private or secret concerns (3) that would be highly offensive to an ordinary, reasonable person."  *Benz v. Wash. Newspaper Publ'g Co.*, No. 05-CV-1760, 2006 WL 2844896, at *8 (D.D.C. Sept. 29, 2006).  Claims for intrusion upon seclusion fail where the plaintiff does not allege that the defendant committed the intrusion.  *See*, *e.g.*, *Nix v. Hoke*, 139 F. Supp. 2d 125, 133 (D.D.C. 2001) ("[p]laintiff has, in fact, alleged no facts to support his assertion that defendant either 'participated in' or 'conducted' the wiretapping").  The Complaint does not allege that the Defendants participated in the alleged hack and therefore fails to allege an essential element.

**I.      Count Eleven fails to state a claim for conversion.**

This claim is also preempted.  Even if it were not preempted, the claim would fail because D.C. law applies and D.C. does not allow conversion of intangible property.  And even if were not preempted and California law applied, the claim would still fail on the merits.

Any claim for conversion of trade secrets is preempted by the UTSA, and any conversion of copyrighted material is preempted by the Copyright Act.  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 240 (Cal. Ct. App. 2010), *overruled on other grounds by Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) (California UTSA preempted conversion claim based on trade secrets); *DSMC, Inc.*, 479 F. Supp. 2d at 83–84 & n.13 (dismissing common law conspiracy claim as preempted by D.C.'s UTSA); *Mktg. Info. Masters, Inc. v. Bd. of Trustees of Cal. State Univ. Sys.*, 552 F. Supp. 2d 1088, 1098 (S.D. Cal. 2008) ("conversion actions seeking

51

only damages for reproduction of [property protected by the Copyright Act]—not return of tangible property—are preempted by the Copyright Act.").

Even if not preempted, the claim fails.  While there are similar elements to a claim of conversion under each of California and D.C. law, a critical difference between the two is that California recognizes the conversion of *intangible* property, while D.C. does not.  The Ninth Circuit has found the fact "that [a document] is stored in electronic form rather than on ink and paper is immaterial."  *Kremen v. Cohen*, 337 F.3d 1024, 1034 (9th Cir. 2003).  D.C., on the other hand, does not recognize a cause of action for conversion of intangible property.  *3D Glob. Sols., Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 10 (D.D.C. 2008); *see also Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1064 (D.C. 2014) ("Whatever other protections the law may offer to protect intangible property rights, the common-law tort of conversion is generally ill-suited to that end."); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 6 (D.D.C. 2013) (rejecting claim of conversion of internet domain names); *Ficken*, 578 F. Supp. 2d at 143 (rejecting claim of conversion of frequent flyer miles).  D.C and California's interpretation of what constitutes conversion therefore differ and conflict.

The only property at stake here is intangible (and poorly alleged) and, as noted above, D.C. does not recognize a cause of action for the conversion of intangible property.  *See, e.g.*, *3D Glob. Sols., Inc.*, 552 F. Supp. 2d at 10.  Under D.C. law, "a plaintiff fails to state a claim for conversion where the defendant is only alleged to have made copies of documents while the plaintiff retains the originals because the mere copying of documents does not seriously interfere with the plaintiff's right of control."  *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz ("Gaubatz II")*, 793 F. Supp. 2d 311, 340 (D.D.C. 2011); *see also Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001).  This rule applies to the "access[ing] and cop[ying] of electronic

data." *Gaubatz II*, 793 F. Supp. 2d at 340.  Once again applying the four-factor governmental interest test, D.C. has the greater interest in having its laws applied.  *See* Sections III.E and III.F, *supra*.  As there is no cause of action for the conversion of intangible property in the District of Columbia, Count Eleven should be dismissed.

The Complaint would fail under California law as well.  To state a claim for conversion under California law, a complaint must plead:  (1) the right to possession or ownership of a property interest; (2) the conversion of the property by a wrongful act or disposition of property rights; and (3) damages.  *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 989 (N.D. Cal. 2015).  As demonstrated, the Complaint does not adequately plead that the Defendants possessed any misappropriated material and therefore does not allege conversion.

