# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BROIDY CAPITAL MANAGEMENT, LLC and ELLIOTT BROIDY,<br><br>            Plaintiffs,<br><br>    v.<br><br>NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC,<br><br>            Defendants. | Civil Action No.  1:19-cv-00150-DLF |

## DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT ON IMMUNITY GROUNDS

Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wileyrein.com
Rebecca J. Fiebig (D.C. Bar # 976854)
rfiebig@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006

*Counsel for Defendants Nicolas D. Muzin and Stonington Global LLC*


Temitope K. Yusuf (*pro hac vice*)
temitope.yusuf@arentfox.com
Mohammed T. Farooqui (*pro hac vice*)
mohammed.farooqui@arentfox.com
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019

Laura E. Zell (D.C. Bar. # 1044336)
laura.zell@arentfox.com
ARENT FOX LLP
1717 K Street NW
Washington, DC 20006


*Counsel for Defendant Joseph Allaham*

Jeffrey A. Udell (*pro hac vice*)
judell@wmhlaw.com
Adam P. Cohen (*pro hac vice*)
acohen@wmhlaw.com
Kraig Ahalt (*pro hac vice*)
kahalt@wmhlaw.com
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, NY 10004

Charles Samuel Fax (D.C. Bar # 198002)
cfax@rwlls.com
RIFKIN WEINER LIVINGSTON LLC
7979 Old Georgetown Road, Ste. 400
Bethesda, MD  20814

*Counsel for Defendant Gregory Howard*

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

I.      Broidy Conflates Derivative Sovereign Immunity with Foreign Official
Immunity. ......................................................................................................................... 2

      A.      Derivative Foreign Sovereign Immunity Applies to Contractors and
Private Agents—Like Defendants Here—Acting at the Direction of the
Foreign Sovereign. ............................................................................................... 3

      B.      Foreign Official Immunity Applies to Foreign Officials Acting in Their
Official Capacity. ................................................................................................ 10

II.     The Case Should Be Dismissed in Its Entirety under the Doctrine of Derivative
Foreign Sovereign Immunity. ......................................................................................... 14

III.    Even If This Court Does Not Apply Derivative Sovereign Immunity, Defendants
Are Entitled to Foreign Official Immunity. .................................................................... 15

      A.      Foreign Official Immunity Can Apply to U.S. Citizens Acting as Agents
of a Foreign Sovereign. ...................................................................................... 16

      B.      If There Was Any Need To Apply Foreign Official Immunity, the State
Department's Two-Factor Test Should Apply, Not the Restatement's
Three-Factor Test. .............................................................................................. 17

      C.      Pursuant to Broidy's Own Allegations, Defendants Satisfy the Two-Factor
Test for Foreign Official Immunity. ................................................................... 19

      D.      Even If § 66 of the Restatement Applies, Defendants Satisfy the Third
Factor. ................................................................................................................. 20

CONCLUSION .......................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABI Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*,
    No. 91-6785, 2016 WL 3959078 (E.D. Pa. July 22, 2016) ....................................................16

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    528 F.3d 934 (D.C. Cir. 2008) ...........................................................................................15

*Al Shimari v. CACI Premier Tech., Inc.*,
    368 F. Supp. 3d 935 (E.D. Va. 2019) ................................................................................12

\* *Alicog v. Kingdom of Saudi Arabia*,
    860 F. Supp. 379 (S.D. Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) ....................... *passim*

*Belhas v. Ya'alon*,
    515 F.3d 1279 (D.C. Cir. 2008) ...................................................................................... *passim*

\* *Butters v. Vance Int'l, Inc.*,
    225 F.3d 462 (4th Cir. 2000) .......................................................................................... *passim*

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016) ...........................................................................................................4, 5

*Chuidian v. Philippine Nat'l Bank*,
    912 F.2d 1095 (9th Cir. 1990) .........................................................................................7, 8, 14

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ...............................................................................................9

\* *Doe I v. Buratai*,
    318 F. Supp. 3d 218 (D.C. Cir. 2018)............................................................................ *passim*

*Dogan v. Barak*,
    No. 15-813, 2016 WL 6024416 (C.D. Cal. Oct. 13, 2016)...................................................19

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003)........................................................................................................4, 14

*Eliahu v. Jewish Agency for Isr.*,
    919 F.3d 709 (2d Cir. 2019)............................................................................................13, 19

*Farhang v. Indian Inst. of Tech.*,
    655 F. App'x 569 (9th Cir. 2016) .........................................................................................19

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
　　905 F.2d 438 (D.C. Cir. 1990) ...................................................................................22

*Greenspan v. Crosbie*,
　　No. 74-4734, 1976 WL 841 (S.D.N.Y. Nov. 23, 1976)..............................................12

*Ivey for Carolina Golf Dev. Co. v. Lynch*,
　　No. 17-439, 2018 WL 3764264 (M.D.N.C. Aug. 8, 2018)........................5, 9, 11, 16

*In re KBR, Inc., Burn Pit Litig.*,
　　744 F.3d 326 (4th Cir. 2014) ...................................................................................12

*Lewis v. Mutond*,
　　918 F.3d 142 (D.C. Cir. 2019) ........................................................................ *passim*

*MacArthur Area Citizens Ass'n v. Republic of Peru*,
　　809 F.2d 918 (D.C. Cir. 1987) ..................................................................................14

*Matar v. Dichter*,
　　563 F.3d 9 (2d Cir. 2009)....................................................................................18, 19

*Moriah v. Bank of China Ltd.*,
　　107 F. Supp. 3d 272 (S.D.N.Y. 2015)..............................................................9, 11, 22

*In re OPM Data Sec. Breach Litig.*,
　　266 F. Supp. 3d 1 (D.D.C. 2017) ................................................................................5

*Persinger v. Islamic Republic of Iran*,
　　729 F.2d 835 (D.C. Cir. 1984)...................................................................................14

*Pine View Gardens, Inc. v. Mut. of Omaha Ins. Co.*,
　　485 F.2d 1073 (D.C. Cir. 1973) ...................................................................................5

*Rosenberg et al. v. Lashkar-E-Taiba et al.*,
　　Civ. No. 1:10-cv-05381-DLI-CLP (E.D.N.Y. Dec. 17, 2012), ECF No. 35 ...........19

*Ruddell v. Triple Canopy, Inc.*,
　　No. 15-1331, 2016 WL 4529951 (E.D. Va. Aug. 29, 2016)................................4, 12

*Samantar v. Yousuf*,
　　560 U.S. 305 (2010)........................................................................................ *passim*

*Scott v. J.P. Morgan Chase & Co.*,
　　296 F. Supp. 3d 98 (D.D.C. 2017) .........................................................................3, 5

