## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT, LLC,
and ELLIOTT BROIDY,

                                        Plaintiffs,

            —v.—

NICOLAS D. MUZIN,
JOSEPH ALLAHAM,
GREGORY HOWARD, and
STONINGTON STRATEGIES, LLC,

                                        Defendants.

Civil Action No. 1:19-cv-00150-DLF

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR CERTIFICATION OF AN INTERLOCUTORYAPPEAL AND A STAY PENDING APPEAL

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

STATEMENT OF FACTS..................................................................................................5

ARGUMENT.......................................................................................................................5

I.     This Court's Denial of Defendants' Motion to Dismiss Is Inappropriate For
Interlocutory Review ...............................................................................................5

        A.    Standard of Review...................................................................................5

        B.    The Court Should Not Certify for Appeal the Question
of Whether There Is a "Distinct" Doctrine of Derivative
Foreign Sovereign Immunity ...................................................................6

              1.   Whether a distinct doctrine of derivative foreign
sovereign immunity exists is not a "controlling" question ...........7

              2.   There is no "substantial ground for difference of opinion"
regarding whether a distinct doctrine of foreign derivative
immunity exists at common law ...................................................11

              3.   An interlocutory appeal on derivative foreign immunity
would not advance the ultimate termination of this litigation ....16

        C.    Defendants' Attack on This Court's Holding That They
Are Not Entitled to Conduct-Based Immunity
Does Not Satisfy § 1292(B)'s Requirements......................................16

              1.   There is no substantial ground for difference of opinion on
extending foreign sovereign immunity to U.S. citizens
asued by U.S. citizens for their tortious conduct in the United States.........17

              2.   There is no substantial ground for disagreement on denying
immunity to individual foreign government agents sued in their
individual capacity ......................................................................20

        D.    The Defendants' Plan to Appeal Under the Collateral Order Doctrine
Has No Bearing on Whether This Court Should Certify Interlocutory
Review .....................................................................................................22

II.    The Court Should Deny Defendants' Request for a Stay ...........................................24

        A.    Standard for a Stay...................................................................................24

        B.    More Delay is Highly Prejudicial to Plaintiffs .....................................24

C.    Defendants Are Unlikely to Prevail in Any Appeal And Cannot Show
      Prejudice ............................................................................................................27

**CONCLUSION** ........................................................................................................**28**

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ABI Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*,
   No. 91-6785, 2016 WL 3959078 (E.D. Pa. July 22, 2016) ...............................................18, 19

*Air Transport Ass'n v. U.S. Dep't of Agriculture*,
   317 F. Supp. 3d 385 (D.D.C. 2018) ...........................................................................................6

*Al Shimari v. CACI Premier Technology, Inc.*,
   775 F. App'x 758 (4th Cir. 2019) ............................................................................................22

*Alicog v. Kingdom of Saudi Arabia*,
   860 F. Supp. 379 (S.D. Tex. 1994) ..........................................................................................15

*APCC Services, Inc. v. Sprint Comm'ns Co.*,
   297 F. Supp. 2d 90 (D.D.C. 2003) ...........................................................................................11

*Azima v. RAK Inv. Auth.*,
   325 F. Supp. 3d 30 (D.D.C. 2018) .............................................................................................6

*Belhas v. Yaalon*,
   515 F.3d 1279 (D.C. Cir. 2008) ...............................................................................................21

*Broidy Capital Management LLC. v. Qatar*,
   No. 18-56256 (argued Feb. 11, 2020) ........................................................................10, 11, 12

*Butters v. Vance Int'l, Inc.*,
   225 F.3d 462 (4th Cir. 2000) ..........................................................................................9, 13, 14

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ..........................................................................................7, 8, 9, 23

*Chavous v. District of Columbia Fin'l Responsibility & Mgmt. Assistance Auth.*,
   201 F.R.D. 1 (D.D.C. 2001) ...............................................................................................24, 27

*Citizens for Responsibility & Ethics in Washington v. Am. Action Network*,
   415 F. Supp. 3d 143 (D.D.C. 2019) ...........................................................................................6

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978) .................................................................................................................16

*Edelman v. Jordan*,
   415 U.S. 651 (1974) .................................................................................................................21

*First Am. Corp. v. Al-Nahyan*,
   948 F. Supp. 1107 (D.D.C. 1996) ............................................................................................11

*Griggs v. Provident Consumer Disc. Co.*,
459 U.S. 56 (1982)......................................................................................................23

*Heaney v. Gov't of Spain*,
445 F.2d 501 (2d Cir. 1971)....................................................................................17, 21

*Ivey for Carolina Golf Devel. Co. v. Lynch*,
No. 1:16-cv-439, 2018 WL 3764264 (M.D.N.C. Aug. 8, 2018) ......................................14, 15

*Johnson v. Jones*,
515 U.S. 304 (1995)....................................................................................................23

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*,
233 F. Supp. 2d 16 (D.D.C. 2002) ..............................................................................5, 7, 11

*In re Kellogg Brown & Root, Inc.*,
756 F.3d 754 (D.C. Cir. 2014).........................................................................................6

*Kentucky v. Graham*,
473 U.S. 159 (1985)....................................................................................................21

*\*Lewis v. Mutond*,
918 F.3d 142 (D.C. Cir. 2019) ................................................................................. *passim*

*Martin v. Halliburton*,
618 F.3d 476 (5th Cir. 2010) .........................................................................................22

*Martin v. Malhoyt*,
830 F.2d 237 (D.C. Cir. 1987).......................................................................................10

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ........................................................................................17, 21

*McMahon v. Presidential Airways, Inc.*,
502 F.3d 1331 (11th Cir. 2007) ......................................................................................22

*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009)......................................................................................................6

*Princz v. Federal Republic of Germany*,
998 F.2d 1 (D.C. Cir. 1993)..........................................................................................23

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014)....................................................................................................14

*Rishikof v. Mortada*,
70 F. Supp. 3d 8 (D.D.C. 2014) ................................................................................18, 21

iv

*Sai v. Dep't of Homeland Security,*
  99 F. Supp. 3d 50 (D.D.C. 2015) ........................................................24

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ............................................................... *passim*

*Schering Corp. v. First DataBank Inc.,*
  No. C 07-01142 WHA, 2007 WL 1747115 (N.D. Cal. June 18, 2007) ...................23

*Swint v. Chambers County Comm'n,*
  514 U.S. 35 (1995) .......................................................................6

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.,*
  928 F.3d 42 (D.C. Cir. 2019) .........................................................7, 8

*United States v. Honeywell Int'l, Inc.,*
  20 F. Supp. 3d 129 (D.D.C. 2013) .....................................................24

*In re World Trade Ctr. Disaster Site Litig.,*
  521 F.3d 169 (2d Cir. 2008) ...........................................................22

*Yearsley v. W.A. Ross Constr. Co.,*
  309 U.S. 18 (1940) .......................................................................8

*Yousuf v. Samantar,*
  699 F.3d 763 (4th Cir. 2012) .................................................... *passim*

## Statutes

18 U.S.C. §§ 1030(b), (c)(4)(A) .............................................................8

18 U.S.C. § 1030(c)(4)(A)(i)(I) ..............................................................8

18 U.S.C. § 1831(a) ..........................................................................8

18 U.S.C. § 1832(a) ..........................................................................8

28 U.S.C. § 1603(b)(3) ......................................................................19

## Other Authorities

8A Charles Alan Wright, et al., Federal Practice & Procedure § 2046
  (3d ed. 2010) ...........................................................................26

Fed. R. Civ. P. 26 ..........................................................................26

Vienna Conv. on Diplomatic Relations § 37 ..................................................19

**INTRODUCTION**

Defendants are U.S. citizens who seek to cloak their tortious conduct in the United States under the veil of a foreign country's immunity.  This Court rightly rejected their unsupported claim of immunity in denying, in relevant part, Defendants' motion to dismiss.  Defendants now seek to certify for interlocutory appeal questions about their unsubstantiated immunity theories and to stay this case in the meantime.  But Defendants cannot meet the exacting standards for certification, as the questions they seek to raise on appeal do not give rise to substantial grounds for disagreement and would not advance this litigation.  Derailing this litigation for such an appeal, and staying all other proceedings, would accomplish little except allow further erosion of an already endangered trail of evidence.  The motion should be denied.

