# EXHIBIT 4



1776 K STREET NW
WASHINGTON, DC 20006
PHONE     202.719.7000

www.wileyrein.com

June 14, 2018

Stephen J. Obermeier
202.719.7465
sobermeier@wileyrein.com

**VIA EMAIL**

Lee S. Wolosky
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Fl.
New York, NY  10022

Re:    *Broidy Capital Management LLC v. State of Qatar*,
         No. 2:18-CV-2421-JFW-E (C.D. Cal.)

Dear Lee:

I write regarding the personal telephone records of my client, Nicolas D. Muzin, which Plaintiffs apparently received in response to a subpoena you served on AT&T on May 9, 2018.  We appear to have never received those records despite assurances from your colleague that they would be produced.  Plaintiffs then proceeded to rely on the records in their opposition to our stay motion and, apparently, leaked their contents to the press.  We hereby demand that you immediately produce the records, and, given their private and personal nature, that they be considered "Attorneys' Eyes Only" and subject to the parties' ongoing negotiations regarding a protective order in this case.

On May 27, 2018, we received the attached email stating that Plaintiffs had received a response to your May 9, 2018 subpoena to AT&T, but that you had "not been able to download the substantive response yet."  *See* Att. 1.  The email further stated that Plaintiffs were "working on this," and would "follow up as soon as we have the underlying documents."  *See id.*  In fact, Plaintiffs never followed up as promised, and we did not become aware that Plaintiffs had obtained the records until Plaintiffs filed their opposition on Monday.

We also learned in the last two days via the attached and other press reports, *see* Atts. 2, 3, that information from the private telephone records have been disseminated to the media for no apparent purpose other than to smear and attack Dr. Muzin publicly.  This bad faith behavior is particularly inappropriate because, as you know, we are in the process of negotiating the contours of a protective order designed to govern exactly this sort of information.

The press leaks, combined with Plaintiffs' failure to provide the records despite assurances to do so, are an abuse of the discovery process.

As you know, and as the parties have already discussed, many of the materials that have been and will be collected in discovery in this case are



Lee S. Wolosky
June 14, 2018
Page 2

confidential, private, or otherwise proprietary. Dr. Muzin's telephone records fall squarely within that category, particularly because they include data regarding Dr. Muzin's personal communications, as well as confidential information with respect to who he communicated with in the course of operating his business. *See, e.g.*, *Cefalu v. Holder*, No. 12-303, 2013 WL 4102160, at *4 (N.D. Cal. Aug. 12, 2013). The disclosure—and any continued disclosure—of this information to parties outside of this litigation for the sole purpose of smearing Dr. Muzin in the press has caused and will cause him irreparable personal and professional harm, as well as harm to the other individuals whose personal information is now being disseminated to the media.

Moreover, Plaintiffs' failure to produce the records is not only deceptive in light of the promise to provide them, it is contrary to Federal Rule of Civil Procedure 45. The Advisory Committee notes to Federal Rule of Civil Procedure 45 make clear that parties serving third party subpoenas "should . . . make reasonable provision for prompt access" for other parties. *See also Arias v. Ruan Transp. Corp.*, No. 16-280, 2017 WL 1427018, at *3 (E.D. Cal. Apr. 21, 2017). Plainly, Plaintiffs understood this obligation, as they have produced other responses received from their many subpoenas.

This abuse of the discovery process must cease immediately. Plaintiffs must immediately produce—and continue to produce—all responses received to subpoenas in this case, including Dr. Muzin's personal telephone records received from AT&T, as Plaintiffs had previously promised. Further, Plaintiffs must consider all phone and other records regarding Dr. Muzin or Stonington Strategies LLC obtained from any party or third party in this case to be "Attorneys' Eyes Only" until the parties finalize a protective order for this case, as the parties discussed during their meet and confer on June 12, 2018. If Plaintiffs fail to comply with these demands, we will seek immediate redress from the court.

I am available to discuss these issues at your convenience.

Regards,

Stephen J. Obermeier

# Attachment 1

**Obermeier, Stephen**

| | |
|---|---|
| **From:** | Josh Friedman <JFriedman@BSFLLP.com> |
| **Sent:** | Sunday, May 27, 2018 11:07 PM |
| **To:** | Obermeier, Stephen; MKamin@cov.com; RVanTassell@cov.com; nsahni@cov.com |
| **Cc:** | Amy Neuhardt; Andrew Chesley |
| **Subject:** | FW: 2474219 JD |
| **Attachments:** | message_zdm.html |

Counsel:

Please see the following response to subpoena. We have not been able to download the substantive response yet. We are working on this, and will follow up as soon as we have the underlying documents.

Best,

Josh

-----Original Message-----
**From:** ATT Mobility Compliance Center [compcent@att.com]
**Sent:** Sunday, May 27, 2018 03:25 AM Eastern Standard Time
**To:** Amy Neuhardt
**Subject:** 2474219 JD



? Help

**This is a secure, encrypted message.**

**Desktop Users:**

Internal AT&T Users: Please go to the Software Store and install the Voltage client for Outlook.

Non-AT&T Users: Open the message_zdm.html attachment and follow the prompts to enroll for an account. If you already have an account, log in with your Voltage SecureMail account credentials.

**Mobile Users:**

For iOS, Android, and BlackBerry users, get the mobile application. For iOS, press and hold the attachment (message_zdm.html) and select the menu item to copy to the Voltage app. For Android, tap the attachment, and tap preview.

For Windows Mobile phones, please forward the message including the attachment to zdmproxy@voltage.it.att.com. You will need to check your Inbox for a link to view the message.

Need Help?

**Disclaimer:**This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender.

Email Security Powered by Voltage IBE(tm)
Copyright 2002-2015 Voltage Security, Inc. All rights reserved.

