**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT, LLC and
ELLIOTT BROIDY,

                             Plaintiffs,

                v.

NICHOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, STONINGTON
STRATEGIES, LLC,

                             Defendants.

Case No. 19-cv-00150-DLF

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS'**
**EMERGENCY MOTION FOR PROTECTIVE ORDER**

Plaintiffs Broidy Capital Management, LLC and Elliott Broidy ("Broidy") respectfully

submit this memorandum of law in opposition to the "emergency" motion for a protective order

submitted by defendants Nicholas D. Muzin ("Muzin"), Joseph Allaham ("Allaham"), Gregory

Howard ("Howard") and Stoningham Strategies, LLC ("Stoningham").[1]

**PRELIMINARY STATEMENT**

The defendants here are U.S. citizens and a U.S. firm sued in their private
capacities by U.S. plaintiffs for violations of U.S. and California law within
the United States. We hold ***they have failed to establish that any foreign
official immunity shields them from further proceedings*** and ultimate
liability.

---

[1] Capitalized terms otherwise undefined shall have the meanings assigned in Defendants'
Memorandum in Support of Defendants' Emergency Motion for a Protective Order, ECF No. 90-
1 ("Defs. Br.").

*Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 792 (D.C. Cir. 2021) (emphasis added).  The Court of Appeals could not have been clearer in affirming this Court's decision on Defendants' motions to dismiss: the Defendants in this case are not protected by "any foreign official immunity."  *Id.*

Yet in the hopes of achieving the functional equivalent of such immunity,[2] Defendants are attempting to erect a massive shield on behalf of nonparty the State of Qatar ("Qatar"), and hide behind that.  Rather than focus on their own confidentiality concerns, Defendants' motion is dedicated almost entirely to Qatar's interests.  Defendants' memorandum refers to Qatar roughly three times as often as all Defendants combined, *see generally* ECF No. 90-1, and while the Argument section of their memorandum and Defendants' draft protective order ("Defendants' Proposal") together refer to Qatar seventeen times, they make not a single reference to any of the individual Defendants.[3]  *See id.* at 10-15; *see also generally* ECF No. 90-2.

One problem for Defendants' effort (among many others) is that they have no standing to move for any kind of protective order on behalf of Qatar – let alone the sweeping and unprecedented provisions that constitute their proposal.  If and when Qatar thinks it needs to act to protect its own sovereign immunity, it can seek to move the Court on its own behalf[4] to intervene under Rule 24, for a protective order under Rule 26, or to quash or modify a subpoena

---

[2] Or rather, what they *wish* to be the functional equivalent of Qatar's immunity, which in fact is significantly more limited than the Defendants' proposed protective order implies.

[3] The only Defendant mentioned in the Argument section or Defendants' Proposal is Stonington, and that in an entirely hypothetical, illustrative example of Defendants' proposed Qatar-protecting mechanisms.  *See* ECF No. 90-2 at 16.

[4] Qatar knows how to contact the Court when it wants to.  *See* ECF No. 66 ("Notice of Interest by Non-Party State of Qatar," dated October 21, 2021).

under Rule 45.  It is surely such tried-and-true measures for protecting confidentiality that the

Court of Appeals had in mind when – after holding that "[t]he indirect risk to Qatar" of Plaintiffs

proceeding with discovery "does not suffice" to cloak Defendants with sovereign immunity – it

added that "[i]n any event, we trust the district court has the appropriate tools to protect Qatar's

absolute FSIA immunity[.]"  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 803-04 (D.C. Cir.

2021) (internal quotation marks omitted).

The Court of Appeals use of the phrase "absolute FSIA immunity" – a phrase that almost

never appears in the entire body post-FSIA case law – does not mean what Defendants and Qatar

hope it does.  No foreign sovereign is "absolutely" immune from suit in the sense of being

immune under any set of conditions whatsoever.  FSIA itself lists four categories of "[g]eneral

exceptions to the jurisdictional immunity of a foreign state," 28 U.S.C. § 1605 (a)-(d), one of

which has six sub-categories.  *Id.* at § 1605 (a)(1)-(6).  Neither is any foreign sovereign

completely immune from discovery.  *See, e.g.,* Restatement (Fourth) of Foreign Relations Law §

462 (2018);  *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014);  *Societe Nationale*

*Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 539–40 (1987).

The Court of Appeals certainly cannot be read to have contemplated, let alone

sanctioned, the Defendants' unprecedented proposal, which, among many other unjustifiable

provisions, would allow any non-party to merely file a notice of interest in this case, and thereby

obtain the right to receive any subpoenaed documents from any producing party – before the

requesting party – and to designate, redact, or withhold altogether any such subpoenaed third-

party documents before they are provided to the requesting party.  *See* ECF 90-2 at 15-17

(describing the so-called "Immunity Protocol"); *see also id.* at 4 (definition of "Interested Non-Party"). Defendants do not – because they cannot – cite any precedent for this absurd result.[5]

In addition to inviting anyone in the world freely to have more access to all discovery in this case than the Plaintiffs or their attorneys would have, Defendants' Proposal also allows any such self-anointed "Interested Non-Party" to designate documents as "Attorneys' Eyes Only (AEO)" if they contain "***any [] information relating to*** the conduct by Qatar of its foreign policy." *See* ECF 90-2 at 2-3 (emphasis added). Of course, all manner of documents could relate in some way to Qatar's foreign policy and yet obviously merit no confidentiality protection whatsoever – for example, a public op-ed (or drafts thereof) by a critic of Qatar, or text messages discussing Qatar's foreign policy between U.S. citizens who (by definition) are not members of Qatar's diplomatic or consular missions. Defendants' Proposal comes nowhere near meeting the legal requirement (among others) that AEO restrictions "be 'narrowly drawn and precise'" and "necessary, such that no 'device less restrictive of a party's access to his lawyer' would avert the

