# EXHIBIT C

# Diplomatic Law

*Commentary on the Vienna Convention on Diplomatic Relations*

FOURTH EDITION

EILEEN DENZA



OXFORD
UNIVERSITY PRESS



Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Eileen Denza 2016

The moral rights of the author have been asserted

This Edition published in 2016

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by licence or under terms agreed with the appropriate reprographics
rights organization. Enquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Crown copyright material is reproduced under Class Licence
Number C01P0000148 with the permission of OPSI
and the Queen's Printer for Scotland

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data
Data available

Library of Congress Control Number: 2015945825

ISBN 978–0–19–870396–9

Printed and bound by
CPI Group (UK) Ltd, Croydon, CR0 4YY

# INVIOLABILITY OF THE ARCHIVES

## Article 24

**The archives and documents of the mission shall be inviolable at any time and wherever they may be.**

The inviolability of diplomatic archives on the premises of the mission followed from the inviolability of those premises, and those in normal transit were protected by the—more limited—inviolability of the diplomatic bag and courier. Only in the twentieth century have courts and governments addressed the question of the status of diplomatic documents not on the premises of the mission nor in the custody of a courier or member of a mission—and perhaps not easily identifiable as diplomatic archives. Only with Article 24 of the Vienna Convention has inviolability in all these circumstances been clearly established.

The first writer to mention inviolability of an ambassador's papers along with that of dispatches sent or received by him was Vattel. In *Le Droit des Gens* he pointed out that without such protection the ambassador would be unable to perform his duties in security. But where the ambassador conspired against the receiving State, Vattel acknowledged that since he himself might be arrested and interrogated, his papers also might be seized in order to expose the conspiracy.[1] State practice supported this approach—for example, when in 1718 Count Cellamare, Spanish Ambassador to France, was discovered by interception of his dispatches to be conspiring against the French Regent, the disregard for the inviolability of his archives and dispatches contrasted with the respect which was shown towards the person of the ambassador who was merely expelled.[2] In 1906, two years after France had broken diplomatic relations with the Holy See, the archives of the former nuncio were seized by the French authorities. This was, however, justified by the Minister of Foreign Affairs on the basis that the archives had not been placed under seal nor entrusted to a protecting power but were found in the apartment of a priest who had no official position and was himself under suspicion.[3] In 1918, following the looting of the British Embassy in Petrograd during the Russian revolution, the diplomatic archives were destroyed.[4]

In all these cases there were immediate protests from the sending States, but it is notable that they all resulted from extreme situations in which diplomatic relations were broken either before or immediately after. It was in fact normal practice on discontinuance of diplomatic relations for the archives either to be destroyed or entrusted to a protecting power on the basis that any protection to which they might be entitled would otherwise lapse along with the inviolability of the mission premises. There was also the risk, if a change of government took place in the sending State, of dispute between the outgoing and incoming heads of mission about the archives and documents. In 1830, for

---

[1] (1758) IV.IX para 123.
[2] Martens (1827) vol I p 149.
[3] 1907 RGDIP 175 and 1966 416–17; Sfez (1966).
[4] Ullman (1961) p 289; *The Times*, 24 October 1918.

example, the newly recognized representative of the King of Portugal in the United States brought proceedings against the chargé d'affaires who had represented the previous Government of Portugal for delivery of the archives and documents which the defendant was taking with him on leaving the United States. The court in *Torlade v Barrozo*[5] did not distinguish between the immunity from arrest and suit of the outgoing chargé d'affaires and the property in the archives and so the suit failed.

In 1928 Article 14 of the Havana Convention on Diplomatic Officers extended inviolability to the 'papers, archives and correspondence of the mission'.[6] The draft Convention drawn up in 1930 by the Harvard Research in Article 5 gave a somewhat more limited protection of archives 'from any violation' and required their confidential character to be safeguarded 'wherever such archives may be located within the territory of the receiving state, provided that notification of their location has been previously given to the receiving state'. The Commentary noted that:

When in earlier centuries an important part of the business of a diplomat was acquisition of information, to which he was not properly entitled, by methods not admitted or proper if used by one other than a state agent, a receiving state might have been regarded as to some extent excused if it sought by dubious means to gain information from the correspondence of a foreign mission.

