UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY, <br><br> Plaintiffs, <br><br> v. <br><br> NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC, <br><br> Defendants. | Civil Action No. 1:19-cv-00150-DLF |

**NON-PARTY STATE OF QATAR'S STATEMENT OF INTEREST WITH RESPECT TO PLAINTIFFS' MOTION FOR RECONSIDERATION**

Non-party State of Qatar ("Qatar") respectfully files this Statement of Interest regarding

Plaintiffs Broidy Capital Management LLC and Elliott Broidy (collectively "Broidy")'s Motion

for Reconsideration of the Protective Order (ECF No. 102).[1]  The Protective Order entered by this

Court (ECF No. 96) incorporates necessary and appropriate protections to safeguard Qatar's

sovereign privileges and immunities.  In particular, the Order's Attorneys'-Eyes-Only ("AEO")

provision is necessary to prevent the dissemination of Qatar's privileged documents and

information that may be produced in this litigation.

In his motion, Broidy maintains that the Court should reconsider the Protective Order and

narrow its protections for AEO information.  Yet he fails to identify any intervening change in the

---

[1] Qatar understands from the Court's order of December 8, 2021 that the Court will accept a statement of interest filed by the State, as "the equivalent of [an] amicus brief[]," in order to bring Qatar's interests and views to the attention of the Court.  Minute Order (Dec. 8, 2021).  In accordance with Local Rule 7(o), Qatar states that undersigned counsel authored the brief in its entirety and that no person other than Qatar contributed money to fund the preparation or submission of this brief.

law since the Court entered the Protective Order last month, and the sole D.C. Circuit case on which he relies, *Doe v. D.C.*, 697 F.2d 1115 (D.C. Cir. 1983), is entirely consistent with the existing Order.  *See* ECF No. 102-1, at 1–2.  Broidy's motion is best understood not as a request for reconsideration (the standard for which he manifestly fails to meet), but rather as a request for a ruling on the substantive scope of Qatar's sovereign privileges and immunities.  It would be premature for the Court to address those questions at this juncture in the abstract and without regard to specific documents and information as to which Qatar may assert a privilege. Nevertheless, in the interest of providing the Court with the relevant legal context for Broidy's motion, Qatar briefly summarizes the privileges and immunities applicable in this case.

I.     **The Protective Order Incorporates Necessary and Appropriate Protections for Qatar's Sovereign Privileges and Immunities.**

The D.C. Circuit has noted that this Court "has the appropriate tools to protect Qatar's absolute FSIA 'immunity from trial and the attendant burdens of litigation.'"  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 804 (D.C. Cir. 2021) (internal citation omitted).  Based on this guidance, the Court instructed the parties to respect Qatar's immunities in their formulation of proposed protective orders.  Minute Order (Nov. 30, 2021).  In his proposal, Broidy argued that the Protective Order should be narrower than the corresponding protective order in the Central District of California action to reflect Broidy's view of the scope of Qatar's privileges and immunities.  ECF No. 92, at 22–23.  Defendants countered that litigation regarding a protective order was not the appropriate opportunity to adjudicate the merits of Qatar's privileges and that the order would incorporate a dispute resolution mechanism that would enable Broidy to raise his arguments in the context of specific documents.  ECF No. 93, at 6–7.

After receiving full briefing from the parties and a Statement of Interest filed by Qatar (ECF No. 94), the Court declined to adopt in full Defendants' proposed order, and instead entered

a Protective Order largely tracking the Central District order, including its definition of "Highly Confidential – Attorneys' Eyes Only (AEO)" information, which includes (i) "information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations," and (ii) "any other information relating to the conduct by Qatar of its foreign policy." ECF No. 96, § 1.D.[2]  In so doing, the Court deferred any dispute on the substantive scope of Qatar's privileges and immunities.

In his Motion for Reconsideration, Broidy again asks the Court to prematurely adjudicate the merits of Qatar's privileges and immunities by narrowing one category of information currently entitled to AEO protections ("information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations") and entirely removing another ("information relating to the conduct by Qatar of its foreign policy").  *See* ECF No. 96, § 1.D. Broidy's request, however, fails to satisfy any aspect of Rule 54(b) of the Federal Rules of Civil Procedure, which requires that "the movant demonstrate[]: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018) (internal citation and quotation marks omitted).  Broidy identifies no intervening change in the law and he points to no new evidence in his motion.  His sole argument is that the Protective Order contravenes *Doe*, in which the D.C. Circuit set out several factors relevant to determining whether AEO protection is appropriate.  *See* 697 F.2d at 1120.

