**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT, LLC and
ELLIOTT BROIDY,

                                  Plaintiffs,

                v.

NICHOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, STONINGTON
STRATEGIES, LLC,

                           Defendants.

Case No. 19-cv-00150-DLF

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**
**DEFENDANTS TO ANSWER DISCOVERY REQUESTS**

KASOWITZ BENSON TORRES LLP
Henry B. Brownstein
Daniel R. Benson
Andrew R. Kurland
Jacob Benson

*Counsel for Plaintiffs Broidy Capital*
*Management, LLC and Elliott Broidy*

Dated:  January 24, 2022

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 7

ARGUMENT .................................................................................................................. 10

I.     The Information Requested is Not Protected Under the Vienna Conventions or
       So-called Considerations of "International Comity" ......................................... 10

II.    Congress Intended "Non-Diplomatic" Foreign Agents to be bound by the
       Obligations of FARA, Not the Vienna Conventions .......................................... 14

CONCLUSION ............................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Broidy Cap. Mgmt. LLC, et al., v. State of Qatar, et al.,*
    No. 2:18-cv-02421-JFW-E (C.D. Cal.), ECF No. 88 ............................................................14

*Broidy Cap. Mgmt. LLC v. Muzin,*
    12 F.4th 789 (D.C. Cir. 2021) ...................................................................................6, 8

*Broidy Cap. Mgmt. v. Allaham,*
    No. 1:18-mc-00240, ECF No. 4 (S.D.N.Y. June 11, 2018)............................3, 7, 13

*Emerson v. Department of Justice,*
    603 F. Supp. 459 (D.D.C. 1985) ...........................................................................17

*Kilburn v. Socialist People's Libyan Arab Jamahiriya,*
    376 F.3d 1123 (D.C. Cir. 2004) ............................................................................13

*Lewis v. Mutond,*
    918 F.3d 142 (D.C. Cir. 2019) .................................................................................8

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa,*
    482 U.S. 522 (1987)...............................................................................................13

**Statutes**

22 U.S.C. § 612(a) .......................................................................................................15

22 U.S.C. § 615...............................................................................................5, 16, 17

28 C.F.R. § 5.500(a)(1) ..........................................................................................5, 16

28 C.F.R. § 5.500(a)(2) ..........................................................................................5, 16

F.R.C.P. 37....................................................................................................................1

U.S. Code § 611(o) .....................................................................................................15

**Legislative History**

H. Rep. 1381, 75th Cong., 1st Sess. (1937) ...............................................................15

S. Exec. Rep. No. 6, 89th Cong., 1st Sess. (1965)......................................................14

S. Rep. No. 89–143, 89th Cong., 1st Sess. (1965) .....................................................14

Plaintiffs Broidy Capital Management, LLC and Elliot Broidy respectfully submit this memorandum of law in support of their motion, pursuant to Rule 37 of the Federal Rules of Civil Procedure, to compel Defendants Nicolas D. Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies, LLC, to produce discovery in response to Plaintiff's requests.[1]

## PRELIMINARY STATEMENT

This motion to compel discovery is necessitated by Defendants' blanket objections to Plaintiffs' discovery requests, based on what they claim is the State of Qatar's sovereign immunity.

Defendants, all private U.S. citizens, are public relations flacks and lobbyists hired and paid millions of dollars by the State of Qatar to launch an unprecedented and shocking attack on another U.S. citizen — including by hacking and disseminating his personal and confidential information — all in retaliation for his First Amendment-protected activities publicizing and opposing Qatar's extensive funding of extremist terrorist and terrorist-supporting groups.

In their objections to Plaintiffs' discovery requests, Defendants claim virtual immunity from discovery, including immunity from producing documents in their possession, custody or control, concerning their egregious activities.  Citing the Vienna Conventions on Diplomatic Relations ("VCDR") and on Consular Relations ("VCCR"),[2] "principles of international comity," and several sovereign immunity cases having nothing to do with whether U.S. citizens must produce documents in their possession, Defendants seek the functional equivalent of the

---

[1] "Brownstein Decl. Ex. __" refers to the exhibits attached to the Declaration of Henry B. Brownstein, dated January 24, 2022 that Plaintiffs have filed in support of their motion.

