# EXHIBIT 11

# INVESTIGATION INTO ABDUCTIONS OF AMERICAN CHILDREN TO SAUDI ARABIA

## HEARINGS

BEFORE THE

## COMMITTEE ON GOVERNMENT REFORM

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

JUNE 12; OCTOBER 2 AND 3; AND DECEMBER 4 AND 11, 2002

### Serial No. 107-83

Printed for the use of the Committee on Government Reform



Available via the World Wide Web: http://www.gpo.gov/congress/house
http://www.house.gov/reform

U.S. GOVERNMENT PRINTING OFFICE

80-882 PDF                    WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800; DC area (202) 512-1800
Fax: (202) 512-2250   Mail: Stop SSOP, Washington, DC 20402-0001

Digitized by Google    Original from PENN STATE

COMMITTEE ON GOVERNMENT REFORM

DAN BURTON, Indiana, *Chairman*

BENJAMIN A. GILMAN, New York
CONSTANCE A. MORELLA, Maryland
CHRISTOPHER SHAYS, Connecticut
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
STEPHEN HORN, California
JOHN L. MICA, Florida
THOMAS M. DAVIS, Virginia
MARK E. SOUDER, Indiana
STEVEN C. LaTOURETTE, Ohio
BOB BARR, Georgia
DAN MILLER, Florida
DOUG OSE, California
RON LEWIS, Kentucky
JO ANN DAVIS, Virginia
TODD RUSSELL PLATTS, Pennsylvania
DAVE WELDON, Florida
CHRIS CANNON, Utah
ADAM H. PUTNAM, Florida
C.L. "BUTCH" OTTER, Idaho
EDWARD L. SCHROCK, Virginia
JOHN J. DUNCAN, Tennessee
JOHN SULLIVAN, Oklahoma

HENRY A. WAXMAN, California
TOM LANTOS, California
MAJOR R. OWENS, New York
EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
PATSY T. MINK, Hawaii
CAROLYN B. MALONEY, New York
ELEANOR HOLMES NORTON, Washington, DC
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
ROD R. BLAGOJEVICH, Illinois
DANNY K. DAVIS, Illinois
JOHN F. TIERNEY, Massachusetts
JIM TURNER, Texas
THOMAS H. ALLEN, Maine
JANICE D. SCHAKOWSKY, Illinois
WM. LACY CLAY, Missouri
DIAN E. WATSON, California
STEPHEN F. LYNCH, Massachusetts

BERNARD SANDERS, Vermont
(Independent)

KEVIN BINGER, *Staff Director*
DANIEL R. MOLL, *Deputy Staff Director*
JAMES C. WILSON, *Chief Counsel*
DAVID A. KASS, *Deputy Chief Counsel*
ROBERT A. BRIGGS, *Chief Clerk*
PHIL SCHILIRO, *Minority Staff Director*

Generated at New York University on 2022-01-20 21:41 GMT / https://hdl.handle.net/2027/psu.000050261297
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from PENN STATE

Mr. BURTON. That is a very cogent statement.

Professor Denza, do you have a statement?

Ms. DENZA. Thank you, Mr. Chairman.

Mr. BURTON. You might pull your mic a little closer, because sometimes it's hard to pick up. And—is your mic on?

Ms. DENZA. I think it is on now.

Mr. BURTON. Thank you.

Ms. DENZA. I would like to begin, before coming on to the exact definition of the term "archives and documents under the Vienna Convention," with a very important provision which governs all the privileges and immunities set out in the Vienna Convention on diplomatic relations. And that's Article 41, first paragraph, and it begins: "without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving state. They also have a duty not to intervene or interfere in the internal affairs of that state."

It is very clearly accepted now as a proposition of modern international law that there is no question short of specific exemptions or exceptions for embassies or their diplomats not to be legally bound. And the Foreign Agent Registration Act, which has been in existence for about 60 years, has a very clear application to the operations of foreign states in the United States. The policy of the act is—it seems to a lawyer from outside, is that it is quite acceptable for the propaganda activities, if I can use that expression, to be carried on, but they must be carried on within the framework of transparency.

There are no specific exemptions in the Foreign Agent Registration Act. The three firms we are dealing with are all registered under the act, and I don't believe that there ever has been any complaint by any foreign state that somehow this act was incompatible with their ordinary operations. And, of course, I accept it is an essential diplomatic function of the Ambassador and his staff to be put in the position of, in this case, Saudi Arabia. It used to be said that the Ambassador was the eyes, the ears, and the mouth of the dissenting state. But no one has ever seen any problem with the act.

