# EXHIBIT 14

## Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

HOUSE OF LORDS

LORD BRIDGE OF HARWICH, LORD BRANDON OF OAKBROOK, LORD GRIFFITHS, LORD OLIVER OF AYLMERTON, AND LORD GOFF OF CHIEVELEY

2, 3, 4, 5 NOVEMBER, 3 DECEMBER 1987

**Constitutional law — Foreign sovereign state — Immunity from suit — International organisation — Inviolability of documents — International Tin Council — Council's 'archives' — Admissibility in judicial proceedings — Documents supplied by council or its officers to third parties — Documents relating to council's trading business — Third parties proposing to use documents in evidence in judicial proceedings — Council intervening to claim privilege — Whether documents supplied by council to third parties privileged — International Tin Council (Immunities and Privileges) Order 1972, arts 7(1), 14(1)(b) — Headquarters Agreement between UK Government and International Tin Council 1972, art 4.**

In 1985 the sellers sold large quantities of tin to the buyers under forward contracts which incorporated the rules of the London Metal Exchange. However, prior to delivery under the contracts the International Tin Council (the ITC), in an attempt to support the falling market price of tin, ran out of money and collapsed leaving huge liabilities owing on contracts it had entered into. In order to avoid the total collapse of the London Metal Exchange caused by the ITC defaulting on its contracts, the committee of the exchange suspended trading in tin on 24 October 1985 and ruled that tin contracts providing for delivery on or after 25 October were to be closed by repurchase contracts at a price fixed by the committee. The sellers contended that the committee's ruling was invalid and not binding on them and they brought an action against the buyers and the committee claiming damages based on the difference between their contract price and the fixed price. Both sides intended in the action to produce in evidence a large number of documents emanating from or connected with the ITC, which intervened in the action to claim that certain documents were protected and inadmissible because art 7(1)[a] of the International Tin Council (Immunities and Privileges) Order 1972 conferred on the ITC the like 'inviolability of official archives' as was accorded in respect of those of a diplomatic mission. The ITC was an international organisation established by treaty between a number of sovereign states, including the United Kingdom, and had its headquarters in London pursuant to a Headquarters Agreement entered into between the ITC and the United Kingdom. Article 4[b] of that agreement provided that 'The archives of the council shall be inviolable' and defined 'archives' as including all correspondence and documents 'belonging to … the council'. The documents for which the ITC sought privilege were all documents relating to the ITC's business which had originated within the ITC and then been supplied to third parties by either (i) a member of the ITC or a member's representative on a delegation to the ITC or (ii) an officer or staff member of the ITC whether with actual or ostensible authority or with no authority at all, including certain documents supplied to third parties by officers of the ITC when, in the course of the ITC's crisis, its officers had approached third parties to assure them of the ITC's financial stability and then to negotiate a settlement of the ITC's debts. The judge ruled that, prima facie, documents relating to the ITC's trading activities were not capable of being 'archives' and were consequently not protected, but if a document was an ITC archive it

[a] Article 7(1) is set out at p 118 *g*, post

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

b Article 4 is set out at p 122 c, post

[*117]

did not lose that status merely because it had been sent to a third party. The ITC appealed and the parties to the action cross-appealed against the judge's rulings. The Court of Appeal, while affirming the protection attaching to the ITC's archives, held that documents in the possession of ITC members or in the public domain or handed to a third party by the ITC for its own purposes could not be part of the ITC's archives. The ITC appealed and the other parties cross-appealed to the House of Lords against the Court of Appeal's decision.

> **Held** – The ITC's appeal would be dismissed and the cross-appeal allowed for the following reasons—
>
> (1) Since art 14(1)*(b)*c of the 1972 order conferred inviolability of documents and the right to waive that inviolability on members of the ITC, once a document had been communicated by the ITC to a member or its representative the document no longer 'belonged' to the ITC but instead belonged to the member and the protection afforded to the ITC by art 7(1) in respect of that document ceased to apply to it. Accordingly, the ITC could not claim protection in respect of documents which had been communicated to third parties by ITC members or their representatives (see p 123 *b j* to p 124 *b* and p 127 *j* to p 128 *e*, post).
>
> c Article 14(1), so far as material, is set out at p 123 *g h*, post
>
> (2) Since a letter, whether confidential or not, normally belonged to the recipient rather than the sender once it was sent and received, a document communicated to a third party by an officer or employee of the ITC who had actual or ostensible authority to send it no longer belonged to the ITC and no longer enjoyed inviolability as part of the ITC's official archives. Furthermore, the very fact that an officer or employee of the ITC was acting and known to be acting in the course of his employment when communicating documents to a third party was strong prima facie evidence that he had at least ostensible authority to do so. Accordingly, if an officer or employee of the ITC was authorised to approach a third party to reassure him of the financial stability of the ITC or to conduct negotiations for a settlement of the ITC's debts he was thereby clothed with ostensible authority to supply any documents to the third party which might assist in that purpose. It followed that it was only if the document had been supplied without authority that ITC might be able to claim privilege (see p 124 *h*, p 125 *b* to p 126 *f* and p 127 *d e j* to p 128 *e*, post); *Juan Ysmael & Co Inc v Government of the Republic of Indonesia* [1954] 3 All ER 236 considered.
>
> Per curiam. The inviolability of documents conferred by art 7(1) of the 1972 order is not restricted to protection from executive or judicial action by the host state but extends to protection in all judicial proceedings, since the underlying purpose of the inviolability is to protect the privacy of diplomatic communications (see p 124 *j* to p 125 *a* and p 128 *c* to *e*, post)

Notes For Headquarters Agreements and privileges and immunities of international organisations, see 18 *Halsbury's Laws* (4th edn) paras 1596–1597, and 5 *Halsbury's Statutory Instruments* (Fourth Reissue) 49–50.

