# EXHIBIT 16

| 89TH CONGRESS<br>*1st Session* | SENATE | EX. REPORT<br>No. 6 |
|---|---|---|

# VIENNA CONVENTION ON DIPLOMATIC RELATIONS AND OPTIONAL PROTOCOL

Mr. CHURCH, from the Committee on Foreign Relations,
submitted the following

## REPORT

ON

## EXECUTIVE H, 88TH CONG., 1ST SESS.



SEPTEMBER 8, 1965.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

51–759                    WASHINGTON : 1965

Digitized by Google

## COMMITTEE ON FOREIGN RELATIONS
### J. W. FULBRIGHT, Arkansas, *Chairman*

JOHN SPARKMAN, Alabama
MIKE MANSFIELD, Montana
WAYNE MORSE, Oregon
RUSSELL B. LONG, Louisiana
ALBERT GORE, Tennessee
FRANK J. LAUSCHE, Ohio
FRANK CHURCH, Idaho
STUART SYMINGTON, Missouri
THOMAS J. DODD, Connecticut
JOSEPH S. CLARK, Pennsylvania
CLAIBORNE PELL, Rhode Island
EUGENE J. McCARTHY, Minnesota

BOURKE B. HICKENLOOPER, Iowa
GEORGE D. AIKEN, Vermont
FRANK CARLSON, Kansas
JOHN J. WILLIAMS, Delaware
KARL E. MUNDT, South Dakota
CLIFFORD P. CASE, New Jersey

CARL MARCY, *Chief of Staff*
DARRELL ST. CLAIRE, *Clerk*

### SUBCOMMITTEE ON THE VIENNA CONVENTION
#### FRANK CHURCH, Idaho, *Chairman*

JOSEPH S. CLARK, Pennsylvania          FRANK CARLSON, Kansas

MORELLA HANSEN, *Staff Assistant*

II

Digitized by Google

# CONTENTS

|  |  | Page |
|---|---|---|
| I. | Main purpose | 1 |
| II. | Background | 2 |
| III. | Provisions of the convention: | |
| | A. Definitions (art. 1) | 2 |
| | B. Diplomatic intercourse in general (arts. 2–20) | 2 |
| | C. Diplomatic privileges and immunities (arts. 21–40): | |
| | 1. Mission premises and archives | 3 |
| | 2. Facilitation of the work of the mission and freedom of movement | 4 |
| | 3. Personal privileges and immunities: | |
| | (a) Immunity from jurisdiction | 5 |
| | (b) Social security legislation | 5 |
| | (c) Tax exemptions and customs privileges | 6 |
| | (d) Other persons entitled to privileges and immunities | 6 |
| | (e) Nationals and residents of the receiving state | 7 |
| | (f) Duration of privileges and immunities | 7 |
| | (g) Duties of third states | 7 |
| | D. Conduct of the mission and its members toward the receiving state (arts. 41–42) | 7 |
| | E. End of the functions of a diplomatic agent (arts. 43–46) | 8 |
| | F. Nondiscrimination (art. 47) | 8 |
| | G. Final articles (arts. 48–53) | 9 |
| | H. Optional protocol | 9 |
| IV. | Committee action | 9 |
| V. | Matters of particular interest: | |
| | A. Departures from present international law and practice | 10 |
| | B. To whom the convention applies | 10 |
| | C. Effect on Federal-State relationships | 11 |
| | D. Effect on domestic laws | 11 |
| | E. Enforcement and safeguards | 12 |
| VI. | Recommendations and conclusion | 13 |

III

Digitized by Google

| 89TH CONGRESS | } | SENATE | { | EXECUTIVE REPT. |
|---|---|---|---|---|
| *1st Session* | | | | No. 6 |

# VIENNA CONVENTION ON DIPLOMATIC RELATIONS

SEPTEMBER 8, 1965.—Ordered to be printed

Mr. CHURCH, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany Ex. H, 88th Cong., 1st sess.]

The Committee on Foreign Relations, to which was referred the Vienna Convention on Diplomatic Relations together with the optional protocol concerning the compulsory settlement of disputes, signed at Vienna under date of April 18, 1961 (Ex. H, 88th Cong., 1st sess.), having considered the same, reports favorably thereon without reservation and recommends that the Senate gives its advice and consent to ratification thereof.

## I. MAIN PURPOSE

The convention, based largely on diplomatic practices as they developed over the years, sets forth the rights, privileges, and duties of all members of a diplomatic mission, of their families and private servants, and the rights and obligations of the state on whose territory they perform their functions. As a partial codification of these practices, it covers a variety of subjects, such as the functions, size and location of missions, diplomatic privileges and immunities—including the treatment of mission premises and archives, freedom of movement, personal privileges and immunities such as immunity from jurisdiction, tax exemptions, and customs privileges—the obligations of a mission and its members toward the state in which they serve, and termination of missions. In general, this convention is more restrictive in its provisions on diplomatic privileges and immunities than current U.S. practices. A detailed description of the convention follows in a later section of the report.

