**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

BROADY CAPITAL MANAGEMENT, LLC and
ELLIOTT BROIDY,

                            Plaintiffs,

            v.

NICHOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, STONINGTON
STRATEGIES, LLC,

                            Defendants.

Case No. 19-cv-00150-DLF


**PLAINTIFFS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION**


KASOWITZ BENSON TORRES LLP
Henry B. Brownstein
Daniel R. Benson
Andrew R. Kurland
Jacob Benson

*Counsel for Plaintiffs Broidy Capital*
*Management, LLC and Elliott Broidy*


Dated: January 26, 2022

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.      Defendants and Qatar Do Not and Cannot Show That *Doe*'s Requirements
Are Not Applicable Here ................................................................................... 3

II.      It is Defendants' and Qatar's Burden to Show AEO Designation Is Warranted
Document-by-Document, Not Plaintiffs' Burden to Show it is Not Warranted ................. 7

III.      The *In re 9/11* Case that Qatar Cites Extensively, In Which the Court Analyzed
Saudi Arabia's Claims of Protection on a Document-by-Document Basis, Supports
Plaintiffs' Position, and Confirms that the Protective Order's Unprecedented AEO
Provisions Must Be Removed ............................................................................. 10

IV.      Qatar Does Not and Cannot Show that the Protective Order Comports with *Doe* ........... 13

V.      Completely Lacking in Legal Support, Defendants and Qatar Resort to Irrelevant,
*Ad Hominem* Untruths That Are Easily Disproven ................................................ 16

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alexander v. F.B.I.*,
    186 F.R.D. 54 (D.D.C. 1998) ............................................................................6

*Broidy Cap. Mgmt. LLC v. Muzin*,
    12 F.4th 789 (D.C. Cir. 2021) ......................................................................1, 12

*D'Onofrio v. SFX Sports Grp., Inc.*,
    256 F.R.D. 277 (D.D.C. 2009) .........................................................................5

*Doe v. D.C.*,
    697 F.2d 1115 (D.C. Cir. 1983) ................................................................ *passim*

*ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*,
    2019 WL 8755131 (D.D.C. Nov. 25, 2019) ............................................. *passim*

*In re 9/11*,
    2019 WL 3296959 (S.D.N.Y. July 22, 2019) ....................................10, 11, 12, 14

*Keaveney v. SRA Int'l, Inc.*,
    2017 WL 1842544 (D.D.C. May 3, 2017) ..........................................3, 9, 15, 16

*Klayman v. Jud. Watch, Inc.*,
    247 F.R.D. 19 (D.D.C. 2007) .............................................................3, 9, 14

*Reino De Espana v. Am. Bureau of Shipping*,
    2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) ....................................................13

*United States v. Broidy*,
    Case No. 20-CR-210, ECF No. 13 (D.D.C. Oct. 23, 2020) ..................................18

*U.S. ex rel. Purcell v. MWI Corp.*,
    209 F.R.D. 21 (D.D.C. 2002) ..........................................................................5

Plaintiffs Broidy Capital Management, LLC and Elliott Broidy (together, "Broidy") respectfully submit this memorandum in reply to Defendants' memorandum (ECF No. 105) and Qatar's Statement of Interest (ECF No. 106) opposing Broidy's motion for reconsideration and revision of the Protective Order (ECF No. 102-1).[1]

## PRELIMINARY STATEMENT

Defendants and Qatar do not and cannot rebut Plaintiffs' showing that the Protective Order is contrary to controlling D.C. Circuit law, insofar as it permits any discovery materials to be designated as "Attorneys Eyes Only (AEO)" if the materials merely "relat[e] to the conduct by Qatar of its foreign policy." ECF No. 96 at 2.[2]  As Plaintiffs showed, this provision does not meet this Circuit's requirements that any provision in a protective order "must be narrowly drawn and precise," and that "the court must be confident that the potential injury is substantial and cannot be prevented through the use of any device less restrictive of a party's access to his lawyer." *Doe v. D.C.,* 697 F.2d 1115, 1119-1120 (D.C. Cir. 1983).  Nor, as also shown, does the D.C. Circuit's opinion in this case, *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021), justify the Protective Order's blanket, *a priori* AEO provisions.  It could not possibly

---

[1] Capitalized terms otherwise undefined shall have the meanings assigned in Plaintiffs' memorandum of law in support of the present motion, ECF No. 102-1.

[2] The Protective Order's AEO provisions thus are impermissibly broad, and on their face, permit the designation of materials that could not conceivably qualify for any kind of protection under D.C. Circuit law.  For example, the Protective Order would permit AEO designation on text messages between and among Defendants and journalists or on non-public drafts of articles, if they discuss Qatar's foreign policy, even though those documents would not be protected by any conceivable privilege or immunity that may or may not attach to Qatar's *own* diplomatic and consular documents.  Defendants and Qatar correctly point out that Plaintiffs erroneously suggested that the Protective Order, like the California Protective Order on which it was based, would permit public materials such as a news article to be designated as AEO (ECF No. 102-1 at 3), but that does not change the fact that the AEO provisions in the Protective Order are impermissibly broad.

"protect Qatar[]…from trial and the attendant burdens of litigation," *id.* at 804, to keep otherwise discoverable material, produced entirely by non-sovereign parties other than Qatar, out of the hands of just one person out of the dozens of people involved in this action.  Nor could it be in the interest of judicial efficiency to invite the inevitable challenges to individual AEO designations to which the Protective Order's overly broad provisions will inevitably lead.

