**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT, LLC and
ELLIOTT BROIDY

                        Plaintiffs,

     v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC

                       Defendants.

Civil Action No.  1:19-cv-00150-DLF

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AND STONINGTON DEFENDANTS' AND HOWARD'S MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL

# <u>TABLE OF CONTENTS</u>

**Page**

I.      BACKGROUND ...................................................................................................... 1

     A.      Broidy's Motion to Compel .................................................................. 1

     B.      Defendants' Motion to Compel ........................................................... 3

     C.      The Parties' Efforts to Resolve the Present Discovery Disputes ........... 5

II.      DEFENDANTS' OPPOSITION TO BROIDY'S MOTION TO COMPEL ......................... 6

     A.      Broidy Identifies No Violation of the Discovery Rules .......................... 9

     B.      Broidy Seeks an Improper Advisory Opinion. ................................... 10

     C.      Broidy's Interpretation of the Vienna Conventions and International
             Comity Principles Is Incorrect as a Matter of Law. ............................... 12

     D.      FARA Obligations Do Not Negate the Protection Afforded by the Vienna
             Conventions. ...................................................................................... 21

III.      DEFENDANTS' MOTION TO COMPEL ............................................................... 24

     A.      Broidy's Blanket, Boilerplate Objections are Defective as a Matter of
             Law. .................................................................................................. 25

     B.      Broidy Refuses to Provide Relevant Documents and Information
             Regarding The Illegal Activity Evidenced in his Leaked Emails. ......... 26

     C.      Broidy Refuses to Produce Relevant Documents Related to his Recent
             Criminal Conviction for Conspiring to Violate FARA. ....................... 33

     D.      Broidy Refuses to Provide Relevant Documents and Information Related
             to the Key Element of His Trade Secrets Claims. ................................ 34

     E.      Broidy Refuses to Provide Documents and Information Directly Related to
             His Alleged Damages. ......................................................................... 36

     F.      Broidy Refuses to Produce Documents Directly Related to Allegations in
             the FAC. ............................................................................................ 38

     G.      Broidy Refuses to Produce Any Documents From Before December 2017. ....... 42

IV.      CONCLUSION .................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3E Mobile, LLC v. Glob. Cellular, Inc.*,
  222 F. Supp. 3d 50 (D.D.C. 2016) ................................................................25

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United
  Nations*, 988 F.2d 295 (2d Cir. 1993) ................................................13, 14

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ........................................................................20

*Alderson v. U.S.*,
  718 F. Supp. 2d 1186 (C.D. Cal. 2010) .......................................................29

*Alexander v. F.B.I.*,
  194 F.R.D. 316 (D.D.C. 2000) .....................................................................24

*Att'y Gen. of U.S. v. Covington & Burling*,
  411 F. Supp. 371 (D.D.C. 1976) ............................................................21, 22

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) .....................................................................................30

*Broidy Cap. Mgmt. LLC v. Muzin*,
  12 F.4th 789 (D.C. Cir. 2021) ......................................................................13

*Broidy Cap. Mgmt., LLC v. Qatar*,
  982 F.3d 582 (9th Cir. 2020) .......................................................................12

*Broidy v. Glob. Risk Advisors LLC*,
  No. 1:19-CV-11861, 2021 WL 1225949 (S.D.N.Y. Mar. 31, 2021) ............32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 3:07-CV-05944, 2015 WL 12952688 (N.D. Cal. Jan. 16, 2015) ...........38

*Cherokee Nation v. U.S. Dep't of the Interior*,
  531 F. Supp. 3d 87 (D.D.C. 2021) ...............................................................25

*Cobell v. Norton*,
  213 F.R.D. 16 (D.D.C. 2003) .......................................................................31

*Cont'l Cirs. LLC v. Intel Corp.*,
  435 F. Supp. 3d 1014 (D. Ariz. 2020) .........................................................31

*Fong v. U.S.*,
   149 U.S. 698 (1893) ........................................................................................................23

*Goodman v. Genworth Fin. Wealth Mgmt.*,
   881 F. Supp. 2d 347 (E.D.N.Y. 2012) ............................................................................29

*In re Grand Jury Subpoena Dated Aug. 9, 2000*,
   218 F. Supp. 2d 544 (S.D.N.Y. 2002) ............................................................................19

*Han v. Fin. Supervisory Serv.*,
   No. 17-CV-4383, 2017 WL 7689223 (S.D.N.Y. Oct. 6, 2017) ......................................11

*Ings. v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ...........................................................................................19

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
   978 F.3d 653 (9th Cir. 2020) ..........................................................................................34

*Inova Health Care Servs. v. Omni Shoreham Corp.*,
   No. 20-CV-784, 2021 WL 6503725 (D.D.C. Jan. 29, 2021) ..........................................26

*Jewish War Veterans of U.S. of Am., Inc. v. Gates*,
   506 F. Supp. 2d 30 (D.D.C. 2007) ..................................................................................24

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004) .................................................................................12, 13

*Kolenich v. Highmark W. Va., Inc.*,
   No. 2:19-CV-38, 2020 WL 8993132 (N.D.W. Va. May 21, 2020) .................................12

*Murray v. Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804) ...........................................................................................23

*Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*,
   No. 07-CV-861, 2009 WL 10719757 (D.D.C. 2009) ................................................37, 38

*Nelson v. Millennium Lab'ys.*,
   No. 2:12-CV-01301, 2013 WL 11687684 (D. Ariz. May 17, 201) .................................33

*Oppenheimer Fund, Inc. v. Sanders*,
   437 U.S. 340 (1978) ........................................................................................................24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   No. 05-MDL-1720, 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) ................................19

*Pietrangelo v. Refresh Club, Inc.*,
   No. 18-CV-1943, 2021 WL 1209300 (D.D.C. Mar. 31, 2021) ................................ *passim*

*Pub. Serv. Elec. & Gas Co. v. FERC*,
   783 F.3d 1270 (D.C. Cir. 2015) ............................................................................................11

*Republic of Arg. v. NML Cap., Ltd.*,
   573 U.S. 134 (2014) ..............................................................................................................19

*Ronaldson v. Nat'l Ass'n of Home Builders*,
   No. 19-CV-01034, 2020 WL 3259226 (D.D.C. June 3, 2020) ...............................................26

*Sandra T.E. v. S. Berwyn Sch. Dist. 100*,
   600 F.3d 612 (7th Cir. 2010) .................................................................................................12

*U.S. ex rel Shamesh v. CA, Inc.*,
   314 F.R.D. 1 (D.D.C. 2016) ...................................................................................................24

*Slate v. Am. Broad. Cos.*,
   802 F. Supp. 2d 22 (D.D.C. 2011) ...........................................................................................9

*Smith v. Schlesinger*,
   513 F.2d 462 (D.C. Cir. 1975) ................................................................................................24

*Smith v. Scottsdale Ins. Co.*,
   40 F. Supp. 3d 704 (N.D. W. Va. 2014) ...................................................................................9

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
   482 U.S. 522 (1987)....................................................................................................13, 15, 19

*Taiwan v. U.S. Dist. Ct. for N. Dist. of Cal.*,
   128 F.3d 712 (9th Cir. 1997) ..................................................................................................18

*Ted Cruz for Senate v. Fed. Election Comm'n*,
   451 F. Supp. 3d 92 (D.D.C. 2020) ....................................................................................24, 25

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*,
   242 F.R.D. 1 (D.D.C. 2007)...............................................................................................35, 45

*In re Terrorist Attacks on Sept. 11, 2001*,
   No. 03-MDL-01570, 2019 WL 3296959 (S.D.N.Y. July 22, 2019).......................................19

*Thomas v. Starz Ent., LLC*,
   No. 15-CV-09239, 2017 WL 11628086 (C.D. Cal. May 26, 2017) .......................................31

*Thong v. Andre Chreky Salon*,
   247 F.R.D. 193 (D.D.C. 2008)................................................................................................31

*U.S. v. Concord Mgmt. & Consulting LLC*,
   347 F. Supp. 3d 38 (D.D.C. 2018) ..........................................................................................31

**Rules and Statutes**

18 U.S.C. § 1030(a)(5) ................................................................................................45

18 U.S.C. § 1839(3) ...........................................................................................34, 44

22 U.S.C. § 612 ........................................................................................................22

22 U.S.C. § 615 ........................................................................................................22

Cal. Civ. Code § 3426.1(d) ...............................................................................34, 44

Cal. Civ. Proc. Code § 2019.210 ...........................................................................34

Fed. R. Civ. P. 26(b)(1) ...........................................................................................24

Fed. R. Civ. P. 33(b)(4) ...........................................................................................26

Fed. R. Civ. P. 37 .................................................................................................1, 25

**Other Authorities**

H. Rep. 1381, 75th Cong., 1st Sess. (1937) ..........................................................23

S. Exec. Rep. No. 6, 89th Cong., 1st Sess. (1965) ................................................23

S. Rep. No. 89-143, 89th Cong., 1st Sess. (1965) .................................................23

Andrew Higgins, *U.S. Hires Company With K.G.B. Link to Guard Moscow
    Embassy*, N.Y. Times (Nov. 14, 2017),
    https://www.nytimes.com/2017/11/14/world/europe/embassy-moscow-
    kgb.html .............................................................................................................17

U.S. Dep't of Justice, *Recent FARA Cases* (Dec. 3, 2021),
    https://www.justice.gov/nsd-fara/recent-cases ................................................27

Defendants Nicolas D. Muzin and Stonington Strategies, LLC (together, the "Stonington Defendants"), Joseph Allaham, and Gregory Howard (collectively, "Defendants"), by counsel, submit their Opposition to Plaintiffs Broidy Capital Management, LLC's and Elliott Broidy's (together, "Broidy") Motion to Compel.  The Stonington Defendants and Howard further submit, pursuant to Federal Rule of Civil Procedure 37, a Motion to Compel Discovery and Memorandum in Support, respectfully asking the Court to compel Broidy to produce documents and information responsive to the Stonington Defendants' and Howard's requests for production of documents ("RFPs"), requests for admission ("RFAs"), and interrogatories ("ROGs") identified below.[1]

## I.   BACKGROUND

As this Court is well aware, Broidy's First Amended Complaint ("FAC"), ECF No. 18-2, accuses the State of Qatar ("Qatar") of orchestrating an elaborate operation to hack his computer systems and, with Defendants' alleged assistance, disseminate "curated" batches of his emails to reporters, who published numerous articles about them.  Broidy claims that these articles falsely portrayed him in a negative light, exposed his confidential communications and trade secrets, and, as a result, damaged his business relationships and public standing.  Mutual discovery related to Broidy's claims and Defendants' defenses has resulted in these motions to compel.

### A.   Broidy's Motion to Compel

On January 24, 2022, Broidy filed a Motion to Compel Defendants to Answer [Unspecified] Discovery Requests.  ECF No. 109.  Broidy's Motion concerns categories of information that Defendants believe are likely to fall within the scope of the Vienna Conventions'[2]

---

[1]      Pursuant to Local Civil Rule 7(f), Defendants respectfully request oral hearing.

[2]      As used throughout, the term "Vienna Conventions" means the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

protections and principles of international comity, and as to which they objected accordingly.

