# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,

Plaintiffs,

v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC,

Defendants.

Civil Action No. 1:19-cv-00150-DLF

**STATE OF QATAR'S MOTION TO VACATE THE COURT'S PRIOR ORDER REGARDING QATAR'S PRIVILEGES AND IMMUNITIES**

The State of Qatar ("Qatar") respectfully moves the Court for an order vacating the portions of its prior order of June 2, 2022, that (1) categorically rejected the application of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (collectively, "Vienna Conventions"), and principles of international comity and related privileges, to materials and information in the possession of Qatar's former contractors; and (2) narrowed what documents could be treated as "Highly Confidential" under the operative protective order in this case. *See* ECF Nos. 148, 149.

Vacatur of the Court's prior order is warranted given the changed posture of this case. Specifically, the Court's prior order issued at a time when the only parties to the case were Plaintiffs Elliott Broidy and Broidy Capital Management, LLC (collectively "Broidy") and Defendants Nicolas D. Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies LLC ("Defendants"). Prior to issuance of that order, Qatar had not yet intervened due to significant,

then-unresolved concerns that intervention might result in a loss of its immunities under the Foreign Sovereign Immunities Act. Accordingly, the Court did not have the opportunity to consider fully Qatar's privileges and immunities as the privilege holder, including through review of a detailed privilege log that substantiated its claims of privilege for specific documents. In addition, since the time of the Court's order, the United States Government has taken the position that "the district court adopted an overly restrictive interpretation of Article 24" of the Vienna Convention on Diplomatic Relations, agreeing with Qatar that the inviolability of materials protected by the Vienna Conventions could extend to materials held by a mission's contractors. Ex. 1, Brief for the United States as Amicus Curiae at 2–3, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576, at *2–3 ("Article 24 covers . . . documents possessed by outside parties with a particular relationship to the mission . . . .").

The D.C. Circuit's directive that courts of this circuit "demonstrate due respect for . . . any sovereign interest expressed by a foreign state" requires that Qatar be given a full opportunity to be heard regarding the privileges and immunities that are implicated by the parties' discovery requests in this case. See *Muzin*, 61 F.4th at 987 (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987)). Accordingly, as set out in Qatar's accompanying Memorandum of Law, the Court should enter an order that recognizes these privileges and immunities may apply to certain materials held by Qatar's former contractors or others with a special relationship to the Embassy.

Because the portion of the Court's order narrowing the operative protective order was based on the Court's "interpretation of the Vienna Conventions," ECF No. 149 at 10, the Court should likewise vacate this portion of its order and revert to the original protective order issued in this case, *see* ECF No. 90-3, as modified by ECF No. 96, in order to ensure that all materials

implicating Qatar's privileges and immunities under either the Vienna Conventions or principles of international comity can be designated attorney's eyes only if produced, including through inadvertent or mistaken production.

In further support of this motion, Qatar files herewith a Memorandum of Law and a Proposed Order. Qatar has met and conferred with the parties pursuant to Local Rule 7(m). Broidy opposes this motion. Defendants do not oppose this motion.

Dated: April 26, 2023                          Respectfully submitted,

                                               */s/ Alexander A. Berengaut*
                                               Alexander A. Berengaut (D.C. Bar No. 989222)
                                               David M. Zionts (D.C. Bar No. 995170)
                                               Amber M. Charles (D.C. Bar No. 1035226)
                                               COVINGTON & BURLING LLP
                                               One CityCenter
                                               850 Tenth St., N.W.
                                               Washington, DC 20001-4956
                                               (202) 662-6000
                                               aberengaut@cov.com
                                               dzionts@cov.com
                                               acharles@cov.com

                                               Mitchell A. Kamin (admitted *pro hac vice*)
                                               COVINGTON & BURLING LLP
                                               1999 Avenue of the Stars, Suite 3500
                                               Los Angeles, California 90067-4643
                                               (424) 332-4800
                                               mkamin@cov.com

                                               *Counsel for State of Qatar*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2023, I caused a true and correct copy of the foregoing State of Qatar's Motion to Vacate the Court's Prior Order Regarding Qatar's Privileges and Immunities to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: April 26, 2023

*/s/ Alexander A. Berengaut*

Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,<br><br>Plaintiffs,<br><br>v.<br><br>NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC,<br><br>Defendants. | Civil Action No. 1:19-cv-00150-DLF |

**MEMORANDUM OF LAW IN SUPPORT OF STATE OF QATAR'S MOTION TO VACATE THE COURT'S PRIOR ORDER REGARDING QATAR'S PRIVILEGES AND IMMUNITIES**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

PROCEDURAL BACKGROUND ..... 2

ARGUMENT ..... 6

I. The Court Has Inherent Authority to Vacate Its Prior Order ..... 6

II. The Court Should Find That Qatar's Privileges and Immunities Are Not Categorically Inapplicable to Materials Held by Its Former Contractors. ..... 8

A. The United States Agrees with Qatar's Position That Vienna Convention Inviolability May Extend to Documents Held by a Mission's Contractors. ..... 8

B. The Text, Purpose, and Negotiating History of the Vienna Conventions Show that Inviolability May Extend to Materials Held by a Mission's Contractors. ..... 11

C. The Foreign Agents Registration Act's Inspection Provisions Do Not Override Vienna Convention Protections. ..... 20

D. Principles of International Comity Also Protect From Disclosure Materials That Implicate Qatar's Foreign Policy and Deliberative Processes ..... 24

CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021)....................22

*Aref v. Holder*,
2012 WL 13075792 (D.D.C. Nov. 26, 2012)....................6

*Att'y Gen. of U.S. v. Covington & Burling*,
411 F. Supp. 371 (D.D.C. 1976)....................21, 22

*In re Bankers Trust Co.*,
61 F.3d 465 (6th Cir. 1995)....................7, 25

*Breard v. Greene*,
523 U.S. 371 (1998)....................20

*Burka v. U.S. Dep't of Health & Hum. Servs.*,
87 F.3d 508 (D.C. Cir. 1996)....................15, 16

*Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*,
40 F.R.D. 318 (D.D.C 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark*,
384 F.2d 979 (D.C. Cir. 1967)....................25, 28

*Carpenter v. United States*,
138 S. Ct. 2206 (2018)....................15, 22

*Cobell v. Jewell*,
802 F.3d 12 (D.C. Cir. 2015)....................6

*Doyle v. U.S. Dep't of Homeland Sec.*,
331 F. Supp. 3d 27, 38, 51 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020)....................15

*E. Airlines, Inc. v. Floyd*,
499 U.S. 530 (1991)....................19

*EM Ltd. v. Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012)....................26

*First Eastern Corp. v. Mainwaring*,
21 F.3d 465 (D.C. Cir. 1994)....................25, 27

*Gonzalez Ramos v. ADR Vantage, Inc.*,
2020 WL 409283 (D.D.C. Jan. 26, 2020)....................28

*In re Grand Jury Subpoena Dated August 9, 2000*,
218 F. Supp. 2d 544 (S.D.N.Y. 2002)....................27

*Heffernan v. Azar*,
417 F. Supp. 3d 1, 15 (D.D.C. 2019)....................16

*Jones v. D.C.*,
2019 WL 5690341 (D.D.C. June 13, 2019)....................8

*Kolovrat v. Oregon*,
366 U.S. 187 (1961)....................7, 8

*Langevine v. District of Columbia*,
106 F.3d 1018 (D.C. Cir. 1997)....................6

*Lozano v. Alvarez*,
697 F.3d 41 (2d Cir. 2012)....................19

*Medellín v. Texas*,
552 U.S. 491 (2008)....................11

*Mich. Cmty. Servs., Inc. v. NLRB*,
309 F.3d 348 (6th Cir. 2002)....................24

*Murray v. Schooner Charming Betsy*,
6 U.S. (2 Cranch) 64 (1804)....................21

*Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*,
512 F.3d 677 (D.C. Cir. 2008)....................16, 27

*Nat'l Treasury Emps. Union v. Chertoff*,
452 F.3d 839 (D.C. Cir. 2006)....................12

*The Navajo Nation v. Peabody Holding Co.*,
255 F.R.D. 37 (D.D.C. 2009)....................22

*Pac. Gas & Elec. Co. v. United States*,
73 Fed. Cl. 333 (2006), *aff'd in part, rev'd in part and remanded on other grounds*, 536 F.3d 1282 (Fed. Cir. 2008)....................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010)....................26

*In re Pishevar*,
2023 WL 2072454 (D.D.C. Feb. 17, 2023)....................8

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014)....................25, 26

*In re Rubber Chems. Antitrust Litig.*,
486 F. Supp. 2d 1078 (N.D. Cal. 2007) ....................................................................26

*Sanchez-Llamas v. Oregon*,
548 U.S. 331 (2006)....................................................................................................11

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ....................................................................................27

*In re Sealed Case*,
494 F.3d 139 (D.C. Cir. 2007) ....................................................................................28

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
482 U.S. 522 (1987)..........................................................................................2, 11, 25

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) ..................................................................................18

*In re Subpoenas Duces Tecum*,
738 F.2d 1367 (D.C. Cir. 1984) ..................................................................................22

*In re Terrorist Attacks on Sept. 11, 2001*,
2019 WL 3296959 (S.D.N.Y. July 22, 2019) ................................................................6

*United States v. Ali*,
718 F.3d 929 (D.C. Cir. 2013) ....................................................................................21

*United States v. Reynolds*,
345 U.S. 1 (1953)........................................................................................................25

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
52 Fed. Cl. 114 (2021) .................................................................................................27

*ZF Auto. U.S., Inc. v. Luxshare, Ltd.*,
142 S. Ct. 2078 (2022).................................................................................................24

*Zicherman v. Korean Air Lines Co.*,
516 U.S. 217 (1996)....................................................................................................11

**Treaties**

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596
U.N.T.S. 261 ...........................................................................................1, 4, 11, 21

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500
U.N.T.S. 95 ....................................................................................................... *passim*

**Statutes and Regulations**

22 U.S.C. § 612 ....................20

22 U.S.C. § 615 ....................20

28 U.S.C. § 1602 *et seq.* ....................1, 3, 7, 8, 26

28 U.S.C. § 1782 ....................8

28 CFR § 5.500 ....................20

36 C.F.R. § 1222.32 ....................15

**Other Authorities**

Acquisition Regulation: Access to and Ownership of Records, 79 Fed. Reg. 56279 (Sept. 19, 2014) ....................15

American Heritage Dictionary (5th ed. 2022) ....................14

Brief for the United States as Amicus Curiae, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576 .................... *passim*

Brief for the United States as Amicus Curiae, *Republic of Argentina v. NML Cap. Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994 ....................26

Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 161 (4th ed. 2016) ....................10, 12, 20

Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs, U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4, 2002), in *Hearings Before the House Committee on Government Reform*, Serial No. 107-83 (Dec. 4, 2002) ....................28

Oxford English Dictionary (June 2022 update) ....................14

*Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938* (Dec. 2020) ....................17

Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec. 11, 2002), in *Hearings Before the House Committee on Government Reform* 1673, 107th Congress, 2d Sess., Serial No. 107-83 ....................13, 18, 21

United Nations Conference on Diplomatic Intercourse and Immunities, *Official Records, Vol. I*, U.N. Doc. A/Conf.20/14 (1962) ....................19

*Yearbook of the International Law Commission, Vol. II*, [1958] 2 Y.B. Int'l L. Comm'n 10 ....................12

**INTRODUCTION**

The State of Qatar ("Qatar") respectfully moves the Court for an order vacating the portions of its prior order of June 2, 2022, that (1) categorically rejected the application of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (collectively, "Vienna Conventions"), and principles of international comity and related privileges, to materials and information in the possession of Qatar's former contractors; and (2) narrowed what documents could be treated as "Highly Confidential" under the operative protective order in this case. *See* ECF Nos. 148, 149.

Vacatur of the Court's prior order is warranted given the changed posture of this case. Specifically, the Court's prior order issued at a time when the only parties to the case were Plaintiffs Elliott Broidy and Broidy Capital Management LLC (collectively "Broidy") and Defendants Nicolas D. Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies LLC ("Defendants"). Prior to issuance of that order, Qatar had not yet intervened due to significant, then-unresolved concerns that intervention might result in a loss of its immunities under the Foreign Sovereign Immunities Act ("FSIA"). Accordingly, the Court did not have the opportunity to consider fully Qatar's privileges and immunities as the privilege holder, including through review of a detailed privilege log that substantiated its claims of privilege for specific documents. In addition, since the time of the Court's order, the United States Government has taken the position that "the district court adopted an overly restrictive interpretation of Article 24" of the Vienna Convention on Diplomatic Relations, agreeing with Qatar that the inviolability of materials protected by the Vienna Conventions could extend to materials held by a mission's contractors. Ex. 1, Brief for the United States as Amicus Curiae at 2–3, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576, at *2–3 (hereinafter "U.S. Amicus

Brief") ("Article 24 covers . . . documents possessed by outside parties with a particular relationship to the mission . . . .").

The D.C. Circuit's directive that courts of this circuit "demonstrate due respect for . . . any sovereign interest expressed by a foreign state" requires that Qatar be given a full opportunity to be heard regarding the privileges and immunities that are implicated by the parties' discovery requests in this case. *See Muzin*, 61 F.4th at 987 (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987)). To provide Qatar with this opportunity, the Court should vacate its prior order and revisit its handling of Qatar's privileges and immunities. In place of its prior categorical ruling, the Court should enter an order that recognizes these privileges and immunities may apply to certain materials held by Qatar's former contractors or others with a special relationship to the Embassy.

**PROCEDURAL BACKGROUND**

Broidy has served extensive discovery demands on Defendants and non-parties to this litigation, seeking discovery that includes materials that are inviolable under the Vienna Conventions and protected by principles of international comity.

Before discovery commenced, Qatar filed a Notice of Interest "to ensure that its sovereignty and immunities are respected in any discovery that is conducted." ECF No. 66 at 1. This Court "decline[d] to strike" the Notice and stated that "Qatar may submit the equivalent of amicus briefs," but that "no pending motion requires addressing Qatar's exact status in this case." Minute Order (Dec. 8, 2021).

In the context of competing proposals for a protective order, Qatar filed a Statement of Interest endorsing Defendants' proposal that Qatar review materials from third parties for potential privilege or inviolability prior to their production. *See* ECF No. 94 at 3. The Court entered a protective order, but declined Defendants' request to permit Qatar "to review and redact

documents" prior to disclosure, reasoning that Qatar, as a "non-party," should not "play such a substantial role in the discovery process," and that "considering the novelty" of the proposal, it was not clearly "necessary for protecting Qatar's sovereign immunity."  Minute Order, ECF No. 96.

Defendants objected to Broidy's discovery requests on the basis that certain materials sought – though in Defendants' possession – implicated Qatar's privileges and immunities.  *See* ECF No. 115 at 7.  Broidy then filed a motion to compel disclosure of all "relevant materials in [Defendants'] possession."[1]  ECF No. 109-1 at 6.  In that motion, Broidy argued that the Vienna Conventions and principles of international comity categorically do not apply to materials in Defendants' possession.  *Id.* at 10−14.

Qatar filed a second Statement of Interest concerning the motion to compel.  *See* ECF No. 114.  In both of its Statements, Qatar proposed to review potentially privileged or inviolable materials before production and identify specific materials over which it asserted a privilege or immunity in a document-by-document log – potentially narrowing the scope of the dispute, and creating a meaningful record for this Court to resolve any remaining questions about the scope of Qatar's privileges and immunities.  *See* ECF No. 107 at 8, ECF No. 114 at 1–5.

On June 2, 2022, the Court granted Broidy's motion to compel Defendants to produce all of the materials in question, finding that Qatar's privileges and immunities categorically "do not apply to any documents or communications in the [D]efendants' possession," because materials "given to non-mission parties fall outside the Convention's scope."  *See* ECF No. 149 at 13, 21.

---

[1] Broidy also filed a motion to reconsider the protective order, arguing that the Court should revise the portion of the protective order relating to the definition of "Attorney's Eyes Only."  ECF Nos. 102, 102-1.  He asserted that there was "no basis in the FSIA or the Vienna Conventions for the proposition that a sovereign has . . . the right to AEO protection over information entirely in the hands of third parties."  ECF No. 102-1 at 5.

The Court further rejected the possibility that international comity could apply to materials held by "American parties," or that the deliberative process privilege could ever "shield documents held by a private, non-governmental entity." *Id.* at 21, 23. The Court also granted Broidy's motion to reconsider the protective order, narrowing the scope of documents that could be designated for "attorney's eyes only." *Id.* at 10.[2] The Court predicated the portion of its order narrowing the protective order on the fact that the narrow "formulation is consistent with this Court's interpretations of the Vienna Conventions." *Id.* Finally, the Court denied Defendants' request for reconsideration of the Court's decision regarding preemption of certain of Broidy's common law claims. *Id.* at 8. Qatar appealed the portion of this Court's order granting Broidy's motion to compel. *See* ECF No. 153.

On July 1, 2022, the D.C. Circuit granted, over Broidy's opposition, a stay of the discovery order pending appeal. *See Muzin*, No. 22-7082, 2022 WL 2525300, at *1 (D.C. Cir. July 1, 2022). The D.C. Circuit then ordered, on its own motion, that the Department of Justice be invited to file an amicus curiae brief "addressing the views of the United States," in particular on two issues: (1) whether the court has jurisdiction over the appeal, and (2) whether the Vienna Conventions "protect from disclosure the documents that are the subject of [Broidy's] discovery requests." Per Curiam Order, *Muzin*, No. 22-7082, ECF No. 1954969, at *1 (July 14, 2022) (citations omitted).

[2] Specifically, the Court removed language that permitted an attorney's eyes only designation for "information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, to the extent such material is produced" and "any other information relating to the conduct by Qatar of its foreign policy." ECF No. 149 at 8 (quoting Protective Order § 1.D, ECF No. 96). The Court instead permitted designation of "information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" only "if the Producing Party is a sovereign state or any diplomatic or consular mission of a sovereign state," and provided no ability to mark other materials implicating Qatar's foreign policy as attorney's eyes only. *See id.* at 10 (modifying the proposed protective order filed at ECF No. 90-3, as adopted and modified by the Court's order in ECF No. 96).

The United States filed its brief on August 26, 2022, arguing that this Court's interpretation of the Vienna Conventions was erroneous.[3] *See* U.S. Amicus Brief at 17–18. The brief was signed by the Department of Justice as well as the Department of State.

The D.C. Circuit held oral argument on October 28, 2022. *See Muzin*, ECF No. 22-7082, ECF No. 1971057. On March 10, 2023, the D.C. Circuit issued an opinion dismissing Qatar's appeal under the "rule that only parties can appeal an adverse judgment." *Muzin*, 61 F.4th at 987. The D.C. Circuit recognized that Qatar would have been entitled to appeal as a nonparty if intervention forfeited its sovereign immunity, but concluded that intervention would not do so. *Id.* at 997. However, the Court also "recogniz[ed] that both the parties and the District Court were operating in uncharted territory regarding how a foreign sovereign may invoke its treaty rights . . . without forfeiting its foreign sovereign immunity." *Id.* at 987 (citations omitted). It accordingly remanded and "instruct[ed]" this Court "to provide Qatar the opportunity to timely intervene to assert its rights under the Vienna Conventions and international comity" prior to "enforc[ement] [of] the [Court's] underlying discovery order." *Id.* at 987, 999. The D.C. Circuit's mandate issued on April 18, 2023. *See Muzin*, No. 22-7082, ECF No. 1995335.

On April 26, 2023, Qatar filed a motion to intervene for the limited purpose of protecting its sovereign privileges and immunities. Qatar attached the present motion to that intervention motion, and requested that the Court deem the present motion filed upon granting Qatar's intervention motion.

[3] The United States further argued that Qatar "ha[d] standing to appeal the district court's order," and that "Qatar's appeal satisfie[d] the requirements of the collateral-order doctrine." U.S. Amicus Brief at 7−17. Alternatively, even if the order were not appealable, the United States argued that the D.C. Circuit could "construe Qatar's notice of appeal as a mandamus petition." *Id.* at 17.

## ARGUMENT

### I.  The Court Has Inherent Authority to Vacate Its Prior Order.

The Court's prior order rejecting the application of Qatar's privileges and immunities to documents held by its former contractors on a categorical basis and narrowing the operative protective order (ECF Nos. 148, 149) is interlocutory in nature.  The D.C. Circuit has made clear that "[i]nterlocutory orders are not subject to the law of the case doctrine," and that a Court "'ha[s] complete power . . . to revise [such orders] when it is consonant with equity to do so.'" *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (citations omitted); *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) (recognizing the "inherent power" of a district court to "afford . . . relief from interlocutory judgments as justice requires") (citations omitted).

Here, under its inherent authority to revisit prior non-final orders, the Court should vacate its ruling on Qatar's privileges and immunities in order to ensure that Qatar is provided a full opportunity to be heard as the privilege-holder, consistent with the D.C. Circuit's directive to accord "due respect" to Qatar's sovereign interests.  *See Muzin*, 61 F.4th at 999.  Because the portion of the Court's order narrowing the operative protective order was based on the Court's "interpretation of the Vienna Conventions," ECF No. 149 at 10, the Court should likewise vacate this portion of its order and revert to the original protective order issued in this case, *see* ECF No. 90-3, as modified by ECF No. 96, in order to ensure that all materials implicating Qatar's privileges and immunities under either the Vienna Conventions or principles of international comity can be designated attorney's eyes only if produced, including through inadvertent or mistaken production. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11")*, 2019 WL 3296959, at *2–4 (S.D.N.Y. July 22, 2019) (recognizing that the Vienna Conventions' protections represent "higher values" justifying sealing documents filed with the court); *Aref v. Holder*, 2012 WL 13075792, at

*11–12 (D.D.C. Nov. 26, 2012) (holding that documents implicating the deliberative-process privilege may receive the designation of "attorney's eyes only").

In light of previously unresolved questions regarding whether intervention would have caused a loss of Qatar's immunity from suit under the FSIA, Qatar has not previously had an opportunity to directly assert its own privileges and immunities as to particular materials sought in discovery, including through service of a privilege log. *See* ECF No. 158 at 8 (questioning "whether Qatar can . . . seek an active role in the discovery process without waiving its immunity from suit"). The D.C. Circuit has now resolved those questions and instructed this Court to provide Qatar an opportunity to intervene to assert its privileges and immunities without a risk of losing its sovereign immunity. *Muzin*, 61 F.4th at 995–96, 999; *accord In re Bankers Trust Co.*, 61 F.3d 465, 468, 472 (6th Cir. 1995) (remanding and holding that district court cannot enforce discovery order directing production of materials held by a bank without first "allow[ing] the Federal Reserve the opportunity to intervene" in order to "assert the [bank examination] privilege and [have] the opportunity to defend its assertion").

Moreover, at the time of the Court's decision, the United States had not clearly articulated its view regarding the scope of the Vienna Conventions. At the request of the D.C. Circuit, it has now done so, stating that the Vienna Conventions can "cover[] . . . documents possessed by outside parties with a particular relationship to the mission," and that a ruling that the Conventions do not cover documents held by outside parties "unless they were lost or stolen" is "overly restrictive." U.S. Amicus Brief at 2−3. The views of the Executive Branch on a question of treaty interpretation are entitled to "great weight." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). This new

interpretation therefore provides another reason why the Court should vacate its prior order and grant Qatar an opportunity to fully assert its privileges and immunities over specific materials.[4]

## II. The Court Should Find That Qatar's Privileges and Immunities Are Not Categorically Inapplicable to Materials Held by Its Former Contractors.

### A. The United States Agrees with Qatar's Position That Vienna Convention Inviolability May Extend to Documents Held by a Mission's Contractors.

At the invitation of the D.C. Circuit, the United States filed an amicus brief setting out its interpretation of the Vienna Conventions in relation to materials held by mission contractors. This Court did not have the benefit of this amicus brief at the time it issued its prior order. Now, however, the interpretation the United States has offered is entitled to "great weight." *Kolovrat*, 366 U.S. at 194 ("[T]he meaning given [to treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight.").

[4] To give practical effect to the D.C. Circuit's directive that Qatar have an opportunity to assert its interests without fear of a loss of FSIA immunity, Qatar's assertions of its privileges and immunities should be considered by the Court *de novo*, not under the more stringent standard for reconsideration that would apply if a party already had a full opportunity to assert specific claims of privilege over materials implicated in discovery. *Cf., e.g.*, *Matter de Leon*, 2020 WL 1047742, at *3 (D.D.C. Mar. 4, 2020) (granting *ex parte* discovery request under 28 U.S.C. § 1782(a), while recognizing that the parties to whom discovery request would be directed would later have an opportunity to be heard by the court in order to "move to quash . . . or to participate in [discovery]" (citations omitted)); *In re Pishevar*, 2023 WL 2072454, at *4 (D.D.C. Feb. 17, 2023) (recognizing that party from whom *ex parte* discovery was sought would have an opportunity "to object" to that discovery request at a later date (citations omitted)). In any case, Qatar's motion meets the standard for reconsideration under Federal Rule of Civil Procedure 54. Reconsideration is warranted when, *inter alia*, there is "a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court." *Jones v. D.C.*, 2019 WL 5690341, at *1 (D.D.C. June 13, 2019) (citation omitted). Here, reconsideration is warranted both because of new and apposite guidance from the Executive Branch related to the Vienna Conventions, whose interpretation is entitled to deference as a matter of law, *see Kolovrat*, 366 U.S. at 194; and because the State of Qatar has now intervened to assert its own privileges and immunities. With respect to the Court's ruling on international comity, for example, the Court concluded that *the Defendants* had not substantiated their ability to claim these privileges as "American parties," *see supra* at pp. 3–4, but the Court did not have the ability to consider these privileges when asserted *by Qatar* – the privilege-holder.

Specifically, the United States in its brief explained that a "rule that materials possessed by outside parties cannot qualify as mission documents unless they were lost or stolen" is "*overly restrictive*" and "*conflicts with Article 24's protection[s]*," which extend to mission documents "wherever they may be." U.S. Amicus Brief at 2 (emphasis added) (quoting Article 24). In contrast to this narrow reading, the United States interprets Article 24 – consistent with Qatar's position – to apply to "documents possessed by outside parties with a special relationship to the mission," so long as the documents were either "provided by" the mission or "solicited by and incorporated information from archives or documents of the mission" and were created for reasons "essential to the functions of the mission and with reasonable expectations of continued confidentiality." *Id.* at 17–18.[5]

The United States grounded this interpretation in the text of the Conventions, their object and purpose, and a review of the negotiating history. As to the text, the United States identified nothing in Article 24 that would limit the principle of inviolability only to documents that were lost or stolen, instead reading that provision of the Conventions to apply "in a variety of circumstances" as necessary to ensure that a "foreign mission can perform its diplomatic functions without interference from the host state." *Id.* at 24. It further warned against adopting a narrow reading of the Conventions that would "expose[]" U.S. missions abroad "to incursions . . . under a foreign state's law." *Id.* (citation omitted). This warning is particularly critical in light of the

[5] As applied to specific materials, there may be questions regarding how best to give effect to various elements of this standard, including how to assess whether materials were "solicited by" the mission or "incorporate" the mission's archival information. In its reply brief on appeal, Qatar identified certain guideposts regarding how the United States' articulated standard would apply in practice in a manner most consistent with the purpose of the Vienna Conventions. At oral argument, the United States did not articulate any disagreement or concern with Qatar's views. *See* Ex. 2, Oral Arg. Tr., *Broidy Cap. Mgmt. LLC v. Muzin* (No. 22-7082), at 24:18–41:1 (hereinafter "Oral Arg. Tr."). Qatar proposes addressing these questions further in the context of actual disputes regarding specific materials, to the extent those arise.

frequency with which foreign missions, including the United States in its operations abroad, hire foreign nationals as contractors. *See infra* at pp. 17–18. The United States also emphasized that a narrow construction "does not square with Article 24's purpose" of ensuring the "protection of the confidentiality of mission records." U.S. Amicus Brief at 2, 20 (citing Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 161, 168 (4th ed. 2016) ("Denza, *Diplomatic Law*")). Finally, the United States noted that the Conventions' negotiating history confirmed its broad reading of Article 24. Specifically, the United States emphasized the portions of the negotiations history in which the delegate from Pakistan objected to adding "anywhere they may be" to Article 24, asserting that inviolability should not extend to documents when they passed to non-mission parties "such as 'nationals of the receiving state.'" *Id.* at 26 (citation omitted) (describing negotiating history). An overwhelming majority of delegates, however, rejected this proposal, and "chose a more expansive construction of inviolability," broad enough to encompass documents held by non-mission parties. *Id.* at 27.

