**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

                Plaintiffs,

       v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

                Defendants.

Civil Action No. 1:19-cv-00150-DLF

**MEMORANDUM OF LAW IN SUPPORT OF STATE OF QATAR'S MOTION TO
VACATE THE COURT'S PRIOR ORDER REGARDING QATAR'S PRIVILEGES AND
IMMUNITIES**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

PROCEDURAL BACKGROUND............................................................................... 2

ARGUMENT ................................................................................................................ 6

I.     The Court Has Inherent Authority to Vacate Its Prior Order................................ 6

II.    The Court Should Find That Qatar's Privileges and Immunities Are Not
       Categorically Inapplicable to Materials Held by Its Former Contractors. ............. 8

       A.     The United States Agrees with Qatar's Position That Vienna Convention
              Inviolability May Extend to Documents Held by a Mission's Contractors............ 8

       B.     The Text, Purpose, and Negotiating History of the Vienna Conventions
              Show that Inviolability May Extend to Materials Held by a Mission's
              Contractors. ...................................................................................................... 11

       C.     The Foreign Agents Registration Act's Inspection Provisions Do Not
              Override Vienna Convention Protections. ........................................................ 20

       D.     Principles of International Comity Also Protect From Disclosure Materials
              That Implicate Qatar's Foreign Policy and Deliberative Processes.................... 24

CONCLUSION........................................................................................................... 29

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021) .........................................................................................................22

*Aref v. Holder*,
    2012 WL 13075792 (D.D.C. Nov. 26, 2012) ...........................................................................6

*Att'y Gen. of U.S. v. Covington & Burling*,
    411 F. Supp. 371 (D.D.C. 1976) .....................................................................................21, 22

*In re Bankers Trust Co.*,
    61 F.3d 465 (6th Cir. 1995) ............................................................................................7, 25

*Breard v. Greene*,
    523 U.S. 371 (1998) ..........................................................................................................20

*Burka v. U.S. Dep't of Health & Hum. Servs.*,
    87 F.3d 508 (D.C. Cir. 1996) .......................................................................................15, 16

*Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*,
    40 F.R.D. 318 (D.D.C 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark*,
    384 F.2d 979 (D.C. Cir. 1967) .....................................................................................25, 28

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) .................................................................................................15, 22

*Cobell v. Jewell*,
    802 F.3d 12 (D.C. Cir. 2015) ..............................................................................................6

*Doyle v. U.S. Dep't of Homeland Sec.*,
    331 F. Supp. 3d 27, 38, 51 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020) ....................15

*E. Airlines, Inc. v. Floyd*,
    499 U.S. 530 (1991) ..........................................................................................................19

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012) ..............................................................................................26

*First Eastern Corp. v. Mainwaring*,
    21 F.3d 465 (D.C. Cir. 1994) .......................................................................................25, 27

*Gonzalez Ramos v. ADR Vantage, Inc.*,
    2020 WL 409283 (D.D.C. Jan. 26, 2020) ...........................................................................28

*In re Grand Jury Subpoena Dated August 9, 2000*,
    218 F. Supp. 2d 544 (S.D.N.Y. 2002)......................................................................27

*Heffernan v. Azar*,
    417 F. Supp. 3d 1, 15 (D.D.C. 2019)......................................................................16

*Jones v. D.C.*,
    2019 WL 5690341 (D.D.C. June 13, 2019)...............................................................8

*Kolovrat v. Oregon*,
    366 U.S. 187 (1961)..........................................................................................7, 8

*Langevine v. District of Columbia*,
    106 F.3d 1018 (D.C. Cir. 1997)..............................................................................6

*Lozano v. Alvarez*,
    697 F.3d 41 (2d Cir. 2012)...................................................................................19

*Medellín v. Texas*,
    552 U.S. 491 (2008)...........................................................................................11

*Mich. Cmty. Servs., Inc. v. NLRB*,
    309 F.3d 348 (6th Cir. 2002)................................................................................24

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804).................................................................................21

*Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*,
    512 F.3d 677 (D.C. Cir. 2008)..........................................................................16, 27

*Nat'l Treasury Emps. Union v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006)..............................................................................12

*The Navajo Nation v. Peabody Holding Co.*,
    255 F.R.D. 37 (D.D.C. 2009)................................................................................22

*Pac. Gas & Elec. Co. v. United States*,
    73 Fed. Cl. 333 (2006), *aff'd in part, rev'd in part and remanded on other
    grounds*, 536 F.3d 1282 (Fed. Cir. 2008) ..............................................................14

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010)..........................................................26

*In re Pishevar*,
    2023 WL 2072454 (D.D.C. Feb. 17, 2023) ...............................................................8

*Republic of Argentina v. NML Cap., Ltd.*,
    573 U.S. 134 (2014)......................................................................................25, 26

*In re Rubber Chems. Antitrust Litig.*,
    486 F. Supp. 2d 1078 (N.D. Cal. 2007) ...........................................................................26

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) .......................................................................................................11

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ......................................................................................27

*In re Sealed Case*,
    494 F.3d 139 (D.C. Cir. 2007) ......................................................................................28

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
    482 U.S. 522 (1987) ...............................................................................................2, 11, 25

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ....................................................................................18

*In re Subpoenas Duces Tecum*,
    738 F.2d 1367 (D.C. Cir. 1984) ....................................................................................22

*In re Terrorist Attacks on Sept. 11, 2001*,
    2019 WL 3296959 (S.D.N.Y. July 22, 2019) ................................................................6

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013) ......................................................................................21

*United States v. Reynolds*,
    345 U.S. 1 (1953) ...........................................................................................................25

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
    52 Fed. Cl. 114 (2021) ..................................................................................................27

*ZF Auto. U.S., Inc. v. Luxshare, Ltd.*,
    142 S. Ct. 2078 (2022) ..................................................................................................24

*Zicherman v. Korean Air Lines Co.*,
    516 U.S. 217 (1996) .......................................................................................................11

**Treaties**

Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596
    U.N.T.S. 261 ......................................................................................................1, 4, 11, 21

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500
    U.N.T.S. 95 ............................................................................................................. *passim*

**Statutes and Regulations**

22 U.S.C. § 612 .................................................................................................................20

22 U.S.C. § 615 .................................................................................................................20

28 U.S.C. § 1602 *et seq.* ............................................................................................1, 3, 7, 8, 26

28 U.S.C. § 1782 ...............................................................................................................8

28 CFR § 5.500 .................................................................................................................20

36 C.F.R. § 1222.32 ..........................................................................................................15

**Other Authorities**

Acquisition Regulation: Access to and Ownership of Records, 79 Fed. Reg. 56279
(Sept. 19, 2014) ...........................................................................................................15

American Heritage Dictionary (5th ed. 2022) ...............................................................14

Brief for the United States as Amicus Curiae, *Broidy Cap. Mgmt. LLC v. Muzin*,
61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576 ............................... *passim*

Brief for the United States as Amicus Curiae, *Republic of Argentina v. NML Cap.
Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994 ...............................................................26

Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on
Diplomatic Relations* 161 (4th ed. 2016) ..............................................................10, 12, 20

Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs, U.S. Dep't of
State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4,
2002), in *Hearings Before the House Committee on Government Reform*,
Serial No. 107-83 (Dec. 4, 2002) .................................................................................28

Oxford English Dictionary (June 2022 update) ............................................................14

*Report of the Attorney General to the Congress of the United States on the
Administration of the Foreign Agents Registration Act of 1938* (Dec. 2020) .........................17

Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec.
11, 2002), in *Hearings Before the House Committee on Government Reform*
1673, 107th Congress, 2d Sess., Serial No. 107-83 ................................................13, 18, 21

United Nations Conference on Diplomatic Intercourse and Immunities, *Official
Records, Vol. I*, U.N. Doc. A/Conf.20/14 (1962) ................................................................19

*Yearbook of the International Law Commission, Vol. II*, [1958] 2 Y.B. Int'l L.
Comm'n 10 ................................................................................................................12

## INTRODUCTION

The State of Qatar ("Qatar") respectfully moves the Court for an order vacating the portions of its prior order of June 2, 2022, that (1) categorically rejected the application of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (collectively, "Vienna Conventions"), and principles of international comity and related privileges, to materials and information in the possession of Qatar's former contractors; and (2) narrowed what documents could be treated as "Highly Confidential" under the operative protective order in this case.  *See* ECF Nos. 148, 149.