Further, to plead that Broidy possessed a valid property interest, the Complaint must identify "an interest capable of precise definition[ that is ]capable of exclusive possession or control[, and] the putative owner must have established a legitimate claim to exclusivity."  *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012) (internal quotations omitted).  To the extent this claim is based on alleged conversion of "login credentials, emails, private communications," FAC ¶ 358, the Complaint does not establish that the Plaintiffs have a legitimate claim to exclusivity over that information, which has plainly been shared with, or was created by, others.  *See Low*, 900 F. Supp. 2d at 1030 (finding LinkedIn user identification number was not property over which plaintiff had claim to exclusivity); *see also In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012) ("personal information" is not property capable of exclusive possession and control).  To the extent the Complaint is premised upon conversion of "business documents, trade secrets, and intellectual property," FAC ¶ 358, it fails to identify the legal basis for the purported property interest.

### J.   Count Twelve fails to state a claim for tortious interference.

This claim is likewise preempted by the UTSA claim and also fails of its own accord.  A complaint alleging tortious interference must allege:  (1) the existence of a valid business relationship; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional interference with that relationship; and (4) resulting damages.  *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038–39 (D.C. 2015); *see Youst v. Longo*, 729 P.2d 728, 733 n.6 (Cal. 1987).  It must plead "a business relationship with a *specific* third party containing the probability of future economic benefit to the plaintiff."  *Prostar Wireless Grp., LLC v. Domino's Pizza*, 360 F. Supp. 3d 994, 1016 (N.D. Cal. 2018) (internal quotations and citations omitted) (emphasis added); *see also Packaging Sys. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1090 (C.D. Cal. 2017) (complaint "must identify specific third parties with whom [plaintiff] had an economic relationship; a general averment . . . is insufficient").

Not only does the Complaint fail to identify any contract or business relationship that Broidy lost as a result of the alleged conduct, it does not even identify a single relationship with which the Defendants interfered.  It only vaguely states that Broidy "will be able to prove at trial that their business relationships has [sic] suffered material harm."  FAC ¶ 365.  This is inadequate as a matter of law.  *See Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 292 (D.D.C. 2018) ("tortious interference claims are routinely dismissed where the plaintiff fails to name specific contractual relationships that the defendant allegedly interfered with, or to identify any facts related to future contracts compromised by the alleged interferer").

### K.   Count Thirteen fails to state a claim for civil conspiracy.

Count Thirteen should also be dismissed.  Neither D.C. nor California law has any kind of independent or "catch-all" claim for civil conspiracy, and the Complaint states no other underlying cause of action.  In any event, to state a civil conspiracy, a complaint must allege:  (1) two or more

54

persons agreeing to a common plan to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages. *City of Industry v. City of Fillmore*, 198 Cal. App. 4th 191, 212 (Cal. Ct. App. 2011); *Friends Christian High Sch. v. Geneva Fin. Consultants*, 39 F. Supp. 3d 58, 64–65 (D.D.C. 2014). But the Complaint does not plausibly allege any agreement. Its conclusory allegations that the "Defendants agreed during one or several of their meetings, and at other times, to engage in the above-mentioned tortious and criminal actions to harm Mr. Broidy's business and public standing," FAC ¶ 370, are plainly deficient as "bare allegations" and "rank" conjecture. *Choate v. County of Orange*, 103 Cal. Rptr. 2d 339, 353 (Cal. Ct. App. 2000) (citation and internal alteration marks omitted). The Complaint does nothing to "nudge [plaintiffs' conspiracy theory] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Having failed to plead civil conspiracy, the Complaint cannot survive without pleading *each* of the preceding counts as to *each* Defendant specifically, which, as explained above, the Complaint does not do. The conclusory allegations of supposed wrongdoing by each of the Defendants do not rule out the obvious alternative, and entirely legitimate explanations for the conduct alleged in the Complaint—in Howard's case, for instance, that he was simply doing exactly what one would expect of a media placement consultant—and thus fail as a matter of law. *RSM Prod. Corp.* 682 F.3d at 1050–52.

## IV.    The Allegations Against Howard Must Fail Because They Seek to Punish Speech Protected Under the First Amendment.

Finally, notwithstanding the reasons above for dismissing this case in its entirety on grounds of derivative sovereign immunity and failure to state a claim, the Complaint must also be dismissed, as to Howard, on Constitutional grounds.