*Smith v. Ghana Comm. Bank, Ltd.*,
　　No. 10-4655, 2012 WL 2930462 (D. Minn. June 18, 2012)....................................13

*In re Totten Metrorail Cases*,
   895 F. Supp. 2d 48 (D.D.C. 2012) .............................................................................5

*Velasco v. Gov't of Indon.*,
   370 F.3d 392 (4th Cir. 2004) ...................................................................................7

*Warfaa v. Ali*,
   811 F.3d 653 (4th Cir. 2016) ...................................................................................8

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940)...........................................................................................5, 6, 7

*Yousuf v. Samantar*,
   552 F.3d 371 (4th Cir. 2009) ...................................................................................8

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) ......................................................................... *passim*

**Statutes**

Torture Victim Protection Act of 1991, Pub. L. 102–256, 106 Stat. 73 (1992) ................10, 18, 21

Defendants Nicolas D. Muzin, Stonington Strategies LLC ("Stonington" and, collectively with Muzin, the "Stonington Defendants"), Joseph Allaham, and Gregory Howard (together "Defendants") respectfully submit this Reply Memorandum in further support of their motions to dismiss the First Amended Complaint ("Complaint" or "FAC"), filed by Plaintiffs Broidy Capital Management LLC and Elliott Broidy (together "Broidy"), pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Broidy's 135-page Opposition Brief ("Opp.") confirms that his claims are utterly baseless. This is merely the latest in a string of lawsuits seeking to deflect attention away from his own legal troubles with unfounded claims that he was a victim of an elaborate cyberespionage campaign orchestrated and directed by the State of Qatar ("Qatar"). The operative complaint in this case is Broidy's fifth bite at the apple, but it remains as deficient as each prior iteration. Specifically, as discussed in painstaking detail in the contemporaneously filed Joint Reply Memorandum In Support of Motion to Dismiss the First Amended Complaint For Failure to State a Claim, Broidy *still* has not alleged any factual basis to conclude that Defendants (1) accessed his computers, (2) received or distributed information obtained from his computers, or (3) entered into an agreement with anyone else—including Qatar—to facilitate such actions. These fundamental flaws doom each of Broidy's thirteen causes of action.

But there is no need for this Court even to address Broidy's 90-plus pages of briefing on the merits of his claims because this entire case should be dismissed with prejudice on the basis of derivative sovereign immunity. As discussed in more detail herein, Broidy does not challenge Qatar's immunity and does not dispute that his ***own allegations*** demonstrate that Defendants at all relevant times were contractors and/or private agents acting at the direction of, and for the benefit of, Qatar. Indeed, Broidy does not take issue with Defendants' characterization of his allegations,

does not request jurisdictional discovery, and does not make any substantive argument that Defendants acted without Qatar's direction.

Instead, as the Court recognized in its June 17 Minute Order, Broidy raises a purely legal challenge arguing that there is no independent doctrine of derivative sovereign immunity and that under the D.C. Circuit's decision in *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), Defendants do not qualify for foreign official immunity. But Broidy misreads the case law—derivative foreign sovereign immunity and foreign official immunity are distinct doctrines. Defendants are entitled to derivative sovereign immunity exactly because they were, according to Broidy, acting at the direction of Qatar. And even if foreign official immunity did apply here, Defendants would still be immune under that doctrine. As a result, the case should be dismissed with prejudice.

## ARGUMENT

### I. BROIDY CONFLATES DERIVATIVE SOVEREIGN IMMUNITY WITH FOREIGN OFFICIAL IMMUNITY.

Broidy concedes—as he must—that he alleges Defendants acted at the direction of and for the benefit of Qatar. In fact, as explained in the Stonington Defendants' opening brief, Broidy's entire case is premised on alleging that Defendants acted at Qatar's behest. Opening Br. at 21-26. Under the doctrine of derivative sovereign immunity—which is the doctrine invoked by Defendants—Broidy's concession is dispositive. *See Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 381 (S.D. Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996).

With no viable response to Defendants' derivative sovereign immunity arguments, Broidy contends that there is no separate doctrine of ***derivative sovereign*** immunity, and that Defendants cannot satisfy the doctrine of ***foreign official*** immunity. But Broidy either ignores or misinterprets circuit court decisions establishing that derivative sovereign and foreign official immunity are

different doctrines with different purposes and different elements.  Derivative sovereign immunity is a common law doctrine that cloaks contractors and private agents of a foreign sovereign— including U.S. citizens—with the sovereign's immunity for actions taken at the sovereign's direction and with its approval.  It applies only where the sovereign itself is immune from suit and is limited to actions taken at the sovereign's direction.  Foreign official immunity, on the other hand, is a separate basis for public ministers, officials, and agents of foreign sovereigns to obtain immunity for actions taken in their official capacities.  Foreign official immunity is not necessarily coextensive with the sovereign's immunity and can exist even where the sovereign is not immune.  As Defendants argued in their opening brief, the doctrine of derivative foreign sovereign immunity is alive, well, and applicable to Defendants here.

> **A.**     **Derivative Foreign Sovereign Immunity Applies to Contractors and Private Agents—Like Defendants Here—Acting at the Direction of the Foreign Sovereign.**

The common law doctrine of derivative foreign sovereign immunity is an extension of the well-established common law doctrine of derivative sovereign immunity that is applied to contractors and private agents of the United States.  *See Butters*, 225 F.3d at 466.  The doctrine "exists because it is in the public interest to protect the exercise of certain governmental functions . . . [even] when the government delegates that function down the chain of command."  *Id.*; *see also Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017) (finding that a contractor or private agent "who acts at the behest of a sovereign entity becomes imbued with some of the sovereign's immunity").  As the Fourth Circuit explained:

> It is but a small step to extend th[e] privilege [of derivative sovereign immunity] to the private agents of foreign governments.  ***All sovereigns*** need flexibility to hire private agents to aid them in conducting their governmental functions.  This is especially true for foreign sovereigns given their lack of human resources while operating within the United States.

*Butters*, 225 F.3d at 466 (emphasis added).  As such, the doctrine applies to American contractors and agents.  *See id.* at 467 (holding an American contractor immune from suit for actions taken at the behest of the Saudi government); *Alicog*, 860 F. Supp. at 381.  A holding otherwise would "discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts." *Butters*, 225 F.3d at 466.