Defendants participated in an elaborate scheme, sponsored by the State of Qatar, to hack into the U.S.-based computer systems of Plaintiffs Elliott Broidy and his firm, Broidy Capital Management, LLC, to steal confidential emails and other sensitive business and personal material.  Defendants then distributed to the media selectively curated batches of stolen emails in an effort to silence Broidy and to destroy his reputation—with an implicit threat to anyone else who, like Broidy, sought to expose Qatar's support for terrorists and extremists.

Last month, this Court denied Defendants' motion to dismiss the case on sovereign immunity grounds.  *See generally* Dkt. 51.  The Court first rejected the Defendants' claim that there is a distinct doctrine of foreign derivative sovereign immunity that would insulate Defendants from liability, based simply on their having engaged in the scheme on behalf of a foreign country, Qatar.  The Court ruled that "derivative" sovereign immunity, recognized in some domestic contexts for U.S. government contractors, should not be extended to agents of foreign countries that may have interests adverse to those of the United States or its citizens.

This Court further held that Defendants cannot demonstrate that common law principles of "conduct-based" immunity for foreign officials should protect U.S. citizens who act as agents for a foreign government in carrying out a tortious scheme against other U.S. citizens on U.S. soil.  (Defendants concede that the other type of immunity for foreign officials, "status-based," is inapplicable.)  The Court's reasons were two-fold:  First, the policy of the United States is that U.S. citizens must be answerable for their own misconduct in the domestic court system.  *See, e.g.*, *Yousuf v. Samantar*, 699 F.3d 763, 777-78 (4th Cir. 2012).  And, second, following longstanding principles of common law found in the Restatement (Second) of Foreign Affairs § 66(f), as interpreted by the D.C. Circuit in *Lewis v. Mutond*, 918 F.3d 142, 147 (D.C. Cir. 2019), immunity is not available under the common law where, as here, a lawsuit seeks relief against alleged foreign agents only in their individual capacities.

Defendants now seek to certify for interlocutory appeal two questions: (1) whether there is a distinct common law doctrine of derivative foreign sovereign immunity, and (2) how a court should determine whether the Defendants satisfy the requirements for conduct-based foreign official immunity.  Defendants do not satisfy the standards of 28 U.S.C. § 1292(b) on these questions.  They do not point to a "controlling" issue of law because the issues they raise would require substantial factual development, especially their novel claims of derivative foreign sovereign immunity.  They also cannot demonstrate a "substantial difference of opinion" on the issues before the Court.  They do not point to any conflicting precedent in this Circuit or elsewhere that recognizes a doctrine of common law derivative foreign sovereign immunity that is "distinct" from conduct-based foreign official immunity.  And the D.C. Circuit's *Lewis* decision all but forecloses any such distinct doctrine.  *See* Dkt. 51 at 13-14.  Nor have Defendants demonstrated a substantial difference of opinion on whether U.S. citizens, sued in

their individual capacity for torts against U.S. citizens on U.S. soil, should be afforded the benefits and protections of foreign official immunity.  The case law consistently supports this Court's opinion.

That makes all the sense in the world, as common law foreign official immunity is a matter of grace and comity.  *See* Dkt. 51 at 14.  Defendants have not identified—nor could they—a single foreign country that recognizes sovereign immunity for local citizens who contract with foreign powers to commit tortious conduct on their own soil.  Adopting Defendants' peculiar immunity theory would give American citizens carte blanche to commit serious violations of American law against other Americans on American soil with no threat of civil liability—and no possibility of compensatory damages for their victims—so long as they were acting on the orders of foreign principals, many of which are unfriendly to the United States.  International grace and comity do not require the United States to limit the remedies available against its own citizens in its own courts.

Defendants seek this Court's certification because of what they concede are doubts about whether they would be able to appeal as of right, under the "collateral order" doctrine, this Court's denial of their motion to dismiss.  As Defendants admit, "there is no case" confirming the right to appeal a denial of derivative foreign sovereign immunity, Defs.' Joint Mem at 1— indeed, no court here or elsewhere has recognized the "distinct" doctrine on which Defendants seek to rely.  And while the D.C. Circuit has acknowledged a right to appeal a denial of statutory immunity under the Foreign Sovereign Immunities Act, it has not, as far as Plaintiffs are aware, conferred an immediate right to appeal on a foreign agent denied *common law* immunity in the early stages of a case—and certainly not a U.S. citizen, accused of a tort on U.S. soil, who claims the protection of foreign immunity.

While the appealability of right of this Court's order under the collateral order doctrine is not a question that *this* Court can resolve, the Court should not ease the Defendants' path to the Court of Appeals by certifying an otherwise baseless claim of immunity under 28 U.S.C. § 1292(b).  Defendants' right to interlocutory appeal should be judged on its own merits, not to remove from Defendants the "unnecessary distraction" of having to prove the Court of Appeals' jurisdiction to hear an appeal.  *See* Defs.' Joint Mem. at 1.  A district court should certify orders for appeal only under exceptional circumstances that overcome strong legislative policy against piecemeal review.  Defendants offer no such reasons for either of the questions they present.

Because the Court should not certify the appeal, it also should deny Defendants' request for a stay pending appeal.  That request is a vain effort to obstruct Plaintiffs from obtaining the discovery—particularly third-party discovery—to which they are entitled.  The facts of this case occurred over two years ago, and this case has been pending for well over a year.  Defendants have fought Plaintiffs' efforts to conduct even minimal discovery to preserve evidence that is fleeting by the day.  Especially given the weakness of Defendants' immunity claims and the improbability of an appellate victory, a stay would be highly prejudicial to Plaintiffs and ultimately futile.

The electronic evidence at stake is extremely vulnerable to destruction.  Plaintiffs have sent preservation letters to numerous entities which have potentially discoverable information. While preservation letters may preserve evidence in the hands of the letters' recipients, they cannot preserve electronic documents in the possession of other parties *to which the preserved evidence would otherwise lead*.   Internet electronic mail service providers, private firms and others periodically destroy electronic data; much of the data to which preserved evidence might otherwise lead likely have been and will, with every passing day, continue to be destroyed.

On the facts currently available, Plaintiffs have been able to establish Defendants'

participation in a wide-ranging conspiracy.  Plaintiffs have every reason to believe that the

digital trail of evidence will confirm the culpability of the Defendants and likely point to others

who helped their scheme. There is no justification for further prejudicing Plaintiffs' ability to

prosecute these claims and investigate the grave wrongs committed against them.  Plaintiffs'

request for a stay pending appeal should be denied.