-----BEGIN VOLTAGE SECURE BLOCK V3-----
MIIKjAYJKoZIhvcNAQcDoIIKfTCCCnkCAQAxggIgMIIBBwIBADCBijCBhDGBgTB/
BgNVBCkTeE1GZ3dEQVlLWUlaSUFZYjlIZ01CQVF3U1lYUjBMbU52Y1lNNeE1qVTBO
ell5T1Rjd01EUXdHZ3dKYm05MFFFtVm1iM0psQkEweE9EQTFNakV3TURBd01EQmFFN
QllNQW1sa0JCQmpiMjF3WTJWdWRFQmhkSFF1WTI5dAIBATAPBgtghkgBhv0eAQEC
AQUABGQrMcbez0QiqxaR1Y9p8hYS79uU8sMvYenJj2AR0gU/VXdCl8/bTgMuRAJ9
MpxJ9a3RveMQ44cBKfwaaHP0CcjCjVvocWa6r10cwL4N9RdWbKDt20H1cO7JcP28
cFQgQEEmOlIVMIIBEQIBADCBlDCBjjGBizCBiAYDVQQpE4GATUZ3d0RBWUtZSVpvJ
QVliOUhnSUJBUXdTWVhSMExtTnZiU1014TWpVMB56WXlPVGN3TURnd0dnd0pibTkw
UWlWbWIzSmxCQTB4T0RBMU1qVXdNREF3TURCYU1Cb01BBWxrQkJSaGJtVjFhFR0Z5
WKhSQVluTm1iR3h3T0GlOdmJRPT0CAQEWDWYLYIZIAYb9HgEBAgEFAARkaRZkpN0H
Z9QU79hbXBrtVOfkmF+GZUmlK+nCRfgY0iPAo86wlWspyEH1HQhDZYvHcjXptdKN
rHuwnLQ6A4ZnSp262Y3L8wJvVXCaCeGG0qsRX6zRG+OtbkDSMN5cD/X9EFdjDjCC
CE4GCSqGSIb3DQEHATAdBglghkgBZQMEAQIEEOBXa4NxQ285zfyQklXxplKAgggg
9HVHlWoY4UuQOktKECs4cYT9sOxM7WjEJxhtZ8xexMWxeh3Va2t/9aMCTsHNUBWy
JYlZJk8nJ5kKMUDkZ3Moe/acUWo48436pI7NdlhAuBZAyKGts9sBwnmnKIuzG1M2
plthdPL5WKFaU2ej0bP6hKid1fLR94caxu6m3OdsE7Rqz2dnh3sfTGMgKDUy9dkh
BrfZE18T8d6djc7yR0KASVVbh/Xidtv0vMbXH/xYWwBYCYPOeSFmkt++lB8RGjlg
CSglp86bXuiFCf73B4/9y4MOCXib8Zv8n7DIpToC5Uo05oF79M7T+LVYL9S+DeCk
VRRU5TcLFZE4gs7LHeJkBQmIwEytLIXk4sPDwfZ3CibytpcwgZrIKEpvjS3KWmuI
8coEaPMlbJS3tKGtw6QauZxTc8ambwY9+/wYMF95qFGDMB7aqnKlalfmUNHlpltJ
54tmL83/rBgDwwvjZg3Pa3AvFyfSZOHUzHAOhxeAoapF7j1a44yNwsdva5L0f/HG
Aww+utYb5xQABuOCJmWvqCd4MyKWKDIOphWldw3+OpfFy8aS+W4s3K8O3Mcb2/Pv
Ic0QcuO2ue+raJpyzB8mSReyCZ5h/LFjOxoxjfH7XtOUPWcs5SnNUTw4JQ/MqBZl
rw4xMXpKDHafbttpnNo/s7aHLN+Tdih24N0y9em5HoMdhEdXTB7Q6IdPQ0JSFwd2
vCPJ0xsskNdOkTLHWW5EKe1+WWQ3QFdNRIXNReJ8TKE33LLpZ9RXP1kmdr0pBzRe
/EoiqJUKaJf0YY9RJBkCwDVEUWincOYkW7q4gicEE3YAt8NKY/qd2hadrPx1RjEd
3cZamXExwmRGYZHVtXHNnSngPaY6LRZDwPxXYC2WPhl5zdKWqgFEj/SEPDCQjWRP
TBUR8Khsx8d/wuqWow93HDuR34B2CmjfD05fr9RPOlslqakBfz2ZW4MYqqTRzXIt
8y8omPHmGse5PcD8E9+J9UFg+cnCAMSyP+qNEbDWSzQs/YE3gF7kYRi976fPbGa7
qAdXR5pXodhhaH0AU7RFtXz8MulcUMv9A0/teXH4y7JVB3UcIAbSivuCL2wbFqGb
rrFyv3URrlalXqgz4ya/ZUFWyyY3QoaX/OZGvRkGS4ZuE6Ftu7XpjKADpDnedDRo

2uITQSKaNKgfQi1PhNu+WvpXyoEFqHVMnK8Xgi2IxkYD+JyrCzHafB/sVcZuKkGF
+QQwx4qTXsOumQ7cbo3cEOovBHD42RHTygubFbfyATzDQWve93BSeeZ6vCxebnuz
tKlovTbOvxjx0rYEH520w38gd15JzxJVj/sSiOwojw1bbmaFacSyay4wOYB9eueo
FhtDIqXoSbM8umH5wEchxYigpeYjCgeEWSxm5LCBPVyylwJk5/a3bm9okOA6zFlF
QJxSQWotYx+XflcMH+Perlc62Imc3R2xSL7ZALXCLI/Hp9rBWxUcr9CCUdrssrFN
QIuuOzhJYUIP6pySd25O0SMKM9HTurbsC48+KtC2j6JR4tLDv3Cs+NHPVOVTtWka
C5qpr1rq+B3siwWjAEnR7FdM4lcng1y3R7dx6Xt3SQvz/MXNKEzRvPKck8TKi1Os
pu+b2VM7ZoNHqgKWB9eVe9zH2za/aj34BOFUAaAXcjNctKVDTYtFltS7iyDpyhkn
AHwvoFaOoLPcihLL33IyWBwadCQKVJyj19ELopcZQcjXs2Zmq3O784QHm3HipaHL
JBVd607YJPTfugUzdZ0wg0Xq6u4TJ5wU937ME3Nd37+DEmQicz8fqlTUdZPOaJ3/
O+8aCarYtT+23Bmmkh8UPnZDAf8mYt/WUHLXAWIGkqBjHz03bOTlo/YE1/ef04nN
fLiA1x0k+21LRnquXHRhMoGC7KYZtRcXZddEZwqlnt+yhYoOXVBGJnDov98UoEgD
xCMeZzg+OjG33qhuKnhzhQtNAacPiDHvvmdRxSpIBEiD07H8tOQi3NCJT5YCCIiz
wKLA9eoDFuBHbc0Aat/4n+5TeSjgFrdQ9UtrvU62ZH3O9pHf1qlkFvYJ4hrM+7AH
5A7OY85ifig/M8hmPG3fc+FXFWOvlChmXm75BjNsYrYj7EX1ly1R9dhnUejNB2Hs
qfHA2RvqN1mYzZjt9+eZWKf2dBbH16UR8teyeoqPmpKJQGIB17NFl2yRM0zAQTnq
pxrtlOmhylm0hlQK7fZk7qfiaw9j37c/s33KSLpijF/QSzClsEsc8L9iwYjuciDO
33b17aHnOc7s4P7qfSzkeugiKOvtRlxvf4WXFwIieZG+j7vh4fg99QsCpAcp+Agc
SB4ivm4IFnDK5HCz+xQceCLS3EyIiZOvPiC7lgAe0PVh2hpnItr2kCYgV53hcgCA
YnJO4679h4bzZZ6mezm9U2hlW6zGnr6HfOjUroH+Cf4B2ygYPWO38LS8n7rARV13
ShLOz6V8i2Js75tBY3x0U0ED3HTLUFdhQWOeVuPtzNAqhKrMGwpQWf45hlVRySlJ
aHmRFmqJHyBJDsytU2yMoJC7IZwBbh0zllqXQcmlnnqHYcvil3AzIn76QL+dDqLO
NAngcG+e5GRg068mdnC262H1rE25kWkpGIqviWNqsCyZYQG7nKuZzfCjUfb/sTXX
v521mRUWQlwbh8jAQOvWgh1lDvsR2xsFx7U0SKXEeC0AC+DCC4snL3csLRymt0Wi
cCNpIcvQqcVN4H9bYQQYMwlzUwwBdtGPerOgcuyyk6vOkitJVCiRhMGHu2Tqhsov
mZk+8BtYyi+N+1yvxbdlvw==
-----END VOLTAGE SECURE BLOCK V3-----

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# Attachment 2

**BuzzFeed NEWS**

BuzzFeed    Videos    Quizzes    Tasty    As/Is    More ⌄

We've updated our privacy notice and cookie policy. Learn more about cookies, including how to disable them, and find out how we collect your personal data and what we use it for.

Show privacy notice and cookie policy

OK



Destination for Hotstar Originals
Get 2 Months at $5*
Use promocode HOTSTAR5 to    Sign up

WORLD

# The FBI Is Not The Only Threat To Reporters' Confidential Sources

The lawsuit by former Trump fundraiser Elliott Broidy is the latest reminder of the difficulty reporters face in keeping their contacts confidential.

Posted on June 12, 2018, at 4:59 p.m.



**Kevin Collier**
BuzzFeed News Cybersecurity Correspondent



Reporting From
Washington, DC

Advertise with BuzzFeed

**BuzzFeed NEWS**

North Korea's Kim Jong Un has a history of human rights abuses, and in a new interview, Trump defended him as a "smart" guy. ›

Apple is adding a new security feature that closes a loophole police used to download data from locked iPhones 📱 ›

Rose McGowan helped bring about Harvey Weinstein's downfall. Now, the activist says he's trying to take her down with him. ›

News moves fast. Keep up with the BuzzFeed News daily email!