---

[5] And to be clear, even if the Defendants had standing to ask for such protections, which they do not, nothing in the Foreign Sovereign Immunities Act ("FSIA") or any other law, nor anything in the Vienna Conventions, provides Qatar or any sovereign with any kind of right to screen and redact materials of third parties that have been properly subpoenaed. FSIA does not even provide a sovereign with complete immunity from discovery of its own information. *See generally Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014). Meanwhile, as explained in detail below, *see infra* at 23-24, the Defendants completely invert the position of the author they rely upon in the single citation they offer to support their (false) proposition that materials in the hands of third parties that simply relate to a sovereign are covered by the Vienna Conventions. *See* ECF No. 90-1 at 13 n. 9 (citing Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 158 (4th ed. 2016)). In fact, Professor Eileen Denza – who literally wrote the textbook on the Vienna Conventions – is in agreement with the U.S. House of Representatives (and the U.K. House of Lords) that documents in the possession of "lobbyists or public relations advisers to [a foreign sovereign's] Embassy," which "relat[e] to professional services performed for the Embassy" are ***not*** "archives and documents of the mission" and therefore are ***not*** protected under the Vienna Conventions. *See* Ex. C, Denza Chapter, at 161-62; *see also infra* at 23-24.

potential harm." *Keaveney v. SRA Int'l, Inc.*, 2017 WL 1842544, at \*5 (D.D.C. May 3, 2017) (quoting *Doe v. D.C.*, 697 F.2d 1115, 1120 (D.C. Cir. 1983)).

While Defendants' Proposal contains such unprecedented and overbroad provisions, Defendants' motion barely touches on Defendants' interests at all.  In the Introduction to their memorandum, after first referring to the "rights of State of Qatar," the Defendants refer generically to "confidential and personal information from the Stonington Defendants and Defendant Allaham."  ECF No. 90-1 at 1.  Later in the Introduction and Background sections, Defendants also make two unsubstantiated (and false) allegations that Broidy previously leaked their phone records to "embarrass" them.  *Id.* at 3-5.  These references constitute the entirety of Defendants' motion's attention to their own interests.  And, as noted, Defendants' Argument section is devoid of any reference to of any of Defendants' confidentiality interests.

Even assuming that the Defendants' passing inclusion of a few conclusory assertions as to their own interests gives them standing to even bring this "emergency" motion at all, those assertions still utterly fail to meet the "good cause" requirement for the entry of the extraordinary protective order they propose.  *See* F.R.C.P. 26(c)(1) ("The court may, for good cause, issue an order to protect"); *see also Mannina v. D.C.*, 2018 WL 10733463, at \*2 (D.D.C. Sept. 29, 2018) ("The party requesting the protective order bears the burden of showing good cause by demonstrating specific evidence of the harm that would result." (internal quotation marks omitted).

Nowhere do the Defendants provide any "specific evidence of the harm that would result" to them absent the entry of their proposed protective order.  Defendants' only allegations boil down to the (false) implication that because Broidy purportedly once leaked Muzin's and Allaham's phone records to embarrass them, he will do so again.  *See* ECF No. 90-1 at 3-5.  But

again, they provide no "specific evidence" that Broidy himself "leaked" anything; why it was embarrassing; or the extent of any "harm" purportedly caused by any such embarrassment. More to the point, they provide no discussion whatsoever – let alone "specific evidence" – of what harm may befall them in the future if the Court does not grant their motion. Defendants' citation – without discussion – to two articles discussing phone records that were made public in the past falls far short of demonstrating "specific evidence of [] harm that would result" absent their proposed order. *Mannina*, 2018 WL 10733463, at *2 (emphasis added); *see also ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*, 2019 WL 8755131, at *8 (D.D.C. Nov. 25, 2019). To the extent any of Defendants' sensitive information deserves protection from the public, such concerns can be addressed completely by protective orders that courts routinely use in civil lawsuits like this one between U.S. citizens – and Plaintiffs' proposed protective order, *see* Ex. A, provides precisely for such protection for materials for which Defendants have legitimate claims of confidentiality.

Just as Defendants' motion is devoid of any real discussion of their own confidentiality interests at stake, it is likewise devoid of any substantive discussion whatsoever of the purported basis for their emergency motion – namely the subpoena issued on Verizon, regarding a single phone number. Defendants have not made a single specific allegation – let alone a substantiated one – that the subpoena is likely to yield any information that could warrant protection from this Court. Defendants make three passing references to the subpoena in their fifteen-page brief and note its return date, but they completely omit any mention whatsoever of the subpoena's contents, the information it seeks, or why the request warrants emergency protection from the Court. They do not refer to the phone number that is the subject of the subpoena, nor do they

make any claim that it is connected to any defendant, anyone connected with Qatar, or anyone that is likely to have material that should purportedly be protected.  *See generally* ECF No. 90-1.

The Defendants' motion, therefore, reveals their *faux* outrage over the issuance of a single subpoena to be the red herring it is – an excuse to come to the Court on an emergency basis in the hope of cloaking themselves with the sovereign immunity that this Court and the Court of Appeals definitively denied them.