The Harvard Research Article was, however, drafted on the basis 'that the normal functioning of modern international intercourse requires a clearer acknowledgment of the confidential character of diplomatic correspondence'. Although it did not go so far as to establish a duty on the receiving State to prevent publication, it 'did however imply a duty to protect more than the mere property rights in and to the archives of a sending state'.[7]

Acceptance of this approach was demonstrated by the inclusion in national legislation of a number of States of specific provisions for the inviolability of diplomatic archives.[8]

In the case of *Rose v The King*[9] in 1946, the Quebec Court of King's Bench, Appeal Side, had to consider the admissibility in criminal proceedings for conspiracy and espionage against a member of the Canadian House of Commons of documents stolen from the Soviet Embassy. Gouzenko, a cipher clerk in the Embassy of the Soviet Union in Ottawa, on defecting to the West took with him and handed to the Canadian Government a large number of secret documents incriminating Canadian private citizens and public servants in espionage. The Soviet Government did not waive the immunity of members of its mission, but a number of prosecutions were brought against others implicated, and the admissibility of the documents taken by Gouzenko was crucial to conviction. Neither the Soviet nor the Canadian Government made any claim to the courts that the documents were inadmissible as diplomatic papers—this argument was put forward by the defence.

---

[5] 1 Miles 366 (Phila D Ct 1830); 9 AILC 181.
[6] 26 AJIL (1932 Supp) 176.
[7] 26 AJIL (1932 Supp) 61–2; Denza (2007) at pp 164–6.
[8] eg Australia: UN Legislative Series vol VIII, *Laws and Regulations regarding Diplomatic and Consular Privileges and Immunities* ('UN Laws and Regulations') p 9; Burma: ibid p 52; Canada: ibid p 57; New Zealand: ibid p 218; UK: Diplomatic Immunities (Commonwealth Countries and Republic of Ireland) Act 1952, 15 & 16 Geo 6 & 1 Eliz 2, c 18, s 1.
[9] [1947] 3 DLR 618; 1946 AD No 76. See background and comment by Maxwell Cohen in 'Espionage and Immunity: Some Recent Problems and Developments', 1948 BYIL 404. The decision is strongly criticized by Salmon (1994) para 318.

On appeal by Rose against conviction, Bissonnette J gave careful consideration against the background of customary international law to the status of the stolen documents. He held that: 'International law creates a presumption of law that documents coming from an Embassy have a diplomatic character and that every Court of Justice must refuse to acknowledge jurisdiction or competence in regard to them.' But this presumption was subject to the overriding right of the State to assure its own security. Competence to repress the abuses of a diplomatic agent rested exclusively on the executive, and if the executive turned over documents to a court for prosecution, the courts could not regard them as entitled to immunity, since otherwise 'the conflict of powers between the executive and the judiciary would lead to an absurdity and juridical anarchy'. Although diplomatic immunity must be accorded to diplomatic agents who claimed it, 'to impose, through a judicial decision, immunity upon a State which does not claim any, would be casting a slur upon its dignity, its sovereignty, and, through a gesture as ungracious as unexpected, would elevate a simple suit to a degree of international importance'. Gagne J supported these arguments and maintained further that the documents, though physically originating within the Embassy of the Soviet Union, were documents of an espionage Bureau not under the control of the ambassador and therefore not embassy documents.

## Negotiating history

The International Law Commission and the Vienna Conference extended the protection to be accorded to diplomatic archives in some respects beyond what had been established under the previous international law. In the first place, the expression 'inviolable' was deliberately chosen by the International Law Commission to convey both that the receiving State must abstain from any interference through its own authorities and that it owes a duty of protection of the archives in respect of unauthorized interference by others.[10] Secondly, the Vienna Conference added the words 'at any time' in order to make clear that inviolability continued without interruption on the breaking of diplomatic relations or in the event of armed conflict.[11] Article 45 requires the receiving State to 'respect and protect' these archives, and entitles the sending State to entrust their custody to a third State, the protecting power. It should, however, be noted that whereas 'premises of the mission' by virtue of Article 1(i) of the Convention lose their status as such once they are no longer 'used for the purposes of the mission', diplomatic archives and documents do not lose their status and retain their inviolability under Article 24 on an indefinite basis.

The third way in which the customary international law rule was extended by Article 24 was that the International Law Commission and the Conference, by adding the words 'wherever they may be', made it clear beyond argument that archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability.[12] The Conference expressly rejected that part of the amendment of France and Italy which would have required archives and documents outside mission premises to

---

[10] *ILC Yearbook* 1957 vol II p 137, Commentary on draft Art 18.
[11] UN Docs A/Conf. 20/C 1/L 149 (amendment of France and Italy); A/Conf. 20/14 p 149 (representative of France).
[12] *ILC Yearbook* 1958 vol II p 96, Commentary on draft Art 22; UN Docs A/Conf. 20/C 1/L 149 (amendment of France and Italy); L 126 (Bulgaria); A/Conf. 20/14 pp 148–50.

be identified by visible official signs. A US amendment which would have defined 'archives and documents' to mean 'the official records and reference collections belonging to or in the possession of the mission' was withdrawn.[13] The position of archives is thus different from other property of the mission which under Article 22(3) is not generally given inviolability unless it is on the premises of the mission. If archives fall into the hands of the receiving State after being lost or stolen they must therefore be returned forthwith and may not be used in legal proceedings or for any other purpose of the receiving State.