---

[2] Qatar's privileges and immunities protect against any disclosure of protected materials, and accordingly, such materials should not be produced by any party or non-party. *See infra* § II.  But, as occurred in the Central District of California litigation, a producing party may not be aware that a document it possesses is protected by one of Qatar's privileges or immunities, and may inadvertently produce it.  In those instances, the Protective Order guards against the further dissemination of those materials and limits the intrusion on Qatar's sovereignty.

At most, Broidy's argument is that the Court misapplied the *Doe* factors in a novel factual context, which is not "clear error" for purposes of Rule 54(b).  *See, e.g., Takata v. Riot Blockchain, Inc.*, 2019 WL 2710273, at *2 (D.N.J. June 26, 2019) ("Movants essentially argue that 'the [c]ourt used the proper standard, but misapplied the facts to it,' which is not an adequate basis for a reconsideration motion.") (internal citation omitted).  In any case, *Doe* fully supports the existing Protective Order.  *Doe* sets out three criteria supporting AEO treatment:  (1) "the harm posed by [disclosure of the protected information] [is] substantial and serious"; (2) the restrictions are "narrowly drawn and precise"; and (3) there are "no alternative means . . . which intrude[] less directly on [attorney-client relations]."  697 F.2d at 1120 (internal citation omitted).  These criteria are not "prohibitive in practice," and "when serious harm to a party or to the community cannot be avoided without . . . curtailing communication between one of the litigants and his attorney regarding discovered materials, the court *should issue such a protective order*."  *Id.* (emphasis added).

Each criterion is met here.  First, with respect to the harm posed by disclosure, Broidy's complaint alleges activities purportedly funded and directed by Qatar as part of the State's foreign policy.  *See* ECF No. 18-2, ¶¶ 2, 7–8.  Discovery in this case will undoubtedly be directed to sensitive materials related to Qatar's governmental and diplomatic functions, as was the case in the Central District litigation.  *See* Suppl. Mem. in Opp'n to Pls.' Mot. Challenging Qatar's Designations of Material Under the Protective Order, *Broidy v. Qatar*, No. 18-cv-2421, ECF No. 240 (C.D. Cal. filed Oct. 26, 2018).  Dissemination of such materials concerning Qatar's core sovereign functions will cause "substantial and serious harm."  *See In re Terrorist Attacks on September 11, 2001 ("In re 9/11")*, 2019 WL 3296959, at *5 (S.D.N.Y. July 22, 2019) (protecting

foreign government "documents that contain traditionally nonpublic information") (internal citation and quotation marks omitted).

Second, the Protective Order is "narrowly drawn and precise" because, as required by *Doe*, it is "limited to designated 'areas of inquiry'" likely to cause harm.  *See* 697 F.2d at 1120–21 (internal citations and quotation marks omitted).  The first disputed AEO category concerns documents protected by the Vienna Conventions.  *See* ECF No. 96, § 1.D(ii).  Broidy concedes that documents protected by the Vienna Conventions warrant an AEO designation, as he retains that category in his proposed protective order.  *See* ECF No. 102-4, § 1.D.  His only modification is to narrow the category to documents produced by a sovereign state or its diplomatic mission, based on his view that the Vienna Conventions do not reach "documents in the hands of third parties."  ECF No. 102-1, at 17.  Broidy is wrong on the merits of this question, *see infra* § II, but the Court need not and should not reach that issue now, in the abstract, particularly given that the Protective Order already incorporates a process for Broidy to raise his arguments in the context of specific documents and information.  ECF No. 96, § 4.