[2] The 1961 Vienna Convention on Diplomatic Relations and the 1963 Vienna Convention on Consular Relations are the treaties that form the core of international diplomatic and consular law governing the treatment of diplomats and consulates, as well as the archives of embassies and consulates.

sovereign immunity this Court and the Court of Appeals have expressly held in this action they are not entitled to.[3]

Defendants' objections are frivolous.  They are flatly, indeed brazenly, contrary to not only the decisions of this Court and the Court of Appeals rejecting Defendants' invocation of Qatar's sovereign immunity, but to every other relevant authority, including: the 2018 decision of the U.S. District Court for the Southern District of New York ("S.D.N.Y. decision") holding that Defendant Allaham was not permitted to withhold documents under the Vienna Conventions, as he and the other Defendants seek to do here; Congress's 2002 decision to reject Saudi Arabia's objections under the Vienna Conventions to that country's U.S. advisors producing documents in connection with a Congressional investigation; the plain and unequivocal intent of Congress in ratifying the Vienna Conventions and enacting the Foreign Agents Registration Act ("FARA"), a statute that requires disclosure of many of the same kinds of documents Defendants seek to withhold here; and the views of the foremost scholar on the Vienna Conventions whom Defendants themselves have cited.

The S.D.N.Y. decision is directly on point.  There, the court held that neither the Vienna Conventions nor the Foreign Sovereign Immunities Act ("FSIA") shielded Qatar-related

---

[3] Defendants' baseless objections pervade their responses to nearly all of Plaintiffs' discovery requests. *See, e.g.*, Brownstein Decl., Ex. 1 [Defendant Howard's Responses and Objections to Plaintiffs' First Requests for Production], General Objection No. 6 at p. 3 ("Howard will not provide documents or information subject to" Qatar's "privileges, immunities, and protections provided under the Vienna Conventions [] and principles of international comity"); Ex. 4 [Defendant Muzin's Responses and Objections to Plaintiffs' First Requests for Production], General Objections D and E at p. 2 (same); Ex. 7 [Defendant Allaham's Responses and Objections to Plaintiffs' First Requests for Production], General Objection Nos. 7-8 at p. 3-4 (same); Ex. 8 [Defendant Allaham's Responses and Objections to Plaintiffs' First Requests for Admission, (making the same general objections, and stating in response to 23 of the 28 requests for admission that "Allaham will not disclose information regarding his authorized activity for Qatar between August 2017 to July 2018."); *see generally id.*, Exs. 1-9.

documents in the hands of a third party (Allaham) from discovery.  Over the objections of
Allaham and Qatar, the court compelled Allaham, then a non-party to a related California action
between the parties, *Broidy Cap. Mgmt., LLC v. Qatar*, No. 2:18-cv-02421 (the "California
Litigation"), to comply with a subpoena seeking production of many of the same types of
materials – without first allowing Qatar to review them – that Defendants here claim the right to
withhold.  Order, *Broidy Cap. Mgmt. v. Allaham*, No. 1:18-mc-00240, ECF No. 4 at 2 (S.D.N.Y.
June 11, 2018).[4]  (Brownstein Decl. Ex. 10.)

The S.D.N.Y. decision was unequivocal, and had reason to be, because no court has ever
held that the Vienna Conventions or vague considerations of "international comity" provide
American public-relations flacks and lobbyists working for foreign governments immunity from
any kind of discovery – let alone the complete immunity Defendants' claim applies to all
materials and information stemming from their lucrative efforts on behalf of Qatar.

Congress has also made clear that the law is precisely the opposite.  In 2002, Congress,
over the objection of Saudi Arabia and its American public-relations flacks and lobbyists,
required them to produce for a Congressional investigation "archives and documents held by
professional consultants to a diplomatic mission," confirming that the VCDR does not shield
documents in the hands of third-party advisors to foreign countries.[5]  *See* ECF No. 92-3 ("Denza
Chapter") at 161-62.

---

[4] Defendants have repeatedly asked this Court to adopt the California Protective Order – which,
as shown in Plaintiffs' pending motion for reconsideration, conflicts with the law in this Circuit –
because the "exact same issues – indeed, some of the exact same documents and information –
[in the California action] are at issue here."  ECF No. 90-1 at 2.  *See also*, *e.g.*, ECF No. 105
("[T]he history of this case demonstrates that documents and information…will be produced
requiring protection, as the Central District of California determined.").  But now Defendants
seek to assert objections emphatically rejected by the S.D.N.Y. decision – an order that, unlike
the California Protective Order, was entered *with* an opinion.

[5] The operative language in the VCDR and the VCCR is the same.