The act, of course, has to operate within the exact terms of the specific privileges and immunities. But part of my reason, before I come to that, for setting out 41 and the background is that I see no reason for construing the term "archives and documents" in this case which—it's an unusual, it's an unprecedented claim. I see no reason for pushing the definition of "archives and documents" out.

I will turn now to the definition and the terms of Article 24 of the Vienna Convention, which says very shortly that the archives and documents of the mission shall be inviolable at any time and wherever they may be.

Now the inviolability of archives is, in the history of diplomatic laws, a relatively recent development. I think it is fair to say that until the early years and perhaps about the time that the Foreign Agent Registration Act was being passed, it was generally regarded as only applying to archives on the premises of the mission. And that's perhaps what one thinks of as archives—ancient documents

Digitized by Google    Original from PENN STATE

on parchment, old treaties, records of memoir which are held physically, securely in the embassy.

The question of the status of archives outside mission premises came very sharply into focus in 1946 in a leading case in Canada where the Canadian courts of appeals had to decide on whether embassy archives from the embassy of the Soviet Union were admissible. What had happened was that a Soviet cipher clerk had defected, and when he defected, he had taken with him incriminating documents which showed the existence in Canada in the early years of the cold war of a whole network of spies; and that extended not only to Soviet citizens, it extended very importantly to a Canadian member of parliament. And that was the Rose who—it was tried and appealed from conviction, arguing that there was no other evidence against him except the stolen embassy documents, and he couldn't be convicted.

Now, there were a variety of reasons given by the court for rejecting admissibility and allowing the conviction to stand on the basis of the archives. One of them, I noticed with some interest, was that one of the judges actually said that the relevant documents, which were documents of an espionage bureau within the Soviet embassy, not directly within the control of the Ambassador, were not embassy documents. I think that's—there may be some importance in that reference to control.

Now, going to 1961, the Rose case was very much in the minds of the negotiators. Certain propositions were clearly established that archives and documents of the mission were inviolable at any time. That was really referring to the possibility of reach of diplomatic relations and wherever they may be. And I think primarily what was in the minds of the negotiators was not that somehow archives and documents could cover up the whole of the in-and-out correspondence of the mission; it was looking at the possibility that the archives were in the custody of a member of the mission physically going to a meeting, administrative foreign affairs, going to the airport without being an accredited courier, possibly even without having a mission status, or that they had actually physically been lost or stolen, and that accident shouldn't deprive them of their character.

The Convention also made clear that the documents don't require to be identified by visible official marks, and of course, in that the position is different from that of diplomatic backs.

Now, there have not been very many cases about archives on the whole. The most sensitive things tend to be rather carefully safeguarded. But the case which I've referred to in the opinion which I've given to the committee is very relevant. It describes the test for archives is that the documents must belong to or be in the possession of the mission. And I think that case, which depended on legislation which carried over the specific terms of the Vienna Convention—while, of course, it clearly would not be binding on the U.S. court, would be very persuasive, a decision at the highest level, the House of Lords, and it was unanimous. And, as I understand it, the test of the belonging to or in the possession of is—I think seems to be generally accepted in the informal discussions there have been.

Generated at New York University on 2022-01-20 21:41 GMT  /  https://hdl.handle.net/2027/pst.000050261297
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google        Original from PENN STATE

1325

Now, there was a slight lacuna in the ten council, international ten council in that the international ten council, to narrow the issues, said they were not concerned with the documents in the possession of an agent or bailie of the council. The reason for that concession, as I recollect—because I actually was one of these appearing in the case—was that there seemed no one reason to support that the documents which had found their way into the public domain had actually done so by being given to agents or bailies. So, the House of Lords don't specifically deal with agency.

I think—I've been thinking about what the test is on the question of documents where there may be some degree of an agency relationship. One possibility is that at that point one looks to local law to interpret. Of course, this is not my area of expertise, but the common law is fairly uniform.

I don't think there are huge differences. I don't believe, under English law, that the documents of consultants, advisors to an embassy would be regarded as the property of the embassy. The basic starting principle of the common law, as I understand it, is that when a letter is sent, the physical property in the documents passes to the recipient. There could, of course, be special terms, but as I understand it, there have been no special terms here. And, of course, there may be other issues of copyright, for example, which I think, again, are not material.