Cases referred to in opinions Cia Naviera Vascongada v Cristina, The Cristina [1938] 1 All ER 719, [1938] AC 485, HL.
International Tin Council, Re [1987] 1 All ER 890, [1987] 2 WLR 1229.
Juan Ysmael & Co Inc v Government of the Republic of Indonesia [1954] 3 All ER 236, [1955] AC 72, [1954] 3 WLR 531, PC.

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

AppealThe International Tin Council (the ITC), the intervener in an action brought by the plaintiffs, Shearson Lehman Bros Inc and Shearson Lehman Metals Ltd (Shearson

[*118]

Lehman), against (i) Maclaine Watson and Co Ltd, (ii) J H Rayner (Mincing Lane) Ltd (Rayners), and (iii) Peter Bonner, Colin Clark, Michael Hutchinson, Edward Jordan, Robert McPhie, Peter Pemberton (committee members of the London Metal Exchange) and Metal Marketing and Exchange Co Ltd (collectively referred to as 'the LME'), applied to prevent the parties to the action from tendering in evidence or relying on certain documents which the ITC alleged could not be produced or relied on in court. The ITC based its claim for protection in respect of the documents on the immunity or privilege of 'inviolability of official archives' conferred on the ITC by art 7(1) of the International Tin Council (Immunities and Privileges) Order 1972. On 24 June 1987 Webster J gave a series of preliminary rulings on points of principle relating to admissibility of the documents and on 29 June he gave a judgment setting out his reasons. The ITC appealed and all the parties to the action cross-appealed against Webster J's judgment. On 31 July the Court of Appeal (Dillon, Mustill LJJ and Sir Roualeyn Cumming-Bruce), having handed down reasoned judgments, ordered that the case be remitted to Webster J to continue his consideration of the ITC's application in the light of the views expressed in the judgments of the court. The ITC appealed and the parties to the action, except Shearson Lehman, cross-appealed with leave of the Appeal Committee granted on 20 October 1987 and on the basis of agreed assumptions of fact (set out at p 119 *j* to p 120 *h*, post) against the decision and rulings of the Court of Appeal. The facts are set out in the opinion of Lord Bridge.

*Nicholas Chambers QC, Rosalyn Higgins QC* and *Peter Irvin* for the ITC.

*Sydney Kentridge QC, John Higham* and *Adrian Hughes* for the cross-appellants.

Their Lordships took time for consideration.

3 December 1987. The following opinions were delivered.

LORD BRIDGE OF HARWICH.
My Lords, the action which gives rise to the present appeal and cross-appeal is one of many proceedings arising out of the financial collapse of the International Tin Council (the ITC). The hearing of the action commenced before Webster J on 8 June 1987. On 11 June the ITC obtained leave to intervene to claim that a large number of documents proposed to be adduced in evidence by the parties were rendered inadmissible by art 7(1) of the International Tin Council (Immunities and Privileges) Order 1972, *SI 1972/120*, which provides:

'The council shall have the like inviolability of official archives as in accordance with the 1961 Convention Articles is accorded in respect of the official archives of a diplomatic mission.'

The objection to the production of the documents, which must all be taken to be relevant to issues arising in the action, was opposed by all parties to the litigation. Between 11 and 28 June a number of affidavits were filed going to the issue of admissibility, but even now the evidence is not closed. On 29 June Webster J delivered a judgment in which he records that at an early stage all the parties—

'agreed with my suggestion that all questions relating to the admissibility of evidence should be deferred until I have given a decision on the questions of principle that arise.'

The judge proceeded to give a number of 'rulings' on a series of abstract and hypothetical questions of law which had been argued before him. I well understand the considerations which prompted the judge to think that the course he took would be the most convenient and expeditious way of disposing of the issues raised by the intervention of the ITC. But with hindsight one cannot escape from the conclusion that great difficulties have arisen from the attempt to resolve questions of law without, first, either finding the facts to

Case 1:19-cv-00150-DLF   Document 109-16   Filed 01/24/22   Page 5 of 12

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

[*119]

which the law falls to be applied or requiring the parties, by way of pleading or otherwise, to set out the facts they allege with sufficient particularity to raise specific questions of law for decision.