1

Digitized by Google

## II. BACKGROUND

One of the most ancient and basic tenets of relations between nation states has been the mutual respect accorded each other's envoys. According to Charles Cheney Hyde:

> Long before the Christian era the idea prevailed that the person of an envoy sent by one ruler to another should be inviolable. * * * The Persians in the time of Xerxes were possessed of the same idea, as were also the Greeks. The Roman law gave recognition to it * * *. Upon the murderer of such a person the Salic Law imposed a penalty, and likewise the codes of the Alamanni, the Saxons, the Frisians, and the Lombards.

As early as 1790 the United States began according to the diplomatic representatives of other countries the privileges and immunities then customary. One of the first attempts to set this developing body of customary international law on paper was made at the Congress of Vienna in 1815 which was attended only by European states. However, most of the nations of the world generally followed the Congress of Vienna regulations. In 1928 another attempt was made, this time by the states of the Western Hemisphere, to codify international law in the area of diplomatic relations but the draft convention never entered into force.

Diplomatic intercourse and immunities was selected as a topic suitable for codification by the International Law Commission of the United Nations in 1949 and work on it was begun in 1954. Draft articles were transmitted to member nations in 1957 and on the basis of comments received a revision was drawn up which formed the basis for discussions at the Vienna Conference in 1961, which resulted in this convention. This, then, is the first comprehensive international convention on the subject of diplomatic relations between sovereign states.

## III. PROVISIONS OF THE CONVENTION

### A. DEFINITIONS (ART. 1)

Article 1 contains definitions of terms used in the convention such as "head of mission," "members of the mission," "diplomatic agent," "premises of the mission," etc.

### B. DIPLOMATIC INTERCOURSE IN GENERAL (ARTS. 2–20)

Article 2 provides that diplomatic relations and missions are established between states by mutual consent. The main functions of a mission are set forth in article 3: representation, protection of the interests and nationals of the sending state, negotiations, reporting on conditions and developments of the receiving state, promoting friendly relations, and developing economic, cultural, and scientific relations.

The custom of requiring an agreement from the receiving state for acceptance of a head of mission is preserved in article 4; dual accreditation is covered in article 5, and article 6 makes possible the accreditation of one person as the representative of two or more states.

Articles 7 and 8 concern the appointment of members of the staff of a mission. Generally, the sending state may freely appoint such

persons but they should be, in principle, of its nationality. If they are not, the consent of the receiving state must be obtained. In the case of military attachés of any service, a receiving state may require the submission of their names before they will be received. The right of a receiving state to declare any member of a diplomatic mission, including its head, persona non grata or not acceptable is recognized in article 9.

Article 10 concerns notification of arrival and departure of all mission personnel. In article 11 it is stated that the receiving state may require that the size of a mission be kept within limits considered by it to be reasonable and normal. In practice the United States has not imposed restrictions on the size of foreign missions in Washington, except for a few Eastern European countries. The United States needs flexibility in determining the size of its missions in foreign countries and almost invariably the size of U.S. missions exceed those of foreign missions in the United States. Without prior approval of the receiving state, offices of the mission cannot be opened in a locality different from that of the mission itself (art. 12).

Article 13 defines the time when a head of mission is deemed to have assumed hs official role and establishes his precedence in the diplomatic corps. The various classes of heads of missions are described in article 14 and the nature of the mutual agreement necessary to determine those classes is defined in article 15. Articles 16, 17, and 18 concern precedence of heads of mission, precedence of diplomatic staff, and their mode of reception. These articles are patterned on the broad outlines of the Vienna Regulations of 1815.

Article 19 recognizes the position of a chargé d'affaires ad interim, whose name, however, must be officially communicated by the foreign ministry of the sending state to make clear that the chargé is not self-appointed. Article 20 relates to the display by the mission and its head of the national flag or emblem.

### C. DIPLOMATIC PRIVILEGES AND IMMUNITIES (ART. 21–40)

#### 1. Mission premises and archives

Article 21 obligates the receiving state to facilitate the acquisition, "in accordance with its laws," of premises necessary for a foreign mission or to assist the latter in obtaining accommodations, including for its members, in some other way. The phrase "in accordance with its laws" recognizes the present authority of Congress to enact legislation governing the construction, alteration, repair, and occupancy of premises for chancery purposes as it did in 1964.

Article 22 relates to the inviolability of the premises of diplomatic missions and the duty of the receiving state to protect them from intrusion or damage and disturbances of the peace or impairment of its dignity. The District of Columbia Code now makes it a criminal offense under certain conditions to picket or congregate within 500 feet of a diplomatic mission. The Department of State does not construe article 22 to preclude the exercise of the right of eminent domain for public purposes, if prompt and adequate compensation and assistance in obtaining new quarters is given.