Because they do not and cannot refute this unassailable showing, Defendants and Qatar resort to outright misstatements of the law and demonstrably false *ad hominem* attacks on Plaintiffs to try to justify obtaining for Defendants and Qatar an unprecedentedly privileged position from which to litigate this action.   For example, they contend that *Doe* is "dated" and otherwise inapplicable – contentions that are contrary to and belied by recent decisions in this Circuit they ignore.  They assert that Mr. Broidy has revealed documents in the past, but even assuming *arguendo* that that were a basis for AEO provisions, the assertion is false and contradicted by the record.

In short, Defendants and Qatar offer no justification for the privileged position they seek under the Protective Order's AEO provisions – provisions that are contrary to controlling law, and that, given that Plaintiffs will have to challenge the designations individually, would ultimately lead only to greater expense for and burden on Plaintiffs (no doubt, their goal) and an entirely unnecessary burden on the Court.

## ARGUMENT

## I.    Defendants and Qatar Do Not and Cannot Show That *Doe*'s Requirements Are Not Applicable Here[3]

Defendants assert that the D.C. Circuit's controlling decision in *Doe* is "dated" and that *Doe* "does not support Broidy's extraordinary request because the facts are inapposite."  ECF No. 105 at 3, 8-9.[4]  Both assertions, as recent decisions in this District make clear, are flatly wrong.  Plaintiffs cited three recent cases from this District in which the courts denied requests for AEO treatment, and in so doing, cited, discussed, and quoted extensively from *Doe*.  *See* ECF No. 102-1 at 2, 6, 11, 12 and 14 (citing *ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.,* 2019 WL 8755131 (D.D.C. Nov. 25, 2019), *Keaveney v. SRA Int'l, Inc.,* 2017 WL 1842544 (D.D.C. May 3, 2017), and *Klayman v. Jud. Watch, Inc.*, 247 F.R.D. 19 (D.D.C. 2007)).  Other than Defendants' sole reference (ECF No. 105 at 10) to the fact that Plaintiffs cited *ICC* (without any discussion of their own of that case), both Defendants' opposition (ECF No. 105) and Qatar's statement (ECF No. 106) are devoid of any reference to *ICC*, *Kleaveney*,

---

[3] Qatar claims, with no support, that Broidy "manifestly fails to meet" the standard for a motion for reconsideration, ECF No. 106 at 2, but there is no question that Plaintiffs' have met the standard.  As Plaintiffs showed, the Protective Order's AEO provisions "directly contravene[] controlling precedent,"  ECF No. 102-1 at 1-2, and "[r]elief on reconsideration is warranted where a court has failed to follow controlling precedent or has otherwise made an error of law." *Id.* at 9-10 (quoting *Univ. of Colorado Health at Mem'l Hosp. v. Burwell,* 164 F. Supp. 3d 56, 62 (D.D.C. 2016), for the propositions that "on reconsideration, a court considers whether it 'made an error in failing to consider controlling decisions'" and that "'a court will grant a motion for reconsideration…when the movant demonstrates…a clear error in the first order.'").

[4] Defendants also misrepresent the holding in *Doe* by implying that the AEO designation regime there applied to all discovery, whereas the Protective Order contains what they claim is a narrow designation regime.  *See* ECF No. 105 at 9.  They leave out the portions of *Doe* that noted that there only "information of specified sorts" was included in the AEO category. *Doe*, 697 F.2d at 1119.  Indeed, the Court of Appeals in *Doe* found that the protective order there met the requirement that it be "limited to designated areas of inquiry" (and the requirement that a risk of "substantial and serious harm" be shown), yet the Court of Appeals still found the district court abused its discretion because it did not employ the least restrictive means possible.  *Id.* (internal quotation marks omitted).

and *Klayman*.  Not only do those cases wholly debunk Defendants' assertion that *Doe* is "dated," ECF No. 105 at 3, but Defendants and Qatar utterly fail to even attempt to distinguish them.

Because Defendants' position cannot withstand scrutiny under D.C. Circuit law, Defendants ignore *Doe* and its progeny, and rely primarily on the California Protective Order. See ECF No. 105 at 1 (stating as the first sentence of Defendants' memorandum that "[i]n entering the Protective Order in this case, this Court simply continued the same reasonable document-protection protocols that the Central District of California established nearly four years ago").  But the existence of the California Protective Order does not come close to meeting the *Doe* requirements in this Circuit, given the undisputed facts that the California magistrate never made the findings required by *Doe* and issued the protective order at the close of a case, to cover limited past discovery[5] (not to mention without opinion in a Court not bound by *Doe*).

By contrast, the Protective Order here is to govern prospectively a case in which Plaintiffs are proceeding on a half-dozen claims upheld by this Court and the Court of Appeals. The California Protective Order, therefore, did not implicate the key interests present here – which the Court of Appeals in this Circuit directs "*must* be accorded considerable weight" – namely, Broidy's "powerful interest in being able to retain and consult freely with an attorney" and "the public['s]…similarly important interest in preserving the ability of each disputant to confer with his lawyer[,]… reinforced by the value we place on the right of every litigant to

---

[5] Defendants contend that Broidy mischaracterizes the California Protective Order as a "*post hoc* clean-up order" (a phrase Broidy never used).  *See* ECF No. 105.  What Broidy said was that the California Protective order was "entered at the very end of the California Litigation…after the claims against the defendants had been dismissed and discovery was over."  ECF No. 102-1 at 5. And Defendants have said the same exact thing: "all defendants had been dismissed, by the time the Court entered the California Protective Order," and therefore "the parties were most concerned about designating materials that had already been produced as more productions were unlikely."  ECF No. 90-1 at 15 n. 10.  Thus, all parties agree that the California Protective Order was entered to govern past discovery over a closed case.

participate in the process whereby justice is done[.]" *Doe*, 697 F.2d at 1119-1120 (emphasis added).