These same issues motivated the issuance of protective orders in this case, the Central District of California, and the Southern District of New York. In particular, to protect Qatar's interests, the California district court ordered that materials protected by the Vienna Conventions, "to the extent such material is produced," and materials "relating to the conduct by Qatar of its foreign policy," were entitled to heightened confidentiality protections. Protective Order at 6, ECF No. 185-1, *Broidy Cap. Mgmt. LLC v. Qatar*, No. 2:18-CV-2421 (C.D. Cal. Aug. 1, 2018) ("California Litigation"). The California Protective Order states—as proposed by Qatar—that the Vienna Conventions "appl[y] in the event another party produces such material, whether or not pursuant to court order." *Id*. at 6 n.2; *see* Minute Order, ECF No. 201, California Litigation. The Protective Order in this case incorporates similar protections. Protective Order at 2, ECF No. 96 (discussing materials protected by Vienna Conventions or "relating to the conduct by Qatar of its foreign policy"). Likewise, the same caution regarding production of Qatar's materials was repeated in the Allaham subpoena proceedings in the New York district court. *See* Order at 2, ECF No. 4, *Broidy Cap. Mgmt. LLC v. Allaham*, No. 1:18-MC-240 (S.D.N.Y. June 11, 2018) (granting Qatar's request for provisional "Attorneys' Eyes Only" designation in light of "any interest Qatar may have in the subpoenaed documents").

In recognition of Qatar's interest in Defendants' documents here, Defendants objected to Broidy's discovery requests on privilege/immunity grounds, while making clear that they would produce documents and information not subject to Qatar's privileges—*i.e.*, would not rest on their objections to stonewall discovery—and subject to other objections not at issue here. In response to Defendants' objections, and after meeting and conferring on the topic, Broidy filed the instant Motion. For a number of reasons, Broidy's Motion is premature and substantively wrong.

*First*, Broidy has not identified any violation of the discovery rules, nor does he identify what specific requests are addressed by his Motion.  Instead, Broidy makes a broadside attack on the application of Qatar's protections ***in the abstract*** and asks the Court vaguely to compel Defendants "to answer all relevant discovery requests."  Mem. Law Supp. Pls.' Mot. Compel at 17, ECF No. 109-1 ("Broidy Mot.").  Broidy also does not state, because he cannot, that he would be entitled to any relief if his Motion were granted.  At best, Broidy seeks an improper advisory opinion regarding the scope of the Vienna Conventions in general.

*Second*, Broidy's Motion relies on a basic misunderstanding about the ownership of the requested materials and the underlying principles of law.  Defendants do not invoke any status- or conduct-based immunity for documents or information in their possession.  Defendants merely seek to comply with their confidentiality obligations to allow Qatar the opportunity to protect its materials, which are protected from disclosure on several separate legal bases.  Because there is no discovery violation for the Court to redress, Broidy cannot claim that he would be entitled to production following a favorable ruling, and Broidy is, in any event, wrong regarding the scope of Qatar's privilege, Broidy's Motion must be denied.

### B.    Defendants' Motion to Compel

Defendants hereby submit their own Motion to Compel because Broidy refuses to respond to more than 100 discovery requests that are directly relevant to Broidy's claims and Defendants' defenses, on the facially and substantively defective grounds that they are "irrelevant."

The FAC alleges an international hacking conspiracy dating back years.  But the FAC does not allege that Defendants performed the hack and, in fact, Broidy can only speculate as to who did.  What Defendants did was communicate with others, including members of the press, about the shocking behavior evidenced in the emails, which were publicly available (FAC ¶ 114) and

widely circulated.  That behavior includes Broidy's covert efforts to lobby then-President Donald Trump, then-Secretary of State Rex Tillerson, then-Attorney General Jeff Sessions, and numerous other U.S. government officials as an (unregistered) agent for foreign principals in exchange for millions of dollars.  Indeed, the gravity and brazenness of the illegality evidenced in the emails are precisely why those emails were front-page news for months, and why Broidy alleges that their public disclosure was so damaging.  Because of their communications about these emails, Defendants have been ensnared in this lawsuit—Broidy's fourth attempt to hold someone accountable for a predicament of his own making—and accused of committing every tort that could conceivably apply to a computer hack.

In response to the FAC's wide-ranging allegations, Defendants have propounded a series of targeted and indisputably relevant discovery requests.  Defendants seek, *inter alia*, documents and information about who perpetrated the alleged hack; the damages Broidy claims to have suffered; the basis for Broidy's claim that his leaked emails contain "trade secrets"; the measures, if any, taken by Broidy to protect his alleged trade secrets; and various factual allegations made by Broidy in the FAC and his other complaints to support his theory of the case.

Defendants also seek information regarding Broidy's criminal efforts to secretly influence U.S. policy on behalf of foreign sponsors, which are relevant to this dispute for at least seven reasons:  they (1) refute Broidy's allegation that the dissemination of his leaked emails caused harm by "creat[ing] a false and injurious image" of him; (2) confirm that Broidy's emails involve illegal activity, which deprives them of trade secret protection; (3) support Howard's First Amendment defense that he acted to expose high-level corruption, and not because he was doing Qatar's bidding; (4) rebut Broidy's claim that his anti-Qatar advocacy was driven by civic-minded patriotism—a theme Broidy no doubt will continue to assert at trial; (5) undermine Broidy's

credibility; (6) offer evidence as to who, besides Qatar, may have wanted to hack Broidy; and (7) establish that Broidy's motive in bringing this and other meritless lawsuits was to artificially inflate his standing as a self-proclaimed adversary of Qatar and, in turn, boost his defense company's business prospects in the United Arab Emirates ("UAE") and Saudi Arabia.

Broidy has effectively stonewalled in response to Defendants' targeted requests. Desperate to keep his criminal conduct out of this case, despite its inextricable connection to the parties' claims and defenses, Broidy has adopted an irrational and legally unsupported view of relevance. Broidy categorically refuses to respond to any of Defendants' discovery requests unless they are strictly focused on the alleged hacking. He likewise refuses to provide any materials that precede the December 2017 onset of the alleged hacking operation, on the grounds that events before the hack are categorically irrelevant. That is, of course, not the case. The events relevant to Broidy's claims began as early as 2016 and early 2017, when many of the leaked emails were sent and when the illicit activities discussed in his emails occurred.

In total, Broidy has refused to answer all 50 of Howard's RFAs, over 70 of Defendants' RFPs, and approximately 20 ROGs on the conclusory grounds that they are irrelevant, unduly burdensome, and so on. These blanket and unsupported objections violate Broidy's discovery obligations under the Federal Rules and impermissibly prevent Defendants from mounting an effective defense against his meritless claims. Broidy should be compelled to respond.

### C.    The Parties' Efforts to Resolve the Present Discovery Disputes

Defendants endeavored to resolve the present disputes without burdening the Court. Broidy requested a meet-and-confer to discuss Defendants' objections related to claims of sovereign or diplomatic immunity. *See* Ex. 1, Email Chain, January 7-14, 2022. On January 10, 2022, Defendants agreed to a mutual meet-and-confer, noting the need to discuss Broidy's

deficient responses and invalid objections to Defendants' discovery requests as well.  *Id.*  On January 12, Defendants followed up with a letter listing the specific responses and objections provided by Broidy that were defective and summarizing the reasons why.  *See* Ex. 2.  The parties met and conferred on January 13 for approximately an hour and fifteen minutes.  Although the parties were able to reach agreement on a singular issue regarding Broidy's improper use of the "attorneys' eyes only" designation, *see* Ex. 3, Email, Jan. 13, 2022, the remainder of the dispute could not be resolved.  Broidy filed his Motion to Compel on January 24.

On January 27, Broidy provided a written response to Defendants' January 12 letter and reiterated the positions he took in his discovery responses and during the parties' meet-and-confer. *See* Ex. 4.  Broidy continued to assert that entire swaths of discoverable information would be withheld on "relevance" grounds.  Given the parties' vastly different views on what Rule 26 requires, and which matters are relevant to this lawsuit, they have agreed that motion practice is necessary to address the many discovery requests propounded by Defendants in dispute.  Those requests are discussed below in Defendants' Motion and, for ease of reference, are also organized in a chart together with Broidy's responses and objections in the attached Exhibit 5.

## II.   DEFENDANTS' OPPOSITION TO BROIDY'S MOTION TO COMPEL

Broidy's Motion is deficient and legally unfounded.  At the same time he refuses to produce responses to more than one hundred discovery requests propounded by Defendants, Broidy has rushed to the Court on a half-baked Motion to Compel that fails to identify any particular discovery failing and does not seek any particular relief.  Procedurally, what Broidy seeks is an improper and premature advisory opinion.  And, on the merits, Broidy is wrong.

As Defendants have said for the past nearly four years of litigation, Broidy's allegations concern Qatar and its documents.  Broidy alleges that Qatar and its agents targeted him as a matter

of Qatar's foreign policy. Based on those allegations, Broidy has repeatedly sought to obtain materials relating to Qatar's conduct of its foreign policy, no doubt to share with his apparent principal, the UAE. *See* Plea Agreement at 3, *United States v. Broidy*, No. 1:20-CR-210, ECF No. 8 (D.D.C. Oct. 20, 2020) ("Broidy Criminal Suit") ("[T]he Government will present information relating to your client's efforts [to] obtain business from a Middle Eastern country and your client's efforts to influence U.S. policy towards a second Middle Eastern country and its alleged support of terrorist activities"). Unable to seek the materials from Qatar directly, Broidy attempts to end run Qatar's immunity and the legal protections afforded to Qatar's materials, by seeking Qatar's materials that are in Defendants' possession. That is improper.

The protections afforded to Qatar's materials have been briefed repeatedly, beginning with the protective order entered in California. That Order was entered in part to address circumstances like these, where Qatar's confidential materials were in the hands of non-parties. *See, e.g.*, Protective Order at 6, California Litigation. And Defendants have explained repeatedly that the Vienna Conventions apply to Qatar's foreign policy materials, even if they are in the hands of non-parties. *See, e.g.*, Mem. Supp. Defs.' Emergency Mot. Protective Order at 14-15, ECF No. 90-1. Accordingly, with respect to Qatar's materials that are in Defendants' possession, Defendants objected to the extent Broidy's discovery requests sought privileged information and, pursuant to the Protective Order, committed to coordinate with Qatar on the preparation of a privilege log to allow the parties to assess (and litigate, if necessary) specific challenges to any privilege or immunity claim. Defendants reiterated this process during the meet-and-confer discussion. But Broidy rejected this solution.

Instead, Broidy opted to rush straight to this Motion, which is improper for at least three reasons. *First*, there has been no violation of the discovery rules, and Broidy does not identify

one.  Under Defendants' confidentiality agreements, relevant case law, and the Protective Order, Defendants did exactly what they were supposed to do.  That is, Defendants objected to Broidy's requests, stating detailed and specific objections, including ones related to the Vienna Conventions and international comity.  Defendants thus put Broidy on notice that his discovery requests intrude on a non-party's privileges and that Qatar would need the opportunity to protect its materials.

*Second*, due to the lack of violation and Broidy's rush to prematurely force this legal issue, his Motion seeks an improper advisory opinion.  Indeed, given the posture of the present dispute, there is no indication that a favorable order would even result in the production of documents that Broidy seeks.  Defendants have asserted a variety of specific objections to Broidy's overbroad requests, and depending on the request, an order striking certain objections may make no difference as to whether the documents or information actually will be produced.  At this stage, Defendants do not know over what materials Qatar may assert its privilege, how Broidy will respond to such an assertion, or whether the disputed materials will be ultimately subject to Defendants' other objections.

*Third*, and in any event, even if the Court were to rule on the existence of certain privileges in the abstract, Broidy is wrong about their scope.  Qatar's documents do not lose their privilege simply because they are in the possession of Qatar's former agents.  And, contrary to Broidy's unfounded assertions, Qatar's documents are protected by both the Vienna Conventions and principles of international comity.  Broidy has further provided no basis for the Court to find that Qatar's privileges are waived or somehow abrogated as a result of Defendants' registration as agents under the Foreign Agent Registration Act of 1938, 22 U.S.C. § 611 *et seq*. ("FARA"). Broidy's Motion should be denied.