To be sure, the United States recognized – and Qatar does not dispute – that not all documents given to contractors will constitute mission documents. Rather, whether a document is inviolable under Article 24 will rest on an analysis of the mission's "special relationship" with the third party and whether the document was created for reasons "essential to the functions of the mission and with reasonable expectations of continued confidentiality." *See Id.* at 17–18. Qatar and the United States agree that determination of whether these standards are met is best done through a document-by-document analysis. *See Id.* at 3 ("[T]he case should be remanded to the district court so it can engage in . . . analysis on a document-by-document basis."). In order to conduct such a document-specific analysis, the Court should consider such factors such as: whether the third party (i) is engaged to assist in the performance of a diplomatic mission's

functions; (ii) holds materials for the sole and limited purpose of aiding the mission in those functions; (iii) is restricted from using those materials for any other purpose; (iv) must return those materials to the mission on demand; and (v) is subject to strict requirements of confidentiality regarding those materials.

With the required deference to the Executive Branch's interpretation of a treaty in mind, Qatar now addresses in more detail the proper interpretation of the Vienna Conventions.

### B. The Text, Purpose, and Negotiating History of the Vienna Conventions Show that Inviolability May Extend to Materials Held by a Mission's Contractors.

Qatar and the United States are party to the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.[6] Under Articles 24 and 27 of the Vienna Convention on Diplomatic Relations, the United States agreed to respect the "inviolability" of all documents, archives, and correspondence "of the mission" of a fellow signatory country. Because Article 24 applies to mission documents and archives "wherever they may be," and Article 27 applies to mission "correspondence," the Convention plainly contemplates that materials can be *of* the mission even if not *held* by the mission.

"An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006) (quoting 1 Restatement (Third) of Foreign Relations Law of the United States §325(1) (1986)). A "treaty's history, the negotiations, and the practical construction adopted by the parties may also be relevant," *Aérospatiale*, 482 U.S. at 534, as "aids to its interpretation," *Medellín v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v.*

[6] Because the relevant language in the two Conventions is materially the same, this brief focuses on the Vienna Convention on Diplomatic Relations.

*Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)). Here, the text, object and purpose, and negotiating history all point to the same conclusion: materials in the possession of a mission's contractor can be "of the mission" for purposes of the Vienna Convention on Diplomatic Relations.

1. Text. Article 24's text confirms that its key phrase, "[t]he archives and documents of the mission," has a broad scope. First, Article 24 makes clear that the location and custody of mission archives and documents is not dispositive of their inviolability. Instead, archives and documents of the mission are inviolable "wherever they may be." *See* Ex. 3, *Yearbook of the International Law Commission, Vol. II* at 96, [1958] 2 Y.B. Int'l L. Comm'n 10 (inviolability "applies to archives and documents, regardless of the premises in which they may be"). "[B]y adding the words 'wherever they may be,'" the Convention's drafters "made it clear beyond argument that archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability." *See* Denza, *Diplomatic Law*, at 158.

There is no basis in the Convention's text to suggest that inviolability persists *only* in circumstances of loss or theft, but not in any other circumstances where documents are held by third parties. "Inviolability" is a legal term of art that does not reflect such a narrow concern. *Cf. Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 861 (D.C. Cir. 2006) (interpreting "term of art" consistent with "long history of legal usage"). Rather, "[i]nviolability in modern international law is a status accorded to premises, persons, or property physically present in the territory of a sovereign State but not subject to its jurisdiction in the ordinary way." Denza, *Diplomatic Law*, at 110. For that reason, "the expression 'inviolable' [in Article 24] was deliberately chosen by the International Law Commission to convey both that the receiving State must abstain from any interference through its own authorities and that it owes a duty of protection of the archives in respect of unauthorized interference by others." *Id.* at 158. In other words, the

word "inviolability" reflects the breadth and absolute nature of Article 24's protection, not a narrow concern with theft.

The critical question, therefore, cannot be whether archives or documents are located *at* the mission, but rather whether they are "*of* the mission." And "of the mission" cannot be interpreted to mean only materials that "are possessed by a mission," ECF No. 149 at 13, because that would read the words "wherever they may be" out of Article 24. As a basic matter of interpretation, there must be some class of documents that are not located on mission premises but are still documents "of the mission," and there is no principled basis for limiting that class of documents to those that have been lost or stolen or those in the possession of mission staff. *See also* Oral Arg. Tr. at 52:11–14 (Judge Rao: Article 24 "doesn't seem to speak to who holds them, but rather, what the documents are.").[7]

[7] In its prior order, the Court drew an analogy between Article 24 and Articles 22 and 29 of the Convention, which relate to personal inviolability, reasoning that because personal inviolability did not extend to "private citizens of . . . the 'receiving state,'" Article 24's protection should not extend to materials held by citizens of the receiving state. *See* ECF No. 149 at 13−14 (quoting, *inter alia*, the command in Articles 22 and 29 that "the premises of the mission" and "the person of a diplomatic agent" be held "inviolable"). But there is good reason that treaty provisions relating to *personal* inviolability have a different scope than provisions related to *archival* immunity. As the Preamble explains, the "purpose" of the Convention "is not to benefit individuals" at all, but to "ensure the efficient performance of the functions of diplomatic missions." Personal inviolability of non-mission parties is generally unnecessary for a mission to function efficiently. But the Vienna Conventions' drafters decided that mission archives and documents must be inviolable "*wherever they may be*," in furtherance of the Conventions' central purpose. The Court also drew an analogy to Article 31, which provides that "diplomatic agent[s]" may not be compelled to "give evidence as a witness." *Id.* at 14 (reasoning that because Article 31 "confers a benefit on one group expressly," others not mentioned lack that "benefit"). Archival immunity, however, is a protection for the mission, not a "benefit" to any individual. If Article 24 was coterminous with Article 31, then it could have no application to materials or information possessed by local embassy staff, as they are not protected by Article 31 from being compelled to "give evidence as a witness." That would be inconsistent with the United States' longstanding practice under the treaty. *See* Ex. 4, Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec. 11, 2002), in *Hearings Before the House Committee on Government Reform* 1673, 107th Congress, 2d Sess., Serial No. 107-83 (hereinafter "Taft Statement") ("Unlike U.S. citizen employees sent overseas by the Department, local nationals do not generally have immunity from compulsory process . . . [but] in a number of instances, the Department has in fact asserted

The ordinary meaning of the word "of" strengthens this conclusion. A document may be "of" someone or something if it originates there. *See, e.g.*, *"Of,"* Am. Heritage Dictionary ("Am. Heritage") (5th ed. 2022) ("1. Derived or coming from; originating at or from"); *"Of,"* Oxford Eng. Dict. (June 2022 update) ("III. Indicating the thing, place, or person from which or whom something originates, comes, or is acquired or sought."). Or it may be "of" someone (or something) that causes it to be created or to whom it belongs or is connected. *See, e.g.*, *"Of,"* Am. Heritage ("2. Caused by; resulting from"; "8. Belonging or connected to"); *"Of,"* Oxford Eng. Dict. ("36. Belonging to a thing, as a logical consequence of its nature").

Consistent with these definitions, the phrase "of the mission" is most naturally read to encompass archives and documents not physically possessed by the mission, but which nevertheless originate from the mission, were caused to be created by it, or are otherwise connected to the mission. There may be a range of indicia bearing on whether a particular document qualifies as "of the mission" under the ordinary meaning of that phrase, including whether materials are shared or created for the sole purpose of aiding the mission's performance of its diplomatic functions, whether their use is restricted to that purpose, whether they must be returned to the mission on demand, and whether they are required to be kept confidential. *Cf., e.g.*, *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 439 (2006), *aff'd in part, rev'd in part and remanded on other grounds*, 536 F.3d 1282 (Fed. Cir. 2008) (interpreting Federal Rule of Evidence 803(8) and concluding that "[t]he qualifier 'of' [a public agency] does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency – just that they must have emanated therefrom") (quotation marks and citation omitted);

---

that the official information in the possession of a local national working in the embassy is 'archival' under the Vienna Convention and thus inviolable.").

36 C.F.R. § 1222.32 ("All data created for Government use and delivered to, or falling under the legal control of, the Government are Federal records"); Acquisition Regulation: Access to and Ownership of Records, 79 Fed. Reg. 56279, 56280 (Sept. 19, 2014) ("Federal records" "includes records created/received by contractors that document the work specified within the contract and are generated or received during the performance of the contract"); *Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (factors used to determine agency ownership of documents include "intent of the document's creator to retain or relinquish control" and "the ability of the agency to use and dispose of [documents] as it sees fit"); *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 38, 51 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020) (record systems, though "located at the Secret Service's headquarters" and operated by Secret Service, are "presidential records," where memorandum of understanding provides that records "shall remain under the exclusive ownership, control, and custody of the President" and Secret Service's access to records is "limited . . . as necessary to perform its protective functions").

Reading the phrase "of the mission" to encompass certain archives and documents in the possession of non-mission parties also accords with analogous principles of domestic law. Justice Gorsuch has made the common-sense point that "the fact that a third party has access to or possession of *your* papers and effects does not necessarily eliminate *your* interest in them." *Carpenter v. United States*, 138 S. Ct. 2206, 2268 (2018) (Gorsuch, J., dissenting) (emphasis added). For instance, "[a] bailment is the 'delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose." *Id.* (quoting Black's Law Dictionary 169 (10th ed. 2014)). In that scenario, the owner of property lacks physical custody, yet still retains control over the property's use and disposition. In the same way, when a mission transfers archives and documents to its contractor to aid the mission's own business, and places

careful limits and controls on the contractor's use of the document subject to the mission's ongoing control, that transfer does not "eliminate" the mission's "interest in" those materials in such a way as to deprive the materials of their status as being "of the mission."

Similarly, the D.C. Circuit has long treated certain documents in possession of a government agency's outside contractors as "agency records," even if "they were neither created by agency employees, nor are … currently located on agency property." *Burka*, 87 F.3d at 515. And it has found such documents to be agency records where contractors "acted on behalf of [the agency] in creating the [records]," and the agency "exercise[d] sufficient control over [the] documents." *Id.* Similarly, the D.C. Circuit has treated government agencies' confidential correspondence with outside consultants as falling within the statutory phrase "intra-agency memorandum," where the consultants are "not pursuing interests of their own" and "some indicia of a consultant relationship" exists. *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 512 F.3d 677, 683–87 (D.C. Cir. 2008); *see also Heffernan v. Azar*, 417 F. Supp. 3d 1, 15 (D.D.C. 2019) (quoting *Nat'l Inst. of Mil. Just.*, 512 F.3d at 686).[8]

[8] Article 27, like Article 24, is also not limited as Broidy argues. Article 27 provides in relevant part: "The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions." This Court previously concluded that Article 27 does not apply to correspondence freely sent to non-mission parties, because Article 27 "defines 'official' to mean 'relating to the mission and its functions,'" such that "the same meaning cannot attach to its phrase 'of the mission,' at risk of surplusage." ECF No. 149 at 16. Qatar's position, however, is not that any correspondence, from anyone to anyone, that "relat[es] to the mission and its functions" is correspondence "of the mission." Instead, Qatar contends that correspondence between and among a mission and its outside contractors can be "of the mission," and thus subject to inviolability, if it is made for the sole purpose of assisting in the mission's performance of its functions, and is subject to confidentiality requirements. *Accord Nat'l Inst. of Mil. Just.*, 512 F.3d at 681–87 (recognizing, in the domestic context, that "communications between an agency and outside consultants" are "intra-agency" records when there is evidence that the consultants were "not pursuing interests of their own," such as when correspondence is "submitted by non-agency parties in response to an agency's request for advice").

2. *Object and Purpose.* Since the phrase "of the mission" is broad and undefined, and at least some documents outside the mission must qualify (lest the phrase "wherever they may be" become surplusage), this Court should adopt an interpretation that best "accords with [the Convention's] objects and purposes." *Abbott*, 560 U.S. at 9, 20–22. The Convention's stated purpose is to "ensure the efficient performance of the functions of diplomatic missions as representing States." Vienna Convention on Diplomatic Relations, Preamble ¶ 5. That objective would be thwarted if materials entrusted to a mission's outside contractors were categorically excluded from Article 24's guarantee of inviolability. Rather, in circumstances where a mission relies on an outside contractor to aid the performance of its diplomatic mission, shares or receives materials for that purpose, and strictly controls the contractor's use and disclosure of such materials, it best ensures the efficient performance of the diplomatic mission to respect the inviolability of such materials as "of the mission."

Diplomatic missions frequently rely on contractors to perform essential mission functions, including for expertise relevant to foreign policy objectives. For example, diplomatic missions in this country have recently retained outside contractors to:

- "expand bilateral trade and foreign direct investment";
- conduct "outreach to U.S. Government officials" focused on "influenc[ing] [the Embassy's] interests";
- promote the country's role "as a longstanding strategic partner of the United States";
- assist with "general bilateral relations with the United States"; and
- support efforts to "deepen relations between [the state] and the U.S. government" on particular policy issues.

*Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938*, at 12, 50, 75, 85, 142 (Dec. 2020), *available at*

https://www.justice.gov/media/1227926/dl?inline.    Particularly given the importance of any country's relations with the United States, it is not surprising that many sovereigns, including Qatar, consider it necessary to the success of their diplomatic objectives to involve outside contractors.  In fact, the United States is no exception.  U.S. missions abroad "rely[] on outside contracting," including for "embassy construction" in "sensitive posts" where contractors "work[] with information" provided to them by the State Department.  *See* Taft Statement.  U.S. missions have also, for example, contracted for services including "media monitoring" and "website and social media content management."[9]

In light of this diplomatic reality, which is hardly unique to Qatar, "the efficient performance of the functions of diplomatic missions" will often require the exchange of mission archives and documents with outside contractors.  Just as U.S. government agencies may have "a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity," *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971), diplomatic missions likewise require the ability to exchange information confidentially with their contractors.  If the rule were otherwise, opportunistic civil litigants could take advantage of broad American-style discovery to probe for information about a sovereign's foreign policy.  And if, as a result, diplomatic missions decide they cannot risk working with contractors due to the risk of sensitive information being disclosed, that will hinder "the efficient performance of the functions of diplomatic missions as representing States."  Vienna Convention on Diplomatic Relations, Preamble ¶ 5.

---

[9] *See* Search for "Embassy AND 'public relations'" *in* Federal Procurement Data System, https://perma.cc/54K X-5ZNB.

3. Negotiating History. The Convention's negotiating history also weighs against a rule that the Convention's protections cannot extend to documents possessed by a mission's contractors. For example, in proposing an amendment to Article 24 to expand inviolability to mission archives and documents "anywhere they may be" (later modified to "wherever they may be"), delegations from Italy and France stated that their intention was "to establish clearly the absolute inviolability of the mission's archives and documents as such." Ex. 5, United Nations Conference on Diplomatic Intercourse and Immunities, *Official Records, Vol. I* at 148, U.N. Doc. A/Conf.20/14 (1962) (hereinafter "United Nations, *Official Records*"). That objective is inconsistent with the view that any materials "freely given" to a non-mission party automatically lose their protections under Article 24. *See* ECF No. 149 at 13.

Indeed, the drafters *rejected* a proposed amendment to Article 24 that would have codified Broidy's preferred approach. *See supra* at p. 10. Pakistan's delegate proposed amending Article 24 to "regard [archival] inviolability as void" when a document was placed in the hands of a non-mission party "with the . . . connivance of the mission concerned," such as by being "deposited with nationals of the receiving State." United Nations, *Official Records*, at 148. That amendment, however, was not accepted. Instead, immediately after the Pakistani delegation raised its concern for a second time, the "wherever they may be" language was put to a vote, with the phrase approved by a 46-6 vote. *Id.* at 16. That the Convention's drafters rejected an amendment that would have accomplished what Broidy says Article 24 already accomplishes weighs heavily against that interpretation. *See, e.g.*, *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 542–44 (1991) (rejection of proposed language informative for treaty interpretation); *Lozano v. Alvarez*, 697 F.3d 41, 53 (2d

Cir. 2012) (drafting history supported interpretation where "the drafters considered and rejected an alternative proposal").[10]

### C. The Foreign Agents Registration Act's Inspection Provisions Do Not Override Vienna Convention Protections.

Contrary to the Court's prior order, *see* ECF 149 at 17−18, FARA's registration and inspection requirements do not suggest that documents in the hands of a diplomatic mission's contractors are ineligible for protection under the Vienna Conventions. The Foreign Agents Registration Act ("FARA") requires agents of foreign principals to register with the Attorney General, and make available for his "inspection" all "such . . . records" as he may prescribe. 22 U.S.C. §§ 612(a), 615. By regulation, that includes "[a]ll correspondence, memoranda, cables, telegrams, teletype messages, and other written communications to and from all foreign principals and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals." 28 CFR § 5.500(a)(1). The Act does not provide for public disclosure of these materials; they may be inspected only by "official[s] charged with the enforcement of" the Act. 22 U.S.C. § 615.

Nothing about the Act, its inspection provisions, or its enforcement undermines Vienna Convention inviolability. As an initial matter, to the extent of any conflict between FARA and the Conventions, the Conventions would prevail as the later in time enactments. *See Breard v. Greene*,

[10] Professor Eileen Denza's commentary observed, correctly, that the inviolability of mission archives is preserved under Article 24 even "[i]f archives fall into the hands of the receiving State after being lost or stolen." Denza Commentary at 159. Yet nowhere does her commentary suggest that *only* lost or stolen materials are entitled to Article 24 protection when located off mission premises. Nor do the negotiating records themselves contain any discussion of lost or stolen materials, much less a suggestion that such materials were the sole focus of the "wherever they may be" clause.

523 U.S. 371, 376 (1998).[11] But there is no conflict. Statutes "ought never to be construed to violate the law of nations if any other possible construction remains," *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013) (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)), and the Act is easily harmonized with Vienna Convention protections. Indeed, FARA has long been understood to coexist with otherwise applicable privileges, a principle that naturally extends to immunities. *See Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371, 377 (D.D.C. 1976) (FARA does not abrogate attorney-client privilege).

This harmonized reading of FARA's inspection provisions and the Conventions is consistent with how the United States has historically implemented the Act. "[A]s a practical matter, the Department of Justice has implemented the Foreign Agents Registration Act in a way that has not caused concerns among foreign governments that their rights under the Vienna Convention are being violated." Taft Statement at 1676. In its amicus brief to the D.C. Circuit, the United States did not suggest any change in that practice, and conspicuously avoided taking the position that the Act's inspection provisions defeat inviolability. U.S. Amicus Brief at 32.

In any case, this Court does not need to decide the relationship between FARA's inspection provisions and the Vienna Conventions. Even assuming inspection rights apply, it would not undermine the inviolability of documents possessed by registered agents. Such documents would merely be subject to inspection by "a certain few officials of the Justice Department . . . who are primarily interested in whether the agent . . . has adequately fulfilled his statutory obligations," in circumstances where "it is very unlikely that disclosure to these officials would result in public

[11] The Vienna Conventions on Diplomatic and Consular Relations went into force in the United States in 1972 and 1969, respectively. FARA was enacted in 1938 and its pertinent implementing regulations were promulgated in 1967.

disclosure of confidential conversations." *Covington & Burling*, 411 F. Supp. at 373. At most, a mission might be said to consent to such inspections by engaging a contractor who must register.[12] As the United States agrees, a mission can share documents with a third party and still consider them inviolable documents "of the mission," provided it reasonably expects confidentiality. U.S. Amicus Brief at 2–3. By the same token, if a mission consents to inspection by select officials for enforcement purposes, but reasonably expects it would not "result in public disclosure," *Covington & Burling*, 411 F. Supp. at 373, those materials remain "documents of the mission" protected by Article 24; *accord* U.S. Amicus Brief at 21 (no protection where document "sen[t] to an outside party for widespread publication").

In analogous circumstances, courts recognize that mandatory disclosure to *someone* does not defeat expectations of confidentiality as to *everyone*. *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (recognizing confidentiality interest in charities' donor information even though it "is already disclosed to the [Internal Revenue Service] as a condition of federal tax-exempt status"); *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (disclosure of "cell phone location information" to carriers, which "there is no way to avoid," does not defeat reasonable expectation of privacy). Similarly, "involuntary disclosures due to judicial compulsion do not generally constitute waiver" of privilege. *The Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 45 n.4 (D.D.C. 2009) (citation omitted); *accord In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1373 (D.C. Cir. 1984) (finding "less reason to find waiver in circumstances of involuntary disclosure"). This case does not even involve actual compelled disclosure, but the

[12] In oral argument before the D.C. Circuit, the United States recognized that this court could draw a distinction between "private party litigation" and "the United States invoking its inspection rights under the statute" so as to find that "the document could potentially still be of the mission" even if a foreign sovereign "consented to them being turned over [to] the United States" for the narrow purpose of FARA inspection rights. *See* Oral Arg. Tr. at 32:3–33:5.

mere theoretical possibility that officials enforcing the Act could seek to inspect certain documents for a limited purpose. That possibility does not prevent Qatar from reasonably expecting that confidential materials in the hands of its contractors will not be made public, so it does not prevent those documents from being "of the mission."

Any other conclusion would defeat the object and purpose of the treaty. As the United States explains, "foreign sovereigns . . . need to rely on outside contractors to carry out essential mission functions." U.S. Amicus Brief at 23. Since FARA will generally apply to contractors with whom the mission forms a "special relationship," U.S. Amicus Brief at 17, and virtually everything possessed by registered agents is subject to inspection, Broidy's interpretation would mean the Vienna Conventions almost never apply to information held by mission contractors, even where "the mission shares information that is directly related to the functions of the diplomatic mission," U.S. Amicus Brief at 23; *see also* Oral Arg. Tr., *Muzin*, No. 22-7082, at 58:12–16 (Judge Rao: it would "require a quite broad ruling" to "determine that any documents that were available potentially in the future to inspection by the U.S. government trumps any Article 24 protection").

That result would have reciprocal consequences for the United States, which is not the only country with foreign agent laws including government inspection rights. *See, e.g.*, Nick Robinson, *"Foreign Agents" in an Interconnected World*, 69 Duke L.J. 1075, 1086–90 (2020) (discussing such laws in Russia, Hungary, and Australia). If this Court treated FARA as effectively defeating Vienna Convention protection for materials possessed by a mission's contractors, foreign countries may apply the same rule to U.S. missions.

The United States in its amicus brief was careful not to take the position that FARA registration defeats inviolability under the Conventions. Instead, the United States suggested that Qatar does not have a reasonable expectation of confidentiality over many of the documents held

by its contractors because its agreement with those contractors specified that disclosures could be made as "required by law." *See* U.S. Amicus Brief at 33. But while the United States is owed significant deference in its interpretation of international law treaties to which it is party, that deference does not extend to its interpretations of a contract between two other parties.

Moreover, the United States' contract interpretation argument relying on the "as required by law" language is circular and implausible. *See* Oral Arg. Tr., *Muzin*, No. 22-7082, at 30:9–12 (Chief Judge Srinivasan: asking whether "that's just circular because the whole question is whether it's required by law"). Whether disclosure is "required by law" depends on what the law requires. Where a legal basis for avoiding disclosure exists – such as inviolability under the Vienna Conventions – disclosure is not "required by law." Further, Qatar's agreements with is contractors state that "[n]othing in this Agreement shall waive or otherwise alter the privileges and immunities to which the Embassy is entitled under the laws of the United States or any treaty to which the United States is a party," confirming that any materials shared with these contractors were shared with an expectation of privacy. *See* ECF No. 109-17 at 7 ("Agreement for Consulting Services").

**D. Principles of International Comity Also Protect From Disclosure Materials That Implicate Qatar's Foreign Policy and Deliberative Processes.**

Comity is "a golden rule among nations – that each must give the respect to the laws, policies, and interests of others that it would have others give to its own in the same or similar circumstances." *Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002) (quoting Black's Law Dictionary, 261–62 (7th ed. 1999)); *see ZF Auto. U.S., Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2088 (2022) (comity "promotes respect for foreign governments and encourages reciprocal assistance"). Principles of international comity can protect materials in the possession of private parties, where those materials reflect the non-public information or deliberative processes of a sovereign.

In ruling on Broidy's motion to compel, this Court found principles of international comity to be categorically inapplicable because such principles could not "shield private, American parties [like Defendants] from discovery."  ECF No. 149 at 21.  Qatar, however, is not seeking to shield any U.S. national from discovery; Qatar seeks to assert its own privileges as a sovereign nation to protect from disclosure materials that, although they are in Defendants' possession, contain Qatar's sensitive, nonpublic information.

Principles derived from international comity give Qatar at least two distinct grounds to protect materials from discovery.  *First*, international comity protects from disclosure materials containing Qatar's sensitive, non-public information.  *Second*, international comity incorporates the deliberative process privilege.  As the privilege-holder, and now as a limited intervenor, Qatar should be permitted to make a showing of how its own privileges apply.  *See, e.g.*, *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327 n.33 (D.D.C 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (D.C. Cir. 1967) ("The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953) (discussing military and state secrets privilege))); *In re Bankers Trust Co*., 61 F.3d at 472 ("[The] privilege belongs to the Federal Reserve, and therefore . . . the Federal Reserve must be allowed the opportunity to assert the privilege.").

1.    <u>*International Comity.*</u>  The Supreme Court has "long recognized the demands of comity in suits involving foreign states, either as parties or sovereigns with a coordinate interest in the litigation," *Aérospatiale*, 482 U.S. at 546, and it has instructed that international comity is an appropriate consideration when determining "the propriety of discovery requests." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 146 n.6 (2014).  As the Second Circuit further

explained, if "a private plaintiff [seeks] the production of sensitive governmental documents of a foreign state," "concepts of governmental privilege . . . apply." *EM Ltd. v. Republic of Argentina,* 695 F.3d 201, 210 (2d Cir. 2012) (citation omitted).

The United States has previously explained that third-party subpoenas seeking sensitive governmental information in the hands of private parties "implicate the same comity and reciprocity concerns that are raised by discovery sought directly from the foreign state," and that "[t]he disclosure of potentially sensitive financial information" concerning a foreign state "is legitimately of significant concern to a foreign state *regardless of who is required to make the disclosure*."[13] U.S. Amicus Brief, *Republic of Argentina v. NML Cap. Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994, at *32–33 (emphasis added).[14] Qatar's legitimate interest in its sensitive governmental information is likewise not lessened by the question of "who is required to make the disclosure." *Id.*; *see also In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1081–84 & n.2 (N.D. Cal. 2007) (denying motion to compel production of European Commission documents in the hands of private parties based on principles of international comity); *In re Payment Card*

[13] The D.C. Circuit's invitation in the recent appeal in this case specified a particular interest in the United States' views on appellate jurisdiction and the correct application of the Vienna Conventions. Accordingly, the United States did not offer an opinion regarding international comity in its amicus brief. *See* Oral Arg. Tr., at 27:17–20, 38:20–24 (Counsel for the United States: "This Court's order asked us to focus on jurisdiction and the treaties, and so the United States did so, and so the United States hasn't offered an opinion on international comity in this case, in this context. . . . [B]ut the United States does not want the Court to read into anything . . . it's not that we, the Government, thinks that comity plays no role here . . . .").

[14] While the Supreme Court ultimately declined to account for these comity interests *in interpreting the Foreign Sovereign Immunities Act* as the United States had suggested, the Court recognized that "other sources of law," including "comity interests," "bear on the propriety of discovery requests." *NML Cap., Ltd.*, 573 U.S. at 146 n.6 (quotation marks omitted). Here, Qatar seeks to assert its comity interests in response to the parties' discovery requests, consistent with the *NML* opinion.

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 2010 WL 3420517, at *10 (E.D.N.Y. Aug. 27, 2010) (same).

2. Deliberative Process. Principles of reciprocity between nations "dictate[] that [U.S.] courts give a foreign sovereign the same protection afforded to the executive branch of the United States." *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002). For that reason, "courts have long held that foreign governments are entitled to protect their executive deliberations," just as the U.S. Executive Branch routinely claims privilege over its own deliberative processes. *Id.* The deliberative process privilege allows a "government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted). The privilege requires that "the material must be predecisional and it must be deliberative," and its purpose is to "allow[] government officials freedom to debate alternative approaches in private." *Id.*

A government's deliberative processes do not lose protection when its materials are sought from third parties. *See, e.g., In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 52 Fed. Cl. 114, 119, 124–25, 125 n.3 (2021) (upholding United States' claim of deliberative process privilege over portions of document held by third-party entity). Rather, the deliberative process privilege "may include materials generated at the request of an agency." *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C. Cir. 1994). That is because "[c]onsultations with temporary consultants are an integral part of an agency's deliberative process." *Nat'l Inst. of Mil. Justice*, 512 F.3d at 678. Thus, the United States claims – and courts entertain – deliberative process privilege claims with respect to communications between agencies and outside

consultants.  *See Gonzalez Ramos v. ADR Vantage, Inc.*, 2020 WL 409283, at *1 (D.D.C. Jan. 26, 2020) (upholding U.S. Department of Agriculture's claim of privilege over "drafts of a workplace Climate Assessment report" created by private consultant).