Vacatur of the Court's prior order is warranted given the changed posture of this case. Specifically, the Court's prior order issued at a time when the only parties to the case were Plaintiffs Elliott Broidy and Broidy Capital Management LLC (collectively "Broidy") and Defendants Nicolas D. Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies LLC ("Defendants").  Prior to issuance of that order, Qatar had not yet intervened due to significant, then-unresolved concerns that intervention might result in a loss of its immunities under the Foreign Sovereign Immunities Act ("FSIA").  Accordingly, the Court did not have the opportunity to consider fully Qatar's privileges and immunities as the privilege holder, including through review of a detailed privilege log that substantiated its claims of privilege for specific documents. In addition, since the time of the Court's order, the United States Government has taken the position that "the district court adopted an overly restrictive interpretation of Article 24" of the Vienna Convention on Diplomatic Relations, agreeing with Qatar that the inviolability of materials protected by the Vienna Conventions could extend to materials held by a mission's contractors. Ex. 1, Brief for the United States as Amicus Curiae at 2–3, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576, at *2–3 (hereinafter "U.S. Amicus

1

Brief") ("Article 24 covers . . . documents possessed by outside parties with a particular relationship to the mission . . . .").

The D.C. Circuit's directive that courts of this circuit "demonstrate due respect for . . . any sovereign interest expressed by a foreign state" requires that Qatar be given a full opportunity to be heard regarding the privileges and immunities that are implicated by the parties' discovery requests in this case. *See Muzin*, 61 F.4th at 987 (citing *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987)). To provide Qatar with this opportunity, the Court should vacate its prior order and revisit its handling of Qatar's privileges and immunities. In place of its prior categorical ruling, the Court should enter an order that recognizes these privileges and immunities may apply to certain materials held by Qatar's former contractors or others with a special relationship to the Embassy.

## PROCEDURAL BACKGROUND

Broidy has served extensive discovery demands on Defendants and non-parties to this litigation, seeking discovery that includes materials that are inviolable under the Vienna Conventions and protected by principles of international comity.

Before discovery commenced, Qatar filed a Notice of Interest "to ensure that its sovereignty and immunities are respected in any discovery that is conducted." ECF No. 66 at 1. This Court "decline[d] to strike" the Notice and stated that "Qatar may submit the equivalent of amicus briefs," but that "no pending motion requires addressing Qatar's exact status in this case." Minute Order (Dec. 8, 2021).

In the context of competing proposals for a protective order, Qatar filed a Statement of Interest endorsing Defendants' proposal that Qatar review materials from third parties for potential privilege or inviolability prior to their production. *See* ECF No. 94 at 3. The Court entered a protective order, but declined Defendants' request to permit Qatar "to review and redact

2

documents" prior to disclosure, reasoning that Qatar, as a "non-party," should not "play such a substantial role in the discovery process," and that "considering the novelty" of the proposal, it was not clearly "necessary for protecting Qatar's sovereign immunity."  Minute Order, ECF No. 96.

Defendants objected to Broidy's discovery requests on the basis that certain materials sought – though in Defendants' possession – implicated Qatar's privileges and immunities.  *See* ECF No. 115 at 7.  Broidy then filed a motion to compel disclosure of all "relevant materials in [Defendants'] possession."[1]  ECF No. 109-1 at 6.  In that motion, Broidy argued that the Vienna Conventions and principles of international comity categorically do not apply to materials in Defendants' possession.  *Id.* at 10−14.

Qatar filed a second Statement of Interest concerning the motion to compel.  *See* ECF No. 114.  In both of its Statements, Qatar proposed to review potentially privileged or inviolable materials before production and identify specific materials over which it asserted a privilege or immunity in a document-by-document log – potentially narrowing the scope of the dispute, and creating a meaningful record for this Court to resolve any remaining questions about the scope of Qatar's privileges and immunities.  *See* ECF No. 107 at 8, ECF No. 114 at 1–5.

On June 2, 2022, the Court granted Broidy's motion to compel Defendants to produce all of the materials in question, finding that Qatar's privileges and immunities categorically "do not apply to any documents or communications in the [D]efendants' possession," because materials "given to non-mission parties fall outside the Convention's scope."  *See* ECF No. 149 at 13, 21.

---

[1] Broidy also filed a motion to reconsider the protective order, arguing that the Court should revise the portion of the protective order relating to the definition of "Attorney's Eyes Only."  ECF Nos. 102, 102-1.  He asserted that there was "no basis in the FSIA or the Vienna Conventions for the proposition that a sovereign has . . . the right to AEO protection over information entirely in the hands of third parties."  ECF No. 102-1 at 5.

The Court further rejected the possibility that international comity could apply to materials held by "American parties," or that the deliberative process privilege could ever "shield documents held by a private, non-governmental entity." *Id.* at 21, 23.  The Court also granted Broidy's motion to reconsider the protective order, narrowing the scope of documents that could be designated for "attorney's eyes only." *Id.* at 10.[2]  The Court predicated the portion of its order narrowing the protective order on the fact that the narrow "formulation is consistent with this Court's interpretations of the Vienna Conventions." *Id.*  Finally, the Court denied Defendants' request for reconsideration of the Court's decision regarding preemption of certain of Broidy's common law claims. *Id.* at 8.  Qatar appealed the portion of this Court's order granting Broidy's motion to compel. *See* ECF No. 153.

On July 1, 2022, the D.C. Circuit granted, over Broidy's opposition, a stay of the discovery order pending appeal. *See Muzin*, No. 22-7082, 2022 WL 2525300, at *1 (D.C. Cir. July 1, 2022). The D.C. Circuit then ordered, on its own motion, that the Department of Justice be invited to file an amicus curiae brief "addressing the views of the United States," in particular on two issues:  (1) whether the court has jurisdiction over the appeal, and (2) whether the Vienna Conventions "protect from disclosure the documents that are the subject of [Broidy's] discovery requests."  Per Curiam Order, *Muzin*, No. 22-7082, ECF No. 1954969, at *1 (July 14, 2022) (citations omitted).

---

[2] Specifically, the Court removed language that permitted an attorney's eyes only designation for "information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, to the extent such material is produced"  and "any other information relating to the conduct by Qatar of its foreign policy."  ECF No. 149 at 8 (quoting Protective Order § 1.D, ECF No. 96).  The Court instead permitted designation of "information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" only "if the Producing Party is a sovereign state or any diplomatic or consular mission of a sovereign state," and provided no ability to mark other materials implicating Qatar's foreign policy as attorney's eyes only. *See id.* at 10 (modifying the proposed protective order filed at ECF No. 90-3, as adopted and modified by the Court's order in ECF No. 96).