If the allegations of the Complaint are to be taken as true, then the claims against Howard must fail because they seek to punish him for engaging in speech that is protected under the First

Amendment.  Specifically, the only *factual* allegations against Howard are, in substance, that he spoke frequently via phone with reporters, prior to their publishing articles about Broidy's hacked emails.  The Complaint then *concludes* from those phone calls that "Howard had received and [was] knowingly using the stolen emails."  FAC ¶ 159.  Even assuming those allegations to be true, because it is clear from the four corners of the Complaint that the Broidy emails embody a matter of great public concern, Howard's conversations with reporters on that topic are protected under the First Amendment and Supreme Court precedent, and therefore the claims against him should be dismissed.  *See Bartnicki v. Vopper*, 532 U.S. 514 (2001).[18]

Although the Complaint never identifies what information was contained in the articles that it says damaged Broidy's reputation, the Court may take judicial notice of the content of the articles on this motion since the Complaint puts them squarely at issue.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).  With respect to Howard, the Complaint alleges that he had a series of conversations with reporters in connection with the following publications:

- A March 3, 2018 New York Times article noting that Broidy had a private meeting in the oval office with President Trump in which, among other things, he "lobbied the president to meet privately" with the military commander of the United Arab Emirates (a major rival of Qatar) and to fire then-Secretary of State Rex Tillerson. FAC ¶ 121; Decl. of Jeffrey A. Udell, May 7, 2019 ("Udell Decl."), Ex. 1.

- A March 26, 2018 Associated Press article citing information from the Broidy emails and reporting that Broidy received a $2.5 million wire "to bankroll an effort to persuade the U.S. to take a hard line against Qatar," and that Broidy later received a "hefty contract with the UAE government."  Howard supposedly had multiple phone calls with the article's author in the period prior to its publication, though the Complaint does not specify who initiated the conversations, and it states that

---

[18]  The District of Columbia and twenty-eight states, including California where Broidy resides, have enacted laws to protect individuals like Howard from lawsuits like this one, which are known as strategic lawsuits against public participation, or "SLAPP" suits.  Anti-SLAPP laws provide SLAPP defendants with certain rights and protections.  Federal law does not have an anti-SLAPP law analog, but their principles of fairness and equity are applicable here.

the author of the article provided hacked emails to Broidy's associates before publication (presumably to seek comment).  FAC ¶¶ 123–26; Udell Decl. Ex. 2.

- A March 26, 2018 McClatchy article about Broidy seeking to enlist the aid of the chair of the House Foreign Affairs Committee to help him win business in Romania.  FAC ¶¶ 141, 148; Udell Decl. Ex. 3.

- A March 28, 2018 Twitter post by a New York Times reporter relating to a prior Newsweek article that had made a comment about Broidy, where the New York Times reporter had spoken to Howard the previous day (but with no allegation in the Complaint that Howard ever spoke to Newsweek).  FAC ¶ 127.

- A May 21, 2018 Associated Press article containing information from Broidy's emails and reporting that Broidy had "helped spearhead a secret campaign to influence the White House and Congress, flooding Washington with political donations."  The Complaint also indicates that the author himself showed the source information to Broidy's representatives, thereby providing an opportunity for comment.  The Complaint alleges that Howard had a number of phone calls with the author prior to publication of the article but does not allege whether Howard or the reporter initiated the calls.  FAC ¶¶ 130–33; Udell Decl. Ex. 4.

In *Bartnicki*, the defendant received a recording anonymously sent to his mailbox that turned out to be an illegally intercepted phone call between two members of a teachers' union discussing labor negotiations with the local school board, which was covered in the press.  532 U.S. at 518–19.  The defendant recognized the voices on the tape and shared it with the media, which publicized it.  *Id.* at 519.  The individuals on the tape sued the defendant under federal and state wiretapping statutes, which prohibit the dissemination of electronic communications by those who know or had reason to know that the such communications were obtained through illegal means.  *Id.* at 520.  The defendant moved for summary judgment, arguing that the wiretapping laws were unconstitutional as applied to his case on First Amendment grounds.  *Id.* at 520–21.

The Supreme Court found the defendant's conduct protected under the First Amendment.  *Id.* at 535.  The Court assumed that the recording was made unlawfully and that the defendant had reason to know so, such that his disclosure of the tape was unlawful under federal and state law.  *Id.* at 525.  The Court also assumed that the defendant played no part in the illegal

interception, that his "access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else," and that the subject matter of the taped conversation was a matter of public concern.  *Id.*  Addressing the question of whether applying the statutes in these circumstances was unconstitutional, the Court held that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern," and found that the statutes were invalid as applied.  *Id.* at 535.