Derivative sovereign immunity developed because, by necessity, governments act through individuals, and the actions of the individuals directed by the state are functionally the actions of the state itself.  *See Ruddell v. Triple Canopy, Inc.*, No. 15-1331, 2016 WL 4529951, at *5 (E.D. Va. Aug. 29, 2016) ("Derivative sovereign immunity exists because the government and its contractors have the same interest in getting the Government's work done." (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 506 (1988))).  Subjecting an individual who is carrying out a government directive to liability would "directly impede the significant governmental interest in the completion of its work," forming an end-run around the sovereign's immunity.  *Butters*, 225 F.3d at 466.  In fact, allowing the government to be held liable through its contractors and private agents when it could not be held liable directly would contravene the entire purpose of recognizing immunity in the first instance.  *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003) ("Foreign sovereign immunity . . . is meant to . . . give foreign states . . . some protection from the inconvenience of suit . . . .").

To be sure, derivative sovereign immunity is not absolute.  Only actions authorized and directed by the sovereign are eligible for protection.  *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (declining to find derivative immunity because "the current record reveals no basis for arguing that [the contractor seeking immunity] complied with the Navy's instructions").  But, in the narrow instance where—as here—the alleged acts of which a plaintiff complains were

performed pursuant to the sovereign's direction, the actor who carried out the sovereign's directives is entitled to immunity.  *See Butters*, 225 F.3d at 466-67 (finding derivative immunity because Saudi Arabia, not the American corporate defendant, made the decision at issue); *Alicog*, 860 F. Supp. at 384 (no liability for repeating the prince's commands); *Ivey for Carolina Golf Dev. Co. v. Lynch*, No. 17-439, 2018 WL 3764264 at *7 (M.D.N.C. Aug. 8, 2018) (U.S. citizen found derivatively immune under *Butters* for "conduct [taken] at the direction of" a foreign official); *see also New York Litigation*, Dkt. 61-2 at 44:20–24 ("To allow plaintiffs to sue Benomar would be to allow a suit for conduct that plaintiffs claim ***was actually committed by the sovereign*** or that Benomar ***committed at the sovereign's direction and on the sovereign's behalf***." (emphasis added)).[1]

The Fourth Circuit's decision in *Butters* is instructive.  There, the court held that a U.S. security contractor was immune from suit for employment discrimination because Saudi Arabia

---

[1] The doctrine of derivative sovereign immunity as it applies domestically dates back to the Supreme Court's 1940 decision in *Yearsley*.  *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940).  Courts in this circuit have had ample occasions to explore its contours.  *See, e.g.*, *In re OPM Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 50 (D.D.C. 2017) (dismissing claims against government contractor on derivative sovereign immunity grounds); *see also Pine View Gardens, Inc. v. Mut. of Omaha Ins. Co.*, 485 F.2d 1073, 1074-75 (D.C. Cir. 1973) (dismissing contract claim against government agent on immunity grounds).  That the doctrine has not been frequently satisfied in this circuit, *see, e.g.*, *Scott*, 296 F. Supp. 3d 98, only underscores the fact that it is a narrow doctrine, the application of which to foreign sovereigns is "but a small step" that will not result in a host of rulings protecting contractors of foreign governments.  *Butters*, 225 F.3d at 466.

Broidy wrongly suggests that *Campbell-Ewald* calls into question the validity of derivative immunity.  Opp. at 39.  In fact, the case ***confirms*** the existence of derivative sovereign immunity and merely recognizes that contractors do not enjoy the absolute immunity available to the states, only limited immunity for specific acts taken at the state's direction and with its approval.  *Campbell-Ewald*, 136 S. Ct. at 674.  Defendants are not claiming that they are entitled to absolute immunity from suit for all causes by virtue of their relationships with Qatar, they are claiming immunity for the actions ***Broidy claims*** they took at Qatar's direction and on its behalf.  *See* Opening Br. at 25.  Judge Walton's decision in *In re Totten Metrorail Cases*, 895 F. Supp. 2d 48 (D.D.C. 2012)—which Broidy contends questions the existence of derivative sovereign immunity, Opp. at 40 n.156—was issued before *Campbell-Ewald* revalidated the doctrine once and for all.

expressly forbade the contractor from promoting the plaintiff because she was female. *Butters*, 225 F.3d at 466. In reaching that conclusion, the court first determined that Saudi Arabia was immune under the FSIA. *Id.* at 465. The court then found—drawing upon cases finding derivative immunity for contractors of the United States government, *see, e.g.*, *Yearsley*, 309 U.S. at 20-21— that "[i]f [the U.S. contractor] was following Saudi Arabia's orders not to promote [the plaintiff], [the U.S. contractor] would be entitled to ***derivative*** immunity"—as opposed to direct statutory immunity—"under the FSIA." *Butters*, 225 F.3d at 466 (emphasis added). Finally, the Fourth Circuit found that Saudi Arabia—and not the American contractor—made the decision not to promote the plaintiff, such that the immunity applied. The court concluded:

> FSIA immunity presupposes a tolerance for the sovereign decisions of other countries that may reflect legal norms and cultural values quite different from our own. Here ***Saudi Arabia*** made a decision to protect a member of its royal family in a manner consistent with Islamic law and custom. The Act requires not that we approve of the diverse cultural or political motivations that may underlie another sovereign's acts, but that we respect them.

*Id.* at 467 (emphasis added). Therefore, the actions of the American contractor—which were effectively the actions of Saudi Arabia, carried out by a private agent—were immune.

In a decision affirmed by the Fifth Circuit, the Southern District of Texas reached a similar conclusion in *Alicog*. There, Prince Saad of Saudi Arabia hired two brothers from Texas—Majid and Salim Afifi—to assist him with making travel arrangements, including arranging security, for a trip to Houston. At the prince's direction, the Afifis directed the security contractor to prevent two employees of the royal family from leaving the hotel. Those employees brought suit against the royal family and the Afifis alleging that they were falsely imprisoned. The court found the Afifis immune as they simply carried out the prince's orders and "did not knowingly participate in a wrong separate from the acts of the Saudi Consul." *See Alicog*, 860 F. Supp. at 381.

Although *Butters* and *Alicog* are directly on point, Broidy pays short shrift to *Butters* and

completely ignores *Alicog*.   According to Broidy, *Butters* simply interpreted the FSIA—as opposed to applying common law—and thus was overruled by *Samantar v. Yousuf*, 560 U.S. 305 (2010), which held that the definition of "foreign state" in the FSIA does not include foreign officials.   Opp. at 38.   But nothing in the *Butters* opinion, its subsequent treatment, or *Samantar* supports Broidy's reading.