## STATEMENT OF FACTS

The facts relevant to this motion are known to the Court.  Plaintiffs' First Amended

Complaint alleged that Defendants are paid agents of Qatar who unlawfully conspired against

Plaintiffs Elliott Broidy and his U.S-based company Broidy Capital Management LLC to hack

their computers and disseminate the hacked materials to the media to intimidate and damage

him, with the ultimate goal of silencing Broidy's anti-Qatari advocacy. Dkt. 51 at 1.  Defendants

are all U.S. citizens.  *Id.* at 2.  Qatar paid Defendants at exorbitant rates for their illegal services.

*Id.* at 5-6.  Qatar's sovereign immunity is currently on appeal in the Ninth Circuit and has neither

been litigated nor established in this case.  Defendants claim immunity derived from Qatar on the

grounds that their actions were for the benefit of, and in some manner, directed by Qatar.

## ARGUMENT

**I.     THIS COURT'S DENIAL OF DEFENDANTS' MOTION TO DISMISS
        IS INAPPROPRIATE FOR INTERLOCUTORY REVIEW**

### A.     Standard of Review

Interlocutory certification under 28 U.S.C. § 1292(b) "is reserved for truly exceptional

cases." *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 20 (D.D.C.

2002) (quotation marks omitted).  The court must determine that "a nonfinal order '[1] involves a

controlling question of law [2] as to which there is substantial ground for difference of opinion

and that [3] an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" *Citizens for Responsibility & Ethics in Washington v. Am. Action Network*, 415 F. Supp. 3d 143, 144-45 (D.D.C. 2019) (quoting 28 U.S.C. § 1292(b)).

"The party requesting certification has the burden of establishing all three elements." *Air Transport Ass'n v. U.S. Dep't of Agriculture*, 317 F. Supp. 3d 385, 393 (D.D.C. 2018). Even where a party can meet the 1292(b) elements, the court "must" proceed to consider whether "certification is appropriate as a discretionary matter." *Azima v. RAK Inv. Auth.*, 325 F. Supp. 3d 30, 35 (D.D.C. 2018); *see Swint v. Chambers County Comm'n*, 514 U.S. 35, 47 (1995); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014).

The "party seeking an interlocutory appeal also bears a heavy burden to show that 'exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment.'" *Citizens for Responsibility & Ethics*, 415 F. Supp. 3d at 145 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)).[1]

## B. The Court Should Not Certify for Appeal the Question of Whether There Is a "Distinct" Doctrine of Derivative Foreign Sovereign Immunity

Defendants' first question asks "whether there is a doctrine of derivative foreign sovereign immunity that is distinct from foreign official immunity and immunizes agents of a foreign sovereign for acts directed by the sovereign." Dkt. 52-1 at 10. Largely because there is not, and no court has ever suggested there is, this question does not satisfy any of the prerequisites for certification under § 1292(b).

---

[1] Defendants suggest that the Supreme Court held in *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009), that certification is obligatory where the § 1292(b) standards are met. But the Supreme Court said no such thing. The Court merely reasoned that district courts should not hesitate to certify appeals "when a[n attorney-client] privilege ruling involves a new legal question or is of special consequence." *Mohawk Indus., Inc.*, 558 U.S. at 111.

### 1. Whether a distinct doctrine of derivative foreign sovereign immunity exists is not a "controlling" question

Whether there is a distinct federal common law doctrine of derivative foreign sovereign immunity is not a "controlling" question of law because it is not "one that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources." *Judicial Watch, Inc.*, 233 F. Supp. 2d at 19 (quotation marks omitted). Defendants contend that this question is "controlling" because reversal of this Court's determination that there is no such distinct common law doctrine would "result in the termination of this action." Dkt. 52-1 at 10. But Defendants are mistaken. In the unlikely event of a decision in their favor, a plethora of additional fact-intensive questions would follow.

*First*, to the extent Defendants seek to borrow from cases addressing federal contractor derivative sovereign immunity, a judicial determination recognizing a distinct doctrine of foreign contractor/agent derivative immunity would raise a number of factual questions about the relationship between Qatar and the Defendants here. In the federal contractor context, derivative sovereign immunity "is less 'embracive' than the immunity a sovereign enjoys." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig. ("In re OPM")*, 928 F.3d 42, 68-69 (D.C. Cir. 2019) (citation omitted); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) (federal contractors do not "share the Government's unqualified immunity"). "It applies only when a contractor takes actions that are 'authorized and directed by the Government of the United States,' and 'performed pursuant to the Act of Congress' authorizing the agency's activity." *In re OPM*, 928 F.3d at 69 (quoting *Campbell-Ewald*, 136 S. Ct. at 673). Contractors

are thus entitled to only a narrow immunity against liability for damages that they cause while performing *lawful* government work.[2]

Thus, it is not the case, as Defendants' argue (Defs.' Joint Mem. at 5), that the judicial recognition of a distinct doctrine of derivative foreign immunity would necessarily end the case. Defendants could not satisfy the standard if it were extended to foreign contracting agents. But at the very least, serious questions regarding the application of this unprecedented immunity would require further proceedings here. Just like the federal contractor in *Campbell-Ewald* who sent unsolicited texts in violation of the Telephone Consumer Protection Act, Defendants here acted in *direct violation* of federal law, including the Defend Trade Secrets Act and the Computer Fraud and Abuse Act. Dkt. 51 at 23-27 (denying Defendants' motion to dismiss Broidy's claims under those statutes).[3] And while Defendants plainly were agents for Qatar, at least with respect to the Stonington Defendants (*i.e.*, Stonington, Muzin and Allaham), their specific actions at issue here likely violated contractual provisions requiring "compliance with any applicable laws or regulations that govern [Defendants'] performance of [their agreement with Qatar]."[4] *See In re OPM*, 928 F.3d at 69-70 (no derivative immunity where contractor

---

[2] *Compare Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 19 (1940) (contractor immune for damage caused by engineering work "done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, for the purpose of improving the navigation of the Missouri River, as authorized by an Act of Congress"), *with Campbell-Ewald*, 136 S. Ct. at 672 (no immunity where federal contractor violated Telephone Consumer Protection Act "by sending text messages to unconsenting recipients").

[3] Plaintiffs have alleged that Defendants committed numerous federal felonies. Misappropriating a trade secret "intending or knowing that the offense will benefit any foreign government … or foreign agent" is a federal offense carrying a sentence of up to 15 years in prison. 18 U.S.C. § 1831(a); *see also* 18 U.S.C. § 1832(a). And conspiracy to violate 18 U.S.C. § 1030(c)(4)(A)(i)(I) carries a sentence of up to 5 years. 18 U.S.C. §§ 1030(b), (c)(4)(A).

[4] *See* Bailey Decl. Ex. H (Stonington Strategies LLC FARA Registration Statement (Sept. 3, 2017), Ex. B (Agreement for Consulting Services) at 1-2, *available at*

acted contrary to government contract). Since Defendants have no right to break federal law in the United States and Qatar has no power to authorize them to do so (regardless of whether Qatar would itself have immunity), this is a case "in which a Government agent ha[s] 'exceeded his authority' or the authority 'was not validly conferred,'" and so "the agent c[an] be held liable for conduct causing injury to another." *Campbell-Ewald*, 136 S. Ct. at 673 (quoting *Yearsley*, 309 U.S. at 21).