Your email addre    Sign up

ADVERTISEMENT



Elliott Broidy
Alex J. Berliner / BEI / REX / Shutterstock

 

Lawyers for Elliott Broidy, the disgraced American businessman and Republican fundraiser who claims Qatar hacked his emails to leak them to journalists, have successfully subpoenaed phone records showing that reporters who wrote about him spoke repeatedly with a former lobbyist for the Persian Gulf nation before writing their stories.

Broidy's lawyers revealed they'd received the phone records in a court filing late Monday in which they described the records as "voluminous" and said they linked Nick Muzin, who once was registered as a lobbyist for Qatar with the Justice Department, to reporters who subsequently wrote stories about Broidy. They offered to make the records available in court.

Obtaining records of reporters' communications with sources is a politically charged issue, highlighted most recently with the indictment of a former Senate Intelligence Committee staffer on perjury charges for attempting to conceal his contacts with reporters. That indictment was based in part on the FBI's seizure of email and phone records of a New York Times reporter who once worked for BuzzFeed News.

But the seizure of records documenting contacts with reporters in a civil court case that does not involve the government is less controversial, largely because the records being sought are not the reporter's.

Broidy, who stepped down as deputy finance chair of the Republican National Committee after the Wall Street Journal revealed he'd paid $1.6 million to a mistress he'd impregnated, has major business ties to, and is an avowed supporter of, the United Arab Emirates, which for the past year has been locked in a bitter dispute with Qatar.



Connect With BuzzFeed World

Like Us On Facebook

Follow Us On Twitter

## More News



Trump Defended Kim Jong Un's Record Of Human Rights Abuses After The Summit



An Arizona Politician Complained "There Aren't Enough White Kids To Go Around" In Public Schools



This Is How The Grenfell Victims Will Be Remembered By Their Loved Ones

ADVERTISEMENT

Broidy is the third person since 2017, and by far the highest-profile, to incur the wrath of a Gulf nation, and then see his emails stolen and leaked in a tailored way to different news outlets, resulting in weeks or months of negative coverage. Stories based on those hacked emails have appeared in the New York Times, the Wall Street Journal, and a number of other outlets.

In April, Broidy's attorneys subpoenaed Muzin for "any and all communications" with "media or press representatives." The Monday filing said that the request resulted in Muzin revealing contacts with "publications that published articles about Plaintiff Broidy, including McClatchy, the New York Times, the Associated Press, and Bloomberg News."

The filing provided specifics of calls between Muzin and one reporter, Tom LoBianco, then of the Associated Press. According to the filing, Muzin and LoBianco spoke "on more than a dozen occasions" during the preparation of a lengthy article the AP published May 21 that was based on Broidy's emails.

LoBianco recently left the AP to complete a book on Vice President Mike Pence and did not respond to requests for comment. In a statement, the AP said it doesn't discuss sources.

Bloomberg declined to comment and the New York Times did not respond to a request for comment. McClatchy declined to address the claims directly. "Generally speaking, however, we believe strongly that a reporter's communication with a confidential source is protected by the First Amendment and by relevant state shield laws," Jeanne Segal, a McClatchy spokesperson, said.

Muzin announced June 6 that he no longer represents Qatar. He acknowledged contacts with LoBianco in a May 22 filing with the Justice Department. He didn't respond to a request for comment. A Qatar spokesperson also did not respond to a request for comment.

For Broidy's team, the phone records are evidence of their claim that Qatar's agents not only hacked Broidy's family server but were behind a campaign to send his most damaging emails to reporters.

For press freedom advocates, however, the subpoena is another worrisome sign that reporters' ability to keep their contacts with sources confidential is under siege, especially coming on the heels of news last week that the FBI had acquired years of metadata for phone calls and emails of New York Times reporter Ali Watkins in a leak probe involving the former security chief of the Senate Intelligence Committee. The former committee staffer, James Wolfe, was indicted on charges he lied to FBI agents about his contacts with reporters, but was not charged with leaking information.

"There is always concern when subpoenas are used to try to identify journalistic sources," said Alexandra Ellerbeck, the North America program coordinator for the Committee to Protect Journalists, an advocacy group.

The use of a subpoena in civil court also runs the danger of circumventing state laws that are intended to shield reporters from having to reveal their sources, said Lynn Walsh, a member of the board of the Society of Professional Journalists. Efforts to pass a federal law that would allow reporters to refuse to reveal their sources have failed.



Apple Is Adding A New Feature That Prevents Police From Unlocking iPhones



A Mother Says Immigration Officials Took Away Her Daughter While She Was Breastfeeding In A Detention Center

ADVERTISEMENT



A Deal To Help DREAMers Looks As Far Away As Ever. Here's Where Things Stand.



Former Trump Adviser Carter Page Said That He Had It Worse Than Ali Watkins

"Is this going to set potentially a precedent? Are more people going to do this to get around state shield laws that do protect sources, and ... make journalists vulnerable to this type of exposure?" Walsh said.

To date, the FBI has not brought charges against anyone for the Gulf email leaks, nor for the 2016 hack of Democratic Party servers that the US intelligence community has attributed to Russian military intelligence.

The FBI is currently investigating the Broidy hack and did not respond to a request for comment.

Jose Orench, a former chief of the FBI's Data Intercept Technology Unit, speculated that the agency also would attempt to obtain details of contacts between Muzin and the reporters he communicated with.

"It's very likely they would have acquired those records," Orench told BuzzFeed News.

Kevin Collier is a cybersecurity correspondent for BuzzFeed News and is based in New York. Contact Kevin Collier at kevin.collier@buzzfeed.com.

Got a confidential tip? Submit it here.



McDonald's Has Cold Brew Now, And What Is Coffee Anymore?



Rose McGowan Is Still Fighting

ADVERTISEMENT



## Now Buzzing



News moves fast. Keep up with the BuzzFeed News daily email!

Your email address          Sign up




Guess's Cofounder Has Quit After A Sexual Harassment Investigation Found He "Exercised Poor Judgment"



An Anti-Disney Troll Account Says It Didn't Actually Lead The Harassment Against Kelly Marie Tran



The Queen And Meghan Markle Are Best Pals Now



**People Are Mad At Stefano Gabbana's "Ugly" Comment On This Pic Of Selena Gomez On Instagram**



**How Many Of These Movies Directed By Women Have You Seen?**



**We Tried A Barbie Vintage Clothing Line**

# Attachment 3



**Tablet**

THE SCROLL

Qatar's Efforts to Influence
American Jews Continue to
Unravel

As a new lawsuit draws attention to lobbyists, one key advisor ends his
relationships with the Gulf state
By Armin Rosen

On Wednesday, Nick Muzin, the political strategist and former
senior staffer for Republican Senators Tim Scott and Ted Cruz
whom Qatar hired to help improve the gulf kingdom's
reputation in the U.S. Jewish community, announced that his
work on behalf of his most controversial client had come to an
end. "Stonington Strategies is no longer representing the State
of Qatar," Muzin tweeted.  "I am proud of the work we did to
foster peaceful dialogue in the Middle East, to increase Qatar's
defense and economic ties with the United States, and to
expand humanitarian support of Gaza." According to FARA
disclosures, the Qatar contract was worth $300,000 a month
for Muzin's consulting firm.