But Defendants' motion involves a much bigger and redder herring than their unmerited invocation of this Court's emergency attention.  Defendants employ this red herring as a strategy for sidestepping the necessity of establishing their own standing to move for a protective order and their own "good cause" for having one granted.  That red herring is the California Protective Order.   While Qatar can – when it has standing – move the Court to use "appropriate tools" to provide requisite protections for Qatar's legitimate sovereign immunity interests, the only way for Defendants to salvage some residual sovereign-immunity protection for themselves is by convincing this Court to apply an *a priori* blanket of protection over all discovery in the entire case.  To achieve this goal, Defendants are trying to convince this Court that simply because the California Protective Order applied in the California Litigation, an updated version of it should apply here.

That reasoning is false.  While Plaintiffs maintain that the magistrate judge erred in approving the California Protective Order in the California Litigation, there are crucial and fundamental differences between this case and the California Litigation, such that even assuming the magistrate's decision was correct, it provides no persuasive precedent for incorporating the California Protective Order in this case (let alone the California Protective Order on steroids – Defendants' Proposal – advanced here by parties without standing to do so).

In the California Litigation, Broidy sued Qatar itself, which was the first-named and primary defendant.  Qatar itself moved for the protective order, *see* California Litigation D.E. 184, and one week later, Qatar was dismissed on grounds of sovereign immunity.  *See id.* at D.E. 198.  A week after that, Stonington and Muzin were dismissed for lack of personal jurisdiction and the defendants' motions to stay discovery were held to be moot.  *See id.* at D.E. 209.  Only after all of that, did the magistrate judge approve the California Protective Order.  *See id.* at D.E. 210.  The remaining served defendants were dismissed a few days later, and the case was terminated about five weeks after the protective order was approved.  *See id.* at D.E. 212 and 227.  Therefore, not only was the California Protective Order entered on the motion of Qatar itself, after Qatar was held to be immune from the California Litigation, but as Defendants themselves explain, and in accord with the decision mooting the motions to stay discovery, "by the time the Court entered the California Protective Order…more productions [in the California Litigation] were unlikely."  ECF No. 90-1 at 15 n. 10 (emphasis added).

In this case, by sharp contrast, this Court and the Court of Appeals have held that the defendants do *not* have any sovereign-immunity protection, and when the Defendants raised Qatar's potential discovery burdens to argue that they should have such immunity, this Court and the Court of Appeals held that "[v]ague assertions about what Qatar might do during discovery," 2020 WL 1536350 at *8, and "[t]he indirect risk to Qatar"  "do[] not suffice."  *Broidy*, 12 F.4th at 803.  Following these orders, Broidy is proceeding on five claims against all defendants. Therefore, Broidy's interests – in being able to see discovery in his own case and to exercise his rights to discuss his case with his lawyers – are much greater than they were in the California Litigation, when the district court had already dismissed Qatar and other defendants before the protective order was ever entered, and hence "more productions were unlikely."  ECF No. 90-1

at 15 n. 10.  Moreover, the public's interest is much greater in knowing about this ongoing

lawsuit, in which "[e]ach individual defendant is a U.S. citizen.…[and] [t]he plaintiff is a U.S.

citizen bringing claims under domestic law [] for actions allegedly committed on United States

soil," 2020 WL 1536350 at *8,  than it was in seeing documents produced in a case about to

close, against Defendants that had already been dismissed prior to entry of the protective order.

Because the interests of the parties and the public here diverge in important and

fundamental ways from the interests at stake in the California Litigation at the time the

California Protective Order was entered, the California Protective Order provides no persuasive

precedent for the entry of a similar order in this case (let alone the even more burdensome order

Defendants seek).  *See Jordan v. U.S. Dep't of Lab.*, 308 F. Supp. 3d 24, 45 (D.D.C. 2018), *aff'd*,

2018 WL 5819393 (D.C. Cir. Oct. 19, 2018) ("In assessing whether a protective order is

appropriate and—if so, how to limit the conditions, time, place, or topics of discovery—the

Court is to undertake an individualized balancing of the many interests that may be present in a

particular case.") (internal quotation marks omitted); *accord Diamond Resorts U.S. Collection

Dev., LLC v. Pandora Mktg., LLC*, 2021 WL 4841182, at *3 (C.D. Cal. Oct. 8, 2021).

In sum, the Defendants' do not have standing to assert the interests of Qatar, and they fail

to show their own good cause for their proposed protective order, which contains such

unprecedented and overbroad provisions as to call into question whether it is even conceivable if

any party in any circumstance could ever show good cause for the entry of such a protective

order.  Qatar is monitoring this case, and if and when it seeks protection from this Court, the

Court can exercise its discretion, based on a specific and non-speculative record and showing,

whether to use any of its "appropriate tools" to grant relief, and if so, which tools and to what

extent.

Plaintiffs respectfully submit that there is no basis for them to propose any specific tools for the additional protection of non-party Qatar, and certainly not more protection than the Federal Rules of Civil Procedure and applicable law provide them, where Qatar itself has not sought to move for protection. Nonetheless, as the Court directed, plaintiffs offer an alternate proposal to Defendants' proposal. *See* Ex. A and B (redline comparison against Defendants' Proposal). Plaintiffs respectfully submit that their proposal provides all parties and non-parties (including Qatar) more than requisite protection, unless and until the Court finds otherwise upon a meritorious motion by a party with standing.