## Subsequent practice

States Parties have generally given full effect to the wide protection provided under Article 24 of the Convention. In 1965, when the United States was not yet a Party, the State Department in response to an attempt to secure access to personnel records of the Cambodian Embassy, whose diplomatic staff had all been withdrawn, said that: 'Although the Embassy is closed, it remains inviolable, and any records which may be stored therein are not subject to subpoena.'[14]

In 1987 the UK Court of Appeal in *Fayed v Al-Tajir*[15] referred to the *Rose* judgment as well as to Article 24 in holding that a document already disclosed voluntarily to the court during discovery should nevertheless be treated as absolutely privileged. The plaintiff claimed that the document in question libelled him and the defendant, who had been and was later reappointed as Ambassador of the United Arab Emirates, accepted responsibility for it, and waived his own diplomatic immunity while arguing that the document itself was entitled to privilege. The Court of Appeal held that although the resulting situation was extraordinary, 'there is no inconsistency in principle between a waiver of the diplomatic immunity of a defendant and the assertion of a claim for immunity of a diplomatic or embassy document whose contents are sought to be introduced into the proceedings against him'.[16]

The same approach to the inviolability of diplomatic archives was taken by the US State Department in the context of a case where they were not prepared to support a claim to state immunity—*Renchard v Humphreys & Harding Inc.*[17] In a letter to the court, the State Department said that in declining to recognize and allow sovereign immunity in a suit for damage to neighbouring property caused by excavations and construction on the Embassy of Brazil, they did not intend to imply that Article 24 could not be used to resist discovery of relevant documents:

Thus, while it is the position of the Department of State that the Government of Brazil does not enjoy immunity from suit in the courts of the United States in the subject litigation, involving the construction of the chancery building in Washington, it is also the position of the Department of

---

[13] A/Conf. 20/C 1/L 153; A/Conf. 20/14 p 149. See also report of US Delegation on this point, in Whiteman, *Digest of International Law* vol VII p 391.
[14] Whiteman, *Digest of International Law* vol VII p 392.
[15] [1988] 1 QB 712; [1987] 2 All ER 396; [1987] 3 WLR 102; 86 ILR 131.
[16] Per Kerr LJ.
[17] Civil Action No 2128–72 US District Court, District of Columbia, 381 F Supp 382 (DDC 1974). See 1975 AJIL 182 and 889.

State that the documents and archives of the Embassy are inviolable under the Vienna Convention as against any order of a United States court.

The same distinction was upheld in the case of *Mission of Saudi Arabia to the United Nations v Kirkwood Ltd*[18] in which a US court confirmed that the Saudi Mission did not lose the separate inviolability of its archives (conferred under the Host State Agreement between the United States and the United Nations) by instituting legal proceedings.

The International Court of Justice in the *Hostages Case*[19] stated in their judgment that: 'Those archives and documents of the United States Embassy which were not destroyed by the staff during the attack on 4 November have been ransacked by the militants. Documents purporting to come from this source have been disseminated by the militants and by the Government-controlled media.' The ICJ emphasized the separate nature of the breach of the inviolability of diplomatic archives in stating that: 'This particular violation has been made manifest to the world by repeated statements by the militants occupying the Embassy, who claim to be in possession of documents from the archives, and by various government authorities, purporting to specify the contents thereof.'

The separate character of the inviolability of diplomatic archives was also underlined by the Eritrea Ethiopia Claims Commission in their Partial Award of 19 December 2005. Ethiopia claimed that Eritrean customs officials at Asmara airport intercepted and retained a diplomatic bag containing blank passports, invoices, and receipts. The Commission found that the package in question was not appropriately labelled and so did not constitute a diplomatic bag, but that the nature of the official Ethiopian correspondence inside was apparent, so that Eritrea by retaining it violated Article 24 of the Convention.[20]