The other AEO category in dispute concerns information regarding "the conduct by Qatar of its foreign policy."  *Id*., § 1.D(iii).  This category is necessary in light of principles of international comity and the deliberative process privilege, both of which protect documents and information about Qatar's governmental functions.  *See infra* § II.  Broidy rejects this category but would retain protection for "highly sensitive, non-public, financial, marketing, customer, regulatory, research, development, personal or commercial information" whose release may harm "the disclosing party or its personnel, clients or customers."  ECF No. 102-4, § 1.D.  Surely if Broidy can avail himself of this category to protect his own "marketing" and "customer" documents, then a foreign sovereign's sensitive foreign policy information deserves no less

protection.  *Id.*  Broidy's claim that this category could cover "[a]n op-ed or news article," or information disclosed pursuant to the Foreign Agents Registration Act ("FARA"), *see* ECF No. 102-1, at 3, is unfounded, as the Protective Order states that a party may not designate material that is "in the public domain."  ECF No. 96, § 4.

As to both these AEO categories, Broidy complains that the Protective Order inappropriately confers "standing on Defendants to seek AEO provisions for the purported benefit of Qatar's sovereign immunity."  ECF No. 102-1, at 4.  But here again, Broidy conflates the substantive scope of Qatar's privileges (*i.e.*, whether Defendants have standing to assert the privileges) with the scope of the Protective Order, which is intended to ensure orderly case management of those substantive issues.  Rather than permit Defendants to designate Qatar's privileged information, Broidy would have the Court require Qatar to file a motion each time it seeks to limit dissemination of its privileged information.  *Id*.  That would pose a significant burden to both the Court and the State, and it contravenes the D.C. Circuit's instruction to limit the "attendant burdens of litigation" on Qatar.  *Id.* (quoting *Muzin*, 12 F.4th at 804).  Broidy argues that his proposal is warranted because Qatar already filed two briefs in this case and thus "voluntarily assumed 'burdens of litigation' in this action.'"  *Id.* at 4 n.5 (quoting *Muzin*, 12 F.4th at 804).  Yet the submissions filed by Qatar (ECF Nos. 66, 94) were both intended to *protect* its privileges and immunities, and it cannot be the case that Qatar's efforts to protect its sovereign interests have the effect of diminishing those interests and subjecting Qatar to greater burdens going forward.

The third *Doe* criterion is also satisfied because there is no more narrowly tailored alternative.  *See* 697 F.2d at 1120.  Contrary to Broidy's suggestion, a "[s]tandard confidentiality restriction" prohibiting public disclosure is insufficient given the sensitivity of the materials at

issue.  ECF No. 102-1, at 14.  Broidy argues that Defendants and Qatar have provided "no supporting evidence" that Broidy would violate a standard confidentiality provision such that AEO protection is necessary, *id.*, but courts routinely incorporate AEO provisions into protective orders without evidentiary submissions, and Broidy's complaint rings hollow given his failure to make any evidentiary submission of his own that AEO protection for his "marketing" and "customer" information is necessary because Defendants would fail to comply with the Protective Order.  ECF No. 102-4, § 1.D.

In any event, even if some showing that a party is likely to violate a protective order were needed to justify AEO protection, Broidy gives the Court ample reason for concern.  Elliot Broidy is a recidivist criminal who has twice been convicted of felonies, including most recently for violating FARA by "secretly do[ing] the bidding of foreign principals" in "a covert campaign to influence the U.S. Government."  U.S. Dep't of Justice, *Recent FARA Cases* (Dec. 3, 2021), https://www.justice.gov/nsd-fara/recent-cases.  As his recent criminal proceedings before a court in this District have made clear, his conduct extended to "efforts to obtain business from a Middle Eastern country and . . . efforts to influence U.S. policy towards a second Middle Eastern country"—comments by the United States that can only be understood as a reference to Broidy's relationship with the United Arab Emirates and his hostility toward Qatar.  Arraignment and Change of Plea Tr. at 65:21–23, *United States v. Broidy*, Case No. 20-CR-210, ECF No. 13 (filed D.D.C. Oct. 23, 2020); *see also* ECF No. 1, ¶ 1.  If given access to Qatar's sensitive foreign policy documents, there is a significant risk that he would disseminate that information to others.  Such actions would violate the Protective Order, to be sure, but it would be difficult for the Court to police such misconduct, particularly since Broidy's own criminal past involves his willingness to

unlawfully maintain surreptitious relationships with his foreign interlocutors.  AEO protection is accordingly necessary.