Congress's position in the Saudi Arabia matter was supported at the time by a submission from Professor Eileen Denza,[6] the author of the textbook on the VCDR – the authority Defendants have incorrectly cited in purported support of their position.  *See* ECF No. 90-1 at 13 n.9.  As Plaintiffs have previously shown, Defendants grossly misrepresented Professor Denza's position, which in fact accords with Plaintiffs' position.  *See* ECF No. 92 at 4 n.5, 23-24; ECF No. 92-3.  In addition to the case involving Congress and Saudi Arabia, Professor Denza cites in her textbook a leading British case, *Shearson Lehman Bros Inc. v. Maclaine, Watson and Co Ltd; International Tin Council (Intervener) (No 2)* [1988] 1 All ER 116, 124-25 (Eng.) (Brownstein Decl. Ex. 14) in which the UK House of Lords unanimously found that documents that the International Tin Council (an international association of tin-producing countries) shared with third parties were not protected, even though UK legislation had provided the Tin Council with "the like inviolability of official archives as was accorded in respect of those of a diplomatic mission."  *See* ECF No. 92-3 (Denza Chapter) at 161.  Professor Denza concluded that the House of Lords' find thus is "equally relevant to the case of archives and documents of a diplomatic mission."  *Id.*

All Defendants were, at various points during the relevant time period, foreign (non-diplomatic) agents of Qatar, registered (and sometimes improperly unregistered) under FARA.  FAC ¶¶ 14-18.  Agency under FARA does not provide Defendants or their documents protection from discovery.  To the contrary, FARA expressly *requires* extensive public disclosures by Americans acting on behalf of foreign governments.  Under FARA, for example, all registrants must keep and preserve, among other things, "correspondence, memoranda, cables, telegrams,

---

[6] *See Investigation into Abductions of American Children to Saudi Arabia: Hearing Before the H. Comm. on Govt. Reform,* 107th Cong. 1326 (2002) (statement of Professor Eileen Denza). (Brownstein Decl., Ex. 11.)

teletype messages, and other *written communications to and from all foreign principals* and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals." 28 C.F.R. § 5.500(a)(1) (emphasis added).[7] All of these records "shall be open at all reasonable times to the inspection of any official charged with the enforcement of" FARA. 22 U.S.C. § 615.

As shown further below, the U.S. government has always understood the Vienna Conventions and FARA to cover entirely distinct groups of people and different types of documents. The VCDR, which was signed in 1961 and ratified by the U.S. Senate in 1965,[8] extends protections to diplomatic agents of foreign governments, as well as some more limited protections to foreign nationals who are employed by a diplomatic mission in other capacities. The VCDR (along with the VCCR, which was ratified in 1969) has no application to American citizens who, like Defendants, choose to sell their public-relations/lobbying services to help foreign governments interfere in U.S. politics. In fact, Article 41 of the VCDR states that persons covered by the VCDR "have a duty not to interfere in the internal affairs of that State," and Article 42 provides that "[a] diplomatic agent shall not in the receiving state practice for personal profit any professional or commercial activity." VCDR at Art. 41-42. FARA, as Congress made clear to Saudi Arabia, does not shield foreign governments' public-relations flacks and lobbyists from public scrutiny:

> [FARA] makes clear that the activities of such "propagandists," including the documents they generate, send and receive in the course of those activities, are to be subject to the "spotlight of pitiless publicity" so that the American people may be fully informed of both the identity of the propagandists and the nature of the activities they undertake on behalf of their foreign masters. It is ludicrous to

---

[7] The registrant must *also* keep "[a]ll correspondence, memoranda,…other written communications to and from" anyone else which "relat[e] to political activity on the part of any of the registrant's foreign principals." 28 C.F.R. § 5.500(a)(2).

[8] The VCCR was signed in 1963 and ratified by the U.S. Senate in 1969.

suggest, as you and your lawyers do, that when the United States ratified the Vienna Convention some 25 years after the enactment of FARA, it intended to shroud in absolute secrecy the very same activities of these propagandists.

Brownstein Decl. Ex. 12, *U.S. House Committee on Government Reform*, *Letter from Dan Burton, Chairman to Prince Bandar bin Sultan bin Abdulaziz*, November 21, 2002 ("Congressional Letter") (quoting H.R. REP. No. 1381, 75th Cong., 1st Sess. 1-2 (1937)).  In fact, if Congress saw any conflicts between FARA and the VCDR, it would have addressed and resolved those conflicts.  The same Senate Foreign Relations Committee in 1965 both unanimously overhauled FARA into its modern structure and unanimously ratified the VCDR.