The test of local law to determine ownership is perhaps not entirely satisfactory because it could lead to—possibly to a lack of uniformity not only among the 180 states who are parties to the Convention, but also, as I understand, within the different jurisdictions in the—in the United States. It would be rather difficult to determine the question differently in the law of Virginia, in the law of District of Columbia.

It may be there that the right test is to look for—at whether there are any circumstances in which documents originating in an embassy, but sent outside could remain protected. And thinking objectively about it, it seems to me that really ought only to be the case where one is perhaps talking about an agent who is purely a mouthpiece for the embassy; and I underlined the possibility of an interpreter or translator sent a document in the foreign language, the language of the sending state, in order to translate it with no substantive input into the content. And I think it's arguable that, in that case, the document would continue to be an archive.

That seems to me very different from the position of public relations specialists whose function is very much to advise; and then that takes me back to the policy of the act that advice on how to present the case for your government is quite proper. It's perfectly proper for the Ambassador to employ local expertise, but he must respect and obey the local law which provides the framework.

So, coming back, it does in fact remain my own conclusion—although, of course, ultimately the question might require—might well require to be tested in a court of law—but that in the present circumstances, these documents, which cover, of course, opinions generated outside the embassy—and I find it very interesting to listen to the kinds of documents listed by the previous witness as to what we are talking about, many of these not in any sense being embassy memoranda or secret communications between the Saudi

Digitized by Google    Original from PENN STATE

Ambassador and his government, but quite different kinds of information, perfectly properly held within the scope of the act, and as it seems to me, perfectly clearly accessible.

I'd just like to also deal with the question of the correspondence of the mission, because that takes us over to a different article of the Convention, Article 27, which deals with freedom of communication. And that has been argued in the exchanges that there have been about the status of the documents.

Article 27.2 says that the official correspondence of the mission shall be inviolable. Now, it is clear from—to some extent from the records of the Convention that what was meant by a correspondence was really material in transit. There is no indication of the records of the conference that they were meaning that any letter that came from an embassy to anyone in the receiving state was inviolable. It was a question of the agents of the receiving states not intercepting this—and, of course, in this article there are a great many cases of interception of an embassy's communications. And again perhaps—I think it probably is the case that letters actually in transit to an embassy are inviolable in that they can't be intercepted in the post.

There is—I think it is also helpful in looking at the extent of the protection given by Article 27 to look back at the beginning of Article 27, which is, my view, the most important article in the Vienna Convention. And what the Article 27, at the beginning, says is, "The receiving state shall permit and protect free communication on the part of the mission for all official purposes." Now, the critical point I think is the next sentence, which says, "In communicating with the government, the other missions and consulates of the sending state wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher." And there are also references to the diplomatic wires.

One sees from the beginning of 27, which I think should be carried over to paragraph 2 of Article 27, that this is not really dealing with the correspondence between the mission and the outside world; it is really dealing with internal correspondence. It means that a state which can't afford to send a courier and a bag can put a letter in the post, address it to the government ministry of foreign affairs, and that letter, if it accidentally is lost or if it is intercepted or stolen, is not admissible in evidence. And again, I think the test on 27.2 is legally the same as that applies in the case of archives and documents.

There is very little case law on 27.2 for the simple reason that it is the practice of government not to send delicate, sensitive, controversial letters through the open post; they send them by hand of a diplomatic agent or they send them by hand of the courier. But I don't think that 27.2 gives a wider protection to any of the documents that we are concerned with.

So simply to sum up in one sentence, it is not my view that the documents in the—which are clearly in the possession of the firms which have been subpoenaed are entitled to inviolability. And it is also my view, having—in the light of the correspondence I've seen, that the implications of accepting the proposition put forward that these archives are inviolable would be very far-reaching and very

dangerous. And I realize that the committee are very well aware of this.

Thank you, Mr. Chairman.

Mr. BURTON. Thank you, Professor.

Professor, do you have any concern that the legal theory being put forward by the Saudis could be used to cloak the documents of spies, terrorists, and other individuals who receive funds and directions from embassies?

Ms. DENZA. So far as documents, yes. I think that was what I was alluding to in my concluding—concluding words. I think there is no distinction of principle.