Neither side was content with the judge's rulings and both appealed to the Court of Appeal. The matter came before Dillon and Mustill LJJ and Sir Roualeyn Cumming-Bruce. On 31 July Dillon and Mustill LJJ delivered separate reserved judgments. Sir Roualeyn Cumming-Bruce expressed agreement with both. The views of Dillon and Mustill LJJ differed significantly from those expressed by Webster J and, at least in some respects, with each other. The difficulties arising from the hypothetical and academic nature of the exercise become fully apparent when one looks at the formal order which was drawn up to give effect to the decision of the Court of Appeal. The order sets out what is described as the 'ruling' of Webster J in a series of 11 propositions, some of them qualified by such adverbial phrases as 'prima facie' or 'as I presently think', but proceeds to make no order on the appeal or cross-appeal. No doubt the intention was that the matter should go back to Webster J, leaving him to extract and apply as best he could the propositions of law to be found in the two main judgments of the Court of Appeal. The discussion whether leave to appeal to your Lordship's House should be granted, which followed the handing down of the judgments, shows that the members of the Court of Appeal were fully aware of the acute difficulty of dealing with the case in the absence of any findings or assumptions of relevant fact. Dillon LJ observed at one point:

> 'It is a problem which really needs to be, I would have thought, in a much more final shape before their Lordships could properly be invited to give any guidance on it.'

The Court of Appeal refused leave to appeal.

When the petitions for leave to appeal, presented by the ITC on the one side, and all the defendants in the action, on the other, came before Lord Keith, Lord Brandon and myself, sitting as the Appeal Committee, we fully shared the view expressed by Dillon LJ in the remark quoted. But our great reluctance to grant leave to appeal was overcome by the fear, convincingly expressed on both sides, that the alternative course of sending the matter back to Webster J to find the facts, with the possibility of fresh appeals to the Court of Appeal and to this House ensuing, would be likely to increase the already considerable and regrettable delay in the disposal of the action occasioned by the intervention of the ITC. Leave to appeal was accordingly granted, but the Appeal Committee stipulated that the parties should attempt to agree assumptions of fact which it was hoped would be sufficient to narrow and define the issues to be determined. A first draft of the agreed assumptions was put before the Appeal Committee before leave was granted and a more elaborate version was presented as the basis for argument of the appeal. Even now I am not satisfied, on the one hand, that the agreed assumptions are, in all cases, sufficiently precise and specific to provide a wholly satisfactory foundation for authoritative preliminary rulings of law nor, on the other hand, that they do not, in some cases, raise questions that probably will turn out to be quite academic. However, in the way the case has developed, we can only do our best with the material before us to provide an authoritative basis for the resolution of the issues.

The 'agreed assumptions of fact' are set out in a document so intituled which I must quote in full:

> 'The parties to the appeal agree to the assumptions of fact set out below for the purposes of this appeal. In each case the term "ITC Document" refers to: (a) an original, or (b) one of a printed run, or (c) a photocopy of (i) a document of record, or (ii) a document drafted by the ITC, or (iii) a document circulated within the Council of the ITC, or (iv) a document received by the ITC.
>
> 1. An ITC document was supplied to a third party (i) with the consent of the ITC or (ii) without the consent of the ITC being asked for or given, by: (a) a Member of

[*120]

> the ITC to whom it was distributed in the ordinary course of the ITC's business; (b) a Member of a delegation to the ITC without the authority of the relevant Member [of the ITC]; (c) an Adviser to a Member of the ITC which obtained the document as in (a); (d) an Institution having observer status at the ITC to whom it was distributed in the ordinary course of the ITC's business; (e) the Executive Secretary of the Association of Tin Producing Countries, whose membership includes Producer Members of the ITC.
>
> 2. An ITC document was supplied to a third party by an officer or by another member of staff of the ITC: (a) with actual authority (b) with ostensible authority (c) without any authority.

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

> 3. Facts as in (2), but the document was supplied to a third party with whom the ITC dealt in order to reassure that third party of the financial position of the ITC.
> 4. Facts as in (2), but the document was supplied to a third party to assist in connection with settlement negotiations, after the ITC became unable to meet its commitments.
> 5. Facts as in (1), (2), (3) or (4) but the third party recipient made a copy of the document and sent the copy to another third party.
> 6. An ITC document which had been discussed or referred to in the settlement negotiations between the ITC and third parties without objection on the part of the ITC subsequently, came into the hands of (a) a third party with whom it had been discussed or referred to, or (b) another third party.
> 7. The House of Commons Select Committee published an ITC document in the minutes of evidence of the Select Committee enquiry. Those minutes of evidence were ordered to be published by the House of Commons, and are publicly available from HMSO.
> 8. A copy of an ITC document which had been before the House of Commons Select Committee was placed in the House of Lords Library. It is there available for inspection by members of the public.
> 9. An ITC document was released by the US Authorities under the United States Freedom of Information Act.
> 10. An ITC document whose provenance was unknown became widely available in the market and was referred to/or quoted from in press reports.
> 11. A copy of an ITC document was received from a private individual. The party who received the document does not know from where or how the private individual obtained it.
> 12. A document was prepared by a third party which contained information derived from an ITC document and was sent to the ITC. A copy of this document was subsequently sent out by the ITC to Member States under cover of an ITC front sheet marked "Confidential".
> 13. Information was derived by third parties from ITC documents in each of the categories referred to above. Some or all of this information was included in documents prepared by third parties and those documents were neither sent to nor seen by the ITC.'