This article also provides that the premises of a mission, furnishings and other property thereon, and the means of transport of a mission shall be immune from search, requisition, attachment, or execution. The committee was assured that this immunity does not preclude the

taking of reasonable measures of self-help to deal with emergency situations created by improperly parked embassy cars.

Article 23 provides that the sending state and the head of the mission shall be exempt from taxation in respect of the premises of the mission, whether such premises are owned or leased, but that such exemption does not apply to taxes payable by persons contracting with the sending state or the head of the mission. The hearing brought out the fact that the exemption also does not apply to the owner of premises leased for diplomatic purposes and such lessor remains subject to such taxes. By article 24, the archives and documents of the mission shall be inviolable, as they now are under international practice.

## 2. Facilitating the work of the mission and freedom of movement and communication

Article 25 provides that the "receiving state shall accord full facilities for the performance of the functions of the mission." The Department of State construes this to refer to providing assistance in obtaining licenses, permits, the installation of equipment, or making of repairs when, as in many cases, authorities of the receiving state act as suppliers and/or contractors. It will not, in implementing this article, go beyond the scope of authorizing legislation and appropriations.

The obligation of a receiving state to insure to all members of missions freedom of movement and travel in its territory is set out in article 26, subject however, to the receiving state's laws and regulations concerning zones, entry into which is prohibited or regulated for reasons of national security. This preserves the right of the United States to impose travel restrictions for reasons of national security. It does not impair the right of the United States to restrict travel of foreign diplomats when that restriction arises from discriminatory treatment in contravention of article 47.

Freedom of communication is the subject of article 27 and it protects the right of free communications by a diplomatic mission, for official purposes, including diplomatic couriers and messages in code or cipher. However, a wireless transmitter may be installed and used only with the consent of the receiving state. This accords with the provisions of the Federal Communications Act of 1934 as amended by Public Law 87-795 in 1962 which authorizes the President, on such terms and conditions as he may prescribe, to permit foreign governments to construct and operate in Washington radio stations for transmission of messages, provided that substantially reciprocal privileges are accorded the United States abroad.

Article 27 also provides that the official correspondence of the mission shall be inviolable; that the diplomatic bag, visibly marked and containing only diplomatic documents or articles intended for official use, shall not be opened or detained; that the diplomatic courier, officially identified, shall be protected in the performance of his functions and enjoy personal inviolability. Provisions are also made for the status of an ad hoc diplomatic courier and the entrusting of the diplomatic bag to commercial pilots. Official fees and charges levied by a mission shall be exempt from all dues and taxes, according to article 28.

### 3. *Personal privileges and immunities of diplomatic agents*

(a) *Immunity from jurisdiction.*—Article 29 sets forth the personal inviolability of a diplomatic agent and his immunity from any form of arrest or detention. The receiving state shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom, and dignity. Several U.S. laws already give effect to this provision. (See 22 U.S.C. 252; 22 U.S.C. 253; 5 U.S.C. 170e–1; and 18 U.S.C. 112.) Article 30 extends the same inviolability to his residence, his papers, and his correspondence except as provided in article 31(3).

Article 31 provides that a diplomatic agent, in the absence of express waiver by his government, shall continue to have complete immunity from the criminal jurisdiction of the receiving state. He shall also enjoy immunity from civil and administrative jurisdiction except in actions relating to (a) private immovable property situated in the territory of the receiving state; (b) acts relating to succession in which he is involved as executor, administrator, heir, or legatee as a private person; and (c) professional or commercial activities exercised by him in the receiving state outside his official functions. These exceptions are new in international law and serve to limit the complete immunity from the civil jurisdiction of the United States presently granted by title 22, United States Code, section 252, to diplomatic agents. However, the complementing legislation (S. 2320) would give the President discretionary authority to extend more favorable treatment than is provided for in the Vienna Convention. Article 31 further exempts a diplomatic agent from the obligation to give evidence as a witness, provides that no measures of execution may be taken against him except in the cases listed above and then only when those measures can be taken without infringing the inviolability of his person or his residence. The agent's immunities from the jurisdiction of the receiving state do not exempt him from the jurisdiction of the sending state.

Article 32 concerns waiver of immunity by the sending state and defines its effect more precisely than has been the case heretofore.

(b) *Social security legislation.*—The social security provision in article 33 is the first international regulation ever adopted in this field. It exempts diplomatic missions or the sending state from complying with local social security legislation for services rendered to the mission. It also exempts from social security obligations private servants who (a) are not nationals or residents of the receiving state, and (b) are covered by social security provisions in force in a sending state or a third state. For persons not covered by these exemptions, diplomatic agents are to observe the social security laws of the receiving state. The article further provides for voluntary participation by exempted persons if such participation is permitted by the receiving state. Existing and future bilateral or multilateral agreements concerning social security moreover are not to be affected by article 33.

Articles 37 and 38 extend the same obligations contained in article 33 with respect to social security laws to members of the administrative and technical staff and the service staff who are not nationals or residents of the receiving state. Nationals and residents of the receiving state are not entitled to the exemptions of article 33. Such

Digitized by Google

Americans are considered to be self-employed under social security legislation.