Defendants claim that Broidy "fails to explain" how being unable to see any discovery materials that relate to the conduct by Qatar of its foreign policy "might undermine his ability to participate meaningfully in this litigation—the underlying rationale motivating the court in *Doe.*" ECF No. 105 at 10.   In making this claim, Defendants (like Qatar) ignore that "Plaintiff does not need to show that Plaintiff is 'prejudiced.' Rather, *Defendants* must meet the high burden of showing that it is absolutely necessary for Plaintiff['s] [attorneys] to be unable to share the [material] with their client." *ICC Evaluation Serv.,* 2019 WL 8755131 at *10 (emphasis in original) (citation omitted).   But more to the point, "the injury to [Broidy] in the instant case [is] palpable." *Doe*, 697 F.2d at 1121.   Under the Protective Order, Broidy will be "prevented, not only from conferring with [his] lawyers regarding how best to respond to" Defendants' arguments and defenses, "but even from checking their files for information relevant" to the case. *Id.*   "Such restrictions [will] certainly impair[] [his] ability to prepare [his] case." *Id.* Indeed, "the right to a hearing would be meaningless were the litigant forbidden to obtain the assistance of a lawyer in determining the nature of the claims against him, the opposing arguments available to him, and the manner in which his case would be most effectively presented." *Id.* at 1119.[6]

---

[6] The cases Plaintiffs cite on this point, ECF No. 105 at 10-11, dealt with circumstances – competitively sensitive materials or medical records – completely unlike those here and none suggests that the burden is on the party resisting AEO to show harm.   In *D'Onofrio v. SFX Sports Grp., Inc.*, 256 F.R.D. 277, 280 (D.D.C. 2009), where the protective order did not prevent plaintiff from reviewing produced discovery materials, the court noted that plaintiff "likely will be" "in a position to compete [commercially] with defendants," and prevented the plaintiff from reviewing defendants' attorney's notes, which supported defendants' claims of legal privilege to withhold documents, and which the defendants offered to make available to plaintiff's attorney. In the qui tam action *U.S. ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21, 28 (D.D.C. 2002), the

Despite now having had five chances,[7] Defendants and Qatar have failed to cite a single

case in which a court has issued a protective order, at the outset of discovery and to govern an

active case, which allowed AEO designations over discovery material, simply because that

material relates to a sovereign's foreign policy.[8]  Qatar is neither a party to this case, nor a

subpoena recipient; nor have Defendants or Qatar identified a single subpoena recipient that

performs ministerial cyberspace storage tasks for Qatar's embassy or consulate, or that may be in

possession of Qatar's lost or stolen diplomatic or consular documents.[9]  Unless and until they do

and Qatar makes a sufficient showing to the Court respecting specific documents in the

possession of specific recipients of a discovery request, there is simply no reason to allow

Defendants, Qatar, or anyone else, to prevent Broidy from being able to see broad swaths of

discoverable information – in the possession of the Defendants (all U.S. Citizens) and other

---

AEO order merely restricted the relator, who was a commercial competitor with defendant, "from having access to certain proprietary information," while the government retained "full access to and use of the information for…prosecuting th[e] case."  And in *Alexander v. F.B.I.*, 186 F.R.D. 54, 60 (D.D.C. 1998), the judge granted a request for AEO over materials produced in response to *a single discovery request*, which sought plaintiffs' medical records.

[7] (1) Defendants' "emergency" motion, ECF No. 90; (2) Defendants' reply to Plaintiffs' opposition to their "emergency" motion, ECF No. 93; (3) Qatar's statement of interest respecting Defendants' "emergency" motion, ECF No. 94; (4) Defendants' opposition to the present motion, ECF No. 105; and (5) Qatar's statement of interest respecting the present motion, ECF No. 106.

[8] That is unsurprising given that such materials are not only not entitled to confidentiality protection, but are subject to disclosure requirements.  As shown in Plaintiffs' pending motion to compel, ECF No. 109-1, the clear intent of the same Congress that ratified the Vienna Convention on Diplomatic Relations was that the 1966 amendment of Foreign Agents Registration Act (FARA) was designed to require "complete public disclosure" by "nondiplomatic [American] agents" of their work "*concerning a country's foreign relations.*" *See* ECF No. 109-1 at 15.

[9] As shown in Plaintiffs' motion to compel, ECF No. 109-1, all decisions and sources – including a clear decision by the Southern District of New York regarding a subpoena on Allaham in connection with the California Litigation – confirm that documents shared with third-party consultants, advisors, or lobbyists are not protected from discovery by the Vienna Conventions or anything else.

third-party subpoena recipients – premised on the sovereign immunity that both this Court and the Court of Appeals have held Defendants do *not* have.[10]  And it does not conform with *Doe* to allow Defendants, Qatar, or anyone else, to prevent Broidy from seeing and conferring with his lawyers about discovery materials, simply because they "relat[e]" to Qatar's foreign policy.