### A.     <u>Broidy Identifies No Violation of the Discovery Rules.</u>

Broidy's discovery requests seek to obtain materials that belong to Qatar, which Defendants have a duty to protect. As Qatar's former agents, Defendants are obliged to protect the confidentiality of Qatar's materials to the extent such materials remain in Defendants' possession. *See, e.g.*, Broidy Mot. Ex. 15 at 5. But even if that were not the case, Defendants— as stewards of a non-party's privileged documents—may properly object to Broidy's requests to preserve the non-party's applicable privileges.

This situation arises routinely in litigation. And reviewing courts confirm that a party who receives a request for a non-party's materials can, and should, object to preserve the non-party's privilege. *See, e.g.*, *Smith v. Scottsdale Ins. Co.*, 40 F. Supp. 3d 704, 717-18 (N.D. W. Va. 2014)[3] (finding insurance company could "assert the insured's attorney-client privilege for documents in an insured's claim file," because "the privilege ultimately belongs to the client and not to the insurance company"). This court has similarly recognized that parties to a litigation may object to disclosure of discovery materials "contain[ing] confidential and personal information" belonging to non-parties "who were never subpoenaed, would be unaware of the production of information related to them, and would have no practical ability to assert their interests." *Slate v. Am. Broad. Cos.*, 802 F. Supp. 2d 22, 26-27 (D.D.C. 2011).

That is precisely what Defendants have done. In response to Broidy's requests for Qatar's documents, Defendants asserted objections to alert Broidy and the Court that Broidy seeks potentially privileged materials, and to preserve Qatar's ability to defend its own privileges and protect its documents from disclosure. Defendants also indicated that they would produce

---

[3]     Unless otherwise indicated, all emphasis in this brief has been added, and all internal quotations, citations, and alterations have been omitted.

otherwise unobjectionable documents and information.  What should have happened next is laid out in the Protective Order: namely, (1) Defendants would coordinate with the owner of the potentially privileged materials (here, Qatar) to review them and identify any applicable claims of privilege; (2) a privilege log would be prepared and submitted to Broidy, describing "the basis for the redaction or withholding, including the type of privilege or immunity being claimed, with reasonably specific particularity so that the Receiving Party may assess the reasonableness of the privilege or immunity claim," and (3) to the extent the parties could not resolve any dispute regarding specific materials withheld on the basis of privilege/immunity, the parties would refer such dispute to the Court for resolution.  *See* Protective Order at 8, 10-11.  Defendants stated their intention at the parties' meet-and-confer to follow the contemplated process.  But Broidy rejected their offer and proceeded directly to the instant motion.

Because Defendants' objections were wholly appropriate, and Broidy's Motion fails to identify any violation of the discovery rules, Broidy's Motion should be denied.

### B.    <u>Broidy Seeks an Improper Advisory Opinion.</u>

In his haste to tee up this dispute regarding the scope of two complex doctrines of international law, Broidy fails to present a justiciable controversy.  Not only has there been no violation of the discovery rules for the Court to remedy, but there is not even reason to believe that Broidy's preferred interpretation of the law would result in the production of any documents that Broidy seeks.    Broidy abruptly interrupted the Protective Order process mid-stream. Consequently, Qatar has been prevented from fully assessing any privilege or immunity, and there is no specificity in the present dispute as to what privileges or immunity will ultimate be asserted; over what documents; with what objection(s) from Broidy; and whether any disputed documents would ultimately be produced in light of ***other*** objections.  Broidy's Motion to "compel Defendants

. . . to produce discovery," Broidy Mot. at 1, is thus plainly premature.  Indeed, Broidy cannot even say which discovery requests may ultimately be impacted by the Court's ruling, asking instead to compel responses to "all relevant discovery requests."  *Id*. at 17.

At best, Broidy seeks an advisory opinion regarding the application of the Vienna Conventions or principles of international comity ***in general***.  But, without a specific assertion of such principles over particular documents, there is no "controversy" for this Court to resolve. "[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions."  *Pub. Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1274 (D.C. Cir. 2015).  And federal courts "frequently invoke" this rule in the context of discovery or evidentiary disputes "which are not yet ripe" and therefore "lack the clear concreteness provided when a question emerges precisely framed and necessary for decision."  *Han v. Fin. Supervisory Serv.*, No. 17-CV-4383, 2017 WL 7689223, at *5 (S.D.N.Y. Oct. 6, 2017), *aff'd*, No. 17-CIV-4383, 2018 WL 791353 (S.D.N.Y. Feb. 8, 2018).  This dispute is not ripe.

Furthermore, even if justiciable, Broidy's alleged injury is not redressible.  Broidy claims (without specificity) that he is being denied discovery, and he asks (again without specificity) that the Court compel Defendants "to produce discovery in response to [his] requests."  Broidy Mot. at 1, 9.  But he cannot show, at this stage, that succeeding in his motion would result in the production of documents.  As is their right, Defendants have lodged a number of specific and detailed objections to Broidy's discovery requests.  *See, e.g.*, Broidy Mot. Exs. 1-8.  Depending on the request at issue, Defendants may have objected on the basis of relevance, burden, attorney-client privilege, or other issues, any of which could ultimately result in non-production.  *See, e.g.*, Broidy Mot. Ex. 4 at 12.  Thus, even if Broidy were correct regarding the legal issues presented (he is not, for the reasons discussed below), resolution of those legal issues would not warrant the

relief that his Motion seeks.

To the extent Broidy ultimately seeks to compel production of any materials—as opposed to seeking a general interpretation of international law—he must identify (1) exactly what discovery responses he seeks to compel, and (2) the reasons those discovery responses are purportedly being withheld on an improper basis. *See Kolenich v. Highmark W. Va., Inc.*, No. 2:19-CV-38, 2020 WL 8993132, at *1 (N.D.W. Va. May 21, 2020) (rejecting as an advisory opinion a motion that failed to "present any specific discovery requests which [plaintiff] contends received unsatisfactory responses"). Because Broidy has failed in both respects, the Court should reject Broidy's Motion as an improper request for an advisory opinion.

### C.    Broidy's Interpretation of the Vienna Conventions and International Comity Principles Is Incorrect as a Matter of Law.

Broidy's Motion demonstrates a fundamental misunderstanding of who owns the requested materials and attendant privilege(s). Documents created for Qatar, communications between Defendants and Qatar, and communications between Defendants when they were acting as agents for Qatar belong to Qatar alone. *Cf. Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 620 (7th Cir. 2010) (privileges "appl[ied] to the communications made and documents generated during [the firm's] investigation."). Contrary to Broidy's mischaracterization, Defendants' objections are not an invocation of immunity on their own behalf. Instead, Defendants seek merely to comply with their confidentiality obligations to ensure that Qatar has the opportunity to protect its sensitive materials from disclosure.

Qatar is immune from suit, as well as the attendant burdens of suit, including discovery. *See Broidy Cap. Mgmt., LLC v. Qatar*, 982 F.3d 582, 596 (9th Cir. 2020) (finding the Foreign Sovereign Immunities Act ("FSIA") bars Broidy's claims against Qatar); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (a foreign sovereign has

"immunity from trial" as well as "the attendant burdens of litigation.").  Even the D.C. Circuit recognized that Qatar may not be compelled to participate in the "attendant burdens of litigation," and charged the Court with protecting those interests.  *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 804 (D.C. Cir. 2021) ("[W]e trust the district court has the appropriate tools to protect Qatar's absolute FSIA immunity from trial and the attendant burdens of litigation.").  Broidy, therefore, cannot seek materials from Qatar directly, and Qatar's materials—regardless of where they reside—are protected by several independent legal doctrines.  *First*, Qatar's materials are "inviolable" under the Vienna Conventions, wherever they may be.  *Second*, principles of international comity weigh in favor of protection and similarly prevent disclosure of Qatar's materials in this case.  And Broidy's assertion that the Southern District of New York rejected these protections is incorrect.

### 1.      Qatar's Materials Are "Inviolable" Under the Vienna Conventions.

The Vienna Conventions are designed to provide broad protection for a sovereign's materials.  These Conventions protect the papers and documents of diplomats and consuls in the U.S. "with the understanding that American diplomats abroad will be afforded the same protections from intrusions by the host state."  *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 300 (2d Cir. 1993).  In creating exceptions, or by ignoring the Vienna Conventions entirely, the U.S. risks exposing American missions abroad to incursion.  *See id.*  "The most secure way to guarantee this protection, the United States tells us, is through blanket immunities and privileges without exception."  *Id.*

The Vienna Conventions require careful review.  Like any international treaty, the Vienna Conventions are "a contract between nations" and courts apply "[g]eneral rules of construction."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 533

(1987) ("*Aerospatiale*").  The Court, therefore, should begin "with the text of the treaty and the context in which the written words are used." *Id.* at 534.  The treaty's history, "the negotiations, and the practical construction adopted by the parties' may also be relevant." *Id.*

The plain language of the Vienna Conventions demonstrates their broad application.  The Vienna Convention on Diplomatic Relations provides that "[t]he archives and documents of the mission shall be ***inviolable at any time and wherever they may be***."  Vienna Convention on Diplomatic Relations, art. 24, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95.  It further specifies that the "official correspondence of the mission shall be ***inviolable***." *Id.*, art. 27.  The Vienna Convention on Consular Relations similarly states that "consular archives and documents shall be ***inviolable at all times and wherever they may be***."  Vienna Convention on Consular Relations, art 33, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.  "Consular archives" is defined broadly, and "includes all the papers, documents, correspondence, books, films, tapes and registers of the consular post." *Id.*, art. 1(k).

The Vienna Conventions protect Qatar's materials regardless of who possesses them or where they may lie.  The use of the term "inviolable" confirms this interpretation.  This "advisedly categorical, strong word . . . makes no provision for exceptions . . . ." *767 Third Ave.*, 988 F.2d at 298.  Application of Vienna Conventions protections to a sovereign's material in the hands of a third party is further supported by use of the phrase "wherever they may be."  The negotiators' addition of this phrase to the Conventions makes "it clear beyond argument that archives not on the premises of the mission ***and not in the custody of a member of the mission*** are entitled to inviolability."  Ex. 6, Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 158 (4th ed. 2016) (hereinafter "Denza Textbook").  The Vienna Conventions further do not contain, and Broidy cannot identify, any textual limitation based on

the *location* of a sovereign's materials.

Qatar's foreign policy materials constitute materials "of the mission."  Although that phrase is not defined in the Vienna Conventions, the plain meaning of the term covers materials and information relating to the conduct by Qatar of its foreign policy.  *See Aerospatiale*, 482 U.S. at 529 (relying on "the plain language of the Convention").  Professor Eileen Denza—whom Broidy quotes extensively—acknowledges that the negotiators of the Vienna Conventions "intended a wide definition to be given to the term."  Denza Textbook at 160.  She further explains that the test "generally applied" to determine whether materials are "of the mission" is that the materials "must belong to or be in the possession of the mission," and that test "has been confirmed by subsequent practice."  Broidy Mot. Ex. 11 at 1340-41.

Broidy plainly seeks materials related to Qatar's foreign policy mission in the U.S.  *See, e.g.*, Broidy Mot. Ex. 1 at 9 ("Produce all proposals, reports, project updates, written contracts, agreements, and memoranda of understanding between Stonington and Qatar."); *id.* at 13 ("Produce documents sufficient to show all payments made directly or indirectly by Qatar or any of its agents, affiliates, or related entities to you or Stonington, or to pay down your debts or expenses, such as your legal fees."); Broidy Mot. Ex. 3 at 13 ("Describe all work you performed for Qatar between March 1, 2017 and December 31, 2019."); Broidy Mot. Ex. 6 at 12 ("Describe each proposal, report, status update, or any other type of information you shared with Qatar or others that contained any mention or discussion of Plaintiffs or related entities, including planned or published media accounts about Broidy, the Hacked Materials, or the Forged Russian documents at any time between March 1, 2017 and December 31, 2019.").