Under principles of international comity and the reciprocity that underlies it, Qatar may likewise claim the deliberative process privilege over documents held by its former contractors. Indeed, in its prior opinion this Court recognized that Defendants could have possibly "invoke[d] the [deliberative process privilege]" if its contractors had "assisted Qatar "in formulating its foreign policy," but ruled that Defendants had "made no showing to that effect."  ECF No. 149 at 23.  As clarified above, however, as the privilege-holder it is Qatar – not Defendants – that must have an opportunity to substantiate its claims of deliberative process related to documents and other materials held by its contractors.  *See Stiftung*, 40 F.R.D. at 327 n.33.

For avoidance of doubt, the two grounds articulated above are not necessarily exclusive. Based on the particular materials held by contractors, it is possible that other privileges or immunities may be available to Qatar under the principles of international comity and reciprocity. This would include the state secrets privilege.  *See In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007) (applying state secrets privilege to agency reports); Ex. 6, Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs, U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4, 2002), in *Hearings Before the House Committee on Government Reform*, Serial No. 107-83, at 1468–69 (Dec. 4, 2002) (explaining that in addition to the Vienna Conventions, State Department would also consider invoking "other possible privileges and protections, such as state secrets" to protect materials and information possessed by the United States' "outside contractors").

**CONCLUSION**

Qatar respectfully moves the Court to vacate the portions of its prior opinion (ECF No. 149) categorically rejecting application of Qatar's privileges and immunities to documents or other materials held by third-party former contractors and modifying the prior protective order. In place of this prior opinion, Qatar moves the Court to:

1. Issue an order making clear that Qatar's privileges and immunities are not categorically inapplicable to materials held by third-party former contractors.
2. Modify the operative protective order in this case to make clear that materials may be marked "Highly Confidential" when a producing party, whether a Defendant or a non-party subpoena recipient, in good faith reasonably believes that such materials contain or comprise information protected by the Vienna Conventions or by any other privilege held by Qatar as a sovereign state, including the deliberative-process privilege or other privileges derived from international comity.

Dated: April 26, 2023

Respectfully submitted,

*<u>/s/ Alexander A. Berengaut</u>*
Alexander A. Berengaut (D.C. Bar No. 989222)
David M. Zionts (D.C. Bar No. 995170)
Amber M. Charles (D.C. Bar No. 1035226)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com
dzionts@cov.com
acharles@cov.com

Mitchell A. Kamin (admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

(424) 332-4800
mkamin@cov.com

*Counsel for State of Qatar*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2023, I caused a true and correct copy of the foregoing State of Qatar's Memorandum of Law in Support of State of Qatar's Motion to Vacate the Court's Prior Order Regarding Qatar's Privileges and Immunities to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: April 26, 2023

*/s/ Alexander A. Berengaut*

Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT LLC and ELLIOTT BROIDY,

Plaintiffs,

v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC,

Defendants.

Civil Action No. 1:19-cv-00150-DLF

**[PROPOSED] ORDER GRANTING STATE OF QATAR'S MOTION TO VACATE THE COURT'S PRIOR ORDER REGARDING QATAR'S PRIVILEGES AND IMMUNITIES**

Upon consideration of State of Qatar's Motion, it is this ___ day of ___, 2023, hereby

**ORDERED** that the Motion is **GRANTED** and the Court's Order of June 2, 2022 (ECF No. 149) is **VACATED IN PART** as to: (1) the Court's determination that privileges and immunities under the Vienna Convention for Diplomatic Relations, the Vienna Convention for Consular Relations, and principles of international comity can never apply to documents or other materials held by Qatar's former contractors, and (2) the portion of this Court's order that modified the scope of the "Highly Confidential" designation in the operative protective order in this case (*see* ECF Nos. 90-3, 96).

The Court now clarifies that Qatar's privileges and immunities are not categorically inapplicable to materials held by third-party former contractors.

The Court further clarifies that, under the operative protective order, materials may be marked "Highly Confidential" when a producing party, whether a Defendant or a non-party subpoena recipient, in good faith reasonably believes that such materials contain or comprise

information protected by the Vienna Conventions or by any other privilege held by Qatar as a sovereign state, including the deliberative-process privilege or other privileges derived from international comity

**SO ORDERED.**

Date: ___________________ ____________________________

Hon. Dabney L. Friedrich
United States District Judge

# EXHIBIT 1

**[ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2022]**

**No. 22-7082**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

BROIDY CAPITAL MANAGEMENT LLC AND ELLIOTT BROIDY,

PLAINTIFFS-APPELLEES

V.

NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, AND STONINGTON STRATEGIES LLC,

DEFENDANTS-APPELLEES

V.

STATE OF QATAR,

APPELLANT

---

On Appeal from the United States District Court
for the District of Columbia

---

# BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

---

RICHARD C. VISEK
*Acting Legal Adviser*
*Department of State*
*Washington, DC 20520*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SHARON SWINGLE
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.   Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellant.

## B.   Rulings Under Review

References to the ruling at issue appear in the Brief for Appellant.

## C.   Related Cases

All related cases are listed in the Brief for Appellant.

*/s/ Martin Totaro*

Martin Totaro

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTERESTS OF THE UNITED STATES ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

ARGUMENT ........ 7

I. This Court Has Appellate Jurisdiction ........ 7

A. Qatar Has Standing To Appeal ........ 7

B. Qatar's Appeal Satisfies the Requirements of the Collateral-Order Doctrine ........ 9

II. This Court Should Correct the District Court's Erroneous Interpretation of Article 24 ........ 17

A. Documents Possessed by Third Parties May in Limited Circumstances Be Documents "of the Mission" Under Article 24 ........ 18

1. The Legal Framework ........ 18

2. The District Court Adopted a Flawed Interpretation of Article 24 ........ 23

B. On Remand, the District Court Should Examine Whether the Documents at Issue Are Documents "of the Mission" ........ 30

CONCLUSION ........ 33

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abelesz v. Magyar Nemzeti Bank*,
692 F.3d 661 (7th Cir. 2012) .......... 14

*Al Odah v. United States*,
559 F.3d 539 (D.C. Cir. 2009) .......... 10

*Ameziane v. Obama*,
699 F.3d 488 (D.C. Cir. 2012) .......... 11

*Aurelius Capital Master, Ltd. v. Republic of Argentina*,
589 F. App'x 16 (2d Cir. 2014) .......... 12, 13

*Broidy Capital Mgmt. LLC v. Muzin*,
12 F.4th 789 (D.C. Cir. 2021) .......... 11, 13
No. 19-150, 2022 WL 2157047 (D.D.C. June 15, 2022) .......... 9

*Castillo v. Cameron County*,
238 F.3d 339 (5th Cir. 2001) .......... 7

*EM Ltd. v. Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012),
*aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014) .......... 16, 17

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
140 S. Ct. 1637 (2020) .......... 24

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
313 F.3d 70 (2d Cir. 2002) .......... 7

*Marino v. Ortiz*,
484 U.S. 301 (1988) .......... 7, 8

*McKinley v. Board of Governors of Fed. Reserve Sys.*,
647 F.3d 331 (D.C. Cir. 2011)....................................................19

*Medellin v. Texas*,
552 U.S. 491 (2008) ....................................................................1

*Mohawk Indus. Inc. v. Carpenter*,
558 U.S. 100 (2009) ....................................10, 12, 14, 15, 16

*Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.*, *In re*,
71 F.3d 298 (8th Cir. 1995) ........................................................8

*Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*,
962 F.3d 576 (D.C. Cir. 2020)....................................................17

*Rojas v. Federal Aviation Admin.*,
989 F.3d 666 (9th Cir. 2021),
*cert. denied*, 142 S. Ct. 753 (2022) ..........................................30

*Sealed Case*, *In re*,
931 F.3d 92 (D.C. Cir. 2019) ................................................10, 11

*Sealed Case (Med. Recs.)*, *In re*,
381 F.3d 1205 (D.C. Cir. 2004) ..............................................2, 7, 8

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to U.N.*, 988 F.2d 295 (2d Cir. 1993)..........................................24

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010)........................................................14

*Taiwan v. U.S. Dist. Court for the N. Dist. of Cal.*,
128 F.3d 712 (9th Cir. 1997) ......................................................21

*Terrorist Attacks on Sept. 11, 2001*, *In re*,
No. 03-MDL-01570, 2019 WL 3296959 (S.D.N.Y. July 22, 2019) .......30

*United States v. Aubrey*,
800 F.3d 1115 (9th Cir. 2015) .......... 19

*United States v. Kirschenbaum*,
156 F.3d 784 (7th Cir. 1998) .......... 8

*United States v. Kranovich*,
401 F.3d 1107 (9th Cir. 2005) .......... 19

*Van Cauwenberghe v. Biard*,
486 U.S. 517 (1988) .......... 11

*Will v. Hallock*,
546 U.S. 345 (2006) .......... 12

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) .......... 11

**Treaty:**

Vienna Convention on Diplomatic Relations,
Apr. 18, 1961, 23 U.S.T. 3227, entered into force Dec. 13, 1972:
Art. 22 .......... 24
Art. 24 .......... 1, 2, 3, 4, 5, 6, 13, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33
Art. 30(1) .......... 24

**Statutes:**

22 U.S.C. § 612(a) .......... 6, 32

22 U.S.C. § 615 .......... 6, 32

28 U.S.C. § 1604 .......... 9

28 U.S.C. § 1607 .......... 9

28 U.S.C. § 1607(c) .......... 9

**Other Authorities:**

*Comments by Governments on the Draft Articles Concerning Diplomatic Intercourse and Immunities*, [1958] 2 Y.B. Int'l L. Comm'n 136, U.N. Doc. A/CN.4/SER.A/1958/Add.1 ..... 25

Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* (4th ed. 2016) ..... 19, 20, 24

*Report of the Commission to the General Assembly*, [1957] 2 Y.B. Int'l L. Comm'n 137, U.N. Doc. A/CN.4/SER.A/1957/Add.1 ..... 24

A. Emil. F. Sandström, *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur*, U.N. Doc. A/CN.4/116 (May 2, 1958) ..... 25, 26

1 *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records*, U.N. Doc. A/CONF.20/14, U.N. Sales No. 61.X.2 (1962) ..... 26, 27

*Webster's Third New International Dictionary* (2002) ..... 18

## GLOSSARY

This brief does not use abbreviations requiring a glossary under

Local Rule 28(a)(3).

## INTRODUCTION AND INTERESTS OF THE UNITED STATES

The United States has a compelling interest in ensuring the proper interpretation and implementation of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, entered into force Dec. 13, 1972.  The United States is a party to the Vienna Convention and its interpretation of the treaty is "entitled to great weight." *Medellin v. Texas*, 552 U.S. 491, 513 (2008).  It also has a substantial interest in the issues presented by this case because it relies on other parties to the Convention to protect U.S. rights set forth in the treaty, and that reliance is threatened when the United States does not safeguard those treaty rights domestically.

Article 24 of the Convention provides that the "archives and documents of the mission shall be inviolable at any time and wherever they may be."  In this case, the State of Qatar contends that the district court's order compels the defendants, who are registered agents of Qatar, to produce inviolable documents of Qatar's mission in violation of Qatar's Article 24 rights.

This Court has jurisdiction over Qatar's appeal.  Qatar has standing because "a non-party may appeal orders for discovery if [it]

has no other effective means of obtaining review." *In re Sealed Case (Med. Recs.)*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004) (quotation marks omitted). And Qatar's appeal meets the requirements of the collateral-order doctrine because the court's order is conclusive, it resolves an important question of treaty interpretation separate from the merits of the underlying suit, and it is effectively unreviewable on appeal from the final judgment in the underlying action because any rights Qatar has under Article 24 would be violated the moment protected mission documents are disclosed.

On the merits, the district court adopted an overly restrictive interpretation of Article 24 by announcing a new rule that materials possessed by outside parties cannot qualify as mission documents unless they were lost or stolen. That approach conflicts with Article 24's protection of documents "of the mission . . . wherever they may be." It is also inconsistent with Article 24's negotiating history and prior views of the U.S. Department of State. And it does not square with Article 24's purpose of protecting the confidentiality of mission documents. Instead, Article 24 covers documents in the possession of the mission (including documents that are in the hands of mission

personnel off the mission premises), documents that are not in the possession of the mission because they were lost or stolen, and documents possessed by outside parties with a particular relationship to the mission where the documents were provided by the mission or, alternatively, were solicited by and incorporated information from archives or documents of the mission for purposes essential to the functions of the mission and with reasonable expectations of continued confidentiality.  Under that framework, a significant number of the documents likely fall outside Article 24.  But that assessment cannot be made at present because of the inadequate factual record.  Accordingly, the case should be remanded to the district court so it can engage in that analysis on a document-by-document basis.[1]

---

[1] This Court's invitation asked the government to address whether the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations protect from disclosure the documents that are the subject of discovery requests made by the plaintiffs.  Similar to Article 24, Article 33 of the Vienna Convention on Consular Relations provides that "[t]he consular archives and documents shall be inviolable at all times and wherever they may be."  Because this case concerns claims regarding an embassy's archives, the Vienna Convention on Diplomatic Relations is the applicable convention.  The Vienna Convention on Consular Relations would apply parallel protections to consular archives according to the same reasoning outlined in this brief.

## STATEMENT OF THE ISSUES

The district court granted the plaintiffs' motion to compel that contested the defendants' attempt to withhold discovery of documents created for Qatar, communications between the defendants and Qatar, and communications between themselves when they were acting as agents for Qatar. JA298. Qatar seeks interlocutory review of that order. Its primary argument is that the court's order will result in a violation of Qatar's rights under Article 24 of the Vienna Convention on Diplomatic Relations, which provides that "[t]he archives and documents of the mission shall be inviolable at any time and wherever they may be." The questions presented are:

(1) Whether this Court has jurisdiction to hear an interlocutory appeal by a non-party foreign sovereign on the ground that, if the district court's pretrial discovery order stands, there is at least a colorable argument that the order will cause a violation of the foreign sovereign's rights under Article 24.

(2) Whether Article 24 protects from disclosure the documents that are the subject of the order granting the plaintiffs' motion to compel.

## STATEMENT OF THE CASE

Plaintiffs Broidy Capital Management, LLC and Elliott Broidy (collectively Broidy) have brought federal- and state-law claims against several consultants working for Qatar: Nicolas Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies, LLC (a company founded by Muzin and Allaham). JA288. Broidy alleges that "the defendants joined a 'Qatari Enterprise,' which conspired against [Broidy] to hack his computers and disseminate the hacked information to the media in retaliation for Broidy's anti-Qatari advocacy." JA288.

In the order under review, the district court granted Broidy's motion to compel that "challenge[d] the defendants' attempt to withhold discovery based on privileges that are purportedly held by Qatar." JA297. According to the defendants, Article 24 "permit[s] them to withhold all '[d]ocuments created for Qatar, communications between [them] and Qatar, and communications between [themselves] when they were acting as agents for Qatar.'" JA298.

The district court ruled that none of the documents at issue is inviolable under Article 24. In doing so, the court held that "the phrase 'documents of the mission' refers most naturally to documents that

either belong to or are possessed by a mission," but not documents "that have been delivered to their intended recipient." JA300. Under that interpretation, "documents freely given to non-mission parties fall outside the Convention's scope." JA300. To reconcile its view with Article 24's express protection of mission documents "wherever they may be," the court stated that that phrase "is best read" to mean that a mission's documents retain their inviolability outside a mission's possession only "if they are lost or stolen." JA302. The court also noted that some of the documents at issue were subject to inspection pursuant to the Foreign Agents Registration Act, 22 U.S.C. §§612(a), 615, which in its view "further confirm[ed] that those communications fall outside" Article 24's reach. JA304-05.

The district court stated that it "need not decide whether the Article's protections extend to documents held by bailees of diplomatic missions," JA300 n.6, but it did not retreat from its conclusion that mission documents "freely given to non-mission parties" invariably lose their Article 24 protections, JA300. The court also stated that the "defendants offer[ed] only conclusory statements that the requested

documents belong to Qatar," JA300, but it did not offer Qatar the opportunity to show that the documents at issue belonged to Qatar.

Qatar sought interlocutory review in this Court and also filed an emergency stay motion. The Court granted Qatar's emergency stay motion. *See* July 1, 2022 Order. It later issued an order expediting the briefing schedule and inviting "the United States Department of Justice . . . to file an amicus curiae brief." July 14, 2022 Order.

## ARGUMENT

### I. This Court Has Appellate Jurisdiction

#### A. Qatar Has Standing To Appeal

Qatar has standing to appeal the district court's order. Although "[t]he rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well-settled," *Marino v. Ortiz*, 484 U.S. 301, 304 (1988), nonparties are "often allowed to appeal" when a "decree affects [their] interests," *In re Sealed Case (Med. Recs.)*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004).[2]

[2] *See Castillo v. Cameron County*, 238 F.3d 339, 349 (5th Cir. 2001) ("[A] nonparty may be allowed to appeal if the decree affects his interests."); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 81-82 (2d Cir. 2002) (nonparty Indonesian Ministry of Finance had "an interest . . . affected by the trial

*Continued on next page.*

That principle applies to discovery orders. "[A] non-party may appeal orders for discovery if [it] has no other effective means of obtaining review." *In re Sealed Case (Med. Recs.)*, 381 F.3d at 1211 n.4 (quotation marks omitted). In this case, although Qatar is not a party and will not be required to turn over documents, the court's order potentially threatens Qatar's right under Article 24 that its documents remain inviolable. And Qatar has no other means of obtaining review because, if protected materials are disclosed, the documents' inviolability will be violated the moment they are turned over to Broidy.

Qatar participated in district court by filing nonparty statements of interest addressing the inviolability of its documents without formally seeking to intervene. *See* JA161; JA227. Outside the context of litigation involving foreign sovereigns, the "better practice" for a nonparty with an interest in a suit is "to seek intervention for purposes of appeal." *Marino*, 484 U.S. at 304. But that practice is substantially less desirable in the context of foreign sovereigns that typically have

court's judgment" because the foreign sovereign claimed an interest in property subject to the district court's garnishment order and could appeal); *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998); *In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.*, 71 F.3d 298, 301 (8th Cir. 1995).

immunity from the jurisdiction of U.S. courts. *See* 28 U.S.C. § 1604. A foreign sovereign that does not wish to waive its sovereign immunity may reasonably fear that, if it intervenes in an action, litigants could rely on its participation to bring counterclaims against it. *See id.* § 1607. Even if those arguments do not prove meritorious, *see, e.g.*, *id.* § 1607(c) (allowing certain counterclaims only if the claim "does not seek relief exceeding in amount or differing in kind from that sought by the foreign state"), a foreign state would be forced to litigate that issue, *see Broidy Capital Mgmt. LLC v. Muzin*, No. 19-150, 2022 WL 2157047, at *4 (D.D.C. June 15, 2022) (district court stating that "whether Qatar can appeal a discovery order and seek an active role in the discovery process without waiving its immunity from suit" is a "complex" question). Given the unique considerations for foreign sovereign litigants, recognizing their standing to appeal to protect their interests without requiring intervention provides a sensible way to protect those litigants' rights.

### B. Qatar's Appeal Satisfies the Requirements of the Collateral-Order Doctrine

Qatar's appeal satisfies the requirements of the collateral-order doctrine. That doctrine recognizes appellate jurisdiction of

interlocutory orders "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus. Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). The district court conclusively decided that the documents at issue are not shielded from discovery; whether a foreign sovereign can invoke its treaty rights to prevent disclosure of documents that are otherwise discoverable is self-evidently important; and this discovery dispute is separate from the claims on the merits that Broidy brought against the defendants. *See* Broidy Stay Opp. 23-26 (only disputing the effectively-unreviewable factor).

This Court's precedents make clear that the district court's interlocutory order is also effectively unreviewable on appeal from a final judgment. For example, in *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009), the court ruled that a discovery order requiring disclosure satisfied this requirement because, "[o]nce the information is disclosed, the 'cat is out of the bag' and appellate review is futile." *Id.* at 544. And in *In re Sealed Case*, 931 F.3d 92 (D.C. Cir. 2019), the court allowed an appeal of an order denying the party's anonymity in

litigation, stating that "if the Appellant's identity is disclosed as required by the [order], the issue would be 'effectively unreviewable on appeal from a final judgment.'" *Id.* at 95; *see also Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) ("[T]he district court's order would be effectively unreviewable on appeal from a final judgment because once the government's official acknowledgment of Ameziane's cleared status is revealed publicly, the disclosure cannot be undone."); *Wuterich v. Murtha*, 562 F.3d 375, 382 (D.C. Cir. 2009). Further, in prior proceedings in this case, this Court noted that "orders denying colorable claims of sovereign immunity generally are immediately appealable pursuant to the collateral order doctrine," explaining that "if immunity appeals had to await final judgment on the merits, immunity erroneously denied would lose its litigation-avoidance component before the error could be corrected." *Broidy Capital Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021). As these cases demonstrate, if an important right cannot be vindicated on appeal because the violation of the right cannot be undone, collateral-order review may be warranted.

To be sure, not all threats to treaty rights justify collateral-order review. *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 526-27 (1988)

(immunity from service of process under an extradition treaty is not a "right not to stand trial" but only a "right not to be subject to a binding judgment," which "may be effectively vindicated following final judgment"). And not all orders implicating a right that is infringed if not reviewed immediately (such as some rights to avoid trial) are subject to immediate review. *E.g.*, *Will v. Hallock*, 546 U.S. 345, 354-55 (2006) (order declining to apply the Federal Tort Claims Act's judgment bar to preclude constitutional tort actions against federal officers). The "decisive consideration" is "whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Industries*, 558 U.S. at 107.

Ensuring that federal courts honor the treaty obligations as to a foreign sovereign's inviolable documents, both under this treaty and other international agreements, is a critical value to the United States.[3]

---

[3] Other international agreements include language similar to Article 24. The International Monetary Fund's Articles of Agreement state that "archives of the Fund shall be inviolable" (Art. IX, §V: https://www.imf.org/external/pubs/ft/aa/index.htm). The charters of the Inter-American Development Bank (Art. XI, §V: https://perma.cc/PEU9-QJX4) and the World Bank (Art. VII, §V: https://perma.cc/NWR6-N4YC) have similar provisions. And the Agreement Establishing the Asian Development Bank (Art. 52: https://perma.cc/NS77-RGF6) as well

*Continued on next page.*

Moreover, not allowing review at this juncture may adversely affect the reciprocal treatment of the United States and its mission archives and documents (which could include sensitive national security and foreign policy materials) in foreign courts. And disclosure of inviolable archives and documents of an embassy could likewise have significant foreign policy and national security repercussions flowing from the release of the sensitive diplomatic information of a foreign government. Accordingly, the issue presented by this appeal is effectively unreviewable on postjudgment review. Because Qatar's claim that the order infringes on its Article 24 rights has "at least colorable merit," *Broidy*, 12 F.4th at 796, this Court has appellate jurisdiction over its appeal of the disclosure order.

Consistent with those principles, courts have allowed immediate appeal in similar circumstances. For example, in an unpublished opinion in *Aurelius Capital Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16 (2d Cir. 2014), the Second Circuit ruled that a foreign

---

as the Agreement Establishing the African Development Bank (Art. 53(2): https://perma.cc/TR6V-A7PQ) provide that "[t]he archives of the Bank and, in general, all documents belonging to it or held by it, shall be inviolable, wherever located."

sovereign could immediately appeal a post-judgment discovery order implicating its treaty rights. The court explained that, "[o]rdinarily, a post-judgment discovery order is not immediately appealable because it is not a final decision," but "otherwise non-final orders that present" issues of treaty interpretation are different because of their importance. *Id.* at 16-17. Other courts have also recognized that orders undermining important treaty rights are subject to collateral-order review. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 668-69 (7th Cir. 2012); *Swarna v. Al-Awadi*, 622 F.3d 123, 140-41 (2d Cir. 2010).

In arguing to the contrary, Broidy has relied on the Supreme Court's decision in *Mohawk Industries*. *See* Broidy Stay Opp. 13-15, 23-26. In that case, the Court held that "the collateral order doctrine does not extend to disclosure orders adverse to the attorney-client privilege." 558 U.S. at 114. The Court stated that "postjudgment appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege," because "[a]ppellate courts can remedy the improper disclosure of privileged material . . . by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109. It noted

that "deferring review until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel." *Id.* And it concluded that even though "a fraction of orders adverse to the attorney-client privilege may . . . harm individual litigants in ways that are 'only imperfectly reparable,'" that "does not justify making all such orders immediately appealable as of right under § 1291." *Id.* at 112. In any event, the Court stated, "Section 1292(b) appeals, mandamus, and appeals from contempt citations facilitate immediate review of some of the more consequential attorney-client privilege rulings." *Id.*

A post-judgment discovery order implicating treaty rights is different in critical respects from an order denying a claim of attorney-client privilege, as the reasoning in *Mohawk Industries* itself demonstrates. Unlike run-of-the-mill disclosure orders adverse to the attorney-client privilege, post-judgment appeals of orders compelling documents in potential violation of a foreign sovereign's treaty rights may not "generally suffice," *Mohawk Industries*, 558 U.S. at 109, because those important rights are violated the moment the documents' inviolability has been compromised. The possibility of disclosure may

also "meaningfully reduce the *ex ante* incentives for full and frank consultations between" a mission and its contractors or consultants if the foreign sovereign faces a credible threat that its archives and documents may be disclosed. *Id.* *Mohawk Industries* also instructed that courts "not engage in an 'individualized jurisdictional inquiry,'" but rather focus on "the entire category to which a claim belongs." *Id.* at 107. Foreign sovereigns in "all" cases similar to this one, *id.* at 112, would be harmed if interlocutory review were not available in this category of cases implicating important treaty rights.

A typical foreign state whose treaty rights are implicated is also differently situated from a typical litigant asserting attorney-client privilege. Qatar is not a party and is not being compelled to disclose documents, so "Section 1292(b) appeals" and "appeals from contempt citations" are not viable options for Qatar to "facilitate immediate review." *Mohawk Industries*, 558 U.S. at 112; *see EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 206 (2d Cir. 2012) ("[B]ecause the Discovery Order does not direct compliance from Argentina itself, Argentina cannot obtain review through disobedience and contempt."), *aff'd sub*

*nom. Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014). The concerns animating *Mohawk Industries* do not apply here.

Because the requirements for collateral-order review have been met, Qatar should not be required to seek mandamus to protect its interests. *See Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 582 (D.C. Cir. 2020). But if this Court rules to the contrary, the United States agrees with Qatar that the Court may construe Qatar's notice of appeal as a mandamus petition. Qatar Br. 28-29. Although the soundest course is to allow a foreign state to seek review under the collateral-order doctrine, it is essential that a foreign state can at least obtain review in a mandamus petition in appropriate circumstances. The requirements for mandamus are otherwise satisfied because, as discussed below, Qatar has a clear entitlement to a remand.

## II. This Court Should Correct the District Court's Erroneous Interpretation of Article 24

Article 24's inviolability protections cover documents in the possession of the mission (including documents that are off the mission premises in the hands of mission personnel) and documents possessed by outside parties with a special relationship to the mission where the document was provided by the mission or, alternatively, was solicited

by and incorporated information from archives or documents of the

mission for purposes essential to the functions of the mission and with

reasonable expectations of continued confidentiality.  Although a

significant number of the documents likely fall outside Article 24's

scope, this Court should remand to allow the district court to apply the

correct legal framework and perform the needed analysis.

### A.   Documents Possessed by Third Parties May in Limited Circumstances Be Documents "of the Mission" Under Article 24

#### 1.   The Legal Framework

Article 24 provides that the "archives and documents of the

mission shall be inviolable at any time and wherever they may be."  The

provision's use of the phrase "of the mission" demonstrates that Article

24's protections reach documents in the possession of the mission

(either on mission premises or off mission premises in the hands of

mission personnel).  *See Webster's Third New International Dictionary*

1565 (2002) ("of" can be "used as a function word indicating a possessive

relationship").  And there is a general understanding by states and

international legal scholars that lost or stolen documents are not

stripped of their inviolability merely because they no longer reside at

the mission. *E.g.*, Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 159 (4th ed. 2016).

In addition, mission documents sent to outside parties may in certain circumstances remain "of the mission" and continue to be subject to the protections of Article 24. In a variety of contexts, something may continue to be a part "of" one entity when possessed by another. *See United States v. Kranovich*, 401 F.3d 1107, 1113 (9th Cir. 2005) (funds are "of the United States" for purposes of a criminal statute, even if possessed by an outside party, where the United States had "title to, possession of, or control over" the funds); *United States v. Aubrey*, 800 F.3d 1115, 1125-26 (9th Cir. 2015) (similar); *cf. McKinley v. Board of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) ("When an agency record is submitted by outside consultants as part of the [agency's] deliberative process, and it was solicited by the agency," it is "entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of" Freedom of Information Act Exemption 5). That principle applies to Article 24's broad protection of materials "wherever they may be," which makes it "clear beyond argument" that archives and documents "not on the premises of

the mission and not in the custody of a member of the mission" do not automatically lose their inviolability. Denza, *supra*, at 158.