The United States filed its brief on August 26, 2022, arguing that this Court's interpretation of the Vienna Conventions was erroneous.[3]  *See* U.S. Amicus Brief at 17–18.  The brief was signed by the Department of Justice as well as the Department of State.

The D.C. Circuit held oral argument on October 28, 2022.  *See Muzin*, ECF No. 22-7082, ECF No. 1971057.  On March 10, 2023, the D.C. Circuit issued an opinion dismissing Qatar's appeal under the "rule that only parties can appeal an adverse judgment."  *Muzin*, 61 F.4th at 987. The D.C. Circuit recognized that Qatar would have been entitled to appeal as a nonparty if intervention forfeited its sovereign immunity, but concluded that intervention would not do so.  *Id.* at 997.  However, the Court also "recogniz[ed] that both the parties and the District Court were operating in uncharted territory regarding how a foreign sovereign may invoke its treaty rights . . . without forfeiting its foreign sovereign immunity."  *Id.* at 987 (citations omitted).  It accordingly remanded and "instruct[ed]" this Court "to provide Qatar the opportunity to timely intervene to assert its rights under the Vienna Conventions and international comity" prior to "enforc[ement] [of] the [Court's] underlying discovery order."  *Id.* at 987, 999.  The D.C. Circuit's mandate issued on April 18, 2023.  *See Muzin*, No. 22-7082, ECF No. 1995335.

On April 26, 2023, Qatar filed a motion to intervene for the limited purpose of protecting its sovereign privileges and immunities.  Qatar attached the present motion to that intervention motion, and requested that the Court deem the present motion filed upon granting Qatar's intervention motion.

---

[3] The United States further argued that Qatar "ha[d] standing to appeal the district court's order," and that "Qatar's appeal satisfie[d] the requirements of the collateral-order doctrine."  U.S. Amicus Brief at 7–17.  Alternatively, even if the order were not appealable, the United States argued that the D.C. Circuit could "construe Qatar's notice of appeal as a mandamus petition."  *Id.* at 17.

## ARGUMENT

**I.      The Court Has Inherent Authority to Vacate Its Prior Order.**

The Court's prior order rejecting the application of Qatar's privileges and immunities to documents held by its former contractors on a categorical basis and narrowing the operative protective order (ECF Nos. 148, 149) is interlocutory in nature.  The D.C. Circuit has made clear that "[i]nterlocutory orders are not subject to the law of the case doctrine," and that a Court "'ha[s] complete power . . . to revise [such orders] when it is consonant with equity to do so.'"  *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) (citations omitted); *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015) (recognizing the "inherent power" of a district court to "afford . . . relief from interlocutory judgments as justice requires") (citations omitted).

Here, under its inherent authority to revisit prior non-final orders, the Court should vacate its ruling on Qatar's privileges and immunities in order to ensure that Qatar is provided a full opportunity to be heard as the privilege-holder, consistent with the D.C. Circuit's directive to accord "due respect" to Qatar's sovereign interests.  *See Muzin*, 61 F.4th at 999.  Because the portion of the Court's order narrowing the operative protective order was based on the Court's "interpretation of the Vienna Conventions," ECF No. 149 at 10, the Court should likewise vacate this portion of its order and revert to the original protective order issued in this case, *see* ECF No. 90-3, as modified by ECF No. 96, in order to ensure that all materials implicating Qatar's privileges and immunities under either the Vienna Conventions or principles of international comity can be designated attorney's eyes only if produced, including through inadvertent or mistaken production. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11")*, 2019 WL 3296959, at *2–4 (S.D.N.Y. July 22, 2019) (recognizing that the Vienna Conventions' protections represent "higher values" justifying sealing documents filed with the court); *Aref v. Holder*, 2012 WL 13075792, at

*11–12 (D.D.C. Nov. 26, 2012) (holding that documents implicating the deliberative-process privilege may receive the designation of "attorney's eyes only").

In light of previously unresolved questions regarding whether intervention would have caused a loss of Qatar's immunity from suit under the FSIA, Qatar has not previously had an opportunity to directly assert its own privileges and immunities as to particular materials sought in discovery, including through service of a privilege log. *See* ECF No. 158 at 8 (questioning "whether Qatar can . . . seek an active role in the discovery process without waiving its immunity from suit"). The D.C. Circuit has now resolved those questions and instructed this Court to provide Qatar an opportunity to intervene to assert its privileges and immunities without a risk of losing its sovereign immunity. *Muzin*, 61 F.4th at 995–96, 999; *accord In re Bankers Trust Co.*, 61 F.3d 465, 468, 472 (6th Cir. 1995) (remanding and holding that district court cannot enforce discovery order directing production of materials held by a bank without first "allow[ing] the Federal Reserve the opportunity to intervene" in order to "assert the [bank examination] privilege and [have] the opportunity to defend its assertion").

Moreover, at the time of the Court's decision, the United States had not clearly articulated its view regarding the scope of the Vienna Conventions. At the request of the D.C. Circuit, it has now done so, stating that the Vienna Conventions can "cover[] . . . documents possessed by outside parties with a particular relationship to the mission," and that a ruling that the Conventions do not cover documents held by outside parties "unless they were lost or stolen" is "overly restrictive." U.S. Amicus Brief at 2–3. The views of the Executive Branch on a question of treaty interpretation are entitled to "great weight." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). This new

7

interpretation therefore provides another reason why the Court should vacate its prior order and

grant Qatar an opportunity to fully assert its privileges and immunities over specific materials.[4]

## II.      The Court Should Find That Qatar's Privileges and Immunities Are Not Categorically Inapplicable to Materials Held by Its Former Contractors.

### A.      The United States Agrees with Qatar's Position That Vienna Convention Inviolability May Extend to Documents Held by a Mission's Contractors.

At the invitation of the D.C. Circuit, the United States filed an amicus brief setting out its

interpretation of the Vienna Conventions in relation to materials held by mission contractors.  This

Court did not have the benefit of this amicus brief at the time it issued its prior order.  Now,

however, the interpretation the United States has offered is entitled to "great weight."  *Kolovrat*,

366 U.S. at 194 ("[T]he meaning given [to treaties] by the departments of government particularly

charged with their negotiation and enforcement is given great weight.").

---

[4] To give practical effect to the D.C. Circuit's directive that Qatar have an opportunity to assert its interests without fear of a loss of FSIA immunity, Qatar's assertions of its privileges and immunities should be considered by the Court *de novo*, not under the more stringent standard for reconsideration that would apply if a party already had a full opportunity to assert specific claims of privilege over materials implicated in discovery.  *Cf., e.g.*, *Matter de Leon*, 2020 WL 1047742, at *3 (D.D.C. Mar. 4, 2020) (granting *ex parte* discovery request under 28 U.S.C. § 1782(a), while recognizing that the parties to whom discovery request would be directed would later have an opportunity to be heard by the court in order to "move to quash . . . or to participate in [discovery]" (citations omitted)); *In re Pishevar*, 2023 WL 2072454, at *4 (D.D.C. Feb. 17, 2023) (recognizing that party from whom *ex parte* discovery was sought would have an opportunity "to object" to that discovery request at a later date (citations omitted)).  In any case, Qatar's motion meets the standard for reconsideration under Federal Rule of Civil Procedure 54.  Reconsideration is warranted when, *inter alia*, there is "a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court."  *Jones v. D.C.*, 2019 WL 5690341, at *1 (D.D.C. June 13, 2019) (citation omitted).  Here, reconsideration is warranted both because of new and apposite guidance from the Executive Branch related to the Vienna Conventions, whose interpretation is entitled to deference as a matter of law, *see Kolovrat*, 366 U.S. at 194; and because the State of Qatar has now intervened to assert its own privileges and immunities.  With respect to the Court's ruling on international comity, for example, the Court concluded that *the Defendants* had not substantiated their ability to claim these privileges as "American parties," *see supra* at pp. 3–4, but the Court did not have the ability to consider these privileges when asserted *by Qatar* − the privilege-holder.