Under a principle known as the "*Daily Mail*" rule, the First Amendment "grants persons a near absolute right to publish truthful information about matters of public interest that they lawfully acquire."  *Republic of Kazakhstan v. Does 1-100*, No. 15-CV-1900, 2015 WL 6473016 at *2 (S.D.N.Y. Oct. 27, 2015) (*citing Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)).  In *Republic of Kazakhstan*, a non-party publisher sought clarification that it was not bound by a preliminary injunction prohibiting the publication of emails that it knew were obtained through hacking, where the publisher was not involved in the hacking.  *Id.* at *1.  Citing *Bartnicki*, the court held that "the *Daily Mail* rule applies even if a re-publisher of information that is of public concern knew that its source had obtained the information illegally," concluding that "the *Daily Mail* rule protects the publication of [stolen] documents by anyone other than those *directly involved* in their purported theft."  *Id.* at *2 (citing *Bartnicki*, 532 U.S. at 535; *Daily Mail Publ'g Co.*, 443 U.S. at 103) (emphasis added).

Those principles apply here.  Even crediting the Complaint's allegations that Howard received hacked emails and disseminated them to reporters, the First Amendment shields Howard from liability so long as:  (1) he was not involved in the theft of the emails; and (2) the information disseminated was of public concern.  Both conditions are satisfied.  First, as discussed above, there is no allegation that Howard was in *any* way involved—even "indirectly" let alone "directly"—in

the theft of the Broidy emails.  Second, the four articles published after their authors allegedly spoke with Howard are undeniably about matters of public concern—they discuss Broidy's involvement in substantive matters of public interest at the highest levels of government, including the President of the United States, other foreign leaders, and high-ranking members of Congress. *See* Udell Decl. Exs. 1 (New York Times article describing effort by Broidy to lobby President Trump to fire Rex Tillerson); 2 (Associated Press article describing Broidy's receipt of $2.5 million "to persuade the U.S. to take a hard line against Qatar"); 3 (McClatchy article describing Broidy effort to persuade a member of Congress to help him win business in Romania); 4 (Associated Press article describing Broidy's efforts to "spearhead a secret campaign to influence the White House and Congress, flooding Washington with political donations").

Under *Bartnicki*, therefore, the Complaint's conclusory allegation that Howard disseminated the Broidy emails to reporters cannot pass constitutional muster.  Broidy's claims are against the hackers, not Howard (or any of the other Defendants).  Accordingly, each of the claims alleged against Howard fails on First Amendment grounds.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss the Complaint in its entirety, with prejudice.

Dated:  May 7, 2019

Respectfully submitted,

*//ss// Charles S. Fax*_____
Charles S. Fax
D.C. Bar No. 198002
RIFKIN WEINER LIVINGSTON, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Tel.: (301) 951-0150
Email: cfax@rwllaw.com

Jeffrey A. Udell (*admitted pro hac vice*)
Adam P. Cohen (*admitted pro hac vice*)
Kraig Ahalt (*admitted pro hac vice*)
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, New York 10004
Tel.: (212) 335-2030
judell@wmhlaw.com
acohen@wmhlaw.com
kahalt@wmhlaw.com

*Attorneys for Defendant Gregory Howard*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum of Law in Support of the Motion to Dismiss the First Amended Complaint was electronically filed this 7th day of May 2019 and will be served on all parties via the Court's electronic filing system:

Filiberto Agusti
Shannen W. Coffin
Michael J. Baratz
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
fagusti@steptoe.com
scoffin@steptoe.com
mbaratz@steptoe.com

*Counsel for Plaintiffs Broidy Capital Management LLC and Elliott Broidy*

Laura E. Zell
ARENT FOX LLP
1717 K Street NW
Washington, DC 20006
laura.zell@arentfox.com

Temitope K. Yusuf
Mohammed T. Farooqui
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019
temitope.yusuf@arentfox.com
mohammed.farooqui@arentfox.com

*Counsel for Defendant Joseph Allaham*

Stephen J. Obermeier
Rebecca J. Fiebig
Wiley Rein LLP
1776 K Street NW
Washington, DC 20006
sobermeier@wileyrein.com
rfiebig@wileyrein.com

*Counsel for Defendants Nicolas D. Muzin and Stonington Strategies LLC*

Respectfully submitted,
/s/ *Jeffrey A. Udell*
Jeffrey A. Udell

1