Foremost, the *Butters* court plainly evaluated whether a company was entitled to "***derivative*** FSIA immunity," not direct protection under the statute itself.   *Butters*, 225 F.3d at 465 (emphasis added).   Indeed, nowhere does the Fourth Circuit interpret that statutory language to conclude that the term "foreign state" as used in the FSIA covers American contractors.   Had that been the Fourth Circuit's reasoning, there would have been no reason to go further and look to common law principles of derivative sovereign immunity.   Yet that is exactly what *Butters* does, relying on cases such as *Alicog* and *Yearsley* to determine whether recognizing an immunity ***derived from*** Saudi Arabia's immunity, but not itself grounded in the FSIA, would be appropriate. *Butters*, 225 F.3d at 466.   It does ***not*** rely on cases applying a broad reading of the FSIA's direct application.   *Contra Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1099 (9th Cir. 1990) (reading FSIA definition of "foreign state" to encompass individuals).   Not surprisingly, then, the Fourth Circuit has not read *Butters* the way Broidy does, instead characterizing *Butters* as reflecting a "narrow, ***judicially-created*** expansion of foreign sovereign immunity." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 399 (4th Cir. 2004) (emphasis added).

*Butters* is thus nothing like *Samantar*—which considered the separate question of whether the FSIA's definition of "foreign state" can be read to cover a foreign official acting in that capacity, 560 U.S. at 319—and was therefore not overruled by that case.   Indeed, the Supreme Court expressly left open the question of whether Samantar specifically might be entitled to

7

immunity under the common law.  *Id.* at 325-26 ("We emphasize, however, the narrowness of our holding.  Whether petitioner may be entitled to immunity under the common law [should] be addressed in the first instance by the District Court on remand.").  And *Butters*' continued validity as a common law doctrine is apparent from its subsequent history.  *Butters* was decided by the Fourth Circuit in 2000.  *Id.* at 462.  *Yousuf v. Samantar*—the decision reviewed by the Supreme Court in *Samantar*—was subsequently decided by the Fourth Circuit in 2009.  552 F.3d 371 (4th Cir. 2009) ("*Yousuf I*").  Despite Broidy's contention that *Samantar* and *Butters* address the same issue, the Fourth Circuit did not even mention *Butters* in its decision, *see generally id.*, even though it would have been bound by *Butters* if it was, as Broidy contends, addressing the same question.  *See Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016) (declining to overrule *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ("*Yousuf II*") because "[o]ne panel's decision is binding, not only upon the district court, but also upon another panel of this court—unless and until it is reconsidered *en banc*" (internal quotation omitted)).  In fact, the Fourth Circuit determined in *Yousuf I* that whether the FSIA applies **directly** to individuals was "still an open question in the Fourth Circuit."  522 F.3d at 378.  Therefore, the Supreme Court's affirmance of *Yousuf I* in *Samantar* could not preclude application of derivative foreign sovereign immunity as recognized in *Butters*, *Alicog*, and similar cases.[2]

---

[2] The limited case law applying the doctrine of derivative foreign sovereign immunity— particularly in this jurisdiction—is understandable for at least two reasons.  *First*, there simply are not many instances where individuals working on behalf of foreign governments have faced legal action in the United States for the actions they were allegedly directed to perform by the foreign sovereign.  Thus, the doctrine is rarely invoked.  *See Samantar*, 560 U.S. at 323 & n.18.  *Second*, the majority of jurisdictions pre-*Samantar*, including the D.C. Circuit, read the FSIA as extending immunity directly to individuals.  *See, e.g.*, *Belhas v. Ya'alon*, 515 F.3d 1279, 1283 (D.C. Cir. 2008); *Chuidian*, 912 F.2d at 1103.  Because individuals subject to suit in those jurisdictions were believed to be directly entitled to statutory immunity, there was no cause for litigants to invoke the common law.

Courts' subsequent treatment of *Butters* also confirms its continued vitality.  On remand, the Fourth Circuit determined that Samantar was not entitled to foreign official immunity.  *Yousuf II*, 699 F.3d at 766.  Once again, the Fourth Circuit did not reference its decision in *Butters*.  *See generally id.*  In fact, at no point on its lengthy trip through the federal court system did *Samantar* address the doctrine of derivative foreign sovereign immunity.  And several courts—including the Fourth Circuit just last year—have continued to cite *Butters* as authority for derivative sovereign immunity.  *See, e.g.*, *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 643 (4th Cir. 2018) (citing *Butters* in holding that "agents of the sovereign are also sometimes protected from liability for carrying out the sovereign's will"); *Ivey*, 2018 WL 3764264, at *7 (party whose "conduct relevant to this action was at the direction of" foreign official derivatively immune from suit); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 278 (S.D.N.Y. 2015) (agent immune for task performed "solely because the National Security Advisor made [the] request").  No court has rejected *Butters*' analysis or otherwise found it to be overruled.  The bottom line, then, is that *Butters*, *Alicog*, and the other cases applying derivative foreign sovereign immunity remain good law, and Broidy has nothing to say about them.[3]

---

[3] Although Broidy disputes that Qatar is immune under the FSIA, he does not address the merits of those arguments in his Opposition.  *See* Opp. at 31 n.143.  Instead, he contends that the Central District of California's finding of immunity is not preclusive because that decision is on appeal, and that this Court should refrain from dismissing the case on derivative sovereign immunity grounds until the Ninth Circuit rules on Qatar's immunity.  *See id.*  As explained in Defendants' opening brief, Opening Br. at 13-14, the Central District's decision is preclusive, and on that basis, this case can be dismissed.  However, should there exist any question about Qatar's immunity, Defendants have no objection to staying this case until the Ninth Circuit has decided Broidy's appeal.  *See id.*  To be clear, however, Defendants object—as Broidy seems to suggest—to simply holding this motion in abeyance while the case continues into discovery.

**B.      Foreign Official Immunity Applies to Foreign Officials Acting in Their Official Capacity.**

While ignoring *Butters* and the doctrine of derivative sovereign immunity, Broidy attacks a straw man.  According to Broidy, the D.C. Circuit's *Lewis* decision establishes that foreign official immunity is the only common law doctrine of individual foreign sovereign immunity and therefore controls this case.  Opp. at 40.  But *Lewis* does no such thing and does not even apply.

The common law doctrine of foreign official immunity is a separate and distinct basis for public ministers, officials, and formal agents of foreign sovereigns to obtain immunity for actions taken in their official capacities.  As explained *supra*, the Supreme Court in *Samantar* clarified that foreign officials are not "foreign states" entitled to direct immunity under the FSIA, as many courts had previously found.  560 U.S. at 320.  But the Court expressly stated that its holding did not disturb common law immunity doctrines, including foreign official immunity.  *Id.* at 321 & n.16.