*Second*, even under Defendants' own expansive view of this unmoored foreign derivative immunity theory, Defendants concede that "derivative sovereign immunity does not apply to the discretionary actions of contractors and private agents." Dkt. 44 at 17. As they explained in support of their motion to dismiss, to render a federal contractor's activities as those of the government, it is not enough that the government contractor "stay[] within the thematic umbrella of the work that the government authorized." *Id.* (citation omitted). The contractor must also adhere closely to the government's express instructions. *Id.* While Broidy alleges that Defendants acted at Qatar's direction, it does not follow that they had no discretion in how to carry out their mission, especially in their actions that violated U.S. law. For this reason, too, an interlocutory win for Defendants on their question presented would likely lead to further proceedings on remand.

*Third*, assuming *arguendo* that such a doctrine exists, foreign derivative sovereign immunity would require, at a minimum, that the *foreign sovereign* is itself immune. *See* Dkt. 44

---

https://efile.fara.gov/docs/6458-Exhibit-AB-20170903-1.pdf). Of course, to the extent that their agreements with Qatar contemplated illegal activity, even the principal case on which they rely for foreign derivative immunity would not extend that immunity to such contracts. *See, e.g.*, *Butters v. Vance Int'l, Inc*., 225 F.3d 462, 466 (4th Cir. 2000) (recognizing immunity under the Foreign Sovereign Immunity Act for foreign government contractor where doing otherwise "would discourage American companies from entering *lawful agreements* with foreign governments and from respecting their wishes even as to sovereign acts") (emphasis added).

at 8 (Defendants conceding that "[d]erivative sovereign immunity . . . applies only where the sovereign itself is immune from suit.").  This Court has never considered (much less decided) whether Qatar would be entitled to immunity here, and Defendants do not suggest that the D.C. Circuit would or should decide that question in the first instance in the course of an interlocutory appeal.  Thus, if Defendants persuaded the D.C. Circuit of their position on the first question presented, the threshold question of Qatar's immunity would still have to be addressed in this case.  Resolving that issue here could further *delay* the ultimate resolution of this litigation because the Plaintiffs currently are appealing to the Ninth Circuit a California District Court ruling that Qatar is immune under the FSIA for its tortious conduct against Broidy.  *See Broidy Capital Management LLC. v. Qatar*, No. 18-56256 (argued Feb. 11, 2020).

Plaintiffs contend that the California District Court's ruling regarding *Qatar's* immunity from suit is currently binding on Plaintiffs.  But as the D.C. Circuit has held, "[a]ccording preclusive effect to a judgment from which an appeal has been taken . . . risks denying relief on the basis of a judgment that is subsequently over-turned.  Consequently, care should be taken in dealing with judgments that are final, but still subject to direct review. . . ."  *Martin v. Malhoyt*, 830 F.2d 237, 264-65 (D.C. Cir. 1987).  That rule obviously applies here.  If the Ninth Circuit rejects Qatar's claim of immunity, there would be no foreign sovereign immunity which Defendants could claim as a basis for their derivative claim.  In these circumstances, it would be inconsistent with the judicial efficiency purposes underlying § 1292(b) to deem Defendants' first question presented "controlling" on the mere assumption that the Ninth Circuit will rule in Qatar's favor.  *See id.* at 264-65.  Because Defendants' first question is not controlling within the meaning of § 1292(b), it provides no basis for allowing an interlocutory appeal and the Court need not consider whether Defendants can satisfy the other two statutory prerequisites.

### 2. There is no "substantial ground for difference of opinion" regarding whether a distinct doctrine of foreign derivative immunity exists at common law

Even if a decision in Defendants' favor would end this lawsuit, certification would still be inappropriate because there is no substantial ground for difference of opinion on the question presented. Defendants seek to apply a doctrine held applicable only to federal contractors in the U.S. sovereign immunity context as a distinct doctrine of *foreign* common law immunity. But no court has ever found that such a distinct common law doctrine of derivative foreign immunity exists. Defendants cannot satisfy § 1292(b)'s standard because there is no real doubt that the D.C. Circuit would *affirm* this Court's ruling. Certifying an appeal would thus unnecessarily delay this action.

The "threshold for establishing the 'substantial ground for difference of opinion' … is a high one." *Judicial Watch, Inc.*, 233 F. Supp. 2d at 19. "Mere disagreement, even if vehement, with a court's ruling on a motion to dismiss does not establish a 'substantial ground for difference of opinion' sufficient to satisfy the statutory requirements for an interlocutory appeal." *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1116 (D.D.C. 1996). Rather, the requisite grounds for difference of opinion are "often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits," or "where a court's challenged decision conflicts with decisions of several other courts." *APCC Services, Inc. v. Sprint Comm'ns Co.*, 297 F. Supp. 2d 90, 97-98 (D.D.C. 2003). The Court "must analyze the strength of the arguments in opposition to the challenged ruling to decide whether the issue is truly one on which there is substantial ground for dispute." *Id.* at 98. Defendants cannot satisfy this heavy burden.

This Court had no difficulty rejecting Defendants' theory that a separate doctrine of "foreign derivative sovereign immunity" can be found within the federal common law. The

Court first observed that "the D.C. Circuit has never adopted foreign derivative immunity as a distinct doctrine." Dkt. 51 at 13. "To the contrary, the D.C. Circuit has suggested that the common law of foreign immunity includes two, and only two, doctrines: status-based immunity and conduct-based immunity." *Id.* at 13-14 (citing *Lewis*, 918 F.3d at 145). Defendants say that "the D.C. Circuit has not squarely resolved the question" of whether a separate "foreign derivative sovereign immunity" doctrine exists. Dkt. 52-1 at 11. But they have no response to this Court's common-sense observation that *Lewis* precludes a holding that such an undiscovered doctrine is consistent with the law of this Circuit.

This Court also explained that "the rationale behind immunity for agents of the U.S. government does not necessarily apply to foreign agents." Dkt. 51 at 14. "The rationale for domestic derivative sovereign immunity is that the United States and agents of the United States have 'the same interest in getting the Government's work done.'" *Id.* (quoting *Boyle v. United Techns. Corp.*, 487 U.S. 500, 505 (1988)). By contrast, "[t]he rationale behind foreign immunity . . . is based on the concept of comity." *Id.* And while Defendants now contend that "[d]epriving the agents [of a foreign state] of sovereign immunity for acts undertaken by the sovereign through those agents is repugnant to such comity" (Dkt. 52-1 at 13), the notion that *international* comity requires the United States to give *its own citizens* immunity from liability for their violations of U.S. law committed against other U.S. citizens on U.S. soil is self-refuting. Unsurprisingly, Defendants can point to no other nation that gives such immunity to its own citizens when they violate domestic laws at the behest of a foreign power.

This Court's analysis was and remains correct. There is not any ground—let alone a substantial ground—for difference of opinion about whether there is a "common law doctrine of

derivative foreign sovereign immunity that is distinct from common law foreign official immunity."  Dkt. 52-1 at 11.

None of the three cases cited by Defendants supports their claim of a substantial ground for difference of opinion on this question.  Their principal authority, the Fourth Circuit's decision in *Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000), did not purport to address federal common law at all.  Its holding was expressly *statutory*.  *Butters* held that an individual contractor working for Saudi Arabia was "entitled to derivative immunity *under the FSIA.*"  225 F.3d at 466 (emphasis added).  The Fourth Circuit's interpretation of FSIA was subsequently superseded by the Supreme Court's decision in *Samantar v. Yousuf*, 560 U.S. 305 (2010).  There, the Supreme Court held that FSIA addresses only a foreign *sovereign's* claims of immunity; the statute "does not govern [an individual's] claim of immunity," which instead must be evaluated "under the common law."  *Id.* at 324-25.  *Butters* therefore does not speak to whether a distinct *common law* doctrine of derivative foreign sovereign immunity can be found in the law.