Muzin's tweet concluded a tumultuous nine months
representing Doha. In September of last year, Muzin largely
failed in attempts to facilitate public meetings between U.S.
Jewish communal figures and high-ranking Qatari officials
during the opening of the United Nations General Assembly. He
was more successful in quietly mediating between the
Qataris and American activists concerned over Al Jazeera's
potential release of video that a British national named
Anthony Kleinfeld collected while infiltrating Jewish and pro-
Israel groups in Washington over the summer of 2016 (the
documentary still hasn't been released yet, and the editor who
oversaw the project has taken a sabbatical from the network).
In November and December of 2017, Mort Klein, Alan
Dershowitz, prominent Orthodox Rabbi Menachem Genack,
and Religious Zionists of America President Martin Oliner,
traveled to Doha on trips that Muzin helped organize. Although
Klein and Dershowitz both told Tablet this past February that
they went to Qatar partly confront the country's leaders over
their alleged support for Hamas and other terror groups, the
trips were still proof that some of the most pro-Israel voices in
America were willing to visit the country.

Given the circumstances, Muzin's tweet is likely to mark the
end of Qatar's latest efforts to court American Jews. Muzin is
currently one of the defendants in a lawsuit that Elliott Broidy,
a businessman, major Republican donor, and critic of Qatar
brought against Qatar, Muzin, and various other defendants.
Broidy alleges that Muzin participated in the dissemination of
emails that Qatari-hired hackers unlawfully obtained and had
operational knowledge of the hack. The hacked emails formed
the basis of stories in the Associated Press and The New York
Times purportedly documenting Broidy's behind-the-scenes

advocacy with the Trump administration on behalf of the United Arab Emirates, a regional opponent of Qatar's where Broidy has business interests.

In an amended complaint filed on May 24th, Broidy's legal team claims that Muzin "exhibited inside knowledge of the attacks on Plaintiffs, and disclosed foreknowledge of future attacks to at least one other potential victim to warn him against taking public positions adverse to the State of Qatar;" it also alleges Muzin's "company (Defendant Stonington) was among the vehicles used by the State of Qatar to funnel funds to others involved in the attack." Broidy's lawyers have already raised concerns that Muzin and Qatar are ending their relationship in order to complicate the lawsuit's ongoing discovery process. In Muzin's contract with Qatar, he pledges he "will not use confidential information for any purpose other than performance of this Agreement, and...will return the information upon request." That contract provision could provide a rationale for Muzin returning documents to the Qatari embassy in Washington, where they would be beyond the court's subpoena power.

So far, Qatar, Muzin, and others related to the Broidy lawsuit have been cagey about relinquishing documents. In a June 4th memorandum in support of a motion to stay discovery, Muzin's lawyers claimed that the defendant and his company were entitled to "derivative sovereign immunity" and to "immunity as diplomatic agents of Qatar." Even though he's a US citizen, and Stonington Strategies is a US entity, Muzin believes he should be protected under the Foreign Sovereign Immunities Act, which shields foreign governments from certain US legal exposure.

Muzin's argument was echoed in the State of Qatar's own motion to stay discovery, also filed on June 4th. "Plaintiffs' already-served discovery seeks sensitive materials exchanged between a sovereign government and its agents regarding matters of foreign policy," Qatar's lawyers write. "For example, two of the first document requests to Defendants Muzin and Stonington Strategies are for '[a]ny and all documents concerning or constituting Communications with any person regarding Your retention by Defendant State of Qatar'" and 'Communications regarding Plaintiffs with Defendant the State of Qatar or with its officials, agents, or any persons acting on its behalf.'" Joey Allaham, a businessman and former kosher restaurateur who helped connect Muzin to his eventual Qatari clients and who is not a defendant in the Broidy lawsuit, was "directed to comply with the subpoena within 72 hours" by the court on June 6th.

It's legitimate to use any permissible tactic to avoid having to share sensitive personal information with one's legal adversaries. Still, the Broidy lawsuit is subjecting Qatar's outreach campaign to the Jewish community to unprecedented public scrutiny (After all, journalists do not have subpoena power). The Broidy case threatens to reveal the architecture of Qatar's influence operation in the United States—as well as how American Jews factored into it.

The disclosures are already coming. On Thursday, Allaham claimed to Politico that he was decisively breaking with Qatar, saying the government "enjoys portraying themselves as the purveyor of peace in the region, but this could not be further from the truth." More importantly, he told the publication that he planned on making a retroactive Foreign Agents Registration Act disclosure with the Department of Justice

about his various efforts on Qatar's behalf, raising the possibility that he was working as an undeclared Qatari agent during the period of Doha's attempted outreach to the US Jewish community. The next day, Qatar's legal team wrote a letter to judge Katherine Forrest, who is presiding over the case, asking to review whatever documents Allaham turned over as a result of her June 6th order that Allaham comply with an earlier subpoena. According to the letter, the review was necessary in order to "protect diplomatic documents" that might have ended up in Allaham's possession. Startlingly, the letter acknowledges that Allaham "was subcontracted by Nicolas Muzin in connection with Muzin's retention by the Qatari Embassy for diplomatic outreach." Allaham's name appears nowhere in Muzin's various FARA disclosures, meaning Qatar's lawyers are now claiming one of the country's own lobbyists wasn't being entirely transparent with the Department of Justice.

All of the defendants, including Muzin, disputes the substance of Broidy's lawsuit, claiming that the case is an attempt to distract from the substance of the emails themselves. "Movant Elliott Broidy currently faces legal scrutiny over his lobbying activities on behalf of various Middle East nations with which he does business," the Qatari legal team's letter reads. "In response to this scrutiny, Broidy concocted a conspiracy theory in which the State of Qatar allegedly masterminded a global network of operatives and ex-CIA agents to hack and publicize Broidy's e-mails."

When Allaham was reached for comment, he directed Tablet to his assistant, Emma Hitchcock, who issued a statement on his behalf: "When I started my work with Qatar, there was no fixed start date, no written contract, and their attorneys never told me whether I had to register with FARA. So I don't know if I ever was a so-called legal agent of Qatar, but I do know that as of Friday I am not anything with them. So I am filing a combined FARA registration and termination report–it may not be required but I want the public record to be clear that I am no longer affiliated with them."

The fact that Allaham spoke with Politico just 48 hours before the deadline to comply with the Broidy team's subpoena could be happenstance. In the statement Hitchcock sent to Tablet, Allaham claims as much: "The Broidy case and ending my work for Qatar are not related.  I had planned for a while on announcing my resignation this Friday. The Broidy case sped up faster than a lot of people thought, so it's a coincidence the two things are happening in the same week." But it's just as possible that there are more revelations on tap about Allaham's work with Qatar—and about Muzin's. For instance, phone records revealed during the discovery process showed over 1,000  calls between Allaham and Klein's numbers during a year-long period ending in mid-May; phone records also show 36 calls between Muzin's number and Klein's home phone number, along with roughly 100 calls and texts between the two men's cell phones over a 9-month period ending in May (When asked to comment, Hitchcock replied that Mr. Allaham and Mr. Klein are "old friends who speak regularly on a variety of topics").

On June 6th, Klein released a lengthy statement explaining his rationale for traveling to Qatar before decrying the country's "alarming steps backward." Klein told Tablet he wrote the statement because of developments over the past week, including an honor given to the Doha-based Muslim

Brotherhood cleric Yusuf al-Qaradawi and Al-Jazeera's coverage of violence at Israel's border with Gaza, which he described as "almost Nazi-ike in promoting the murder of Jews." When Tablet asked about the timing of the statement and why he thought these developments represented such a significant change in behavior on Qatar's part, Klein replied, "What does that have to do with it? Why are you asking stupid questions?," and said, "I'm not going to answer questions that don't make any sense." He added that he didn't learn that Qatar and Muzin parted ways until earlier on Thursday. He declined to discuss his relationship with Allaham. When asked about the call records showing how frequently they had spoken, Klein said, "I don't discuss things that have to do with legal cases." When asked if he had in fact talked to Allaham 1,000 times over a year-long period he replied, "Really, what's wrong with you? I just told you i'm not discussing anything that concerns that case."