## FACTUAL BACKGROUND

### I.      RELEVANT PROCEDURAL HISTORY

**This Action.** Broidy commenced this action in January 2019, and filed the FAC in April 2019. On March 31, 2020, this Court ruled on defendants' motions to dismiss, allowing five of plaintiffs' causes of action to proceed. *See Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350 (D.D.C. Mar. 31, 2020). The Court of Appeals affirmed this Court's decision earlier this year. 12 F.4th 789 (D.C. Cir. 2021). In its decision, this Court held (and noted all parties' agreement) that the suit is not subject to the Foreign Sovereign Immunities Act (FSIA). 2020 WL 1536350 at *5. The Court further held that Defendants did not have common law sovereign immunity under either of the potentially applicable tests. *Id.* at *6. Rather, defendants are all "U.S. citizen[s] who reside[] in the United States" and "plaintiff is a U.S. citizen bringing claims under domestic law—federal and state—for actions allegedly committed on United States soil." *Id.*

The Court explained that the determination that Defendants lack sovereign immunity is not altered by ***"[v]ague assertions about what Qatar might do during discovery*** and amorphous

predictions about how this case might affect Qatar's future decisions[.]"  *Id.* (citation and quotation marks omitted) (emphasis added).

**Prior California Action.**  On March 26, 2018, Broidy filed suit in the Central District of California against Qatar, Muzin and Stonington (Muzin and Stonington are Defendants here), and others, alleging that they conspired to hack his and his family's private accounts, and use the illegally obtained information therefrom to smear him.  *See* California Litigation, D.E. 1.  The Defendants filed motions to dismiss, and the district court granted Qatar's motion to dismiss on grounds of sovereign immunity on August 8, 2018.  *See id.* at D.E. 198.  Muzin and Stonington were dismissed on August 16, 2018, and on that date the court mooted the defendants' pending motions to stay discovery.  *See id.* at D.E. 209.  The following day, the magistrate judge entered the California Protective Order.  *See id.* at D.E. 210.  Over the next few weeks, the other defendants who had appeared in the action were dismissed for lack of personal jurisdiction, and shortly thereafter the plaintiffs voluntarily dismissed the case as against the remaining defendants.  *See id.* at D.E. 227.

## II.   THERE WAS NO "EMERGENCY" JUSTIFYING DEFENDANTS' MOTION

The history of the parties' negotiations concerning a protective order confirms that there was no "emergency" justifying defendants' motion.

On November 4, 2021, defense counsel sent Plaintiffs' predecessor counsel a draft protective order, which is attached to Defendants' motion as Exhibit A.  *See* ECF No. 90-2 (the "Defendants Proposal").  Defendants' Proposal contains unprecedented provisions that are extremely burdensome on Plaintiffs'.  One section provides that before any subpoena can be served on a non-party, the requesting party must provide notice to all parties and any non-parties who simply file a notice of interest in this case.  *Id.* at 15; *see also id.* at 4 (definition of

"Interested Non-Party").  If any subpoena "seeks or implicates the production of information that may be protected by… any immunity possessed by the State of Qatar," then any such party or self-anointed Interested Non-party can claim the right, pursuant to a so-called "Immunity Protocol," to receive the subpoenaed documents from the subpoena recipient before the requesting party, and to designate, redact, or withhold altogether any such third-party documents before being they are provided to the requesting party.  *Id.* at 15-17.  Defendants' Proposal also allows any such self-anointed censor – where party or "Interested Non-Party" – to designate documents as "Attorneys' Eyes Only (AEO)" if they contain "***any*** [] information relating to the conduct by Qatar of its foreign policy."  *See* ECF 90-2 at 2-3 (emphasis added).

While the California Protective Order did not contain the Immunity Protocol, it did contain the excessively broad AEO definition.  And because this, and much else from the Defendants' Proposal was based on the California Protective Order, on November 7 Plaintiffs' predecessor counsel asked to review the sealed motion practice from the California Litigation to assess how, as a practical matter, AEO designations were made under the California Protective Order.  *See* ECF No. 90-9 at 2.  Defense counsel immediately responded, "[n]o trouble at all. Let me look into this, and I'll get back to you ASAP." *Id.* at 1.  Defense counsel followed up the next morning that, "[a]s it turns out, this is more complicated than I expected….I can't access them on PACER with my credentials.  It would seem that your client should have them, but I understand that you're just trying to streamline things." *Id.*

Three days later, on November 11, 2021, predecessor counsel wrote to defense counsel stating that it saw no need for AEO designations in the case, and proposing an interim solution to accord all discovery confidential, *i.e.*, non-public, treatment for sixty days while the parties negotiated a protective order.  *See* ECF No. 90-10.  Defense counsel rejected this proposal the

next morning, November 12, 2021, stating their view that AEO protections were needed in any interim period as well.  *See* ECF No. 90-11 at 1-2.  Later that afternoon, predecessor counsel responded, "we will get back to you on this the first of next week. We do not intend to send any third party subpoenas in the interim."  *Id.*

During the week of November 15, 2021, Broidy retained new counsel (the undersigned), who, on November 23, followed up on the request for a copy of the sealed motion practice regarding the California Protective Order, *see* ECF No. 90-13 at 2, making clear that they would not use the sealed documents for any purpose other than to obtain the necessary background and context to discuss (or litigate, if necessary) a protective order in this action.  *Id.* at 3.  In the same email, counsel reiterated predecessor counsel's offer to treat all material as confidential for 60 days and offered to consider AEO on a case-by-case basis during that 60-day interim period*.  Id.* at 2.  This November 23 email, which included a new offer of compromise as to a potential interim discovery approach, constituted the "get[ting] back to" defense counsel that ended the period during which prior plaintiff counsel had committed not to issue any third-party subpoenas.