## What are the 'archives and documents of the mission'?

The terms 'archives and documents' were not defined in the Convention. Their inviolability is not conditional on their being identifiable, and there is no obligation to identify them when they are outside mission premises (in contrast, for example, to the diplomatic bag). It is clear that the negotiators intended a wide definition to be given to the term, and the words 'and documents' were added to the text in order to cover, for example, negotiating documents and memoranda in draft—which are strictly not archives in the ordinary sense of the word.[21] The Vienna Convention on Consular Relations provided in Article 1(1)(k) that '"consular archives" includes all the papers, documents, correspondence, books, films, tapes and registers of the consular post, together with the ciphers and codes, the card-indexes and any article of furniture intended for their protection or safekeeping'. In practice this extensive definition has been applied by analogy to the Vienna Diplomatic Convention, on the basis that given the wider immunities generally given to diplomatic missions, it would be absurd for a narrower construction of the term 'archives' to be applied to diplomatic archives than to consular archives. Given that the

---

[18] Index No 112122/01, summarized in 2003 DUSPIL 573.

[19] *Case concerning United States Diplomatic and Consular Staff in Tehran* 1980 ICJ Reports 3, at paras 24 and 77.

[20] Eritrea Ethiopia Claims Commission, Partial Award on Ethiopia's Claim, The Hague, 19 December 2005. See also ICJ Judgment of 19 December 2005 in *Case concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v Uganda)* para 343 dealing with Uganda's counterclaim.

[21] *ILC Yearbook* 1958 vol I pp 135–6 (Mr Liang, Mr Zourek).

underlying purpose is the protection of the confidentiality of information stored, it is clearly right that the words 'archives and documents' should be regarded as covering modern methods of storage such as computers and computer disks. Modern international agreements giving broadly a diplomatic level of inviolability and immunity to international organizations have also adopted a more detailed description of what storage methods are to be covered. The Headquarters Agreement between the Government of the United Kingdom and the International Maritime Organization regarding the Headquarters of the Organization, for example, extends inviolability to 'all archives, correspondence, documents, manuscripts, photographs, films and recordings belonging to or held by the Organization and to all information contained therein'.[22] There is, however, the danger that in attempting to list modern methods of information storage, any detailed definition may fail to keep pace with the increasing proliferation of techniques. It is probably better simply to rely on the clear intention of Article 24 to cover all physical items storing information.

The UK House of Lords addressed the meaning of the expression 'archives and documents of the mission' in the case of *Shearson Lehman Bros Inc v Maclaine Watson & Co Ltd and others (International Tin Council Intervening)*.[23] The case was one of those which arose following the collapse of the International Tin Council in 1985, leaving huge liabilities on its trading and loan contracts. It was intended to place in evidence documents originating (through means which were never clearly determined) from the Tin Council, which was entitled under UK legislation giving effect to its Headquarters Agreement to 'the like inviolability of official archives as was accorded in respect of those of a diplomatic mission'. The International Tin Council intervened in the case claiming that these documents were inadmissible. Lord Bridge, giving the leading judgment of the House of Lords, said that 'it would seem to me perfectly natural to interpret the phrase "the archives and documents of the mission" in Article 24 of the Vienna Convention as referring to the archives and documents belonging to or held by the mission'. One particular difficulty arising in that case—the status of documents communicated by the Tin Council to one of its member governments or a representative of a government—was not relevant to the case of archives or documents of a diplomatic mission. The House of Lords, however, also held that letters or documents communicated to a third party by an officer or employee of the Tin Council with actual or ostensible authority no longer belonged to the Council and thus no longer enjoyed inviolability as part of its archives. This finding is equally relevant to the case of archives and documents of a diplomatic mission.

The House of Lords in the same judgment rejected the argument that the inviolability of archives gave only protection from executive or judicial action of the receiving State, so that a document which was stolen or otherwise obtained by improper means from a diplomatic mission was not necessarily inadmissible in evidence. Of this submission Lord Bridge said:

The underlying purpose of the inviolability is to protect the privacy of diplomatic communications. If that privacy is violated by a citizen, it would be wholly inimical to the underlying purpose that the

---

[22] UKTS No. 18 (1969), Art 3(3). See also Lee (1991) pp 427–8, and Satow (5th edn 1979) para 14.26.
[23] [1988] 1 All ER 116; [1988] 1 WLR 16; 77 ILR 145. The judgments at first instance and in the Court of Appeal, which are also of interest on the question of 'archives and documents' are in 77 ILR 107 and 124.

judicial authorities of the host State should countenance the violation by permitting the violator, or anyone who receives the document from the violator, to make use of the document in judicial proceedings.[24]

It should be noted that since 'the mission' does not have legal personality, archives belong strictly to the sending State. If a change of government takes place in the sending State, the archives retain their inviolability, but the recognition by the receiving State of a new government of the sending State will normally have the effect of transferring title to the archives and documents to the new government. The new government, or its newly appointed representative, would, however, be entitled to enforce its title in the courts of the receiving State only if they were prepared to accept that they would not be immune in respect of any directly connected counterclaim.