II.     **The Court Should Defer Consideration of Qatar's Privileges and Immunities Until Any Questions Arise in the Context of Specific Discovery Disputes.**

The Court should reject Broidy's efforts to narrow the definition of AEO information for an additional reason:  it would be premature for the Court to consider Qatar's privileges and immunities on this record, in the abstract and without regard to particular categories of documents and information as to which Qatar is asserting a privilege.  As the cases involving discovery disputes concerning foreign privileges and immunities make clear, this analysis should be conducted in a concrete, document-by-document fashion.  *See In re 9/11*, 2019 WL 3296959, at *2, *4–6 (S.D.N.Y. July 22, 2019) (analyzing Saudi Arabia's assertions of Vienna Convention, international comity, and deliberative process privileges on a document-by-document basis); *Reino De Espana v. Am. Bureau of Shipping*, 2005 WL 1813017, at *9, *13 (S.D.N.Y. Aug. 1, 2005) (same with respect to comity and deliberative process).  Nevertheless, in the interest of providing the Court with the relevant legal context for the issues raised by Broidy's motion, Qatar sets forth below a brief overview of its relevant privileges and immunities:

*Vienna Conventions*.  The Vienna Conventions on Diplomatic and Consular Relations mandate certain privileges and immunities applicable to diplomatic agents, consular officials, diplomatic and consular missions, and related documents and information.  *See* Vienna Convention on Diplomatic Relations ("VCDR"), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95; Vienna Convention on Consular Relations ("VCCR"), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (collectively, the "Conventions").  The absolute immunities contained in the Vienna Conventions — which the treaties repeatedly stress by reference to "inviolability" — are broad and expansive, and are meant to protect the ability of diplomatic missions to function effectively in the United

States "with the understanding that American diplomats abroad will be afforded the same protections from intrusions by the host state." *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 300 (2d Cir. 1993).  As courts have explained, "[t]he most secure way to guarantee this protection . . . is through blanket immunities and privileges without exception."  *Id.*; *see also In re 9/11*, 2019 WL 3296959, at *3 ("The mandate . . . is clear: federal courts should not interfere with objects imbibed with inviolability by the [Vienna] Conventions.").

The Conventions contain several independent privileges that are relevant here.  First, the Conventions mandate that diplomatic and consular "archives and documents" are "inviolable at any time."  VCDR, art. 24; *see also* VCCR, art. 33 (same, except archives and documents are protected "at all times").  "[A]rchives and documents" include "all the papers, documents, correspondence, books, films, tapes and registers of the [diplomatic or] consular post, together with the ciphers and codes, the card-indexes and any article of furniture intended for their protection or safe keeping."  VCCR, art. 1(1)(k); *see In re 9/11*, 2019 WL 3296959, at *3 (applying VCCR's definition of "archives and documents" to VCDR).

Diplomatic archives and documents are inviolable regardless of who possesses them.  *See* VCDR, art. 24 ("The archives and documents of the mission shall be inviolable . . . *wherever they may be.*") (emphasis added); VCCR, art. 33 (same, for consular materials).  In adopting this language, the drafters specifically rejected proposals that would have required such documents or information to be in "the possession of the mission," or to be "identified by visible official signs" if outside the mission, in order to retain their inviolability.  *See* Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 158–59 (4th ed. 2016).

Pointing to the Denza treatise, Broidy argues that the Vienna Conventions do not apply to materials outside of the possession of a diplomatic or consular mission unless they are "lost or stolen."  ECF No. 102-1, at 5, 11 (citing ECF No. 92, at 4 n.5, 23–24, and ECF No. 95, at 2–3).  As Denza makes clear, however, the fact that Article 24 protects lost or stolen materials does not preclude other situations where materials may be protected outside of a mission, so long as those materials otherwise meet the definition of "archives and documents."  *See* Denza, *supra*, at 158.  Indeed, in the very same paragraph Broidy cites, Denza confirms that "it [is] clear beyond argument that archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability."  *Id.*  Denza goes on to explain that the phrase "wherever they may be" should include "cyberspace," such that electronic communications can be considered "archives and documents" even if they are located in "computer storage facilities."  *Id.* at 166–67.