In short, there is no good faith argument that American public relations flacks and lobbyists are entitled to withhold relevant materials in their possession based on the protections the Vienna Conventions afford only to the very limited set of diplomatic agents and genuine diplomatic/consular documents.  Nor do vague, unsupported assertions of "international comity" provide Defendants with any kind of right to withhold documents.  Rather, as Congress recognized in 1937, and as confirmed on numerous occasions including in 2002 with respect to Saudi Arabia, Defendants' "propagand[a]" and other efforts on behalf of Qatar are unquestionably subject to disclosure requirements, including discovery in civil lawsuits." Congressional Letter.

This is not the first time that Defendants have attempted to cloak themselves in the "privileges and immunities" of the State of Qatar.  They previously claimed entitlement to derivative sovereign immunity in order to try to escape this litigation altogether.  This Court and the Court of Appeals both rejected that attempt, with the latter explaining that Defendants "failed to establish that any foreign official immunity shields them from further proceedings and ultimate liability."  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 792 (D.C. Cir. 2021).  But

by claiming the right to withhold, ostensibly on Qatar's behalf, massive swaths of the information most relevant to this case, Plaintiffs are now trying to achieve the functional equivalent of the "foreign official immunity" that the Court of Appeals and this Court held they do not have.  Defendants' attempted workaround by asserting meritless objections to discovery must be rejected, and they must be compelled to produce any and all information they are withholding on the basis of the Vienna Conventions, "principles of international comity" or any other baseless and non-existent protections they assert.

## BACKGROUND

In 2018, in connection with the case in the Central District of California, the California Litigation, Broidy issued a subpoena in the Southern District of New York on Allaham, who was not then a party to the California Litigation.  Allaham did not respond, and then Allaham and Qatar both opposed Broidy's motion to compel filed in the Southern District of New York.  The S.D.N.Y. Court held that "neither the FSIA nor the Vienna Conventions protect [Qatar] from civil discovery collected from [Allaham]", and it ordered Allaham to immediately produce documents, while rejecting Qatar's request to first screen pre-screen Allaham's production.  *See* Order, *Broidy Cap. Mgmt. v. Allaham*, No. 1:18-mc-00240, ECF No. 4 at 2 (S.D.N.Y. June 11, 2018) (Brownstein Decl. Ex. 10.)

This Court has already concluded multiple times that the Defendants are not entitled to invoke Qatar's "privileges and immunities" just because they have at various times been American public-relations flacks and lobbyists on behalf of Qatar.  *See, e.g.,* ECF No. 51 at 10-17.

The Court held that Defendants are not entitled to invoke foreign sovereign immunity, based either on their status or on what they were doing.  "Status-based immunity is reserved for diplomats and heads of state and attaches regardless of the substance of the claim."  *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019) (internal quotation omitted).  Defendants are not, and of course do not claim to be, either Qatari diplomats or Qatari heads of state.  Conduct-based immunity "is afforded to any public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state."  *Id.* (internal quotation omitted) (alterations adopted).  This Court held that Defendants are not entitled to conduct-based immunity, because, among other things, holding these U.S. citizens accountable for their misconduct would not constitute "enforce[ing] a rule of law against the [foreign] state."  ECF No. 51.  In affirming, the Court of Appeals held that Defendants "have failed to establish that any foreign official immunity shields them from further proceedings and ultimate liability."  *Muzin*, 12 F.4th at 792.

In November 2021, Plaintiffs served their first sets of discovery requests, including Interrogatories, Requests for Production, and Requests for Admission, on each of the Defendants.  All Defendants' responses to each of Plaintiffs' discovery requests included general objections on the basis that materials sought were protected by the Vienna Conventions and principles of international comity.  For example, Defendant Allaham's responded in part with the following two general objections to Plaintiffs' requests for production:

> 7. Allaham objects generally to the Requests to the extent they seek information that is subject to protection under the Vienna Convention on Diplomatic Relations and/or the Vienna Convention on Consular Relations. Discovery materials are absolutely protected from disclosure under the Vienna Conventions, which provide that the documents and information of a diplomatic mission are "inviolable at any time and wherever they may be." Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, 108; *see also* Vienna Convention on Consular Relations and Optional Protocol on Disputes, art. 33, Apr.