Mr. BURTON. Let me just interrupt, because I want to make sure in layman's language everyone understands. As I understand your statements and all of the research that you have done, if it's between the embassy and other internal governmental agencies, that is held inviolate.

Ms. DENZA. Indeed. Yes.

Mr. BURTON. But if it is correspondence or some kind of transmission between an embassy government or government entity to a public relations firm that is in the control of the public relations firm, then that is not inviolate?

Ms. DENZA. I believe that is the correct position. These documents are not inviolable.

Mr. BURTON. Now, let me ask you about your credentials, because I think this is very, very important. You advise—as I understand it, you advise the British Government and the U.S. State Department regarding the Vienna Convention. Is that correct?

Ms. DENZA. I was a legal advisor within the British Foreign Office for a number of years. I think my main credentials really are that I have written what I think is the standard book on the Vienna Convention and diplomatic relations. And I did work on these issues when I was working within government.

Mr. BURTON. So you are considered probably, and I don't—I know you are probably very modest. But you are probably one of the foremost experts on the Vienna Convention.

Ms. DENZA. I've always been very, very interested in it. When I joined the Foreign Office as an assistant legal advisor, the first thing I was asked to do was to—which was after the conclusion of the Vienna Convention—was to write an article. And the article grew over a period of about 10 years into a book. And there has been a more—a second edition, which, of course, I've written outside government and therefore which—without using any privileged information.

Mr. BURTON. Excuse me for 1 second. In the letters of the lawyers for the Saudi Embassy, which you have received, they claim that a court could conduct an in-camera review of documents in a case of espionage and find that law enforcement's need for the documents outweighs the embassy's interests in keeping them secret. Do you think there is any support for such a theory, or are the Saudis just making that theory up to draw attention away from the disastrous consequences of the privilege claim?

Ms. DENZA. It is my view that this idea will not work in the context of inviolable documents. I've—except that the position may be different if you're dealing with a privilege conferred by local law;

for example, the privilege of the executive or the privilege of the lawyer. It's then perhaps possible for a national court, a domestic court, to carry out a balancing act.

When you're dealing with inviolable documents, which if they are inviolable essentially belong to a foreign government, I don't think this is practical or possible. Either the documents are inviolable or they're not inviolable.

Of course, some of the documents may also be covered by claims to privilege, which is not my concern; that's a legal professional privilege where there may be more than one ground advanced to protect the documents. And, of course, I'm not saying anything about what's the position, if it was argued they were covered by legal professional privilege; but I don't think there's any support in any of the cases for the idea that an inviolability—the court of the receiving State—in this case the United States—can properly balance the interests of the foreign state against the interests of its own judicial system. Such balancing as is done has to be done by the actual terms of the convention.

Mr. BURTON. Thank you. We have a little bit more tape I'd like to run and then we'll get back to our questions and wrap this up.

[Tape played.]

Mr. BURTON. I think that pretty much says it all.

I asked questions of the State Department when they were here. One of the questions was, has the State Department expressed any concern to the Saudi Government regarding its role in the kidnapping of Heidi Al-Omary? And the answer they wrote back to me in writing was the Department has no evidence that the Saudi Government played a role in the kidnapping of Heidi.

And that is just so disgusting because it's so evident that the Saudi Government knew about it, they were informed about it, and they went ahead and granted the passports anyhow. And I'm disappointed in our State Department for making that kind of a statement because it's so evident that they were complicitous.

Professor Denza, let me just ask you one more question. Is there any reason to think that the definition of inviolability under the Vienna Convention would differ depending upon whether the Justice Department or Congress was asking for the documents?

Ms. DENZA. No. Inviolability implies that neither the executive nor the legislative nor the judicial authorities in the receiving State can use any legal powers of compulsion to require documents to be supplied; or, in the case of personal immunity, a person to appear. That was very clearly helpfully set out in the judgment in the international case to which I referred.

Mr. BURTON. So if a public relations firm had correspondence and other information in their control, in your opinion, whether it was the Justice Department, the administration or the Congress, the legislative branch, subpoenaed those, they would be able to get them?

Ms. DENZA. That's right. If they're not inviolable, then the ordinary process of U.S. law apply.

Mr. BURTON. OK. Let me just ask Ms. Roush and Ms. McClain just a couple of questions here, and then we'll—I'll make a final statement and then we'll wrap this up.