Before addressing the issues which must be resolved in order to determine whether documents in the several categories contemplated by the assumed facts are rendered inadmissible by art 7(1) of the 1972 order it is appropriate to sketch the background and to refer to some preliminary considerations.

The ITC is an international organisation presently constituted under the Sixth International Tin Agreement (New York, 30 April 1982; Misc 13 (1982); Cmnd 8546), a treaty concluded in 1981. There are 22 members including the United Kingdom and the European Economic Community. The headquarters of the organisation, as constituted under an earlier treaty, were established in London under the Headquarters Agreement, a treaty between the United Kingdom and the ITC concluded in 1972 (London, 9

[*121]

February 1972; TS 38 (1972); Cmnd 4938). The 1972 order was made under the International Organisations Act 1968 to come into operation when the Headquarters Agreement came into force.

The functions and unfortunate collapse of the ITC are concisely described and recounted in the judgment of Millett J in *Re International Tin Council* [1987] 1 All ER 890 at 893, [1987] 2 WLR 1229 at 1233, where he said:

> 'Its main functions were to provide for adjustment between world production and consumption of tin and to alleviate serious difficulties arising from surplus or shortage of tin, whether anticipated or real, and to prevent excessive fluctuations in the price of tin and in export earnings from tin. To these ends, it maintained and operated a buffer stock of tin and engaged in the buying and selling of tin by entering into sale and purchase contracts, both for immediate and forward delivery, on recognised markets including the London Metal Exchange. In 1985, in a vain attempt to support the world price of tin, the ITC ran out of money and collapsed. In October 1985 the ITC announced that it was unable to meet its commitments. Dealings in tin on the London Metal Exchange were suspended and the ITC ceased to trade in tin.'

For the sequel to this story I turn to the judgment in the instant case of Dillon LJ which reads:

> 'The collapse of the ITC achieved considerable notoriety at the time, both in financial circles and among those concerned with tin. There was some attempt to negotiate a financial rescue package, but it was unsuccessful. The ITC was left with vast liabilities. The effect of the collapse, and of the suspension of dealings in tin on the London Metal Exchange, was a drastic fall in the price of tin and financial chaos among dealers and brokers in tin who were parties to uncompleted

Case 1:19-cv-00150-DLF   Document 109-16   Filed 01/24/22   Page 7 of 12

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

contracts entered into before the collapse. It also, it is said, led the tenth defendant in this action, the Metal Market & Exchange Co Ltd, which operates the London Metal Exchange, to add a new rule, rule M, to the rules of the exchange, whereby all outstanding bargains in tin between members of the exchange were deemed to have been reversed by reverse bargains at a lower close-out price prescribed by the exchange. The nature of the present action is that the plaintiffs are seeking to enforce against the first and second defendants contracts for tin which had before the collapse of the ITC been entered into between the plaintiffs as sellers and those defendants as buyers at prices well above present market prices, and the plaintiffs are also seeking to establish that the new rule M is not valid or binding on them.'

A question which troubled me and, I believe, others of your Lordships in the course of the argument was why this insolvent organisation should have undertaken the expense of intervening in the present litigation and what detriment to any subsisting interest of the ITC was apprehended by the use in evidence before Webster J of the disputed documents, especially having regard to the inclusion of such categories as those referred to in paras 7, 8 and 9 of the assumed facts. The answer, so far as counsel for the ITC were able to proffer one, seems to be that no detriment is apprehended from the use of any of the documents in the *present* litigation, but that the ITC felt obliged to intervene lest failure to do so should preclude it from objecting to the admission of similar documents in other litigation in which it may be directly affected and also to establish that the protection of art 7(1) of the 1972 order may be invoked to prevent the use in evidence for probative purposes of documentary material notwithstanding that it is fully available to the public. That said, I bear in mind, of course, that, if the claim to exclude the documents is well founded in law, the ITC is entitled to assert it without having to satisfy your Lordships that it will serve any useful purpose.

The reference in art 7(1) of the 1972 order to the '1961 Convention Articles' is a reference to the articles of the Vienna Convention on Diplomatic Relations which are set

[*122]

out in Sch 1 to the Diplomatic Privileges Act 1964. Article 24 of the Vienna Convention provides: 'The archives and documents of the mission shall be inviolable at any time and wherever they may be.'

In the argument before your Lordships nothing turned on the use of the word 'official' in art 7(1) of the 1972 order and counsel appearing for all the defendants in the action as respondents to the ITC's appeal and as cross-appellants (to whom I will simply refer as 'the defendants') was content to accept that art 7(1) of the 1972 order should be construed as conferring inviolability on the archives and documents of the ITC to the like extent that art 24 confers inviolability on the archives and documents of a diplomatic mission. Counsel for the ITC relied, as an aid to construction, on art 4 of the Headquarters Agreement, which provides:

> 'The archives of the council shall be inviolable. The term "archives" includes all records, correspondence, documents, manuscripts, photographs, films and recordings belonging to or held by the council.'