In sum, these provisions will not require changes in existing U.S. social security legislation but will result in a change in practice in two respects; these provisions will require members of diplomatic missions to pay certain taxes from which they are now exempt and will exempt certain private servants from the present coverage under U.S. law, thus slightly narrowing the group now subject to the old age, survivors, and disability insurance program.

(c) *Tax exemptions and customs privileges.*—Article 34 provides with certain well-defined exceptions, that diplomatic agents shall be exempt from all dues and taxes, personal or real, national, regional, or municipal. The exceptions, upon which there is no exemption, are indirect taxes; taxes on private income having its source in the receiving State and on capital gains on investments; estate taxes; taxes on private immovable property; charges levied for specific services rendered; and registration, court or record fees, mortgage dues, and stamp duties with respect to private immovable property. These tax exemptions are already provided in various sections of the Internal Revenue Code of 1954, the District of Columbia tax regulations, and laws in Virginia, Maryland, and New York. In fact Revenue Ruling 296 of December 21, 1953, as amended, accords even greater tax exemptions.

Article 35 exempts diplomatic agents from all personal and public services (like jury duty), and military obligations. The customs privileges set forth in article 36 accord with present usage and provide for free entry of articles for the official use of the mission and the personal use of a diplomatic agent or his family. It also provides exemption from baggage inspection but not when there are serious grounds for presuming that the baggage contains articles not intended for personal or family use of the diplomatic agent or that the import or export laws and regulations of the receiving state were being violated. This proviso is new and is a lesser immunity than the total inviolability now given by the United States to diplomatic baggage.

(d) *Other persons entitled to privileges and immunities.*—Article 37, paragraph 1, provides that members of the family forming part of the household of a diplomatic agent, shall, if they are not nationals of the receiving state, enjoy the privileges and immunities specified in articles 29 to 36. Paragraph 2 states that the administrative and technical staff and their families, who are not nationals or permanent residents of the receiving state, shall enjoy the same personal privileges and immunities including complete immunity from criminal jurisdiction as diplomatic agents except that immunity from civil and administrative jurisdiction applies only to acts performed during the course of their duties and customs exemptions only for articles imported at the time of first arrival. Members of the service staff are even more restricted and will enjoy immunity, civil and criminal, from jurisdiction only with respect to official acts, exemption only from income taxes on their salaries, and exemption from local social security provisions. The families of the service staff enjoy no privileges and immunities at all. Finally, with respect to private servants (not nationals or residents of the receiving state) the article accords them exemption only from the income tax. It obliges the receiving state, however, to exercise its jurisdiction over private servants in such a

manner as not to interfere unduly with the performance of the functions of the mission.

All of these provisions are considerably more narrow than the immunities now granted by the United States. For instance, the U.S. wife or offspring of a foreign diplomatic agent presently enjoys the immunities of articles 29–36. Also under present practice, the members of the administrative and technical staff and of the service staff and private servants enjoy complete immunity from civil and criminal jurisdiction. Their privileges and immunities will now be much restricted. Only one group will receive immunities to which they are not now entitled, that is the members of the families of the administrative and technical staff which presently are accorded no immunities. Upon enactment of the complementing legislation, it will be possible for the President to extend more favorable treatment to the person to whom article 37 applies.

(e) *Nationals and residents of the receiving state.*—Article 38 provides that a diplomatic agent who is a national of, or permanently resident in, the receiving state shall enjoy immunity from jurisdiction and inviolability only with respect to official acts performed in the exercise of his functions. This is academic insofar as the United States is concerned since it has long been the practice of the United States neither to send nor to recognize as diplomatic officers persons who are nationals or residents of the receiving state. The second paragraph, providing that private servants and other staff members of the mission who are nationals or residents of the receiving state are to be entitled to enjoy privileges and immunities only to the extent admitted by the receiving state, accords generally with the present practice of the United States.

(f) *Duration of privileges and immunities.*—Article 39 provides that every person entitled to diplomatic privileges and immunities shall enjoy them from the moment he enters the territory of the receiving state or, if already in this territory, from the moment his appointment is notified to the appropriate ministry. These immunities normally cease when the individual leaves the country or has had a reasonable time to do so.

(g) *Duties of third states.*—Article 40 provides inviolability and such other immunities as are required for persons going to or coming from their posts through the territory of third states. It does not grant an absolute right of entry or transit; consequently the United States retains control over entry of such persons by means of the visa procedure. This means that the United States is not obliged to allow diplomatic personnel from countries it does not recognize to transit the United States. The same treatment is also to be accorded diplomatic couriers and official communications and correspondence.