## II.    It is Defendants' and Qatar's Burden to Show AEO Designation Is Warranted Document-by-Document, Not Plaintiffs' Burden to Show it is Not Warranted

Qatar agrees that determinations about the necessity of AEO must be made on a document-by-document basis.  *See* ECF No. 106 at 8 ("As the cases involving discovery disputes concerning foreign privileges and immunities make clear, this analysis should be conducted in a concrete, document-by-document fashion.").  But Qatar (and Defendants) want to reverse the governing procedure, by which parties seeking to apply an AEO designation must make a specific showing that (among other things) it is "absolutely necessary" and the least restrictive means possible for achieving the stated goals.  *ICC,* 2019 WL 8755131 at *10; *see also Doe*, 697 F.2d at 1119-1121.  Instead, Defendants and Qatar ask this Court to make AEO the default position for any materials "relat[ed]" to Qatar's foreign policy and require Plaintiffs to challenge that default on a document-by-document basis.  *See* ECF No. 105 at 15 ("Broidy will then have

---

[10] Defendants note that they have not designated any material yet as AEO, and Broidy made one designation.  *See* ECF 105 at 9 n. 7 and 13.  But discovery has just begun, and Defendants and the majority of third-party subpoena recipients have yet to produce anything all.  Moreover, as Defendants' openly admit, they are (improperly) withholding documents on the same bases they assert warrant AEO protection – now the subject of Plaintiffs' motion to compel.  *See* ECF No. 109.  Of course, if Defendants can withhold discoverable information altogether, then they will not need to use AEO improperly to prevent Plaintiffs from reviewing relevant discovery materials.  Finally, Defendants' feigned indignation at Broidy's sole AEO designation to date – which was made over two sentences that deal with trade secrets, a category all parties agree is entitled to AEO protection – is absurd.  After Defendants' attorneys' pointed out that the level of generality at which the trade secrets were described did not merit AEO protection, Broidy's attorneys agreed, and promptly removed the designation.  Far from indicating that Broidy will abuse AEO, it indicates his good faith engagement in the meet-and-confer process.

ample opportunity to challenge any claims of privilege he believes are improper."). This is flatly contrary to the law.

Defendants and Qatar claim that it is "premature" to make a determination about "Qatar's privileges and immunities" and how they may or may not implicate discovery in this case. *See*, *e.g.*, ECF No. 105 at 13 ("Broidy suggests that Qatar's privileges and immunities are irrelevant to documents and information in the hands of third-party agents of Qatar. Such a claim at this stage is, of course, premature and properly addressed only after an assertion of diplomatic or other privilege is actually made and challenged." (citation omitted)); *see also* ECF No. 106 at 8.

But of course, Defendants and Qatar were the ones that asked this Court to make a substantive determination about Qatar's privileges and immunities – namely, that they justify blanket, *a priori* AEO treatment of all discovery materials from any and all Defendants and third parties that simply "relat[e]" to Qatar's foreign policy. *See, e.g.,* ECF No. 94 ("Qatar respectfully submits that the protective order proposed by Defendants is an appropriate and pragmatic tool to help safeguard Qatar's sovereign privileges and immunities as discovery moves forward in this case."). So their rhetoric about deferring decision is pure posture; in reality, Defendants and Qatar are simply asking the Court to make a *different* (and incorrect) ruling on the extent of Qatar's privileges and immunities from the correct ruling Plaintiffs seek.

Indeed, Qatar concedes that "it would be premature for the Court to consider Qatar's privileges and immunities on this record, in the abstract and without regard to particular categories of documents and information as to which Qatar is asserting a privilege." ECF No. 106 at 8. It is for this very reason (among others), that Plaintiffs' motion should be granted and the Protective Order amended. The *Klayman* decision, cited by Plaintiffs (ECF No. 102-1 at 12) and ignored by Defendants and Qatar, is on point:

Defendants seek a blanket order, which the Court declines to enter. Defendants' current filings provide the Court no basis for determining whether particular documents or categories of discovery information in fact …merit the entry of an attorneys' eyes only order. The Court is mindful of the D.C. Circuit's warning that "[d]istrict courts must be [ ] chary of issuing protective orders that restrict the ability of counsel and client to consult with one another during trial or during the preparation therefor." *Doe v. District of Columbia,* 697 F.2d 1115, 1119 (D.C.Cir.1983 ). Based on Defendants' current filings, the Court cannot undertake the "individualized balancing of the many interests that may be present in a particular case," which it is required to perform when considering the entry of a protective order. *Diamond Ventures,* 452 F.3d at 898. The Court shall therefore deny Defendants' motion for a protective order insofar as it seeks an attorneys' eyes only restriction. In the event that either party believes that certain discovery information is entitled to such protection (and that such protection is necessary despite the Court's Order limiting the use and dissemination of discovery information), that party shall consult with opposing counsel in an effort to resolve the dispute. If the parties are unable to do so, *the party seeking the protective order may make a specific application* to Magistrate Judge Kay, *precisely identifying the information it seeks to protect* as well as the legal basis for the protection sought.