The relationship between the requested documents and Qatar's foreign policy has been confirmed.  In the California Litigation, Broidy obtained from Defendant Allaham (then a third

party) certain lobbying strategy materials created for, or at the request of, Qatar; communications with Qatar and Qatar's agents regarding the provision of services to Qatar; and records of Qatar's diplomatic conduct as revealed in telephone, bank, or internet records.[4]  The California district court—in evaluating Broidy's challenges to redaction of these materials under the pertinent protective order—determined that such material "contains or comprises information relating to conduct by Qatar of its foreign policy."  Minute Order at 1, ECF No. 242, California Litigation.

Broidy's reliance on Professor Denza's statement that "a document communicated to a third party . . . no longer belongs to the [sovereign]," Broidy Mot. at 12, is misplaced.  This statement comes from Professor Denza's Congressional hearing testimony discussing a 1987 English case relating to the International Tin Council, which Broidy quotes at length.  Broidy, however, fails to quote the portion of Professor's testimony stating that the Council was "***not concerned with the documents in the possession of an agent or bailie of the council***."  Broidy Mot. Ex. 11 at 1325.  Unlike here, the Tin Council's documents were provided to an unrelated and independent third party.  Indeed, Professor Denza states in her textbook that "the status of documents communicated by the Tin Council to one of its member governments or a representative of a government[] was not relevant to the case of archives or documents of a diplomatic mission."  Denza Textbook at 161.  The Tin Council case—and Professor Denza by extension in describing the case—thus, never addressed the objection made by Defendants here: that a sovereign's materials, in the possession of an agent or bailee of that sovereign, are entitled to protection as materials "of the mission."

Broidy similarly mischaracterizes Professor Denza's letter regarding a subpoena issued by

---

[4]     Allaham was required to produce certain of those documents by the Southern District of New York because that court held that he had waived his objections. *See infra* § II.C.3.

the House Committee on Government Reform to the Kingdom of Saudi Arabia.   Although
Professor Denza opines in that letter that the requested records in the possession of three lobbying
firms were not "archives or documents of the Saudi mission," Broidy again leaves out a key detail.
Professor Denza is clear that ***Saudi Arabia never claimed ownership of the requested materials***.
*See* Denza Textbook at 162 ("The documents in question were records relating to the professional
services performed for the Embassy, but it was not claimed that [the documents] were in the
ownership or possession of the Embassy.").   The lobbyist materials at issue failed Denza's of-the-
mission test.   Unlike Saudi Arabia, Qatar has stated its ownership of materials within Defendants'
possession.   Professor Denza, therefore, simply does not speak to the issues presented here.

Even as he mischaracterizes Denza, Broidy concedes that Vienna Conventions protection
may extend to a sovereign's materials in the possession of third-party agents.   *See* Broidy Mot. at
11 n.10.   Broidy agrees, for example, that the Vienna Conventions protect "a third-party internet-
or computer-server company performing ministerial storage services," and "those documents do
not lose protection by virtue of being in cyberspace."   *Id.*   But he states—without support—that
his example is different from the circumstances here.   Broidy draws a distinction without a
difference.   It cannot be that Qatar's materials in the possession of a third-party internet storage
entity are somehow due ***more protection*** than materials created by, and at the request of, Qatar, in
the hands of its agents that were retained to prepare the materials.   Broidy's arbitrary distinction
has even less force considering the regular practice of foreign sovereigns—the U.S. included—of
hiring local agents to assist in furtherance of a diplomatic mission abroad.   *See, e.g.*, Andrew
Higgins, *U.S. Hires Company With K.G.B. Link to Guard Moscow Embassy*, N.Y. Times (Nov.
14, 2017), https://www.nytimes.com/2017/11/14/world/europe/embassy-moscow-kgb.html.

At bottom, Broidy cannot circumvent Qatar's immunity, or the protections of the Vienna

Conventions, by seeking Qatar's materials from its former agents.  The Ninth Circuit's reasoning in a similar case, *Taiwan v. U.S. Dist. Ct. for N. Dist. of Cal.*, 128 F.3d 712, 714 (9th Cir. 1997), makes this clear.  There, the court found that an agreement between the United States and its Taiwanese diplomatic counterpart that the "archives and documents of the sending counterpart organization [would] be inviolable" prevented the court from directly compelling production of the Taiwanese organization's documents.  *Id.* at 718.  Undeterred, plaintiffs noticed a deposition for the organization's deputy director.  The Ninth Circuit ultimately quashed the deposition, reasoning that "the protection afforded by [the provision] would be practically useless if an employee could be compelled to testify about the contents of the organization's documents." *Id.* So too, here.  Allowing Broidy to obtain Qatar's materials via discovery requests to Defendants would undermine Qatar's immunity and the protections offered by the Vienna Conventions.  It would also undermine U.S. interests by removing protections for materials created by local agents in service of the U.S. mission abroad.

### 2.     Qatar's Materials Are Similarly Protected by International Comity.

Broidy fails to articulate a dispute with Defendants' international comity objections. International comity is a legal doctrine that is distinct from—although compatible with—the concerns addressed in the Vienna Conventions.  Broidy lumps the two together, and he provides no analysis of this separate legal objection.

Comity refers to the "spirit of cooperation" that a domestic court employs in "cases touching on the interests of other sovereign states."  *Aérospatiale,* 482 U.S. at 543 n.27.  The Supreme Court has "long recognized the demands of comity in suits involving foreign states" and has commanded courts to "demonstrate due respect" for "any sovereign interest expressed by a foreign state."  *See id.* at 546.  In discovery, comity requires "a more particularized analysis of the

respective interests of the foreign nation and the requesting [party]," *id.* at 543-44, and courts should not "unnecessar[ily] circumvent[]" a foreign state's rights, *Ings. v. Ferguson,* 282 F.2d 149, 152 (2d Cir. 1960); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MDL-1720, 2010 WL 3420517, at *5 (E.D.N.Y. Aug. 27, 2010).

International comity has broad applicability, which Broidy disregards.  For example, principles of international comity protect materials in which a foreign sovereign has an interest, including "highly sensitive documents that contain traditionally nonpublic information of a foreign government." *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570, 2019 WL 3296959, at *5 (S.D.N.Y. July 22, 2019).  Comity also incorporates the deliberative process privilege, as it requires giving "a foreign sovereign the same protection afforded to the executive branch of the United States." *See, e.g.*, *In re Grand Jury Subpoena Dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002).  And comity protects against overly burdensome discovery of a foreign sovereign.  *See Republic of Arg. v. NML Cap., Ltd.*, 573 U.S. 134, 146 n.6 (2014).

One method to evaluate the application of international comity principles is a balancing test.  To address competing foreign and domestic interests, the Supreme Court has relied on a five-factor balancing test stated in the Restatement (Third) of Foreign Relations Law:

(1)   the importance to the . . . litigation of the documents or other information requested;

(2)   the degree of specificity of the request;

(3)   whether the information originated in the United States;

(4)   the availability of alternative means of securing the information; and

(5)   the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aerospatiale*, 482 U.S. at 544 n.28.  The fifth factor—which compares the national interests at stake—is regarded as "the most important." *In re Payment Card*, 2010 WL 3420517, at *6-7.

Here, the balance of interests weighs against disclosure.[5] *First*, Broidy has failed to explain the importance of the information requested.  He seeks wide-ranging discovery regarding the whole of Defendants' work for Qatar and provides no explanation why such information is important.  *Second*, Broidy's requests are overbroad and vague.  *Third*, although the information originated in the United States, it was created solely for, and in furtherance of, Qatar's foreign mission.  *Fourth*, Broidy has many avenues to seek relevant information about Defendants' alleged role in the dissemination of hacked materials—which is, after all, the conduct actually at issue in this case—including requesting Defendants' communications with journalists and news outlets. *Fifth*, and most importantly, Broidy has not identified a single U.S. interest that would be harmed by the nondisclosure of Qatar's confidential materials.  In contrast, there is no question that Qatar would suffer severe injury from the compelled disclosure of its nonpublic diplomatic, foreign affairs, and strategic materials to an apparent agent of its geo-political rival, the UAE.  *See* ECF No. 8 at 3, Broidy Criminal Suit.

### 3.    The New York District Court's Order Similarly Contemplates Protection of Qatar's Materials.

The New York district court's Order provides little support to Broidy's Motion.  Broidy mischaracterizes the New York district court as issuing a blanket rejection of protections under the Vienna Conventions and international comity when it ordered Defendant Allaham (then a third-party) to respond to a subpoena.  Broidy Mot. at 2-3.  This is incorrect for three reasons.  *First*, contrary to Broidy's telling, the New York district court found that Defendant Allaham had waived any objections to production by failing to serve them in time.  *See* Ex. 7, June 6, 2018 Tr. 28:7-9,

---

[5]    The Court should reject any belated attempt by Broidy to argue these factors in his Reply Brief.  *See, e.g.*, *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").

*Broidy Cap. Mgmt. LLC v. Allaham*, No. 18-MC-240 (S.D.N.Y.) ("All defenses have been waived as there was no objection served as of June 1, when it was supposed to be served."). *Second*, the New York district court's statement that the Vienna Conventions does not "protect sovereign entities from civil discovery collected from non-agent third-parties," Broidy Mot. Ex. 10 at 1-2, is inapplicable. The statement does not concern international comity principles, and it was premised on the court's assumption that the Allaham subpoena sought materials from a "non-agent." Allaham has since registered as an agent of Qatar under FARA, and Broidy bases his Motion at least in part on that fact. *Third*, the New York district court still recognized that production of Allaham's materials implicated Qatar's interests and implemented additional protections. The court ordered a provisional "Attorneys' Eyes Only" designation, to be later addressed in the California Litigation, concluding that such designation "adequately protects any interests Qatar may have in the subpoenaed documents." *Id.* at 2.

### D.    FARA Obligations Do Not Negate the Protection Afforded by the Vienna Conventions.

Broidy also confusingly claims that FARA—which does not apply to Qatar—negates any protection offered by the Vienna Conventions. Broidy has no support for this claim, and his reading of FARA is contrary to established principles of statutory interpretation.

FARA can be, and has been, interpreted to ***protect*** privileged materials that fall within its scope, not to waive privilege. In *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371 (D.D.C. 1976), for example, the Attorney General sought an order requiring Covington & Burling to disclose certain documents to the Justice Department for inspection. The request related to the firm's representation of the Republic of Guinea and included documents subject to the attorney-client privilege. *Id.* at 372. Like Broidy, the Attorney General asserted that FARA overrides those privileges. *Id.* But the court disagreed. After determining that the relevant legislative history did

not "seriously consider the question" of the possible disclosure of privileged materials, the court found that FARA and the asserted privilege could be harmonized to allow a FARA-registered attorney to "validly claim the attorney-client privilege to withhold from disclosure to [the Attorney General] documents or portions thereof which are required to be kept under the Act." *Id.* at 377. This is precisely the route the Court should employ here.

Even if FARA were to operate as a waiver of Qatar's privilege, however, such a waiver would be narrow and would not entitle ***Broidy*** to anything. FARA is a registration and record-keeping statute. It requires that certain publications and high-level, summary materials be publicly disclosed. *See* 22 U.S.C. § 612 (describing filing requirements). And it requires that a registered agent maintain certain books and records related to its work for a limited period of time, so that the Attorney General—only—may "inspect[]" them upon request. *See id*. § 615. As a matter of practice, if an inspection takes place, the Attorney General does not take possession of any documents and reviews materials only for compliance with FARA's requirements. Consequently, nothing about FARA can be read to authorize a private civil litigant, like Broidy, to engage in a fishing expedition through an agent's books and records.