Although Article 24's text does not resolve *when* documents provided to outside parties retain their inviolability, its clear purpose provides relevant guideposts. The "underlying purpose" of inviolability under Article 24 "is the protection of the confidentiality of [the] information stored," so "the inviolability given to" archives and documents "is *entirely* for the protection of the confidentiality of mission records." Denza, *supra*, at 161, 168 (emphasis added). In light of that purpose, documents in the hands of outside parties with a special relationship to the mission may retain their status as documents "of the mission" where the documents were provided with the reasonable expectation of continued confidentiality and provided for the purpose of carrying out "the efficient performance of the functions of" the mission, Vienna Convention on Diplomatic Relations, pmbl. ¶ 5. And documents generated by third parties can be subject to Article 24 protections only in rare circumstances: either when they were solicited by the mission in the performance of essential functions and incorporate information from archives or documents of the mission, or where they include a portion of

an inviolable mission document provided by the mission (for example, if a non-mission document quotes an inviolable mission document). *Cf. Taiwan v. U.S. Dist. Court for the N. Dist. of Cal.*, 128 F.3d 712, 718 (9th Cir. 1997) (overturning an order compelling an individual to testify about the contents of an organization's documents because the inviolability protection afforded to the documents "would be practically useless" if compelled testimony about the documents were permissible).

This framework's focus on confidentiality recognizes that, where a mission has no reasonable expectation that its archives and documents provided to outside parties will remain confidential, the documents cease to be inviolable. For example, a document a mission posts on the internet or sends to an outside party for widespread publication or as part of a commercial transaction does not remain inviolable.

The framework also acknowledges that a mission's reasonable expectations of confidentiality will be informed by the nature of the relationship between the foreign mission and an outside party. A foreign mission that shares information with an outside party such as an agent or contractors or consultants working for it may have greater expectations of confidentiality compared to information shared with

someone who has no relationship with the mission, such as a commercial vendor or service provider.[4] As the State Department has explained, although an outside contractor working on U.S. embassy construction may possess mission documents that are subject to continued protection under Article 24, a different situation arises for "information passed to third parties" without "any relationship of lender and borrower, bailor and bailee or principal and agent" between the foreign state and the outside party. Qatar Stay Mot. Ex. E, at 2-3 (2002 Kelly Submission).

Finally, the framework recognizes that the inquiry may be affected by the nature of the archives and documents. A foreign mission may share routine commercial information with contractors—such as account numbers, account transactions, and phone records maintained by the outside vendor—to facilitate the provision of commercial services. Such routine commercial information, when maintained by

---

[4] *See* Case C316/19, *European Comm'n v. Slovenia* (2020) (Grand Chamber of the European Court of Justice holding that documents may be "covered by the concept of 'archives of the [European Central Bank]' even if they are held by national central banks and not by the [European Central Bank] itself" based in part on "the particularly close relations between" the two bodies) (https://perma.cc/H4Z3-SCKV).

the outside vendor, is not properly considered to be the archives or documents of the mission and thus is not inviolable. By contrast, where the mission shares information that is directly related to the functions of the diplomatic mission as defined in Article 3 of the Convention, the mission may have a greater expectation that its archives and documents will remain inviolable.

### 2. The District Court Adopted a Flawed Interpretation of Article 24

The district court concluded that mission documents "freely given to non-mission parties," JA300, necessarily fall outside of Article 24. That overly restrictive view could undermine the respect owed to foreign sovereigns that need to rely on outside contractors to carry out essential mission functions. And it could implicate reciprocity concerns for U.S. embassies relying on, for example, the provision of sensitive mission documents to architects, building contractors, and security contractors to safeguard U.S. missions.

As a threshold matter, the district court's interpretation lacks support in Article 24's text. To reconcile its approach with Article 24's broad textual guarantee of inviolability of documents "wherever they may be," the district court stated that Article 24's reference to

"inviolability" indicates a concern with the theft or seizure of diplomatic materials. JA300. But the inviolability provided by the Vienna Convention is broader, applies in a variety of circumstances, and is designed to ensure that a foreign mission can perform its diplomatic functions without interference from the host state. *E.g.*, Arts. 22, 30(1) (inviolability of mission premises); Denza, *supra*, at 158. And "[t]he risk in creating an exception to mission inviolability in this country is of course that American missions abroad would be exposed to incursions that are legal under a foreign state's law." *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to U.N.*, 988 F.2d 295, 300 (2d Cir. 1993). Further, although the district court defined "inviolable" to mean "safe from violation," disclosure of mission documents during a discovery dispute between private parties would encroach on inviolability afforded by Article 24.

The district court's categorical approach, moreover, overlooks the Vienna Convention's negotiating history that allows for the possibility that documents provided to outside parties may remain inviolable. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1646 (2020) ("Our precedents have

looked to the negotiating and drafting history of a treaty as an aid in determining the shared understanding of the treaty." (quotation marks omitted)). The initial draft article proposed by the U.N. International Law Commission in 1957 stated that "[t]he archives and documents of the mission shall be inviolable." *Report of the Commission to the General Assembly*, [1957] 2 Y.B. Int'l L. Comm'n 137, U.N. Doc. A/CN.4/SER.A/1957/Add.1. Though the language "wherever they may be" had not yet been added, the Commentary clarified that inviolability applied to archives and documents "regardless of the premises in which they may be." *Id.*

During the course of negotiations, the United States sought to limit inviolability to "archival material . . . on the premises of the mission, in ordinary transit by courier or sealed pouch, or in the personal custody of duly authorized officers of the mission for use in the performance of their functions." *Comments by Governments on the Draft Articles Concerning Diplomatic Intercourse and Immunities*, [1958] 2 Y.B. Int'l L. Comm'n 136, U.N. Doc. A/CN.4/SER.A/1958/Add.1. That construction was rejected. As the Special Rapporteur observed, "protection is due to the mission's documents regardless of their

whereabouts." A. Emil. F. Sandström, *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur* 43, U.N. Doc. A/CN.4/116 (May 2, 1958).

The 1958 draft article was considered at the United Nations Conference on Diplomatic Intercourse and Immunities in 1961. The delegates from France and Italy submitted a joint amendment to add language establishing that archives and documents are inviolable "at any time and anywhere they may be" with a second sentence requiring that they "be identified by visible signs" outside of the mission.

The delegate from Pakistan objected to the French-Italian language as overly broad. He stated that Pakistan would not regard as inviolable documents that a mission had allowed to pass into "unauthorized hands," such as "nationals of the receiving State," and urged that the article be redrafted to "prohibit[] such abuse." 1 *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records* 148, U.N. Doc. A/CONF.20/14, U.N. Sales No. 61.X.2 (1962). Some delegates also worried that adopting the identification provision of the French-Italian amendment would impose an unwarranted condition on

inviolability. *Id.* at 149-50. Ultimately, advocates for a broader construction prevailed. The identification provision of the French-Italian amendment was rejected. *Id.* Instead, the Committee adopted the first sentence of the French-Italian amendment, altering Article 24 to read that mission archives and documents are inviolable "at any time and wherever they may be." *Id.* at 150.

When Article 24 was considered at the Conference's sixth plenary meeting, the delegate from Pakistan once again raised his concerns regarding its "sweeping" language. *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records*, *supra*, at 16. Pakistan did not dispute the immunity of mission archives and documents "when ordinarily used, stored or despatched in transit." *Id.* But Pakistan would not regard as inviolable documents given by a mission "to persons not entitled to hold them." *Id.* Here again, the delegates chose a more expansive construction of inviolability and voted to retain the words "at any time and wherever they may be," adopting what would become the final language of Article 24. *Id.*

This negotiating history is also consistent with longstanding State Department views and practice with respect to its assertion of

inviolability abroad to protect the archives and documents of U.S. missions. In 2002, the House Committee on Government Reform invited the State Department to opine on whether the House could compel production of records from contractors for a foreign embassy in the United States. Although it declined to offer a definitive legal view of the "complex" and "novel" question, JA371, the State Department testimony rejected the view adopted by the district court in this case that mission documents sent to outside parties automatically lose their inviolability.

The State Department explained that "the mere fact that archives have passed to a third party does not resolve the issue." JA371 (2002 Taft Submission). For example, if a foreign sovereign were to seek to compel an outside contractor working on U.S. embassy construction to produce information the United States has provided the contractor, "we would want to argue that the information is protected under the Vienna Convention." Qatar Stay Mot. Ex. E, at 2 (2002 Kelly Submission). These concerns are not hypothetical: "In a number of instances, the Department has in fact asserted that the official information in the possession of the local national working in the embassy is 'archival'

under the Vienna Convention and thus inviolable." JA369. The United States "would have greater difficulty making this argument persuasively if, in the United States, the information of foreign embassies given to contractors is subject to compulsory process and release." Qatar Stay Mot. Ex. E, at 3.

The district court's contrary approach appeared to stem from its view that the Vienna Convention's safeguards do not "extend protections to private citizens" of the receiving state. JA301. It noted, for example, that the Convention does not provide consultants with sovereign immunity or the ability to refuse requests to give evidence as a witness. JA300, JA301. And it similarly stated that other provisions in the treaty focus on "protecting diplomatic missions and their members from harassment and interference" but do not "shield non-mission parties." JA301. But Article 24's inviolability protections apply by their plain terms to *documents* of the mission "wherever they may be," not to people. These protections are independent of any separate treaty rights the possessor of the documents—whether a mission or a non-mission party—might have.

### B. On Remand, the District Court Should Examine Whether the Documents at Issue Are Documents "of the Mission"

Remand is warranted because the district court adopted an overbroad rule and did not consider individual documents or categories of documents pursuant to the analyses set forth above. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570, 2019 WL 3296959, at *4 (S.D.N.Y. July 22, 2019) (analyzing inviolability under Article 24 according to particular documents); *cf. Rojas v. Federal Aviation Admin.*, 989 F.3d 666, 675 (9th Cir. 2021) ("Because the scope of Exemption 5 turns on the character of the document at issue—it is the memorandum or letter that must be 'intra-agency'—these principles should be applied on a document-by-document basis."), *cert. denied*, 142 S. Ct. 753 (2022). Although the court erred in adopting a categorical approach that documents sent to outside parties automatically lose their inviolability status, it is likewise not correct that every mission document provided to an outside party retains that status.

In light of the limited factual development below, it is unclear whether any of the documents fall under Article 24. To resolve this discovery dispute, the district court should conduct a two-part inquiry

that asks whether a document ever was "of the mission" and, if so, whether it continues to be so even when possessed by another party.

At step one, a significant number of the documents do not appear to ever have been documents "of the mission" because the Qatari mission never possessed the documents (meaning that it also did not provide them to defendants), nor is there any indication that it both solicited the creation of those particular documents and provided information from inviolable documents or archives that is included in the documents. *E.g.*, Dkt. No. 109-3, at 18-19 (defendant's correspondence with private parties); *id.* at 13-14 (documents showing payments to Qatar).

At step two, materials in this case that were at one time documents of the mission may fall outside Article 24's scope because Qatar may have lacked sufficient objectively reasonable expectations of those documents' confidentiality. The court should look at the mission's expectations of confidentiality by examining the nature of the relationship between the mission and a defendant, the nature of the documents, and any other relevant indicia of confidentiality. Relevant to that inquiry, when a foreign government hires outside parties to

perform non-mission functions under circumstances in which its communications are not being provided any reasonable expectation of confidentiality, such documents are not inviolable within the meaning of Article 24.

In this case, the defendants are all registered agents of Qatar who must comply with the requirements of the Foreign Agents Registration Act. That Act requires registered agents to keep "such . . . records" as the Attorney General may prescribe, and to make those records available for "inspection." 22 U.S.C. §§612(a), 615. For records that fall within this provision of the Act, the expectation of confidentiality is diminished because the documents are provided with the prospect that they could be subject to further disclosure. This case does not require this Court to determine whether any document subject to inspection under the Act falls outside Article 24, *see* Qatar Br. 50-51, because Qatar's consulting agreement with the defendants in this case specifically acknowledged that the documents may be disclosed "as required by law," JA225; Qatar Br. 7-8 & nn.4-5.[5] Given that language,

[5] *See also, e.g.*, Agreement for defendant Howard's former employer Conover + Gould to provide IMS, Inc. with communications

*Continued on next page.*

which contemplates disclosures required by law regardless of any protections provided by Article 24, and the specific requirements of the Act, Qatar did not have a reasonable expectation that the documents that are in fact subject to inspection under the Act would remain protected from disclosure.

## CONCLUSION

The district court's discovery order should be reversed.

services in support of Qatar (https://perma.cc/95H3-BMAZ); Consulting Services Agreement Between IMS and Qatar ¶ 5 (documents confidential "and will not be disclosed by Consultant to any person except as authorized by the Embassy, or as required by law") (https://perma.cc/TE2G-E79Q); Agreement Between Howard employer Mercury Public Affairs and Qatar Schedule 1 ("Consultant will comply with the provisions of all federal state and local laws, regulations, and requirements pertaining to the performance of services under this contract.") (https://perma.cc/5MV9-HGMF).

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

RICHARD C. VISEK
*Acting Legal Adviser*
*Department of State*
*Washington, DC 20520*

SHARON SWINGLE
*/s/ Martin Totaro*
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*
*martin.v.totaro@usdoj.gov*

August 2022

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6394 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Martin Totaro*
Martin Totaro

# EXHIBIT 2

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

- - - - - - - - - - - - - - - - X

BROIDY CAPITAL MANAGEMENT LLC AND ELLIOTT BROIDY,

Appellees,

v. No. 22-7082

NICOLAS D. MUZIN et al., STATE OF QATAR,

Appellant.

- - - - - - - - - - - - - - - - X

Friday, October 28, 2022

Washington, D.C.

The above-entitled matter came on for oral argument pursuant to notice.

BEFORE:

CHIEF JUDGE SRINIVASAN, AND CIRCUIT JUDGES WILKINS AND RAO

APPEARANCES:

ON BEHALF OF THE APPELLANT:

DAVID M. ZIONTS, ESQ.

ON BEHALF OF AMICUS CURIAE:

MARTIN TOTARO, ESQ.

ON BEHALF OF THE APPELLEES:

DANIEL A. SAUNDERS, ESQ.
DANIEL R. BENSON, ESQ.

**Deposition Services, Inc.**
P.O. Box 1040
Burtonsville, MD 20886
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com www.DepositionServices.com

C O N T E N T S

| ORAL ARGUMENT OF: | PAGE |
| --- | --- |
| DAVID M. ZIONTS, Esq.<br>On Behalf of the Appellant | 3; 64 |
| MARTIN TOTARO, Esq.<br>On Behalf of Amicus Curiae | 24 |
| DANIEL A. SAUNDERS, Esq.<br>On Behalf of the Appellees,<br>Jurisdiction Issues | 41 |
| DANIEL R. BENSON, Esq.<br>On Behalf of the Appellees,<br>Vienna Convention Issues | 51 |

WC

P R O C E E D I N G S

THE CLERK: Case No. 22-7082, Broidy Capital Management LLC and Elliott Broidy versus Nicolas D. Muzin et al., State of Qatar, appellant. Mr. Zionts for the appellant. Mr. Totaro, amicus curiae. Mr. Saunders for the appellees, jurisdiction issues. Mr. Benson for the appellees, Vienna Convention issues.

JUDGE SRINIVASAN: Good morning, counsel. Mr. Zionts, please proceed when you're ready.

ORAL ARGUMENT OF DAVID M. ZIONTS, ESQ.

ON BEHALF OF THE APPELLANT

MR. ZIONTS: Thank you, Your Honor. May it please the Court. The district court made two important errors that harm Qatar's rights and interests as a sovereign: First, the court held that the Vienna Convention on Diplomatic Relations is categorically inapplicable, the documents, archives, and correspondence, whenever they are freely given to a non-mission party. Second, the court held that principles of international comity are also categorically inapplicable when discovery is sought from a private party that is a U.S. national.

This Court should reverse both rulings and remand with appropriate guidance for the district court to conduct a document-by-document assessment. In doing so, the Court should reject two arguments that had been advanced to limit

Qatar's protections: First --

JUDGE RAO: Mr. Zionts, first, I mean, assume if we did agree with you that the Vienna Convention is not categorically off the table and we were to remand. I mean, how do we articulate the standards that the district court should apply since we don't have the documents before us? We don't have any sense of what type of issues are going to arise in that document-by document consideration.

MR. ZIONTS: Sure, Your Honor. I think -- I think it's unfortunate that the -- you know, frankly, Qatar's request to develop this in a concrete way with a log is not where we are, but we are where we are. We do think it is in the interest of the sovereign, of the parties to this case, of the district court to at least get into some of these issues. So, for example, we know that there is this issue of FARA. There is this issue that's been raised about the contract. We know that there will be issues about the standard for documents that are generated by the contractors that incorporated --

JUDGE RAO: So, I mean, is it your view it's sufficient for us just simply to reverse and not provide guidance or --

MR. ZIONTS: Your Honor, you know, I think, the, in our view, the district court was wrong as a matter of law and the Court should reverse and hold that the categorical

WC

rule it adopted was incorrect and the process needs to start. Obviously, the documents aren't here. The documents -- you know, there has been no log. So we think there's going to be a lot of work to do in the district court. You know, our request would be that it would be in the interest of all parties and the district court if the Court did go a step beyond reversing that categorical ruling.

JUDGE RAO: And what does that look like, I guess is my question.

MR. ZIONTS: Sure, Your Honor. So I think we would start, you know, with a point of agreement with the United States about, you know, what documents of the mission means. They're entitled to inviolability. We have offered certain factors. I think those are really, in our view, more granular ways of getting at some of the things that the United States government was talking about in terms of a special relationship, looking to, you know, was the purpose of the engagement and of the work the contractors were doing related to the mission's performance of its -- of its functions, was there -- was there an expectation of confidentiality, was the mission exercising control and the treatment so that -- of those documents and information? So I think that is -- that is the first step. That's the standard that we would suggest.

And then I think there are these sort of secondary

issues that have -- that have risen. So take one, this argument that Mr. Broidy makes -- the United States does not endorse this argument -- but this idea that because of this existence out there of a possible FARA inspection, right, that means that the expectation of confidentiality vanishes. You know, if that were -- if that were accepted on remand, I think that would -- that would, you know, maybe entirely or pretty close to entirely end this. So we think that is something that the court should also address as a matter of law.

JUDGE RAO: That seems to me to be a very tricky question, because it seems, at least from the briefing and the records, that the application of FARA is -- you know, it's often worked out between DOJ and, you know, diplomatic missions, and so our stepping into that with some type of standard seems like a difficult place for this Court to be without more knowledge of whether FARA will even come up with respect to the particular documents at issue, but you're saying that we should address that question. That seems to me to be a very -- a very tough question.

MR. ZIONTS: Your Honor, I think there's two aspects to that question, one of which, I agree, is very difficult and we do not urge the Court to decide, even though, you know, it's raised by Mr. Broidy's arguments, and the other, which I think is a much less fraught path. You

know, our view is that probably the better practice is not to get into this question of if you had a clash between sovereigns where the United States Department of Justice said we want to inspect these records or the contract or of the mission and then the sovereign representing that mission came in and said, no, some of these records are documents of the mission and they're inviolable under the Vienna Conventions. You know, we think that is a legitimately hard, difficult problem. I completely agree, Judge Rao, with your point that this tends to be worked out between sovereigns, and I think, unless and until, you know, two sovereigns can't work that out, that that is an issue, you know, better left for another day.

You know, our view on how this case -- how this issue should be resolved is to say let's assume for the sake of argument that DOJ does have these inspection rights. It is -- that does not mean the expectation of confidentiality that the mission has and the documents held by the contractor completely vanish.

So we have this, you know, possibility that maybe DOJ will exercise inspection rights and maybe, you know, that -- maybe the sovereign will or won't object, maybe that will be worked out some other way, but you know, we think that, you know, that doesn't change the fact that in this civil case, there is no -- there is still a reasonable

expectation of confidentiality that when the mission shares with its contractors for the purposes of assisting in its diplomatic missions, that that's not -- the United States gives the example of stuff getting posted on the Internet -- that's not anything close to what we're -- to what we're talking about with this hypothetical possibility of a DOJ inspection. So that's the path we'd suggest the Court would go down.

It does leave for another day --

JUDGE SRINIVASAN: I'm not --

JUDGE WILKINS: I --

JUDGE SRINIVASAN: -- I don't -- go ahead.

JUDGE WILKINS: I'm interested in a whole nother path going down. Perhaps it's the old district court judge in me, but I want to ask you some questions about the motion to dismiss this appeal. Do you think, as a general matter, that it should be easier for a nonparty to get interlocutory review than a party in a civil case?

MR. ZIONTS: Your Honor, you know, one of the two grounds for interlocutory review here is the Perlman doctrine, and so under that doctrine, under this Court's precedent applying for it, I think there are cases where an appeal would be available to a nonparty but not to a party. I don't think the Court needs to get into that because this is -- this -- you know, regardless of who is appealing, we

think under the collateral order doctrine, this is appealable, but I think the concept of the Perlman doctrine is that there could be cases where, if you were a party, you would essentially have to go the contempt route if you wanted to appeal but a nonparty may have a separate basis to appeal.

JUDGE WILKINS: Well, when has the collateral order doctrine been used with respect to a nonparty?

MR. ZIONTS: Your Honor --

JUDGE WILKINS: Can you cite a case?

MR. ZIONTS: Your Honor, I think, you know, this Court's Sealed Case did rely on the collateral order doctrine. Now -- and Mohawk may have -- may have undermined the particular collateral order holding in Mohawk, but that was a case, you know, just, you know, zooming out as a conceptual matter, where a -- where a nonparty to the case filed a notice of appeal and this Court entertained that appeal both under collateral order and Perlman grounds.

JUDGE WILKINS: So I've looked at a bunch of our cases and the Supreme Court cases invoking either the collateral order doctrine or the Perlman doctrine, and I can't find a single one where the appellant wasn't at least a movant of some sort in the district court where they didn't -- where they filed either a motion to quash or they filed a formal objection or they sought some sort of relief

and then they were appealing the denial of the specific relief that they sought. You didn't do that here.

MR. ZIONTS: Your Honor, I think we did. The case is complicated, you know, because Qatar is a foreign sovereign and because it was essentially facing the threat that if it intervened, you know, the serious concern that Mr. Broidy would contend that that was a waiver --

JUDGE WILKINS: Who cares what he would contend? I mean, we have held since at least 1980 in the U.S. v. AT&T case that a nonparty can intervene for the limited purpose in a civil case to assert a privilege in a discovery dispute, and there's nothing in the text of 1605(a)(1) or 1607 that suggests that that limited intervention is going to waive sovereign immunity to be able to assert some sort of claims against Qatar.

And the fact of the matter is, is that you could have sought such limited intervention consistent with our practice and what the Supreme Court says is the preferred way of proceeding and then, if that had been -- if your limited intervention had been denied you, then you could seek interlocutory appeal of that denial, along with consideration of the merits of the dispute, and we wouldn't have this situation where we don't know what you are. Are you fish or foul? We don't know. You're an amicus. You can't preserve arguments as an amicus below. We even have a

rule where, if you're a party and you don't join in a motion or an objection below, you can't assert it on appeal if you didn't join it, and that's if you're a party.

So this is all a mess because you didn't pursue the option that was available to you to pursue, and I have a problem with that.

MR. ZIONTS: Your Honor, you know, a couple of responses to that -- one, I do think, you know, when a sovereign is involved, it is something fraught. You know, I agree with you that it would not in fact have been an implied waiver or trigger the counterclaim exception. I think a foreign sovereign has a legitimate, reasonable interest to not even being subject to that risk, not even being subject to having to defend that claim. We know the district court suggested that it viewed that as a complex question. We could have wound up, you know, with expensive proceedings, both in the district court and the court of appeals. So I think that's just a factual response with the unique circumstances here.

On the broader -- on the broader question of whether you need to be -- you know, intervene or need to be a movant at -- a movant in the district court, you know, I think that's not what happened in this Court's Sealed Case. It's not what happened in the Supreme Court's case in Devlin v. Scardelletti. The Supreme Court engaged in --

WC

JUDGE WILKINS: But there the party was going to be bound by the order. Here Qatar isn't bound by the discovery order.

MR. ZIONTS: It's not bound in the sense -- in the sense that it's not directed at Qatar, but it is losing an immunity, an inviolability that Qatar --

JUDGE WILKINS: If bound went that far, then someone who had an attorney-client privilege that they -- or work product privilege -- that they were concerned about losing would be bound by a discovery order, and that's not the way that we -- bound has a term of art that has a particular meaning. It means that the judgment binds you for contempt or other enforcement purposes or perhaps for res judicata or collateral estoppel/issue-preclusive purposes, and this doesn't do that. So you're not bound. So you don't fall within Devlin.

MR. ZIONTS: Sure, Your Honor. You know, I think this Court in the Sealed Case referred to being bound or otherwise having interests affected and undermined. That certainly was happening, but I think you're certainly -- I'm not saying that Devlin is factually on all fours. What I do think Devlin stands for is, the court says, first of all, this is not a question of Article III jurisdiction. That's satisfied by the personal stake. It's not even an assessment of prudential standing. It's essentially -- or a

prudential rule about who has the right to an appeal. In the court's analysis where it said there that intervention was not required to get out some class members, it is a very functional analysis, and that's why I think it is appropriate to look to these questions of whether a foreign sovereign should be put into this position.

The only other thing I would say is, Your Honor --

JUDGE WILKINS: Well, it's practical -- also, you can say it's a practical analysis on appeal. It's practical in the district court whether or not you formally intervene or not, at least for this limited purpose, so that you can preserve arguments so that it's clear, like, what arguments you're making and what arguments we can hear on appeal; what record you want to make; what you want to put in the record; what specific procedure you want so that we don't have a situation where we're trying to figure out on appeal is this something that the defendant asserted and did they make Argument X but you, as an amicus, made Argument X Prime; the defendant doesn't appeal but you do.

It's -- this is all -- all of that could be solved if you had done what was available to you to do and which would have provided no risk to you, because if you seek limited intervention and it's the -- not -- you're not allowed to intervene on the limited terms and conditions that you set forth, then you can challenge that.

MR. ZIONTS: Your Honor, I'd respectfully push back on the no-risk proposition there. I think that, you know -- you know, in deciding -- in the State of Qatar deciding how best to assert its interests here, we did look for guidance on this, found this to be, you know, an uncertain playing field. I think going forward, if this Court were to adopt a rule that said a foreign sovereign that finds itself in this position should intervene, doing so will not be construed as any kind of waiver of sovereign immunity and, if you don't do that, you're out of luck, I think that would be a perfectly reasonable and acceptable rule going forward.

I think, as applied to this case, you know, the FSIA provides an exception for sovereign immunity to waivers that are implied. The district court in this case at least thought it was a complex question whether this would constitute a waiver of sovereign immunity, and we had no, you know, court of appeals authority, any other authority to be able to say, you know, to a sovereign, you are not at any risk here by showing up and intervening for purposes of this discovery dispute. Certainly, we might have said, we think we would ultimately prevail there, but I really don't think it's no risk. So I think -- I think you would be probably --

JUDGE WILKINS: I think it's no risk in the sense

WC

that the way that I understand intervenor practice -- and you can tell me if I'm wrong about this and direct me to a case -- but when a party seeks limited intervention, like, I've seen cases involving Indian tribes, et cetera, that have -- in the United States -- that have sovereign immunity, they can say, look, we want to intervene on this limited basis, in -- under these conditions, where we are preserving our -- and not waiving our immunity as to a, b, and c and we're only intervening on this limited basis, and if the district court agrees that that's appropriate after hearing from the parties, then it grants that, and if it disagrees and says, no, I think that if you intervene, you're going to waive this particular immunity that you don't want to waive, that doesn't mean that, like, you are forced in under those conditions. You can challenge that in the court of appeals, and if the court of appeals finds that that's an abuse of discretion, then you can intervene on those terms, and if it disagrees and you don't want to intervene on those terms, then maybe we have a question as to whether or not you should be able to pursue as something -- pursue this as something other than a party.

MR. ZIONTS: Your Honor, I think, you know, in terms of foreign sovereign immunity, I'm just not aware of cases addressing this question. I think the analysis wouldn't necessarily be the same in the way it works in

tribal sovereignty, only because we're talking about a specific statute that has a specific implied waiver exception for sovereign immunity.

So I do think that there was risk there and this was a reasonable path under the circumstances and that this question of, you know, who is entitled to appeal as a nonparty is functional and equitable, you know, as Devlin says, of the -- I would suggest, you know, the cases that this Court cites in its footnote in the Sealed Case, when you look at how other circuits address this, it's way an amorphous, you know, set of considerations that go to what's equitable, what's fair in the circumstances for whether a nonparty is able to go.

The last thing I would say on this is, you know, there is the possibility of construing this as a mandamus petition. The United States agrees with us that there was a clear error here, an entitlement to remand, and I think is another option that may avoid some of these problems.