Specifically, the United States in its brief explained that a "rule that materials possessed by outside parties cannot qualify as mission documents unless they were lost or stolen" is "*overly restrictive*" and "*conflicts with Article 24's protection[s]*," which extend to mission documents "wherever they may be."  U.S. Amicus Brief at 2 (emphasis added) (quoting Article 24).  In contrast to this narrow reading, the United States interprets Article 24 – consistent with Qatar's position – to apply to "documents possessed by outside parties with a special relationship to the mission," so long as the documents were either "provided by" the mission or "solicited by and incorporated information from archives or documents of the mission" and were created for reasons "essential to the functions of the mission and with reasonable expectations of continued confidentiality."  *Id.* at 17–18.[5]

The United States grounded this interpretation in the text of the Conventions, their object and purpose, and a review of the negotiating history.  As to the text, the United States identified nothing in Article 24 that would limit the principle of inviolability only to documents that were lost or stolen, instead reading that provision of the Conventions to apply "in a variety of circumstances" as necessary to ensure that a "foreign mission can perform its diplomatic functions without interference from the host state."  *Id.* at 24.  It further warned against adopting a narrow reading of the Conventions that would "expose[]" U.S. missions abroad "to incursions . . . under a foreign state's law."  *Id.* (citation omitted).  This warning is particularly critical in light of the

---

[5] As applied to specific materials, there may be questions regarding how best to give effect to various elements of this standard, including how to assess whether materials were "solicited by" the mission or "incorporate" the mission's archival information.  In its reply brief on appeal, Qatar identified certain guideposts regarding how the United States' articulated standard would apply in practice in a manner most consistent with the purpose of the Vienna Conventions.  At oral argument, the United States did not articulate any disagreement or concern with Qatar's views.  *See* Ex. 2, Oral Arg. Tr., *Broidy Cap. Mgmt. LLC v. Muzin* (No. 22-7082), at 24:18–41:1 (hereinafter "Oral Arg. Tr.").  Qatar proposes addressing these questions further in the context of actual disputes regarding specific materials, to the extent those arise.

frequency with which foreign missions, including the United States in its operations abroad, hire foreign nationals as contractors.  *See infra* at pp. 17–18.  The United States also emphasized that a narrow construction "does not square with Article 24's purpose" of ensuring the "protection of the confidentiality of mission records."   U.S. Amicus Brief at 2, 20 (citing Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 161, 168 (4th ed. 2016) ("Denza, *Diplomatic Law*")).  Finally, the United States noted that the Conventions' negotiating history confirmed its broad reading of Article 24.  Specifically, the United States emphasized the portions of the negotiations history in which the delegate from Pakistan objected to adding "anywhere they may be" to Article 24, asserting that inviolability should not extend to documents when they passed to non-mission parties "such as 'nationals of the receiving state.'" *Id.* at 26 (citation omitted) (describing negotiating history).  An overwhelming majority of delegates, however, rejected this proposal, and "chose a more expansive construction of inviolability," broad enough to encompass documents held by non-mission parties.  *Id.* at 27.

To be sure, the United States recognized – and Qatar does not dispute – that not all documents given to contractors will constitute mission documents.  Rather, whether a document is inviolable under Article 24 will rest on an analysis of the mission's "special relationship" with the third party and whether the document was created for reasons "essential to the functions of the mission and with reasonable expectations of continued confidentiality."  *See Id.* at 17–18.  Qatar and the United States agree that determination of whether these standards are met is best done through a document-by-document analysis.  *See Id.* at 3 ("[T]he case should be remanded to the district court so it can engage in . . . analysis on a document-by-document basis.").  In order to conduct such a document-specific analysis, the Court should consider such factors such as: whether the third party (i) is engaged to assist in the performance of a diplomatic mission's

functions; (ii) holds materials for the sole and limited purpose of aiding the mission in those functions; (iii) is restricted from using those materials for any other purpose; (iv) must return those materials to the mission on demand; and (v) is subject to strict requirements of confidentiality regarding those materials.

With the required deference to the Executive Branch's interpretation of a treaty in mind, Qatar now addresses in more detail the proper interpretation of the Vienna Conventions.

**B.      The Text, Purpose, and Negotiating History of the Vienna Conventions Show that Inviolability May Extend to Materials Held by a Mission's Contractors.**

Qatar and the United States are party to the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.[6]  Under Articles 24 and 27 of the Vienna Convention on Diplomatic Relations, the United States agreed to respect the "inviolability" of all documents, archives, and correspondence "of the mission" of a fellow signatory country.  Because Article 24 applies to mission documents and archives "wherever they may be," and Article 27 applies to mission "correspondence," the Convention plainly contemplates that materials can be *of* the mission even if not *held* by the mission.

"An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006) (quoting 1 Restatement (Third) of Foreign Relations Law of the United States §325(1) (1986)).  A "treaty's history, the negotiations, and the practical construction adopted by the parties may also be relevant," *Aérospatiale*, 482 U.S. at 534, as "aids to its interpretation," *Medellín v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v.*

---

[6] Because the relevant language in the two Conventions is materially the same, this brief focuses on the Vienna Convention on Diplomatic Relations.

*Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)). Here, the text, object and purpose, and negotiating history all point to the same conclusion: materials in the possession of a mission's contractor can be "of the mission" for purposes of the Vienna Convention on Diplomatic Relations.

1.    *Text.*   Article 24's text confirms that its key phrase, "[t]he archives and documents of the mission," has a broad scope. First, Article 24 makes clear that the location and custody of mission archives and documents is not dispositive of their inviolability. Instead, archives and documents of the mission are inviolable "wherever they may be." *See* Ex. 3, *Yearbook of the International Law Commission, Vol. II* at 96, [1958] 2 Y.B. Int'l L. Comm'n 10 (inviolability "applies to archives and documents, regardless of the premises in which they may be"). "[B]y adding the words 'wherever they may be,'" the Convention's drafters "made it clear beyond argument that archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability." *See* Denza, *Diplomatic Law*, at 158.

There is no basis in the Convention's text to suggest that inviolability persists *only* in circumstances of loss or theft, but not in any other circumstances where documents are held by third parties. "Inviolability" is a legal term of art that does not reflect such a narrow concern. *Cf. Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 861 (D.C. Cir. 2006) (interpreting "term of art" consistent with "long history of legal usage"). Rather, "[i]nviolability in modern international law is a status accorded to premises, persons, or property physically present in the territory of a sovereign State but not subject to its jurisdiction in the ordinary way." Denza, *Diplomatic Law*, at 110. For that reason, "the expression 'inviolable' [in Article 24] was deliberately chosen by the International Law Commission to convey both that the receiving State must abstain from any interference through its own authorities and that it owes a duty of protection of the archives in respect of unauthorized interference by others." *Id.* at 158. In other words, the

12

word "inviolability" reflects the breadth and absolute nature of Article 24's protection, not a narrow concern with theft.