*Lewis* addressed a post-*Samantar* claim of immunity under the foreign official immunity doctrine.  The plaintiff brought a lawsuit under the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. 102–256, 106 Stat. 73 (1992), against two foreign officials from the Democratic Republic of Congo ("DRC") for alleged torture.  *Lewis*, 918 F.3d at 144.  With respect to so-called conduct-based immunity for foreign officials acting in their official capacities—as opposed to status-based immunity—the court explained that a two-step procedure is used to determine whether a foreign official is immune.  *Id.*  "At the first step, a foreign official requests a 'suggestion of immunity' from the State Department and, if granted, the District Court is divested of its jurisdiction."  *Id.* at 145.  If, however, "the State Department does not grant a suggestion of immunity, the District Court is authorized to decide whether all the requisites for foreign-official immunity exist."  *Id.* at 145-46.  Because the State Department did not respond to the DRC's

repeated requests for a statement of immunity, the *Lewis* court proceeded to analyze the defendants' immunity under Step 2 and found that they were not immune. *Id.* at 146.

As explained in more detail below, *see infra* § III.B, the *Lewis* court did not adopt the three-factor test for Step 2 that Broidy advocates here and in fact, expressed significant skepticism about that test. But regardless of what factors comprise the judicial test for foreign official immunity, nothing in *Lewis*—or any other case in this jurisdiction—forecloses the application of derivative sovereign immunity here. The court never addressed derivative sovereign immunity for contractors and private agents acting at the specific direction of the sovereign at all. Nor did it hold that foreign official immunity is the only common law immunity doctrine still in effect after *Samantar*. In fact, the *Samantar* Court itself contemplated that there are other bases upon which an individual might enjoy foreign sovereign immunity. *Samantar*, 560 U.S. at 321 ("[I]mmunity of individual officials is subject to a caveat not applicable to ***any of the other entities or persons to which the foreign state's immunity extends***." (emphasis added)).

It is true that courts occasionally use the terms "derivative sovereign immunity" and "foreign official immunity" interchangeably. *See, e.g.*, *Moriah*, 107 F. Supp. 3d at 276-77; *Ivey*, 2018 WL 3764264, at *6-7. But such imprecise language does not change the fact that important differences remain between the two doctrines that demonstrate why each remains a viable basis for determining immunity in a given case. *See* 1 Litigation of International Disputes in U.S. Courts § 3:59 (describing both derivative sovereign immunity and foreign official immunity as good law post-*Samantar* and explaining that "'[d]erivative immunity' may extend to private persons acting under the direction of the foreign sovereign").

The main difference between the two doctrines is the importance of a foundational finding that the sovereign state itself is in fact entitled to immunity. Derivative sovereign immunity is

11

coterminous with the immunity enjoyed by the sovereign.  Thus, it can only apply in cases where the sovereign itself is immune from suit, and it is limited to actions taken at the direction of the sovereign.  *See Butters*, 225 F.3d at 466 ("If Vance was following Saudi Arabia's orders not to promote Butters, Vance would be entitled to derivative immunity under the FSIA."); *see also Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 970 (E.D. Va. 2019) (finding no derivative sovereign immunity where sovereign itself was not immune); *Ruddell*, 2016 WL 4529951, at *5 ("Put simply, a contractor cannot claim a derivative immunity that exceeds the immunity of the sovereign.").

Foreign official immunity, on the other hand, is not necessarily coextensive with the state's immunity and can exist even in cases where the sovereign is not immune.  In fact, that distinction was a primary reason for the Supreme Court's holding that the FSIA could not have been intended to codify the doctrine of foreign official immunity.  *See Samantar*, 560 U.S. at 321-22 (noting that officials can be immune when the sovereign is not, thus state and official immunities are not coextensive, rather "***the immunity of individual officials is subject to a caveat not applicable to any of the other entities or persons*** to which the foreign state's immunity extends" (emphasis added)); *see also Greenspan v. Crosbie*, No. 74-4734, 1976 WL 841 (S.D.N.Y. Nov. 23, 1976) (State Department issued declaration of immunity as to individual officers, but not to the province itself in case involving allegations of securities fraud).

Moreover, derivative sovereign immunity does not apply to the discretionary actions of contractors and private agents.  "[T]he contractor must adhere to the government's instructions to enjoy derivative sovereign immunity; staying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'the act[s] of the government.'"  *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014) (quoting

12

*Yearsley*, 309 U.S. at 22).   Foreign official immunity, on the other hand, asks only whether the official was acting in an official capacity and within the scope of his or her authority.   *See, e.g.*, *Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 713 (2d Cir. 2019) (noting that even an official's erroneous exercise of power is protected, only acts taken in the absence of delegated authority fall outside doctrine's scope); *Smith v. Ghana Comm. Bank, Ltd.*, No. 10-4655, 2012 WL 2930462, at *10 (D. Minn. June 18, 2012) (finding Ghanaian Attorney General to be immune from suit for acts taken in his official capacity because exercising jurisdiction would interfere with his substantial discretion).   Thus, foreign official immunity can be applied to immunize actors who retained significant discretion to act precisely because they were acting as foreign officials.

Finally, derivative foreign sovereign immunity advances different policy interests than those motivating foreign official immunity.   In particular, derivative foreign sovereign immunity protects the sovereign's ability to carry out its goals by ensuring that individuals—including private actors like Defendants here—alleged to have acted at the express direction of a foreign sovereign have immunity regardless of the formalities of the actors' official role.   *See* 1 Litigation of International Disputes in U.S. Courts § 3:59.  As the Fourth Circuit explained, "*[a]ll sovereigns* need flexibility to hire private agents to aid them in conducting their governmental functions." *Butters*, 225 F.3d at 466 (emphasis added).   And that flexibility should not be limited in any way when the private actors are following the sovereign's orders such that they are acting as the sovereign itself.   *See id.*

A foreign sovereign's immunity from suit would be nullified if the contractors or private agents who allegedly carry out its wishes could be sued for the foreign sovereign's directions and decisions.   *Cf. Belhas*, 515 F.3d at 1286 ("Every act committed by a sovereign government is carried out by its officials and agents," thus "it is difficult to say how [a state] c[an] act within its

immunity without being able to extend that immunity to the individual officials who acted on its behalf."); *Chuidian*, 912 F.2d at 1102 ("The rule that foreign states can be sued only pursuant to the specific provisions of [the FSIA] would be vitiated if litigants could avoid immunity simply by recasting the form of their pleadings."). Indeed, that is the case here. At bottom, Broidy alleges that Qatar used intelligence tradecraft to carry out an espionage and foreign policy campaign aimed at alleviating a diplomatic crisis and related trade embargo. *Cf. MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 922 (D.C. Cir. 1987) (recognizing importance of immunity for "decisions grounded in social, economic, and political policy"). If Defendants are not immune, Qatar will, in all practical respects, be on trial and subject to discovery for its immune and quintessentially governmental actions. Foreign sovereign immunity is meant to "give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." *Dole Food Co.*, 538 U.S. at 479. Failing to give adequate protections for the policy decisions of foreign nations renders the United States' agents vulnerable to similar exposure in foreign courts. *See, e.g.*, *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984).