As this Court observed, Dkt. 51 at 14, *Butters* had no reason to address the common-law analysis prescribed by *Samantar*.  That analysis asks "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize."  *Samantar*, 560 U.S. at 312 (quotation marks omitted).  Defendants point out that deference to State Department policy "was an established part of the common law of foreign immunity analysis … before *Samantar* was decided."  Dkt. 52-1 at 13.  But *Butters* did not interpret the common law, only the FSIA, and the court did not need to consider State Department policy in its analysis.[5]  As this Court

---

[5] Relatedly, Defendants suggest that "it is not clear that the State Department's policy should play any role" in evaluating derivative immunity claims because "[t]he FSIA … transferred primary responsibility for immunity determinations from the Executive to the Judicial Branch." Dkt. 52-1 at 14 (quotation marks omitted).  But the whole point of *Samantar* is that the FSIA governs only the foreign state's *own* immunity, not the immunity of individuals derived from the

recognized, it is not established State Department policy to grant immunity to U.S. citizens who choose to work for foreign states, particularly where they harm other U.S. citizens in violation of U.S. law on U.S. soil.  Dkt. 51 at 12-13; *see* discussion, *infra*, § I.C.1.[6]  Moreover, while *Butters* turned on the proposition that "[s]overeign immunity exists because it is in the public interest to protect the exercise of certain governmental functions" (225 F.3d at 466)—an accurate rationale for the immunity of the *United States* government—"[f]oreign sovereign immunity is, and always has been, 'a matter of grace and comity.'"  *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014) (citation omitted); *see* Dkt. 51 at 14 (distinguishing the rationales for domestic and foreign immunity).

Next, Defendants cite the recent unpublished decision of a district court in the Fourth Circuit, *Ivey for Carolina Golf Devel. Co. v. Lynch*, No. 1:17-cv-439, 2018 WL 3764264 (M.D.N.C. Aug. 8, 2018).  *Ivey* applied the holding of *Butters*, but did so to illuminate its own understanding of "common law foreign official immunity," not, as Defendants claim, any "distinct" doctrine of derivative foreign official immunity.  *See id.* at *2 (explaining that

---

state.  *See* 560 U.S. at 322.  Defendants also point to *Samantar*'s statement that, absent input from the State Department, a court "has authority to decide for itself whether all the requisites for foreign immunity exist."  Dkt. 52-1 at 14 (brackets and quotation marks omitted).  But that statement creates no "grounds for disagreement over … the Executive's role in foreign affairs." *Id.*  The judiciary's role "[i]n making that decision," is to "inquire[] whether the ground of immunity is one which it is the established policy of the State Department to recognize."  560 U.S. at 312 (brackets and quotation marks omitted).

[6] Defendants insinuate that *Samantar* actually "contemplated that there are other bases beyond foreign official immunity upon which a party might enjoy foreign sovereign immunity" (Dkt. 52-1 at 14-15) because the Court stated that "[i]mmunity of individual officials is subject to a caveat not applicable to any of the other entities or persons to which the foreign state's immunity extends." (560 U.S. at 321).  But Defendants omit the Court's accompanying footnote, which makes clear that the "other … persons" in question are "the head of state, head of government, or foreign minister," who are entitled to status-based immunity not available to run-of-the-mill officials.  560 U.S. at 321 n.15.  The Court was in no way cryptically referring to a "distinct" doctrine of foreign derivative immunity.

"immunity from 'claims arising out of … official acts while in office'—often referred to as conduct-based immunity—'derives from the immunity of the State'") (citation omitted).  *Ivey* directly *refutes* Defendants' view of a distinct derivative foreign immunity doctrine.  *See id.* at *7 (contractor "immune from this suit based on *common law foreign official immunity*" (emphasis added)).[7]

Finally, the Texas district court's decision in *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), provides no support for a federal common law derivative foreign sovereign immunity doctrine, for the reason this Court noted in its opinion.  *See* Dkt. 51 at 15. *Alicog* plainly stated that "[u]nder *Texas law*, the [defendants] are not liable because they did not knowingly participate in a wrong separate from the acts of the Saudi Counsul."  *Alicog*, 860 F. Supp. at 381.  Whatever the meaning of *Alicog*, it does not demonstrate a difference of opinion on the question before the Court because it did not interpret federal common law at all.  Thus, Defendants' authority does not satisfy their burden of proving *any* difference of opinion on the subject, let alone a "substantial" one.

For all of these reasons, Defendants cannot satisfy their burden of demonstrating a substantial difference of opinion on the question of whether a *distinct* doctrine of foreign derivative sovereign immunity exists.

---

[7] As *Ivey* suggests, while the authority for the doctrine is scarce, to the extent there is any common law doctrine of foreign official immunity (or conduct-based immunity) at common law, that immunity has always been considered as deriving from the immunity of the foreign state. *Yousuf*, 699 F.3d at 774 (emphasis added); *see also Samantar*, 560 U.S. at 322 ("in some circumstances the immunity of the foreign state extends to an individual"); *see also* Restatement § 66(f) (describing circumstances where the "immunity of a foreign state … extends to" an "agent of the state").  It is thus plain that "derivative foreign sovereign immunity" and "foreign official immunity" are just two labels for a single common law doctrine governing conduct-based immunity for foreign officials and agents.

### 3.   An interlocutory appeal on derivative foreign immunity would not advance the ultimate termination of this litigation

Section 1292(b)'s third requirement is that immediate appeal would materially advance the ultimate termination of the litigation.  The general rule that a losing party is entitled to just a single appeal after final judgment promotes weighty interests in speed and efficiency for both the parties and the judiciary.  *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978).  Certification of an interlocutory appeal is warranted only in those "exceptional circumstances" where it appears that allowing an immediate appeal will advance those interests better than following the general rule.  *Id.*  This is not such a case.

Considering the paucity of support for their position, there can be little doubt that Defendants would lose on appeal as they did before this Court, in which case the appeal would merely delay the resolution of this case while wasting the parties' and the D.C. Circuit's time and resources.  And if, as defendants hope, discovery is stayed pending appeal, evidence that incriminates them will continue to disappear with the passage of time.  Indeed, even if Defendants prevailed on appeal, the most they could hope for would be a remand to this Court to determine whether Qatar is itself immune and, if so, whether derivative immunity protects their unlawful (and even criminal) conduct on the facts of this case.  The Court should decline Defendants' invitation to start down this road.

### C.   Defendants' Attack on This Court's Holding That They Are Not Entitled to Conduct-Based Immunity Does Not Satisfy § 1292(B)'s Requirements

Defendants' second proposed question is "how a court should determine whether a defendant satisfies the requirements for conduct-based foreign official immunity."  Dkt. 52-1 at 7, 15.  But as they formulate it, this is hardly a "controlling" question of law; it does not assign any error to this Court's analysis.

Properly understood, Defendants are effectively seeking to certify the question of whether this Court erred in concluding they did not qualify for conduct-based immunity.  The Court gave two alternative grounds for its conclusion on this point:  (1) that U.S. policy is to hold U.S. citizens answerable for their own misconduct in the domestic court system, *see Yousuf*, 699 F.3d at 777-78; and that (2) under the Restatement (Second) of Foreign Affairs, § 66(f) immunity is not available against alleged foreign agents in their individual capacities because such suits would not involve damages flowing from state funds or otherwise "enforc[ing] a rule of law against the foreign state."  There is no "substantial ground for difference of opinion" as to either—and certainly none for both taken together.