Phone records also indicate that Muzin spoke with Ahmed al-Rumaihi, a Qatari who carried a diplomatic passport identifying him as a "consul general" throughout 2017 and a defendant in the Broidy case, over a dozen times in June of 2017—a few months before Muzin began his work on behalf of the emirate. According to the amended complaint filed last month, Al-Rumaihi, who until 2016 was head of a $100 billion subsidiary of the Qatar Investment Authority, "worked with unregistered Qatari agent Joey Allaham to identify Defendants Muzin and Stonington to assist in the State of Qatar's campaign to influence the Jewish community in the United States."

Two sources confirmed to Tablet that Rumaihi presented his diplomatic passport as his primary form of identification to business partners on the West Coast later that year. Jassim al-Thani, Qatar's media attached in Washington, said in a May 16th statement that "Since March 2017, Mr. Al-Rumaihi has not represented the State of Qatar in official matters." Still, Rumaihi was listed as a "C/O" on the Qatari government's June 2017 lobbying contract with a law firm owned by former attorney General John Ashcroft.

A spokesperson for Sport Trinity, Rumaihi's current company, said that "Mr. Al-Rumaihi is a private citizen and he does not have a role with the government. The fact that the passport he got when he worked as consul general has not expired yet is not notable. You are not required to return diplomatic passports when you stop carrying the title. You can remain in possession of them after you leave the position."

Rumaihi, who met with transition officials in Trump Tower in December of 2016  is a crucial figure in Broidy's case against Qatar and Muzin. In the amended complaint, Broidy's lawyers claim Rumaihi was part of an "unlawful conspiracy" to target their client, and acted as an "architect" of efforts to discredit American critics of his country. Rumaihi strategically built contacts throughout the US Jewish community: He was present at the Zionist Organization of America's annual gala in November of 2017, and was spotted at an AIPAC event in Los Angeles in January of this year. Some of his other outreach efforts were more fanciful: Rumaihi was an investor in the Big 3, a 3-on-3 basketball league co-founded by the rapper Ice Cube. One of Rumaihi's business cards included the Big 3 logo and listed him as a "director" of the league.

The Big 3 insinuated a former Qatari diplomat within a business endeavor that involved athletes, musicians, and other

American celebrities. Rumaihi had recognized the messaging potential in something that would appear to be totally apolitical and disconnected from any overt Qatari interests. Doha's Jewish outreach campaign isn't all that different. Few would accuse Qatar of being especially close with Israel, and its foreign policy is less aligned with the Jewish state's than the UAE or Saudi Arabia's, two countries that imposed a blockade on Qatar over its support of the Muslim Brotherhood last year. Muzin's work shows that Doha believed it could use supporters of Israel to advance its interests without meaningfully changing any of the emirate's policies. Thanks to Muzin's efforts—and perhaps because of the constant threat of Qatari state media revealing undercover footage of the Washington pro-Israel world—the project seemed to pay off for a time.

But the Big 3 echoes Qatar's efforts with American Jews for another reason. Rumaihi's basketball investment ended in an April lawsuit that Ice Cube and league co-founder Jeff Kwatinetz filed against Rumaihi and other Qatari investors, alleging that the Qataris stiffed them on several million in promised funding and that Rumaihi was using his participation in the league in an attempt to bribe former White House advisor Steve Bannon. According to the Broidy lawsuit, Muzin wasn't just advancing Qatar's case in the American political sphere, but helping coordinate a hack on one of Doha's loudest US critics, and then using leading US media outlets to boost the attack's impact. Allaham, meanwhile, wasn't merely a business and social fixer with high-powered Qataris in his network, but someone engaged in undisclosed "diplomatic outreach" on behalf of a foreign government. (When reached for comment, a spokesperson for Rumaihi told Tablet that "The allegations in the Broidy complaint related to Mr. Ahmed Al-Rumaihi are false.")

In each instance, pro-Qatar forces, including the ones most eager to influence US Jews, are alleged to have skirted the boundaries of normative public advocacy. Even if Broidy's lawsuit turns out to be unfounded, as the case progresses we're likely to learn more about how and why Qatar's Jewish outreach took place.

Armin Rosen is a New York-based writer. He has written for The Atlantic, City Journal, and World Affairs Journal, and was recently a senior reporter for Business Insider.

f  t  p  g+  Q          COMMENT    PRINT  EMAIL

MORE IN:    NICK MUZIN    QATAR



**Dazzling Vintage Photos**          Historic Photos So
Groovy History                        Beautiful We Can't
                                      Stop Staring



Marcus Strickland, Wayne Shorter, and Ambrose Akinmusire in a still from 'Blue Note Records: Beyond the Notes.'(Photo courtesy Mira Film)

Blue Note Records has produced music from the greatest names in jazz: Miles Davis, Thelonious Monk, John Coltrane, Art Blakey, Bud Powell, Horace Silver, Cannonball Adderley, Dexter Gordon, Ornette Coleman, Herbie Hancock, and Wayne Shorter. A new documentary by Swiss filmmaker Sophie Huber, Blue Note Records: Beyond the Notes, had its premiere at the Tribeca Film Festival this spring and is currently playing the festival circuit. Hancock and Shorter appear in the film, along with the sly, funny octogenarian Lou Donaldson (hailed as one of the greatest alto sax players ever), the genre-crossing Norah Jones, A Tribe Called Quest co-founder Ali Shaheed Muhammad, and longtime soundman Rudy Van Gelder, who engineered such legendary albums as A Love Supreme, Walkin', Colossus, and Song for My Father. (Van Gelder died in 2016, at 91, before the film was completed.) Younger artists, too, speak to the camera about jazz's continuing importance in their lives and in the American cultural conversation. For jazz fans, the movie is a delicious deep dive into the label's eight-decade history. But as I watched, I kept thinking about the missed opportunities.

Blue Note was founded in 1939 by Jewish refugees from Nazi Germany, Alfred Lion and Francis Wolff. (Fellow co-founder Max Margulis isn't discussed in the movie, perhaps because he was more of a behind-the-scenes guy, providing much of the early funding, writing ad copy, giving voice lessons to artists, and reviewing music and stirring things up in lefty publications including The Daily Worker.) We hear scratchy radio interviews in which Wolff and Lion discuss their love of the genre. Lion tells of his mother in Berlin bringing home a jazz album in 1926; in his Yiddish accent, he tells a plummy, mid-Atlantic-inflected. WASP-y radio interviewer, "I vas very much impressed by vhat I heard!" Wolff agrees: "I didn't understand it; I couldn't follow it ... but I just liked it!" They created Blue Note, the story goes, because they wanted to be around the music all the time. Their artists led them into introducing new jazz forms. "Ve kept making Dixieland records, and then slowly drifted over into the sving and then into the modern, into the bop," Lion says. That last sentence somehow sounds hilarious in a Yiddish accent.

The film is full of photos (Wolff was a passionate photographer), musical snippets, and footage of black jazz artists from the 1940s to the '60s doing their thing. Blue Note's most important behind-the-scenes hire was Van Gelder, another Jew, who was associated with it for decades; for almost seven years in the 1950s, the label's albums were recorded in Van Gelder's parents' living room. Van Gelder, Donaldson, Hancock, Shorter, and jazz historian Michael Cuscuna—a consultant for Blue Note since 1984—talk about how much

artists loved Lion and Wolff, how they never took advantage of the musicians who recorded for them, how they were directed by a pure love of the music. Which is probably true! But anyone who pays attention to contemporary music should be clued in to the oft-contentious relationship between African-Americans and Jews in the music business. Were Lion and Wolff extraordinary? How do they fit into the narrative of African-American art forms being capitalized on, popularized, and monetized by Jewish composers from Berlin to Jolson to Gershwin to Bernstein? Black artists have spoken of feeling exploited by white management; Jews have pointed to anti-Semitism in hip hop. Jazz in particular feels like a complex petri dish of cultural anxiety; hip hop has seemingly taken on much of the urgency jazz once had, and jazz audiences today feel heavy on wannabe-down white dudes in fedoras. (As I did on Unorthodox a while back, I shall put in a plug for Jesse Andrews' musical YA novel The Haters, with its gaspingly hilarious mockery of the pretensions of the current jazz scene.) As its fans age, does an art form get less relevant?