The next afternoon, Plaintiffs served a subpoena on Verizon, targeting information about a single phone number that Plaintiffs have a reasonable basis to believe may have been connected with the hacking attacks alleged in the FAC.  Plaintiffs gave prior notice of the subpoena and otherwise complied with Rule 45 of the Federal Rules of Civil Procedure, setting a return date of 21 days following the issuance of the subpoena – adding an extra week to the default 14 days provided by the Rules.

In response, Defendants rejected the request for the sealed documents, no longer saying as they did on November 7 "[n]o problem at all," and ignored plaintiff counsel's move toward compromise in its November 23 email indicating a willingness to consider interim AEO

13

protection.  Defendants also erroneously asserted that "it is apparent that you have abandoned prior counsel's assurances that plaintiffs would continue to negotiate[.]" *Id.*  Defendants' response did not ask about, or object to anything specific in, the content of the November 23 subpoena issued on Verizon, but simply threatened to come to this Court – a threat they followed through on despite the absence of any emergency." *Id.*

## ARGUMENT

## I.   DEFENDANTS HAVE NO CAUSE TO BRING AN EMERGENCY MOTION

Defendants make a number of incorrect assertions contradicted by their own exhibits, in claiming that "[e]mergency relief is appropriate when, like here, the harm presented is imminent and the parties do not have time to brief the matter in the normal course before the event sought to be prevented by the protective order takes place."  *See* ECF No 90-1 at 11-12.[6]

There was no emergency here, the Verizon subpoena implicated no confidentiality concerns, and counsel specifically offered to consider interim confidentiality and even AEO protection.  On November 23, 2021, counsel reiterated the offer to treat all incoming discovery as confidential for a sixty-day period, and expanded on that prior offer by stating a willingness to discuss AEO on a case-by-case basis in the interim period.  This would have afforded the parties at least two months to try to agree on a protective order, while permitting discovery to proceed

---

[6] Defendants assert that "Broidy's immediately prior counsel had agreed not to serve third-party subpoenas during discussions of the interim policy," *see* ECF No. 90-1 at 3, but in fact, prior counsel agreed to "get back to [defense counsel] on [] the first of next week" and not to send third-party subpoenas "in the interim" – meaning, before "get[ting] back" to defense counsel regarding the protective-order and interim-discovery-phase issues.  *See* ECF 90-11 at 2. Relatedly, Defendants mischaracterize the issuance of a single subpoena on Verizon (targeting a single phone number) as plaintiffs "launching third party subpoenas."  *Id.* at 11.  Defendants' exhibits also clearly demonstrate the falsity of Defendants' claim that "Broidy's new counsel also rejected the use of *any* interim attorneys' eyes only protections." *Id.* at 10; *see also* ECF No. 90-13 at 2 (modifying prior counsel's proposal for an interim period to *include* "discuss[ion of] AEO protection on a document-by-document basis").

and protecting confidentiality claims.  Meanwhile, defendants have not even made a single

allegation that plaintiffs' sole subpoena on Verizon – their entire purported basis for moving for

emergency relief – is likely to yield any information that they think warrants protection from this

Court.  Defendants make three passing references to the subpoena in their fifteen-page brief and

note its return date, but they completely omit any mention whatsoever of the subpoena's

contents, the information it seeks, or why those requests warrant emergency protection from the

Court.  They do not refer to the phone number that is the subject of the subpoena, nor do make

any claim that it is connected to any defendant, or anyone connected with Qatar, or even anyone

that is likely to have material that should purportedly be protected.  *See generally* ECF No. 90-1.

Because plaintiffs' good faith offer would have provided defendants with all the

protection they need (and more) for at least another two months, and because defendants have

not even claimed (let alone identified with any precision) why or how the single subpoena issued

on Verizon threatens any confidentiality interests they assert, there were no grounds for

defendants to have filed an emergency motion.

## II.   THE DEFENDANTS DO NOT HAVE STANDING TO MOVE FOR THE PROPOSED PO

As noted, Defendants' motion refers to Qatar roughly three times as often as it refers to

all the Defendants' combined.  *See generally* ECF No. 90-1.  The Argument section from

Defendants' brief, together with Defendants' draft protective order, collectively make not a

single mention of any the individual Defendants, while referring to Qatar seventeen times.  *See

id.* at 10-15; *see generally* ECF No. 90-2.  Entire portions of Defendants' Proposal serve *only* the

interests of Qatar – including the "Immunity Protocol."  *See id.* at 15-17.  Indeed, Defendants'

motion is based almost entirely on Qatar's purported sovereign immunity and other related

rights.