The status of archives and documents held by professional consultants to a diplomatic mission was considered in 2002 by the US House of Representatives Committee on Government Reform and by the State Department. For the purposes of an investigation into abductions of children of dual US and Saudi Arabian nationality in which the Embassy of Saudi Arabia was alleged to be complicit, the House Committee issued subpoenas seeking relevant documents to three US firms which were lobbyists or public relations advisers to the Embassy. The documents in question were records relating to professional services performed for the Embassy, but it was not claimed that they were in the ownership or possession of the Embassy. The lobbyists and the Saudi Arabian Embassy refused to comply with the subpoenas on the ground that the documents requested were 'archives and documents of the mission', but the Committee was not persuaded. Their stance was backed in an opinion and by oral testimony submitted to the Committee by the present author. The basis of these submissions was that the statement by Lord Bridge in the English House of Lords case of *Shearson Lehman Brothers Inc and another v Maclaine Watson & Co Ltd and another*, described above, although not binding, would be a persuasive authority in US courts on the interpretation of Article 24 of the Vienna Convention, and that Lord Bridge had held that a document communicated to a third party with actual authority, express or implied, or with ostensible authority, was no longer entitled to inviolability. It would follow that correspondence to or documents supplied to a third party not being a member of the diplomatic mission or in any other capacity an employee of the sending State would normally become the property of the recipient and so would no longer form part of the archives and documents of the mission.

The Committee on Government Reform also invited the US State Department to appear before them or to indicate their views, and on the date of the oral hearing, the State Department responded in writing. They pointed out that this was the first time that a legislature had attempted to compel production of records from contractors for an embassy in that country, and that they did not have firm views on the correct interpretation of the Vienna Convention in that context. They pointed out that the State

---

[24] Contrast the position taken by the House of Lords in the later case of *R v Khan (Sultan)* [1996] 3 WLR 162, where evidence obtained through an electronic listening device attached by the police to a private house without the knowledge of the owners or occupiers was held admissible in the absence of unfairness. Although the European Court of Human Rights later held in *Khan v United Kingdom*, Application No. 35394/97, ECHR 2000 V, 12.5.00, that the United Kingdom was in breach of Art 8 (right to respect for private life) and Art 13 (duty to provide an effective remedy) of the European Convention on Human Rights, that court did not accept that the unlawfully obtained evidence should necessarily have been excluded.

Department contracted overseas with local nationals to fill some embassy positions and that in a number of instances the Department had asserted that information in the possession of such local nationals was 'archival' under the Vienna Convention and thus inviolable. They also used outside US contractors for embassy construction in sensitive posts and would want to argue that information provided to such contractors was protected. The letter pointed out that the analysis of Lord Bridge in the *Shearson Lehman* case referred to above had noted the absence in that case of 'any relationship of lender and borrower, bailor and bailee or principal and agent'. While it is true that it is unusual for a national legislature to use compulsory means to secure attendance of witnesses or production of documents, the question of the limits of inviolability of mission archives are of application to the executive and judicial as well as the legislative branch of a State. The subpoenas issued were, however, never tested in a US court since shortly after the oral hearings described the Committee on Government Reform was reconstituted. The State Department made clear that their written statement reflected only their own views and not those of other interested agencies or Departments. The exchanges in the context of the enquiry into the possible involvement of Saudi Arabia in child abduction cases therefore illustrate the issues and the practical difficulties which are likely to arise elsewhere, but do not resolve them. Where it is desired to protect sensitive documents to be supplied to persons who are not members of the diplomatic mission, such as building contractors, it would be safer to make special arrangements to ring-fence them in order to guarantee their continued inviolability. This could be done either by ensuring that the documents did not physically leave the mission premises or that if they do they are clearly marked as property of the State or Government entitled to inviolability for its diplomatic archives.[25] Perhaps in response to these events, the Agreement concluded between the United States and the People's Republic of China in 2003 for the construction of embassies in Beijing and Washington makes specific provision for papers on the construction and design of the premises to be treated as archives of the mission.[26]