Broidy also invokes Denza for the related argument that the Vienna Conventions' protections do not apply to documents in the hands of third parties such as contractors or consultants.  *See* ECF No. 92, at 24.  Broidy overstates Denza's analysis of this issue, which was articulated in proceedings before a House Committee on the validity of congressional subpoenas issued to certain consultants of the Saudi Arabian Embassy.  *See Hearings Before the House Committee on Government Reform*, 107th Congress, 2d Sess., at 1323–28 (Dec. 4, 2002) (Statement of Eileen Denza, Visiting Professor of Law, Univ. College London) ("Denza Statement"); Letter from Eileen Denza, Visiting Professor of Law, Univ. College London, to Dan Burton, Chairman, House Comm. on Gov't Reform (Nov. 18, 2002), in *Hearings Before the House Committee on Government Reform*, Serial No. 107-83, at 1340–42 (Nov. 18, 2002) (Gov't Printing Office 2003) ("Denza Letter").  Denza relied on a 1987 U.K. court decision to conclude that the subpoenas to the specific consultants at issue were appropriate.  *See* Denza Statement at 1325;

Denza Letter at 1340.  As the State Department pointed out in its written testimony, however, the U.K. decision on which Denza relied did "not appear to reach the situation in which documents or information are given to an agent, contractor or attorney."  *See Hearings Before the House Committee on Government Reform*, 107th Congress, 2d Sess., at 1675 (Dec. 11, 2002) (Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State) ("State Department Statement"). Broidy also fails to acknowledge other material aspects of the State Department's interpretation of Article 24, which is entitled to "great weight."  *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). While not articulating a definitive position on whether "records from a contractor for an embassy" are protected by the Conventions, the State Department stated that it had asserted Article 24 protections over materials in the possession of local nationals employed at U.S. Embassies and would also "look seriously at asserting . . . inviolability[] under the Vienna Convention" to protect such information possessed by a contractor for a U.S. embassy.  State Department Statement, at 1673–74.

Second, the Conventions also protect the "official correspondence of the mission" or "consular post," providing that such correspondence similarly "shall be inviolable."  VCDR, art. 27(2); VCCR, art. 35(2).  The Conventions define "official correspondence" in broad terms, as "*all* correspondence relating to the mission [or consular post] and its functions."  VCDR, art. 27(2) (emphasis added); *see also* VCCR, art. 35(2).  "It is probable . . . that 'correspondence' includes e-mails and their attachments which have become the most usual method of correspondence." Denza, *supra*, at 189.  Documents that either "were received" or "were sent" by either "a member of the Embassy" or the "Consulate" can constitute not only official correspondence, if they "relat[e] to the mission and its functions," but also "archives or documents."  *See In re 9/11*, 2019 WL 3296959, at *4 (internal citations and quotation marks omitted).

11

Third, the VCDR provides that the "correspondence" of a diplomat "enjoy[s] inviolability." VCDR, art. 30(2). A diplomat's communications, including electronic correspondence embodied in emails and text messages, thus cannot be "intercepted [or] searched," even if they are "private in character." Denza, *supra,* at 228–29. All countries have "a duty to abstain from any interference with such correspondence." *Id.* at 228. The fact that "there seem to be no cases where . . . there has been complaint at any breach" of this provision demonstrates the sanctity and importance of this privilege. *Id.* at 228.

Each of these categories of documents and information is "inviolable" under the Conventions, which means that parties are categorically barred from seeking production of these materials in litigation. *See Ewald v. Royal Norwegian Embassy*, 2013 WL 6094600, at *5–6 & n.5 (D. Minn. Nov. 20, 2013) (denying discovery that would violate VCDR Article 24's provision of inviolability for mission archives and documents); *Mission of Saudi Arabia to the United Nations v. Kirkwood Ltd.*, 2003 WL 25668170, at *1–2 (N.Y. Sup. Ct. Apr. 10, 2003) (refusing to impose sanctions when Saudi Arabia's mission to the United Nations declined to produce its correspondence with Saudi Arabia's Foreign Office). The Protective Order's AEO provision accordingly functions as an important backstop in the event of an inadvertent disclosure of these inviolable materials.

*International Comity*. International comity "refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. Of Iowa*, 482 U.S. 522, 543 n.27 (1987)). A court exercising its discretion as to whether "discovery is warranted . . . may appropriately consider comity interests and the burden that the discovery might cause to the foreign state" when determining "the propriety of discovery requests." *Republic*

*of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 146 n.6 (2014) (internal citations and quotation marks omitted).