24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, 289 (providing the same inviolability for consular archives). The Ninth Circuit has also determined that Qatar is immune from suit. *See Broidy Capital Mgmt., LLC v. Qatar*, 982 F.3d 582, 586 (9th Cir. 2020). That means not only that Qatar has "immunity from trial" but also from "the attendant burdens of litigation." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (quoting *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1026 (D.C. Cir. 1997)).

8. Allaham objects generally to the Requests to the extent they seek information contained in documents and correspondence that are protected by principles of international comity in light of Qatar's interest in maintaining the confidentiality of information that relates to its governmental policies. *See* Notice of Interest by Non-Party State of Qatar, ECF No. 66 (Oct. 21, 2021); *see also Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. Of Iowa*, 482 U.S. 522, 546 (1987).

Brownstein Decl. Ex. 9, General Objections Nos. 7-8.

Defendant Muzin's general objections to each of the requests were almost identical to Allaham's, and Howard's were substantively the same.[9]

All Defendants also invoked the Vienna Conventions and principles of international comity in refusing to answer large numbers of specific requests.  For example, in response to 23 of the 28 requests for admission that Plaintiffs' served on Allaham, he responded that he "will not disclose information regarding his authorized activity for Qatar between August 2017 to July 2018."  *See* Brownstein Decl. Ex. 8, General Objections 7, 8.

It is plain that Defendants are simply concocting a never-before-used "lobbyist/public-relations flack privilege," to try to withhold huge swaths of relevant and discoverable information, without any basis in law, history, or common sense.

---

[9] See, *e.g.*, Brownstein Decl., Ex. 4 [Defendant Muzin's Responses and Objections to Plaintiffs' First Requests for Production], General Objections D and E at p. 2 (same); Ex. 1 [Defendant Howard's Responses and Objections to Plaintiffs' First Requests for Production], General Objection No. 6 at p. 3 ("Howard will not provide documents or information subject to" Qatar's "privileges, immunities, and protections provided under the Vienna Conventions [] and principles of international comity").

Even worse, Defendants' objections fly in the face of this Court's rejection of the unprecedented and groundless "Immunity Protocol" Defendants requested be included in the Protective Order.  In seeking the "Immunity Protocol" in their "emergency" motion regarding the Protective Order, Defendants originally tried to support their contention that the VCDR protects materials in the hands of third parties by misrepresenting the expert position of Professor Eileen Denza.  *See* ECF No. 90-1 at 13 n.9.  As Plaintiffs have shown (*see* ECF No. 92 at 4 n.5, 23-24, and ECF No. 92-3), Professor Denza's actual position is the opposite of what Defendants claimed.  Defendants appear now to have given up their (mis)reliance on Denza, and instead simply cite to the Conventions themselves with no other authority whatsoever, in the hope that their cursory, ahistorical, and "ludicrous" (*see* Congress Letter) misreading of the text might somehow carry the day.  It does not.

## ARGUMENT

**I.      The Information Requested is Not Protected Under the Vienna Conventions or So-called Considerations of "International Comity"**

Defendants are withholding discovery materials based on assertions that information Plaintiffs seek is (a) "absolutely protected from disclosure under the Vienna Conventions, which provide that the documents and information of a diplomatic mission are 'inviolable at any time and wherever they may be,'" and (b) "protected by principles of international comity in light of Qatar's interest in maintaining the confidentiality of information that relates to its governmental policies."  *See* Brownstein Decl. Ex. 7 [Defendant Allaham's Responses and Objections to Plaintiffs' First Requests for Production]; *see also generally* Brownstein Decl. Exs. 1, 4, 7, 8. The requested documents and information in Defendants' possession, custody or control are in no way protected under either the Vienna Conventions or principles of international comity.

10

First, nothing in the text of the Vienna Conventions supports the notion that diplomatic privileges extend to documents that have been disclosed to individuals or entities who are not part of the diplomatic mission, and that have thereby been taken out of the mission's "archives" by such individuals. *See generally* VCDR; Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 189 (4th ed. 2016) (Brownstein Decl. Ex. 13.) Article 24 of the VCDR states that "[t]he archives and documents of the mission shall be inviolable at any time and wherever they may be." VCDR at Art. 24. Defendants (and Qatar, *see* ECF No. 107) rely on the phrase "wherever they may be"[10] while ignoring the prerequisite that in order to be inviolable the archives and documents must first be "*of the mission*." In explicating what exactly this phrase means, it is worth quoting at length Professor Denza, whom Defendants themselves recognize as the foremost expert on these matters, in a letter she sent to the U.S. House of Representatives Committee on Government Reform in 2002. Professor Denza had been asked whether records in possession of lobbyists and public-relations flacks retained by a foreign embassy were entitled to be regarded as "archives and documents of the mission…wherever they may be" so as to be protected on the basis of inviolability from disclosure. Professor Denza responded with an unequivocal "no," and explained that:

---

[10] As Plaintiffs' previously explained, the language "wherever they may be" is targeted primarily at the protection of documents that may have been "lost or stolen." *See* ECF No. 92 at 23-24, and 92-3, Denza Chapter. Defendants' and Qatar have recently raised the idea that this also refers to cyberspace. *See* ECF No. 105 at 13 and No. 106 at 10. Plaintiffs agree that, for example, to the extent the mission's genuinely protected documents are also technically held by a third-party internet- or computer-server company performing ministerial storage services, then those documents do not lose protection by virtue of being in cyberspace. But that is a completely different case from documents intentionally shared with third-party consultants, which all authorities hold are not entitled to protection. Qatar can notify the third-party companies that perform ministerial storage tasks for its embassy and consulate that if they receive any subpoena for the mission's documents, then they are to notify Qatar, which can then move for a protective order. But neither Qatar nor Defendants have made any showing that Plaintiffs have subpoenaed any such storage company.

Article 24 of the Vienna Convention on Diplomatic Relations reflects pre-existing customary international law, but also goes beyond it. It establishes, for example, that archives not situated on mission premises are entitled to inviolability...To be entitled to inviolability, however, archives and documents must be 'of' the mission. The test generally applied is that they must belong to or be in the possession of the mission… 'belonging to or in the possession of the mission' has been confirmed by subsequent practice. These or very similar words appear in a number of agreements conferring privileges and immunities on international organisations where the context suggests that they were intended to be declaratory of the meaning of Article 24 of the Vienna Convention on Diplomatic Relations.

The relevance of the test of ownership or possession to protection as 'archives and documents' was explored very thoroughly by English courts in 1987 in the context of the collapse of the International Tin Council (ITC)…At first instance, Webster, J, accepted that if a document was deliberately sent to a third party 'its archival character and its inviolability are lost'. On appeal, Dillon, LJ, maintained that documents in the hands of independent experts consulted by the International Tin Council ceased to be archives of the organisation. When the case reached the House of Lords, the Tin Council conceded that inviolability could not arise 'with respect of any documents held by third parties on loan from the ITC or otherwise as bailees or agents for the ITC'. Lord Bridge held that *a document communicated to a third party by an officer or employee of the ITC with actual authority, express or implied, or with ostensible authority, no longer belongs to the ITC and hence no longer enjoys inviolability as part of the official archives.'* . . . It was a unanimous judgment, and I believe that it would be a persuasive authority in United States courts.

Brownstein Decl. Ex. 11, Letter from Eileen Denza, Visiting Professor of Law, Univ. College London, to Dan Burton, Chairman, House Comm. on Gov't Reform (Nov. 18, 2002), in *Hearings Before the House Committee on Government Reform,* Serial No. 107-83, at 1340–42 (Nov. 18, 2002).

Congress agreed with Denza and compelled production from Saudi Arabia's advisors.

*See* ECF No. 92-3 at 161-162.  Four days after Denza's testimony, the chair of the relevant

committee of the House of Representatives explained to Saudi Arabia that FARA:

makes clear that the activities of such "propagandists," including the documents they generate, send and receive in the course of those activities, are to be subject to the "spotlight of pitiless publicity" so that the American people may be fully informed of both the identity of the propagandists and the nature of the activities they undertake on behalf of their foreign masters.  It is ludicrous to suggest, as you and your lawyers do, that when the United States ratified the Vienna Convention some 25 years after the enactment of FARA, it intended to shroud in absolute secrecy the very same activities of these propagandists.

Congress Letter, *supra* (quoting H.R. REP. No. 1381, 75th Cong., 1st Sess. 1-2 (1937)) (*see also Shearson Lehman Bros Inc. v. Maclaine, Watson and Co Ltd; International Tin Council (Intervener) (No 2)* [1988] 1 All ER 116, 124-25 (Eng.) (holding that records provided to third parties are not protected by the equivalent of Vienna-Convention protections) (Brownstein Decl. Ex. 14); Order, *Broidy Cap. Mgmt. v. Allaham,* No. 1:18-mc-00240, ECF No. 4 at 2 (S.D.N.Y. June 11, 2018) (holding that "neither the FSIA nor the Vienna Conventions protect [Qatar] from civil discovery collected from [Allaham].").  (Brownstein Decl. Ex. 10.)