Digitized by Google    Original from PENN STATE

Ms. Roush, you have lot of experience dealing with Saudi lobbyists. Have they been honest with you in the past?

Ms. ROUSH. No, sir. They have manipulated me and they've lied to me and betrayed me and used me.

Mr. BURTON. Have you ever received assurances from the Saudi lobbyists that they're working on the return of your children and that the Saudi Government was working in good faith and what was really going on?

Ms. ROUSH. No. They have continually betrayed me and deceived me, and the Saudi Government and their paid mouthpieces have worked hand in hand for 17 years to keep me from my daughters.

Mr. BURTON. Let me ask both of you this question. It's my understanding that both of you have been threatened in the past by Saudi lobbyists. Can you tell us how they were threatening you?

Ms. MCCLAIN. They have threatened us via e-mail. They have threatened us with legal action on occasion if we did not drop boycotts that we were involved in. And they just boycotted our press conference that we had here in Washington. That was kind of an implied threat, I felt.

Ms. ROUSH. Yes, when we were dealing with Hill & Knowlton, the torture lobbyists in Washington, they sent me a letter that is included in the file, saying they were going to sue me because in fact they did not represent the Saudi Government. Which I sent a letter back to them stating under—in the book Agents of Influence by Pat Choate in 1990, they were listed as not only representing the Saudi Arabian Government, but Prince Talal and Adnan Koshaggi.

Mr. BURTON. Did the lobbyists from Hill & Knowlton lie to you regarding their relationship with the Saudi Government? That's what you just commented about. They did lie to you.

Ms. ROUSH. Yes, they lied; blatantly lied.

Mr. BURTON. You believe that permanent damage was done to your daughters by what happened on August 31st in London, correct?

Ms. ROUSH. Oh, sir, sir, what they did to my daughters in London is unspeakable. It's inhuman. It's—these people, Petruzello and etc., they should be held responsible for what they did to my daughters, let alone what they did to me that weekend. I truly thought that this was all coming down around me, all my work to get my daughters back. But never mind what they did to me. I can't even imagine Alia and Aisha and Alia's baby in that hotel room in London, and that woman from Qorvis was there, and they were coordinating all this, and O'Reilly's producer. And they knew they were in a free country and they couldn't get out, d they were forced to say things against their mom, again and again and again. And then they were taken back to Saudi Arabia, knowing full well that they couldn't get out. They knew that was a chance. Alia did. Aisha was probably so confused by it all, but certainly Alia knew what was happening.

And it's frightful to realize the power of the Saudi Arabian Government and the power of these lobbyists, how they manipulate, how they manipulated my daughters. It's unspeakable and it's against all of our laws and the laws of the Lord.

Digitized by Google    Original from PENN STATE

Mr. BURTON. Do you think it's important that we obtain the documents from the lobbyists so that we can see what was really going on and why they sent your daughters to London?

Ms. ROUSH. I think that's exactly true. I think it's so important because they're hiding so much about the interference—the participation of the public relations firms with what happened not only in the very past past, but also concerning this whole scheme, this whole Stalinistic show trial in London. I mean, I think there are documents there. It's my belief, sir, that there are such incriminating documentation that they might even be able to go to jail because of what they did.

Mr. BURTON. The Saudis claim that they're trying to resolve the kidnapping of your daughter, Ms. McClain. Have you seen any evidence of that?

Ms. MCCLAIN. I have not seen any evidence that they're trying to resolve this. I just found out from an article on the Internet that they had told Patton Boggs to go ahead and try to resolve these. I haven't had any calls from Patton Boggs saying we'd like to work with you on this. So the answer is no.

Mr. BURTON. The Saudis and the U.S. State Department deny that the Saudi Embassy was complicit in your daughter's kidnapping. Do you believe them?

Ms. MCCLAIN. That is patently false. Several years before my daughter was ever kidnapped, I sent all my legal documents to Prince Bandar, to all the Saudi consulates in the United States. I believe there was one in Houston at the time and I think the other one was in Los Angeles. They all have those documents. I sent them registered. I sent them certified. I had them translated into Arabic so they knew exactly what they said. And I said, this child does not have permission from me or from the court to leave the United States of America with her father. And Prince Bandar knew that.

Mr. BURTON. So the State Department, en they say they have no evidence that this—that the Saudis were complicitous, the State Department must have their eyes covered.