The Court of Appeal, for reasons which I need not examine, did not accept that the definition in the Headquarters Agreement could be relied on in construing the 1972 order. But counsel for the ITC helpfully drew your Lordships' attention to a consistent practice in domestic legislation, enacted to give effect to treaties concluded by the United Kingdom with international organisations, of referring in the domestic enactment to 'archives' or 'official archives' simpliciter, when the corresponding treaty embodied a definition similar to that in art 4 of the Headquarters Agreement. Nothing turns on the terms used in the definition except the phrase 'belonging to or held by the council' which, counsel for the ITC submitted, was available in the light of the legislative practice to indicate the meaning intended by the domestic enactment. Counsel for the defendants presented no argument to the contrary and I am the readier to accede to the submission since it would seem to me perfectly natural to interpret the phrase 'the archives and documents of the mission' in art 24 of the Vienna Convention as referring to the archives and documents belonging to or held by the mission and thus I am inclined to the view that resort to the definition in the Headquarters Agreement only makes explicit what is already implicit in art 7(1) of the 1972 order interpreted by reference to art 24 of the Vienna Convention.

We are not in this appeal in any way concerned with documents held by the ITC. Ex hypothesi the categories of documents in the assumed facts are held by third parties. No claim is made against the ITC requiring them to produce documents which they hold. Thus the central question at the heart of the dispute which has to be asked in relation to each category is whether the documents in that category 'belong to' the ITC. In relation to the categories embraced in paras 2 to 13 of the assumed facts I shall shortly need to examine a number of factors bearing on that central question and to consider whether light is thrown on the ambit of the documents which can be regarded as belonging to the ITC by the concept of inviolability which attaches to the documents if they do.

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

But the first and perhaps most important categories of documents in dispute, judging by the central place accorded to them in argument, are the several categories of documents embraced in para 1 of the assumed facts. They raise a special question said to turn on the peculiar juristic qualities of international organisations in general and of the ITC in particular and on the relationship between the ITC and its constituent members, whether sovereign states or intergovernmental organisations. The submission for the ITC was that all documents relating in any way to the business of the ITC which originate within the ITC and therefore commence life as documents which belong to the ITC retain that character unimpaired when they are communicated to constituent members or their representatives. Thus it was said, for example, that when the official representative of the Malaysian government leaves a meeting of the ITC carrying away in his briefcase a sheaf of minutes and reports about the business of the ITC all those documents remain part of the official archives of the ITC and still belong to the ITC not only when they are

*[\*123]*
in the Malaysian representative's hotel bedroom in London, but also when he returns to Kuala Lumpur and hands them over to his own government. This led to an interesting argument as to the extent to which United Kingdom domestic legislation can be construed as conferring diplomatic inviolability of the kind in question extraterritorially. But I find it unnecessary to discuss this issue separately since it seems to me that the case advanced by the ITC in relation to documents communicated by the ITC to constituent members or their representatives fails at an earlier stage.

Article 16 of the Sixth International Tin Agreement is headed 'Privileges and immunities' and provides as follows:

> '1. The council shall have legal personality. It shall in particular have the capacity to contract, to acquire and dispose of movable and immovable property and to institute legal proceedings.
> 2. The council shall have in the territory of each member, to the extent consistent with its law, such exemption from taxation on the assets, income and other property of the council as may be necessary for the discharge of its functions under this agreement.
> 3. The council shall be accorded in the territory of each member such currency exchange facilities as may be necessary for the discharge of its functions under this agreement.
> 4. The status, privileges and immunities of the council in the territory of the host government shall be governed by a Headquarters Agreement between the host government and the council.'

The Headquarters Agreement between the United Kingdom and the ITC was made in pursuance of para 4 of this article.

I need not cite in extenso other provisions of the treaty. The ITC has its own distinct powers and functions under art 7 of the treaty, exercisable in accordance with the procedure laid down by the treaty, in particular the voting procedure prescribed by arts 14 and 15.

In the light of these provisions determining the constitution of the ITC I found it difficult to follow the argument of counsel for the ITC that in the conduct of its internal affairs the ITC could not be treated as distinct from its constituent members. But, whatever validity that argument might have in any other context, it seems to me to be conclusively refuted for present purposes by art 14(1) of the 1972 order. This provides, so far as relevant:

> 'Except in so far as in any particular case any privilege or immunity is waived by the government of the member country or by the intergovernmental organisation whom they represent, representatives of member countries of the council and of intergovernmental organisations participating in the International Tin Agreement in accordance with article 50 of the Fourth International Tin Agreement or a corresponding article in any succeeding agreement shall enjoy … *(b)* while exercising their functions and during their journeys to and from the place of meetings convened by the council … the like inviolability for all their official papers and documents as is accorded to the head of a diplomatic mission … '