### D. CONDUCT OF THE MISSIONS AND ITS MEMBERS TOWARD THE RECEIVING STATE (ARTS. 41 AND 42)

Article 41 states for the first time in a legal covenant the duty of all persons enjoying privileges and immunities to respect the laws and regulations of the receiving state. They also have a duty not to interfere in the internal affairs of that state. The committee attaches great importance to this article both from the standpoint of its personnel abroad and from the standpoint of diplomatic personnel in Washington, D.C. Illegal parking, speeding, and other violations by cars

8                VIENNA CONVENTION ON DIPLOMATIC RELATIONS

bearing diplomatic licenses are frequently the subject of newspaper reports. The committee was assured by Department of State witnesses that the provisions of this article will be helpful in securing better compliance with local laws by members of the diplomatic communities here and abroad.

This article also states the general rule that all official business of the mission is to be conducted with or through the ministry for foreign affairs or such other ministry as may be agreed. As a result of its study of the activities of nondiplomatic representatives of foreign governments, the Committee on Foreign Relations would like to see greater reliance on this principle.

Article 42 provides that "a diplomatic agent shall not in the receiving state practice for personal profit any professional or commercial activity." The Department of State at present makes exceptions to this principle, for those engaged in educational and cultural pursuits. It has been the practice of the Department to permit diplomatic agents to accept teaching or similar positions which contribute to the knowledge or culture of the United States particularly since the Department encourages its own Foreign Service personnel to engage in occasional educational or cultural activities abroad. However, the discussion at the Vienna Conference indicated that this article is not intended to prevent a diplomatic agent from pursuing literary or artistic activities or from teaching at educational institutions.

### E. END OF THE FUNCTIONS OF A DIPLOMATIC AGENT (ARTS. 43–46)

Article 43 provides that the functions of a diplomatic agent terminate on notification by the sending state that his function has come to an end, or on notification by the receiving state that it refuses to recognize him.

Article 44 speaks of the duty of a receiving state in the event of armed conflict. Article 45 covers situations where diplomatic relations are broken off between states and provides for the protection of the mission, and custody of the mission and protection of interests and nationals by third states, acceptable to the receiving state. Article 46 authorizes a sending state with the approval of the receiving state to undertake the temporary protection of third state interests.

### F. NONDISCRIMINATION (ART. 47)

Article 47 sets forth a general rule of nondiscrimination as between states in applying the provisions of the convention subject to two qualifications. Discrimination, however, shall not be deemed to be taking place (a) where the receiving state applies any of the provisions of the present convention in a restrictive manner because of like restrictions placed on its mission in the sending state, and (b) where by custom or agreement states extend to each other more favorable treatment than is required by the convention. The first exception will permit the United States to take restrictive action against any state which applies the convention restrictively to U.S. personnel, such as by establishing large zones prohibited to travel. The second exception will permit the United States to grant, subject to enactment of S. 2320, special treatment with respect to certain Federal taxes, and

Digitized by Google

immunity from civil and criminal jurisdiction of the United States on a reciprocal basis.

### G. FINAL ARTICLES (ARTS. 48–53)

These articles (48–53) contain formal provisions such as those regarding signature, ratification, accession, entry into force, and notification.   They are similar to others found in various international agreements to which the United States is a party.

### H. THE OPTIONAL PROTOCOL

The Vienna convention is accompanied by an optional protocol, signed by the United States, concerning the compulsory settlement of disputes.   It provides that disputes arising out of the interpretation or application of the convention may be brought before the International Court of Justice by any party to the dispute, which is also a party to the protocol, unless some other form of settlement—negotiation, conciliation, or arbitration—has been agreed upon within a reasonable period of time.   The so-called Connally reservation, therefore, would not apply in cases in which the United States might become involved relating to application and interpretation of the Vienna Convention.   The protocol has the effect of eliminating application of the Connally amendment to a narrow group of cases which might arise only out of disputes as to the meaning or application of this particular convention.   Similar provisions have been included in at least 31 treaties and 10 other international agreements to which the United States has become a party in recent years.   Eighteen nations are parties to the optional protocol to date.

## IV. COMMITTEE ACTION

The Vienna convention was signed by the United States on April 18, 1961.   It was transmitted to the Senate on May 14, 1963.   On May 28, 1965, it was referred to a subcommittee composed of Senators Church, chairman, Clark, and Carlson.   A public hearing was held on July 6, at which members of the full committee were invited to be present.   The Legal Adviser of the Department of State, the Honorable Leonard C. Meeker, made the executive branch presentation and answered questions.   Further questions were answered in writing. No one else requested to be heard and the committee knows of no opposition to the convention.   The record of the hearing is printed for the use of the Senate but a corrected version of certain pages appears in the appendix.

The committee considered the convention in executive session on August 31, 1965, and decided by voice vote to order the convention reported favorably to the Senate.

The matters of particular interest to the committee are discussed in the section that follows.

## V. Matters of Particular Interest

### A. DEPARTURES FROM PRESENT INTERNATIONAL LAW AND PRACTICE

For the most part, the Vienna convention is a codification of principles hitherto observed by governments in their diplomatic relations. For instance, the categories of chiefs of mission and the manner of determining precedence go back to the Congerss of Vienna in 1815. Others, such as the inviolability of premises, archives, communications, and the immunity of diplomatic officers go far back into history.