*Klayman.*, 247 F.R.D. at 24-25 (D.D.C. 2007) (emphasis added); *see also Keaveney*, 2017 WL 1842544, at *5 (holding that "Defendants [] stumble over Doe's second criteria—that the AEO provision be 'narrowly drawn and precise'" because the provision "leaves too much to the discretion of the party making the designation.  Indeed, it risks turning a provision that ought to be a shield to protect certain types of especially sensitive commercial information into a sword whereby one party, through over-designation, can infringe on the other party's ability to consult with their counsel about matters disclosed in discovery." (quoting *Doe*, 697 F.2d at 1120)); *compare ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*, 2019 WL 8755131, at *10 (D.D.C. Nov. 25, 2019) (holding that while Defendants failed to meet two of *Doe'*s requirements and thereby failed to justify use of AEO, Defendants did satisfy the second requirement "because the designation is narrowly tailored to encompass only select transcripts").

**III.    The *In re 9/11* Case that Qatar Cites Extensively, In Which the Court Analyzed Saudi Arabia's Claims of Protection on a Document-by-Document Basis, Supports Plaintiffs' Position, and Confirms that the Protective Order's Unprecedented AEO Provisions Must Be Removed**

The cases that Qatar and Defendants cite from other Circuits support Plaintiffs' position (or at most do nothing to support Defendants' and Qatar's position).  For example, Qatar repeatedly cites *In re 9/11*, 2019 WL 3296959 (S.D.N.Y. July 22, 2019), including as purported support for their attempt to meet *Doe's* first requirement that a party seeking AEO protection must establish "substantial and serious harm."  *See* ECF No. 106 at 4-5 (citing and quoting *In re 9/11*, 2019 WL 3296959 at *5, for "protecting foreign government 'documents that contain traditionally nonpublic information'").  Qatar also cites this case for its (correct) proposition, quoted above, that "[a]s cases involving discovery disputes concerning foreign privileges and immunities make clear, this analysis should be conducted in a concrete, document-by-document fashion."  *Id.* at 8 (citing *In re 9/11,* 2019 WL 3296959, at *2, *4–6).  And Qatar cites the case for having respected the privileges and immunities afforded by the Vienna Conventions.  *Id.* at 9 (citing *In re 9/11,* 2019 WL 3296959, at *2, *4–6).

But while Qatar repeatedly cites *In re 9/11* for generalities, it studiously avoids reciting the facts in that opinion, which did not deal with AEO at all.  In that case, "Saudi Arabia produced documents from its Consulate in Los Angeles, California[], and its Embassy in Washington, D.C.," and moved to seal those documents from public access on the basis that "the 'inviolability' provisions of the [Vienna] Conventions constitute 'higher values' that justify sealing."  *In re 9/11*, 2019 WL 3296959, at *2.  The fourt noted that the "parties did not provide — and the Court was unable to locate — any caselaw that discusses whether either Convention can overcome the First Amendment presumption of public access" (the New York Times had filed a letter to the court opposing Saudi Arabia's request), but the court "conclude[d] that, where

applicable, both Conventions can justify sealing judicial documents under the First Amendment"
for "documents found in a consulate or an embassy." *Id.* at *2-3.  The court proceeded to
identify – by Bates and exhibit number – each specific document that was held to be "'archives
or documents' under Article 24 of the VCDR." *Id.* at *4. The court explained that "[m]ost of the
exhibits show, on their face, that they were received by a member of the Embassy or that they are
otherwise Embassy documents. In addition, *each of the exhibits was collected and produced
from either the Embassy's files*, *or the files of the Saudi Arabia Cultural Mission in Washington,
D.C., which is part of the Embassy*." *Id.* (emphasis added).  The court also proceeded to identify
– by Bates and exhibit number – each specific document that was held to be "'official
correspondence' under Article 27 of the VCDR," *id.*, all of which were "were collected and
produced from the Embassy." *Id.* n. 3.

After holding that specifically identifiable documents, which had been produced by Saudi
Arabia from its embassy and consulate, were entitled to be filed under seal due to the Vienna
Conventions, the court in *In re 9/11* evaluated Saudi Arabia's claims that twelve other
documents should be sealed due to "international comity" and the "deliberative process
privilege." *Id.*  The court explained that *"[b]ecause the exhibits do not involve either the
Embassy or the Consulate, their sealing cannot be justified with reference to the Vienna
Conventions.*" *Id.* (emphasis added).  The court analyzed each of the twelve documents and
concluded that eight of the twelve documents should be filed under seal, in part because "the
participants…are senior Saudi Arabia officials*, i.e., at least the head of a Saudi ministry." *Id.* at
*5.  The court explained that the "[t]he remaining four exhibits should be filed on the public
docket," in part because "[t]hey involve lower-level Saudi officials." *Id.* at *6.  The court
rejected Saudi Arabia's argument that those remaining four documents should be filed under seal

"because they are pre-decisional documents subject to the deliberative process privilege," *id.* (internal quotation marks omitted), explaining that "[t]his argument is meritless" and that Saudi Arabia provided no supporting case law. *Id.*

In sum, *In re 9/11* stands for the proposition that the Vienna Conventions provide a basis on which to seal (from the public's First Amendment right to access) materials produced by a sovereign directly from its embassy and consulate, not materials produced by American public relations flacks and lobbyists.  It also stands for the proposition that considerations of "international comity" *may* provide a limited basis on which to seal materials of senior officials of a sovereign (i.e., "at least the head[s] of [] ministr[ies]") produced by a sovereign.  The opinion says nothing about AEO, and plaintiffs in that case were allowed to see even those documents the court held enjoyed some protections under the Vienna Conventions.  Moreover, the opinion did not protect any document that had not been produced by Saudi Arabia itself.  And, as Qatar acknowledges, the case demonstrates that a court should evaluate the types of claims Defendants and Qatar make here, on a document-by-document basis – an evaluation that, as far as *In re 9/11* goes, may ultimately justify standard confidentiality restrictions that are not in dispute here as a general matter.