In any event, FARA does not abrogate the Vienna Conventions as Broidy contends. Broidy suggests that Congress intended only diplomatic agents to be subject to the Vienna Conventions and for "nondiplomatic agents" to be separately governed by FARA, as though the two are mutually exclusive by Congressional design. He is wrong. As discussed in detail above, the protections guaranteed by the Vienna Conventions apply to Qatar and its materials "wherever they may be," including in the possession of third-party agents. And any supposed distinction between diplomatic and nondiplomatic agents is irrelevant here regardless. As also discussed above, Defendants do not invoke any conduct- or status-based immunity on their own behalf. Defendants'

objections were made on behalf of Qatar itself.

Broidy's interpretation is also unsupported by the legislative record on which he relies. FARA—which predates the Vienna Conventions by more than thirty years—could not have been intended to negate or lessen Vienna Conventions protections. *See, e.g.*, H. Rep. 1381, 75th Cong., 1st Sess. (1937) (cited by Broidy). Indeed, even during the 1965 legislative updates to FARA, Congress did not discuss—much less embrace a limitation of—the Vienna Conventions in relation to FARA at all. *See, e.g.*, S. Rep. No. 89-143, 89th Cong., 1st Sess. (1965); S. Exec. Rep. No. 6, 89th Cong., 1st Sess. (1965) (cited in Broidy Mot. at 14). Neither FARA's legislative history, nor the records of the Vienna Conventions ratification, support Broidy's position.

To the contrary, as a matter of legal interpretation, were there any conflict between the two regimes, the terms of the later-ratified Vienna Conventions would govern. *See, e.g.*, *Fong v. U.S.*, 149 U.S. 698, 720-21 (1893) ("[T]he last expression of the sovereign will must control."). The language of FARA can, and should, be interpreted to respect the privileges later provided by the Vienna Conventions. It is an undisputable legal maxim that "an [A]ct of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

At bottom, Broidy provides no basis to believe that Defendants have waived ***Qatar's privileges*** by registering for FARA. Such a ruling would be illogical in any event. If Broidy were correct, the law would bestow a ***higher level*** of protection on materials in the hands of non-registered agents than registered ones, creating a perverse incentive for foreign sovereigns and their agents to ***avoid registering under FARA***. For all of these reasons, Broidy's Motion should be denied.

### III.   DEFENDANTS' MOTION TO COMPEL

Broidy's responses to Defendants' discovery requests are procedurally defective and substantively untenable.  To date, Broidy has produced no documents and has refused to respond to more than one hundred discovery requests propounded by Defendants, broadly asserting that the requested information is irrelevant to the case.  Broidy's blanket, boilerplate objections are defective on their face.  And they espouse an unreasonably narrow view of relevance that cannot be squared with the issues presented in this case.

Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  The moving party bears the initial burden of establishing that the information sought is relevant.  *U.S. ex rel Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016).  "Once that showing is made, however, the burden shifts to the objecting party to explain why discovery should not be permitted."  *Jewish War Veterans of U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 42 (D.D.C. 2007).

Relevance is a low hurdle.  Under Rule 26, relevance is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  "[A] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action."  *Alexander v. F.B.I.*, 194 F.R.D. 316, 325 (D.D.C. 2000).  Such information need not even be admissible at trial.  *Smith v. Schlesinger*, 513 F.2d 462, 472-73 (D.C. Cir. 1975).  "This broad interpretation of relevance advances Rule 26's liberal and expansive purpose of permitting the parties to develop the facts, theories, and defenses of the case."  *Ted Cruz for Senate v. Fed. Election Comm'n*, 451 F. Supp. 3d 92, 98 (D.D.C. 2020).  "Ultimately, discovery generally should be allowed unless it is

clear that the information sought can have no possible bearing on the claim or defense of a party." *Cherokee Nation v. U.S. Dep't of the Interior*, 531 F. Supp. 3d 87, 98 (D.D.C. 2021); *see also Ted Cruz for Senate*, 451 F. Supp. at 98-99 (compelling production because the court could not "conclude that the information sought by Defendants would have no bearing on any merits-based defense [Defendants] may raise").

As explained below, every one of Defendants' disputed discovery requests easily satisfies Rule 26's low threshold. Each one is highly relevant to critical issues in this case. And Broidy offers no principled justification for his refusals to respond.[6] Accordingly, Broidy should be compelled to respond in full, and to pay Defendants' expenses and attorneys' fees in connection with the present motion. *See* Fed. R. Civ. P. 37(a)(1), (a)(3)(B) (providing that "a party may move for an order compelling . . . discovery" when an adversary refuses to provide requested documents or information); Fed. R. Civ. P. 37(a)(5)(A)(ii) (providing, if the movant is successful, that the compelled party must pay the movant's reasonable expenses and attorneys' fees unless refusal was "substantially justified"); *see also 3E Mobile, LLC v. Glob. Cellular, Inc.*, 222 F. Supp. 3d 50, 53 (D.D.C. 2016) (noting district courts possess "wide discretion" to compel discovery and award expenses and attorneys' fees).

## A.  Broidy's Blanket, Boilerplate Objections are Defective as a Matter of Law.

As an initial matter, Broidy's boilerplate objections to Defendants' requests are *per se* defective. In response to a multitude of requests, Broidy merely states that he objects on grounds that the requests are "overly broad," "vexatious," "harassing," "irrelevant to the case," and/or "not

---

[6]     Because the disputed requests are voluminous, Defendants have attempted to organize them in this brief into six different categories. Defendants have listed the requests—along with Broidy's corresponding responses and objections—in Exhibit 5, organized according to the sections of this brief.

proportional to the needs of the case," without elaboration. *See, e.g.*, Resp. to Howard RFAs 1-50; Resp. to Howard ROGs 4-6, 7(f), 8-11; Resp. to Stonington Defs.' ROGs 5-8, 16-22. Broidy also asserts a blanket "relevance" objection throughout. *See, e.g.*, Resp. to Howard RFPs 33-42, 44 (objecting that requests are "irrelevant to the claims and defenses in this case"); Resp. to Stonington Defs.' ROGs 16-22 (same); Resp. to Stonington Defs.' RFPs 14-15, 50-51, 54-56, 58-105, 109-121. These vague, boilerplate objections are improper and should be stricken.

The 2015 amendments to the Federal Rules of Civil Procedure require that objections to requests for the production of documents "be stated with specificity." *See* 2015 amend. Comm. Notes on Rule 34. The requirement that objections to interrogatories "be stated with specificity" has been in force even longer. Fed. R. Civ. P. 33(b)(4). Vague, blanket objections like Broidy's were disfavored in this Court even before 2015. *See, e.g.*, *DL v. D.C.*, 251 F.R.D. 38, 43 (D.D.C. 2008) (overruling "objections in their entirety," where "general objections are not applied with sufficient specificity to enable this court to evaluate their merits"). But now, in light of the 2015 amendments to the Federal Rules, Broidy's objections are patently improper. *See Inova Health Care Servs. v. Omni Shoreham Corp.*, No. 20-CV-784, 2021 WL 6503725, at *2-3 (D.D.C. Jan. 29, 2021) ("[I]t is not this Court's role to put flesh on the bones of [a party's] skeletal responses or read between the lines of its cut-and-paste objections. Any ground not stated in a timely objection—with the requisite level of specificity—is waived unless the court, for good cause, excuses the failure."); *Ronaldson v. Nat'l Ass'n of Home Builders*, No. 19-01034, 2020 WL 3259226, at *4 (D.D.C. June 3, 2020) ("Broad and unsubstantiated boilerplate objections may also be deemed waived."). Broidy's generic, boilerplate objections should be stricken.

**B.      Broidy Refuses to Provide Relevant Documents and Information Regarding The Illegal Activity Evidenced in the Leaked Emails Underlying his Claims.**

This case is about the publication of supposedly sensitive information contained in

Broidy's allegedly hacked emails.  Broidy claims that Defendants received those emails and shared them with journalists, who published—and continue to publish—numerous articles about them, thereby damaging Broidy.  *See, e.g.*, FAC ¶¶ 117, 119, 122-23, 126, 130, 141-42, 144, 148, 151-52, 158.  Tellingly, the FAC does not divulge the substance of those articles or the emails on which they are based.  That is because they are incredibly damning for Broidy and his claims.

As detailed in the articles addressed in the FAC, the leaked emails reveal a vast operation in which Broidy and entities under his control sought to influence U.S. government officials (including President Trump, the Secretary of State, the Attorney General, and members of Congress), civic leaders, and the public in exchange for millions of dollars from foreign principals—all without filing any of the disclosures and registrations required under FARA.  *See, e.g.*, Ex. 8.  The emails provide insight into Broidy's covert efforts to leverage his access to the Trump Administration in order to shape U.S. domestic and foreign policy in ways that benefited high-paying foreign clients, including the UAE, Saudi Arabia, Angola, and Malaysia.  Broidy eventually pleaded guilty to conspiring to violate FARA (though he was subsequently pardoned by President Trump).[7]  ECF No. 13 at 80, Broidy Criminal Suit.  As described by the Department of Justice, Broidy was "secretly do[ing] the bidding of foreign principals" in "a covert campaign to influence the U.S. Government."  U.S. Dep't of Justice, *Recent FARA Cases* (Dec. 3, 2021), https://www.justice.gov/nsd-fara/recent-cases.

Defendants served several discovery requests regarding the illicit activity reflected in Broidy's emails, which are directly relevant to Broidy's claims and alleged damages and

---

[7]     This was Broidy's second felony conviction.  In 2009, he pleaded guilty to charges that he paid nearly one million dollars in gifts to New York State officials in order to obtain a $250 million investment from the State.

Defendants' defenses.[8]  These requests seek documents and information concerning the following:

- Broidy's lobbying of U.S. government officials on behalf of foreign principals;[9]
- Broidy's contracts with, payments from, and communications with the UAE, Saudi Arabia, Angola, Malaysia, and other foreign clients;[10] and
- Broidy's efforts to attack and undermine Qatar, a geopolitical rival of Broidy's foreign clients and prospective clients in the region.[11]

Broidy refuses to respond to these discovery requests, claiming—without specificity or support—that they are categorically irrelevant.[12]  Broidy's objections are too general and unspecific to advise Defendants of Broidy's reasoning, much less to support his repeated refusals to produce relevant and responsive materials.  Regardless, he is wrong.  Discovery regarding Broidy's relationships with and undisclosed work on behalf of foreign principals is highly relevant, and critically important, for at least seven reasons.

 *First*, such discovery will enable Defendants to refute Broidy's claim that the leaked emails "create[d] a false and injurious image" of him and thereby caused him harm.  FAC ¶ 33; *see also id.* ¶¶ 8, 26, 255, 364 (alleging Defendants "falsely and misleadingly connect[ed] Mr. Broidy to wrongdoing," "falsely associat[ed] him with illegal activity," and sought "to damage his image"

---

[8] *See* Howard's RFAs 1-43, 45-50, RFPs 33-42, 44-45, ROGs 5-6, 7(f), 8-11; Stonington Defs.' RFPs 51, 54, 58-72, 80-88, 96, 104, 109, 114, 116, 119, ROGs 17-22.

[9] *See* Howard's RFAs 8, 10-11, 13-14, 17-18, 19-20, 30, 34-37, 40-43, 45, 47-50, RFPs 35-36, 40, 42, 44-45; Stonington Defs.' RFPs 54, 58-63, ROGs 20-22.

[10] *See* Howard's RFAs 1-7, 9, 12, 15, 17-18, 29, 38-39, 45-47, 49, RFPs 35-36, 38, ROGs 5-6, 8-11; Stonington Defs.' RFPs 21, 64-72, 80-88, 114, 119, ROGs 7-8, 17-19.

[11] *See* Howard's RFAs 16, 20, 21-28, 31-33, 34-36, RFPs 33-34, 37-39, 42, ROGs 5-6; Stonington Defs.' RFPs 51, 96, 104, 109, 116.