JUDGE WILKINS: The concern I have -- the reason why I think we got to go the first principles here is Mohawk. I mean, Mohawk seems to say that you got to pick one door, you got to either pick the interlocutory appeal door under the collateral order doctrine or you pick mandamus, because one of the rationales of Mohawk's holding is that, look, as a categorical matter, attorney-client

privilege claims, we're going to say, are not subject to this collateral order/interlocutory appeal doctrine because there's a couple of things that you could do, you could -- you could perhaps suffer contempt and get direct appeal that way; you could ask for the order to be certified for interlocutory appeal and, if it's a novel question, then that's generally going to happen and you get interlocutory appeal that way; or, if neither of those are really going to be available to you, then mandamus will be available to you and so you don't go through this door.

So I think we have to figure out, as a doctrinal matter, which door must you have to go through, and if it's the petition for mandamus door, the reason that that door would be available to you is because there's no other adequate relief that's available. So we have to, you know, make a decision as to whether in these cases in general that's the way that they're going to be handled, not just we're handling it that way in this case because you didn't seek intervenor status.

I think if you could have and were supposed to have sought intervenor status to deal with this, then the mandamus option shouldn't be available to you, because you would -- you should exhaust these other possibilities as seeking collateral review under a party.

MR. ZIONTS: Sure. Sure. I understand, Your

WC

Honor, and I think, actually, this Court's decision in the prior Broidy v. Muzin appeal is actually a good example of how the Court has addressed something, you know, for purposes of this case but also going beyond, and what it said there was that case was entitled to a collateral order review but, because of what the Court clarified in that decision, you know, other cases might not actually, you know, rise to the level.

Here I think the Court, you know, could quite reasonably say, you know, going forward, if a foreign sovereign is in this position, it should intervene and doing so will not constitute any possibility of a waiver of sovereign immunity, and if a sovereign is on notice of that going forward and tries to do it another way, then I think that would be a perfectly sensible rule going forward.

I think, you know, in terms of, you know, of the (indiscernible), Your Honor, to a foreign sovereign, as the Supreme Court has said, seeking to have its interest heard in U.S. courts, there just wasn't guidance for what to do in this -- in this circumstance. You know, we think that this was a reasonable way for the State of Qatar, you know, faced with these (indiscernible), faced with these concerns, to proceed.

JUDGE SRINIVASAN: Can I ask one follow-up question to --

WC

MR. ZIONTS: Sure, Your Honor.

JUDGE SRINIVASAN: -- the colloquy earlier?

MR. ZIONTS: Yes.

JUDGE SRINIVASAN: So can you just state concisely what you think we should say about the FARA issue?

MR. ZIONTS: Your Honor, I think that the Court does not have to --

JUDGE SRINIVASAN: If we get to it.

MR. ZIONTS: Sure. If you get to the FARA issue, I think the Court can say it is a hard question, you know, what would happen if DOJ was seeking to inspect records that a foreign sovereign claimed was -- were inviolable documents of the mission? I think in this case the Court can say that in this civil discovery dispute, you know, the hypothetical possibility that DOJ may in the future seek to inspect these records does not so undermine the expectation of confidentiality in those mission records, in those mission documents that they cease to become documents of the mission under the standards that United States and Qatar --

JUDGE SRINIVASAN: And why do we -- why would we even say that? Why not just leave it all open to be worked out on remand the way that the FARA intersects with inviolability principles, and then we can always consider it in a subsequent appeal, if necessary.

MR. ZIONTS: Your Honor, I certainly don't

 disagree that that's a path that's open to you. You know, Mr. Broidy has raised, you know, objections to the possibility --

JUDGE SRINIVASAN: In other words, you don't -- you don't view the state of things in the district court to be such that if we get to that stage and if we were to send it back, that the issue of the way the FARA intersects with inviolability is already a foregone conclusion in the district court?

MR. ZIONTS: Your Honor, there is a -- there is a, I believe, a paragraph or so of the --

JUDGE SRINIVASAN: Right.

MR. ZIONTS: -- district court's opinion that does address that. It is sort of confirmatory -- as I read the opinion --

JUDGE SRINIVASAN: Right.

MR. ZIONTS: -- it's sort of confirmatory of the district court's, you know, broader textual --

JUDGE SRINIVASAN: Other conclusions, but by hypothesis, we would have already --

MR. ZIONTS: Correct.

JUDGE SRINIVASAN: -- if we would get to that stage, then the premise would be gone. So --

MR. ZIONTS: Correct. Yes. I think --

JUDGE SRINIVASAN: Okay.

 MR. ZIONTS: -- I think it would be open. You know --

JUDGE SRINIVASAN: Okay.

MR. ZIONTS: -- I think, you know -- you know, we're here as a nonparty wanting to be heard, and if that means, you know -- you know, having this fleshed out in the district court with the possibility of coming back if it results in another categorical ruling that we think is wrong, I think that's okay with us. I think the parties may have -- may have views about that, and we're not trying to be obstructive in the process.

JUDGE SRINIVASAN: Yes, but the way you read -- the way you read the state of things in the district court is that it would all be open?

MR. ZIONTS: Your Honor, I think, by hypothesis, if the Court --

JUDGE SRINIVASAN: Yes.

MR. ZIONTS: -- rejected the district court's overall framework, adopted, you know, another one, perhaps one similar to the United States' and Qatar's, I do think it would be open. My view personally is that it would be useful, but certainly, you know, I think we could -- we could make that argument.

JUDGE WILKINS: I have a question, another question about Mohawk. Mohawk, the Supreme Court said,

WC

we're not going to look at, like, creating whether this sort of discovery dispute involving attorney-client privilege kind of falls within the third prong by looking at the facts and circumstances of any particular case, we're just going to make a categorical ruling that attorney-client privilege challenges don't meet this third prong of the Cohen standard, right, and they said we're going to do that by looking at how much deferring review or the inapplicability of review, you know, would thaw and harm people who would seek to benefit from the privilege, and the court acknowledged that, you know, part of the argument here is that this type of privileged information should never be disclosed but the court reaches a conclusion that, you know, notwithstanding all of that, we don't think that this is going to essentially have some sort of a serious negative, deleterious effect on people's ability to consult with their attorneys.

Don't we have to -- for you to prevail and for us to agree to hear this appeal, don't we have to kind of reach a conclusion contrary to Mohawk's analysis of attorney-client privilege or this particular privilege that you are asserting?

MR. ZIONTS: Your Honor, I agree that the analysis is categorical. So on the question of the collateral order doctrine, the question is not, you know, is Qatar's specific

claim here on the facts of this case, you know, effectively unreviewable? The question, I think -- I would phrase it as, you know, an objection to disclosure and discovery on the basis that something would violate the Vienna Convention on Diplomatic Relations. That's the category. So I think you would go through the Mohawk analysis, and the court gave a number of reasons why for attorney-client privilege, you know, an appeal at the end of -- after a final judgment was enough, and as the -- and what the court said is, as important as the attorney-client privilege rule, the rules of the road are known, this is well settled, not much is going to be gained by all these appeals, there's going to be a lot that's lost by having all those appeals, and the courts of appeals' burden with that.

I think, you know, as the United States' brief confirms here, what's at -- what's at issue here is a question of the United States' compliance with its obligations under an international treaty. You know, as important as the attorney-client privilege is, you know, that's something of a different order. It's not something, as the court emphasized in Mohawk, where there's sort of a well-tried analysis that the court of appeals have developed so there's not much of a chance of reversal on appeal. You know, these are -- these are complex and novel issues.

So, you know, I think, you know, we have no

problem with following the analysis in Mohawk. We just think it comes out in a different way here, just as, you know, this Court -- this has never reached the Supreme Court -- but this Court routinely holds that a denial of sovereign immunity, because of the particular harms involved of forcing a sovereign who may be immune from facing the burdens of suit, that this Court routinely says that qualifies under the collateral order doctrine.

I think when you have the category here of a claim of inviolability under the Vienna Convention on Diplomatic Relations and the possibility that United States will instantaneously be put in violation of its international law obligations the moment of disclosure, then that is a particularly important interest that's at peril and that justifies review under the Mohawk standard.

JUDGE SRINIVASAN: Thank you, counsel.

MR. ZIONTS: Thank you, Your Honor.

JUDGE SRINIVASAN: We'll hear from the Government now, Mr. Totaro.

ORAL ARGUMENT OF MARTIN TOTARO, ESQ.

ON BEHALF OF AMICUS CURIAE

MR. TOTARO: Thank you, Your Honors. Martin Totaro for the United States. If I could just briefly address the jurisdictional piece before moving to the merits. I think, unlike evidentiary privileges that can be

protected through an appeal with a remedy, if the defendants turn over inviolable documents, Qatar's treaty rights will have been violated at that very moment, and so that's a value of high order, not only because we're talking about Qatar's treaty rights, but we're also talking about the United States' obligation to safeguard those very rights. So I think in that circumstance, coupled with all the other distinctions with Mohawk Industries we discuss in the brief, just a very different case.

And then the final brief point I'll make is that this Court the first time this case was up on appeal took a practical, pragmatic approach to appellate jurisdiction and we think it should do so again here in the same way that it does when we're talking about an issue of foreign sovereign immunity where we're talking about a violation, where the harm occurs at the time of the violation that cannot be remedied on appeal.

JUDGE SRINIVASAN: Can I ask you, do reciprocity considerations come into play even with respect to jurisdiction? So, for example, I could understand that the United States would be concerned that if it were in a similar situation in a foreign jurisdiction, they would also want the ability to get its inviolability assertion heard as soon as possible before the documents would be disclosed.

MR. TOTARO: Hundred percent correct, Your Honor,

yes, we agree with that.

JUDGE WILKINS: And should that -- should that be done by mandamus, or should that -- under the mandamus standard, which is different because you have to show kind of a clear right to relief, clear and indisputable, versus a nonparty being able to avail itself of the, I guess, lesser standard of collateral order review?

MR. TOTARO: Judge Wilkins, I think in this specific case, the Government is agnostic, because whether it be through the collateral order doctrine and a lack of an effectively -- an effective remedy on appeal or through mandamus, the district court's categorical approach, which we think was clearly an error, that could be resolved through mandamus as well.

So I don't -- I understand -- I take your point that in many cases, party, you're going to have to generally choose collateral order or mandamus. Here I think, regardless of which path the Court chooses, all of the requirements are satisfied. So it doesn't really matter to the United States how appellate jurisdiction is established, just the fact that it is established so, as Chief Judge Srinivasan pointed out, the foreign sovereign's treaty rights can be safeguarded.

JUDGE WILKINS: Just so that I'm clear about the United States' position, what do you think is the clear

WC

error -- the Vienna Convention's analysis or the international comity analysis or both?

MR. TOTARO: The clear error, Your Honor -- and I think this can also lead me into the merits -- is the adoption of a categorical rule that whenever documents are freely given to third parties, those documents necessarily fall outside of the Vienna Convention, and I'm happy to talk about why that's irreconcilable with the text purpose --

JUDGE SRINIVASAN: Because you didn't -- you didn't even talk about international comity in your brief, right? You only --

MR. TOTARO: But -- you're correct -- this Court's --

JUDGE SRINIVASAN: -- your entire brief talked about --

MR. TOTARO: Yes, Your Honor, sorry to interrupt. This Court's order asked us to focus on jurisdiction and the treaties, and so the United States did so, and so the United States hasn't offered an opinion on international comity in this case, in this context.

And so on this --

JUDGE RAO: Can you -- oh, sorry. Yes, go ahead.

MR. TOTARO: So I will address the text of the treaty, the purpose, practice, but at the outset I wanted to be up front that one critical concern to the United States

is that the district court's categorical error poses a serious threat to how the United States operates its embassies overseas in terms of reciprocity.

So the United States, as a matter -- I don't know if routinely is the proper word -- but it not infrequently uses outside contractors to carry out essential functions as defined under Article 3 of the Vienna Convention. This is most often seen in terms of, like, embassy construction or security personnel, and as the Government reads the district court's order, none of the very important documents that are provided to those individuals -- including, for example, like, blueprints of an embassy -- would be protected by Article 24; and that, as a matter of reciprocity, is a very serious error and it cannot be reconciled with the text of Article 24, which is talking about the protection of documents wherever they may be.

JUDGE RAO: Can you also speak to the question about the intersection between the Vienna Convention and FARA, because obviously DOJ is the, you know, is the entity that enforces FARA?

MR. TOTARO: So --

JUDGE RAO: I mean, do we need to even -- do we need to say anything about that in this case and -- you know, do we need to, should we, you know, and what would that look like?

MR. TOTARO: So I do not push back against the hypothetical or the question lightly, but I think the Court should be very careful about what it says about the potential intersection between the FARA and the Vienna Convention, because doing so could raise significant domestic and international concerns.

There is no need for this Court to address whether there is a potential conflict between the FARA and the treaty, and one potential way to avoid that issue would be through the framework we've adopted, which is to say, look, the text of the treaty does not resolve when documents given to third parties are, quote, of the mission, even though those documents would be subject to FARA inspection.

The critical inquiry, instead, as we know from international scholars like Denza, is whether the entity had a reasonable expectation of confidentiality when it handed those documents over to a third party, and on that question our brief provides a framework where we set forth three critical -- or three factors that all point toward that overarching question of confidentiality. And then to get directly to your point, as applied in this case, we have the text of the contracts between the mission and the particular consultants. That, in the United States' view, allows this Court to sidestep the direct issue of whether the FARA ever poses a conflict with Article --

WC

JUDGE SRINIVASAN: Well, suppose we disagree with that. Suppose we don't think that the boilerplate about as required by law -- that's what you're talking about, right?

MR. TOTARO: Yes, Your Honor.

JUDGE SRINIVASAN: Suppose that we don't think that that resolves this issue. Then -- I mean, I know your argument is that, as required by law, FARA is a law and therefore the contract already presupposes that documents can be turned over under FARA, but suppose we think that there's something to the other side's notion, which is, well, that's just circular because the whole question is whether it's required by law. Then where are we with respect to FARA, and then where does the United States think we should go in an opinion if all the other predicate steps --

MR. TOTARO: Right. So --

JUDGE SRINIVASAN: -- get us to that point?

MR. TOTARO: -- on the premise of the question, just to be clear, under Qatar's view, as required by law has no meaning whatsoever in the contract, boilerplate or not, because it, under Qatar's view -- this is in footnote 11 of the brief -- that only applies to documents that are of the mission anyway, and so that phrase need not -- need not be an error at all. And so those contracts could have very easily said, for example, consultant, while you may under

the laws of the United States give those documents to the Department of Justice if inspected, under no circumstances can you give these documents to others in third -- in private litigation, but Qatar chose not to do that. And so our point is merely that when you hand over documents to a third party against the backdrop of FARA, that diminishes but does not eliminate the expectation of confidentiality.

And to get to the point, well --

JUDGE SRINIVASAN: Well, suppose -- I take that point, but suppose we just don't think it's -- that that's definitive with respect to FARA.

MR. TOTARO: Right, and so I think the problem there is that a document either is of the mission or it's not of the mission, and so a document can't be of the mission if it's requested -- not of the mission if it's requested by the United States but, at the same time, being of the mission when requested by a private party in litigation.

So our point was merely that once you undermine that confidentiality expectation, it takes it out of the realm of being a document of the mission, but I take the point that -- I don't want to -- I don't want to fight gravity here, and if the Court disagree with that, one option, which I think Qatar laid out on page 22 of its reply, is to say, look, these documents might still be of

WC

the mission but the contracts consented or waived any request by the United States, by the Department of Justice when we were in the land of FARA. So in that circumstance the documents could potentially still be of the mission but the Court would not have to address any potential conflict between FARA and the treaty because it would say regardless of whether those documents are of the mission -- even if those documents are of the mission, the Government -- the Qatar mission has consented to them being turned over by the United States.

JUDGE RAO: So if we were to remand and the district court concluded that a particular document was of the mission and therefore inviolable, is it the Government's view that they could still seek that document under FARA --

MR. TOTARO: So then it would be --

JUDGE RAO: -- like, if there had been a ruling by district court that it was inviolable in private litigation?

MR. TOTARO: I think so, Your Honor, because it wouldn't address this issue of consent or a waiver, and so it would be -- the district court would say, look, this seems like a very important document that satisfies the framework of confidentiality. It's --

JUDGE RAO: And then it's just a separate question of --

MR. TOTARO: And then it's a separate question,

and I think it would be important, if the Court went that route, to make clear that it is a separate question when we're not talking about private party litigation but when we're talking about the United States invoking its inspection rights under the statute.

The reason why this hasn't popped up, I suspect, is because, as Your Honor noted, this tends to be done on a sovereign-to-sovereign basis as opposed to this rather unique situation, and so --

JUDGE SRINIVASAN: But then the result would be, though -- there is something intuitively, at least, possible about this result -- is that inviolability prevents the document from being turned over in this kind of litigation but it doesn't prevent the Government from obtaining the document pursuant to FARA.

MR. TOTARO: And I think that would be because of some sort of consent that, again, that Qatar --

JUDGE SRINIVASAN: So you think they'd have to point to something in a contract itself in order to reach that result; but for that, there's no way to reach that result?

MR. TOTARO: I think the contract is the easiest way to duck the potential very thorny issue of whether, if a document on a remand is of the mission, whether the United States can invoke its statutory inspection rights without

being in tension with Article 24, but again, I cannot stress enough that I don't think the Court needs to reach that direct issue.

I think, rather, the more appropriate course is to say, district court, the categorical approach you adopted is incorrect, here are the proper factors and then, focusing on the language of the contract, either agreeing with the United States' position that this has significantly, under Qatar, diminished the expectation of confidentiality, therefore taking -- probably taking those documents outside of mission status under 24, or the route Qatar has proposed, which is to say, but the documents, at a minimum, consent to inspection by the Government, but that's a separate question entirely from whether in private party litigation they're subject to discovery.

JUDGE SRINIVASAN: Or just leave that off.

MR. TOTARO: I'm sorry?

JUDGE SRINIVASAN: Or just leave that off, to be worked out on remand. I don't even know that -- why would we even have to do either of those two? Why would we not just send it back and say the --

MR. TOTARO: It is certainly within the Court's discretion not to do that. I think this is a situation where more guidance might be better than less, just to provide the proper signposts so we're not here --

JUDGE SRINIVASAN: If we thought we had enough information with which to give signposts and --

MR. TOTARO: Yes, Your Honor.

JUDGE SRINIVASAN: Yes.

JUDGE RAO: Just ask you a factual -- as a factual matter, does DOJ litigate under FARA against foreign sovereigns? I'm assuming not very often, but I was just wondering, as a factual matter, if those, you know, such cases are --

MR. TOTARO: Unfortunately, I'm by no means a FARA or criminal expert. I know these issues pop up. I think they're -- I don't know how many inspections there are a year. I think it's something like 20 inspections, and I just don't know how often it gets litigated where -- well, I don't think it gets litigated, but I don't know how often a foreign sovereign comes in and says, wait a minute here, we're dealing with very sensitive ground, and I --

JUDGE RAO: I was curious.

MR. TOTARO: -- and I think the lack of cases speaks volumes about, to the extent it's ever addressed, how it's addressed at a more diplomatic level.

JUDGE SRINIVASAN: Can I ask you, does -- the Government didn't reference Article 27 in its brief, I think.

MR. TOTARO: We did not, Your Honor.

WC

JUDGE SRINIVASAN: And is there a reason for that? Is --

MR. TOTARO: We're not sure that Article 27.2 gives anything more that Article 24 otherwise wouldn't provide, and it seems like the clear thrust of Article 27 is talking about correspondence between the sending state and the embassy itself. I don't want to sort of put forth a categorical position that the United States' view, that that's the only circumstance --

JUDGE SRINIVASAN: The only -- yes.

MR. TOTARO: -- in which Article 27 applies, but here, as I think the (indiscernible) Denza said it best, it seems that Article 27's protections are duplicative. So I just don't think it does --

JUDGE SRINIVASAN: It doesn't add anything.

MR. TOTARO: -- I don't think it does any work that Article 24 doesn't already provide, just like I'm not sure that the Perlman doctrine on jurisdiction would do any more work than the collateral order doctrine or the mandamus --

JUDGE SRINIVASAN: And you don't think if Article 27 is narrower, that then Article -- that narrowness gets read back into Article 24?

MR. TOTARO: No, I don't think Article 27 takes away anything provided --

JUDGE SRINIVASAN: Okay.

JUDGE WILKINS: One last FARA question -- what triggers the inspection power or rights of the Government? Is there -- is it just because they want to, or do they have to have some sort of cause or justification? Do they have to seek leave of court? What enables the Government to inspect the records that are required to be kept under FARA?

MR. TOTARO: Well, I'm not exactly sure what triggers the exception right except I know you are subject to the regulations that can trigger when you have to register as an agent under the Foreign Agents Registration Act. So I'm not sure if there -- and I apologize -- if there's not a second further step. I would be surprised if there were. The critical question, I think, is that question in the first instance of whether you need to register, and all of these defendants have.

JUDGE WILKINS: So we don't know whether you'd have to get a warrant or whether the FBI can just show up and say, you're registered under FARA, there's all these records you're required to keep, we're here to see them, hand them over?

MR. TOTARO: It's my understanding, as a matter of practice, this isn't something where federal agents are banging down your door. It's a collaborative process where there's an inspection that occurs, I think, either on

premises or even, you know, through a server or whatever, where the documents are put, and then the Government can look at the documents.

JUDGE SRINIVASAN: I have -- oh, I'm sorry.

JUDGE WILKINS: So at least you don't have any reason to believe that a warrant or subpoena or some sort of court authorization is required for that inspection to occur?

MR. TOTARO: I could be very wrong, but I don't -- I don't think so, Your Honor.

JUDGE SRINIVASAN: I have one other question, and this goes back to international comity. So I know you didn't address it in your brief. You didn't have to, but you could have, and -- because I don't think the order cabined the grounds, just pointed to particular grounds as a possibility, and I'm just wondering, do you have a view on that on behalf of the United States? Does the United States think that comity adds anything when you've got something specific that deals with the terrain like Article 24 does?

MR. TOTARO: So the United States did not opine on that question, but the United States does not want the Court to read into anything -- like, it's not that we, the Government, thinks that comity plays no role here or can play a role on remand. We just have taken no position, and instead, we, you know, focused on the text of the Court's

order in a rather compressed --

JUDGE SRINIVASAN: And what is -- I know you didn't do it in your brief, but are you -- are you prepared to say anything about the Government's view about comity in the abstract here or the role that comity may or may not have vis-à-vis the particular provisions in the Conventions?

MR. TOTARO: No, Your Honor. We think this case can be resolved -- this appeal can be resolved clearly on the Court's interpretation of Article 24.

JUDGE SRINIVASAN: But I don't -- I don't know about that because if the -- if under the Conventions what the Government wants is us -- for us to remand and to have a document-by-document run-through to see if the factors are satisfied with respect to each document, which is where I think you are --

MR. TOTARO: Yes, Your Honor.

JUDGE SRINIVASAN: -- then there's a -- there's, at least conceptually, a broader question, which is, would comity come in and come across the board and say you don't even have to do document-by-document, it's more wholesale than that?

MR. TOTARO: I'm not sure I understand how it would be more wholesale by, like, category-by- -- I think the factors we set forth in the brief could go a long way toward the type of document-by-document or

category-of-document-by-category-of-document review, why Your Honor is suggesting on remand --

JUDGE SRINIVASAN: And --

MR. TOTARO: -- but we're not -- I'm not saying that comity should be foreclosed on remand. The Government has merely -- hasn't taken a position on the issue altogether, one way or the other.

JUDGE SRINIVASAN: And comity would not give Qatar any more than that, I assume, because otherwise -- and we do more than remand and just set out the factors -- because there'd be the potential that there'd be a greater grounds for what we'll call inviolability pursuant to an overhanging comity doctrine.

MR. TOTARO: I could imagine Qatar arguing something along the lines of apply the factors as set forth in the United States' brief but, if there are close calls, then comity could play a role in the district court's decision of whether a document is in or out, and on that issue, again, we're not taking any --

JUDGE SRINIVASAN: You don't have any view on that.

MR. TOTARO: -- position, but I could imagine it playing a role.

JUDGE SRINIVASAN: All right. Thank you.

MR. TOTARO: And, again, thank you for giving us

the opportunity to participate in oral argument.

JUDGE SRINIVASAN: Thank you, counsel. Mr. Saunders.

ORAL ARGUMENT OF DANIEL A. SAUNDERS, ESQ.

ON BEHALF OF THE APPELLEES,

JURISDICTION ISSUES

MR. SAUNDERS: Your Honors, may it please the Court, and I will be addressing the jurisdictional issues, turning it over to my partner, Mr. Benson, to address the issues regarding the Conventions and the comity.

So the two questions, separate questions, that really need to be addressed at the outset, two separate hurdles that Qatar needs to overcome are, one, is the district court's discovery order granting the motion to compel appealable at this stage and, two, does the State of Qatar, a nonparty, who has not intervened, sought to intervene, have standing to appeal it, and unless both of those preliminary questions are answered affirmatively, you don't even need to reach any of the other issues that we've been discussing here today.

Mr. Zionts suggested, essentially, that this Court should issue an advisory opinion regarding what would have happened if Qatar had sought to intervene for a limited purpose and what effect that would have had on its sovereign immunity. We're not looking at advisory opinions here, I

submit. Let's look at where we are based on what has happened in the district court and where Qatar stands now.

With respect to standing, we know that allowing nonparties to appeal even a final judgment is a rare exception to the general rule that only parties to a lawsuit or those that properly become parties can appeal an adverse judgment.

Qatar talks about the In re Sealed Case decision from this Court, specifically a footnote that talks about standing. It's actually dictum because the footnote itself makes clear that standing wasn't even challenged in that case, and of course, In re Sealed Case, which relied on this Court's decision in U.S. v. Philip Morris, was itself overruled by Mohawk. So we're talking about their main authority for standing being dictum in a footnote in a since overruled case.

That footnote states that if the decree affects a third party's interests, he is often allowed to appeal, and that was actually quoted language from the Fifth Circuit's decision in Castillo v. Cameron County, which was a case where a state that was itself a former party to the litigation was bound by an injunction that related to jail overcrowding and it risked being found in contempt if it violated that injunction.

The only other cases that Qatar relies on for

WC

standing are similarly cases where, such as Devlin, where the nonparty was an unnamed member of a certified class that was bound by a settlement, or the Karaha Bodas case from the Second Circuit, where the nonparty was required to surrender property pursuant to an order of attachment --

JUDGE SRINIVASAN: Can I ask you, do you agree that if there would have been an intervention, that there would not have been a waiver of foreign sovereign immunity?

MR. SAUNDERS: I agree with Judge Wilkins that there's clear precedent for intervening for a limited purpose, and that --

JUDGE SRINIVASAN: Do you agree that there's a way that Qatar could have intervened, you can call, for a limited purpose, such that they would not have waived their sovereign immunity but still would have been able to assert the arguments that they're making now?

MR. SAUNDERS: You know, I think it's an open question that would have to be resolved based on the specific arguments that they made in connection with the intervention.

JUDGE SRINIVASAN: So the more it's an open question -- I mean, if you're not able to agree to that, then it seems difficult to reach the conclusion that they should have intervened and not worried about waiving foreign sovereign immunity.

MR. SAUNDERS: Well, again, that would have been --

JUDGE SRINIVASAN: Maybe I misunderstood.

MR. SAUNDERS: -- something that would have been addressed by the district court, and as Judge Wilkins pointed out, it could have been taken up to this Court if the district court had denied it and that could have been resolved, but they didn't even attempt to do any of that. So that never ended up coming before the district court or this Court.

But as Judge Wilkins pointed out, the language from Devlin that Qatar relies on talks about nonparties being able to appeal if they are bound by the order that they are seeking to appeal. So what does it mean to be bound by the order? Again, we have cases where nonparties were bound by an injunction, nonparties were bound by an order of attachment. Qatar isn't bound by anything because the district court's order doesn't require it to do anything.

Much more on point is this Court's decision in Moten, which held that a party that had filed papers in the district court but had not sought to intervene and stood in the position of an amicus was not entitled to appeal and that this Court had no jurisdiction. That's exactly what we have here. Just like the nonparty in Moten, Qatar never

sought to intervene.

The district court ruled in its minute order of December 8th, 2021, that Qatar would be allowed to submit statements of interest in the posture of an amicus, and Qatar did not appeal from that order, the order that said it only had amicus standing. It did not seek to intervene in response to that order. It accepted its limited role as an amicus curiae, and in fact, in its statement of interest that was submitted in connection with the motion to compel, Qatar stated, quote, pursuant to the court's order of December 8th, 2021, Qatar files this statement of interest as the equivalent of an amicus brief. That's at Joint Appendix 227. So when they accepted their status as an amicus, in doing so they accepted the consequences of that status, which is, they don't get to appeal.