The critical question, therefore, cannot be whether archives or documents are located *at* the mission, but rather whether they are "*of* the mission."  And "of the mission" cannot be interpreted to mean only materials that "are possessed by a mission," ECF No. 149 at 13, because that would read the words "wherever they may be" out of Article 24.  As a basic matter of interpretation, there must be some class of documents that are not located on mission premises but are still documents "of the mission," and there is no principled basis for limiting that class of documents to those that have been lost or stolen or those in the possession of mission staff.  *See also* Oral Arg. Tr. at 52:11–14 (Judge Rao: Article 24 "doesn't seem to speak to who holds them, but rather, what the documents are.").[7]

---

[7] In its prior order, the Court drew an analogy between Article 24 and Articles 22 and 29 of the Convention, which relate to personal inviolability, reasoning that because personal inviolability did not extend to "private citizens of . . . the 'receiving state,'" Article 24's protection should not extend to materials held by citizens of the receiving state.  *See* ECF No. 149 at 13–14 (quoting, *inter alia*, the command in Articles 22 and 29 that "the premises of the mission" and "the person of a diplomatic agent" be held "inviolable").  But there is good reason that treaty provisions relating to *personal* inviolability have a different scope than provisions related to *archival* immunity.  As the Preamble explains, the "purpose" of the Convention "is not to benefit individuals" at all, but to "ensure the efficient performance of the functions of diplomatic missions."  Personal inviolability of non-mission parties is generally unnecessary for a mission to function efficiently.  But the Vienna Conventions' drafters decided that mission archives and documents must be inviolable "*wherever they may be*," in furtherance of the Conventions' central purpose.  The Court also drew an analogy to Article 31, which provides that "diplomatic agent[s]" may not be compelled to "give evidence as a witness."  *Id.* at 14 (reasoning that because Article 31 "confers a benefit on one group expressly," others not mentioned lack that "benefit").  Archival immunity, however, is a protection for the mission, not a "benefit" to any individual.  If Article 24 was coterminous with Article 31, then it could have no application to materials or information possessed by local embassy staff, as they are not protected by Article 31 from being compelled to "give evidence as a witness."  That would be inconsistent with the United States' longstanding practice under the treaty.  *See* Ex. 4, Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec. 11, 2002), in *Hearings Before the House Committee on Government Reform* 1673, 107th Congress, 2d Sess., Serial No. 107-83 (hereinafter "Taft Statement") ("Unlike U.S. citizen employees sent overseas by the Department, local nationals do not generally have immunity from compulsory process . . .  [but] in a number of instances, the Department has in fact asserted

The ordinary meaning of the word "of" strengthens this conclusion.  A document may be "of" someone or something if it originates there.  *See, e.g.*, *"Of,"* Am. Heritage Dictionary ("Am. Heritage") (5th ed. 2022) ("1. Derived or coming from; originating at or from"); *"Of,"* Oxford Eng. Dict. (June 2022 update) ("III. Indicating the thing, place, or person from which or whom something originates, comes, or is acquired or sought.").   Or it may be "of" someone (or something) that causes it to be created or to whom it belongs or is connected.  *See, e.g.*, *"Of,"* Am. Heritage ("2. Caused by; resulting from"; "8. Belonging or connected to"); *"Of,"* Oxford Eng. Dict. ("36. Belonging to a thing, as a logical consequence of its nature").

Consistent with these definitions, the phrase "of the mission" is most naturally read to encompass archives and documents not physically possessed by the mission, but which nevertheless originate from the mission, were caused to be created by it, or are otherwise connected to the mission.  There may be a range of indicia bearing on whether a particular document qualifies as "of the mission" under the ordinary meaning of that phrase, including whether materials are shared or created for the sole purpose of aiding the mission's performance of its diplomatic functions, whether their use is restricted to that purpose, whether they must be returned to the mission on demand, and whether they are required to be kept confidential.  *Cf., e.g.*, *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 439 (2006), *aff'd in part, rev'd in part and remanded on other grounds*, 536 F.3d 1282 (Fed. Cir. 2008) (interpreting Federal Rule of Evidence 803(8) and concluding that "[t]he qualifier 'of' [a public agency] does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency – just that they must have emanated therefrom") (quotation marks and citation omitted);

---

that the official information in the possession of a local national working in the embassy is 'archival' under the Vienna Convention and thus inviolable.").

36 C.F.R. § 1222.32 ("All data created for Government use and delivered to, or falling under the legal control of, the Government are Federal records"); Acquisition Regulation: Access to and Ownership of Records, 79 Fed. Reg. 56279, 56280 (Sept. 19, 2014) ("Federal records" "includes records created/received by contractors that document the work specified within the contract and are generated or received during the performance of the contract"); *Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (factors used to determine agency ownership of documents include "intent of the document's creator to retain or relinquish control" and "the ability of the agency to use and dispose of [documents] as it sees fit"); *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 38, 51 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020) (record systems, though "located at the Secret Service's headquarters" and operated by Secret Service, are "presidential records," where memorandum of understanding provides that records "shall remain under the exclusive ownership, control, and custody of the President" and Secret Service's access to records is "limited . . . as necessary to perform its protective functions").

Reading the phrase "of the mission" to encompass certain archives and documents in the possession of non-mission parties also accords with analogous principles of domestic law. Justice Gorsuch has made the common-sense point that "the fact that a third party has access to or possession of *your* papers and effects does not necessarily eliminate *your* interest in them." *Carpenter v. United States*, 138 S. Ct. 2206, 2268 (2018) (Gorsuch, J., dissenting) (emphasis added). For instance, "[a] bailment is the 'delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose." *Id.* (quoting Black's Law Dictionary 169 (10th ed. 2014)). In that scenario, the owner of property lacks physical custody, yet still retains control over the property's use and disposition. In the same way, when a mission transfers archives and documents to its contractor to aid the mission's own business, and places

15

careful limits and controls on the contractor's use of the document subject to the mission's ongoing control, that transfer does not "eliminate" the mission's "interest in" those materials in such a way as to deprive the materials of their status as being "of the mission."

Similarly, the D.C. Circuit has long treated certain documents in possession of a government agency's outside contractors as "agency records," even if "they were neither created by agency employees, nor are … currently located on agency property." *Burka*, 87 F.3d at 515. And it has found such documents to be agency records where contractors "acted on behalf of [the agency] in creating the [records]," and the agency "exercise[d] sufficient control over [the] documents." *Id.*   Similarly, the D.C. Circuit has treated government agencies' confidential correspondence with outside consultants as falling within the statutory phrase "intra-agency memorandum," where the consultants are "not pursuing interests of their own" and "some indicia of a consultant relationship" exists. *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 512 F.3d 677, 683–87 (D.C. Cir. 2008); *see also Heffernan v. Azar*, 417 F. Supp. 3d 1, 15 (D.D.C. 2019) (quoting *Nat'l Inst. of Mil. Just.*, 512 F.3d at 686).[8]

---

[8] Article 27, like Article 24, is also not limited as Broidy argues.  Article 27 provides in relevant part: "The official correspondence of the mission shall be inviolable.  Official correspondence means all correspondence relating to the mission and its functions."  This Court previously concluded that Article 27 does not apply to correspondence freely sent to non-mission parties, because Article 27 "defines 'official' to mean 'relating to the mission and its functions,' such that "the same meaning cannot attach to its phrase 'of the mission,' at risk of surplusage."  ECF No. 149 at 16.  Qatar's position, however, is not that any correspondence, from anyone to anyone, that "relat[es] to the mission and its functions" is correspondence "of the mission."  Instead, Qatar contends that correspondence between and among a mission and its outside contractors can be "of the mission," and thus subject to inviolability, if it is made for the sole purpose of assisting in the mission's performance of its functions, and is subject to confidentiality requirements.  *Accord Nat'l Inst. of Mil. Just.*, 512 F.3d at 681–87 (recognizing, in the domestic context, that "communications between an agency and outside consultants" are "intra-agency" records when there is evidence that the consultants were "not pursuing interests of their own," such as when correspondence is "submitted by non-agency parties in response to an agency's request for advice").