## II.   THE CASE SHOULD BE DISMISSED IN ITS ENTIRETY UNDER THE DOCTRINE OF DERIVATIVE FOREIGN SOVEREIGN IMMUNITY.

As detailed in the Stonington Defendants' opening brief, the Defendants should be dismissed with prejudice under the doctrine of derivative sovereign immunity. Opening Br. at 20-25. At no point does Broidy argue that Defendants fail the test for derivative sovereign immunity. That is because Broidy does not—and cannot—seriously dispute that pursuant to his ***own allegations***, Defendants were at all times contractors and/or private agents of Qatar acting at Qatar's direction. Indeed, Broidy does not even seek jurisdictional discovery to demonstrate otherwise.

Therefore, while Broidy (erroneously) claims that Defendants bear the burden to establish immunity, Opp. at 27, it is irrelevant.   "[T]he party invoking federal jurisdiction bears the burden of establishing it." *Doe I v. Buratai*, 318 F. Supp. 3d 218, 226 (D.C. Cir. 2018).   That is, Broidy bears the initial burden of pleading facts sufficient to demonstrate that this Court has jurisdiction over his claim, and that Defendants are *not* immune from suit.   *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) ("[T]o the extent that jurisdiction depends on particular factual propositions . . . the plaintiff must, on a challenge by the defendant, present adequate supporting evidence.").   Because Broidy has failed to do so here, that is the end of the matter.   Broidy carefully chose to plead this case in the manner that he did—the operative complaint is the ***fifth one*** he has filed on these issues.   The natural consequence of Broidy's allegations is that Defendants are entitled to derivative sovereign immunity.

## III.   EVEN IF THIS COURT DOES NOT APPLY DERIVATIVE SOVEREIGN IMMUNITY, DEFENDANTS ARE ENTITLED TO FOREIGN OFFICIAL IMMUNITY.

Even if this case is analyzed under the foreign official immunity doctrine, dismissal is appropriate.[4]   *First*, foreign official immunity can apply to American citizens acting as foreign agents.   *Second*, in light of *Lewis*'s skepticism regarding the application of § 66 of the Restatement of Foreign Relations, this Court should apply the two-factor foreign official immunity test preferred by the State Department.   *Third*, Defendants plainly satisfy that two-factor test because they are alleged to be agents of Qatar acting at Qatar's direction.   *Finally*, even if this Court were to apply § 66, Defendants would still be immune because they also satisfy the third factor.

---

[4] No party has requested a suggestion of immunity from the State Department, so this Court is free to analyze the applicability of the foreign official immunity doctrine under common law principles. *See Lewis*, 918 F.3d at 146.

A. **Foreign Official Immunity Can Apply to U.S. Citizens Acting as Agents of a Foreign Sovereign.**

Broidy's contention that Defendants' U.S. citizenship renders them ineligible for foreign official immunity is simply wrong. No court has held that foreign citizenship is an element of foreign official immunity. And the single, nonbinding, unpublished district court case that Broidy cites is neither well-reasoned for the point Broidy cites nor factually comparable to the present case. *See ABI Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, No. 91-6785, 2016 WL 3959078 (E.D. Pa. July 22, 2016).

As an initial matter, *ABI* is a derivative sovereign immunity case and thus is directly contrary to *Butters*, *Alicog*, and *Ivey* and has no bearing on whether foreign official immunity can be extended to U.S. citizens. Moreover, *ABI* involved a team of lawyers—including an American lawyer living abroad—who appointed and directed a Libyan receiver to execute a judgment in contravention of a court order. *Id.* at *15. Fighting contempt citations, the defendants claimed derivative immunity by virtue of their relationship with the receiver, which was—itself—not found to be immune. *Id.* at *17. Unlike the present case where Broidy alleges that Qatar hired the defendants to take specific actions to rehabilitate its diplomatic relations, the *ABI* court found that the ***defendants*** hired the Liberian receivers "to further ***their own private interests***" and could not "claim as their own any sovereign immunity to which the Receivers may be entitled." *Id.* at *15. *ABI* thus could not be more factually distinct and does not preclude a finding that Defendants are entitled to foreign official immunity.[5]

---

[5] Broidy also completely mischaracterizes this Court's decision in *Buratai*. *See* Opp. at 32. The quoted language applies to the conclusion that no *jus cogens* exception should apply to the torture claims in that case. *See Buratai*, 318 F. Supp. 3d at 236 ("The executive branch's position on a *jus cogens* exception therefore weighs heavily against the Court adopting an exception on its own, much less crafting the contours of an exception without an established executive branch policy from which to draw."). And Broidy omits key aspects of *Yousuf II*. There, the Fourth Circuit relied on the State Department's findings that Samantar was a U.S. citizen **and** that Samantar "is

**B.      If There Was Any Need To Apply Foreign Official Immunity, the State Department's Two-Factor Test Should Apply, Not the Restatement's Three-Factor Test.**

Broidy's argument that Defendants otherwise fail to satisfy the test for foreign official immunity is based on his erroneous assumption that *Lewis* adopted the three-factor test for immunity established in § 66 of the Restatement of Foreign Relations.  In fact, the D.C. Circuit did not determine which factors must be satisfied to find foreign official immunity and questioned the application of § 66.  In light of the D.C. Circuit's skepticism, and given substantial authority supporting a two-factor test that applies only the first two elements of § 66, this Court should adopt the two-factor test here if it applies this doctrine.

As the D.C. Circuit pointed out, "[t]he Supreme Court has 'expressed no view on whether . . . § 66 correctly sets out the scope of the common-law immunity applicable to current or former foreign officials.'"  *Lewis*, 918 F.3d at 145 (quoting *Samantar*, 560 U.S. at 321 n.15).  The test adopted in § 66 requires that: (1) the actor is a public minister, official, or agent of the foreign state; (2) the acts were performed in his or her official capacity; and (3) exercising jurisdiction would serve to enforce a rule of law against the foreign state.  *Id.* at 146 (citing § 66(f)).  It was only because "both parties assume[d] § 66 accurately sets out the scope of common-law immunity for current or former officials," that the *Lewis* court "proceed[ed] on that understanding ***without deciding the issue***."  *Id.* (emphasis added).  And under that test, the court found that the defendants lacked immunity.  *Id.* at 147.