> **1.     There is no substantial ground for difference of opinion on extending foreign sovereign immunity to U.S. citizens sued by U.S. citizens for their tortious conduct in the United States**

As to this Court's first conclusion—that agents of a foreign power who are citizens and residents of the United States cannot enjoy immunity from suit in U.S. Courts—Defendants begin by asserting that "neither courts nor the State Department treat proof of foreign citizenship as a necessary element of conduct-based foreign official immunity."  Dkt. 52-1 at 15.  But this statement flies in the face of established authority, and the decisions that they cite as proof of a difference of opinion on the question do not address the question at all.  First, two Second Circuit cases cited by Defendants had no need to address conduct-based immunity for U.S. citizens because the defendants there were foreigners.  *See Matar v. Dichter*, 563 F.3d 9, 11, 14 (2d Cir. 2009) (pre-*Samantar* decision affording immunity to Israeli defendant based on State Department suggestion of immunity); *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971) (Friendly, C.J.) (pre-FISA decision affording immunity to Spanish Consul General on the basis of § 66(f) of the Restatement).  The decisions do not suggest that U.S. citizens may claim foreign official immunity.

Nor does Defendants' third cited ruling, *Rishikof v. Mortada*, support their argument. 70 F. Supp. 3d 8 (D.D.C. 2014). *Rishikof* did not analyze the question of whether a U.S. citizen was entitled to share in the immunity of a foreign state because, apparently, no one raised the issue. *See* Dkt. 51 at 15. Instead, the district court there applied the Restatement test and granted immunity to an agent of Switzerland because, unlike in this case, the test set out in § 66(f) was satisfied—exercising jurisdiction there would have had the effect of enforcing a rule of law against a foreign state because the plaintiff sought to hold Switzerland jointly and severally liable for its agent's actions. 70 F. Supp. 3d at 15. It is now undisputed (and indisputable) that Defendants would lose under that test, regardless of their citizenship, because *Lewis* makes clear that they cannot satisfy the test's third element. *Rishikof* provides no basis for certification.

Defendants also cannot show a "substantial ground for difference of opinion" about the United States' policy of denying immunity to U.S. citizens and residents in the courts of the United States. *See Yousuf*, 699 F.3d at 777 (affording "substantial weight" to government's position that "U.S. residents like Samantar who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents"); *see also ABI Jaoudi & Azar Trading Corp. v. Cigna Worldwide Ins. Co.*, No. 91-6785, 2016 WL 3959078, *18 (E.D.Pa. July 22, 2016) (holding defendant's "U.S. citizenship precludes him from claiming derivative sovereign immunity").

Defendants point to the State Department's statement in *Samantar* that a "former foreign official's decision to permanently reside in the United States is not, in itself, determinative of the former official's immunity from suit for acts taken while in office." Dkt. 52-1 at 16 (quoting State Department suggestion of *non*-immunity). But the Fourth Circuit viewed the State Department's position that the U.S. residence of the defendant there supported the rejection of

foreign immunity as a "major basis" for the federal government's position.  699 F.3d at 777.

There, the lawsuit related entirely to overseas torture by a former Somali official who had taken

up residence in Virginia.  Despite the tenuous connection to the United States, the Fourth Circuit

found the residence of the defendant to be critical to the immunity analysis because the

defendant "has a binding tie to the United States and its court system."  *Id.* 777-78.

Here, the tie to the United States is even stronger—defendants are U.S. citizens and are

sued by U.S. citizens for their misconduct *in the United States.*  As the *ABI Jaoudi* court

reasoned, denying immunity to U.S. citizens in similar circumstances is "consistent with

authority suggesting that (statutory) foreign sovereign immunity does not extend to U.S. citizens

service in non-official roles in foreign governments."  2016 WL 3959078, *19.[8]  For similar

reasons, it is also consistent with the provisions of major international agreements, such as the

Vienna Convention on Diplomatic Relations, which explicitly deny their immunities to persons

who are permanent residents or nationals of the host countries.  *See, e.g.*, Vienna Conv. on

Diplomatic Relations § 37 (excluding individuals who are nationals or permanently resident in

host nation from privileges and immunities); *see also* Dkt. 51 at 12-13.[9]

---

[8] The FSIA excludes from the scope of its immunity an artificial entity that is a "citizen of a State of the United States."  28 U.S.C. § 1603(b)(3).  While the FSIA does not govern immunity for individuals, this cuts against Defendants' position inasmuch as it would be an "odd result" if "a corporation that is the citizen of a state is … not immune … whereas a natural person who is the citizen of a state … retains his immunity."  *Samantar*, 560 U.S. at 316 n.8.

[9] Defendants' citations to the suggestions of immunity in *Dogan v. Barak* and *Rosenberg v. Lashkar-E-Taiba* are even further off base.  Dkt. 52-1 at 16.  The defendants in those cases were not U.S. citizens or residents, so it is unremarkable that the State Department said nothing there about immunity for U.S. citizens.  Its silence on that issue in cases where the issue was not implicated did not create a "substantial ground for difference of opinion."

**2.     There is no substantial ground for disagreement on denying immunity to individual foreign government agents sued in their individual capacity**

Defendants next argue that there is "substantial ground for disagreement" concerning the correctness of § 66(f)'s requirement that "exercising jurisdiction would serve to enforce a rule of law against the foreign state." Dkt. 52-1 at 16-17. But apart from the separate opinion of Judge Randolph in *Lewis v. Mutond*, Defendants do not identify *any* actual legal decision that questions the Restatement's requirement, which the Court in *Lewis* interpreted to mean that "an individual-capacity claim seeking relief against an official in a personal capacity," as a proper statement of the common law. And Judge Randolph's separate opinion is hardly as helpful to Defendants as they suggest. He states: "It may well be that there is not now and never was *any* common law immunity for foreign officials sued in the United States," *Lewis*, 918 F.3d at 149 (Randolph, J., concurring) (emphasis added). This does not advance Defendants' claim of foreign official immunity here.

Defendants cite the Supreme Court's footnote in *Samantar*, in which the Court reserved judgment on whether Restatement Section 66 "correctly sets out the scope of common-law immunity applicable to current or former officials," and also agents. Dkt. 52-1 at 17 (quoting *Samantar*, 560 U.S. at 321 n.15). But in the same opinion, the Court emphasizes the very part of Section 66(f) at issue here*,* noting that common law foreign official immunity "is subject to a caveat not applicable to any of the other entities or persons to which the foreign state's immunity extends," *i.e.*, the requirement that the "*effect of exercising jurisdiction would be to enforce a rule of law against the state.*" 560 U.S. at 321 (quoting *Restatement* § 66(f); emphasis in original). The Court also stated that it has "previously found [the Second Restatement § 66(f)] instructive" in its decisions. *Id.* (citing *Permanent Mission of India v. City of New York*, 551 U.S. 193, 200 (2007)).

Moreover, numerous lower court cases—including the two Second Circuit cases cited by the Defendants—rely on the Second Restatement § 66(f) as a proper distillation of the common law of foreign official and foreign agent immunity.  *See Heaney*, 445 F.2d at 504 (citing Restatement Section 66(f)); *Matar*, 563 F.3d at 14 (same); *see also Yousuf*, 699 F.3d at 769 (same); *Rishikoff,* 70 F. Supp. 3d at 15.  Pre-*Samantar* decisions of the D.C. Circuit relied on it to understand the common law in determining the scope of official immunity under the FSIA.  *See Belhas v. Yaalon*, 515 F.3d 1279, 1285 (D.C. Cir. 2008) ("In 1976, it was well settled that sovereign immunity existed for 'any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'  Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965)").  While the *Lewis* Court had no reason to decide whether Restatement Section 66(f) was an accurate statement of the common law, there is little reason to doubt that it is.