These are big questions. But this movie doesn't go there. It's purely a celebration of one label, which may be sufficient for informed jazz fans and lovers of classic jazz, but isn't enough for viewers who seek to understand jazz's place in the world now. Young and young-ish Blue Note artists like drummer Kendrick Scott, pianist and educator Robert Glasper, and bassist Derrick Hodge talk eloquently about why jazz mattered back in the day. The film shows footage of civil-rights protests and the musicians reflect on how the music reflected the social upheaval of the era. "Never at any point do I hear the music and hear them being defeated," Hodge reflects. "Somehow, regardless of what they were fighting with, they're going down in history, creating something … in a way that I felt freedom, in a way that brought me joy, in a way that made me want to write music that gave people hope."

The film doesn't effectively convey the fury and grief of the civil-rights movement. It's not until hip-hop producer Terrace Martin shows up that we feel the immediacy and high stakes that jazz must have conveyed in the 1960s. "When I was a kid, the ghettos wasn't used to seeing motherfuckers with instruments no more," he says intently. "Because at that point they'd killed all the music programs in the schools." Director Huber pairs his words with images of crumbling walls, burned-out buildings, graffiti reading "broken promises." "I think that was one thing that made gangbangers turn up a whole bunch in the '80s," Martin continues, "because the kids had nothing to do. No more afterschool programs, gangbangers turning up, self-hate turning up, murder rate turning up, crack turning up. All that was left was the records, the albums, and turntables—no instruments. Motherfuckers took records and turntables and went to the South Bronx and parks and got down."

Ali Shaheed Muhammad, co-founder of A Tribe Called Quest, picks up the thread: "Putting your record player and your neighbor's record player together—that's the birthplace of hip hop: that communal need to get together, to understand, to express."

Blue Note went dormant in the early '80s. But its influence continued to be felt in hip hop; the label became this burgeoning genre's first stop for samples. Donaldson's "Ode to Billie Joe" is now Blue Note's most sampled track. ("I found out by looking at my royalties," Donaldson says with a laugh.)

Huber illustrates this via recognizable snippets in songs by Kanye, ATCQ, De La Soul, and Eminem.

The label relaunched in 1985. Today, Blue Note's president is Don Was (né Don Fagenson), a Jew from Oak Park, Michigan. But he's also a former musician, perhaps an indication that like the label's founders, he'll try to make commerce take a back seat to art. Glasper is now one of Blue Note's clearest voices, blending jazz with hip hop and R&B. He's determined to move jazz out of where it often seems to be now—a secret society for the cognoscenti—into more mainstream popularity. He's on Pulitzer Prize-winner Kendrick Lamar's album To Pimp a Butterfly, along with fellow Blue Note artist Ambrose Akinmusire.

But no one would call Lamar a jazz artist. So what's the future of jazz? Will it require infusions with hip hop and R&B to be relevant? What's the role of race and gender (the only woman who appears in the entire documentary is Norah Jones) in the genre as it moves forward?

Who knows? But maybe the fact that jazz is such a collaborative genre bodes well for a callback to the positive aspects of black-Jewish musical relations. As the Chicago Tribune noted, in a review of a different jazz documentary, "The Jews of Tin Pan Alley and early Broadway naturally gravitated to the new, all-American sound, which was jazz. ... Ultimately, the two musical cultures shared fundamental truths, which helps explain why visionary black musicians such as Louis Armstrong, Billie Holiday, Ella Fitzgerald, and others could find so much meaning in songs written by Jews of Eastern European birth or heritage. And why those songwriters embraced the syntax of black music." Perhaps jazz in the future can move forward suffused with awareness of how black and Jewish narratives in America have diverged, despite the similar elements in our histories. It seems fitting that a blue note, aka a "worried note," is a note sung or played at a slightly different pitch than standard. It's a note for an uncertain time.

\*\*\*

Like this article? Sign up for our Daily Digest to get Tablet Magazine's new content in your inbox each morning.

Marjorie Ingall is a columnist for Tablet Magazine, and author of Mamaleh Knows Best: What Jewish Mothers Do to Raise Successful, Creative, Empathetic, Independent Children.

         PRINT   EMAIL 

MORE IN:   BLUE NOTE RECORDS    DOCUMENTARY FILM    HIP-HOP

JAZZ    R&B    TRIBECA FILM FESTIVAL



(Photocollage: Tablet Magazine; original photo: Gali
Tibbon/AFP/Getty Images)

To Heal the World? How the Jewish Left Corrupts Judaism
and Endangers Israel is a sweeping critique of the
contemporary progressive Jewish left, arguing that its roots in
the Jewish enlightenment (haskala) and classical Reform
Judaism render it a distortion of "traditional Judaism" and a
danger to Jews. When I say that To Heal the World? does not
live up to its stated goals, it is not because I disagree with its
conclusion, which I do. Rather, it's because author Jonathan
Neumann does not appear to have the requisite historical tools
or sufficient knowledge of Judaism to make his case.

There are certainly well-argued and compelling books from the
Jewish right criticizing the Jewish left. The reader can easily
access the essays of Jon Levenson, David Novak, and Alan
Arkush to note only three examples. These writers all have the
requisite knowledge of history, general and Jewish, and a firm
grasp of the literary canon sufficient to wage such critiques. I
may disagree with them but I read them with utter seriousness
and respect. To Heal the World?, on the other hand, does not
meet this standard in terms of substance, method, or
argumentation.

It is not that Neumann is always wrong. I agree with some of
the interpretive excesses of the liberal Jewish adaptation of
sources he notes, but his argument, even when on the mark,
often collapses under the clay of its foundations. It is an
example—one can find others in the pages of Commentary and
other like-minded publications—of someone from the right
who knows little about Judaism polemicizing against the left
by claiming they know little about Judaism. In the chapter on
tikkun olam almost all the rabbinic sources Neumann cites are
sources used by social-justice activists themselves (which he
contests) or sources he cites from secondary literature. In other
words, this is not a source-based critique of social-activist
Judaism but simply an ideological bromide against Jewish
liberalism under the guise of a serious critique of social
activism.

Neumann's argument is that the progressive social-justice
movement is aberrant of "traditional Judaism." So what is
"traditional Judaism," or "traditional Jewish
thought"—phrases that Neumann uses dozens of times yet
never once defines. Does it include only rabbinic Judaism, or
even books like Pirkei d'Rabbi Eliezer with its fantastical
stories of ghosts and demons that many of its contemporaries
rejected? How about the Zohar, whose doctrine of the sephirot
was accused of being non-monotheistic by some sages? Or
Lurianic Kabbalah whose theory of creation arguably
undermined rabbinic teaching? Or maybe nascent Hasidism
that was banned by the Gaon of Vilna as heresy? Or Rav Kook,
whose books were burned in the public square by the old-
settlement Jews in Jerusalem? We would never know because
for Neumann "traditional Judaism" is largely a placeholder
that doesn't really mean anything other than the opposite of
whatever social-justice Jews are doing.

More to the point, Neumann's argument fails because most of
the social-justice advocates he is intent on pillorying are not
arguing that their rendering of tradition is "traditional

Judaism." That does not mean they do not consider what they do legitimate Judaism, just not "traditional Judaism"—certainly not if by that term Neumann means Orthodox Judaism. Such an essentialist definition of "tradition" exhibits a significant lack of historical understanding of tradition as something that is continually made or re-made, rather than as a prepackaged gift bequeathed in turn to every generation.