Simply put, Defendants do not have standing to assert Qatar's immunity or other interests – whatever they may be – nor do they have standing to move for their proposed protective order that is designed essentially entirely for Qatar's benefit.  The Court of Appeals has already explained in this very case that Defendants *"have failed to establish that any foreign official immunity shields them from further proceedings* and ultimate liability." *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 792 (D.C. Cir. 2021) (emphasis added).  Moreover, as a general matter, a party "lacks standing to challenge a subpoena issued to a third party absent a claim of privilege, proprietary interest, or personal interest in the subpoenaed matter. A motion to quash, or for a protective order, should generally be made by the person from whom the documents or things are requested."  *Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C.), *on reconsideration*, 232 F.R.D. 6 (D.D.C. 2005) (citing D.D.C. and S.D.N.Y. precedent and 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2459 (2d ed.1995)). The Defendants do not base their motion on any of their own privileges or propriety interests in discoverable material in the possession of third parties, and while a party can challenge third-party discovery under Rule 26 standards such as relevance and proportionality, Defendants' motion contains no arguments as to relevance or proportionality. *See generally* ECF 90-1. *Compare* See, *Thurgood Marshall Acad.*, 230 F.R.D. at 21 (after noting general rule cited above, court assessed merits of movant's arguments as to relevance and overbreadth).

Defendants' papers make abundantly clear that they are moving for a protective order for the benefit of Qatar, which would cover all discovery to be produced in this action, including all materials produced by any and all non-Defendant and non-Qatari third parties.  Putting aside that such an enormously overreaching attempt would be entirely unreasonable coming from anyone, including Qatar itself, Defendants simply do not have standing to make it.  *Id.; see also, e.g., W.*

*Coast Prods., Inc. v. Does 1-5829*, 275 F.R.D. 9, 11–12 (D.D.C. 2011) (denying defendants'

various motions to quash and for protective orders where plaintiff served subpoenas on internet

service providers [ISPs], in part because "the ISPs are the proper parties to be filing such a

motion" and "the movants lack standing to assert [certain] procedural objections to the

subpoenas served on ISPs" (citing *Thurgood Marshall Acad.*, 230 F.R.D. at 21)); *Malibu Media,*

*LLC v. Doe*, 2018 WL 5985284, at *3 (S.D.N.Y. Nov. 14, 2018) ("Doe also moves for a

protective order preventing Malibu from obtaining further discovery as to Doe pursuant to

Federal Rule of Civil Procedure 26(c). Doe lacks standing for such relief because a motion for a

protective order should generally be made by the person from whom the documents or things are

requested. Though Malibu seeks identifying information about Doe, Malibu seeks to obtain that

information not from Doe but from a non-party, Verizon. Accordingly, Doe's motion for a

protective order is denied." (citing *Thurgood Marshall Acad.*, 230 F.R.D. at 21) (cleaned up));

*Bradley v. Cooper Tire & Rubber Co.*, 2006 WL 8455082, at *1 (S.D. Miss. Apr. 7, 2006) ("Fed.

R. Civ. P. 26(c) permits a motion for a protective order to be brought 'by a party or by the person

from whom discovery is sought ... for good cause shown....' While [defendant] Ford may argue,

in the context of a protective order, issues related to Ford Motor Company's concerns in this

litigation, it is not clear what standing the company has to assert the rights of non-parties.");

*Burton Mech. Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 234 (N.D. Ind. 1992) ("[Defendant]

has failed to demonstrate that the dates referred to in the interrogatory constitute confidential

business information of a third party. And, even if he had made such a showing, there is no

indication that he has standing in this action to assert the rights of [of the third parties] with

respect to the protection of their proprietary or confidential business information."); *Bush Dev.*

*Corp. v. Harbour Place Assocs.*, 632 F. Supp. 1359, 1364 (E.D. Va. 1986) ("Since the

documents involved are the business records of [third-party] Home Federal Bank, the defendants have no standing to challenge the subpoena issued to the bank.").

On this basis alone, Defendants' motion should be denied.

### III.   ASSUMING DEFENDANTS HAVE STANDING BASED ON A HANDFUL OF CONCLUSORY CONCERNS RELATED TO THEMSELVES, SUCH CONCERNS UTTERLY FAIL TO ESTABLISH "GOOD CAUSE" FOR ENTRY OF THEIR PROPOSED PROTECTIVE ORDER

The Defendants sprinkle a few allegations as to their own interests amidst their motion to protect non-party Qatar.  The first is a generalized, conclusory assertion as to "confidential and personal information from the Stonington Defendants and Defendant Allaham."  *See* ECF No. 90-1 at 1.  The second is the false and conclusory statement that "the last time Broidy received third-party discovery in the absence of a protective order, he promptly leaked Defendant Muzin's and Defendant Allaham's personal phone records to the press solely to embarrass them." *Id.* at 3-4.  The third and final allegation as to the Defendants' interests at stake in this motion is the reiteration of the second (false) allegation as it pertains to Muzin.  *Id.* at 5.  Defendants' memorandum is devoid of any allegations as to Defendant Howard's interests or as to confidential or sensitive information of Defendant Stonington.

Even assuming that these few conclusory assertions give them standing to make their motion, which is otherwise devoted entirely to nonparty Qatar's interests, the motion is completely meritless and should be denied. "The party requesting the protective order bears the burden of showing good cause 'by demonstrating ***specific evidence*** of the harm that would result.'" *Mannina v. D.C.*, 2018 WL 10733463, at *2 (D.D.C. Sept. 29, 2018) (quoting *Jennings v. Family Mgmg*. 201 F.R.D. 272, 275 (D.D.C. 2001)) (emphasis added).  "In meeting this burden, the moving party 'must make ***a specific demonstration*** of facts in support of the request

***as opposed to conclusory or speculative statements*** about the need for a protective order and the

harm which will be suffered without one.'" *Mannina v. D.C.*, 2018 WL 10733463, at *2 (D.D.C.

Sept. 29, 2018) (quoting *Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998)) (emphasis added).