## The *Bancoult* Case

The extent of protection to be accorded to archives and documents of a diplomatic mission was re-examined by the English Divisional Court and then by the Court of Appeal in the case of *R (Bancoult) v Secretary of State for Foreign and Commonwealth Affairs (No 3)*.[27] The case was a further stage in the long-running litigation which followed the removal and subsequent exclusion by the UK of the population of the Chagos Islands in its dependency, the British Indian Ocean Territory. The challenge in this case was not to the expulsion as such but to the decision by the UK Foreign Secretary to create a large marine protected area in the territory in which fishing would be forbidden. One of the grounds for challenge was that the decision was based at least in part on an improper motive on the part of the Secretary of State of seeking to make the eventual re-settlement of the Chagos Islands impossible. To support their claim, the Chagos Islanders relied on a

---

[25] Information about the enquiry, correspondence and hearings was available from the Committee website www.house.gov/reform. The State Department response to the Committee is printed in 2002 DUSPIL 567.
[26] Extracts from the Agreement of 17 November 2003 are in 2003 DUSPIL 256.
[27] Divisional Court Judgment [2013] EWHC 1502 (Admin); Court of Appeal Judgment [2014] EWCA Civ 708; Times Law Reports, 10 June 2014.

document published by WikiLeaks and by the newspapers the *Daily Telegraph* and the *Guardian* which claimed to be a copy of a record of a meeting in the US Embassy in London sent by cable to Washington and to the US Embassy in Mauritius. It was suggested, but not proved, that it was one of many documents alleged to have been illicitly obtained by Private Bradley Manning from a US facility in Iraq, and it was clear that it had not been published by or with the authority of the US Government. In this US account, two UK diplomatic service officers were recorded as having made statements which appeared to support the claim of improper motive. The accuracy of the account was disputed by the UK officers, but the UK could offer no alternative record of the critical meeting.

The Divisional Court held that the document was inadmissible because in the absence of consent by the US Government it remained an archive and a communication of the US mission, notwithstanding the fact that it had been leaked by a third party and given widespread publicity. The Court relied on the speech by Lord Bridge in the *Shearson Lehman* (ITC) case described above in which he said:

> The underlying purpose of the inviolability conferred is to protect the privacy of diplomatic communications. If that privacy is violated by a citizen, it would be wholly inimical to the underlying purpose that the judicial authorities of the host State should countenance the violation by permitting the violator, or anyone who receives the document from the violator, to make use of the document in judicial proceedings.

The Divisional Court accepted that the cable, created, transmitted, received and stored electronically, remained a document for the purposes of Article 24 and remained 'official correspondence' for the purposes of Article 27.2 of the Vienna Convention. Its inviolability was not lost merely because it was sent to and received by the US Government or because it was held in a place geographically remote from the US mission in London. The Court said:

> We are required to apply a broad and sensible construction to Articles 24 and 27.2. Taken together, they provide for comprehensive rules for the enduring protection of all forms of diplomatic communication.[28]

On the basis of other evidence of advice and communications within the FCO, however, the Divisional Court rejected the claim that the Secretary of State had been influenced by an improper motive.

Before the Court of Appeal it was argued for the appellants, first, that the words 'wherever they may be' was limited territorially to places within the receiving State and, secondly, that the term 'inviolability' did not automatically imply inadmissibility in judicial proceedings but was limited to excluding interference or compulsion on the part of the receiving State. The Court of Appeal saw 'considerable force' in the argument that the UK could not violate the diplomatic archives or documents of the US mission if they are not in its territory or otherwise under its jurisdiction and that it was irrelevant that they originated in the US mission in the UK. In the light of its decision on the issue of admissibility, however, it did not express a concluded view about it.

On the question of whether inviolability implied inadmissibility of an archive or document, the Court of Appeal concluded that it was not bound by the statement by

---

[28] Paras 40–45.

Lord Bridge in the *Shearson Lehman* case where he rejected the proposition that the only protection afforded by inviolability was against executive or judicial action by the host State and asserted that if a stolen document was put in evidence, it would be contrary to the duty to protect the privacy of diplomatic communications to permit the violator or anyone receiving the document from the violator to make use of it in judicial proceedings. Because the rejection of the claim to admissibility in *Shearson Lehman* turned on disclosure with the express or implied authority of the ITC, the Court of Appeal in *Bancoult* held that Lord Bridge's assertion was not part of the ratio and that the present case was distinguishable on the facts in that the person seeking to adduce the document in evidence was not complicit in its disclosure.

The Court quoted the definition of inviolability offered by Professor Clive Parry:

Immunity from all interference, whether under colour of law or right or otherwise, and connotes a special duty of protection, whether from such interferences or from mere insult, on the part of the receiving state.