Principles of international comity apply with special force when discovery intrudes upon documents and information in which a foreign sovereign itself has an interest, including when discovery seeks "highly sensitive documents that contain traditionally nonpublic information of a foreign government." *In re 9/11*, 2019 WL 3296959, at *5 (internal citations and quotation marks omitted); *see also Omari v. Ras Al Khaimah Free Trade Zone Auth.*, 2017 WL 3896399, at *2, *14 (S.D.N.Y. Aug. 18, 2017) (comity requires protection of alleged "smear report" commissioned by UAE subdivision ruler).[3]

In determining whether to apply principles of international comity, "courts should . . . take care to demonstrate due respect . . . for any sovereign interest expressed by a foreign state." *Aerospatiale*, 482 U.S. at 546. For example, in *In re Rubber Chemicals Antitrust Litigation*, the court denied a motion to compel the discovery of European Commission documents based on "principles of comity," after the Commission expressed its view that discovery should not proceed. 486 F. Supp. 2d 1078, 1081–82, 1084 (N.D. Cal. 2007). The court emphasized that a sovereign's expression of concern is entitled to deference, noting that "American courts, in supervising pretrial proceedings, should exercise special vigilance" to accord "due respect" for a sovereign's interests. *Id.* at 1081–84 (discussing European Commission's letter explaining that discovery of documents

---

[3] Principles of international comity also apply to both governmental and non-governmental documents in circumstances where compliance with a discovery request would require a party to violate foreign law. In this situation, courts are instructed to weigh several factors: "(1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Aerospatiale*, 482 U.S. at 544 n.28.

related to an anti-competition investigation would "undermine [the Commission's] ability to initiate and prosecute future investigations"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2010 WL 3420517, at *10 (E.D.N.Y. Aug. 27, 2010) (denying motion to compel production of European Commission's document on similar basis, and also denying alternate proposal to grant motion but impose protective order because order "would not sufficiently protect the EU's interest").

*Deliberative Process Privilege*.   In addition to the general protections encompassed by principles international comity, comity also "dictates that courts in this country give a foreign sovereign the same protection afforded to the executive branch of the United States," including the deliberative process privilege. *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002).   "[C]ourts have long held that foreign governments are entitled to protect their executive deliberations." *Id.* (internal quotation marks and citation omitted); *see also Reino De Espana*, 2005 WL 1813017, at *13.   In fact, the availability of such privileges was envisioned by the drafters of the Foreign Sovereign Immunities Act ("FSIA").   FSIA legislative history indicates that, while the FSIA itself does not "deal with questions of discovery," that was because "[e]xisting law" in that area is "adequate," including the notion that "concepts of governmental privilege would apply" if a plaintiff sought "sensitive governmental documents of a foreign state."   *See* H.R. Rep. 94-1487, 94th Cong., 2d Sess., 6621 & n.11 (1976) (citing the Freedom of Information Act).

The purpose of the deliberative process privilege is to "allow[] government officials 'freedom to debate' policies' in private." *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d at 552 (citing *In re Sealed Case (Espy)*, 121 F.3d 729, 737 (D.C. Cir. 1997)).   The privilege thus protects from disclosure documents that are "predecisional," *i.e.*, "prepared in order

to assist an agency decisionmaker in arriving at her decision," and "deliberative," *i.e.*, "related to the process by which policies are formulated." *Reino De Espana*, 2005 WL 1813017, at *11 (internal quotation marks and citations omitted).

\*       \*       \*

Given the nature of Broidy's allegations and his prior discovery in the Central District of California, it is likely that the Court will be called upon to analyze the Vienna Conventions, international comity, and the deliberative process privilege as part of this case.  Now, however, is not the time.  The Court should decline Broidy's invitation to adjudicate the merits of Qatar's privileges and immunities on a motion to reconsider the scope of an Attorneys' Eyes Only section of a protective order, and defer these questions until they can be analyzed in the context of specific discovery requests and objections.

## CONCLUSION

For these reasons, the State of Qatar respectfully requests that the Court deny Plaintiffs' Motion for Reconsideration.

Dated: January 19, 2022

Respectfully submitted,

Mitchell A. Kamin*
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
(424) 332-4800
mkamin@cov.com
*Pro Hac Vice* motion pending

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
David M. Zionts (D.C. Bar No. 995170)
Megan M. O'Neill (D.C. Bar No. 1601067)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com
dzionts@cov.com
moneill@cov.com

*Counsel for Non-Party State of Qatar*