The cases that Defendants cite in their objections are wholly inapplicable.  One, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (quoting *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1026 (D.C. Cir. 1997)), deals with the immunities of foreign sovereign states themselves under the FSIA; the other, *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa,* 482 U.S. 522, 546 (1987), deals with discovery taken against a foreign sovereign state itself under the Hague Evidence Convention.  Neither dealt with claims by public-relations flacks and lobbyists that discovery in their possession were somehow entitled to protection under the Vienna Conventions.

Likewise, particularly in light of the existing law and separate frameworks established by the Vienna Conventions and FARA (as well as their *explicit* disclosure requirements), Defendants' unmoored and unsupported appeal to vague "principles of international comity" is entirely unavailing.  As this Court has made clear, the decision of whether to extend immunity as an act of comity was historically a job for the Executive Branch, and under the State Department test, these Defendants would *not* be granted immunity.  ECF No. 51 at 14.  Nor would their documents.  Qatar's own agreements with its contractors expressly recognize that any

"documents, information, or communications" "received" by them are subject to being disclosed "as required by law." *See Broidy Cap. Mgmt. LLC, et al., v. State of Qatar, et al.*, No. 2:18-cv-02421-JFW-E (C.D. Cal.), ECF No. 88 at 9; Brownstein Decl. Ex. 15.  Both Qatar and Defendants have always known that documents and information Qatar puts into the custody of third-party agents are not "inviolable" and are subject to discovery, and their contracts, with these explicit terms, appear in Defendants' FARA disclosures.

## II.   Congress Intended "Non-Diplomatic" Foreign Agents to be bound by the Obligations of FARA, Not the Vienna Conventions

Diplomatic immunity under the VCDR applies to *diplomatic agents* of the sending country's missions.  *See* VCDR, prelude ("Recalling that peoples of all nations from ancient times have recognized the status of diplomatic agents), and Art. 1 (clarifying that a "diplomatic agent" is the "head of the mission or a member of the diplomatic staff of the mission"). [11] FARA, as evidenced by the diplomatic exemption in § 613 and confirmed by the 1965 Senate Report, was specifically designed to cover the conduct of "*nondiplomatic agents*," meaning Americans engaged by foreign powers to influence U.S. policies or public opinion – like defendants.  Brownstein Decl. Ex. 17, S. Rep. No. 89–143, 89th Cong., 1st Sess. (1965) (the "FARA Report") at 3 (emphasis added)). As Congress originally made clear, FARA was passed to:

> publicize the nature of subversive or other similar activities of such foreign propagandists, so that the American people may know those who are engaged in this country by foreign agencies to spread doctrines alien to our democratic form

---

[11] The 1965 House Report on amendments to the VCDR also made clear that "it has long been the practice of the United States neither to send nor to recognize as diplomatic officers persons who are nationals or residents of the receiving state."  Brownstein Decl. Ex. 16, S. Exec. Rep. No. 6, 89th Cong., 1st Sess. (1965) at 7.

of government, or propaganda for the purpose of influencing American public opinion on a political question.

H. Rep. 1381, 75th Cong., 1st Sess. (1937).  The 1965 FARA Report placed great emphasis on Congress's intent that the detailed contents in FARA's Registration and Supplemental Statements should "be given wide distribution" in order to inform the public about the range of actions undertaken by foreign agents.  *Id.* at 1, 5.  The FARA Report also noted that the main purpose of the bill is "to protect the interests of the United States by requiring *complete public disclosure* by persons acting for or in the interests of foreign principals where their activities are political in nature *or border on the political*."  *Id.* at 1 (emphasis added).  *See also* 22 U.S. Code § 611(o).  Crucially, with respect to that phrase, the FARA Report added that, "It is the committee's understanding that the phrase refers to matters which . . . in the international context may be called questions *concerning a country's foreign relations*."  *Id.* at 9) (emphasis added).  This directly contradicts Defendants' contention that the Vienna Conventions somehow protect from disclosure materials that "relate to the conduct by Qatar of its foreign policy."  In this regard, it is plain that the overarching purpose of the hack-and-smear operation funded by Qatar alleged in the FAC was to discredit and silence Qatar's critics and thereby "influence American public opinion," *supra,* precisely the kind of activity FARA was enacted to address. Thus, any documents or other evidence relating to the hack-and-smear would be *precisely* the type of materials subject to the jurisdiction of FARA – and thus *not* covered by the VCDR.