Ms. MCCLAIN. I don't know if the State Department has that evidence or not. I've told the State Department. I don't know if the Saudis have turned those documents over to the State Department or shared that information with them. But——

Mr. BURTON. But you think the State Department ought to help us in our quest to get these documents from the public relations firm so that we can check that out.

Ms. MCCLAIN. Definitely. The State Department, the Justice Department, the FBI, needs to get involved in this. I don't think this is any less bad than embassy officials writing letters and checks to terrorists. You know, to me this is just as bad. My children are victims of terrorism.

Ms. ROUSH. It's worse. It involves our flesh and blood.

Mr. BURTON. Let me just end up by saying—and I want to thank my staff for all the hard work they've been doing on this. Jim and David and Kevin, you guys work very hard and I really appreciate it. You guys ought to give them a pat on the back when you get a chance.

Generated at New York University on 2022-01-20 21:41 GMT  /  https://hdl.handle.net/2027/pst.000050261297
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
                             PENN STATE

Let me end up by saying this. We're at the end of the year and I see some of the lawyers for the public relations firms out there. And I'm sure that they understand that at the end of a session like this, it's hard to go ahead and get legal actions taken. And so I'm confident that they feel they can run out the clock on us. But it isn't going to work because we're going to continue this next year. We now have the Senate that's going to work with us. And I promise you that we will continue to beat on this issue until something is resolved.

And the people are getting $200,000 $300,000 a month or however much they get representing the Saudis, need to give them some good advice. And that is, resolve these cases. Show the American people and these mothers that they really do want to solve these problems and do care, and that the Wahhabis over there are not controlling the government—as many of us, myself included, think that they are to a large degree—and that they're going to be concerned about the human rights and the rights of American citizens who have been kidnapped here in the United States and taken overseas.

So this isn't going to go away. It's something that will continue. I won't be chairman next year, but I don't know if you guys know much about me. But I won't keep my light hidden under a basket, and I'll make sure that we push the right buttons to continue to move this thing forward. So you ladies, don't give up hope. There's still—still some good possibility that we'll get this thing resolved eventually.

And with that, thank you all for being here. We stand adjourned.

[Whereupon, at 12:37 p.m., the committee was adjourned.]

[Additional information submitted for the hearing record and a complete set of exhibits follow:]

Generated at New York University on 2022-01-20 21:41 GMT  /  https://hdl.handle.net/2027/psu.000050261297
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
PENN STATE

1340

19-NOV-2002 16:49     UCL LAWS FACULTY            02076791403           P.02



**Faculty of Laws**
## UNIVERSITY COLLEGE LONDON
BENTHAM HOUSE  ENDSLEIGH GARDENS  LONDON WC1H 0EG
Tel: 020 7679 2000   Fax: 020 7387 9597

18 November 2002

Dear Mr Burton,

Thank you for your letter of 12 November 2002. I have considered the arguments put forward by and on behalf of the Embassy of Saudi Arabia in support of their claim that records in possession of three firms of lobbyists retained to work for them are entitled to be regarded as 'archives and documents of the mission'. I am assuming that the relations between the three firms and the Saudi Embassy are based on a contract for professional services between one of the three firms, Qorvis Communications, and the Kingdom of Saudi Arabia. The other two firms are in contractual relations with Qorvis Communications and not with Saudi Arabia or with the Ambassador. On that basis it is my opinion that the records which are the subject of subpoenas from the Committee on Government Reform of the House of Representatives are not archives or documents of the Saudi mission and so not protected on the basis of inviolability from disclosure.

I will respond to your questions in order:-

    1. Article 24 of the Vienna Convention on Diplomatic Relations reflects pre-existing customary international law, but also goes beyond it. It establishes, for example, that archives not situated on mission premises are entitled to inviolability. Nor do the archives of the mission (unlike the diplomatic bag) require to be identified by visible official marks indicating their character.

    Subsequent practice has given a wide construction to the term 'archives and documents' by including modern methods of storage of information. The 1963 Vienna Convention on Consular Relations states that 'consular archives' includes all the papers, documents, correspondence, books, films, tapes and registers of the consular post, together with the ciphers and codes, the card-indexes and any article of furniture intended for their protection or safekeeping. This wide description has always been regarded as applicable to the 1961 Vienna Diplomatic Convention, particularly since the immunities accorded to diplomatic missions are generally wider than those accorded to consular posts.