The 1972 order was made under s 1 of the 1968 Act. The effect of s 1(2) is to empower Her Majesty by Order in Council to 'specify an organisation' to which s 1 applies (here the ITC) and to confer relevant diplomatic immunities and privileges 'in respect of the organisation so specified'. It is perfectly clear, therefore, that in art 14(1)*(b)* of the 1972 order the phrase 'all *their* official papers and documents' relates to documents concerning ITC business and includes documents emanating from the ITC which are now no longer documents *of* the ITC but documents *of* the member country or intergovernmental organisation. It is the member who both needs and, by virtue of this provision, enjoys an inviolability in respect of the documents which is distinct from that attaching to the

Scott Glass

Case 1:19-cv-00150-DLF   Document 109-16   Filed 01/24/22   Page 9 of 12

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

[*124]

'official archives' of the ITC and, still more significantly, art 14 expressly recognises that it is the member, not the ITC, by whom this inviolability may be waived. It follows that once a document has been communicated by the ITC to a member or the representative of a member the protection of art 7(1) of the 1972 order ceases to apply to it. The documents of the categories referred to in para 1(a), (b) and (c) of the assumed facts are not, therefore, rendered inadmissible as claimed. It was, I think, conceded but must in any event follow logically that the same conclusion applies to the categories in para 1(d) and (e).

The issues arising for consideration in determining whether the remaining categories of documents contemplated by the assumed facts are rendered inadmissible by art 7(1) of the 1972 order have been very considerably narrowed by concessions which have been made at different stages in the proceedings up to the conclusion of the arguments addressed to your Lordships. As Dillon LJ recorded in his judgment:

> '… it has not been suggested that any of the copies of ITC archival documents which have come into the possession of any of the parties to the actions have been stolen from the premises of the ITC or have been illicitly copied within those premises or have been obtained by bribing or deceiving members of the staff of the ITC.'

It was conceded before your Lordships that in these circumstances it was unnecessary to consider the possibility that any ITC document now in the hands of a third party, or any original ITC document referred to as the basis of any derivative document, was originally obtained by any dishonesty either on the part of the third party who first obtained it or on the part of any member of the staff of the ITC who first communicated it to that third party. It was further conceded before your Lordships that no question now arises with respect to any documents held by third parties on loan from the ITC or otherwise as bailees or agents for the ITC.

There is a danger of some confusion of thought clouding the issues for decision from the use of the term 'confidentiality' to describe that which art 7(1) of the 1972 order protects. Of course in one sense it is no doubt true that the purpose of conferring inviolability on the archives and documents of a diplomatic mission and on the official archives of the ITC is to preserve the confidentiality of the information which the documents contain. But on the other hand it is now clear, and was rightly accepted by counsel for the ITC whatever doubt there may have been at any earlier stage in these proceedings, that if a document was communicated to a third party by or on behalf of the ITC in circumstances such as to impose a duty of confidentiality on the third party not to disclose the information which the document contained, any breach of that duty of confidentiality would be quite irrelevant to the claim which the ITC is now seeking to establish. If A writes to B in confidence, A may be able to restrain a breach of that confidence in appropriate proceedings, but the imposition of a duty of confidence does not prevent the property in the letter which conveys the confidential information passing in the ordinary course from A to B. When A writes the confidential letter, it belongs to A. When B receives it, it belongs to B. I prefer therefore to speak not of the confidentiality, but of the privacy, of documents which art 24 of the Vienna Convention and art 7(1) of the 1972 order are designed to protect.

Counsel for the cross-appellants presented a forceful argument for the cross-appellants based on the proposition that the only protection which the status of inviolability conferred by art 24 of the Vienna Convention and art 7(1) of the 1972 order affords is against executive or judicial action by the host state. Hence, it was submitted, even if a document was stolen, or otherwise obtained by improper means, from a diplomatic mission, inviolability could not be relied on to prevent the thief or other violator from putting it in evidence, but the mission would be driven to invoke some other ground of objection to its admissibility. I need not examine this argument at length. I reject it

[*125]

substantially for the reasons given by the Court of Appeal. The underlying purpose of the inviolability conferred is to protect the privacy of diplomatic communications. If that privacy is violated by a citizen, it would be wholly inimical to the underlying purpose that the judicial authorities of the host state should countenance the violation by permitting the violator, or any one who receives the document from the violator, to make use of the document in judicial proceedings.

At the heart of the issue on which the validity of the ITC's claim to inviolability for the categories of document referred to in paras 2 to 13 of the assumed facts depends lies the question of authority. As I have pointed out in connection with the question of confidentiality, if A, an individual, communicates a document to B in the absence of any relationship of lender and borrower, bailor and bailee or principal and agent, the ordinary inference must be that the property in the document communicated passes to B when he receives it. If A is a body such as the ITC which can only act through an agent, I see no reason why the same inference should not be drawn in respect of any communication to B which A's agent had authority to make. Accordingly, I have no difficulty, in the light of the