In other areas where practice has not been uniform or established, the convention establishes new rules and these were given particular attention by  he committee. The effect of these new rules has been to limit in some places the scope of diplomatic privileges and immunities. For instance, as noted in the discussion of article 31, the exemptions from criminal and civil jurisdiction of diplomatic agents are somewhat narrower, and for administrative and technical staff and service staff (art. 37) they are even narrower yet. These more limited privileges concern tax and customs matters and immunity from local jurisdiction.

Of a broadening nature only are the provisions granting certain privileges and immunities to families of persons forming the administrative and technical staff of a foreign mission.

### B. TO WHOM THE CONVENTION APPLIES

Since there are a great many more foreign official representatives in the United States than those attached to permanent diplomatic missions accredited to the Government of the United States, the committee received assurances that the Vienna convention applied only to the latter group. Members of trade missions and other negotiating groups, representatives to international organizations headquartered in the United States, visiting foreign heads of state or government or other high officials, special envoys, etc. (except insofar as provided for in complementing legislation), are not within the scope of this convention. It is strictly limited to the permanent diplomatic missions maintained by foreign governments at the seat of other foreign governments. The convention does not apply to consular officials. Their privileges and immunities for the most part are governed by bilateral consular conventions between the United States and other countries and are more restricted. To the extent that these conventions contain most-favored-nation clauses these clauses do not apply to the Vienna Convention. The United States has signed a Vienna Convention on Consular Relations for which the advice and consent to ratification by the Senate may be sought in the future.

It should be noted, however, that article 15 of the United Nations Headquarters Agreement provides that designated persons forming part of a resident mission to the United Nations (not members of the U.N. Secretariat) shall be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as the United States accords to diplomatic envoys accredited to it. And article 104 of the Charter of the Organization of American States provides that representatives of the Governments on the Council of the Organization, the representatives

on the organs of the Council, the personnel of their delegations, as well as the Secretary General and the Assistant Secretary General of the Organization shall enjoy the privileges and immunities necessary for the independent performance of their duties.   To the extent that the Vienna convention has narrowed or changed the customary privileges and immunities accorded by the United States to diplomatic missions in the District of Columbia, these will be applied to the persons covered by article 15 of the United Nations Headquarters Agreement and, by reference, to missions to the OAS as well. Altogether, the number of persons enjoying diplomatic status in Washington, D.C., and New York City is about 3,000.

### C. EFFECT ON FEDERAL-STATE RELATIONSHIPS

Since the convention is self-executing and becomes the supreme law of the land, the committee questioned the treaty's effect on Federal-State relationships.   In only one small area does the treaty affect the powers of the several States of the Union and that is with respect to exemption from taxation of real property no matter where located, as long as it is used for diplomatic purposes.   This means that if chanceries or embassies should be established in Virginia or Maryland those States could not collect real property taxes on exempt premises.   In actuality, neither State is presently collecting any such taxes.   Except to this extent, the committee was assured that the powers of the Federal Government vis-a-vis the States are not being enlarged in any degree by this treaty.

### D. EFFECT ON DOMESTIC LAWS

According to a memorandum from the Department of State, the Vienna Convention on Diplomatic Relations would in and of itself, and without implementing legislation, supersede any Federal, State, or local legislation which does not accord the privileges, immunities, and exemptions required by the convention.   The convention will not automatically supersede Federal, State, and local leglislation which accords greater privileges and immunities than is required by the convention.   At the present time, mission members are considered exempt, in accordance with international practice or on the basis of courtesy and comity, from the requirements of certain legislation which contains no reference to or exemption for foeign diplomatic personnel.

Specific areas in which Federal, State, and local legislation may be affected by the convention with respect to countries parties thereto are:

(1) Diplomatic agents and members of the administrative and technical staff and their families, provided they are not nationals or permanent residents of the United States, will be exempt from direct taxes as provided in articles 36 and 37 and from estate taxes as provided in article 39.

(2) Pursuant to article 33, private servants of diplomatic agents, provided they (*a*) are not nationals or permanent residents of the United States and (*b*) are covered by the social security provisions in force in the sending state or a third state, will be exempt from coverage under the present old-age, survivors, and disability program.

Digitized by Google

(3) Mission members and their families will henceforth not be exempted from Federal and State taxes on income received from private sources within the United States, and will not be exempted from paying the employer's share of social security taxes due with respect to household employees who are covered by such legislation.

(4) The provision in article 23 that the sending state and the head of the mission will be exempt from all dues and taxes, except those in payment for specific services rendered, with respect to the premises of the mission (defined in art. 1(i) as the chancery and the residence of the head of mission) will assure that states grant exemption from their real property taxes even though their laws do not specifically provide for such an exemption.