The court in *In re 9/11* was applying the sorts of "appropriate tools" that the D.C. Circuit referred to in its opinion in this case.  *Broidy*, 12 F.4th at 804.  The Protective Order as it stands is not an appropriate tool, and it violates *Doe*'s requirements.  Qatar's own *In re 9/11* case – in which the court evaluated documents actually produced directly by a sovereign, on a document-by-document basis, to see if there was justification merely for sealing them – provides a glaring contrast.

So does *Reino De Espana v. Am. Bureau of Shipping*, 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005), which Qatar cites in support of its comity and deliberative process arguments. *See* ECF No. 106 at 8, 14-15. In that case, the court rejected all of Spain's claims of privileges, explaining, with respect to some of the materials at issue, that "[t]he Court [] is persuaded that the production of the [] File is vital to Defendants' ability to mount a fair defense" and that "[g]iven that 'mutual knowledge of all relevant facts gathered by both parties is essential to proper litigation,' and that the [] File is relevant," Spain was ordered to produce. *Reino De Espana*, 2005 WL 1813017 at *7 (quoting *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)).

## IV.   <u>Qatar Does Not and Cannot Show that the Protective Order Comports with *Doe*</u>[11]

Without any law (even its own cases) supporting its position, Qatar cannot but fail in its effort to show that the Protective Order comports with *Doe.* Qatar argues that the Protective Order meets *Doe'*s requirement of the risk of "substantial and serious harm" in the absence of AEO, because "[d]issemination of such materials concerning Qatar's core sovereign functions will cause 'substantial and serious harm.'" ECF No. 106 at 4. Qatar's only citation for this proposition is *In re 9/11*, which it cites for "protecting foreign government 'documents that contain traditionally nonpublic information.'" *Id.* at 4-5. But as shown, that case simply granted Saudi Arabia's request to seal certain specifically identified documents that the sovereign itself had already produced; the case had nothing to do with AEO provisions, let alone with broad and ill-defined categories of documents produced entirely by non-sovereigns. The case therefore provides no support for Qatar's claim of "substantial and serious harm" warranting AEO protection. Nor does the nature of Qatar's claimed harm; this kind of claimed harm "merely

---

[11] Plaintiffs already demonstrated, *see supra* § 1, the failure of Defendants' limited engagement with *Doe*.

addresses whether there is a need for standard confidentiality restrictions" and "in no way rationalizes AEO."  ECF No. 102-1 at 14; *see also Klayman*, 247 F.R.D. at 23-25, *supra* at p. 9.

Furthermore, Qatar does not identify a single specific document that concerns its "core sovereign functions," ECF No. 106 at 4, nor does it provide any detail about what kind of harm any materials produced in this case will cause.  Its vague "speculation" does not meet *Doe*'s first requirement.  *ICC Evaluation Serv.*, 2019 WL 8755131, at *10 ("Defendants do not satisfy [*Doe*'s] first requirement [of showing 'substantial and serious' harm] because…the potential harm to Defendants is speculation" (citation and internal quotation marks omitted)).

Qatar argues that the Protective Order meets *Doe*'s second requirement that AEO provisions be "narrowly drawn and precise," because the category of materials "relating to the conduct by Qatar of its foreign policy" is "necessary in light of principles of international comity and the deliberative process privilege, both of which protect documents and information about Qatar's governmental functions."  ECF No. 106 at 5.  But as noted above, the *In re 9/11* case determined that Saudi Arabia's argument with respect to deliberative process was "meritless," when Saudi Arabia was seeking merely standard confidentiality protection.  *In re 9/11*, 2019 WL 3296959, at *2.  And pursuant to "international comity," the court in *In re 9/11* only permitted Saudi Arabia to seal eight, specifically identified documents, where "the participants…[were] senior Saudi Arabia officials*, i.e., at least the head of a Saudi ministry*."  *Id.* (emphasis added). That court explicitly rejected attempts to seal documents that "involve[d] lower-level Saudi officials" and required those to be filed publicly.  *Id.* at *6.  Given this context, no consideration of "international comity" or the "deliberative process" can possibly justify AEO treatment over *any* materials in the hands of any non-Qataris that produce documents in this case – let alone

over all materials that simply "relat[e]" to Qatar's foreign policy.  Qatar therefore utterly fails to show that the Protective Order is "narrowly drawn and precise" in line with *Doe*.