[12] With respect to one request (Howard's RFP 45), Broidy agrees to produce certain self-serving documents, but none that are actually responsive.  *See* Broidy's Response ("Resp.") to Howard's RFP 45 (stating Broidy will produce documents that "***support*** the allegations in paragraph 33 of the FAC" in response to a request for documents that ***refute*** those allegations).

through "false and misleading stories based on the hacked and stolen information"). Discovery showing that Broidy's business dealings were accurately reflected in the leaked emails and articles written about them will allow Defendants to rebut this allegation and disprove Broidy's claimed damages. *See Pietrangelo v. Refresh Club, Inc.*, No. 18-CV-1943, 2021 WL 1209300, at *10 (D.D.C. Mar. 31, 2021) (holding "Defendants are entitled to discovery regarding [all alleged] damages"), *aff'd*, 2021 WL 2156504 (D.D.C. May 26, 2021) (Friedrich, J.). Indeed, it was Broidy—in making these allegations—who put these issues in play and opened himself to discovery on them. *See id.* at *9 & n.3 (explaining that insertion of even "one word" in a complaint can "open a can of discovery worms," and that a "seasoned litigator such as Plaintiff ought to know better than to include . . . language in a complaint if he is not prepared to litigate it").

*Second*, the requested discovery will allow Defendants to defeat Broidy's trade secrets claims. Information is not entitled to trade secret protection if it is part of illegal, deceptive, or otherwise harmful activity. *See, e.g., Goodman v. Genworth Fin. Wealth Mgmt.*, 881 F. Supp. 2d 347, 355 (E.D.N.Y. 2012) ("Deceptive, illegal or fraudulent activity simply cannot qualify for protection as a trade secret."); *Alderson v. U.S.*, 718 F. Supp. 2d 1186, 1200 (C.D. Cal. 2010) (rejecting the notion "that a person can receive trade secret protection for information about ongoing illegal activities") *aff'd*, 686 F.3d 791 (9th Cir. 2012). Defendants seek discovery regarding the matters discussed in Broidy's leaked emails in order to prove that those emails reflect unlawful lobbying, corruption, and other illegal activity, thus negating any trade secret protection.

*Third*, the requested discovery is important to Howard's First Amendment defense.[13]

---

[13]    Broidy incorrectly claims that "the Court expressly *rejected* [this] defense as a matter of law," and promises to "seek sanctions" if Howard "seek[s] discovery in support of [this] defense." Ex. 4 at 3-4 (emphasis in original). The Court did not reject that defense. Instead, it held that the

(continued...)

Howard asserts that the claims against him fail because they seek to punish him for engaging in protected speech (communication with journalists about Broidy's leaked emails) regarding matters of grave public importance.  *See Bartnicki v. Vopper*, 532 U.S. 514 (2001) (holding the First Amendment protects disclosure of illegally intercepted communications involving matters of sufficient "public importance" by parties who did not participate in the interception).  Discovery illuminating the criminal nature and scope of Broidy's undisclosed foreign lobbying will help Howard show that he communicated with journalists about the leaked emails in order to expose dangerous efforts to corrupt American democracy, and not, as is alleged, because he was part of an illegal conspiracy to hack and silence Qatar's critics.  Indeed, Howard was not even working for Qatar at the time.  Thus, the requested discovery will help Howard establish the necessary public importance of the emails and the lawful purpose of his actions, which are critical to his First Amendment defense.  Moreover, evidence regarding Broidy's efforts to corrupt the Trump Administration and the Department of Justice is relevant to demonstrate why it was necessary for Howard to expose Broidy through the press, as opposed to through federal law enforcement.[14]

*Fourth*, the requested discovery is necessary to support Defendants' unclean-hands defense and to rebut Broidy's repeated allegations that he was targeted because of his supposedly altruistic opposition to Qatar, a theme Broidy no doubt will seek to press at any trial.  Throughout the FAC, Broidy portrays himself as an American patriot who was victimized because he dared speak out

---

First Amendment will shield Howard from liability unless Broidy can prove his allegation that Howard "conspired with the hackers."  ECF No. 51 at 43-44.  Because that is an evidentiary issue, the Court concluded that it could not be resolved on a motion to dismiss.  *Id.*

[14]     Notably, a DOJ official participated in the same criminal conspiracy as Broidy.  *See* ECF No. 14, *U.S. v. Harley*, No. 18-CR-34 (D.D.C. Nov. 12, 2018).

against the international threat allegedly posed by Qatar. *See, e.g.*, FAC ¶¶ 1-2, 12, 45-49.[15]   In

reality, he was a corrupt mercenary covertly working on behalf of foreign powers to influence U.S.

policy with respect to Qatar (among other countries).   Defendants are permitted to pursue

discovery to show that Broidy's "misconduct occurred in connection" with the activities

underlying his claims. *Pietrangelo*, 2021 WL 1209300, at *10.   And, if Broidy insists on

portraying himself as an innocent victim to gain sympathy and admiration, now or at trial,

Defendants are entitled to rebut that picture through his own documents. *See Thomas v. Starz Ent.,

LLC*, No. 15-CV-09239, 2017 WL 11628086, at *2 (C.D. Cal. May 26, 2017) ("Defendants are

entitled to take discovery to find information that may rebut" plaintiff's statements regarding his

own work); *Cont'l Cirs. LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1019 (D. Ariz. 2020) (holding

"Defendants are entitled to conduct discovery that may refute potential trial themes").

*Fifth*, evidence of Broidy's undisclosed advocacy on behalf of foreign principals, in blatant

violation of FARA, is relevant to Broidy's credibility. *See Thong v. Andre Chreky Salon*, 247

F.R.D. 193, 196 (D.D.C. 2008) ("[D]iscoverable information includes evidence relevant to the

credibility of a party or a key witness.").   As this Court has held, such undisclosed activity is

inherently dishonest and deceptive. *U.S. v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d

38, 49-50 (D.D.C. 2018) (Friedrich, J.) (holding the "failure to disclose information to the United

States—in the face of a legal obligation to do so [under FARA]—qualifies as deceit, craft or

trickery").   Therefore, discovery regarding such activity is unquestionably relevant to credibility.

*See Cobell v. Norton*, 213 F.R.D. 16, 25 n.3 (D.D.C. 2003).

---

[15]     Broidy presses the same narrative in his most recent filing, claiming that his efforts to
influence U.S. policy regarding Qatar were merely "a continuation of his deeply-held beliefs" and
commitment to "counterterrorism and enhancing U.S. national security."  ECF No. 110 at 17 n.15.

*Sixth*, the requested discovery is also relevant because it will offer clues as to who may have actually hacked Broidy's emails. Broidy assumes, with no proof, that Qatar was behind the alleged hack. *See* FAC ¶¶ 103-05 (alleging that hackers accessed Broidy's servers at least 180 times over months, only two of which involved an IP address located in Qatar). Qatar has vehemently and publicly denied this accusation. And Broidy's lawsuit against a company he claims Qatar hired to perpetrate the alleged hack, FAC ¶ 79, was dismissed because Broidy failed to plausibly allege the company had anything to do with it. *Broidy v. Glob. Risk Advisors LLC*, No. 1:19-CV-11861, 2021 WL 1225949, at *10 (S.D.N.Y. Mar. 31, 2021) ("The only identifiable facts about the hacks (*e.g.*, IP addresses linked to a limited number of hacks) are not linked to Defendants in any way and cannot lead to a plausible inference of their liability."). Broidy's own third-party discovery has revealed an apparent connection to Ukraine, which is not surprising given the advocacy work Broidy reportedly performed and sought to perform on behalf of Russian and Ukrainian entities, which was itself the subject of a Ukrainian criminal investigation. *See* Ex. 9.

Discovery regarding Broidy's illegal business dealings and secret lobbying on behalf of foreign interests will likely reveal evidence of numerous parties, other than Qatar, who had a motive and the means to hack Broidy's email. Such evidence will allow Defendants to rebut at trial Broidy's speculative theory that a so-called "Qatari Enterprise"—encompassing Qatar and those who, like Defendants, had previously performed work for it—conspired against him.

*Lastly*, discovery into Broidy's relationships with the UAE, Saudi Arabia, and other regional rivals of Qatar is relevant to show that Broidy's motive in bringing this and other similar lawsuits—notwithstanding their lack of merit—was to artificially inflate his standing as a self-proclaimed adversary of Qatar and, in turn, boost his defense company's business prospects. *See Pietrangelo*, 2021 WL 1209300, at *9-10 (holding "plaintiff's motives for bringing this lawsuit"

are relevant "to defenses the [Defendants] may seek to mount," including an unclean-hands defense); *Nelson v. Millennium Lab'ys*, No. 2:12-CV-01301, 2013 WL 11687684, at *6 (D. Ariz. May 17, 2013) (granting motion to compel production of all documents related to plaintiff's fee agreement where defendant suspected a market competitor was funding the litigation). Evidence of such improper motive would naturally cause a factfinder to view Broidy's claims with doubt.

In sum, the illegal activity evidenced in Broidy's leaked emails is highly relevant to this case. Broidy's blanket refusal to respond on this issue has no legitimate justification.

### C.   Broidy Refuses to Produce Relevant Documents Related to his Recent Criminal Conviction for Conspiring to Violate FARA.

Broidy also refuses to provide relevant and responsive information related to his guilty plea for conspiring to violate FARA, despite its obvious connection to Defendants' defenses. During his plea hearing, the Court noted Broidy's "efforts to obtain business from a Middle Eastern country and efforts to influence U.S. policy towards a second Middle Eastern country." ECF No. 13 at 65:21-23, Broidy Criminal Suit. That reference plainly relates to Broidy's efforts on behalf of the UAE, Saudi Arabia, or other regional rivals against Qatar.

Defendants served 10 RFPs focused on this specific issue.[16] They seek documents and communications arising from Broidy's criminal case, his presidential pardon, and the investigation conducted by Special Counsel Robert Mueller (referenced in paragraph 147 of the FAC) relating to Broidy's efforts on behalf of the UAE and/or Saudi Arabia against Qatar.

Broidy refuses to produce any documents responsive to these RFPs, again asserting that they are irrelevant. This refusal is unjustified for each of the seven reasons identified above. And because these RFPs relate specifically to a criminal conviction, they have heightened relevance

---

[16]    *See* Stonington Defs.' RFPs 74-79, 100-03.

with respect to four of those reasons.  Documents responsive to the RFPs will offer especially strong proof of: (1) the illegal nature of Broidy's leaked emails, which deprives them of trade secret protection; (2) the public importance of the emails, which strengthens Howard's First Amendment defense; (3) Broidy's lack of credibility, which bolsters Defendants' case in general; and (4) Broidy's corrupt, profit-driven opposition to Qatar, which undermines his narrative that such opposition was purely altruistic and which supports Defendants' unclean-hands defense. Accordingly, Broidy should be compelled to respond to these RFPs.

### D.     Broidy Refuses to Provide Relevant Documents and Information Related to the Key Element of His Trade Secrets Claims.

Broidy has alleged that Defendants misappropriated trade secrets contained in his leaked emails in violation of both the federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act.  *See* FAC Counts V and VI.  In order to prevail under either statute, Broidy must prove that the information allegedly misappropriated was a "trade secret," including that he took "reasonable measures" to keep the information at issue secret and that the information was not "generally known" or "readily ascertainable."  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d); *see also* Cal. Civ. Proc. Code § 2019.210 (requiring trade secret plaintiff to "identify the trade secret with reasonable particularity"); *InteliClear, LLC v. ETC Global Holdings, Inc*., 978 F.3d 653, 658 n.1 (9th Cir. 2020) (applying § 2019.210 to DTSA and CUSTA claims).