JUDGE WILKINS: Let me follow up on Chief Judge Srinivasan's question. Do you agree that if Qatar had filed a motion for intervention that says we want to intervene on the condition that we don't waive our sovereign immunity by this limited intervention and if you, District Court, are you not willing to essentially rule that that will be the terms of our intervention, then we withdraw our request to intervene, so they make clear that, like, we are requesting to intervene only if we get a ruling from you that says that this will not result in a waiver, District Court, do you

agree that they could have filed a motion to that effect?

MR. SAUNDERS: I agree they could have a filed a motion to intervene under specific conditions, and if that motion was denied, then that motion would itself, I believe, be appealable to this Court.

JUDGE WILKINS: And do you agree that they couldn't be kind of like forced to intervene on conditions other than what they requested?

MR. SAUNDERS: I would agree, either they intervene as requested in the motion or, if the district court finds that is not possible, they're not going to compel them to intervene if Qatar is not seeking to intervene, and Qatar would not be seeking to intervene for those --

JUDGE WILKINS: In other words, they can't be compelled to intervene and waive if they say we only want to intervene if we're not waiving?

MR. SAUNDERS: I think that's correct, Your Honor, and if the court denies that, they can then make a decision and they either accept that status of (a) we're not going to intervene or we're going to intervene under the conditions that the district court allows --

JUDGE SRINIVASAN: And --

MR. SAUNDERS: -- or we're going to take up the decision to the court of appeals.

JUDGE SRINIVASAN: And then if they do that and the district court says in response, well, I don't know that you need to do that because all -- maybe we can just proceed so that you participate in the way that Qatar did, then your review would be that, no, Qatar shouldn't accept that because they can get an up or down on the motion so that they can make sure that they preserve their status as an intervenor with the party able to appeal and they could say, no, we need you to resolve our motion and, if you don't, we're going to take that up, because we want to make sure that we get -- we get a definitive resolution on whether we can intervene so that we can protect ourselves from the counterargument that we should have intervened. That's what should have happened?

MR. SAUNDERS: I think that's correct.

JUDGE SRINIVASAN: I see. That's quite -- that's quite intricate, but I take the point.

MR. SAUNDERS: But, you know, again, we're talking about a hypothetical scenario that just doesn't apply here. We're looking at where we are today --

JUDGE SRINIVASAN: Yes.

MR. SAUNDERS: -- with a party that accepted its status as an amicus, did not seek to intervene, and is now seeking to claim standing under dictum in a footnote in an overruled case.

I see I'm out of time. With the Court's indulgence, I'd like to say a few things about the collateral order doctrine.

JUDGE SRINIVASAN: Yes, if you could keep it brief, though, please do.

MR. SAUNDERS: That's okay. I'll try to keep it very focused.

JUDGE SRINIVASAN: Yes. Thank you.

MR. SAUNDERS: So I agree, Judge Wilkins. You said you haven't found a case under either collateral order or Perlman where the appellant wasn't at least a movant in the district court. We're not aware of one either, and clearly, we know that under Mohawk this is a discovery order. Discovery orders, including those rejecting claims of privilege, are not subject to the collateral order doctrine, even though the Supreme Court recognized there may be some collateral damage, there may be some harm that is only imperfectly reparable.

Now, Qatar tries to distinguish Mohawk by saying that the privilege here is on an entirely different level from the attorney-client privilege, but I'd point the Court to pages 22 and 23 of Qatar's reply where Qatar expressly analogizes the claimed Convention protections to a series of attorney-client privilege cases, and this Court itself has recognized the attorney-client privilege as inviolable.

The Government talked about once the documents are turned over, the Convention is violated at that very moment, but once attorney-client privilege documents are turned over, the privilege is violated at that very moment too, and yet under Mohawk that itself is not enough to invoke the collateral order doctrine.

And we'll submit on the Perlman doctrine on the briefs. We don't have a disinterested third party here. I mean, everything in the record shows that.

Mandamus, we don't have a clear abuse of discretion. We don't have a clear and indisputable right to relief. The district court relied on all available precedent in its reading of the Conventions, and even should this Court disagree -- which we certainly don't think the Court should; we think the district court's order was sound -- it's not the type of rampant district court decision that is some type of usurpation of power, as discussed in Mohawk, that allows for mandamus.

And the last point I'd make before turning it over is this: I'd quote from this Court's own opinion in the first appeal in this case on the immunity issue. Court said, quote, immediate appealability is strong medicine that is harmful when misused. We are now in this case that was filed nearly four years ago. This is the second interlocutory appeal. Discovery has still not even begun in

earnest. Defendants have produced virtually no documents.

If this Court were to find that Qatar has standing, that this is an appealable order and further remand to the district court for a document-by-document review, I promise you -- I don't need a crystal ball for this -- we're going to be back here on document-by-document appeals, because Qatar's interest here is delay. Judge Forrest, in the Southern District of New York, when this same issue came up with (indiscernible) Allaham's documents and, at Joint Appendix 281, about Qatar's tactics, it just smells like gamesmanship.

So every determination that the district court makes regarding production of particular documents -- not just discovery directed to the defendants, but there are third-party subpoenas that are out to other FARA-registered agents -- as to all of those, Qatar is going to appeal those, every determination of turning over documents, as implicating its privilege as immunities and implicating international comity. We will have piecemeal prejudgment appeals that will be subject to tremendous delay and abuse. It'll be five more years before anything happens in this case, clearly undermining efficient judicial administration and all of the other very real problems that the final judgment rule of section 1291 was intended to alleviate.

So with that I'll turn it over to Mr. Benson.

WC

Thank you.

JUDGE SRINIVASAN: Thank you, Mr. Saunders. Mr. Benson, good morning.

ORAL ARGUMENT OF DANIEL R. BENSON, ESQ.

ON BEHALF OF THE APPELLEES,

VIENNA CONVENTION ISSUES

MR. BENSON: Good morning and may it please the Court, Daniel Benson for appellees. Fortunately, that parade of horribles does not need to and should not take place. There is -- the Government and Qatar's position that the order -- the decision below is categorical is not really true. The judge made clear that she wasn't ruling on, for example, bailee -- bail or bailee situations or construction contractors or the like, that she was -- that she was -- the order applies to these defendants with respect to these documents, and this Court can confirm on that basis. It doesn't need to issue an affirmance saying, you know, if any document is turned over to a third party, it's no longer inviolable under the Vienna Conventions. It can do a more limited ruling.

I'm not saying, by the way, that that is wrong. It may very well be right. There's a cogent and potentially correct argument that if the Government turns over documents to a third party, then by definition they're no long inviolable, but here we have a situation where Qatar put

WC

documents in the -- that contained highly confidential trade secrets, according to Qatar -- in the hands of public relations flacks and lobbyists, even though it knew that those documents would be subject to inspection at any time, on reasonable notice, by the U.S. government.

JUDGE RAO: Mr. Benson, isn't the district court's decision categorical as to -- I mean, you agree that it's categorical as to these defendants?

MR. BENSON: Yes, it is categorical as to these defendants.

JUDGE RAO: So how does that fit with the text of Article 24 of the Vienna Convention, which speaks of documents of the mission? It doesn't seem to speak to who holds them but, rather, what the documents are.

MR. BENSON: Well, the -- if -- the Vienna Convention was adopted after FARA had been in existence for probably 30 years.

JUDGE RAO: Well, just put aside FARA for a second and just focus on the text of Article 24. I mean, under --

MR. BENSON: Professor Denza, whom the Government and Qatar recognize as the leading expert, has opined to Congress, and in her treatise -- she's the leading expert, about the only expert on the Vienna Conventions, and she's explained what that -- of the mission is -- you know, that these -- in fact, before Congress she testified, and I

recommend reading her testimony, but -- in full -- but she testified and opined that documents that a country -- that Saudi Arabia gave to public relations consultants were not of the mission and were not protected under the Vienna Convention.

If the Vienna Convention had meant to protect those kinds of documents, it would have said wherever they may be and whoever might be in possession of them or, you know, more to the point, wherever they may be and whoever may be in possession of them, even if those people who are in possession of them are subject to a host country disclosure requirement. It doesn't say that.

JUDGE RAO: But it also doesn't say mission documents. It says documents of the mission, which suggests that they could be held by somebody other than the mission itself.

MR. BENSON: That is, I think, overbroad, and there was no intention to protect all documents of the mission. As Professor Denza explains, it really meant documents that were, in effect, on the premises of the mission or diplomatic pouches or, you know, or the like.

JUDGE SRINIVASAN: So what is -- what's your view as to when of the mission stops, that once the documents leave the premises, they're no longer of the mission?

MR. BENSON: Well, if they go to third parties, I

think there's a very strong argument that they're no longer of the -- they're no longer inviolable and no longer of the mission, but --

JUDGE SRINIVASAN: Period, whenever they're given to a third party?

MR. BENSON: -- you don't have to reach that issue.

JUDGE SRINIVASAN: And what's the narrower way to do it, then, if they're --

MR. BENSON: Pardon me?

JUDGE SRINIVASAN: What's the narrower way, that you say don't have to reach, because that ground means --

MR. BENSON: If they're given to -- if they're given to individuals in the host country who are subject to a disclosure requirement to the host country's government, those --

JUDGE SRINIVASAN: So that's the fair argument?

MR. BENSON: Yes.

JUDGE SRINIVASAN: So the broader argument would be, once documents are given to a third party, they're no longer of the mission, period. The narrower argument would be, once documents are given to a third party and they're something like FARA, they're no longer of the mission.

MR. BENSON: Correct, with an addition that once the -- once -- I mean, the reason for the first argument is

that the country is, Qatar -- in this case, Qatar -- is treating them as not inviolable by giving them to third parties.

JUDGE SRINIVASAN: So can I ask you this? If Qatar invites a third party onto the, excuse me, onto the embassy's premises and says you're my contractor, I need you to do some work, in order for you to be able to do the work, I need you to look at some documents but I'm really concerned about these documents, so I'd like you to come on my premises and look at the documents, I'm going to put you in a separate room, here's the documents, and the contractor looks at the documents and leaves without the documents but now knows what the documents say and can use that to the benefit of the contracting enterprise, whatever that may be, you don't think in that situation the documents cease to be -- to be subject to the inviolability --

MR. BENSON: That's correct.

JUDGE SRINIVASAN: And then if that's true, then does it make all the difference if a country then says, instead of having you come over here, here's what I'm going to do, I'm going to give you these documents but here's all the conditions, it's exactly the same conditions that I would have imposed on you if you came onto my premises, I'm going to take them to you in an armored truck, my security guard is going to be standing right next to you while you

look at the documents, I'm going to take them from you and then I'm going to take them back, is it no longer of the mission because they were allowed to leave the premises?

MR. BENSON: If they're in the hands of couriers of the -- in effect, of couriers with protection like that, then I think there's an argument that they're still of the mission.

JUDGE SRINIVASAN: I see. Okay. So it's not a premises-specific. It's --

MR. BENSON: Once in the hands of couriers or in diplomatic pouches or on the premises of the embassy, but again, this Court doesn't need to reach those kinds of issues. There's no question that even under Qatar's framework, which is a made-up framework, but that, you know, that it depends on the expectation of confidentiality, there's no way that a country could have an expectation of privacy when it turns over documents to FARA-registered agents, and --

JUDGE RAO: Well, that might be why, you know, why they lose on a document-by-document review, but it doesn't suggest why there should be a categorical --

MR. BENSON: But if the documents are open to the inspection by the Government at any time for three years after the end of the agency -- of the relationship, how can they have an expectation of privacy with respect -- or

confidentiality --

JUDGE RAO: Why --

MR. BENSON: -- with respect to any of those documents?

JUDGE WILKINS: Can you just clarify what the document request that's at issue says? What does it request?

MR. BENSON: There are a -- they're assorted categories of documents, communications between Qatar and the defendants, payments by Qatar to the defendants, a whole series of questions like that. And, by the way, Qatar professes ignorance as to what these documents are. These documents are three categories: documents they sent to the defendants, documents they received from the defendants, and what they claim are documents between the -- between and among the defendants. They know the vast -- what those documents are. They certainly know what the information is that they claim is so sensitive and inviolable. They could have made a showing to the district court.

JUDGE WILKINS: But do we know that all of the documents that -- all within the document requests would be subject to the record keeping and inspection requirements of FARA?

MR. BENSON: And I believe that the inspection requirements of -- I think that a FARA-registered agent is

required to keep all -- pretty much, all documents. If you look at FARA, it's a very broad requirement, and they have to keep the documents open for inspection at any time for --

JUDGE WILKINS: So it's your position -- I'm just trying to understand your position -- that every document that would be responsive to the document request would fall within FARA's record keeping and inspection requirement?

MR. BENSON: Certainly the document -- at a minimum, all documents that Qatar professes to be now concerned about would be.

JUDGE WILKINS: Okay.

JUDGE RAO: So -- but, Mr. Benson, wouldn't that require a quite broad ruling from us, though, to determine that any documents that were available potentially in the future to inspection by the U.S. government trumps any Article 24 protection that the documents might have --

MR. BENSON: It doesn't trump --

JUDGE RAO: -- for Qatar?

MR. BENSON: -- the Article 24 protection. The Vienna Conventions provide -- just like Qatar's contracts provide that they're subject to the law, the Vienna Conventions in Article 41 say that the laws of the host country must be respected. So the countries who adopted the Vienna Convention, including Qatar, I believe in 1961, knew about FARA. They knew about -- they obviously adopted

Article 41, which said that they agreed to respect laws of the host country. So there's no -- I don't think that there's an argument that -- we're not arguing that FARA trumps --

JUDGE RAO: It's effectively -- it's --

MR. BENSON: -- the Vienna Convention. We're arguing that it's perfectly consistent with the Vienna Convention.

JUDGE RAO: Well, but that to the extent something is covered by FARA, it is --

MR. BENSON: Pardon?

JUDGE RAO: That to the extent that a document is covered by FARA, that it cannot receive the protections of the Vienna Convention.

MR. BENSON: Not inviolable. It's no longer inviolable --

JUDGE RAO: I mean --

MR. BENSON: -- by the actions of the country itself.

JUDGE RAO: I mean, the Department of Justice doesn't take that view. I mean, they are charged with enforcing both -- I mean, the U.S. government is charged with enforcing both its treaty obligations and its statutory obligations, and they think that they are, in most instances, compatible.

MR. BENSON: I think the Government is wrong. I think they're plainly wrong. I think every authority that has addressed this issue has come down the way -- the way Professor Denza has come down, which is, documents delivered to people subject to FARA are not inviolable under the Vienna Conventions.

JUDGE WILKINS: Well, I think you kind of can't have it both ways. I mean, you say that inviolable under the Vienna Conventions is, you know, is the same as the attorney-client privilege is considered to be inviolable, but there are limited exceptions where privileged documents might be able to be reviewed for some purposes but not disclosed for other purposes, and so why can't it be under the Vienna Conventions that it's still considered inviolable?

Maybe under U.S. domestic law there's some limited availability for the Justice Department to inspect documents for its compliance purposes, for its counterespionage or national security purposes, but that doesn't mean that any -- you know, every Tom, Dick, and Harry that files a civil lawsuit can have access to the documents.

MR. BENSON: There's no authority or support in the Vienna Conventions or in FARA or any other law that would support that, but even more importantly, what Qatar is arguing for and what the Government is arguing for is an

WC

analysis of what the reasonable expectations of Qatar were, and attorney-client privilege is the long-standing doctrine that's asserted every day.

This inviolability for FARA documents that are exposed to the public -- I mean, that are exposed -- that are available for inspection, every authority that's ruled on it has agreed with our position, and so when Qatar signed those contracts with their -- with these defendants, they knew that Congress said that those documents would be not inviolable. They knew that Professor Denza said that those documents would not be inviolable. They knew that the House of Lords had ruled that those kind -- those -- you know, documents given to a certain -- a broad array of third parties would not be inviolable. They knew -- they didn't have any reasonable expectation of confidentiality or of inviolability. They couldn't have. So under their own analysis, these documents are not inviolable.

JUDGE SRINIVASAN: Because of FARA?

MR. BENSON: Because of FARA --

JUDGE SRINIVASAN: Can I ask -- can I just ask --

MR. BENSON: -- and because of -- and because of all the authorities, before they signed the contract -- contracts -- that agreed with that analysis.

JUDGE SRINIVASAN: About FARA?

MR. BENSON: About FARA.

WC

JUDGE SRINIVASAN: Yes. Can I just ask a basic factual question? Is it the case that every third party that contracts with an -- with a foreign sovereign has to register as a -- I take it there's some contractors that don't have to be subject to FARA, or is that wrong?

MR. BENSON: I think that's correct. I think it's directed toward contractors that are -- I mean, a lot of times people, I think, register out of excessive caution, just, you know, on it's a criminal -- it's a criminal offense, but I don't believe that, for example, if a plumber who does work for --

JUDGE SRINIVASAN: Yes.

MR. BENSON: -- Qatar would have to register. I think it's these kinds of activities, propaganda activities, and the purpose of FARA, of course, is to make sure that those clandestine activities are subject to exposure and subject to the Government finding out about them.

JUDGE SRINIVASAN: So can I ask this question, then? If it's true that not everybody who contracts with a foreign sovereign is subject to FARA, then if we go to a foreign country -- and let's just hypothesize a foreign country that's a surveillance state, that wants to surveil everything -- and they pass something that's much more robust than FARA and just say every time an embassy within our borders does any business with any third party, any

documents they share are subject to surveillance by the government, subject to read by the government, then would the FARA argument mean that in that country that the Vienna Convention basically just doesn't apply, the inviolability principle just doesn't apply to any document, period, because there's this law, this hypothetical law that just allows for robust, you know --

MR. BENSON: No. No --

JUDGE SRINIVASAN: It wouldn't?

MR. BENSON: -- and because they're changing the expectations of the countries -- of the parties, the Vienna Convention. The Vienna --

JUDGE SRINIVASAN: Right. So would --

MR. BENSON: -- the Vienna Convention was signed on to by these countries knowing that FARA existed. In your hypothetical --

JUDGE SRINIVASAN: Oh, I see. So it's temporally. The --

MR. BENSON: Right.

JUDGE SRINIVASAN: -- answer from your perspective is that that law postdates --

MR. BENSON: Right.

JUDGE SRINIVASAN: -- whereas FARA predated --

MR. BENSON: Right.

JUDGE SRINIVASAN: -- and that's --

MR. BENSON: So there, I think, there would be an argument that, no, it does not override or, you know --

JUDGE SRINIVASAN: So if there were a country that had that law beforehand, then --

MR. BENSON: Then there would be an argument --

JUDGE SRINIVASAN: Then there would -- then that would be the situation.

MR. BENSON: -- for non-inviolability.

JUDGE SRINIVASAN: Yes, across the board, even though it would -- it would be -- it would be very robust non-inviolability?

MR. BENSON: Right.

JUDGE SRINIVASAN: Okay. If there's no further questions.

MR. BENSON: Thank you.

JUDGE SRINIVASAN: Thank you. Mr. Benson, thank you. Mr. Zionts, we'll give you three minutes for rebuttal.

ORAL REBUTTAL OF DAVID M. ZIONTS, ESQ.

ON BEHALF OF THE APPELLANT

MR. ZIONTS: Thank you, Your Honor. Just a few quick points, one on the comity question, going back to Chief Judge Srinivasan's colloquy with Mr. Totaro -- I agree that comity does matter. Right now, you know, the question before about, you know, there's a limited remand, what is still open in the district court, there is a categorical

WC

ruling right now that comity is not available that the district court reached without looking at anything, without developing a record.

You know, the United States hasn't commented in this proceeding. It read the Court's order as not requesting it. In the NML case in the Supreme Court, we think that what the United States said about comity and, in particular, comity in the context of discovery targeted at third parties, it is entirely inconsistent with the district court's categorical order. So, in our view, you know, that is a separate and important issue in this appeal that should be resolved.

And I endorse what Mr. Totaro said, that, you know, document of the mission is a particular phrase, particular construct. We think that will be quite protective on remand, but international comity is a different way of getting at the protection in appropriate circumstances of sensitive governmental information, and it very well may be that there could be some close questions under the Vienna Convention where there is an easier answer once you get into the documents on comity. So we think that the Court -- that is an issue that is presented for the Court and, you know, having the Court send it back on that issue would be helpful for remand proceedings.

On jurisdiction, I don't want to, you know, unless

the Court has question, I don't want to belabor that point. I do just want to, you know, create a factual point that I believe Mr. Saunders said. He referred to the minute order of December 8th, 2021, as deciding that Qatar had amicus status. The court said that Qatar could file the equivalent amicus briefs but no pending motion requires addressing Qatar's exact status in this case. I don't think the district court ever, you know, changed that until it retroactively said in its final decisions here that, actually, Qatar really was just an amicus all along. So I think, you know, Qatar really was proceeding through this minefield without a compass and it would be -- it would be troubling for a foreign sovereign, you know, to basically be deemed to have given up its rights under a treaty for not doing it one particular way.

Finally, on the FARA points, going to the last point that was addressed about reciprocity concerns, this is not hypothetical. Russia has a FARA-type law that has government audit inspection provisions, and so I think, you know, I would -- I would, you know, take seriously that the United States has not endorsed Mr. Broidy's position that FARA just vitiates any inviolability under the Conventions. I think there is, you know -- I think we would -- that we -- our view is that the best view is that inviolability could be argued in the case if DOJ came knocking but the Court

really doesn't need to get into that.

I think this consent concept exists in the treaty, in Article 22; you know, inviolability of mission premises is rejected. The next sentence talks about the possibility of consent. You know, it is possible that you could view sort of the decision to engage a contractor under FARA's regime, understanding that it is only law enforcement officers not concerned with snooping around in the sovereign's secrets but focused on enforcement of FARA, that that could be a way forward, that that could at least be assumed to be correct in a way that doesn't undermine inviolability in this proceeding.

JUDGE WILKINS: Let's suppose we find that the only path available to you is mandamus. Ordinarily, we deny mandamus unless there is some clear precedent that demonstrates that the district court's position was error, not for something where -- or the district court, you know, clearly used, like, the -- there's a standard that's been articulated in the case law, and the district court did not use that standard. How do you meet that standard here?

MR. ZIONTS: Your Honor, you know, a couple responses -- one, I think this Court and others, particularly in the context of foreign sovereigns, has taken a more pragmatic view of the threshold for mandamus review. This Court's decision in Papandreou, I think, makes that

point, that when you talk about, you know, potential injury to a foreign sovereign, the court is going to be a little bit more forward-leaning in recognizing those types of arguments.

You know, this comes up also in the context of executive branch privileges. We cited the Karnoski case in the Ninth Circuit, where I don't think it was sort of clear error that normally might have triggered but, because of the broad issues raised by the deliberative process issue in that case, was reviewed by mandamus.

That said, I think, you know, the normal standard is met. Here we don't have -- you know, this is a complex and novel issue. It's also one that at least now we have the United States government saying that this treaty interpretation by the district court was wrong. We had asked the district court, you know, we think that you should defer decision until you go through a document-by-document process. We asked the district court, if you are inclined not to do that, this is really sensitive stuff and we think you should ask the Government --

JUDGE WILKINS: Did the defendants ask to do that?

MR. ZIONTS: Pardon?

JUDGE WILKINS: Did the defendants make that request?

MR. ZIONTS: Your Honor, I don't recall that they

 did. I know that Qatar, in its --

JUDGE WILKINS: But see, that gets me back to my problem, I guess, maybe as an old district -- former district court judge and trial court litigator, is that, like, now you're wanting us to say that the district court erred because they didn't take an approach that wasn't put to it by a party --

MR. ZIONTS: Your Honor --

JUDGE WILKINS: -- and an amicus can't preserve issues.

MR. ZIONTS: Your Honor, I think I go back, you know, to where I started a few minutes ago. The district court didn't tell us that we were an amicus at that point. It said that I'm not -- I don't need to resolve your exact status yet. So I think we were just operating without guidance about what the best way to do this was.

The issue is, there -- I really made that point only for the very limited purpose that, you know, we know now that the United States government, which is entitled to great deference in treaty interpretation, you know, agrees with us that the district court was wrong. We had suggested that there was a way to find out the United States' position earlier in the day. That was my limited point on that.

JUDGE SRINIVASAN: Thank you, counsel. Thank you to all counsel. We'll take this case under submission.

(Whereupon, the proceedings were concluded.)

WC

DIGITALLY SIGNED CERTIFICATE

I certify that the foregoing is a correct transcription of the electronic sound recording of the proceedings in the above-entitled matter.

Wendy Campos
___________________________ January 27, 2023

WENDY CAMPOS

DEPOSITION SERVICES, INC.

# EXHIBIT 3

# YEARBOOK OF THE INTERNATIONAL LAW COMMISSION 1958

*Volume II*

*Documents of the tenth session including the report of the Commission to the General Assembly*

UNITED NATIONS 

Case 1:19-cv-00150-DLF Document 173-3 Filed 04/26/23 Page 164 of 188

immunities, the Commission will mention the "exterritoriality" theory, according to which the premises of the mission represent a sort of extension of the territory of the sending State; and the "representative character" theory, which bases such privileges and immunities on the idea that the diplomatic mission personifies the sending State.

(2) There is now a third theory which appears to be gaining ground in modern times, namely, the "functional necessity" theory, which justifies privileges and immunities as being necessary to enable the mission to perform its functions.

(3) The Commission was guided by this third theory in solving problems on which practice gave no clear pointers, while also bearing in mind the representative character of the head of the mission and of the mission itself.

(4) Privileges and immunities may be divided into the following three groups, although the division is not completely exclusive:

(*a*) Those relating to the premises of the mission and to its archives;

(*b*) Those relating to the work of the mission;

(*c*) Personal privileges and immunities.

SUB-SECTION A. MISSION PREMISES AND ARCHIVES

### *Accommodation*

### *Article 19*

**The receiving State must either permit the sending State to acquire on its territory the premises necessary for its mission, or ensure adequate accommodation in some other way.**

*Commentary*

(1) The laws and regulations of a given country may make it impossible for a mission to acquire the premises necessary to it. For that reason the Commission has inserted in the draft an article which makes it obligatory for the receiving State to ensure the provision of accommodation for the mission if the latter is not permitted to acquire it.

(2) This obligation, because it would impose too heavy a burden on the receiving State, does not apply to the residences of the members of the staff of the mission.

### *Inviolability of the mission premises*

### *Article 20*

**1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, save with the consent of the head of the mission.**

**2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.**

**3. The premises of the mission and their furnishings shall be immune from any search, requisition, attachment or execution.**

*Commentary*

(1) This article (which reproduces unchanged the text of article 16 of the 1957 draft), deals firstly with the inviolability of the premises of the mission.

(2) The expression "premises of the mission" includes the buildings or parts of buildings used for the purposes of the mission, whether they are owned by the sending State or by a third party acting for its account, or are leased or rented. The premises comprise, if they consist of a building, the surrounding land and other appurtenances, including the garden and car park.

(3) From the point of view of the receiving State, this inviolability has two aspects. In the first place, the receiving State is obliged to prevent its agents from entering the premises for any official purpose whatsoever (paragraph 1). Secondly, it is under a special duty to take all appropriate steps to protect the premises from any invasion or damage, and to prevent any disturbance of the peace of the mission or impairment of its dignity (paragraph 2). The receiving State must, in order to fulfil this obligation, take special measures—over and above those it takes to discharge its general duty of ensuring order.

(4) The inviolability of the mission premises is not the consequence of the inviolability of the head of the mission, but is an attribute of the sending State by reason of the fact that the premises are used as the headquarters of the mission.

(5) A special application of this principle is the rule that no writ may be served within the premises of the mission, and that no summons to appear before a court may be served in the premises by a process server. Even if process servers do not enter the premises but carry out their duty at the door, such an act would constitute an infringement of the respect due to the mission. The service of such documents should be effected in some other way. In some countries, the persons concerned may apply to the Ministry for Foreign Affairs of the receiving State. There is nothing to prevent service through the post if it can be effected in that way.

(6) The inviolability concerned confers on the premises, their furnishings and fixtures, immunity from any search, requisition, attachment or execution. The opinion had been expressed that the rule laid down in paragraph 3 of this article was unnecessary, because the acts referred to could not be performed without a contravention of the provisions of paragraph 1. Nevertheless, the rule has a value of its own in that it provides that the premises must not be entered even in pursuance of a judicial order. If the premises are leased or rented, measures of execution may of course be taken against the private owner, provided that it is not necessary to enter the premises of the mission.

(7) While the inviolability of the premises may enable the sending State to prevent the receiving State from using the land on which the premises of the mission are situated, in order to carry out public works (widening of a road, for example), it should on the other hand be remembered that real property is subject to the laws of the country in which it is situated. In these circumstances, therefore, the sending State should co-operate in every way in the implementation of the plan which the receiving State is contemplating; and the receiving State, for its part, is obliged to provide adequate compensation or, if necessary, to place other appropriate premises at the disposal of the sending State. The Commission did not consider it advisable to insert in the article itself a provision on these lines, which had formed paragraph (4) of the commentary on article 16 of the draft adopted by the Commission at its ninth session. To do so would convey the erroneous impression that the commentary was concerned with an exception to the principle of inviol-

ability. The text of the commentary refers solely to the moral duty of the sending State to co-operate.