16

2.    *Object and Purpose.*  Since the phrase "of the mission" is broad and undefined, and at least some documents outside the mission must qualify (lest the phrase "wherever they may be" become surplusage), this Court should adopt an interpretation that best "accords with [the Convention's] objects and purposes."  *Abbott*, 560 U.S. at 9, 20–22.  The Convention's stated purpose is to "ensure the efficient performance of the functions of diplomatic missions as representing States."  Vienna Convention on Diplomatic Relations, Preamble ¶ 5.  That objective would be thwarted if materials entrusted to a mission's outside contractors were categorically excluded from Article 24's guarantee of inviolability.  Rather, in circumstances where a mission relies on an outside contractor to aid the performance of its diplomatic mission, shares or receives materials for that purpose, and strictly controls the contractor's use and disclosure of such materials, it best ensures the efficient performance of the diplomatic mission to respect the inviolability of such materials as "of the mission."

Diplomatic missions frequently rely on contractors to perform essential mission functions, including for expertise relevant to foreign policy objectives.  For example, diplomatic missions in this country have recently retained outside contractors to:

- "expand bilateral trade and foreign direct investment";

- conduct "outreach to U.S. Government officials" focused on "influenc[ing] [the Embassy's] interests";

- promote the country's role "as a longstanding strategic partner of the United States";

- assist with "general bilateral relations with the United States"; and

- support efforts to "deepen relations between [the state] and the U.S. government" on particular policy issues.

*Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938*, at 12, 50, 75, 85, 142 (Dec. 2020), *available at*

17

https://www.justice.gov/media/1227926/dl?inline.    Particularly given the importance of any country's relations with the United States, it is not surprising that many sovereigns, including Qatar, consider it necessary to the success of their diplomatic objectives to involve outside contractors.  In fact, the United States is no exception.  U.S. missions abroad "rely[] on outside contracting," including for "embassy construction" in "sensitive posts" where contractors "work[] with information" provided to them by the State Department.  *See* Taft Statement.  U.S. missions have also, for example, contracted for services including "media monitoring" and "website and social media content management."[9]

In light of this diplomatic reality, which is hardly unique to Qatar, "the efficient performance of the functions of diplomatic missions" will often require the exchange of mission archives and documents with outside contractors.  Just as U.S. government agencies may have "a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity," *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971), diplomatic missions likewise require the ability to exchange information confidentially with their contractors.  If the rule were otherwise, opportunistic civil litigants could take advantage of broad American-style discovery to probe for information about a sovereign's foreign policy.  And if, as a result, diplomatic missions decide they cannot risk working with contractors due to the risk of sensitive information being disclosed, that will hinder "the efficient performance of the functions of diplomatic missions as representing States."  Vienna Convention on Diplomatic Relations, Preamble ¶ 5.

---

[9] *See* Search for "Embassy AND 'public relations'" *in* Federal Procurement Data System, https://perma.cc/54K X-5ZNB.

3. _Negotiating History._ The Convention's negotiating history also weighs against a rule that the Convention's protections cannot extend to documents possessed by a mission's contractors. For example, in proposing an amendment to Article 24 to expand inviolability to mission archives and documents "anywhere they may be" (later modified to "wherever they may be"), delegations from Italy and France stated that their intention was "to establish clearly the absolute inviolability of the mission's archives and documents as such." Ex. 5, United Nations Conference on Diplomatic Intercourse and Immunities, _Official Records, Vol. I_ at 148, U.N. Doc. A/Conf.20/14 (1962) (hereinafter "United Nations, _Official Records_"). That objective is inconsistent with the view that any materials "freely given" to a non-mission party automatically lose their protections under Article 24. _See_ ECF No. 149 at 13.

Indeed, the drafters _rejected_ a proposed amendment to Article 24 that would have codified Broidy's preferred approach. _See supra_ at p. 10. Pakistan's delegate proposed amending Article 24 to "regard [archival] inviolability as void" when a document was placed in the hands of a non-mission party "with the . . . connivance of the mission concerned," such as by being "deposited with nationals of the receiving State." United Nations, _Official Records_, at 148. That amendment, however, was not accepted. Instead, immediately after the Pakistani delegation raised its concern for a second time, the "wherever they may be" language was put to a vote, with the phrase approved by a 46-6 vote. _Id._ at 16. That the Convention's drafters rejected an amendment that would have accomplished what Broidy says Article 24 already accomplishes weighs heavily against that interpretation. _See, e.g._, _E. Airlines, Inc. v. Floyd_, 499 U.S. 530, 542–44 (1991) (rejection of proposed language informative for treaty interpretation); _Lozano v. Alvarez_, 697 F.3d 41, 53 (2d

19

Cir. 2012) (drafting history supported interpretation where "the drafters considered and rejected an alternative proposal").[10]

### C.    The Foreign Agents Registration Act's Inspection Provisions Do Not Override Vienna Convention Protections.

Contrary to the Court's prior order, *see* ECF 149 at 17−18, FARA's registration and inspection requirements do not suggest that documents in the hands of a diplomatic mission's contractors are ineligible for protection under the Vienna Conventions.  The Foreign Agents Registration Act ("FARA") requires agents of foreign principals to register with the Attorney General, and make available for his "inspection" all "such . . . records" as he may prescribe.  22 U.S.C. §§ 612(a), 615.  By regulation, that includes "[a]ll correspondence, memoranda, cables, telegrams, teletype messages, and other written communications to and from all foreign principals and all other persons, relating to the registrant's activities on behalf of, or in the interest of any of his foreign principals."  28 CFR § 5.500(a)(1).  The Act does not provide for public disclosure of these materials; they may be inspected only by "official[s] charged with the enforcement of" the Act.  22 U.S.C. § 615.

Nothing about the Act, its inspection provisions, or its enforcement undermines Vienna Convention inviolability.  As an initial matter, to the extent of any conflict between FARA and the Conventions, the Conventions would prevail as the later in time enactments.  *See Breard v. Greene*,

---

[10] Professor Eileen Denza's commentary observed, correctly, that the inviolability of mission archives is preserved under Article 24 even "[i]f archives fall into the hands of the receiving State after being lost or stolen."  Denza Commentary at 159.  Yet nowhere does her commentary suggest that *only* lost or stolen materials are entitled to Article 24 protection when located off mission premises.  Nor do the negotiating records themselves contain any discussion of lost or stolen materials, much less a suggestion that such materials were the sole focus of the "wherever they may be" clause.