_____

a former official of a state with no currently recognized government to request immunity on his behalf" or to take a position as to "whether the acts in question were taken in an official capacity." 699 F.3d at 777.  Regardless, to the extent the State Department's position is that U.S. citizens "***ordinarily*** should be subject to the jurisdiction of the [U.S.] courts," *see id.* (emphasis added), that is not the case here, where Defendants were acting at the direction of the foreign sovereign.

Judges Randolph and Srinivasan each concurred in the judgment under the assumption that § 66 applied, but neither found that it is the proper standard. *Id.* at 142. Judge Randolph expressed serious reservations about § 66, noting that the Restatement "does not pretend to be a statement of 'common law,'" but is rather "a distillation of scant case law in this country, international treaties to which the United States may or may not be a party, the writings of law professors here and abroad, negotiated settlements of international disputes, and other non-judicial sources." *Id.* at 149. In addition, had any of the parties argued that the TVPA superseded foreign official immunity—as they "should have"—Judges Randolph and Srinivasan would have agreed. *Id.* at 148-49. In other words, despite having the issue directly before them, not a single judge on the *Lewis* panel held that § 66 establishes the appropriate test for foreign official immunity.

Thus, although Broidy relies ***entirely*** on *Lewis* in arguing that § 66 applies to foreign official immunity, that case in fact says very little about what factors apply. Meanwhile, the weight of authority is that foreign official immunity is determined by a two-factor test comprised of only the first two elements of § 66—whether the defendant is a public official, and whether he or she acted in his or her official capacity. Indeed, even *Lewis*—which turned on the application of the third element of § 66—relied upon cases that did not apply the three-factor test. *See Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (referencing § 66 but only for the proposition that "the common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for 'acts performed in his official capacity'"); *Yousuf II*, 699 F.3d at 775 ("[A] foreign official may assert immunity for official acts performed within the scope of his duty, but not for private acts where 'the officer purports to act as an individual and not as an official, [such that] a suit directed against that action is not a suit against the sovereign.'" (quoting *Chuidian*, 912 F.2d at 1106)). Various other cases considering foreign official immunity also apply the two-factor test.

*See, e.g.*, *Eliahu*, 919 F.3d at 712; *Farhang v. Indian Inst. of Tech.*, 655 F. App'x 569, 571 (9th Cir. 2016); *Dogan v. Barak*, No. 15-813, 2016 WL 6024416, at *9 (C.D. Cal. Oct. 13, 2016).[6] Furthermore, the State Department—whose analysis, in the absence of a Suggestion of Immunity, courts seek to replicate—applies a two-factor test with regard to foreign official immunity and does not follow the Restatement.  *See, e.g.*, *Rosenberg et al. v. Lashkar-E-Taiba et al.*, Civ. No. 1:10-cv-05381-DLI-CLP (E.D.N.Y. Dec. 17, 2012), ECF No. 35 at 10-11 (analyzing only whether the directors general of a Pakistani intelligence service were acting within the scope of their authority with respect to terrorist attacks in Mumbai, with no analysis regarding whether exercising jurisdiction would have the effect of enforcing a rule of law against Pakistan).  Therefore, to the extent this Court finds that the doctrine of foreign official immunity applies here, it should apply the two-factor test adopted by these various courts and the State Department itself, rather than the three-factor § 66 test that the D.C. Circuit refused to adopt and seriously questioned in *Lewis*.

**C.     Pursuant to Broidy's Own Allegations, Defendants Satisfy the Two-Factor Test for Foreign Official Immunity.**

Broidy does not seriously dispute that Defendants satisfy the correct two-factor test for foreign official immunity.  *See* Opp. at 34 n.149 ("While defendants fail to establish that they were acting within the scope of their authority as agents of Qatar, the court can assume, for purposes of argument, that the defendants satisfy that standard here.").  Nor could he.  Despite its name, the foreign official immunity doctrine applies to both officials and ***agents*** of a foreign sovereign.  *See Matar*, 536 F.3d at 14.  And as long as the agent was acting in his or her official capacity, immunity applies.  *See id.*

---

[6] This Court applied § 66 in *Burutai* based on its invocation by the defendants, the *Lewis* district court decision, and *Samantar*'s comment that § 66 is "instructive."  *Doe 1 v. Burutai*, 318 F. Supp. 3d 218, 230 n.5 (D.D.C. 2018).  As the D.C. Circuit explained, however, the parties in *Lewis* simply assumed the application of § 66, and the court expressed skepticism about its viability. *Lewis*, 918 F.3d at 146.

As detailed in the Stonington Defendants' opening brief, Broidy affirmatively alleges in his amended complaint that all defendants were agents of Qatar.  *See* Opening Br. at 21-22.  And again, Broidy also alleges—as he must to substantiate his theory that Defendants participated in a Qatari-backed hacking conspiracy—that Defendants were acting within the scope of their authority in carrying out the complained-of actions.  *See id.* at 23-25.  In other words, Broidy has "pleaded [himself] out of court."  *Belhaus*, 515 F.3d at 1284.  His "complaint identifies nothing that [Defendants are] alleged to have done in an individual capacity" and Defendants' "personal liability . . . seems to be entirely based on the proposition that the '[D]efendant[s], acting singly and in concert with others,' conducted a [cyberespionage] operation which was rather plainly on behalf of the state of [Qatar]."  *Id.*  Accordingly, Defendants would also be entitled to foreign official immunity.

### D.    Even If § 66 of the Restatement Applies, Defendants Satisfy the Third Factor.

Broidy's argument against the application of foreign official immunity to Defendants focuses on the third factor of § 66, *i.e.*, whether exercising jurisdiction over Defendants would have the effect of enforcing a rule of law against Qatar.  *See* Opp. at 34-36.  But even if this Court applies the doctrine of foreign official immunity instead of derivative sovereign immunity, and applies § 66's three-factor test—and it should do neither—Defendants satisfy this third factor. Broidy argues that because a judgment in this case would not result in money being paid "direct[ly]" from Qatar's coffers or force Qatar to take some specific action, it cannot be tantamount to enforcing a rule of law against Qatar.  Opp. at 34-35 & n.150.  The *Lewis* decision, however, is not so narrow, and even if it was, allowing this case to go forward will necessarily result in the application of rules of law against Qatar.