Indeed, as the *Lewis* Court itself indicated, the Restatement's requirement that a judgment against foreign officials or agents would have an effect on the foreign country's fisc before immunity could attach is consistent with other immunity decisions under U.S. law.  Thus, *Lewis* cited *Edelman v. Jordan*, 415 U.S. 651, 664 (1974), which recognized that where an action against a state official is "in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity."  *See Lewis*, 918 F.3d at 147; *see also Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (individual capacity suit against government official not entitled to sovereign immunity).

In sum, the Second Restatement's requirement, as interpreted by *Lewis*, that a suit against individual foreign officials or agents must have an effect on the foreign fisc before immunity can

attach at common law is not subject to reasonable disagreement.  Defendants' request for interlocutory certification should be denied.

### D.    The Defendants' Plan to Appeal Under the Collateral Order Doctrine Has No Bearing on Whether This Court Should Certify Interlocutory Review

Recognizing the uncertainty of an appeal as of right, Defendants ask this Court to certify for interlocutory review its order on their motion to dismiss.  *See* Defs.' Joint Mem. 1.  This Court should not permit Defendants to circumvent the requirement of establishing the D.C. Circuit's appellate jurisdiction.  Defendants' motion for interlocutory certification should be decided on its own merits.  And, as it lacks merit, the Court should deny the motion.

The question of whether this Court's denial of the Plaintiffs' motion to dismiss on grounds of immunity is appealable as of right under the collateral order doctrine is a question for the D.C. Circuit.  As Defendants admit, no court has granted an appeal as of right from denial of a motion for common law *derivative* foreign sovereign immunity.  In fact, no court has ever considered this a distinct common law doctrine because, as noted above, it does not exist.  *See* Dkt. 51 at 13 ("[T]he D.C. Circuit has never adopted foreign derivative immunity as a distinct doctrine."); *id.* at 13-14 ("To the contrary, the D.C. Circuit has suggested that the common law of foreign immunity includes two, and only two, doctrines: status-based immunity and conduct-based immunity." (citing *Lewis*, 918 F.3d at 145)).[10]

---

[10] Even in the context of domestic contractors, the question of whether a denial of derivative immunity is immediately appealable as of right under the collateral order doctrine has led disagreement among courts of appeals.  *Compare Martin v. Halliburton*, 618 F.3d 476, 485 (5th Cir. 2010) ("a denial of derivative sovereign immunity is not subject to immediate review under the collateral order doctrine" (brackets and quotation marks omitted)), and *Al Shimari v. CACI Premier Technology, Inc.*, 775 F. App'x 758, 760 (4th Cir. 2019) (same), *with McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1339 (11th Cir. 2007) (allowing collateral order appeal of "claim to derivative *Feres* immunity"), and *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 192-93 (2d Cir. 2008) (allowing collateral order appeal on "derivative Stafford Act immunity").  The D.C. Circuit has not reached the question.

To obtain jurisdiction for their contemplated appeal under the "collateral order" doctrine, Defendants will have to convince the D.C. Circuit that this Court's denial of their motion to dismiss "resolve[s] an important issue completely separate from the merits of the action." *Johnson v. Jones*, 515 U.S. 304, 310 (1995) (quotation omitted). This will be difficult to do. Derivative sovereign immunity, even if extended to foreign agents, is generally not available where the agent violates federal law. *See Campbell-Ewald*, 136 S. Ct. at 663; *see* discussion, *supra*, Section I.B.1. Here, determining whether Defendants violated federal law is an issue inextricably intertwined with the merits of Plaintiffs' claims. Resolution of that immunity claim would require a determination of the merits prior to discovery and trial, which defeats Defendants' claim to an appeal as of right on the issue of derivative foreign immunity.

Allowing the D.C. Circuit to address its own jurisdiction—and not by-passing that process via certification—is especially appropriate, given the draconian consequence the Defendants argue would follow: a blanket divestiture of jurisdiction from this Court during the entire pendency of the appeal, which could take a year or more.[11] Instead, Defendants' certification motion must be judged on its own merits, and neither of their questions presented meets § 1292(b)'s requirements or otherwise establishes that certification is appropriate as a discretionary matter.

---

[11] Plaintiffs do not agree with this characterization. Even assuming the Court's ruling is an appealable collateral order, this Court would be deprived of jurisdiction only as to "those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). In the statutory foreign sovereign immunity context, the D.C. Circuit has suggested this means that during a collateral appeal, a district court may not proceed to trial. *Princz v. Federal Republic of Germany*, 998 F.2d 1, 1 (D.C. Cir. 1993). But "those aspects of the case involved in the appeal" do not divest the district court jurisdiction to decide issues short of trial, such as third-party discovery, which should proceed. *See, e.g., Schering Corp. v. First DataBank Inc.*, No. C 07-01142 WHA, 2007 WL 1747115, at *4 (N.D. Cal. June 18, 2007) (concluding that pending "appeal did not divest this Court of jurisdiction to rule on pretrial and case-management issues, including discovery").

## II.     THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A STAY

The Court should deny Defendants' request for a discretionary discovery stay because Defendants' baseless appeal on unprecedented theories cannot justify the prejudice Plaintiffs would suffer from delaying matters even further.  Given the significant harm to the Plaintiffs from a continued delay in discovery of potentially vanishing electronic evidence related to Defendants' unlawful and covert scheme, particularly those records held by third-parties, the balance of equities weighs powerfully against a stay.

### A.     Standard for a Stay

Defendants bear the burden to show that a stay is warranted.  *United States v. Honeywell Int'l, Inc*., 20 F. Supp. 3d 129, 132 (D.D.C. 2013).  Where the requested stay is based on a contemplated appeal that would potentially "eliminate the need for . . .  discovery," the benefit to the movant must be balanced against "the harm produced by a delay."  *Chavous v. District of Columbia Fin'l Responsibility & Mgmt. Assistance Auth*., 201 F.R.D. 1, 3 (D.D.C. 2001).  The Court has "broad discretion" to "weigh [the] competing interests" at hand, and to determine which side's interests are stronger.  *Honeywell*, 20 F. Supp. 3d at 131.  There are no bright-line rules in this context; rulings on stay motions are "case-specific."  *Sai v. Dep't of Homeland Security*, 99 F. Supp. 3d 50, 59 (D.D.C. 2015).

### B.     More Delay is Highly Prejudicial to Plaintiffs

A stay would be highly prejudicial to Plaintiffs.  This case was filed 16 months ago and concerns events that in large part occurred over two years ago.  Plaintiffs have not yet been permitted to begin discovery.  An appeal would add roughly one year to the delay, meaning that discovery would not begin in earnest until *three years* after the underlying events.

The risk that evidence is lost or destroyed with a delay that long is substantial, and grows with each day.  Evidence held by third parties such as telephone companies, internet service

providers, vendors or others may be lost as they purge older materials in the ordinary course of

business.  There are no mandatory data retention laws in the United States applicable to ISPs or

related electronic data vendors, which may have widely divergent data retention policies.  For

example, the major telephone carriers appear to retain call history data for periods ranging from

12 months to 7 years (and various time periods in between).  Bailey Decl. ¶¶ 10-14 & Exs. D-G.