***

The historical errors are plentiful but for the sake of brevity I will only mention a few. Neumann tells us that before the 19th century most Jews lived in ghettos, continually suffered persecution, and remained devoted to traditional Jewish practice. The first Jewish ghetto was established in Venice in 1516. Other ghettos existed after that but most Jews didn't live in them. Before that Jews lived multivalent lives, some more in line with "traditional Judaism," some less. In Medieval Spain and Renaissance Italy, for example, Jews enjoyed a fair amount of freedom interspersed with periods of persecution. The notion of what Salo Baron called the "lachrymose" understanding of Jewish history, stated as fact by Neumann, has not been taken seriously by historians for decades.

Neumann claims that when Jews were emancipated they were required to abandon their Jewish identity and that Jews were emancipated only as individuals but not as a community. The first claim is misleading. Even as many Jews did choose to distance themselves from their Jewish identity it was not often a condition. Many understood themselves to be fully emancipated yet remained fully Jewish, Moses Mendelssohn being the iconic model. The second claim was true in France but not in America, where George Washington's 1790 letter to the Jews of Newport makes it very clear that Jews would be free as a community to practice their religion. They were not asked to abandon their Jewish identity.

Neumann attempts to set up a simplistic and outdated dichotomy of Jewish life before and after modernity to make the case that modernity itself is the poison that leads to the distortions of contemporary Jewish social activism. The basic trajectory of Neumann's argument is that there is a straight line between classic Reform's "treyf banquet" in Cincinnati in 1883 and contemporary forms of social-activist Judaism today. This is based on his claim that the reformers misconstrued prophetic verses to claim that Judaism was a religion of "ethical monotheism" (he never uses this popular term, which is surprising) where rituals and Jewish difference were abandoned for ethics and universalism.

There is certainly a case to be made that classical Reform Judaism went too far in its accommodation to America but Neumann gives no context whatsoever as to why and how those decisions were made. One would think from reading Neumann that the great reformers of the 19th century, from Abraham Geiger to Isaac Meyer Wise, David Einhorn, and Kaufman Kohler were meddling liberal rabbis who knew a smattering of the Hebrew Bible and distorted it toward assimilationist ends. In truth all were highly trained scholars in the Hebrew Bible and rabbinics. Einhorn published a German commentary on the siddur replete with zoharic references and Kohler was, among other things, one of the great scholars of rabbinics and early Christianity in his generation. They knew how to read texts and made their choices carefully. We may see some of those choices as mistaken. But to insinuate they could

not properly read or understand a biblical or rabbinic text in context is quite astonishing since Neumann himself seems to have a very limited understanding of the tradition he espouses.

The crux of the argument that classical Reform's errors extends to contemporary social-justice Jews is weak. Firstly, contemporary advocates of social-justice Judaism such as Aryeh Cohen, Elliot Dorff or Jill Jacobs, who are central figures in the book, do not center their work primarily on biblical texts but rather on rabbinic literature. It is the turn from the Hebrew Bible to the rabbinic corpus that marks one significant difference between classical Reform and these new iterations of social justice. Secondly, contemporary social-justice leaders such as Cohen, Dorff and Jacobs do not eschew Jewish ritual at all but are highly functioning practitioners of traditional rituals now based on egalitarian principles. Jacobs and Dorff both write halakhic responsa. Neumann's claim that these activists think the prophet Isaiah's critique of Israel's ritual behavior supports rejecting the need for ritual in toto, which was the case for some classical Reformers, is simply baseless. Their entire body of work contradicts that accusation. In their view, progressive liberalism can, and should, work with ritual practice now refracted through the lens of certain liberal principles. In that sense it is not "traditional Judaism" (although again we don't know what means for Neumann) but it is certainly non-assimilatory; as Emmanuel Levinas, a hero of many of these activists said, it represents a universalism that is performed through its particularism.

Regarding theology, Neumann spends some time criticizing Arthur Green's Radical Judaism as an example of precisely what is wrong with Jewish liberalism. Neumann claims Green presents a universalized spirituality that is barely Jewish at all. The problem is that he doesn't seem to understand Green's project or what underlies it. To criticize Green for not being in concert with "traditional Jewish thought" is somewhat ludicrous given that the title of Green's book is Radical Judaism! Setting that aside, Neumann claims Green's argument of acosmism, the "oneness of being" and his claim to use creation, with its universal message, as a lens to view revelation, with its particularistic message, is closer to Eastern mysticism than to Judaism.

The only problem with this assertion is that it is mistaken. Agree with him or not, Green's assessment is born from a deep reading of traditional Jewish sources. Neumann simply doesn't know them. He claims Hasidism only "flirted' with some of these ideas. He clearly has not read Sefer Baal Shem Tov, the Maggid of Mezritch's Maggid Devarav le-Yaakov or R. Shneur Zalman of Liady's Likkutei Torah carefully where the notion of the "oneness of all being" and thus a kind of panentheism, is standard fare. The Hasidic 'ayn od milvado (there is nothing except God) or the zoharic leit atar panui minei (there is no place void of God) are just two common examples. On the creation-revelation dichotomy Neumann is clearly not familiar with the Zohar or Tikkunei Zohar which is entirely made up of 72 renderings of the first verse in Genesis often using creation as a lens through which to understand revelation. Nor does Neumann seem familiar with Lurianic Kabbalah or R. Moshe Cordovero's Pardes Rimonim where creation plays a pivotal and central role.

In fact, one of Kabbalah's great innovations is the way in which it shifted emphases from revelation to creation, or creation as a way to understand revelation. For example, some Hasidic

masters argue that the aleph of revelation (Anochi, I am the Lord your God) is the lost aleph of creation, that begins with a "bet" (Bereshit). There are many other examples one could bring from these "traditional" sources. One need not agree with Green's admittedly "radical" and certainly creative and "nontraditional" renderings of these motifs. But to argue they are not born from, and highly informed by, traditional Jewish texts, is simply false.

Neumann could have proffered a different kind of critique of Green by arguing against his conclusions, even if derived from traditional sources. He could have argued that Green's "radical" interpretation would undermine precepts that are needed today to maintain a stable and functioning Jewish spirituality. Instead of arguing the "un-Jewishness" of Green, an argument which collapses under Neumann's lack of knowledge of the sources, he could have said that all forms of legitimate Jewish spirituality are not applicable at all times. This would then open up a robust debate about what forms of Jewish spirituality best serve this historical moment and why. Regrettably, this opportunity was missed.

Neumann repeatedly claims social-activist Jews focus on biblical stories that are not central to "traditional Judaism," for example the story of Sodom. This is nonsensical for a few reasons; first, there is a plethora of exegetical literature on this story, and the rabbis didn't make such distinctions in any case, they commented extensively on what was in front of them. Yes, some episodes got more attention but that was not because they were deemed more important per se. For example, the talmudic rabbis focus extensively on the exodus from Egypt and only briefly with the sin of Adam and Eve. Yet kabbalists in the zoharic and Lurianic tradition focus extensively on the sin of Adam and Eve and less so on the exodus. The Talmud focuses much more on Moses than Abraham, yet Hasidic masters seems infatuated with Abraham. The rabbis are less concerned with verses regarding the land while Zionists such as R. Zvi Yehuda Kook make that the centerpiece of his writings. The inclinations of the interpreter, and what is at stake for them in constructing their reading of Judaism, will determine those choices. From a "traditional" perspective, every verse in scripture is of utmost importance, from the exodus to the decorative hem of the High Priest's garment. According to Kabbalah, every letter is significant from the aleph of Anochi (I am the Lord your God) to the small yud of Vayikra (the beginning of Leviticus).