Nowhere do the Defendants provide any "specific evidence of the harm" that would

result without the entry of a protective order. *Id.* Defendants' only allegations boil down to the

(false) implication that because Broidy purportedly once leaked Muzin's and Allaham's phone

records, he will do so again. *See* ECF No. 90-1 at 3-5. But their entire argument consists of

"conclusory or speculative statements" about what they expect to happen given their (false)

allegations as to Broidy's alleged past leaks. *Id.* Defendants provide no "specific evidence"

whatsoever that Broidy himself, or anyone at his direction, ever "leaked" anything at all. They

fail to explain what phone records were purportedly leaked, why they were "personal" or

"embarrassing", and what specific damage such purported leaks caused them. Moreover, they

admit that there was no protective order governing the purportedly leaked documents at the time

they were purportedly leaked, and do not otherwise allege that the "leaks" were made in

violation of any law or otherwise improper. They fail to discuss whether or not the purportedly

leaked phone calls were required to have been made public anyway under Defendants' required

FARA disclosures. Defendants likewise fail to explain how any information sought by the

November 24 Subpoena targets any sensitive information. Their entirely unsubstantiated and

conclusory allegations as to prior purported "leaks" render any predictions about the future based

on such allegations entirely "speculative."

Weighing against Defendants' minimal, meager, and insufficient showing as to the

supposed harm to them in the absence of a protective order, is the imposition of an

unprecedented and extremely burdensome protective order that significantly encroaches on

Broidy's constitutional rights to prosecute his case and engage with his counsel.  In sum, therefore, whatever reasons the Defendants assert that may give them standing utterly fail to meet the "good cause" requirement of Rule 26(c) for the entry of their unprecedented, bespoke, and extremely restrictive proposed protective order.

## IV.   EVEN IF DEFENDANTS HAD STANDING TO ASSERT ALL OF QATAR'S INTERESTS AS WELL AS THEIR OWN, THIS COURT SHOULD STILL REJECT THEIR PROPOSED PO

### A.   The Magistrate Judge's Decisions Regarding the Protective Order in the California Litigation Are Neither Binding on This Court Nor Persuasive Precedent

It goes without saying that the decisions of a magistrate judge in California cannot bind a district court judge in Washington, D.C. in the management of discovery that is produced in a later case.  Furthermore, a number of factors about the magistrate judge's decisions with regard to the California Protective Order should lead this Court to disregard those decisions even as persuasive, non-binding precedent.

First, the reasons for magistrate judge's decision to grant the California defendants' motion for the California Protection Order are not public.  *See* California Litigation, D.E. 210 (noting simply that "The Motion is granted").  Furthermore, the only reason provided for magistrate judge's decision to deny plaintiffs challenge to defendants' designations of documents as AEO was that "each such designated document and all such designated testimony 'contains or comprises' 'information relating to the conduct by Qatar of its foreign policy,' within the meaning of paragraph D4 of the 'Protective Order.'" *Id.* at D.E. 242.  However, such a rationale is plainly insufficient, *per se*, to warrant AEO treatment, or, in fact, any confidentiality treatment at all.  After all, a public-domain op-ed by an adversary of Qatar, which criticizes Qatar's foreign policy, surely "contains or comprises information relating to the conduct by Qatar of its foreign

policy," but no one could ever claim in good faith that such a document would warrant protection under a protective order.  Because magistrate judge's decisions are "nonbinding and unpersuasive," this Court should not give them weight in its determination on the present motion. *See Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *6 (D.D.C. Mar. 31, 2020), *aff'd,* 12 F.4th 789 (D.C. Cir. 2021) ("The defendants have identified three out-of-circuit cases in which courts have extended foreign sovereign immunity to U.S. citizens. But these cases are nonbinding and unpersuasive." (citing *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 384 (S.D. Tex. 1994), *aff'd,* 79 F.3d 1145 (5th Cir. 1996), among two other cases); *see also id.* at *7 ("The *Alicog* decision likewise fails to help the defendants. With little explanation, *Alicog* granted immunity for two U.S. citizens simply because 'they were agents of the Saudi government' and Saudi Arabia was immune in the case. But as explained above, that conclusion is inconsistent with the State Department's policy." (quoting *Alicog,* 860 F. Supp. at 384)).

Second, even according magistrate judge's decisions all possible deference with respect to the California Litigation, they cannot provide persuasive precedent due to the fundamental differences between this Action and the California Litigation.  In the California Litigation, Magistrate Eick adopted the California Protective Order after the case was essentially over, and the main defendant who moved for the order had been dismissed on grounds of sovereign immunity.  Indeed, Defendants themselves explain in their brief that "***by the time the Court entered the California Protective Order…the parties were most concerned about designating materials that had already been produced as more productions were unlikely***."  *See* ECF No. 90-1 at 15 n. 10 (emphasis added).