It then relied with approval on the statement by Dr Francis Mann where he said:

'Inviolability' let it be stated once more, simply means freedom from official interferences. Official correspondence of the mission over which the receiving state has had no control can, as has been submitted above, be freely used in judicial proceedings.

The Court considered in detail various cases cited (including *Rose v The King*)[29] and concluded that they did not clearly resolve the admissibility issue.

The conclusion of the Court of Appeal was that

Inviolability involves the placing of a protective ring around the ambassador, the embassy and its archives and documents which neither the receiving state nor the courts of the receiving state may lawfully penetrate. If, however, a relevant document has found its way into the hands of a third party, even in consequence of a breach of inviolability, it is prima facie admissible in evidence. The concept of inviolability has no relevance where no attempt is being made to exercise *compulsion* against the embassy. Inviolability, like other diplomatic immunities, is a defence against an attempt to exercise state power and nothing more.[30]

The Court further held that the view that inviolability of archives and communications implied inadmissibility was inconsistent with the central object and purpose of the immunities in the Convention which was 'to ensure the efficient performance of the functions of the diplomatic mission'. Where a document had already been disclosed the damage had already been done and it made no sense for a party who had no responsibility for the disclosure to be precluded from using it in legal proceedings. It was also relevant that the US Government had not objected to the use of the cable in the proceedings.

## Comment on the *Bancoult* Case

Since the Court of Appeal, along with the Divisional Court, found on the basis of other evidence that the Secretary of State was not influenced by an improper motive, there was no incentive for either side to appeal on the question of the admissibility of the leaked

---

[29] [1947] 3 DLR 618. The case is discussed above at p 157.
[30] Para 58.

cable. The reasoning favoured, or relied on by the Court of Appeal does, however, have important implications for the general protection available to archives, documents and communications of a diplomatic mission.

The Vienna Conventions on Diplomatic and Consular Relations were drawn up at a time when electronic communications between a State and its diplomatic and consular missions abroad were not as general as they have since become. They were, however, developing fast, and it was clear that the negotiators of both Conventions sought to ensure that protection of the confidentiality of records communications would not depend on the use of methods already in existence. Since a diplomatic mission has no legal personality, its archives and documents belong at all times to the sending State, as was pointed out above. The seamless protection of confidentiality of archives and documents is also emphasized by the fact that in transmission they are also protected as official correspondence of the mission under Article 27.2 of the Convention. Article 40.3 requires third States to accord to official correspondence and other official communications in transit, including messages in code or cipher, the same freedom and protection as is accorded by the receiving State. It is this triple protection of the confidentiality of archives, documents, correspondence, and communications which ensures that diplomatic missions and their staff provide to all sending States a clear advantage over press reporting.

Under modern practice a record or memorandum generated within a diplomatic mission will usually be transmitted electronically to the government of the sending State and often to other missions of that State. The proposition that once this has occurred, the document 'becomes the property of the sending State' and that on leaving the territorial jurisdiction its status lapses so that that Articles 24 and 27 are no longer engaged and the Convention no longer applies would annihilate entirely the protection intended to be given by those Articles.

It is true that the receiving State is not responsible for protecting copies of a document in other jurisdictions. But this does not mean that a copy which is physically present (whether or not it has been electronically transmitted out of the jurisdiction) has ceased to be an archive or document of the mission. This was clearly explained by Professor (later Judge) Higgins in the passage cited to the Court of Appeal where she said:

It is true that an English court is not likely to be in a position to enforce the inviolability of a document from the authorities of another country where that particular document happens to be located. But it is entirely another thing to say that, because a document happens to be outside the jurisdiction, an English court is thereby entitled to treat it, in matters that do fall within its own competence, as non-archival and thus without benefit of such inviolability as it is in a position to bestow.[31]

It is unfortunate that the Court of Appeal saw 'considerable force' in the approach which would truncate the inviolability of diplomatic archives and documents as soon as they are transmitted in electronic form to the government of the sending State and thus in some sense leave the territory of the receiving State. The Court, however, did not express a concluded view on the argument. It therefore remains possible to maintain that the words 'wherever they may be' in Article 24 must be construed to include cyberspace as well as computer storage facilities outside the receiving State if the protection of confidentiality

---

[31] *Problems and Process: International Law and How We Use It* (1994), cited in para 27 of the Court of Appeal Judgment.

required by Article 24 is to be effective under modern methods of recording and transmitting information. It seems clear that this is required in order to give proper effect to Article 24 as was intended by the original Parties.