Under FARA, all registrants must disclose, among other things, all written agreements in place with the foreign principal, a statement of the registrant's business, and a statement of the nature of the work the registrant performs for the foreign principal, including a detailed disclosure documenting *all* interactions with government officials or journalists.  22 U.S.C. § 612(a).  Of particular relevance to this case, the FARA Report also spelled out Congress's intent

that registered agents must disclose non-financial incentives offered to journalists.  The FARA Report discusses a "practice among some agents of giving away valuable films, photographs, articles, exclusive interviews, etc., to the mass media and distributors for the purpose of inducing the recipient to distribute them further."  (Brownstein Decl. Ex. 16 at 10.)  No specific language was added to the new legislation addressing this type of conduct, however, "because it is the committee's belief that under existing law the disposition of such 'things of value * * * disposed of by the registrant' must be reported in detail…[with] that degree of specificity necessary to permit meaningful public evaluation of each of the significant steps taken to achieve the purposes of the agency."  To be clear, Congressional intent held that all forms of compensation offered to journalists and media outlets – whether financial or otherwise (such as exclusivity or merely providing pre-packaged hacked materials) – could fairly be categorized as "things of value" given "for the purpose of inducing the recipient to distribute them further."

In addition, a FARA registrant must keep "such books of account and other records with respect to *all* his activities . . . as the Attorney General, having due regard for the national security and the public interest, may by regulation prescribe[.]"  22 U.S.C. § 615 (emphasis added).  Department of Justice regulations specify that registrants must keep and preserve, among other things, "correspondence, memoranda, cables, telegrams, teletype messages, and other written communications *to and from all foreign principals* and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals."  28 C.F.R. § 5.500(a)(1) (emphasis added).  The registrant must *also* keep "[a]ll correspondence, memoranda, cables, telegrams, teletype messages, and other written communications *to and from all persons, other than foreign principals*, relating to the registrant's political activity, or relating to political activity on the part of any of the registrant's foreign principals."  28 C.F.R.

§ 5.500(a)(2).  All of these records "shall be open at all reasonable times to the inspection of any official charged with the enforcement of" FARA.  22 U.S.C. § 615.  The Justice Department has frequently exercised its rights under 22 U.S.C. § 615 to obtain and inspect the records of individuals and entities registered under FARA.  *See Emerson v. Department of Justice*, 603 F. Supp. 459, 462 (D.D.C. 1985).  The documents sought by Plaintiffs are required to be preserved and open for inspection, and the DOJ makes such information publicly available.  They are certainly and demonstrably not "inviolable" under the Vienna Conventions.

The absurdity of defendants' position is made even clearer by considering the ramifications of their argument.  If Defendants are correct, foreign governments could employ U.S. citizens to engage in any number of highly illegal acts to change U.S. policies and sway public opinion, and then cloak all documents about that criminal enterprise in diplomatic immunity.  Not only would that be directly counter to the fundamental purpose of the Vienna Convention, it would also eviscerate FARA.  Such a position is, in the words of the U.S. House Committee on Government Reform, "ludicrous."  *Id.* at 1.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant its Motion to Compel Defendants to answer all relevant discovery requests, and to affirm that the documents and information in the hands of Defendants are not immune from discovery under either the Vienna Conventions or any principles of international comity.

Dated: January 24, 2022

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: /s/ *Henry B. Brownstein*
    Henry B. Brownstein
    D.C. Bar No. 1026042
    1399 New York Avenue, Suite 201
    Washington, D.C. 20005
    Tel.: (202) 760-3400
    hbrownstein@kasowitz.com

    Daniel R. Benson (*pro hac vice*)
    Andrew R. Kurland (*pro hac vice*)
    Jacob Benson (*pro hac vice*)
    1633 Broadway
    Tel.: (212) 506-1700
    New York, New York 11019
    dbenson@kasowitz.com
    akurland@kasowitz.com
    jbenson@kasowitz.com

    *Counsel for Plaintiffs Broidy Capital*
    *Management, LLC and Elliott Broidy*