    To be entitled to inviolability, however, archives and documents must be 'of' the mission. The test generally applied is that they must belong to or be in the possession

1341

of the mission. It may be noted that at the Vienna Conference, the United States proposed, and later withdrew an amendment which would have defined archives as

> 'the official records and reference collections belonging to or in the possession of the mission'

Although the first part of this amendment is clearly too narrow, the second part of the proposed definition: 'belonging to or in the possession of the mission' has been confirmed by subsequent practice. These or very similar words appear in a number of agreements conferring privileges and immunities on international organisations where the context suggests that they were intended to be declaratory of the meaning of Article 24 of the Vienna Convention on Diplomatic Relations.

The relevance of the test of ownership or possession to protection as 'archives and documents' was explored very thoroughly by English courts in 1987 in the context of the collapse of the International Tin Council (ITC). The ITC archives were entitled under international agreement, given effect in United Kingdom domestic law, to the same inviolability as was accorded to the official archives of a diplomatic mission. The ITC intervened in the case of *Shearson Lehman Brother Inc. and Another v. Maclaine Watson & Co. Ltd. and Another* seeking to claim inviolability for documents originating in the ITC but which had found their way into the hands of third parties. You will find the successive judgments of the English High Court, the Court of Appeal and the House of Lords conveniently together in 77 International Law Reports, beginning at p. 107.

At first instance, Webster, J, accepted (p. 122) that if a document was deliberately sent to a third party 'its archival character and its inviolability are lost'. On appeal, Dillon, LJ, maintained (p. 130) that documents in the hands of independent experts consulted by the International Tin Council ceased to be archives of the organisation. When the case reached the House of Lords, the Tin Council conceded that inviolability could not arise 'with respect of any documents held by third parties on loan from the ITC or otherwise as bailees or agents for the ITC' (p. 152). Lord Bridge held (p. 155) that 'a document communicated to a third party by an officer or employee of the ITC with actual authority, express or implied, or with ostensible authority, no longer belongs to the ITC and hence no longer enjoys inviolability as part of the official archives.' The House of Lords judgment, given the agreement and legislation which was in issue, is of equal application to archives of a diplomatic mission. It was a unanimous judgment, and I believe that it would be a persuasive authority in United States courts.

2. The case of *In re Liberian Eastern Timber Corporation v. The Government of the Republic of Liberia* is not authority for the argument that documents sent with authority to a third party for the purposes of obtaining

1342

professional advice remain 'archives and documents of the mission'. It relates to the entirely separate question of whether embassy bank accounts are immune from attachment or execution. The Vienna Convention on Diplomatic Relations gives inviolability to property of a diplomatic mission (other than archives, which are treated separately) only where it is on the premises of the mission. There have been a series of cases in several jurisdictions, this case being one of them, which now establish that embassy bank accounts are entitled to protection under customary international law. The case cannot be used in order to enlarge the protection given under a different Article of the Vienna Convention where the wider construction cannot be supported either by the words of the Convention, by practice, or by authorities in other jurisdictions.

3. Lobbyists and public relations specialists providing professional services to the Embassy of Saudi Arabia would not on that basis be exempt from an obligation to testify as witnesses. The only persons entitled to exemption from the duty to testify are diplomatic agents notified and accepted as such, as well as other members of the mission entitled under the terms of Articles 37 and 38 of the Vienna Convention on Diplomatic Relations. Beyond those categories, employees and agents of the Kingdom of Saudi Arabia might be able to assert a claim of sovereign immunity if asked to give evidence on official matters. This is a more difficult area, but I understand that the persons concerned are in fact independent contractors rather than officials or agents of Saudi Arabia.

For completeness I should add that I have considered whether the documents sought might be entitled to inviolability as 'official correspondence of the mission' under Article 27.2 of the Vienna Convention on Diplomatic Relations. There is virtually no practice establishing the extent of protection given under Article 27.2 of the Convention, for reasons which I set out in my commentary on the provision (*Diplomatic Law*, 2nd ed. pp. 163 - 184). In my view, however, correspondence to a third party not being an employee of the sending State is not entitled to inviolability once it has been received and become the property of the recipient.

Yours sincerely,

Eileen Denza
Visiting Professor of Law

Dan Burton
Chairman, Committee on Government Reform
House of Representatives
Congress of the United States