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

concessions to which I have referred, in concluding that a document in categories 2(a) or (b) of the assumed facts, sc a document communicated to a third party by an officer or employee of the ITC with actual authority, express or implied, or with ostensible authority, no longer belongs to the ITC and hence no longer enjoys inviolability as part of the official archives. But what is here involved in the concept of ostensible authority? The issue of ostensible authority normally falls for decision where one party as agent has purported to undertake some obligation on behalf of another party as principal. In those circumstances the party seeking to enforce the obligation in reliance on the agent's ostensible authority will need to show that the principal held the agent out as having the necessary authority so as to create an estoppel. But here there is no question of any obligation to be enforced. The question is simply whether a limitation on the actual authority of an officer or employee of the ITC who, acting honestly and in the course of his employment by the ITC, communicates a document to a third party prevents the document communicated becoming the property of the recipient, notwithstanding that the recipient is unaware of any lack of authority. In the real world it seems to me that business would come to a standstill if persons who receive documents from clerks or secretaries, acting in the course of their employment, were not entitled to assume that those documents were sent with the authority of the employer, and if this is true of the ostensible authority of staff in such humble grades, it must equally be true of staff at higher levels. Thus, in my opinion, the very fact that an officer or employee of the ITC was acting and known to be acting in the course of his employment in communicating documents to a third party would be strong prima facie evidence that he had at least ostensible authority to do so. To rebut the inference from that prima facie evidence it would be necessary, as I think, not only to prove absence of actual authority but also to show something in the circumstances in which the transaction took place sufficient to put the recipient of the document on inquiry that the ITC's officer or employee might be acting without authority.
In the light of these considerations I strongly suspect that the issue raised as to documents in category 2(c) of the assumed facts is purely academic. This suspicion is reinforced, first, by the fact that no evidence has yet been adduced to suggest any want of authority on the part of any officer or employee of the ITC who communicated any of the disputed documents to any third party, although the ITC have reserved the right to adduce such evidence; secondly, by the particular circumstances in which documents in categories 3 and 4 of the assumed facts are taken to have been communicated. These categories have presumably been singled out for special consideration as typical cases where authority might be in dispute. But to my mind it is beyond argument that an officer or employee of the ITC authorised to approach a third party to reassure him of the financial stability of the ITC or, when that assurance was falsified, authorised to conduct negotiations for a settlement must thereby have been clothed with ostensible authority

[*126]

to supply any documents to the third party which might assist in promoting the authorised purpose.
I think it is possible to reach the same conclusion as that which I have sought to express in considering the question of ostensible authority by approaching the issue from another point of view. The protection which art 7(1) of the 1972 order provides is expressed by the word 'inviolability'. An infringement of the protection must amount to a violation of the protected documents. It would surely be a misuse of language to say that a protected document had been violated because an officer of the ITC supplied it to a third party without authority, unless the recipient was or ought to have been aware of the absence of authority. Putting the same point in other language, which I gratefully adopt from counsel for the cross-appellants, the inviolability conferred on the archives and documents of a diplomatic mission cannot have been intended to protect the mission from the consequences of errors on the part of the staff whom the mission chose to employ.
Turning to the remaining categories of documents which fall to be considered in accordance with the assumed facts, the concessions excluding dishonesty, loan, bailment or agency as the basis of the original transmission from the ITC to any third party of ITC documents embraced within the categories, or referred to, as for example in paras 5, 12 and 13, as the source from which other documents were derived, entitle and indeed oblige your Lordships to assume that the original transmission whereby all these documents initially passed out of the possession and control of the ITC into the possession and control of third parties was effected by officers or employees of the ITC acting in the course of their employment. This leads back to the conclusion that in every case the determinative question whether the original communication of any documents was authorised or unauthorised depends on the considerations already examined under para 2.
The conclusions I have expressed may seem to go a long way, as I think they do, towards shutting the door on the ITC's claim to exclude the admission in evidence of any of the disputed documents in reliance on art 7(1) of the 1972 order. But they must, of course, since the agreed assumptions do not admit of a final ruling, at least leave the door ajar. The only live issue, however, which, as it seems to me, will remain for decision by Webster J is whether any particular document proposed to be put in evidence, or in the case of a derivative document, the original ITC

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

document communicated by an officer or employee of the ITC to a third party on which the derivative document is founded, was so communicated without authority, actual or ostensible.

It was argued for the ITC that the principle expressed in Juan Ysmael & Co Inc v Government of the Republic of Indonesia *[1954] 3 All ER 236*, [1955] AC 72 would operate to preclude the court from adjudicating on any such issue. The question which arose in that case appears from the following passage in the judgment of the Judicial Committee of the Privy Council delivered by Earl Jowitt (*[1954] 3 All ER 236* at *238*–239, [1955] AC 72 at 86–87):

> 'The rule according to a foreign sovereign government immunity against being sued has been considered and applied in many cases. The basis of the rule is that it is beneath the dignity of a foreign sovereign government to submit to the jurisdiction of an alien court, and that no government should be faced with the alternative of either submitting to such indignity or losing its property. The rule was stated by LORD ATKIN in *Compania Naviera Vascongada* v. *Steamship Cristina, The Cristina* (*[1938] 1 All ER 719*, [1938] AC 485), as involving two propositions. The first that the courts of a country cannot implead a foreign sovereign; and the second that they would not by their process, whether the sovereign is a party to the proceedings or not, seize or detain property which is his or of which he is in possession or control … In whichever way the rule is stated it is apparent that difficulty may arise in the application of the second branch of it. Where the foreign sovereign state is directly

[*127]

> impleaded the writ will be set aside, but where the foreign sovereign state is not a party to the proceedings, but claims that it is interested in the property to which the action relates and is, therefore, indirectly impleaded, a difficult question arises as to how far the foreign sovereign government must go in establishing its right to the interest claimed.'