What the Department of State terms "complementing" legislation has been submitted and is pending before the committee. A report on this legislation (S. 2320) will be submitted to the Senate after full committee consideration. In brief, the bill would (1) provide discretionary statutory authority for according the privileges and immunities specified in the Vienna convention to diplomatic missions and the personnel thereof of states not parties to the Vienna convention; (2) authorize according more favorable treatment to foreign diplomatic missions in the United States and their personnel, depending, inter alia on reciprocal treatment of U.S. diplomatic missions and their personnel in the territory of the sending states concerned; (3) clarify the status in the United States of foreign heads of state and of government and special envoys, and specify the privileges and immunities to which they and members of their official parties shall be entitled during their sojourn; and (4) repeal of Revised Statutes sections 4063–4066 (22 U.S.C. 252–254), relative to definitions of diplomatic personnel and their privileges and immunities, which are inconsistent with the Vienna convention. These sections, touched in somewhat archaic language, now allow the granting of greater privileges and immunities than contained in the Vienna convention.

The Department of State intends to recommend to the President that ratification be withheld until the complementing legislation is enacted.

### E. ENFORCEMENT AND SAFEGUARDS

The committee was mindful of recurrent violations of the standard of conduct laid down in the Vienna convention such as damage done to American diplomatic premises abroad, unjustified expulsion of American diplomatic personnel, and occasional disregard for domestic laws by foreign diplomatic personnel in the United States. Significant disputes arising from the treaty can, of course, be dealt with by the optional protocol which provides for the reference of disputes on the application and interpretation of the convention to the World Court, if they cannot be settled through negotiations, conciliation, or arbitration. Short of that there are other remedies such as declaring an individual who violates the provisions of the convention a persona non grata, discussing the conduct of mission personnel with a chief of mission, and by engaging in action which is permissible under the terms of the nondiscrimination clause of article 47 which reserves to a state the right to take certain action if it is not securing the kind of treatment to which it is entitled to in another state. Through the

visa process, moreover, the United States retains control over who may be admitted to the United States as a member of a mission.

The presence of article 41 in the convention should be useful, stressing as it does the duty to respect the laws and regulations of the receiving state. Members of American diplomatic missions abroad are instructed to follow these meticulously and the committee attaches great importance to this. By the same token, it attaches great importance to like conduct by foreign diplomatic personnel stationed in the United States.

## VI. Recommendations and Conclusions

In considering the Vienna convention, its reciprocal nature must constantly be borne in mind. Each party to the treaty both sends and receives diplomatic personnel. This report has stressed the obligations which the United States will assume toward the local diplomatic community. Of greater real importance, of course, are the reciprocal privileges and immunities which U.S. diplomatic personnel will obtain abroad, since the U.S. missions abroad are almost invariably larger than the corresponding ones in Washington, D.C. The convention therefore must be regarded from the standpoint of how the United States wants its personnel abroad treated as well as the treament the United States is willing to accord foreign personnel in its territory. From both points of view, the committee believes that provisions of the convention are equitable, reasonable, and practical.

There are other positive benefits from becoming a party to the Vienna convention. It specifies exactly what privileges and immunities shall be provided for the members of diplomatic missions and their families. With increasing number of countries and the increasing size of mission staffs the practice of governments in this respect was beginning to vary. The convention resolves, in an orderly fashion, many questions regarding immunity from jurisdiction, customs privileges, and tax exemptions.

As already noted, the convention is largely a restatement of international law. Where it changes international law or makes new law, on balance these changes have been of a restrictive rather than broadening nature.

Prospects for universal application of the convention are good. Sixty-three nations signed it at Vienna and New York; 40 of these have already deposited their instruments of ratification or accession. The convention entered force on April 24, 1964.

The safeguards, to which the committee paid particular attention, are considered adequate. They are certainly no less than those available now, and in some ways they are greater.

The committee concurs in the opinion of the Department of State that "the convention constitutes an important contribution to the progressive development of international law, and should contribute to the development of friendly relations between states."

It urges the Senate to give its advice and consent to ratification of the Vienna Convention on Diplomatic Relations and the accompanying optional protocol at an early date.

Digitized by Google

Digitized by Google

# APPENDIX

## EXCERPT FROM HEARING

### BEFORE THE

## SUBCOMMITTEE OF THE
## COMMITTEE ON FOREIGN RELATIONS
## UNITED STATES SENATE

### EIGHTY-NINTH CONGRESS
### FIRST SESSION

#### ON

## EXECUTIVE H, 88TH CONGRESS, 1ST SESSION

THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS, TOGETHER
WITH THE OPTIONAL PROTOCOL CONCERNING THE COMPULSORY
SETTLEMENT OF DISPUTES, SIGNED AT VIENNA UNDER DATE OF
APRIL 18, 1961

---

JULY 6, 1965

---

Printed for the use of the Committee on Foreign Relations

[EDITORIAL NOTE: The pages which follow have been reprinted to eliminate a
stenographic error which confused the names of Senators Clark and Case
during the examination of witnesses.]