Qatar equally fails with respect to *Doe*'s third requirement that there be no less restrictive means of averting the purported harm.  Qatar states, in conclusory fashion and without any citation, that standard confidentiality restrictions are "insufficient given the sensitivity of the materials at issue."  ECF No. 106 at 6-7.  Yet Qatar – neither a party nor subpoena recipient – fails to identify a single document that may be produced by Defendants or any other third party, which is so sensitive that it deserves greater protection (AEO) than the protection (standard confidentiality) given to a limited subset of Saudi Arabia's own documents that qualified for protections under by the Vienna Conventions.  Qatar further claims, without citation, that "courts routinely incorporate AEO provisions into protective orders without evidentiary submissions," ECF No. 106 at 7, but ignores the fact that such provisions are "routinely incorporate[d]" by stipulation, not where, as here, there has been a complete failure to make any evidentiary showing justifying AEO designation.  Indeed, "[l]itigants in other cases seeking an AEO designation have made significant evidentiary showings…and yet still have not received the AEO provision of their choosing." *Keaveney,* 2017 WL 1842544 at *4.[12]

---

[12] Qatar irrelevantly claims, ECF No. 106 at 7, that Broidy has failed to offer evidence for the AEO provisions in his proposed Amended Protective Order.  Broidy previously explained that "[t]hough no need for AEO protections has been established," Plaintiffs would agree to a compromise that "would permit AEO designation of materials constituting competitively sensitive commercial information" and materials produced by a sovereign that are actually protected by the Vienna Conventions.  ECF 102-1 at 8.  Qatar bizarrely and illogically tries to use this offer of compromise as a reason that Qatar and Defendants should not have to offer evidence on the necessity for an AEO provision on which the parties *do not agree*.

**V.   Completely Lacking in Legal Support, Defendants and Qatar Resort to Irrelevant, _Ad Hominem_ Untruths That Are Easily Disproven**

Defendants and Qatar resort to a few false and unsupported _ad hominem_ attacks, none of which come close to justifying the Protective Order's overbroad AEO regime.  Perhaps most egregiously, in rehashing specious claims they have made previously, Defendants claim that "Broidy violated" the SDNY's provisional AEO order (that accompanied its order compelling Allaham, over Qatar's objections, to produce documents) "when he published AEO information produced by Allaham on the California docket."  ECF No. 105 at 5.

But Defendants know this is a lie.  In a declaration, under penalty of perjury, Broidy's former lawyers explained to the court in the California Litigation that the inadvertent filing of protected material was an error by the law firm, which was corrected in less than one hour.  _See_ California Litigation, ECF No. 149.  The other supposed "leak" of AEO-protected information was the reference to a single message in the publicly-available version of the initial Complaint in this litigation, which was corrected within 24 hours after Qatar's counsel alerted Plaintiffs' then-counsel about the error.[13]

Furthermore, Defendants again fail to provide evidence that Broidy was responsible for the purported leak relating to Muzin's total call volume with journalists and the head of a think tank (which in any event happened in the absence of a confidentiality order), ECF No. 105 at 5, and instead try to shift the burden to Broidy to prove a negative, _see id._ at n. 3, though it is _their_ burden to provide evidence that AEO is "absolutely necessary."  _ICC Evaluation Serv.,_ 2019 WL 8755131 at *10; _Keaveney,_ 2017 WL 1842544 at *4 ("Litigants in other cases seeking an AEO

---

[13] Given that the "message" in question was simply the full text of a news article—with no comments added—shared between non-Qataris, it was an understandable error for Plaintiffs' then-counsel to assume that a message containing solely the text of a publicly-available article would not be designated "AEO."

designation have made significant evidentiary showings…and yet still have not received the AEO provision of their choosing.").  Defendants also fail to provide any evidence of why Muzin's summary phone records data was supposedly embarrassing to Defendant Muzin, particularly given that FARA requires registered agents to disclose *all* such communications with entities in the realms of public opinion or public policy whom the agent is attempting to influence on behalf of a foreign state.[14]

In addition to the false and specious claims regarding past purported leaks, both Defendants and Qatar make a last-gasp effort at justifying AEO, by falsely claiming that Broidy "act[ed] as an unregistered agent of the United Arab Emirates."  ECF No. 105 at 15; *see also* ECF 106 at 7.  In making this claim, Defendants and Qatar blatantly mischaracterize, in two ways, the only piece of purported evidence they cite in support of that accusation.

The first mischaracterization is clear from the surface of Defendants' own memorandum: the DOJ never "indicated" that Broidy acted as an unregistered agent for the UAE or any other Middle Eastern country or that his work exposing Qatar's "support of terrorist activities" was done on anyone else's behalf[15]; the DOJ merely indicated it had information that Broidy sought to "obtain business from a Middle Eastern country."  *See* ECF No 105 at 10 (quoting the Plea Agreement at 3, *United States v. Broidy*, ECF No. 8 (D.D.C. Oct. 20, 2020) for the proposition that "the Government will present information relating to *your client's efforts [to] obtain*

---

[14] As discussed in Plaintiffs' motion to compel, ECF No. 109-1 at 18, FARA requires all registered agents to file semi-annual "Supplemental Statements," in which agents must disclose a wide array of detailed information about their activities, including a listing of *all* interactions intended to influence U.S. policy or public opinion on behalf of a foreign principal.

[15] As noted in the FAC, Broidy has for at least two decades been deeply involved in supporting non-profits focused on counterterrorism and enhancing U.S. national security, which is relevant context showing that his efforts exposing Qatar's "support of terrorist activities" were a continuation of his deeply-held beliefs. *See* ECF No. 18-2 at ¶¶ 1, 12, 45.

*business from a Middle Eastern country* and your client's efforts to influence U.S. policy

towards a second Middle Eastern country and its alleged support of terrorist activities."