To effectively challenge Broidy's trade secrets claims, Defendants interposed discovery requests that seek to determine what "trade secrets" Broidy alleges were taken and to evaluate the secrecy of Broidy's alleged trade secrets and the measures taken by Broidy to protect that secrecy. Specifically, they requested that Broidy:

- Identify all trade secrets that Broidy alleges were misappropriated, including who created each trade secret and on what date (Stonington Defs.' ROG 11 and Howard's ROG 7(a));

- Produce "[a]ll communications that discuss, transmit, attach, disclose, publish, share, forward, or disclose each alleged trade secret" (Stonington Defs.' RFP 14);

- Produce "[a]ll communications between [Broidy] and any person in which [Broidy] disclosed any of [his] alleged trade secrets" (Howard's RFP 23); and

- "Explain with precision and specificity how each such trade secret is different from information that is available in the public domain" (Howard's ROG 7(f)).

These requests go to the heart of Broidy's trade secrets claims—including what trade secrets Broidy claims were misappropriated—which are vital to Defendants' ability to defend against them.  Broidy either defers responding,[17] maybe until the expert phase of discovery, or refuses to provide the requested discovery at all, claiming the requests are irrelevant.[18]  According to Broidy, requests like these, which are "unrelated to the hacking," are "irrelevant to any claim or defense in the case."  Resp. to Stonington Defs.' RFP 14; Resp. to Howard's RFP 23, ROG 7(f).

Discovery requests need not be limited to the underlying hack alleged in the FAC in order to be relevant.  *See, e.g., Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 242 F.R.D. 1, 6-7 (D.D.C. 2007) ("[I]nformation not directly pertinent to the incident in suit could be relevant to claims or defenses raised in a given action.").  The requests at issue here speak to key elements of Broidy's trade secrets claims—the identity and secrecy of the information—and are undoubtedly relevant the subject matter at hand.  Broidy should be required to immediately produce all responsive documents and information in his possession, custody, or control.

---

[17]     In response to Howard's ROG 7(a) Broidy demurs, asserting that he is "still in the process of compiling responsive information."  And as discussed below, Broidy similarly fails to disclose any specific damages that he has suffered as a result of Defendants' alleged actions.  Broidy's failure to provide such information is especially troubling because it has been nearly four years since he first raised his trade secret and damages allegations.

[18]     With respect to Howard's RFP 23, Broidy agrees only to produce certain "policies or procedures" (which are not responsive to the request), and only during "the relevant time period" (which he does not define, but which is apparently after December 1, 2017, the cutoff date noted in his General Objections to Defendants' RFPs).

**E.**     **Broidy Refuses to Provide Documents and Information Directly Related to His Alleged Damages.**

Broidy has claimed all manner of monetary and non-monetary damages caused by Defendants' alleged hack of his computers, misappropriation of his alleged trade secrets, possession of his allegedly stolen property, and intrusion upon his privacy.  His open-ended damages allegations include loss of business, harm to his business relationships, loss of purported consumer goodwill, and injury to his reputation and public image.  *See* FAC ¶¶ 33, 26, 255, 272, 286, 303, 317, 328, 364, 374.

"Defendants are entitled to discovery regarding [all alleged] damages."  *Pietrangelo*, 2021 WL 1209300, at *10.  That fundamental proposition is especially true here since damages are an element of one of the counts in the FAC (Count XIII - Civil Conspiracy).  *See* Mem. Op. at 41, ECF No. 51 (stating that civil conspiracy *requires* "damage resulting to plaintiff").  That conspiracy count has outsized significance in this case, as Defendants' only liability for the hack at issue is through an alleged conspiracy.

Defendants directed several discovery requests to Broidy's alleged damages.  Broidy, however, refuses to respond, claiming without legal or factual justification that Defendants' requests are irrelevant and/or unduly burdensome:

- Broidy refuses to produce any communications with "any person who [he] ha[s had] a business relationship with that [he] claim[s] has been disrupted as a result of the conduct alleged in the FAC, as well as any documents relating to such communications."  Resp. to Stonington Defs.' RFP 33.  This request is relevant because Broidy specifically alleges that he lost business and consumer goodwill as a result of the alleged hack.

- Broidy refuses to produce documents regarding the business that he, or companies under his control, conducted or sought to conduct with Saudi Arabia, the UAE, and others relating to Qatar.  Resp. to Stonington Defs.' RFPs 83-85.  These requests are relevant because they seek to assess whether, and to what extent, Broidy's foreign business ventures suffered as a result of the alleged hack as he contends.

- Broidy refuses to identify the entities he controls, the business he and those entities have

conducted on behalf of foreign clients, or his recent employment history. Resp. to Stonington Defs.' ROGs 7-8. These requests are relevant because they seek to understand the scope of Broidy's business ventures that were allegedly harmed by Defendants.

- Broidy refuses to provide information or documents relating to his efforts, if any, to mitigate damages, including his communications with journalists regarding the articles they wrote that allegedly "create[d] a false and injurious image" of him (FAC ¶ 33). Resp. to Stonington Defs.' RFP 104; Howard's RFP 26, ROG 4.[19] These requests are relevant because they seek to ascertain whether Broidy in fact believed at the time that the articles were false and whether he took any steps to prevent or minimize their supposed "injurious" effect. In addition, Broidy put his communications with journalists at issue by making repeated allegations about those communications. *See* FAC ¶¶ 123, 128, 131, 132, 154, 155, 158, 175.

- Broidy refuses to produce any bank information, call logs, calendars, contact lists, business travel itineraries, expense reimbursements, or cell phone information. Resp. to Stonington Defs.' RFPs 89-95, ROGs 5-6. This requested material is relevant because it will allow Defendants to verify Broidy's alleged damages and the scope of Broidy's allegedly harmed business relationships.

- Broidy fails to detail the basis for, or to identify any documents supporting, the categories of damages alleged in the FAC, including his claim for lost contracts, customers, or business opportunities or disruption of business relationships. Resp. to Stonington Defs.' ROGs 12-14. This information will allow Defendants to verify Broidy's alleged damages and the scope of Broidy's allegedly harmed business relationships. Broidy even acknowledges that he is required to produce such information, yet has failed to do so. *Id.*

Broidy's refusal to produce material responsive to these damages-related requests is unjustified. Damages is a critical component of this case, and Broidy is in sole possession of the relevant evidence. The targeted requests identified above seek discovery that Defendants need in order to effectively defend themselves on the issue of damages, which, as noted above, is also an element of one of the counts in this case. Because of the indisputable relevance and importance of these requests, Broidy should be compelled to respond in full. *See Nat'l Cmty. Reinvestment*

---

[19] With respect to Howard's RFP 26, Broidy agrees only to produce communications with journalists "regarding the hacking." This would exclude communications regarding the articles or his leaked emails on which the articles were based—which are the relevant topics for purposes of mitigation of damages.

*Coal. v. NovaStar Fin., Inc.*, No. 07-CV-861, 2009 WL 10719757, at *2 (D.D.C. 2009) (compelling damages discovery).

**F.**    **Broidy Refuses to Produce Documents Directly Related to Allegations in the FAC.**

The FAC contains wide-ranging allegations relating to Broidy's theory that Defendants conspired to hack and leak his emails in order to punish him for his supposedly patriotic opposition to Qatar.  Many of the allegations do not specifically relate to the underlying hack—with good reason—because Defendants in this case are not even alleged to have conducted it.  By asserting these allegations in the FAC, Broidy has necessarily put them at issue for purposes of discovery. *Pietrangelo*, 2021 WL 1209300, at *9 & n.3; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-CV-05944, 2015 WL 12952688, at *3 (N.D. Cal. Jan. 16, 2015) (holding discovery that can "rebut allegations" is discoverable even if allegations are not central to plaintiff's claims).

Broidy refuses to produce discovery regarding many of these allegations, claiming they are somehow irrelevant.  When Broidy does agree to provide responsive materials, he consistently limits his responses to materials he considers "relevant to the hacking," even when his own underlying allegations relate to other important issues in the case.  According to Broidy, "documents unrelated to the hacking . . . are . . . irrelevant" and need not be produced.  *See, e.g.*, Resp. to Stonington Defs.' RFP 14; Resp. to Howard's RFP 23.  But Broidy also objects on relevance grounds to several requests that ***do*** directly relate to the alleged hacking.  *See infra*. Broidy's relevance objections are thus not only unreasonable, but also incoherent.

Broidy alleges repeatedly that Defendants leaked his emails to various publications specifically to "create a false and injurious image" of him.  FAC ¶ 33; *see also id*. ¶¶ 8, 26, 255, 364.  The Stonington Defendants sought to probe this allegation in their ROG 16, which states, "With respect to each publication of information that you describe in the FAC, identify all false

statements in such publication and explain why they are false," with a list of representative publications.  Without elaboration, Broidy asserts that ROG 16 is "not relevant or proportional to the needs of the case," and that he "will not respond."  Resp. to Stonington Defs.' ROG 16.  The relevance of this interrogatory is plain, as it asks Broidy to simply substantiate his claims regarding the allegedly false stories Defendants allegedly caused to be written about him.  Broidy has not articulated, and cannot articulate, a valid reason for his non-response.

Asserting similar conclusory objections based on relevance and proportionality, Broidy likewise refuses to produce documents supporting allegations regarding his opposition to Qatar. These include:

- The Stonington Defendants' RFP 55, which seeks documents and communications "demonstrating that Broidy's efforts against the State of Qatar 'succeeded in generating opposition' to the State of Qatar, as described in paragraph 46 of the FAC";

- The Stonington Defendants' RFP 54, which seeks documents and communications "regarding any statements Broidy has made to, including communications with, any U.S. government official about the State of Qatar, its government, or its relationship with Israel, including any white papers, affidavits, reports, notes, presentations, or talking points, whether in draft or final form (see paragraph 47 of the FAC)"; and

- The Stonington Defendants' RFP 56, which seeks documents and communications "relating to the allegations in paragraph 59 of the FAC that 'the "black ops" team that carried out the "dirty tricks" campaign that played the critical role in winning [Qatar's] tainted World Cup bid was overseen by Ahmad Nimeh.'"

Again, Defendants are simply asking Broidy to produce materials to substantiate and/or allow them to refute his own allegations, which are quoted and/or cited in the requests themselves. Those allegations, which Broidy considered important enough to include in his Complaint, claim that Defendants were members of a Qatari-backed criminal conspiracy to "retaliate against, discredit, and ultimately silence" those like him who "spoke out forcefully and effectively" against Qatar's alleged support for terrorism.  FAC ¶¶ 2, 32.  Defendants are entitled to refute those allegations, and they cannot do so effectively without documents in Broidy's possession.

Where Broidy has agreed to respond to discovery requests regarding allegations in the FAC, he has unjustifiably limited that agreement to materials "relevant to the hacking."  The Stonington Defendants' ROG 4, for example, asks Broidy to "[i]dentify all persons, if not already identified and excluding attorneys, with whom you have communicated regarding the subject matter of the FAC."  Similarly, the Stonington Defendants' RFP 120 asks Broidy to produce the "recorded conversations, whether audio or video, to the extent not already requested, in Broidy's possession between Defendants and any person regarding any of the events described in the FAC."[20]  The Stonington Defendants' RFP 121 also requests any documents regarding the transmittal of such recorded conversations.[21]  These requests simply seek relevant information regarding the witnesses and evidence Broidy may use to prove his allegations at trial, and which Defendants may likewise explore in their defense.  Such material will enable Defendants to evaluate the scope of Broidy's investigation, his basis for asserting the claims in the FAC, and his witnesses' knowledge.  Because there are many issues relevant to this case beyond just the hacking itself, Broidy should be compelled to respond in full, without this unreasonable limitation.