### *Exemption of mission premises from tax*

### *Article 21*

**The sending State and the head of the mission shall be exempt from all national, regional or municipal dues or taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.**

*Commentary*

(1) The text of this article reproduces that of article 17 of the 1957 draft, with slight changes which do not alter the substance. The article now mentions "national, regional or municipal dues or taxes", which is a more comprehensive description and, according to the Commission's interpretation, covers all dues and taxes levied by any local authority. The phrase at the end of the article "for services actually rendered" has been replaced by the corresponding phrase used in article 32 "for specific services rendered". the Commission thought that a reference to *specific* services rendered was preferable to the phrase "for services *actually* rendered".

(2) The provision does not apply to the case where the owner of leased premises specifies in the lease that such taxes are to be defrayed by the mission. This liability becomes part of the consideration given for the use of the premises and usually involves, in effect, not the payment of taxes as such, but an increase in the rental payable.

### *Inviolability of the archives*

### *Article 22*

**The archives and documents of the mission shall be inviolable.**

*Commentary*

(1) This article reproduces unchanged the text of the corresponding provision in article 18 of the 1957 draft. As the Commission pointed out in the commentary to its 1957 draft: "The inviolability applies to archives and documents, regardless of the premises in which they may be. As in the case of the premises of the mission, the receiving State is obliged to respect the inviolability itself and to prevent its infringement by other parties."

(2) It was suggested that the words "and documents" in the text of the article should be deleted, and that the statement in the commentary that the inviolability applies to archives and documents, regardless of the premises in which they may be, was too sweeping. The commission cannot share this view. The mission's documents, even though separated from the archives, and whether belonging to the archives or not, must, like the archives themselves, be inviolable, irrespective of their physical whereabouts (e.g., while carried on the person of a member of a mission). It was for that reason that this extension was provided for in the General Convention on the Privileges and Immunities of the United Nations (article II, section 4).

(3) Although the inviolability of the mission's archives and documents is at least partly covered by the inviolability of the mission's premises and property, a special provision is desirable because of the importance of this inviolability to the functions of the mission. This inviolability is connected with the protection accorded by article 25 to the correspondence and communications of the mission.

## SUB-SECTION B. FACILITATION OF THE WORK OF THE MISSION, FREEDOM OF MOVEMENT AND COMMUNICATION

### *Facilities*

### *Article 23*

**The receiving State shall accord full facilities for the performance of the mission's functions.**

*Commentary*

(1) This article, which corresponds to article 19 of the 1957 draft, remains unchanged.

(2) A diplomatic mission may often need the assistance of the Government and authorities of the receiving State, in the first place during the installation of the mission, and to an even greater extent in the performance of its functions, for instance in obtaining information, an activity referred to in article 3 (*d*). The receiving State (which has an interest in the mission being able to perform its functions satisfactorily) is obliged to furnish all the assistance required, and is under a general duty to make every effort to provide the mission with all facilities for the purpose. It is assumed that requests for assistance will be kept within reasonable limits.

### *Free movement*

### *Article 24*

**Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.**

*Commentary*

One of the necessary facilities for the performance of the mission's functions is that its members should enjoy freedom of movement and travel. Without such freedom, the mission would not be able to perform adequately its function of obtaining information under article 3 (*d*). This freedom of movement is subject to the laws and regulations of the receiving State concerning zones entry into which is prohibited or regulated for reasons of national security. The establishment of prohibited zones must not, on the other hand, be so extensive as to render freedom of movement and travel illusory

### *Freedom of communication*

### *Article 25*

**1. The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher.**

**2. The official correspondence of the mission shall be inviolable.**

**3. The diplomatic bag shall not be opened or detained.**

**4. The diplomatic bag, which must bear visible external marks of its character, may only contain diplomatic documents or articles intended for official use.**

Case 1:19-cv-00150-DLF Document 173-3 Filed 04/26/23 Page 166 of 188

**5. The diplomatic courier shall be protected by the receiving State. He shall enjoy personal inviolability and shall not be liable to any form of arrest or detention.**

*Commentary*

(1) Apart from paragraph 2, which is new, the article substantially reproduces the text of article 21 of the 1957 draft. Paragraph 2 being new, the succeeding paragraphs have been re-numbered accordingly. In the former paragraph 3 (now paragraph 4) the phrase "which must bear visible external marks of its character" has been added after the words "The diplomatic bag".

(2) This article deals with another generally recognized freedom, which is essential for the performance of the mission's functions, namely freedom of communication. Under paragraph 1, this freedom is to be accorded for all official purposes, whether for communications with the Government of the sending State, with the officials and authorities of that Government or the nationals of the sending State, with missions and consulates of other Governments or with international organizations. Paragraph 1 of this article sets out the general principle, and states specifically that, in communicating with its Government and the other missions and consulates of that Government, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. If a mission wishes to make use of its own wireless transmitter it must, in accordance with the international conventions on telecommunications, apply to the receiving State for special permission. Provided that the regulations applicable to all users of such communications are observed, such permission must not be refused.

(3) Formerly, the freedom to employ all appropriate means of communications was limited in principle to the diplomatic mission's exchanges, on the one hand with the Government of the sending State and, on the other, with the consulates under its authority within the receiving State. Nowadays, with the extension of air communications, the practice has changed. Communications with embassies and consulates in other countries no longer always pass through the Ministry for Foreign Affairs in the sending State; often use is made of certain intermediate posts from which despatches are carried to the various capitals to which they are addressed. The Commission has therefore not changed the rule laid down in paragraph 1.

(4) Paragraph 3 (former paragraph 2) states that the diplomatic bag is inviolable. Paragraph 4 (former paragraph 3) indicates what the diplomatic bag may contain. The Commission considered it desirable that the statement of the inviolability of the diplomatic bag should be preceded by the more general statement that the official correspondence of the mission, whether carried in the bag or not, is inviolable. In accordance with paragraph 4, the diplomatic bag may be defined as a bag (sack, pouch, envelope or any type of package whatsoever) containing documents and (or) articles intended for official use. According to the amended text of this paragraph, the bag must bear visible external marks of its character.

(5) The Commission has noted that the diplomatic bag has on occasion been opened with the permission of the Ministry for Foreign Affairs of the receiving State, and in the presence of a representative of the mission concerned. While recognizing that States have been led to take such measures in exceptional cases where there were serious grounds for suspecting that the diplomatic bag was being used in a manner contrary to paragraph 4 of the article, and with detriment to the interests of the receiving State, the Commission wishes nevertheless to emphasize the overriding importance which it attaches to the observance of the principle of the inviolability of the diplomatic bag.

(6) Paragraph 5 deals with the inviolability and the protection enjoyed by the diplomatic courier in the receiving State. The diplomatic courier is furnished with a document testifying to his status: normally, a courier's passport. When the diplomatic bag is entrusted to the captain of a commercial aircraft, he is not regarded as a diplomatic courier. This case must be distinguished from the not uncommon case in which a diplomatic courier pilots an aircraft specially intended to be used for the carriage of diplomatic bags. There is no reason for treating such a courier differently from one who carries the bag in a car driven by himself.

(7) The protection of the diplomatic bag and courier in a third State is dealt with in article 39.

### *Article 26*

**The fees and charges levied by the mission in the course of its official duties shall be exempt from all dues and taxes.**

*Commentary*

This article states a rule which is universally accepted.

## SUB-SECTION C. PERSONAL PRIVILEGES AND IMMUNITIES

This sub-section deals with members of the mission who are foreign nationals (articles 27 to 36), with nationals of the receiving State (article 37), and with certain general matters (articles 38 and 39).

### *Personal inviolability*

### *Article 27*

**The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all reasonable steps to prevent any attack on his person, freedom or dignity.**

*Commentary*

(1) This article confirms the principle of the personal inviolability of the diplomatic agent. From the receiving State's point of view, this inviolability implies, as in the case of the mission's premises, the obligation to respect, and to ensure respect for, the person of the diplomatic agent. The receiving State must take all reasonable steps to that end, possibly including the provision of a special guard where circumstances so required. Being inviolable, the diplomatic agent is exempted from measures that would amount to direct coercion. This principle does not exclude in respect of the diplomatic agent either measures of self-defence or, in exceptional circumstances, measures to prevent him from committing crimes or offences.

(2) The paragraph 2 which formed part of the corresponding article 22 in the 1957 draft has been deleted in consequence of the introduction of article 1 (definitions).

### *Inviolability of residence and property*

### *Article 28*

**1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.**

United States Government would not object to a provision that the receiving State is entitled to decline to receive a particular category of officials to perform a function which may be performed only as a matter of privilege and not as a matter of right. However, once the sending State is granted the right of legation, such State is entitled to staff its mission with all categories of persons necessary to the performance of those functions implicit in the right of legation. Also, the sending State and the receiving State concerned alone are in a position to determine the circumstances and conditions which may affect the size and composition of their respective missions in the territory of the other.

As noted in the observations regarding article 4, although the authority is exercised with restraint, any State may deny entry to any foreign national, including service attachés. The United States Government does not require *agréments* for military, naval, or air attachés except on the basis of reciprocity. Since the Governments of Hungary, Italy, the Philippines, Romania and Spain require *agréments* for the top service officers only, this Government reciprocates and requires a similar *agrément.* Even those Governments do not require *agréments* for assistant military, air or naval attachés. In the event these Governments would eliminate the requirement for any such *agréments* the United States Government would reciprocate.

*Article 8*

Article 8 lays down a rule as to the time when the head of a mission is entitled to take up his functions in relation to the receiving State. This is largely a matter of protocol or local custom. In the United States of America, ambassadors and ministers are received by the President, but a new head of mission first presents to the Secretary of State copies of his letters of credence, the letters of recall of his predecessor, and a copy of the remarks he proposes to make when received by the President. After this presentation to the Secretary of State he may perform all the functions of his office.

*Article 9*

This provides that if the post of head of mission is vacant, or if the head of mission is unable to perform his functions, the affairs of the mission shall be handled by a *chargé d'affaires ad interim,* whose name shall be notified to the Government of the receiving State. The article further provides that in the absence of such notification, the member whose name appears next on the mission's diplomatic list is presumed to be in charge.

The United States Government finds this article unacceptable. In each instance the United States Government would require appropriate notification before recognizing any member of the mission as *chargé d'affaires ad interim.* This is true whether the post is vacant, or whether the head of mission is temporarily away from the capital or is ill. The United States Government would not "presume" that a certain official was empowered to speak for his Government in the capacity of *chargé d'affaires ad interim.* Moreover, it would be particularly objectionable to require States to make such a presumption on the basis of the order in which names might appear on a diplomatic list. Some Governments do not publish such a list and, if they do, the published list may be out of date. Also, it should be noted that the diplomatic list is not intended to be used for the purpose of determining which officer shall be *chargé d'affaires ad interim.* Some Governments, for instance, customarily list, after the name of the head of mission, the name of the highest ranking military, naval or air attaché.

*Article 10*

This article divides heads of mission into three classes. It is suggested that this article might begin with the words "For purposes of precedence and etiquette . . .".

*Article 11*

This article restates the general practice of States, which is to agree on the class to which the heads of their missions are to be assigned. The United States Government observes, however, that the receiving and sending States concerned need not be represented by heads of mission of the same rank. One State may be represented by an ambassador, for instance, while the other prefers to be represented by a minister or a *chargé d'affaires.*

*Article 12*

The rules of precedence of heads of missions prescribed in article 12 deal with matters of practice and protocol in the receiving State, rather than with principles of international law suitable for codification. See, also, observations on article 8 above.

*Article 13*

The United States Government agrees with the provisions of article 13, which would require each State to establish a uniform mode for the reception of heads of mission of each class.

It is suggested that the article further provide that such uniform mode of reception should be applied without discrimination. See, also, comment on article 8, above.

*Article 14*

The United States Government agrees that, except as concerns precedence and etiquette, there should be no differentiation between heads of mission by reason of their class.

*Article 15*

The United States Government agrees with the apparent intent of article 15, that it is the duty of the receiving State to ensure that the sending State has adequate accommodations, but that the receiving State is under no duty to make exceptions from its laws relating to title to or ownership of real property. The United States believes, however, that for added clarity the article should be revised to read somewhat as follows:

"The receiving State shall either permit the sending State to acquire in its territory the premises necessary for its mission, or, in some other way, ensure accommodations, including housing and other facilities, for members of the mission."

*Article 16*

The United States Government agrees that the premises of a diplomatic mission shall be regarded as inviolable and may not be entered by local authorities except with the consent of the head of the mission. However, such consent will be presumed when immediate entry is necessary to protect life and property, as in the case of fire endangering adjacent buildings.

Paragraph 3 of the article, considered in the light of the commentary thereon, presents special problems. This paragraph provides that the premises and furnishings of the mission shall be immune from search, requisition, attachment or execution. It would appear that paragraph 1 of the article covers "search" of a mission, as used in paragraph 3. If there is agreement to this, then the word "search" should be deleted from paragraph 3. If not, the United States Government would appreciate an explanation of what sort of search is intended. Second, while fortunately Governments have rarely been forced to requisition property used for foreign diplomatic missions, the United States Government is of the view that international law does not absolutely preclude the requisition of such property or its taking by exercise of right of eminent domain. This right, of course, could only be exercised under very limited circumstances, such as the happening of a disaster of great magnitude, or the necessity of making important improvements to the city which require the taking of all or some of the land on which the premises of the mission are located. In such case, the receiving State is obligated to make prompt and adequate compensation for the property taken and, if necessary, to use its good offices to assist the sending State in obtaining other suitable accommodations. Last, as to attachments and executions, in the case of rented or leased property international law requires only that the premises of the mission not be invaded to enforce an order of the court. The situation is different, of course, where the property is owned by the foreign Government and used for diplomatic purposes. In such case, the claim of sovereign immunity would preclude attachment or execution.

The United States Government does not agree with the last sentence of paragraph (2) of the commentary. It is not

clear what sort of judicial notices are referred to. The United States Government agrees that a process server may not serve a summons or process on the premises of the mission. However, this Government does not agree that judicial notices of any nature whatsoever need be delivered through the Minister for Foreign Affairs of the receiving State. If the person to whom the *subpoena* or process is addressed does not enjoy diplomatic immunity, the document should be served on him at his home or other appropriate place away from the premises of the mission. If the person concerned enjoys diplomatic immunity, he is not subject to the jurisdiction of the local courts in the absence of a waiver by his Government. The Foreign Office need become involved only where such a document has been erroneously served, and the head of mission requests the Foreign Office to return the process to the court with an appropriate suggestion of immunity.

The United States Government could not approve the language used in paragraph (4) of the commentary. It is suggested that the substance of this paragraph be restated as a rule of international law worded somewhat as follows:

"Notwithstanding the inviolability of the premises of the mission, real property is subject to the laws of the country in which it is situated. The sending State is obligated to permit the land on which the premises of the mission are situated to be used for carrying out public works, such as the widening of a road, for example. The receiving State, for its part, is obliged to provide prompt and adequate compensation and, if necessary, to place other appropriate premises at the disposal of the sending State."

*Article 17*

The United States Government agrees with this article, if it is intended to grant an exemption from taxes in respect of the premises of a diplomatic mission for which the foreign Government concerned would be liable either as owner or lessee. This Government does not agree, however, if the article is intended to grant an exemption from taxes levied against rented or leased property for which the landlord, rather than the sending State, is liable, or for taxes due with respect to real property owned by the head of the mission personally. Moreover, the article fails to clarify the particular categories of property which shall be considered as constituting the premises of the mission. The article might be revised to read as follows:

"The sending State shall be exempt from all national or local dues or taxes in respect of the premises of the mission owned by or on behalf of the sending State and used for legation purposes, other than, on a basis of reciprocity, such charges as represent payment for services actually rendered. For the purposes of this article, property used for legation purposes shall be deemed to include the land and buildings used for the embassy or legation, the chancery and all annexes thereto, and residence for officers and employees of the mission."

The commentary might explain that property used for legation purposes should be deemed to include the land on which the buildings are situated, including gardens, parking lots and vacant or unimproved land, provided such lands are adjacent to the land on which the buildings are situated.

*Article 18*

The United States Government agrees that the archives of the mission are inviolable, but suggests that the words "and documents" should be omitted, as the phrase is confusing and unnecessary.

The United States Government cannot agree with the statement in the commentary that the inviolability applies to "archives and documents, regardless of the premises in which they may be". The inviolability which properly attaches to the archives of the mission presupposes that archival material will be on the premises of the mission, in ordinary transit by courier or sealed pouch, or in the personal custody of duly authorized officers of the mission for use in the performance of their functions.

*Article 19*

The United States Government agrees that the receiving State should accord appropriate facilities for the performance of the mission's functions. However, there should be some indication as to the meaning and scope of the words "full facilities".

*Article 20*

Article 20 is so broadly phrased as to sanction the present practice of certain Governments of restricting so extensively the travel of members of a diplomatic mission as to render the right of freedom and movement illusory. The latter part of the article would require that travel controls be applied without discrimination to diplomatic representatives of all States, including those which do not restrict the movements of representatives of the receiving State. The principle of reciprocity, however, is an integral factor in matters of this nature. It is believed that it would be preferable to have no article on the subject, rather than one so subject to arbitrary abuse.

*Article 21*

The United States Government concurs generally with paragraphs 1 and 3 of article 21. This Government recommends, however, that a new sentence be added to paragraph 2 of article 21, which would read as follows:

"Any article which is radio-active may not be considered as an article intended for official use of a diplomatic mission, and any diplomatic bag containing such an article may be rejected."

The United States Government further suggests that paragraph 4 be revised to read as follows:

"The diplomatic courier shall be protected while in transit in the receiving State or in the territory of a third State which he entered with proper documentation."

This Government is of the view that in a number of respects the commentary on this article does not reflect existing rules of international law.

*Article 22*

This provides that the persons of diplomatic agents, defined as the head of the mission, and members of the diplomatic staff of the mission, shall be inviolable, and that they shall not be subject to arrest or detention, be it administrative or judicial. As stated in the observations regarding article 4, above, the composition of the diplomatic staff requires more precise definition.

*Article 23*

The United States Government agrees with paragraph 1 of article 23, to the effect that the private residence of a diplomatic agent is inviolable. However, this Government is of the opinion that paragraph 2 requires further consideration. For instance, no inviolability would attach to the property, papers, and correspondence of a diplomatic agent pertaining to a commercial venture in the receiving State.

*Article 24*

This article undertakes to lay down a new rule of international law. While providing complete immunity from criminal jurisdiction, the article would make the exemption from civil jurisdiction subject to certain exceptions not presently recognized under international law. Moreover, paragraph 4 of the article undertakes to prescribe which court in the sending State is competent to exercise jurisdiction over its own diplomatic agents.

The United States Government is of the opinion that the article should be revised to restate existing principles of international law on the subject. This, it is submitted, requires complete exemption of persons entitled to diplomatic immunity from criminal and civil process, in the absence of a waiver by the sending State, except with respect to real property owned by such person in his private capacity. In the latter case, court proceedings are usually *in rem* rather than *in personam*. The United States Government also suggests that the last sentence of paragraph 4 of the article be deleted.

*Article 25*

The United States Government agrees with the principles expressed in paragraphs 1 and 2 of article 25, which provide that the immunity of diplomatic agents may be waived by the sending State, and that in criminal proceedings, the waiver must always be expressly made by the Government.

Paragraphs 3 and 4, however, recognize implied waivers of immunity in certain civil proceedings. This is inconsistent with the accepted theory that the immunity is for the benefit of the Government concerned, not the individual. For various reasons, the sending State may object to one of the members of its mission becoming involved in judicial proceedings in the receiving State. Accordingly, the United States Government is of the opinion that, in each case, there should be an express waiver of immunity by the sending State.

*Article 26*

Article 26 cannot be considered as a statement of the tax exemptions to which diplomatic agents are presently entitled under existing principles of international law. While some of the provisions thereof may conform with requirements of international law, others do not.

*Article 27*

Paragraph 1 of the article provides that customs duties shall not be levied on articles for the use of the mission or for the personal use of a diplomatic agent or members of his family belonging to his household. Assuming that the term "diplomatic agent" refers only to an individual recognized in an officer status, this paragraph conforms with United States practice in the matter.

Paragraph 2 of the article further provides that the personal baggage of a diplomatic agent may not be inspected except under limited circumstances and in the presence of such agent or his authorized representative. It is the view of the United States Government that the customary exemption from inspection by customs authorities of the personal baggage of a diplomatic officer is accorded as a matter of courtesy, and not because it is a requirement of international law.

*Article 28*

This article provides that, in addition to diplomatic agents, the privileges and immunities mentioned in articles 22 to 27 shall also be enjoyed by members of the family of the diplomatic agent, and likewise the "administrative and technical staff" of the mission, and their families, provided such persons are not nationals of the receiving State. Members of the "service staff", however, are to enjoy immunity only in respect of acts performed in the course of their duties and, if not nationals of the receiving State, are to be exempt only from dues and taxes on their salaries. The last two paragraphs of the article apply to private servants.

The United States Government considers that a careful and precise statement by the International Law Commission as to the privileges, immunities and exemptions to which the various categories of officers and employees of a mission should be considered entitled would materially contribute to the betterment of relations between Governments.

It is well known that few Governments are as generous as the United States Government in extending privileges and immunities to all members of the staff of a diplomatic mission. The United States, just as most Governments, does not extend immunity to families of employees of diplomatic missions in Washington whose names are not included in the Diplomatic List. Also, except on first arrival and for a reasonable period thereafter, such employees and their families do not, in the absence of reciprocal arrangements, enjoy free importation privileges and certain other tax exemptions enjoyed by officer personnel. Also, the United States Government, on request, suggests to American courts the immunity from jurisdiction of all officers and employees of a diplomatic mission in Washington, regardless of nationality, who have been duly notified to and accepted by the United States in such capacity, as well as the immunity of families of officers included on the Diplomatic List.

Other Governments may be of the opinion that the granting of diplomatic immunities to subordinate employees of a mission for other than official acts is not required under international law. The United States Government is hopeful that the International Law Commission will be able to restate the international law rule on the subject with sufficient clarity that it will serve as a firm guide to what immunities Governments must accord to members of foreign diplomatic missions.

*Article 29*

This article provides that, as regards the acquisition of nationality of the receiving State, no person enjoying diplomatic privileges and immunities in that State, other than the child of one of its nationals, shall be subject to the laws of the receiving State. This represents existing United States law on the subject and is in conformity with international law as the United States Government interprets it.

*Article 30*

This article provides that a diplomatic agent who is a national of the receiving State shall enjoy immunity from the jurisdiction only in respect of official acts performed by him in the exercise of his functions. The last paragraph of the commentary states that the proposed rule implies that members of the administrative and service staff of a mission who are nationals of the receiving State shall enjoy only such privileges and immunities as may be granted them by the receiving State.

The United States Government is of the opinion that all officers and employees of a diplomatic mission, regardless of nationality, should enjoy immunity from jurisdiction in respect of official acts. Such immunity is for the benefit of the Government, and not the individual (see observations regarding articles 6 and 28, above).

*Article 31*

The United States Government agrees with the provisions of article 31 specifying that entitlement of an individual to diplomatic privileges and immunities commences on the moment of his entry into the territory to take up his post, and continues until his departure on expiry of his appointment or a reasonable time thereafter in which to depart and have his effects removed. The United States Government submits, however, that where the person is already in the territory of the receiving State, his privileges and immunities begin only when his appointment is notified to *and accepted* by the Ministry for Foreign Affairs.

*Article 32*

The United States Government agrees with article 32, if it is intended to apply only to the duties of a third State with respect to a diplomatic agent passing through or in its territory in immediate and continuous transit proceeding on official business to or from a post to which he is regularly assigned. However, a third State is not obligated to accord inviolability to a diplomatic agent while in transit for other purposes or during a sojourn in such third State. The United States Government further observes that this article should be revised to cover other members of the staff of the mission.

It is of course a condition precedent to the claiming of any rights by persons in transit through a third State, whether as a diplomatic courier, a diplomatic agent, or any other person connected with a diplomatic mission, that the individual concerned be properly documented, and that the third State has authorized his transit, or that his presence in the third State is inadvertent and unplanned, being due to a unforeseen circumstance, as in the case of shipwreck or forced landing of an airplane.

*Article 33*

The United States Government agrees with the statement that persons entitled to diplomatic immunity should nonetheless respect the laws and regulations of the receiving State, and should refrain from interfering in the internal affairs of that State. Also, the United States Government further agrees that, in the absence of special agreement, the mission should conduct its business through the Foreign Office, and that the premises of the mission should not be used for purposes incompatible with the functions of the mission. However, see United States observations on article 2, regarding the functions of a mission.

*Article 34*

This article appears correctly to describe, ***inter alia***, the various modes of termination of appointment, except that paragraph (*c*) should be reworded. A notification that an individual has become ***persona non grata***, or a request that he be recalled, is customarily given by the receiving State to the head of the mission concerned, rather than to the individual.

# EXHIBIT 4

Y 4.G 74/7:C 43/16

# INVESTIGATION INTO ABDUCTIONS OF AMERICAN CHILDREN TO SAUDI ARABIA

## HEARINGS

BEFORE THE

## COMMITTEE ON GOVERNMENT REFORM HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

JUNE 12; OCTOBER 2 AND 3; AND DECEMBER 4 AND 11, 2002

**Serial No. 107–83**

Printed for the use of the Committee on Government Reform

Pennsylvania State University Libraries

APR 11 2003

Documents Collection
U.S. Depository Copy

Available via the World Wide Web: http://www.gpo.gov/congress/house
http://www.house.gov/reform

Generated at New York University on 2022-01-20 21:41 GMT / https://hdl.handle.net/2027/pst.000050201297
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from PENN STATE

December 11, 2002

GOVERNMENT REFORM COMMITTEE STATEMENT

Thank you for providing the Department of State the opportunity to appear before the Committee today. I am Will Taft, Legal Adviser. I am accompanied today by Dianne Andruch, Deputy Assistant Secretary in the Consular Affairs Bureau. I am submitting this written statement for the record. Ms. Andruch will be available to answer questions concerning consular affairs matters.

The Committee's investigation of child abductions to Saudi Arabia has focused public attention on an important issue in our bilateral relationship with Saudi Arabia.

As Department officials testified in June and October of this year, we are committed to the objectives that American children abducted to or wrongfully retained in Saudi Arabia be returned to the United States, and that American women be free to depart Saudi Arabia without permission from their husbands or sponsors. President Bush discussed the issue with Saudi Ambassador Bandar Bin Sultan on August 8 at Crawford. Secretary Powell raised the matter a number of times with his Saudi counterpart over the summer, during the UN General Assembly on September 17, and again on November 1.

Your attention to these cases and your visit to Saudi Arabia have been very useful in underscoring to the Government of Saudi Arabia the importance the Congress and the American people attach to resolution of these cases and to the treatment that United States citizens receive abroad. Your involvement has buttressed our own efforts to encourage the Government of Saudi Arabia to work with us towards an arrangement to help resolve these cases in a more rapid and fairer manner than in the past.

We understand that the Committee's concern about child abductions by Saudi parents has led it to issue subpoenas to three private firms that work under contract with the Embassy of Saudi Arabia. We also understand that the Embassy has taken the position through its counsel that, among other things, the information and documents constitute embassy "archives" and "correspondence" which is

https://hdl.handle.net/2027/pst.000050201297
t.org/access use#pd-google

accordingly protected from disclosure by the Vienna Convention on Diplomatic Relations.

We further understand that the Committee has rejected the Saudi government's position, arguing that none of the subpoenaed documents are protected by the Vienna Convention and that testimony by representatives of the subpoenaed firms is not privileged.

The Department has explained, by letters to you of November 22 and 29 and December 4, that your request raised novel and complex questions that concern both domestic and international law. In your letter to Secretary Powell of November 18, 2002, you requested that by November 25, the Department provide the Committee with responses to four questions regarding the Saudi claim that the documents are privileged. Specifically, your letter asked whether the records sought by the Committee are "archives and documents of the mission" protected by the Vienna Convention on Diplomatic Relations. You also posed hypothetical situations and asked, if the Saudi position in this matter were correct, whether the records of consultants would be protected from disclosure in those situations. Finally, you asked about the relationship of the Vienna Convention to the Foreign Agents Registration Act.

These are issues of first impression. To our knowledge, your subpoenas constitute the first time a legislature in any country has attempted to compel the production of records from a contractor for an embassy in that country. How we answer your questions has implications for our law enforcement activities, our diplomatic practices, and Congressional oversight. The issues also could be relevant to future litigation. We continue to review these issues precisely because the national interests are so important and we want and need to get the answers right.