523 U.S. 371, 376 (1998).[11]  But there is no conflict.  Statutes "ought never to be construed to violate the law of nations if any other possible construction remains," *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013) (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)), and the Act is easily harmonized with Vienna Convention protections.  Indeed, FARA has long been understood to coexist with otherwise applicable privileges, a principle that naturally extends to immunities.  *See Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371, 377 (D.D.C. 1976) (FARA does not abrogate attorney-client privilege).

This harmonized reading of FARA's inspection provisions and the Conventions is consistent with how the United States has historically implemented the Act.  "[A]s a practical matter, the Department of Justice has implemented the Foreign Agents Registration Act in a way that has not caused concerns among foreign governments that their rights under the Vienna Convention are being violated."  Taft Statement at 1676.  In its amicus brief to the D.C. Circuit, the United States did not suggest any change in that practice, and conspicuously avoided taking the position that the Act's inspection provisions defeat inviolability.  U.S. Amicus Brief at 32.

In any case, this Court does not need to decide the relationship between FARA's inspection provisions and the Vienna Conventions.  Even assuming inspection rights apply, it would not undermine the inviolability of documents possessed by registered agents.  Such documents would merely be subject to inspection by "a certain few officials of the Justice Department . . . who are primarily interested in whether the agent . . . has adequately fulfilled his statutory obligations," in circumstances where "it is very unlikely that disclosure to these officials would result in public

---

[11] The Vienna Conventions on Diplomatic and Consular Relations went into force in the United States in 1972 and 1969, respectively.  FARA was enacted in 1938 and its pertinent implementing regulations were promulgated in 1967.

disclosure of confidential conversations." *Covington & Burling*, 411 F. Supp. at 373.  At most, a mission might be said to consent to such inspections by engaging a contractor who must register.[12] As the United States agrees, a mission can share documents with a third party and still consider them inviolable documents "of the mission," provided it reasonably expects confidentiality.  U.S. Amicus Brief at 2–3.  By the same token, if a mission consents to inspection by select officials for enforcement purposes, but reasonably expects it would not "result in public disclosure," *Covington & Burling*, 411 F. Supp. at 373, those materials remain "documents of the mission" protected by Article 24; *accord* U.S. Amicus Brief at 21 (no protection where document "sen[t] to an outside party for widespread publication").

In analogous circumstances, courts recognize that mandatory disclosure to *someone* does not defeat expectations of confidentiality as to *everyone*.  *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021) (recognizing confidentiality interest in charities' donor information even though it "is already disclosed to the [Internal Revenue Service] as a condition of federal tax-exempt status"); *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (disclosure of "cell phone location information" to carriers, which "there is no way to avoid," does not defeat reasonable expectation of privacy).  Similarly, "involuntary disclosures due to judicial compulsion do not generally constitute waiver" of privilege.  *The Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 45 n.4 (D.D.C. 2009) (citation omitted); *accord In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1373 (D.C. Cir. 1984) (finding "less reason to find waiver in circumstances of involuntary disclosure").  This case does not even involve actual compelled disclosure, but the

---

[12] In oral argument before the D.C. Circuit, the United States recognized that this court could draw a distinction between "private party litigation" and "the United States invoking its inspection rights under the statute" so as to find that "the document could potentially still be of the mission" even if a foreign sovereign "consented to them being turned over [to] the United States" for the narrow purpose of FARA inspection rights.  *See* Oral Arg. Tr. at 32:3–33:5.

mere theoretical possibility that officials enforcing the Act could seek to inspect certain documents for a limited purpose. That possibility does not prevent Qatar from reasonably expecting that confidential materials in the hands of its contractors will not be made public, so it does not prevent those documents from being "of the mission."

Any other conclusion would defeat the object and purpose of the treaty. As the United States explains, "foreign sovereigns . . . need to rely on outside contractors to carry out essential mission functions." U.S. Amicus Brief at 23. Since FARA will generally apply to contractors with whom the mission forms a "special relationship," U.S. Amicus Brief at 17, and virtually everything possessed by registered agents is subject to inspection, Broidy's interpretation would mean the Vienna Conventions almost never apply to information held by mission contractors, even where "the mission shares information that is directly related to the functions of the diplomatic mission," U.S. Amicus Brief at 23; *see also* Oral Arg. Tr., *Muzin*, No. 22-7082, at 58:12–16 (Judge Rao: it would "require a quite broad ruling" to "determine that any documents that were available potentially in the future to inspection by the U.S. government trumps any Article 24 protection").

That result would have reciprocal consequences for the United States, which is not the only country with foreign agent laws including government inspection rights. *See, e.g.*, Nick Robinson, *"Foreign Agents" in an Interconnected World*, 69 Duke L.J. 1075, 1086–90 (2020) (discussing such laws in Russia, Hungary, and Australia). If this Court treated FARA as effectively defeating Vienna Convention protection for materials possessed by a mission's contractors, foreign countries may apply the same rule to U.S. missions.

The United States in its amicus brief was careful not to take the position that FARA registration defeats inviolability under the Conventions. Instead, the United States suggested that Qatar does not have a reasonable expectation of confidentiality over many of the documents held

by its contractors because its agreement with those contractors specified that disclosures could be made as "required by law."  *See* U.S. Amicus Brief at 33.  But while the United States is owed significant deference in its interpretation of international law treaties to which it is party, that deference does not extend to its interpretations of a contract between two other parties.

Moreover, the United States' contract interpretation argument relying on the "as required by law" language is circular and implausible.  *See* Oral Arg. Tr., *Muzin*, No. 22-7082, at 30:9–12 (Chief Judge Srinivasan: asking whether "that's just circular because the whole question is whether it's required by law").  Whether disclosure is "required by law" depends on what the law requires.  Where a legal basis for avoiding disclosure exists – such as inviolability under the Vienna Conventions – disclosure is not "required by law."  Further, Qatar's agreements with is contractors state that "[n]othing in this Agreement shall waive or otherwise alter the privileges and immunities to which the Embassy is entitled under the laws of the United States or any treaty to which the United States is a party," confirming that any materials shared with these contractors were shared with an expectation of privacy.  *See* ECF No. 109-17 at 7 ("Agreement for Consulting Services").

### D.     Principles of International Comity Also Protect From Disclosure Materials That Implicate Qatar's Foreign Policy and Deliberative Processes.

Comity is "a golden rule among nations – that each must give the respect to the laws, policies, and interests of others that it would have others give to its own in the same or similar circumstances."  *Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002) (quoting Black's Law Dictionary, 261–62 (7th ed. 1999)); *see ZF Auto. U.S., Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2088 (2022) (comity "promotes respect for foreign governments and encourages reciprocal assistance").  Principles of international comity can protect materials in the possession of private parties, where those materials reflect the non-public information or deliberative processes of a sovereign.

24

In ruling on Broidy's motion to compel, this Court found principles of international comity to be categorically inapplicable because such principles could not "shield private, American parties [like Defendants] from discovery." ECF No. 149 at 21. Qatar, however, is not seeking to shield any U.S. national from discovery; Qatar seeks to assert its own privileges as a sovereign nation to protect from disclosure materials that, although they are in Defendants' possession, contain Qatar's sensitive, nonpublic information.

Principles derived from international comity give Qatar at least two distinct grounds to protect materials from discovery. *First*, international comity protects from disclosure materials containing Qatar's sensitive, non-public information. *Second*, international comity incorporates the deliberative process privilege. As the privilege-holder, and now as a limited intervenor, Qatar should be permitted to make a showing of how its own privileges apply. *See, e.g.*, *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327 n.33 (D.D.C 1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark*, 384 F.2d 979 (D.C. Cir. 1967) ("The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953) (discussing military and state secrets privilege))); *In re Bankers Trust Co*., 61 F.3d at 472 ("[The] privilege belongs to the Federal Reserve, and therefore . . . the Federal Reserve must be allowed the opportunity to assert the privilege.").