*Lewis* found that if § 66 is the proper standard for foreign official immunity, the third factor cannot be satisfied merely by showing that the official or agent acted within the scope of his or her

authority; to find otherwise would render the third factor superfluous. *Id.* at 146. Thus, the court rejected the argument that the DRC's conduct was at issue simply because the officials were acting in their official capacity when they allegedly tortured the plaintiff. *Id.*; *see also Lewis*, 258 F. Supp. 3d at 174. The court then, "through the lens of the small number of decisions speaking to the existence and scope of common-law immunity," provided examples of situations that would satisfy the third factor. *Lewis*, 258 F. Supp. 3d at 146 (factor would be satisfied when a judgment would bind or be enforceable against the foreign state); *see also id.* at 147 (factor would be satisfied where plaintiff seeks to draw on foreign state's treasury or force the state to take a specific action); *id.* (factor would be satisfied where state is the real party in interest). Nothing in the opinion suggests that the court intended for those examples to constitute the universe of scenarios that are "tantamount to enforcing a rule of law against [the sovereign]." *Id.* at 146.

As such, *Lewis* did not purport to—and did not—overrule this Court's analysis of the third factor in *Burutai*. *See* Opp. n.150. There, the Nigerian official defendants were alleged to have engaged in violent conduct against plaintiffs in violation of the TVPA and Alien Tort Statute. *Burutai*, 318 F. Supp. 3d at 222-23. After finding that the officials satisfied the first two factors of § 66, this Court then found that they satisfied the third factor not only because "[t]he Nigerian government claimed the defendants' actions as the country's own," but because "the plaintiffs s[ought] millions of dollars in compensatory and punitive damages from defendants throughout Nigeria's government, military, and police," and "[a] decision by this Court exacting such damages would affect how Nigeria's government, military, and police function, regardless whether the damages come from the defendants' own wallets or Nigeria's coffers." *Id.* at 233. That is, "[b]y interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria." *Id.*

Under any reading of *Lewis* and *Burutai*, Defendants here satisfy the third factor of § 66. Allowing this case to go forward will require Qatar to take specific actions and incur associated expenses to protect its interests in litigation, which is precisely the result that the FSIA is intended to avoid. *See Belhas*, 515 F.3d at 1286 ("[A] purpose of foreign sovereign immunity is to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns." (internal quotation omitted)); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (foreign sovereign "immunity involves protection from suit, not merely a defense to liability").

It is beyond question that Broidy brought this (third) suit "to gain information regarding the [Qatari] government's actions and decisions" and "the information that [he] hope[s] to obtain from [discovery] relates solely to 'political acts' that implicate [Qatar's] diplomatic relations with other nations." *Moriah*, 107 F. Supp. 3d at 280. Though it has been dismissed on the grounds of sovereign immunity, Broidy continues to allege that Qatar—purportedly the leading member of a "Qatari enterprise"—masterminded, bankrolled, and directed a campaign to smear Broidy's personal and professional reputation by commissioning the hack and distribution of private materials. This cyberespionage campaign was carried out—Broidy alleges—to discredit a vocal critic in the hope of alleviating sanctions imposed on Qatar by other nations.

Thus, though he claims that he is bringing this case against Defendants in their personal capacities for private actions they allegedly undertook, it is plain that this case continues to center on Qatar's actions, and Qatar is truly the party in interest. If this case is allowed to proceed, the Court will of course be asked to rule on the legality of Qatar's actions notwithstanding the fact that "the 'rationale for sovereign immunity is the avoidance of possible embarrassment to those responsible for the conduct of the nation's foreign relations . . . .'" *Id.* (quoting *Heaney v. Gov't*

*of Spain*, 445 F.2d 501, 503 (2d Cir. 1971)).  And while Broidy seeks direct damages only from Defendants, exercising jurisdiction here will necessarily affect Qatar's fiscal decisions with respect to the hiring of contractors and agents to advance its interests in the United States.  *See Burutai*, 318 F. Supp. 3d at 233.

Finally, allowing this case to proceed will also directly affect Qatar in that it will be required to monitor, participate in, and object to discovery in accordance with the rules of procedure governing actions in this Court.  In fact, this suit has already caused Qatar to incur litigation expenses associated with responding to Broidy's motion to clarify the application of the California protective order to protect its sensitive, foreign-policy related information.  Should this litigation continue, Qatar will be compelled to engage in serious issues relating to the continued protection of such information, either through a robust protective order or by litigation regarding the appropriate scope of discovery in light of the Vienna Convention on Diplomatic Relations. Such issues will touch on vast amounts of information that could be subject to discovery such that Qatar will be, for all intents and purposes, a party.  Thus, the defendants are entitled to foreign official immunity even under § 66.

## CONCLUSION

For the reasons stated herein, and for the reasons in Defendants' opening briefs and the Rule 12(b)(6) reply brief filed contemporaneously herewith, the Court should dismiss this case with prejudice.

Dated: June 18, 2019

Respectfully submitted,

By: /s/ Stephen J. Obermeier
Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wileyrein.com
Rebecca J. Fiebig (D.C. Bar # 976854)
rfiebig@wileyrein.com
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
Phone: (202) 719-7000
Facsimile: (202) 719-7049

*Counsel for Defendants Nicolas D.*
*Muzin and Stonington Global LLC*

By: /s/ Temitope K. Yusuf
Temitope K. Yusuf (*pro hac vice*)
temitope.yusuf@arentfox.com
Mohammed T. Farooqui (*pro hac vice*)
mohammed.farooqui@arentfox.com
ARENT FOX LLP
1301 Avenue of the Americas, Floor 42
New York, NY 10019
Phone: (212) 457-5489
Facsimile: (212) 484-3990

Laura E. Zell (D.C. Bar. # 1044336)
laura.zell@arentfox.com
ARENT FOX LLP
1717 K Street NW
Washington, DC 20006
Phone: (202) 857-6032

*Counsel for Defendant Joseph Allaham*

By:  /s/ Jeffrey A. Udell
Jeffrey A. Udell (*pro hac vice*)
judell@wmhlaw.com
Adam P. Cohen (*pro hac vice*)
acohen@wmhlaw.com
Kraig Ahalt (*pro hac vice*)
kahalt@wmhlaw.com
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, NY 10004
Phone: (212) 335-2030
Facsimile: (212) 335-2040

Charles Samuel Fax (D.C. Bar # 198002)
cfax@rwlls.com
RIFKIN WEINER LIVINGSTON LLC
7979 Old Georgetown Road, Ste. 400
Bethesda, MD  20814
Phone: (301) 951-0150
Facsimile: (301) 951-0172

*Counsel for Defendant Gregory Howard*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Reply Memorandum of Law in Support of Motion to Dismiss the First Amended Complaint on Immunity Grounds was electronically filed this 18th day of June 2019 and will be served on all parties via the Court's electronic filing system.

Respectfully submitted,

/s/ Stephen J. Obermeier
Stephen J. Obermeier