Internet providers purge historic IP assignment and session information.  For example,

Comcast's Xfinity service retains IP assignment and session information (including dynamic IP

address log files) for only 180 days.  *Id.* ¶ 13 & Ex. G at 2, 6.

The risk of lost evidence is especially pronounced given the nature of this case.  The

hackers working with Defendants hid behind multiple virtual private networks ("VPNs") or

virtual private servers ("VPSs") owned by third parties based in the United States, such as Micfo

LLC and InstaVPS, that are in the business of providing VPNs or leasing VPSs to customers

wishing to conceal their internet activity.  Dkt. 18-2 ¶¶ 112-14.  Plaintiffs' subpoenas in the

Central District of California case (which allowed only limited, jurisdictional discovery) have

revealed that certain of the IP addresses ("IPs") were leased to companies that appear to be

intermediaries that, in turn, offered those IPs to act as VPNs or VPSs used by others.  Bailey

Decl. ¶¶ 4-5 & Exs. A-C.[12]  Plaintiffs expect to issue successive discovery requests to trace these

transactions to the end users, including Defendants or their co-conspirators.

We expect this will be an iterative process, because we do not how many layers of

obfuscation the attackers built into their scheme.  Issuing discovery in this manner—discovery

---

[12] As this Court may remember, much of the jurisdictional discovery in the Central District of
California litigation against Qatar has been held by that court to be protected against use in other
litigation, including this case.  It thus will have to be subject to renewed discovery in this case.
The information cited here by way of example is not designated as confidential or otherwise
protected, however.

that is itself aimed at identifying "persons who know of any discoverable matter"—is "deeply entrenched in practice" and is critical in a case like this one, involving sophisticated and concealed wrongdoing.  *See* Fed. R. Civ. P. 26, advisory committee's notes to 2015 amendments. *See also* 8A Charles Alan Wright, et al., Federal Practice & Procedure § 2046 (3d ed. 2010) ("Often use of one discovery device will lead naturally to use of another.").

Along similar lines, the hacked, stolen emails were distributed to the media via (among other means) an anonymous email address, LA.Confidential@mail.com.  Dkt 18-2 ¶¶ 112-14.  A subpoena to the operator of mail.com in the Central District of California case has revealed the IPs that accessed the account, but further subpoenas will be necessary to trace those IPs to their end users, again in an iterative process.

As a final example, we expect subpoenas to telephone companies will reveal who the conspirators were calling at the relevant times, and will assist in uncovering who else (whether wittingly or not) was helping the scheme or may have knowledge that will corroborate Defendants' participation.  Bailey Decl. ¶ 8.  Those third parties will likely have probative, discoverable information, including telephone or Internet usage records, that risks being lost or diminished with the passage of time.

Defendants have emphasized that the Court, in denying Plaintiffs' motion to expedite discovery last year, highlighted the preservation notices Plaintiffs had sent to third parties as a way to mitigate spoliation risk.  *See* Minute Order, June 17, 2019.  We respectfully submit that those third parties are more likely to comply with formal process (such as subpoena) that has the imprimatur of the Court, particularly as the preservation notices become more dated.

But even assuming the preservation notices are unfailingly effective, they cover only those discovery targets presently known.  As the foregoing examples illustrate, there are almost

certainly third parties who remain unknown to Plaintiffs and will be identified only through discovery.  Those third parties have no reason to know they should preserve documents, risking substantial prejudice to Plaintiffs.  And even telephone companies and internet service providers which have received preservation letters as to one body of data may not preserve other data— telephone or internet records relating to yet unidentified third parties, for example.  Plaintiffs' ability to follow the evidence is critical, as discussed above, but is placed at great risk as months and years go by with discovery frozen at the starting gate.

### C.     Defendants Are Unlikely to Prevail in Any Appeal And Cannot Show Prejudice

On the other side of the ledger, Defendants cannot even make the basic showing that an appeal will "eliminate the need for . . . discovery." *Chavous*, 201 F.R.D. at 3.  As discussed above, if the contemplated appeal is heard at all, it would have little chance of success.  And even if Defendants prevailed, factual issues would remain on remand that would likely foreclose their claims of immunity (such as whether or not U.S. laws were violated, the extent of Qatar's immunity, or whether Defendants were acting strictly at Qatar's direction, which is generally required under any concept of derivative immunity).

Nor can Defendants show any meaningful prejudice from the absence of a stay. They argue that "sensitive considerations of international comity that underlie sovereign immunity" would be "prejudiced," Dkt. 52-1 at 21, but that presumes such considerations are triggered in the first place.  They are not.  As the Court has already held, Qatar's sovereign interests are not implicated by this suit, which centers on the unlawful acts of individual U.S. citizens acting on U.S. soil.  Dkt. 51 at 16-17.

Defendants next argue that "[n]o material changes of circumstances have taken place" since the Court last year denied Plaintiffs' application for expedited discovery to proceed in

parallel with Defendants' pending motion to dismiss.  Dkt. 52-1 at 22.  Not so.  The major change in circumstance is that the Court has now denied the Defendants' motion to dismiss, confirming that Defendants' lack immunity and that Plaintiffs have stated causes of action. Moreover, *nearly an additional year has passed*, leading to additional opportunities for spoliation of an already fragile evidentiary trail.  For exactly that reason, Defendants' argument that a stay could spare them "potentially needless discovery," Dkt. 52-1 at 17, is far less compelling than it was a year ago.  Now that the Court has denied Defendants' motion to dismiss, the possibility the discovery will turn out to be "needless" is remote.  Balanced against the prejudice from the cumulative delay facing Plaintiffs—which is much more severe than a year ago—the Court should allow discovery to proceed immediately, and should deny Defendants' requested stay.[13]

## CONCLUSION

Because there is no substantial ground to doubt that this Court rightly denied Defendants immunity, certifying an interlocutory appeal would not "materially advance the ultimate termination of the litigation."  The D.C. Circuit would affirm this Court's well-reasoned ruling, leaving the Court and the parties exactly where they are now at a substantial cost in time and resources.  For the foregoing reasons, the Court should deny defendants' motion for certification and a stay pending appeal.

---

[13] Defendants' snide footnote accusing Plaintiffs of "blitz[ing]" them with expedited discovery and leaking their responses to the press is both highly inaccurate and highly ironic.  Dkt. 52-1 at 8 n.2.  Plaintiffs have scrupulously abided by the Courts' rules and rulings—going so far as to file an amended complaint removing certain sealed allegations to comply with the Central District of California's protective order ruling denying their use in this case.  The irony, of course, is that this entire case is based on Defendants hacking Plaintiffs' accounts, stealing information, and unlawfully leaking that information to the press.

Dated:  April 17, 2020

Respectfully submitted,

/s/ Filiberto Agusti
Filiberto Agusti (DC Bar No. 270058)
Shannen W. Coffin (DC Bar No. 449197)
Michael J. Baratz (DC Bar No. 480607)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone:  (202) 429-3000
Fax:  (202) 429-3902
fagusti@steptoe.com
scoffin@steptoe.com
mbaratz@steptoe.com

*Counsel for Plaintiffs Broidy Capital
Management and Elliott Broidy*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2020, I electronically filed the foregoing by using the

Court's CM/ECF system to all counsel and parties receiving electronic notice of pleadings filed

in this case.

/s/ Filiberto Agusti
Filiberto Agusti