But the real claim Neumann is making here is that the social-activist Jews he despises are arguing that their liberal universalistic interpretations are the only legitimate ones. This would be damning, except that for the fact that most of those criticized in the book simply do not make that claim. Cohen, Dorff, and Jacobs certainly do not think the only legitimate reading of a text is the liberal one. Certainly they think it is a legitimate reading, perhaps even the best reading, but not the only one. They all know that the tradition can bear the weight of many kinds of readings. They know this because they are trained in the classical tradition. They know, as do most social-activist leaders, that biblical texts can support everything from social welfare and universal health care to Baruch Goldstein's murder of 29 Muslim worshippers. They just choose the former.

Late in the book Neumann presents a dichotomy, "Unlike Judaism which is built on a personal God, revelation … Jewish

social justice holds ... Unlike Judaism which offers a
particularistic path to universal redemption ... Jewish social
justice is ...." (italics added). The particulars aren't important,
what is problematic here is the term Judaism. Someone
educated in the intricacies of the Jewish tradition would rarely
use the word Judaism as if it is a prepackaged hermetically
sealed object. Judaism? Whose, what, when, where?

Neumann faults social-justice Jews for decontextualizing
scriptural verses to meet contemporary needs. He often tries to
undermine their readings by showing that in context the verse
does not mean what they say it means or, more surprisingly,
that the verses in question do not directly relate to their
contemporary concerns, i.e., labor laws, health care, living
wage, or socialist principles. This suggests that social-justice
Jews are the first readers of scripture to use such methods to
respond to contemporary issues. One wonders if Neumann has
ever read midrash, whose genius is the art of de-
contextualizing verses and twisting them creatively to mean
something other than their contextual meaning. Neumann
deploys the dichotomy between exegesis and eisogesis (reading
out of a verse or reading into a verse) to chastise social-justice
Jews for their irresponsible reading. But this dichotomy is so
outdated it hardly serves as a critique of anything. Remember,
these social-justice Jews are not learning law (halakha) from
their midrashic readings, but rather using the Hebrew Bible or
rabbinic texts as resources to articulate a value they believe the
tradition can represent.

Neumann's claim that the social-justice Jews' preferred
rendering of scripture always yields a liberal conclusion is true,
of course. In fact, that is their point, they are liberal Jews!
Zionists do exactly the same thing, as do ultra-Orthodox anti-
Zionists, Hasidic Jews, or Modern Orthodox Jews. Neumann's
own method of reading of scripture perhaps comes closest to
that of Christian fundamentalists, whose quasi-literalism
critically accuses the midrashic (traditional) reading as
"pharisaic." Refusing to take a biblical text out of
context—more strongly, delegitimizing that enterprise—is not
the traditional rabbinic method of reading scripture.

***

In some way the centerpiece of Neumann's critique is what he
determines is the misconstrual of the term tikkun olam (fixing
the world) that has become the leitmotif of social-justice Jews.
Let us say for the sake of argument that he is correct, that the
term in liturgical and later kabbalistic usage does not refer to
the Jewish responsibility to fix the world. That social-justice
Jews are in large part articulating a Jewish social gospel that
originated in early 20th century Protestantism. Is this new?
Not at all. It would be hard for example to find a representative
text in the Hebrew Bible that embodies our conventional
notion of monotheism. Where can we find anything in the
tradition resembling Zionism, a collective move to return to the
ancestral land before the messiah and without a Temple? Yes,
the term tikkun as it used in kabbalistic literature bears little
resemblance to what it meant in the Bible or the rabbis. The
word devekut in the Hebrew Bible and rabbinic texts hardly
means what it has come to mean in Hasidism. And Rav Kook's
use of the term teshuva (repentance) as a marker for cosmic
return is hardly aligned with the biblical and prophetic use of
the term. In short, tikkun olam is simply a sign, the adaptation
of a Hebrew term to embrace a liberal Jewish ideology. The
fact that the term did not mean that in the aleinu prayer or

even in kabbalistic literature is in some way obvious but also banal. Neumann can disagree with the liberal principles embodied under the banner of the contemporary usage of tikkun olam but rendering it illegitimate by showing it deviates from the term's original meaning is no critique at all.

What Neumann could have done, and here he would have some sympathy from a reader like me, would be to argue that some of the connections Jewish social-justice activists try to make to connect their contemporary concerns to Judaism are unfounded because the tradition itself does not have sufficient resources to make such a claim. He could have argued that liberalism itself, like any contemporary cultural or political ideology, does not always (he could even say, often) cohere with a tradition for which such sentiments would simply be anachronistic. He doesn't do so, I presume, because he wants to argue liberalism and "traditional Judaism" almost never cohere with tradition and because he wants to preserve a seemingly immaculate tradition that he can then use to support his more conservative ideological positions. This is unfortunate, and to my mind a missed opportunity.

The second part of the book focusing on Israel is neither original nor particularly compelling. It is a standard neoconservative pro-Israelist argument claiming that liberalism destroys or endangers the Jewish national project. You either buy it or you don't. For those who don't, there is nothing here that will cause you to change your mind. But there is something here to say about Zionism. Neumann does not seem to understand that vis-à-vis the tradition, however construed, the old reformers and new social-justice Jews and Zionists were engaged in a similar project toward different ends; that is, a critique or strong reading of traditional sources to come to terms with a new contemporary reality. There was good reason why a large swath of traditional Jews rejected Zionism early on just as they rejected the Reform movement; in their minds both Zionism and Reform were illegitimate positions. The fact that today contemporary diasporism in the form of Jewish social justice, and Zionism, religious and secular, have both won the day only attests to the compelling nature of their nontraditional critiques and their ability to present them over time as part of "tradition."

Why do I care about all this? I consider myself part of the progressive left Neumann is attacking (full disclosure, Neumann mentions me numerous times, mostly parenthetically). I too have critiques of the community to which I belong and I think liberals and progressives sometimes overextend their reading of Judaism to serve progressive ends. I do not think Judaism always supports a progressive agenda. But then neither do most of the people Neumann criticizes. Having spent the past 40 years studying Judaism from haredi to progressive yeshivot to universities and seminaries, as a university professor of Jewish studies and a rabbi (ordained Orthodox but no longer Orthodox), I see it as my professional obligation to be a critic of Judaism. Like all religions, Judaism is in a constant process of evolution, correction, and adaptation, and I think the sources of Judaism bear witness to that assessment. But I am fully devoted to the notion that any critique, right or left, contain the requisite understanding of the tradition one is defending or criticizing. When I read To Heal the World? I thus feel moved to bring its deficiencies to light, not just because I disagree with its conclusions but because I take issue with its lack of preparedness to enter into

what is a real and significant debate about Judaism in the 21st century.

\*\*\*

Like this article? Sign up for our Daily Digest to get Tablet Magazine's new content in your inbox each morning.

Shaul Magid is the Jay and Jeanie Schottenstein Professor of Jewish Studies at the Borns Jewish Studies Program and the Department of Religious Studies at Indiana University/Bloomington and Kogod Senior Research Fellow at The Shalom Hartman Institute of North America. His latest book is Hasidism Incarnate: Hasidism, Christianity, and the Making of Modern Judaism. In 2017-2018 he will be the NEH senior research fellow at The Center for Jewish History in New York City.

        PRINT  EMAIL 

MORE IN:    DIASPORA JEWS    JEWISH LEFT    JEWISH LIBERALISM

JONATHAN NEUMANN    SOCIAL JUSTICE    TIKKUN OLAM    ZIONISM

ZOHAR



**ARTS & CULTURE**
Books
Fiction
Film
The Internet
Music
Television
Theater & Dance
Visual Art & Design

**LIFE & RELIGION**
Observance
Food
Family
Personal History
Notebook

**NEWS & POLITICS**
United States
Middle East
World
Sports

THE SCROLL
UNORTHODOX
ABOUT US
CONTACT
NEXTBOOK PRESS

Tablet Magazine is a project of Nextbook Inc.

Copyright © 2018 Nextbook Inc. All rights reserved. | Terms of Service & Privacy Policy | Site by Superfame