In this case, by contrast, this Court and the Court of Appeals have held that the defendants do not have any sovereign immunity interests, and when the Defendants' raised Qatar's potential discovery burdens to argue for Defendants' own immunity, this Court and the Court of Appeals held that "[v]ague assertions about what Qatar might do during discovery," 2020 WL 1536350 at *8, and "[t]he indirect risk to Qatar"  "do[] not suffice."  *Broidy*, 12 F.4th at 803.  Following these orders, Broidy is proceeding on five claims against all defendants. Therefore, Broidy's interests – in being able to see discovery in his own case and to exercise his rights to discuss his case with his lawyers – are much greater than they were in the California Litigation, when the district court had already dismissed Qatar and other defendants before the protective order was ever entered, and hence "more productions were unlikely."  ECF No. 90-1 at 15 n. 10.  Moreover, the public's interest is greater in knowing about this ongoing lawsuit, where "[e]ach individual defendant is a U.S. citizen who resides in the United States…[and] [t]he plaintiff is a U.S. citizen bringing claims under domestic law [] for actions allegedly committed on United States soil," 2020 WL 1536350 at *8,  than it was in seeing documents produced in a case soon to close, against Defendants that were already dismissed.

### B.    No Interests of Any Party or Non-Party – Including the Potential Sovereign Immunity of Any Non-Party – Warrants Adoption of Defendants' Proposal

As shown above, Defendants assertion of their own interests completely fails to provide good cause for their proposed protective order.  Ultimately, the same is true even if the Court were to consider Qatar's interests on this motion.   As already discussed, Defendants' Proposal contains unprecedented provisions allowing for any third-party to hijack discovery, and screen, redact, or withhold any other third-party or party documents.  Even a sovereign nation never comes close to getting this kind of power, nor should it.

There is no blanket immunity against discovery for sovereigns *themselves* under the FSIA.  *See, e.g.,* Restatement (Fourth) of Foreign Relations Law § 462 (2018);  *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014);  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 539–40 (1987).  And there is certainly no implied right for a foreign sovereign to screen and censor the discovery materials of any and all third-party subpoena recipients in a given case.

Nor is any such right, or anything close to it, in the Vienna Conventions.  Defendants' sole citation supporting their contention that the Vienna Conventions protect materials in the hand of third parties completely misrepresents –to the point of inversion – the import of the cited source.  *See* ECF No. 90-1 at 13 n. 9 (citing Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 158 (4th ed. 2016)).

Defendants cite to a sentence of Denza's from the chapter entitled "Inviolability of the Archives" ("Denza Chapter") from her commentary on the Vienna Convention.  *Id.*; *see also* Denza Chapter, attached as Ex. C.   That sentence comes from one of the Denza Chapter's subsections, entitled "Negotiating history."  *Id.* at 158.  The subsection discusses three ways in which the Vienna Convention altered prior international law, and discusses the first two of them in the first of two paragraphs in the subsection.  *Id.*  The second and final paragraph of the subsection begins that "[t]he third way in which the customary international law rule was extended by adding the words 'wherever they may be', [which] made it clear beyond argument that [diplomatic] archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability."  *Id.*  The paragraph notes a few other rejected amendments, and then concludes, also concluding the subsection, that "[i]f archives fall into the

23

hands of the receiving State *after being lost or stolen* they must therefore be returned forthwith and may not be used in legal proceedings or for any other purpose of the receiving State." *Id.* at 159 (emphasis added).  Clearly, according to Denza's discussion, the amendment was targeted at preserving the protections of diplomatic documents that had been *lost or stolen*.  The real-world examples cited in the subsection that immediately follows in the Denza Chapter confirm this focus.  *See e.g., id.* at 160 (discussing the cases of a U.S. embassy that had been ransacked by militants and the improper seizure by Eritrea of protected documents of Ethiopia).

Later in the Denza Chapter, Denza explicitly confirms that her position is the exact opposite of that for which Defendants cite her work.  In the subsection entitled "What are the 'archives and documents of the mission'?" Denza discussed a situation in which "[t]he status of archives and documents held by professional consultants to a diplomatic mission was considered in 2002 by the US House of Representatives Committee on Government Reform and by the State Department."  *Id.*  The case involved an investigation into abductions of children "in which the Embassy of Saudi Arabia was alleged to be complicit" and

> the House Committee issued subpoenas seeking relevant documents to three US firms which were lobbyists or public relations advisers to the Embassy. The documents in question were records relating to professional services performed for the Embassy, but it was not claimed that they were in the ownership or possession of the Embassy. The lobbyists and the Saudi Arabian Embassy refused to comply with the subpoenas on the ground that the documents requested were 'archives and documents of the mission', but the Committee was not persuaded. ***Their stance was backed in an opinion and by oral testimony submitted to the Committee by the present author.***

*Id.* (emphasis added); *see also id.* at 161-162 (noting agreement of the U.K. House of Lords with Congress and Denza).

**V.    PLAINTIFFS' PROPOSAL**

Plaintiffs respectfully submit neither plaintiffs nor the Court *sua sponte* has the responsibility to propose any specific tools for the additional protection of non-party Qatar, when Qatar itself has not moved for any more protection than the Federal Rules and applicable law provide them.  Nonetheless, at the Court's request, plaintiffs offer an alternate proposal to Defendants' proposal.  It revises Defendants' fantastical creation into an appropriate protective order.  *See* Ex. A and B (redline comparison against Defendants' Proposal).  Plaintiffs respectfully submit that such an order provides all parties and non-parties (including Qatar) more than requisite protection, unless and until the Court finds otherwise upon a meritorious motion by a party with proper standing.

<u>**CONCLUSION**</u>

Plaintiffs respectfully request that Defendants' Emergency Motion for a Protective Order be denied in its entirety.

Dated:   December 2, 2021

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: ___/s/ Henry Brownstein_____
Daniel Benson
Andrew Kurland
Henry Brownstein
Jacob Benson

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800
Email:  hbrownstein@kasowitz.com

*Attorneys for Plaintiffs*