As to the proposition that the term 'inviolability' implies only protection from interference by the authorities of the receiving State, so that a document in the hands of a third party, even in consequence of a breach of inviolability, is *prima facie* admissible in evidence, the Court of Appeal correctly pointed out that most of the cases cited did not directly address this point. The Court, however, relied heavily on the statement by Dr Mann that inviolability 'simply means freedom from official interference. Official correspondence of the mission over the removal of which the receiving state has had no control can, as has been submitted above, be freely used in judicial proceedings.' Dr Mann, however, while citing with approval the definition of inviolability suggested by Professor Clive Parry, in his own definition totally ignores the element of a 'special duty of protection, whether from such interferences or from mere insult, on the part of the receiving state'. Inviolability—whether of diplomatic premises, diplomatic agents, or of archives, documents, and communications—clearly also comprises this duty of protection from intrusion, detention, injury, insult, or breach of confidentiality by third parties. It is under this head that the general obligation of courts to regard as *prima facie* inadmissible documents not disclosed by or on behalf of the sending State must be examined. The conclusion of the Court of Appeal[32] that 'The concept of inviolability has no relevance where no attempt is being made to exercise *compulsion* against the embassy. Inviolability, like other diplomatic immunities is a defence against an attempt to exercise state power and nothing more' ignores entirely the protective aspect of inviolability and is potentially greatly damaging to the application of the concept in many contexts throughout the Convention.

It is also at odds with those earlier cases where the document was not obtained by coercion of any sort on the part of the receiving State. The Court quoted Bissonnette J in the *Rose* case emphasizing the absence of protest in that case either by the sending State (the Soviet Union) or the receiving State (Canada), but it did not quote his starting point which was that

International law creates a presumption that documents coming from an Embassy have a diplomatic character and that every Court of Justice must refuse to acknowledge jurisdiction or competence in regard to them.

Nor did the Court of Appeal take into account that the International Law Commission deliberately chose to confer 'inviolability' on diplomatic archives to convey both that the receiving State must abstain from any interference through its own authorities and that it owed a duty of protection of the archives in respect of unauthorized interference by others.[33] It did not discuss the case of *Fayed v Al-Tajir*[34] where the relevant document had not been obtained by the authorities of the receiving State but disclosed voluntarily during discovery, but was nevertheless held to be absolutely privileged. It did cite the conclusion of Lord Bridge in *Shearson Lehman* who expressly dismissed the argument that

---

[32] Para 58 of the Judgment.
[33] ILC Yearbook 1957 vol II p 137, Commentary on draft Art 18.
[34] [1988] 1 QB 712, [1987] 2 All ER 396, 86 ILR 131, described above.

inviolability connoted only protection from interference by the receiving State, but chose to differ from his view on the ground that the finding was not part of the ratio in that case.

The Court of Appeal, however, in allowing admissibility of the leaked cable placed reliance on two other factors where its views are more persuasive. The first was that the damage to the confidentiality of the documents had already been done by their disclosure by a third party for which the party which wished to adduce the evidence had no responsibility. It may be argued that it should not be relevant whether the party seeking to admit the evidence bears no responsibility for the initial disclosure, since the inviolability given to archives is entirely for the protection of the confidentiality of mission records. There is, however, more force in the argument that there is no longer any confidentiality to protect, although it will not always be the case that admission as evidence in court of a leaked document, even where widely circulated, causes no further damage to the sending State. In an era where leaking is increasingly common and is in some circles applauded as contributing to freedom of information, governments may well take the view that admitting a document as evidence in court compounds the original breach of trust and acts as an encouragement to other potential leakers.

The Court also placed importance on the fact that the US Government had not objected to the use of the cable in the proceedings. If this failure to intervene or to assert inadmissibility was deliberate, it would bring the case squarely within the ratio of the *Shearson Lehman* case—the document ceased to be archival because its confidentiality was in effect waived by disclosure with the express or implied authority of the US Government whose archive it was. The case was of course unusual in that it was not the sending State which had the primary substantive interest in withholding the document from the court but the receiving State, the UK.

The Court allowed the appeal on admissibility 'on the narrow basis that admitting the cable in evidence in the instant case did not violate the archive and documents of the US mission since it had already been disclosed to the world by a third party'.[35]

Confining the ratio of the decision on admissibility to these grounds would be much less damaging to the protection given by Article 24 of the Convention than the much wider proposition that the term inviolability does not cover inadmissibility unless some organ of the sending State was responsible for the initial violation. The wider proposition would substantially reduce the protection available under Article 24.[36]

---

[35] Para 65.
[36] For analysis of the issues and modern practice, see Duquet and Wouters (2015b).