The Board's answer to the difficult question posed appears where Earl Jowitt said (*[1954] 3 All ER 236* at *240*, [1955] AC 72 at 89–90):

> 'In their Lordships' opinion, a foreign government claiming that its interest in property will be affected by the judgment in an action to which it is not a party, is not bound as a condition of obtaining immunity to prove its title to the interest claimed, but it must produce evidence to satisfy the court that its claim is not merely illusory, nor founded on a title manifestly defective. The court must be satisfied that conflicting rights have to be decided in relation to the foreign government's claim. When the court reaches that point it must decline to decide the rights and must stay the action, but it ought not to stay the action before that point is reached.'

If the *Juan Ysmael* principle falls to be applied, I am of opinion, for the reasons I have already explained, that even the limited evidential burden imposed on a sovereign claiming immunity, on the ground that he is indirectly impleaded by a claim to property to which he asserts title, could only be discharged here by the ITC if they could adduce some evidence to show that the original communication of a disputed document to a third party was effected in circumstances putting the recipient on inquiry as to the absence of authority on the part of the officer or employee of the ITC to make such a communication. But, for my part, while I recognise the propriety of safeguarding the dignity of foreign sovereigns by securing that they are neither directly nor indirectly impleaded, I should be extremely reluctant to see the rule in *Juan Ysmael* extended any further than is strictly necessary for that purpose. It is one thing for the courts to decline jurisdiction to adjudicate on a claim by a plaintiff to recover from a defendant property to which a foreign sovereign asserts a title which he is able to support by prima facie evidence. It would be an entirely different thing for the court to decline jurisdiction to adjudicate on a claim by a foreign sovereign or any other organisation entitled to invoke the inviolability of diplomatic documents to prevent the court from receiving otherwise relevant and available evidence in proceedings to which the sovereign is not a party. All other distinctions apart, in the first case the sovereign is resisting a claim made against him, in the second he is asserting a claim against another. If a sovereign wishes to recover his property from a third party in possession of it, he must choose between saving his dignity or invoking and thereby submitting to the jurisdiction of the court. I cannot see why it should make any difference that the sovereign, instead of seeking to recover his property, is, in effect, asserting a right of property in a document in the possession of a third party as a ground for preventing the court from receiving that document in evidence. Accordingly, in my opinion, if the ITC do produce prima facie evidence to the effect I have indicated, that will not be the end of the matter, but the parties to the action will be entitled to challenge and, if they can, to controvert that evidence and the legal burden will rest on the ITC to

Scott Glass

Shearson Lehman Bros Inc and others v Maclaine Watson & Co Ltd and others (International Tin Council intervening) (No 2) [1988] 1 All ER 116

establish that the relevant document was communicated to the third party without authority, actual or ostensible, with the consequence that it did not cease to be part of the official archives of the ITC.
Having regard to the way in which this matter reached your Lordships, it is not perhaps surprising that one cannot identify with precision the issues raised by the appeal and the cross-appeal respectively. But the effect of the conclusions I have expressed is that the ITC have failed and the defendants have succeeded on all the issues save that raised by the separate argument advanced by counsel for the defendants with respect to inviolability which I have rejected. In the event the rejection of that argument turns out to be of minimal significance in the context of the overall dispute. It seems to me,

[*128]

therefore, that the appropriate order would be that the appeal be dismissed and the cross-appeal allowed, that the order of the Court of Appeal be set aside, that there be substituted therefor an order that the matter be remitted to Webster J to determine the admissibility of the disputed documents in accordance with the opinions expressed in your Lordships' House and that the costs of the proceedings before the House be paid by the ITC. I would not think it appropriate to make any order with respect to the costs in the Court of Appeal, where many of the cross-appellants were separately represented, and the costs of the proceedings on the ITC's intervention before Webster J will, of course, remain in his discretion.

LORD BRANDON OF OAKBROOK.
My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Bridge. I agree with it, and for the reasons which he gives I would make the orders in respect of both the appeal and the cross-appeal proposed by him.

LORD GRIFFITHS.
My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Bridge and for the reasons that he gives I too would dimiss the appeal and allow the cross-appeal.

LORD OLIVER OF AYLMERTON.
My Lords, I have had the advantage of reading in draft the speech delivered by my noble and learned friend Lord Bridge. I agree with it and concur in the order which he has proposed.

LORD GOFF OF CHIEVELEY.
My Lords, for the reasons given in the speech of my noble and learned friend Lord Bridge, which I have had the opportunity of reading in draft, I too would dismiss the appeal and allow the cross-appeal.
Appeal dismissed; cross-appeal allowed.

Solicitors: *Cameron Markby* (for the ITC); *Allen & Overy* (for Maclaine Watson); *Clyde & Co* (for Rayners); *Linklaters & Paines* (for the LME).

*Mary Rose Plummer Barrister.*

End of Document