**15**

Digitized by Google

Digitized by Google

# VIENNA CONVENTION ON DIPLOMATIC RELATIONS

—————

**TUESDAY, JULY 6, 1965**

United States Senate,
Subcommittee of the
Committee on Foreign Relations,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 10:05 a.m., in room 4221, New Senate Office Building, Senator Frank Church presiding.

Present: Senators Church and Clark.

Also present: Senators Sparkman and Case.

Senator Church. The subcommittee will please come to order.

The subject for the hearing this morning is Executive H of the 88th Congress, 1st session, of the Vienna Convention on Diplomatic Relations, together with an optional protocol on the settlement of disputes under it.

(For text of Vienna convention see p. 40.)

Senator Church. This is the first time a comprehensive international convention on this subject has been before the Committee on Foreign Relations, and I hope that members other than the subcommittee members who are interested in this subject will be present today. I understand that several other Senators plan to attend the hearings this morning.

The principal witness from the Department of State is the Honorable Leonard C. Meeker, Legal Adviser of the Department of State.

Mr. Meeker, you are here, are you not? Please come up and be seated.

## STATEMENT OF LEONARD C. MEEKER, LEGAL ADVISER, DEPARTMENT OF STATE

Mr. Meeker. Thank you, Mr. Chairman.

\*       \*       \*       \*       \*       \*       \*

### NEED FOR EXPANDING WORLD LAW

I have only one other matter I want to mention to you which is not really relevant to this treaty. I heard a very interesting talk the other day before a group which calls itself Members of Congress for World Peace Through World Law, by Prof. Roger Fisher at Harvard University Law School, in which he suggested the possibility of making a perceptible extension of the field of international law by arranging through diplomatic channels to permit courts to take a wider jurisdiction of judicial controversy than is presently the case, such as matters which were now reserved. For example, if the limousine or the automobile of the American Ambassador to Paris runs over a

**17**

French citizen, it is my understanding that this becomes a diplomatic matter rather than a matter for the courts; is that correct?

Mr. MEEKER. Well, it can be if immunity is not waived; yes.

Senator CLARK. I just mention this for your consideration and perhaps later I will come up and talk to you about it. Perhaps we could make a really rather significant contribution to the spread of international law if our State Department took a somewhat less conventional view toward the controversies which could be considered justiciable before the courts of foreign countries rather than insisting on handling them as a diplomatic matter. In this way we might even build up the jurisdiction of the World Court. I make those observations not for any particular comment from you but just to indicate the possibility at a later date we might talk about it.

Mr. MEEKER. I think it is a very interesting suggestion. One of the things we have been interested in is arranging for a very comprehensive, broad coverage plan of insurance for diplomats' cars, both the mission vehicles and the individually owned cars. We have discussed this with the Superintendent of Insurance here in Washington, and with representatives of some associations of insurance companies, and I think it will not be impossible or indeed difficult in the end to work out an entirely satisfactory plan.

We are at the moment trying to gather some further information from missions here in Washington on which to base our proposals.

Senator CLARK. As you know, in many States, the interest of an insurance company cannot be revealed to the jury. In this situation you are speaking of, would this result—in the event there was disagreement between the plaintiff and the insurance company as to the amount of recovery—in a case getting into court, or would it still have to be handled through diplomatic channels?

Mr. MEEKER. It could go to court and what we would expect would be to have the normal immunity waived for the purposes of the lawsuit.

Senator CLARK. In connection with the insurance there would be an automatic waiver?

Mr. MEEKER. Yes.

Senator CLARK. Professor Fisher's suggestion was a good deal broader than that and I just give you an example which may or may not have any merit. He said for years and years the United States and United Kingdom have been arguing about the status of Christmas Island out in the Pacific. This seemed to him to be a typical kind of a situation that ought to go to the World Court for solution. It is handled in diplomatic channels and pretty far down the line in the line of priority and it would be an action of timidity to give in, in the interests of your own country.

I don't know whether you know that and wonder whether you would comment on it.

Mr. MEEKER. I would only comment that we did 4 years ago make a rather large survey of a number of disputed island territories, especially in the Pacific, to see whether there would be some real purpose to be served by litigating their proper title, ownership, and sovereignty.

We came to the conclusion that the effort would probably not be justified by the results. The amount of work that would have to be done by the other countries and by ourselves would be very large. The amounts of real estate are very small.

Digitized by Google

VIENNA CONVENTION ON DIPLOMATIC RELATIONS    **19**

Quite frequently, the basis of the U.S. claim is a lot less strong than we might like to see it. and our ultimate conclusion was that we would do better to leave the legal situation alone and to continue to make agreed arrangements from time to time with the other country asserting claims.   We have done this very successfully in a very large number of instances, and that approach has appeared to be satisfactory even though, perhaps, not as intellectually satisfying as to have the legal issues finally resolved.

Senator CLARK. Thank you, sir.   Thank you, Mr. Chairman.

O

Digitized by Google