(emphasis added)).  Defendants' second mischaracterization is that they cut off the end of the

sentence they quote from the plea agreement (which was in the form of a letter to Broidy's

counsel), which continued, after the words "terrorist activities," to note that "and your client has

the right to contest the matter."  *See* Plea Agreement at 3.  By removing these words, Defendants

(and Qatar[16]) implied that Broidy conceded the DOJ's "information" about his efforts to "obtain

business," whereas in fact, that "information" was not conceded, and regardless, does not in any

way suggest or indicate that Broidy somehow acted as an unregistered agent for a Middle

Eastern country.  As it happens, the lead prosecutor on Broidy's case is now the subject of an

ethics complaint that he "coerced" a businesswoman in that same case "into making a false

admission."[17]

  In sum, while Defendants openly say that they will continue to coordinate with Qatar, *see*

ECF No. 105 at 14-15 ("Defendants plan to allow Qatar to review its documents in Defendants'

possession"[18] before producing any discovery), they present no evidence whatsoever for their

false claims that Broidy acted as an unregistered agent of the UAE, let alone their equally

---

[16] Qatar made the same misleading presentation as Defendants, but using the judge's recital of
the plea agreement at the arraignment.  *See* ECF No. 106 at 7 (quoting *United States v. Broidy,*
Case No. 20-CR-210, ECF No. 13 (filed D.D.C. Oct. 23, 2020)); *see also United States v.
Broidy,* Case No. 20-CR-210, ECF No. 13 at 65:20-25 ("And the parties agree the Government
will present information relating to your efforts to obtain business from a Middle Eastern country
and your efforts to influence US policy towards a second Middle Eastern country and its alleged
support of terrorist activities. *And you have a right to contest that matter.*" (emphasis added).

[17] https://www.politico.com/news/2021/12/31/complaint-doj-foreign-agent-prosecutions-526278

[18] Defendants admit they are allowing Qatar to prescreen their discovery in spite of this Court's
holding that "Qatar may not receive or review ongoing discovery in this case…without moving
to intervene" (which Qatar has not done).  *See* Minute Order (Dec. 8, 2021).

baseless – and audaciously hypocritical claim – that "[i]n all likelihood, [the UAE] have funded parts or all of this litigation."[19]  ECF No. 105 at 15.  It is completely out in the open that Qatar is aiding Defendants' litigation at every opportunity.  For example, Qatar's submission on the present motion essentially doubled the length of Defendants' opposition, and unlike Defendants, Qatar did make an attempt (albeit a failed one) to discuss *Doe*'s requirements – suggesting Defendants and Qatar coordinated their submissions and divided the labor.

But even if all Defendants' and Qatar's lies were true, there is still no justification for the Protective Order's AEO provisions.  Qatar does not have sovereign immunity rights to block Broidy from seeing huge swaths of discoverable information that is in the possession of *non-Qatari* parties and non-parties.

* * * * *

At bottom, Defendants' and Qatar's claims reduce to the contention that Broidy shouldn't be able to see anything about Qatar because he and Qatar are in an adversarial position.  Of course, litigation is by definition adversarial, and the fact that parties are on opposite sides of litigation is most obviously no reason for permitting the use of AEO; if it were, it would be used in every case.  Defendants and Qatar have collectively failed to show that Qatar has any right to prevent Broidy from seeing *any* kind of discoverable document in the hands of American lobbyists, journalists, and other third-party subpoena recipients – let alone that Qatar has a right to prevent him from seeing such a broad category of all materials that simply "relat[e]" to Qatar's foreign policy.[20]

---

[19] These baseless accusations have no evidentiary support whatsoever, nor have Defendants' counsel suggested any basis that they could find such evidentiary support upon investigation.

[20] While this reply focuses on category (iii) of the Protective Order, Defendants have, for the reasons discussed herein, also failed to justify the impermissibly vague language of category (i),

Defendants and Qatar do not come close to carrying their burden of showing that the

Protective Order's AEO protections abide by controlling D.C. Circuit precedent.

## <u>CONCLUSION</u>

Plaintiffs' motion for reconsideration should be granted in its entirety.

---

which should be amended as Plaintiffs proposed.  *See* ECF No. 102-1 at 17.   This Court has now been asked to rule on the Vienna Conventions on Plaintiffs' motion to compel, ECF No. 109, and for the reasons stated in connection with this motion, the motion to compel, ECF No. 109-1, and in prior filings, *e.g.*, ECF No. 92 at 4 n. 5, 23-24, and the Denza Chapter, the Court should also amend category (ii) to make clear that only a sovereign can invoke AEO protections premised on the Vienna Convention, and only over the documents it produces itself.  *See* ECF No. 102-1 at 17.

Dated: January 26, 2022

KASOWITZ BENSON TORRES LLP

By: /s/ Henry B. Brownstein
    Henry B. Brownstein
    D.C. Bar No. 1026042
    1399 New York Avenue, Suite 201
    Washington, D.C. 20005
    Tel.: (202) 760-3400
    hbrownstein@kasowitz.com

    Daniel R. Benson (*pro hac vice*)
    Andrew R. Kurland (*pro hac vice*)
    Jacob Benson (*pro hac vice*)
    1633 Broadway
    Tel.: (212) 506-1700
    New York, New York 11019
    dbenson@kasowitz.com
    akurland@kasowitz.com
    jbenson@kasowitz.com

    *Counsel for Plaintiffs Broidy Capital*
    *Management, LLC and Elliott Broidy*