Despite his insistence that the alleged hacking is the only relevant issue in this case, Broidy nonetheless refuses—on vague relevance grounds, among other baseless grounds—to produce documents in response to RFPs *regarding that very issue*, including:

- The Stonington Defendants' RFP 97, which seeks "communications, with any person, including without limitation [Broidy's] associates, any member of the media, foreign heads of state, agents or representatives of foreign states, or U.S. government officials, agents, or representatives (current or former) regarding the alleged hacking";

- The Stonington Defendants' RFP 98, which seeks "documents that Broidy shared with

---

[20]     Broidy quotes and describes secretly recorded conversations involving Muzin in the FAC. *See* FAC ¶¶ 171-87.

[21]     Broidy reverts to his primary answer and refuses to produce any documents responsive to this request.  Resp. to Stonington Defs.' RFP 121.

officials, agents, or representatives of the United States government (current or former) regarding the alleged hacking"; and

- The Stonington Defendants' RFP 99, which seeks "documents and communications regarding Broidy's efforts to have representatives of the United States government prosecute persons allegedly involved with the alleged hacking that were shared with or received from the U.S. government or any third party."

These requests specifically relate to the alleged hacking. And they seek material that will help Defendants understand the details of that event, Broidy's response to it, his contemporaneous views as to who may have done it, potential witnesses' knowledge, and Broidy's motives for bringing this and other hacking-related lawsuits. Yet Broidy declares—without any elaboration—that these requests are "irrelevant to the claims and defenses in this case" and that he "will not produce documents in response."[22] Given the central importance of the alleged hacking to this case, there is no justification for Broidy's refusal to respond to requests for documents about it.

Broidy similarly refuses to respond to RFPs that seek to discover who might have perpetrated the alleged hack. Broidy's entire case is predicated on the flawed assumptions that Qatar was responsible and that Defendants colluded with Qatar in an alleged hack-and-disseminate conspiracy. Defendants are entitled to rebut those false allegations and served three narrowly drawn RFPs to explore other potential culprits. They request:

- "[D]ocuments and communications concerning any hacks of Broidy's electronic devices, email accounts, or computer servers prior to" the alleged hack at issue in this lawsuit (Howard's RFP 28);

- "[D]ocuments and communications concerning any hacks of Broidy's electronic devices, email accounts, or computer servers" after the alleged hack at issue in this lawsuit (Howard's RFP 29); and

---

[22]     Resp. To Stonington Defs.' RFPs 97-99. Broidy also repeats his other stock objections that the requests are "overly broad, unduly burdensome, . . . and not proportional to the needs of the case." *Id.* These similarly unspecific objections are equally baseless, particularly without any elaboration.

- "Documents sufficient to identify any person that [Broidy], [his] staff, agents, or representatives—or an entity [Broidy is] affiliated with—have employed, hired, utilized, or otherwise consulted with, whether personally or professionally, for their ability to breach defenses or exploit weaknesses in computer systems or networks" (Stonington Defs.' RFP 20).

Broidy refuses to produce the requested documents, claiming in his typical conclusory fashion that the materials sought are "irrelevant." Resp. to Stonington Defs.' RFP 20; Resp. to Howard's RFPs 28, 29.[23]  Once again, he is incorrect.  There is nothing more relevant to this case than figuring out who did the alleged hack.  And there are only so many ways to explore that issue. One logical approach is to identify parties who have hacked Broidy on other occasions.[24]  Another is by seeking to identify those who possess the unique skill set and familiarity with Broidy's computer systems to have successfully committed the hack alleged in this case.  The RFPs quoted above do both.  Accordingly, Broidy should be compelled to produce responsive material.

### G.    Broidy Refuses to Produce Any Documents From Before December 2017.

Across the board, Broidy has expressed an intention to unilaterally limit his document production to materials "created on or after December 1, 2017."  *See* Broidy Resp. to Howard's RFPs at 4; Broidy Resp. to Stonington Defs.' RFPs at 4.  This claim is directly contrary to Broidy's position in his most recent filing that his advocacy work over the past "two decades" provides

---

[23]     With respect to the Stonington Defendants' RFP 20, Broidy refuses to produce any documents whatsoever.  With respect to Howard's RFPs 28 and 29, Broidy repeats his mantra that he will only produce documents "to the extent they are relevant to the hacking at issue in this case." Because those RFPs explicitly seek documents regarding hacking incidents unrelated to the hacking at issue in this case, Broidy is effectively refusing to respond.  Broidy also makes clear that he will not respond to Howard's RFP 28 (regarding prior hacks) by stating that he will not produce documents before December 2017, when the hacking operation alleged in this case supposedly began.  Resp. to Howard's RFPs at 4.

[24]     Broidy has sought third-party discovery regarding a recent hacking attempt. *See, e.g.*, ECF No. 90-14 (Verizon Subpoena).  Yet he refuses to respond to Howard RFP 29 on that very topic.

"relevant context" for this case.  ECF No. 110 at 17 n.15.[25]  And Broidy provides no basis for this limitation, thereby waiving any substantive objection on the issue, as discussed above.  To the extent that Broidy reasons that the alleged hacking operation began sometime around December 2017, and he thus need not produce documents created before then, he is mistaken.  Putting aside the fact that the FAC makes allegations about hacks going back as far as 2014 (*see, e.g.*, FAC ¶¶ 9, 108), and that Broidy himself requests documents from well before December 2017, this date cutoff is unreasonable *per se* because it denies Defendants access to critically important discovery.

Highly relevant evidence predates the December 2017 alleged hack.  The most obvious example is the allegedly hacked emails themselves, which were of course created beforehand.[26]  It goes without saying that those emails are core evidence in this case, as the documents that Broidy contends were obtained from his computer without authorization (Count IV - Computer Fraud and Abuse Act ("CFAA")); the allegedly misappropriated trade secrets (Counts V and VI - Misappropriation of Trade Secrets); the allegedly stolen property (Count VII - Possession of Stolen Property); and the allegedly private data into which Defendants allegedly intruded (Count X - Intrusion Upon Seclusion).  There is no possible justification for withholding them.

Further, it is not just the emails, but also contemporaneous and antecedent documents that provide necessary context to those emails.  Such documents will elucidate the wrongdoing evidenced in the emails and allow a factfinder to better understand their significance.  As discussed above, documents relating to Broidy's unregistered foreign lobbying[27] are vital for at least seven

---

[25]    Broidy's foreign-sponsored lobbying and public-relations campaign against Qatar peaked in early-to-mid-2017, conveniently just before his discovery cutoff.

[26]    *See* Stonington Defs.' RFPs 7-11, 37, 123; Howard's RFPs 3-7, 9, 19, 22, 24-25.

[27]    *See* Stonington Defs.' RFPs 50, 54, 58-72, 74-96, 100-105, 107-109, 119; Howard's RFPs 30-42, 44-45.

reasons that are central to the Broidy's allegations and Defendants' defenses.  *See supra* § III.B.

Documents created before December 2017 are also relevant to Broidy's alleged damages, trade secrets, and CFAA claim.  With respect to damages, Broidy claims to have lost business and consumer goodwill as a result of the alleged hack.  FAC ¶¶ 272, 286, 303, 317, 328, 374.  In order for Defendants and their experts to assess, and ultimately contest, this alleged loss, they need to review evidence of Broidy's business relationships and consumer goodwill ***before*** the alleged hack to compare them to his business relationships and consumer goodwill ***afterward***.[28]  In addition, evidence regarding Broidy's illicit foreign lobbying before the alleged hack is necessary to rebut Broidy's claim that he was injured by supposedly false and misleading articles accusing him of such conduct.[29]  FAC ¶¶ 8, 26, 33, 255, 364.

With respect to the alleged trade secrets, as discussed, Broidy's claims cannot survive if he has failed to take "reasonable measures to keep such information secret" or if the information was "generally known" or "readily ascertainable" before the alleged misappropriation.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).  Documents and communications that predate the alleged hack will shed light on whether, and to what extent, Broidy shared his alleged trade secrets with others and/or failed to take "reasonable measures" to ensure their protection.[30]  Further, evidence regarding prior hacks of Broidy's computer systems, and Broidy's response to those prior hacks, will help determine what measures were "reasonable" under the circumstances.[31]  Evidence of

---

[28]   *See* Stonington Defs.' RFPs 16, 28, 30-33, 49-50, 64-66, 74, 80-96, 109, 119, 124-25; Howard's RFPs 34-36.

[29]   *See* Stonington Defs.' RFPs 50, 54, 58-72, 74-96, 100-105, 107-109, 119; Howard's RFPs 30-42, 44-45.

[30]   *See* Stonington Defs.' RFPs 1-2, 11-14, 26-27, 31, 42; Howard's RFPs 10, 23, 26, 28.

[31]   *See* Howard's RFP 28.

prior hacks and attempts will also aid in determining who may have committed the alleged hack.

Evidence regarding the pre-hack security of Broidy's computer systems are also relevant to his CFAA claim. The CFAA penalizes anyone who "accesses a protected computer without authorization." 18 U.S.C. § 1030(a)(5). Evidence from before the alleged hack will shed light on the extent to which Broidy's computers were "protected" and accessed "without authorization."[32]

In short, there is no principled reason why Broidy's discovery obligations should be limited to documents created after the December 2017 alleged hacking operation began. *See Tequila Centinela*, 242 F.R.D. at 6-7 (noting that "information not directly pertinent to the incident in suit" can still be relevant and discoverable). Such a limitation would unfairly prevent Defendants from obtaining documents that are not only relevant, but crucial to this case. Because Broidy has not justified, and cannot justify, his December 1, 2017 cutoff date, he must produce responsive documents regardless of date.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Broidy's Motion to Compel, compel Broidy to respond in full to the discovery requests identified above and listed in Exhibit 5, award Defendants the reasonable expenses and attorneys' fees they incurred in making this motion, and grant such other relief as appropriate.

---

[32]   *See* Stonington Defs.' RFPs 1-2, 12-13, 23, 12p4, 127; Howard's RFPs 22, 28.

Dated: February 7, 2022

| | |
|---|---|
| | /s/ Stephen J. Obermeier |
| Charles S. Fax | Stephen J. Obermeier (D.C. Bar # 979667) |
| RIFKIN WEINER LIVINGSTON LLC | sobermeier@wiley.law |
| 7979 Old Georgetown Road, Suite 400 | Rebecca Saitta (D.C. Bar # 488110) |
| Bethesda, MD 20814 | rsaitta@wiley.law |
| cfax@rwlls.com | Rebecca Fiebig (D.C. Bar # 976854) |
| | rfiebig@wiley.law |
| Liesel J. Schopler | Enbar Toledano (D.C. Bar # 1030939) |
| RIFKIN WEINER LIVINGSTON LLC | etoledano@wiley.law |
| 225 Duke Of Gloucester Street | Krystal B. Swendsboe (D.C. Bar # 1552259) |
| Annapolis, MD 21401 | kswendsboe@wiley.law |
| lschopler@rwlls.com | WILEY REIN LLP |
| | 2050 M Street NW |
| Jeffrey A. Udell | Washington, DC 20036 |
| Adam P. Cohen | Phone: (202) 719-7000 |
| Jacob Gardener | Facsimile: (202) 719-7049 |
| WALDEN MACHT & HARAN LLP | |
| 250 Vesey Street, 27th Floor | *Attorneys for Defendants Stonington* |
| New York, NY 10281 | *Strategies LLC and Nicolas D. Muzin* |
| judell@wmhlaw.com | |
| acohen@wmhlaw.com | Randall A. Brater |
| jgardner@whmlaw.com | ARENT FOX LLP |
| | 1717 K Street NW |
| *Counsel for Defendant Gregory Howard* | Washington, DC 20006 |
| | randall.brater@arentfox.com |
| | |
| | Eric Roman |
| | Mohammed T. Farooqui |
| | ARENT FOX LLP |
| | 1301 Avenue of the Americas, Floor 42 |
| | New York, NY 10019 |
| | eric.roman@arentfox.com |
| | mohammed.farooqui@arentfox.com |
| | |
| | *Counsel for Defendant Joseph Allaham* |