The Administration has taken no position on the merits of this dispute between the Committee and the Embassy. Nor am I am here to provide an opinion on which side has the better argument. I am here out of great respect for the work of the Committee to help the Congress understand some of the questions that the Executive Branch is exploring as it analyzes the Vienna Convention in response to your questions.

https://hdl.handle.net/2027/pst.000050201297
t.org/access use#pd-google

The State Department believes strongly in the need for proper and effective law enforcement in the United States. We do not expect the Vienna Convention to protect U.S. citizens who are not attached to a foreign mission and are recruited here by foreign missions to perform illegal activities such as espionage or terrorism. We also understand the need of the Congress and its committees to exercise its legislative duties. Let me assure you, Mr. Chairman, we support that role.

In analyzing the Convention's proper interpretation, we must also weigh the legitimate interests of the United States overseas. We too rely heavily on the protections of the Vienna Convention. As the Committee knows, the Convention protects our embassies from intrusion, our diplomats from arrest, and our communications and archives from interference. Our diplomats and embassies are on the front lines in the fight against global terrorism. As we analyze the precise questions the Committee has raised, we must remain cognizant of the overall importance of the Convention to U.S. interests. U.S. agencies must therefore consider whether lack of protection under the Convention of all documents and information such as are sought by the Committee here would adversely affect our ability to carry out our responsibilities overseas.

Let me give you some concrete examples. The State Department uses local nationals and personnel to fill some positions in our embassies. Unlike U.S. citizen employees sent overseas by the Department, local nationals do not generally have immunity from compulsory process, so they must appear in a court or elsewhere if they receive a subpoena. Our research to date indicates that, in a number of instances, the Department has in fact asserted that the official information in the possession of a local national working in the embassy is "archival" under the Vienna Convention and thus inviolable. Our experience has been that when the local national appears and declines to answer questions about official activities, the issue is not pursued in that way. If countries take the view that these local personnel working with the U.S. Government could be compelled to release information otherwise protected as Embassy archives, we would object strongly. And we believe Congress would expect us to do so.

Some of the same concerns extend to situations where we are relying on outside contracting. For example, the

https://hdl.handle.net/2027/pst.000050201297 / t.org/access use#pd-google

Department uses outside contractors for embassy construction. In such situations, cleared U.S. contractors and personnel build our embassies in sensitive posts working with information we provide them. To the best of our knowledge, up to the present, there has never been a situation in which foreign authorities have pressed one of these contractors to produce such information. If that were to happen, we would work vigorously in an attempt to protect the information. We would look seriously at asserting a claim of privilege, or inviolability, under the Vienna Convention. We would also consider other possible privileges and protections, such as state secrets, that might apply to these and other situations.

Examples such as these highlight why we are proceeding carefully in developing our conclusions.

On those rare occasions when U.S. Embassy representatives have been asked to appear before foreign legislatures, we have declined to do so on grounds of immunity under the Vienna Convention. On the same basis, U.S. embassies do not, as a matter of general practice, provide formal documentary submissions to foreign legislatures. The more information we require from embassies and their contractors, the more difficult it will clearly be for the United States to avoid reciprocal requests overseas.

It is in the context of these practices and functions of the United States Government that we analyze the Vienna Convention issues presented by the Committee's requests. Our starting point, shared we understand by the Committee and the Saudi government, is that embassy information and documentation in the embassy is inviolable and immune from process and similarly information in the hands of accredited diplomats and other embassy personnel is protected. Under Article 24 of the Convention, embassy archives are immune "wherever they may be" and "at any time." Under Article 27, embassy correspondence is "inviolable" and the state in which the embassy is located has an obligation to respect these rights and to protect free communication of the embassy. In this respect the Vienna Convention binds the entire U.S. government, not just the executive branch.

The issue the Committee posed, as we understand it, is whether these materials retain that immunity under the

https://hdl.handle.net/2027/pst.000050201297
t.org/access_use#pd-google

Convention when they are given to, or relied upon by, third parties. As I have noted, this is a novel and complex question. In contemplating the reach of the Convention, we would need to consider a number of issues, including among others: what may constitute "archives" (an undefined term in the treaty), exactly what documents and other information may be encompassed in a demand for production, and the relationship of the person who holds the information to the embassy.

One of the difficulties in resolving the reach of the Vienna Convention in this context is that it has rarely been tested by courts here or abroad. There is little reported practice. So the mere fact that archives have passed to a third party does not resolve the issue.

In the one significant case Professor Denza has cited to the Committee, the United Kingdom's House of Lords decision in Shearson, Lehman Brothers, Inc. v. Maclaine Watson & Co., Ltd., Lord Bridge concluded that certain documents passed to third parties by the International Tin Council had lost their archival inviolability in the specific circumstances of that case. However, Lord Bridge conditioned his decision on "the absence of any relationship of lender and borrower, bailor and bailee or principal and agent." Thus, as a technical legal matter, and as Professor Denza noted, the decision would not appear to reach the situation in which documents or information are given to an agent, contractor or attorney.

You have also expressed concern that a foreign embassy might employ a U.S. citizen to harass and intimidate U.S. parents or to assist in terrorist funding. On that basis, you have asked if the interpretation given the Vienna Convention by the Saudis would protect those activities. We would vigorously oppose such activities by foreign embassies. If situations such as these did arise, we would expect to draw upon a variety of tools and work closely with the Justice Department to address them.

Finally, you have asked about the Foreign Agents Registration Act. That statute is administered by the Department of Justice, not the State Department. We are not, therefore, in a position to respond to your question. We note only that we are not aware of the issue of "embassy archives" previously arising in this context - making this again a novel question. What that suggests to me, Mr.

https://hdl.handle.net/2027/pst.000050201297 / http://www.hathitrust.org/access use#pd-google

Chairman, is that as a practical matter, the Department of Justice has implemented the Foreign Agents Registration Act in a way that has not caused concerns among foreign governments that their rights under the Vienna Convention are being violated.

We appreciate the opportunity to bring these points to the Committee's attention. At this point, we are not in a position to present definitive legal views. The national interests involved are too important for us to give you answers that have not been carefully considered and reviewed by all interested agencies.

/ https://hdl.handle.net/2027/pst.000050201297
t.org/access use#pd-google

# EXHIBIT 5

A.CONF.20/14

United Nations Conference
on Diplomatic Intercourse
and Immunities

**Vienna — 2 March - 14 April 1961**

# Official Records

**Volume I :**

Summary Records
of Plenary Meetings
and of Meetings
of the Committee of the Whole

*GENEVA - 1962*

Digitized by UNOG Library

*Paragraph 3*

10. Mr. de ERICE y O'SHEA (Spain) recalled that in the Committee of the Whole (21st meeting) his delegation had submitted an amendment (A/CONF.20/C.1/L.168) specifically mentioning the mission's means of transport among the property entitled to inviolability. His delegation had withdrawn the amendment on the understanding that the expression " other property " would be interpreted as including the mission's means of transport. He noted, however, that in the Committee's report (A/CONF.20/L.2, para. 108) the expression in question was taken to mean only property within the premises of the mission. In his opinion, it was necessary to specify that the mission's means of transport were immune from requisition and attachment. Accordingly, he proposed that, after the words " and other property thereon ", the words " and also of its means of transport " should be added.

11. Mr. CARMONA (Venezuela) agreed in principle with the Spanish representative. However, some special cases might occur. For example, a motor-car or other vehicle belonging to the mission might be used for illegal purposes by persons enjoying asylum; in such cases, it could hardly be argued that vehicles so used should be immune. It would be better not to mention means of transport among property enjoying immunity, and his delegation would therefore vote for paragraph 3 as it stood.

12. Mr. BOUZIRI (Tunisia) said he would vote for paragraph 3 on the understanding that article 20 did not prevent the receiving State from using the land on which the premises of the mission stood for public works, as provided by an amendment submitted by Mexico (A/CONF.20/C.1/L.129) in the Committee of the Whole and later withdrawn.

13. Mr. MARESCA (Italy) approved and supported the Spanish representative's oral amendment. There would be a serious gap in the convention if the mission's means of transport were not specifically included among property enjoying immunity. However, means of transport should be immune only when used for official purposes in the course of the mission's normal activities.

*The Spanish representative's amendment was adopted by 41 votes to 7, with 16 abstentions.*

*Article 20 as a whole, as amended, was adopted by 67 votes to one, with 3 abstentions.*

14. Mr. de ROSENZWEIG DIAZ (Mexico) said he had voted for article 20, but maintained the opinion on it which he had expressed in the Committee of the Whole.

ARTICLE 21

*Paragraph 1*

15. Mr. GLASER (Romania) said he approved paragraph 1, which stated the correct principle of the immunity of the sending State and of the head of the mission from taxation, but could not accept paragraph 2 because, no doubt for praiseworthy reasons, it made an exception to a rule which should be absolute. His delegation would therefore request a separate vote on paragraph 2.

16. Mr. de ROSENZWEIG DIAZ (Mexico) did not agree that paragraph 2 contained an exception to the rule stated in paragraph 1. Its object was merely to prevent a private person from taking advantage of the rule.

17. Mr. USTOR (Hungary) said that article 21, paragraph 1, which granted exemption from all dues and taxes in respect of premises of the mission not only owned but also leased by the sending State, was a valuable contribution to the progressive development of international law. Some States could not buy the premises necessary for their missions, and the provision flowed naturally from the principle of the sovereign equality of all States. His delegation would therefore vote for paragraph 1. However, it would vote against paragraph 2, which undermined the principle stated in paragraph 1 and could be interpreted as denying exemption from dues and taxes in respect of leased premises, a possible source of confusion. Accordingly he likewise requested a separate vote on paragraph 2.

*Paragraph 1 was adopted by 69 votes to 1, with 2 abstentions.*

*Paragraph 2 was adopted by 48 votes to 12, with 9 abstentions.*

*Article 21 as a whole was adopted by 69 votes to none, with 1 abstention.*

ARTICLE 22

18. Mr. BAIG (Pakistan) said he would have to vote against article 22, which was too sweeping. The provision as originally drafted by the International Law Commission (A/3859) had been too broad; with the addition of the words " at any time and wherever they may be " the article had become even less acceptable, and his delegation requested a separate vote on the words in question. Pakistan did not in any way challenge the complete immunity of the mission's archives and documents when ordinarily used, stored or despatched in transit. Sometimes, however, documents which were manifestly diplomatic were used for illicit purposes or handed to persons not entitled to hold them. In such cases the Pakistan Government would reserve the right, if article 22 were adopted as it stood, to treat the papers in question as not entitled to the benefit of immunity.

19. The PRESIDENT put to the vote the words " at any time and wherever they may be " in article 22.

*The Conference decided by 46 votes to 6, with 13 abstentions, to retain those words in article 22.*

*Article 22 was adopted by 64 votes to 1, with 7 abstentions.*

ARTICLE 23

*The article was adopted unanimously.*

Digitized by UNOG Library

would probably be decided by the Drafting Committee. In any case, his delegation would vote for the article as it stood.

67. Mr. USTOR (Hungary) said that in the case of a lease, dues and taxes were payable by the landlord, who could, however, recover them by including them in the rent. If the tenant was a State, it should be exempt also from dues and taxes charged indirectly in so far as the landlord was liable for them. That interpretation would be particularly satisfactory for a State which was unable to buy buildings and which had no choice but to rent the premises necessary for its mission. His delegation would be willing to support any amendment in that sense but did not consider the Mexican amendment suitable.

68. The CHAIRMAN put to the vote the Mexican amendment (L.130), which was co-sponsored by Austria and Spain.

*The amendment was adopted by 44 votes to 2, with 27 abstentions.*

69. The CHAIRMAN proposed that the Belgian amendment (L.164) should be referred to the Drafting Committee.

*It was so agreed.*

*Article 21, as amended, was adopted by 72 votes to none, with 1 abstention.*

**Appointment of sub-committee to consider item 11 of the agenda (Special missions)**

70. The CHAIRMAN recalled that, under item 11 of the agenda, the Conference was to study certain draft articles on special missions. He proposed that a sub-committee should be appointed for that purpose composed of the following countries: Ecuador, Iraq, Italy, Japan, Senegal, Union of Soviet Socialist Republics, United Kingdom, United States of America and Yugoslavia.

*It was so agreed.*

The meeting rose at 1 p.m.

## TWENTY-FOURTH MEETING

*Tuesday, 21 March 1961, at 3 p.m.*

*Chairman:* Mr. LALL (India)

**Consideration of the draft articles on diplomatic intercourse and immunities adopted by the International Law Commission at its tenth session (A/CONF.20/4)** *(continued)*

*Article 22* (Inviolability of the archives)

1. The CHAIRMAN invited debate on article 22 and drew attention to the amendments submitted by Bulgaria (L.126), France and Italy (L.149) and the United States of America (L.153).

2. Mr. de VAUCELLES (France), introducing the joint French-Italian amendment, said that its object was to establish clearly the absolute inviolability of the mission's archives and documents as such, and not merely as part of the furniture of the mission. As in the case of the official correspondence of the mission (article 25, paragraph 2) their inviolability should be absolute, wherever they happened to be, even outside the premises of the mission — for what were archives but old correspondence ? It was therefore essential that they should be immediately identifiable: otherwise a sending State would have no justification in complaining if documents found outside the mission were read.

3. With regard to the United States amendment, he asked for an explanation of the meaning of the words " reference collections ".

4. Mr. CAMERON (United States of America) said that his delegation had submitted its amendment because it did not think that article 22 could be properly applied without some definition or limitation of the meaning of " archives and documents ". He would accept any drafting changes that would make the amendment more acceptable to the Committee, provided that the final wording made it clear that the government of the receiving State should be able to recognize the material whose inviolability it undertook to respect. He would oppose any definition that included documents outside the mission's premises unless they were identified as proposed by the French-Italian amendment.

5. Mr. BAIG (Pakistan) said that his government was somewhat concerned over article 22. It did not question the complete inviolability of the archives and documents of diplomatic missions when in proper custody or transit — for instance, while they were on the mission premises or in the physical possession or custody of a member of the mission, or when carried in a diplomatic bag. Cases did occur, however, and had occurred in his country, in which documents purporting to belong to a mission had been found in entirely unauthorized hands — deposited with nationals of the receiving State, for example; and such documents sometimes related to actionable matters.

6. Even though article 40, paragraph 1, contained an express exhortation, his government hoped that article 22 would be re-drafted in terms prohibiting such abuse. His delegation was not proposing a specific amendment because of the difficulty of devising language which would not impair the inherent inviolability of diplomatic archives and documents which, as all agreed, must be upheld. He considered it necessary to state, however, that if a diplomatic document was found in unauthorized hands in his country, and there was good reason to believe that it was in those hands with the positive, or even negative, connivance of the mission concerned, the Government of Pakistan would regard its inviolability as void; for the document, whether or not it still bore visible external signs of its origin, would then have ceased to retain its true diplomatic character.

7. Hence, his delegation could not support the Bulgarian amendment which sought to extend inviolability beyond

Digitized by UNOG Library

limits which his government already considered too wide. The amendment submitted by France and Italy, despite its qualifying second sentence, seemed to have a similar effect. The amendment proposed by the United States was the closest approach to what his government had in mind, and his delegation would support it.

8. Mr. GOLEMANOV (Bulgaria), introducing his delegation's amendment (L.126), said that it would not affect the principle of inviolability so clearly stated in draft article 22, but would place more emphasis on the importance of the principle and on the duty of the receiving State to ensure that it was respected. It also conformed with the opinion expressed by the International Law Commission in its commentary (A/3859), which he shared, that the documents of a mission were inviolable even when separated from the archives or carried by a member of the mission. He recognized that the joint French-Italian amendment had, in part, the same object as the Bulgarian amendment, though he regarded the words " at any time " as unnecessary and considered that the second sentence of the French-Italian amendment was concerned with detail rather than with principle.

9. Mr. BARTOŠ (Yugoslavia) said he was entirely satisfied with the article as it stood. The point raised by Bulgaria and by France and Italy had been discussed on more than one occasion in the Commission and had given rise to the question whether archives and documents outside the mission's premises should be given absolute protection or protection only by reason of the principe of the inviolability of the premises. It was difficult to lay down that a State had the duty to protect archives and documents that were not properly protected by the mission; the Yugoslav Government did not feel able to guarantee that the police and the courts would safeguard archives and documents that fell into unauthorized hands. It was no use expecting protection for material bearing visible identification marks, if the other conditions were not fulfilled. He would therefore support the United States amendment, but oppose those submitted by France and Italy and by Bulgaria.

10. Mr. YASSEEN (Iraq) said that the principle of the inviolability of archives and documents was absolute and did not derive from the inviolability of the mission's premises. The archives and documents of the mission were accordingly inviolable at all times and in all places. In his opinion, the article as it stood was perfectly adequate, since it contained no condition as to time or place. Nevertheless, it might be useful to make the text still clearer, and he would therefore support the Bulgarian amendment and the first sentence of the French-Italian amendment. The second sentence of the French-Italian amendment, however, appeared to make the identification of documents and archives outside the Commission's premises a condition of their inviolability, and if that were so he would vote against it.

11. Mr. JEZEK (Czechoslovakia) considered that the amendment proposed by Bulgaria, and similar drafting in the final part of the amendment proposed jointly by France and Italy, would make article 22 more explicit

and should therefore be adopted. It would also be useful to include the definition proposed by the United States of America.

12. Mr. DADZIE (Ghana) thought that the definition proposed by the United States would only complicate article 22; it would be preferable to include it in article 1 (Definitions). With regard to the amendment proposed by France and Italy, he considered that the second sentence was unnecessary and added nothing to the existing text. The amendment proposed by Bulgaria was an improvement. He would prefer the article to remain unchanged, but would support the Bulgarian amendment if it was put to the vote.

13. Mr. GASIOROWSKI (Poland) fully agreed with the representative of Iraq that the inviolability of archives and documents was entirely independent of the inviolability of the mission premises. That was recognized in the amendments submitted by Bulgaria and by France and Italy. The additional words " at any time " went a little too far, however, and he could not support the second sentence of the French-Italian amendment since it was really a statement of the obvious.

14. The representative of the United States of America, in introducing his amendment, had referred to limitation. He was against any limitation of diplomatic privileges and immunities and could therefore not support that amendment.

15. Mr. de VAUCELLES (France) said that he had been somewhat surprised at some of the comments on the second sentence of the French-Italian amendment. Its intention was precisely to prevent the kind of abuses referred to by the representative of Pakistan, for it was obvious that there would be no justification for a complaint alleging violation of diplomatic immunity unless proper precautions had been taken. With regard to the comments on the words " at any time ", he said their object was to cover the case of the severance of diplomatic relations where there might be an interim period during which archives and documents were without proper supervision.

16. Mr. CAMERON (United States of America) said he had no intention of limiting inviolability; the only intention of his delegation's amendment was to define archives and documents so that the receiving State would be able to carry out its obligations and fully to respect their absolute inviolability. That would prevent possible difficulties between receiving and sending States over what constituted the archives and documents of the mission. In view of the comments that had been made, however, he withdrew his amendment.

17. Mr. GLASER (Romania) said he had no objection to the first sentence of the French-Italian amendment, though he agreed with the representative of Iraq that its intention was in any case implicit in the draft of article 22. He had doubts about the second sentence, however, in spite of the explanation given by its sponsor, for it would complicate rather than simplify the application of the article. The identification mark was not an integral part of the archives or documents; hence it

Digitized by UNOG Library

had nothing to do with the principle of their inviolability and should not be mentioned in the convention. The fact that violation might occur through failure to recognize a diplomat, his car or his documents was irrelevant to the principle. He hoped that the representatives of France and Italy would reconsider the second sentence of their amendment.

18. Mr. SUCHARITAKUL (Thailand) strongly supported the principle that the archives and documents of a mission, being confidential, should be protected from violation. He would therefore vote for article 22 as drafted, but would oppose the amendment by France and Italy because it sought to extend the limits of inviolability and might be interpreted to give protection to prohibited documents in unauthorized hands.

19. Mr. SOLHEIM (Norway) expressed support for the Bulgarian amendment. He also supported the first sentence of the French-Italian amendment, but opposed the second sentence.

20. At the request of Mr. YASSEEN (Iraq), the CHAIRMAN put to the vote separately the second sentence of the amendment submitted by France and Italy (L.149).

*The second sentence of the amendment was rejected by 26 votes to 15, with 27 abstentions.*

21. At the request of Mr. TUNKIN (Union of Soviet Socialist Republics) the CHAIRMAN put to the vote separately the words " at any time " in the first sentence of the amendment submitted by France and Italy (L.149).

*The words " at any time " were adopted by 24 votes to 19, with 26 abstentions.*

22. The CHAIRMAN put to the vote the first sentence of the amendment by France and Italy (L.149).

*The first sentence of the amendment was adopted by 45 votes to 5, with 18 abstentions.*

23. The CHAIRMAN said that, as the Bulgarian amendment (L.126) was covered by the amendment just adopted, it was unnecessary to put it to the vote. The amendment adopted replaced the text of article 22, so that the article as a whole had been adopted.

*Article 23* (Facilities)

24. The CHAIRMAN said that no amendments had been submitted to article 23.

*Article 23 was adopted without comment.*

*Proposed additional article* (Concerning deeds executed on mission premises)

25. Mr. de ERICE y O'SHEA (Spain) said that his delegation's proposal (L.192) was intended to ensure that documents officially issued or executed in a diplomatic mission obtained in the receiving State the same measure of recognition which that State gave to documents issued or executed in the sending State itself. The Spanish proposal merely stated the existing practice in the matter and was, in a sense, consequential on the Committee's acceptance of the principle that diplomatic missions could perform consular functions (9th meeting, para. 16).

26. Mr. BARTOŠ (Yugoslavia), speaking on a point of order, asked the Chairman to rule on whether the Spanish proposal was within the Conference's terms of reference. In his opinion it was not. He had full powers from his government to deal with the question of diplomatic intercourse and immunities, but not with the intricate question of the territorial effects of legal instruments.

27. The CHAIRMAN said that the Spanish proposal related to the acceptability of a document under the laws of the receiving State and did not seem to raise any question of diplomatic intercourse or immunities. He appreciated the spirit in which the amendment had been proposed but, since its subject was outside the scope of the Conference, he must, with regret, rule it out of order. If there was no objection, he would take it that the Committee accepted his ruling.

*It was so agreed.*

*Article 24* (Free movement)

28. The CHAIRMAN invited debate on article 24, to which amendments had been submitted by the Philippines (L.141), Venezuela (L.144) and Italy (L.150/Rev.1).

29. Mr. REGALA (Philippines), introducing his delegation's amendment (L.141), said that its purpose was to spell out in the body of article 24 the important principle recognized in the International Law Commission's commentary on the article: " The establishment of prohibited zones must not, on the other hand, be so extensive as to render freedom of movement and travel illusory."

30. If the restrictions imposed by the receiving State on grounds of national security on the free movement of diplomats were so extensive as to render freedom of movement illusory or nugatory, diplomatic agents would be unable to perform the function of " ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the government of the sending State ", which the Committee had approved in article 3 (*d*).

31. It might be objected that the amendment was, in a sense, an interpretation of article 24; but he would point out that at its previous meeting the Committee had adopted a Mexican amendment to article 21 (L.130) which was likewise in the nature of interpretation.

32. There was a marked tendency on the part of many States to restrict the movement of diplomats — a tendency which his delegation viewed with concern. He had read with great interest the records of the discussions in the International Law Commission on the subject at its ninth session, in 1957, and, in particular, the remark of Sir Gerald Fitzmaurice, then a member of the Commission and since elected a judge of the International Court of Justice, that a provision on freedom of movement would not have been necessary thirty years previously; it would then have been considered axio-

Digitized by UNOG Library

# EXHIBIT 6



United States Department of State

*Washington, D.C. 20520*

DEC - 4 2002

Dear Mr. Chairman:

This written statement, provided for the Committee's consideration in its December 4 hearing, entitled: "The Saudi Claim of Privilege: Must Saudi Lobbyists Comply with Subpoenas in the Committee's Investigation of Child Abduction Cases," responds to your letter of December 3, 2002. This statement reflects the State Department's views. It does not reflect the views of other concerned agencies and/or Departments.

We understand that the Committee's concerns about children wrongfully abducted to or retained in Saudi Arabia have led it to issue subpoenas to three firms that work under contract with the Embassy of Saudi Arabia and, further, that the Embassy has taken the position that the requested information and documents constitute embassy "archives" and "correspondence" which are accordingly protected by the Vienna Convention on Diplomatic Relations.

To our knowledge, your subpoenas constitute the first time a legislature in any country has attempted to compel the production of records from a contractor for an embassy in that country. Thus, your subpoenas have raised novel issues. In your letter to Secretary Powell of November 18, 2002, you requested that the Department provide the Committee with responses to four questions regarding the Saudi claim that the documents are privileged. As we have previously explained, we are not in a position to present our views. I can, however, identify some issues your questions raise for the Department of State.

The State Department believes strongly in the need for proper law enforcement in the United States. For example, we do not expect the Vienna Convention to protect U.S. citizens who are not attached to a foreign mission and who might be recruited by foreign missions here to

The Honorable
Dan Burton, Chairman,
Committee on Government Reform,
House of Representatives.

Digitized by Google



undertake illegal activities such as espionage. We also understand the need of the Congress and its committees to exercise its oversight role and conduct investigations. In analyzing the Convention's proper interpretation, U.S. agencies would have to consider whether protection of information such as that sought by the Committee's subpoenas would adversely affect U.S. law enforcement interests on the ability of Congress to carry out its legislative responsibilities. The converse is also true: U.S. agencies would have to consider whether a narrow view of the Convention might hamper the conduct of U.S. foreign policy and other activities necessary to protect our national security overseas.

The State Department contracts overseas with local nationals and personnel firms to fill some embassy positions. Unlike U.S. citizen employees sent overseas by the Department, local nationals do not generally have immunity from compulsory process, so they must appear in a court or elsewhere if they receive a subpoena. While these people do not generally have access to U.S. Government classified information, they do in a number of cases have access to nonpublic information. In a number of instances, the Department has asserted that the official information in the possession of the local national is "archival" under the Vienna Convention and thus inviolable. Our experience has been that when local nationals decline to answer questions about their official activities on behalf of the U.S. Government, the examining law enforcement officer or other authority does not pursue the issue. Were countries to take the view that local personnel working under contract with the U.S. Government could be compelled to release information otherwise protected as Embassy archives, we would object strongly.

These concerns extend to situations involving outside contracting. For example, the Department uses outside contractors for embassy construction. In the latter use, cleared U.S. contractors and personnel build our embassies in sensitive posts working with information we provide them. To the best of our knowledge at present, there has never been a situation in which foreign authorities have pressed one of these contractors to produce such information. If that were to happen, we would want to argue that the information is protected under the Vienna Convention. We would also consider other possible privileges and protections, such as state secrets, that

Digitized by Google

might apply to these, and other, situations. We would have greater difficulty making this argument persuasively if, in the United States, the information of foreign embassies given to contractors is subject to compulsory process and release.

The protections of the Vienna Convention are written broadly. It is beyond debate that embassy information in the embassy is inviolable and immune from process and that information in the hands of accredited diplomats and other embassy personnel is protected. Under Article 24, Embassy archives are immune "wherever they may be" and "at any time." Under Article 27, embassy official correspondence is "inviolable" and the state where the embassy is located must protect free communication of the embassy. We would want these provisions to be applied in a manner that allows our own embassies to fulfill their functions of representing the U.S. Government abroad without shielding improperly foreign governments' information about wrongdoing.

The reach of the Vienna Convention in this area has rarely been tested in court. There is little reported practice. That may be because countries have not tested in a contentious setting the outer limits of the Convention by attempting to obtain information widely considered protected. The materials the Committee has assembled rely on one case, the decision of the United Kingdom's House of Lords in Shearson, Lehman Brothers, Inc. v. Maclaine Watson & Co., Ltd. In that case, the House of Lords concluded that information passed to third parties by the International Tin Council lost its inviolability. However, Lord Bridge's analysis noted the absence of "any relationship of lender and borrower, bailor and bailee or principal and agent."

You have also asked if the interpretation of the Vienna Convention favored by the Saudi Embassy would protect from disclosure documents related to a foreign embassy's employment of a U.S. citizen to harass and intimidate U.S. parents or to assist in terrorist funding. We would vigorously oppose such activities by foreign embassies. While we agree that it is useful to determine the Convention's scope and the breadth of the Convention's protections, hypothetical questions of this nature are not necessarily the best way to do this. We are certainly not aware that the Committee's subpoenas to the Saudi

Digitized by Google

consultants in this case have any connection to terrorist financing.

We appreciate the opportunity to bring these points to the committee's attention and request that they be included in the record of the hearing. A witness could provide the Committee today with no further information than what is presented here.

Sincerely,

Paul V. Kelly
Assistant Secretary
Legislative Affairs

Digitized by Google