1.     <u>International Comity.</u>  The Supreme Court has "long recognized the demands of comity in suits involving foreign states, either as parties or sovereigns with a coordinate interest in the litigation," *Aérospatiale*, 482 U.S. at 546, and it has instructed that international comity is an appropriate consideration when determining "the propriety of discovery requests." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 146 n.6 (2014). As the Second Circuit further

explained, if "a private plaintiff [seeks] the production of sensitive governmental documents of a foreign state," "concepts of governmental privilege . . . apply." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 210 (2d Cir. 2012) (citation omitted).

The United States has previously explained that third-party subpoenas seeking sensitive governmental information in the hands of private parties "implicate the same comity and reciprocity concerns that are raised by discovery sought directly from the foreign state," and that "[t]he disclosure of potentially sensitive financial information" concerning a foreign state "is legitimately of significant concern to a foreign state *regardless of who is required to make the disclosure*." [13]  U.S. Amicus Brief, *Republic of Argentina v. NML Cap. Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994, at *32–33 (emphasis added).[14]  Qatar's legitimate interest in its sensitive governmental information is likewise not lessened by the question of "who is required to make the disclosure." *Id.*; *see also In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1081–84 & n.2 (N.D. Cal. 2007) (denying motion to compel production of European Commission documents in the hands of private parties based on principles of international comity); *In re Payment Card*

---

[13] The D.C. Circuit's invitation in the recent appeal in this case specified a particular interest in the United States' views on appellate jurisdiction and the correct application of the Vienna Conventions.  Accordingly, the United States did not offer an opinion regarding international comity in its amicus brief.  *See* Oral Arg. Tr., at 27:17–20, 38:20–24 (Counsel for the United States: "This Court's order asked us to focus on jurisdiction and the treaties, and so the United States did so, and so the United States hasn't offered an opinion on international comity in this case, in this context. . . . [B]ut the United States does not want the Court to read into anything . . . it's not that we, the Government, thinks that comity plays no role here . . . .").

[14] While the Supreme Court ultimately declined to account for these comity interests *in interpreting the Foreign Sovereign Immunities Act* as the United States had suggested, the Court recognized that "other sources of law," including "comity interests," "bear on the propriety of discovery requests." *NML Cap., Ltd.*, 573 U.S. at 146 n.6 (quotation marks omitted).  Here, Qatar seeks to assert its comity interests in response to the parties' discovery requests, consistent with the *NML* opinion.

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 2010 WL 3420517, at *10 (E.D.N.Y. Aug. 27, 2010) (same).

2.      *Deliberative Process.*   Principles of reciprocity between nations "dictate[] that [U.S.] courts give a foreign sovereign the same protection afforded to the executive branch of the United States."   *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002).   For that reason, "courts have long held that foreign governments are entitled to protect their executive deliberations," just as the U.S. Executive Branch routinely claims privilege over its own deliberative processes.   *Id.*   The deliberative process privilege allows a "government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"   *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted).   The privilege requires that "the material must be predecisional and it must be deliberative," and its purpose is to "allow[] government officials freedom to debate alternative approaches in private."   *Id.*

A government's deliberative processes do not lose protection when its materials are sought from third parties.   *See, e.g., In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 52 Fed. Cl. 114, 119, 124–25, 125 n.3 (2021) (upholding United States' claim of deliberative process privilege over portions of document held by third-party entity).   Rather, the deliberative process privilege "may include materials generated at the request of an agency."   *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C. Cir. 1994).   That is because "[c]onsultations with temporary consultants are an integral part of an agency's deliberative process."   *Nat'l Inst. of Mil. Justice*, 512 F.3d at 678.   Thus, the United States claims – and courts entertain – deliberative process privilege claims with respect to communications between agencies and outside

27

consultants.  *See Gonzalez Ramos v. ADR Vantage, Inc.*, 2020 WL 409283, at *1 (D.D.C. Jan. 26, 2020) (upholding U.S. Department of Agriculture's claim of privilege over "drafts of a workplace Climate Assessment report" created by private consultant).

Under principles of international comity and the reciprocity that underlies it, Qatar may likewise claim the deliberative process privilege over documents held by its former contractors. Indeed, in its prior opinion this Court recognized that Defendants could have possibly "invoke[d] the [deliberative process privilege]" if its contractors had "assisted Qatar "in formulating its foreign policy," but ruled that Defendants had "made no showing to that effect."  ECF No. 149 at 23.  As clarified above, however, as the privilege-holder it is Qatar – not Defendants – that must have an opportunity to substantiate its claims of deliberative process related to documents and other materials held by its contractors.  *See Stiftung*, 40 F.R.D. at 327 n.33.

For avoidance of doubt, the two grounds articulated above are not necessarily exclusive. Based on the particular materials held by contractors, it is possible that other privileges or immunities may be available to Qatar under the principles of international comity and reciprocity. This would include the state secrets privilege.  *See In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007) (applying state secrets privilege to agency reports); Ex. 6, Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs, U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4, 2002), in *Hearings Before the House Committee on Government Reform*, Serial No. 107-83, at 1468–69 (Dec. 4, 2002) (explaining that in addition to the Vienna Conventions, State Department would also consider invoking "other possible privileges and protections, such as state secrets" to protect materials and information possessed by the United States' "outside contractors").

## **CONCLUSION**

Qatar respectfully moves the Court to vacate the portions of its prior opinion (ECF No. 149) categorically rejecting application of Qatar's privileges and immunities to documents or other materials held by third-party former contractors and modifying the prior protective order.  In place of this prior opinion, Qatar moves the Court to:

1.  Issue an order making clear that Qatar's privileges and immunities are not categorically inapplicable to materials held by third-party former contractors.

2.  Modify the operative protective order in this case to make clear that materials may be marked "Highly Confidential" when a producing party, whether a Defendant or a non-party subpoena recipient, in good faith reasonably believes that such materials contain or comprise information protected by the Vienna Conventions or by any other privilege held by Qatar as a sovereign state, including the deliberative-process privilege or other privileges derived from international comity.


Dated: April 26, 2023                                  Respectfully submitted,

                                        */s/ Alexander A. Berengaut*
                                        Alexander A. Berengaut (D.C. Bar No. 989222)
                                        David M. Zionts (D.C. Bar No. 995170)
                                        Amber M. Charles (D.C. Bar No. 1035226)
                                        COVINGTON & BURLING LLP
                                        One CityCenter
                                        850 Tenth St., N.W.
                                        Washington, DC 20001-4956
                                        (202) 662-6000
                                        aberengaut@cov.com
                                        dzionts@cov.com
                                        acharles@cov.com

                                        Mitchell A. Kamin (admitted *pro hac vice*)
                                        COVINGTON & BURLING LLP
                                        1999 Avenue of the Stars, Suite 3500
                                        Los Angeles, California 90067-4643

(424) 332-4800
mkamin@cov.com

*Counsel for State of Qatar*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2023, I caused a true and correct copy of the foregoing State of Qatar's Memorandum of Law in Support of State of Qatar's Motion to Vacate the Court's Prior Order Regarding Qatar's Privileges and Immunities to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: April 26, 2023

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*