# EXHIBIT 1

**[ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2022]**

**No. 22-7082**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

BROIDY CAPITAL MANAGEMENT LLC AND ELLIOTT BROIDY,

PLAINTIFFS-APPELLEES

V.

NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD,
AND STONINGTON STRATEGIES LLC,

DEFENDANTS-APPELLEES

V.

STATE OF QATAR,

APPELLANT

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———————————

RICHARD C. VISEK
*Acting Legal Adviser*
*Department of State*
*Washington, DC 20520*

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SHARON SWINGLE
MARTIN TOTARO
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel

certifies as follows:

### A.    Parties and Amici

All parties, intervenors, and amici appearing before the district

court and in this Court are listed in the Brief for Appellant.

### B.    Rulings Under Review

References to the ruling at issue appear in the Brief for Appellant.

### C.    Related Cases

All related cases are listed in the Brief for Appellant.

*/s/ Martin Totaro*
Martin Totaro

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTERESTS OF THE UNITED STATES ........ 1

STATEMENT OF THE ISSUES ................................................. 4

STATEMENT OF THE CASE ................................................. 5

ARGUMENT .................................................................... 7

I.   This Court Has Appellate Jurisdiction ........................... 7

    A.   Qatar Has Standing To Appeal ............................. 7

    B.   Qatar's Appeal Satisfies the Requirements of the
    Collateral-Order Doctrine ................................. 9

II.  This Court Should Correct the District Court's Erroneous
    Interpretation of Article 24 .................................... 17

    A.   Documents Possessed by Third Parties May in Limited
    Circumstances Be Documents "of the Mission" Under
    Article 24 ................................................. 18

        1.   The Legal Framework ............................. 18

        2.   The District Court Adopted a Flawed
        Interpretation of Article 24 ....................... 23

    B.   On Remand, the District Court Should Examine
    Whether the Documents at Issue Are Documents "of
    the Mission" ............................................. 30

CONCLUSION .............................................................. 33

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Abelesz v. Magyar Nemzeti Bank,*
    692 F.3d 661 (7th Cir. 2012) .................................................................. 14

*Al Odah v. United States,*
    559 F.3d 539 (D.C. Cir. 2009) ................................................................ 10

*Ameziane v. Obama,*
    699 F.3d 488 (D.C. Cir. 2012) ................................................................ 11

*Aurelius Capital Master, Ltd. v. Republic of Argentina,*
    589 F. App'x 16 (2d Cir. 2014) ........................................................ 12, 13

*Broidy Capital Mgmt. LLC v. Muzin,*
    12 F.4th 789 (D.C. Cir. 2021) ........................................................ 11, 13
    No. 19-150, 2022 WL 2157047 (D.D.C. June 15, 2022) ......................... 9

*Castillo v. Cameron County,*
    238 F.3d 339 (5th Cir. 2001) .................................................................. 7

*EM Ltd. v. Republic of Argentina,*
    695 F.3d 201 (2d Cir. 2012),
    *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.,*
    573 U.S. 134 (2014) ...................................................................... 16, 17

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu*
    *Stainless USA, LLC,*
    140 S. Ct. 1637 (2020) ......................................................................... 24

*Karaha Bodas Co. v. Perusahaan Pertambangan*
    *Minyak Dan Gas Bumi Negara,*
    313 F.3d 70 (2d Cir. 2002) ..................................................................... 7

*Marino v. Ortiz,*
    484 U.S. 301 (1988) .......................................................................... 7, 8

*McKinley v. Board of Governors of Fed. Reserve Sys.*,
   647 F.3d 331 (D.C. Cir. 2011) ................................................................ 19

*Medellin v. Texas*,
   552 U.S. 491 (2008) ................................................................................. 1

*Mohawk Indus. Inc. v. Carpenter*,
   558 U.S. 100 (2009) ................................................ 10, 12, 14, 15, 16

*Piper Funds, Inc., Institutional Gov't Income Portfolio Litig., In re*,
   71 F.3d 298 (8th Cir. 1995) .................................................................... 8

*Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*,
   962 F.3d 576 (D.C. Cir. 2020) ............................................................... 17

*Rojas v. Federal Aviation Admin.*,
   989 F.3d 666 (9th Cir. 2021),
   *cert. denied*, 142 S. Ct. 753 (2022) ..................................................... 30

*Sealed Case, In re*,
   931 F.3d 92 (D.C. Cir. 2019) ........................................................... 10, 11

*Sealed Case (Med. Recs.), In re*,
   381 F.3d 1205 (D.C. Cir. 2004) .................................................... 2, 7, 8

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to
U.N.*, 988 F.2d 295 (2d Cir. 1993) ....................................................... 24

*Swarna v. Al-Awadi*,
   622 F.3d 123 (2d Cir. 2010) .................................................................. 14

*Taiwan v. U.S. Dist. Court for the N. Dist. of Cal.*,
   128 F.3d 712 (9th Cir. 1997) ................................................................. 21

*Terrorist Attacks on Sept. 11, 2001, In re*,
   No. 03-MDL-01570, 2019 WL 3296959 (S.D.N.Y. July 22, 2019) ....... 30

*United States v. Aubrey*,
  800 F.3d 1115 (9th Cir. 2015) ............................................................. 19

*United States v. Kirschenbaum*,
  156 F.3d 784 (7th Cir. 1998) ................................................................ 8

*United States v. Kranovich*,
  401 F.3d 1107 (9th Cir. 2005) ............................................................. 19

*Van Cauwenberghe v. Biard*,
  486 U.S. 517 (1988) ............................................................................. 11

*Will v. Hallock*,
  546 U.S. 345 (2006) ............................................................................. 12

*Wuterich v. Murtha*,
  562 F.3d 375 (D.C. Cir. 2009) ............................................................. 11

**Treaty:**

Vienna Convention on Diplomatic Relations,
  Apr. 18, 1961, 23 U.S.T. 3227, entered into force Dec. 13, 1972:
    Art. 22 .............................................................................................. 24
    Art. 24 ................................................. 1, 2, 3, 4, 5, 6, 13, 17, 18, 19, 20, 21, 22,
                                                        23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33
    Art. 30(1) ........................................................................................ 24

**Statutes:**

22 U.S.C. § 612(a) ...................................................................................... 6, 32

22 U.S.C. § 615 ........................................................................................... 6, 32

28 U.S.C. § 1604 ............................................................................................. 9

28 U.S.C. § 1607 ............................................................................................. 9

28 U.S.C. § 1607(c) ......................................................................................... 9

**Other Authorities:**

*Comments by Governments on the Draft Articles Concerning
   Diplomatic Intercourse and Immunities*, [1958]
   2 Y.B. Int'l L. Comm'n 136, U.N. Doc. A/CN.4/SER.A/1958/Add.1 .....25

Eileen Denza, *Diplomatic Law: Commentary on the
   Vienna Convention on Diplomatic Relations*
   (4th ed. 2016) ........................................................................... 19, 20, 24

*Report of the Commission to the General Assembly*, [1957]
   2 Y.B. Int'l L. Comm'n 137, U.N. Doc. A/CN.4/SER.A/1957/Add.1 .....24

A. Emil. F. Sandström, *Diplomatic Intercourse and Immunities:
   Summary of Observations Received from Governments
   and Conclusions of the Special Rapporteur*,
   U.N. Doc. A/CN.4/116 (May 2, 1958) ............................................25, 26

1 *U.N. Conference on Diplomatic Intercourse and Immunities:
   Official Records*, U.N. Doc. A/CONF.20/14,
   U.N. Sales No. 61.X.2 (1962) .......................................................26, 27

*Webster's Third New International Dictionary* (2002) ...........................18

## GLOSSARY

This brief does not use abbreviations requiring a glossary under

Local Rule 28(a)(3).

## INTRODUCTION AND INTERESTS OF THE UNITED STATES

The United States has a compelling interest in ensuring the proper interpretation and implementation of the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, entered into force Dec. 13, 1972.  The United States is a party to the Vienna Convention and its interpretation of the treaty is "entitled to great weight." *Medellin v. Texas*, 552 U.S. 491, 513 (2008).  It also has a substantial interest in the issues presented by this case because it relies on other parties to the Convention to protect U.S. rights set forth in the treaty, and that reliance is threatened when the United States does not safeguard those treaty rights domestically.

Article 24 of the Convention provides that the "archives and documents of the mission shall be inviolable at any time and wherever they may be."  In this case, the State of Qatar contends that the district court's order compels the defendants, who are registered agents of Qatar, to produce inviolable documents of Qatar's mission in violation of Qatar's Article 24 rights.

This Court has jurisdiction over Qatar's appeal.  Qatar has standing because "a non-party may appeal orders for discovery if [it]

has no other effective means of obtaining review." *In re Sealed Case (Med. Recs.)*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004) (quotation marks omitted).  And Qatar's appeal meets the requirements of the collateral-order doctrine because the court's order is conclusive, it resolves an important question of treaty interpretation separate from the merits of the underlying suit, and it is effectively unreviewable on appeal from the final judgment in the underlying action because any rights Qatar has under Article 24 would be violated the moment protected mission documents are disclosed.

On the merits, the district court adopted an overly restrictive interpretation of Article 24 by announcing a new rule that materials possessed by outside parties cannot qualify as mission documents unless they were lost or stolen.  That approach conflicts with Article 24's protection of documents "of the mission . . . wherever they may be." It is also inconsistent with Article 24's negotiating history and prior views of the U.S. Department of State.  And it does not square with Article 24's purpose of protecting the confidentiality of mission documents.  Instead, Article 24 covers documents in the possession of the mission (including documents that are in the hands of mission

2

personnel off the mission premises), documents that are not in the possession of the mission because they were lost or stolen, and documents possessed by outside parties with a particular relationship to the mission where the documents were provided by the mission or, alternatively, were solicited by and incorporated information from archives or documents of the mission for purposes essential to the functions of the mission and with reasonable expectations of continued confidentiality.  Under that framework, a significant number of the documents likely fall outside Article 24.  But that assessment cannot be made at present because of the inadequate factual record.  Accordingly, the case should be remanded to the district court so it can engage in that analysis on a document-by-document basis.[1]

---

[1] This Court's invitation asked the government to address whether the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations protect from disclosure the documents that are the subject of discovery requests made by the plaintiffs.  Similar to Article 24, Article 33 of the Vienna Convention on Consular Relations provides that "[t]he consular archives and documents shall be inviolable at all times and wherever they may be."  Because this case concerns claims regarding an embassy's archives, the Vienna Convention on Diplomatic Relations is the applicable convention.  The Vienna Convention on Consular Relations would apply parallel protections to consular archives according to the same reasoning outlined in this brief.

## STATEMENT OF THE ISSUES

The district court granted the plaintiffs' motion to compel that contested the defendants' attempt to withhold discovery of documents created for Qatar, communications between the defendants and Qatar, and communications between themselves when they were acting as agents for Qatar.  JA298.  Qatar seeks interlocutory review of that order.  Its primary argument is that the court's order will result in a violation of Qatar's rights under Article 24 of the Vienna Convention on Diplomatic Relations, which provides that "[t]he archives and documents of the mission shall be inviolable at any time and wherever they may be."  The questions presented are:

(1)    Whether this Court has jurisdiction to hear an interlocutory appeal by a non-party foreign sovereign on the ground that, if the district court's pretrial discovery order stands, there is at least a colorable argument that the order will cause a violation of the foreign sovereign's rights under Article 24.

(2)    Whether Article 24 protects from disclosure the documents that are the subject of the order granting the plaintiffs' motion to compel.

## STATEMENT OF THE CASE

Plaintiffs Broidy Capital Management, LLC and Elliott Broidy (collectively Broidy) have brought federal- and state-law claims against several consultants working for Qatar: Nicolas Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies, LLC (a company founded by Muzin and Allaham).  JA288.  Broidy alleges that "the defendants joined a 'Qatari Enterprise,' which conspired against [Broidy] to hack his computers and disseminate the hacked information to the media in retaliation for Broidy's anti-Qatari advocacy."  JA288.

In the order under review, the district court granted Broidy's motion to compel that "challenge[d] the defendants' attempt to withhold discovery based on privileges that are purportedly held by Qatar."  JA297.  According to the defendants, Article 24 "permit[s] them to withhold all '[d]ocuments created for Qatar, communications between [them] and Qatar, and communications between [themselves] when they were acting as agents for Qatar.'"  JA298.

The district court ruled that none of the documents at issue is inviolable under Article 24.  In doing so, the court held that "the phrase 'documents of the mission' refers most naturally to documents that

5

either belong to or are possessed by a mission," but not documents "that have been delivered to their intended recipient." JA300. Under that interpretation, "documents freely given to non-mission parties fall outside the Convention's scope." JA300. To reconcile its view with Article 24's express protection of mission documents "wherever they may be," the court stated that that phrase "is best read" to mean that a mission's documents retain their inviolability outside a mission's possession only "if they are lost or stolen." JA302. The court also noted that some of the documents at issue were subject to inspection pursuant to the Foreign Agents Registration Act, 22 U.S.C. §§ 612(a), 615, which in its view "further confirm[ed] that those communications fall outside" Article 24's reach. JA304-05.

The district court stated that it "need not decide whether the Article's protections extend to documents held by bailees of diplomatic missions," JA300 n.6, but it did not retreat from its conclusion that mission documents "freely given to non-mission parties" invariably lose their Article 24 protections, JA300. The court also stated that the "defendants offer[ed] only conclusory statements that the requested

6

documents belong to Qatar," JA300, but it did not offer Qatar the opportunity to show that the documents at issue belonged to Qatar.

Qatar sought interlocutory review in this Court and also filed an emergency stay motion.  The Court granted Qatar's emergency stay motion.  *See* July 1, 2022 Order.  It later issued an order expediting the briefing schedule and inviting "the United States Department of Justice . . . to file an amicus curiae brief."  July 14, 2022 Order.

## ARGUMENT

## I.   This Court Has Appellate Jurisdiction

### A.   Qatar Has Standing To Appeal

Qatar has standing to appeal the district court's order.  Although "[t]he rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well-settled," *Marino v. Ortiz*, 484 U.S. 301, 304 (1988), nonparties are "often allowed to appeal" when a "decree affects [their] interests," *In re Sealed Case (Med. Recs.)*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004).[2]

---

[2] *See Castillo v. Cameron County*, 238 F.3d 339, 349 (5th Cir. 2001) ("[A] nonparty may be allowed to appeal if the decree affects his interests."); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 81-82 (2d Cir. 2002) (nonparty Indonesian Ministry of Finance had "an interest . . . affected by the trial

*Continued on next page.*

That principle applies to discovery orders. "[A] non-party may appeal orders for discovery if [it] has no other effective means of obtaining review." *In re Sealed Case (Med. Recs.)*, 381 F.3d at 1211 n.4 (quotation marks omitted). In this case, although Qatar is not a party and will not be required to turn over documents, the court's order potentially threatens Qatar's right under Article 24 that its documents remain inviolable. And Qatar has no other means of obtaining review because, if protected materials are disclosed, the documents' inviolability will be violated the moment they are turned over to Broidy.

Qatar participated in district court by filing nonparty statements of interest addressing the inviolability of its documents without formally seeking to intervene. *See* JA161; JA227. Outside the context of litigation involving foreign sovereigns, the "better practice" for a nonparty with an interest in a suit is "to seek intervention for purposes of appeal." *Marino*, 484 U.S. at 304. But that practice is substantially less desirable in the context of foreign sovereigns that typically have

---

court's judgment" because the foreign sovereign claimed an interest in property subject to the district court's garnishment order and could appeal); *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998); *In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.*, 71 F.3d 298, 301 (8th Cir. 1995).

immunity from the jurisdiction of U.S. courts. *See* 28 U.S.C. § 1604. A foreign sovereign that does not wish to waive its sovereign immunity may reasonably fear that, if it intervenes in an action, litigants could rely on its participation to bring counterclaims against it. *See id.* § 1607. Even if those arguments do not prove meritorious, *see, e.g.*, *id.* § 1607(c) (allowing certain counterclaims only if the claim "does not seek relief exceeding in amount or differing in kind from that sought by the foreign state"), a foreign state would be forced to litigate that issue, *see Broidy Capital Mgmt. LLC v. Muzin*, No. 19-150, 2022 WL 2157047, at *4 (D.D.C. June 15, 2022) (district court stating that "whether Qatar can appeal a discovery order and seek an active role in the discovery process without waiving its immunity from suit" is a "complex" question). Given the unique considerations for foreign sovereign litigants, recognizing their standing to appeal to protect their interests without requiring intervention provides a sensible way to protect those litigants' rights.

## B. Qatar's Appeal Satisfies the Requirements of the Collateral-Order Doctrine

Qatar's appeal satisfies the requirements of the collateral-order doctrine. That doctrine recognizes appellate jurisdiction of

interlocutory orders "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus. Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). The district court conclusively decided that the documents at issue are not shielded from discovery; whether a foreign sovereign can invoke its treaty rights to prevent disclosure of documents that are otherwise discoverable is self-evidently important; and this discovery dispute is separate from the claims on the merits that Broidy brought against the defendants. *See* Broidy Stay Opp. 23-26 (only disputing the effectively-unreviewable factor).

This Court's precedents make clear that the district court's interlocutory order is also effectively unreviewable on appeal from a final judgment. For example, in *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009), the court ruled that a discovery order requiring disclosure satisfied this requirement because, "[o]nce the information is disclosed, the 'cat is out of the bag' and appellate review is futile." *Id.* at 544. And in *In re Sealed Case*, 931 F.3d 92 (D.C. Cir. 2019), the court allowed an appeal of an order denying the party's anonymity in

10

litigation, stating that "if the Appellant's identity is disclosed as required by the [order], the issue would be 'effectively unreviewable on appeal from a final judgment.'"  *Id.* at 95; *see also Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) ("[T]he district court's order would be effectively unreviewable on appeal from a final judgment because once the government's official acknowledgment of Ameziane's cleared status is revealed publicly, the disclosure cannot be undone."); *Wuterich v. Murtha*, 562 F.3d 375, 382 (D.C. Cir. 2009).  Further, in prior proceedings in this case, this Court noted that "orders denying colorable claims of sovereign immunity generally are immediately appealable pursuant to the collateral order doctrine," explaining that "if immunity appeals had to await final judgment on the merits, immunity erroneously denied would lose its litigation-avoidance component before the error could be corrected." *Broidy Capital Mgmt. LLC v. Muzin*, 12 F.4th 789, 796 (D.C. Cir. 2021).  As these cases demonstrate, if an important right cannot be vindicated on appeal because the violation of the right cannot be undone, collateral-order review may be warranted.

To be sure, not all threats to treaty rights justify collateral-order review.  *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 526-27 (1988)

(immunity from service of process under an extradition treaty is not a "right not to stand trial" but only a "right not to be subject to a binding judgment," which "may be effectively vindicated following final judgment"). And not all orders implicating a right that is infringed if not reviewed immediately (such as some rights to avoid trial) are subject to immediate review. *E.g.*, *Will v. Hallock*, 546 U.S. 345, 354-55 (2006) (order declining to apply the Federal Tort Claims Act's judgment bar to preclude constitutional tort actions against federal officers). The "decisive consideration" is "whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Industries*, 558 U.S. at 107.

Ensuring that federal courts honor the treaty obligations as to a foreign sovereign's inviolable documents, both under this treaty and other international agreements, is a critical value to the United States.[3]

---

[3] Other international agreements include language similar to Article 24. The International Monetary Fund's Articles of Agreement state that "archives of the Fund shall be inviolable" (Art. IX, §V: https://www.imf.org/external/pubs/ft/aa/index.htm). The charters of the Inter-American Development Bank (Art. XI, §V: https://perma.cc/PEU9-QJX4) and the World Bank (Art. VII, §V: https://perma.cc/NWR6-N4YC) have similar provisions. And the Agreement Establishing the Asian Development Bank (Art. 52: https://perma.cc/NS77-RGF6) as well

*Continued on next page.*

12

Moreover, not allowing review at this juncture may adversely affect the reciprocal treatment of the United States and its mission archives and documents (which could include sensitive national security and foreign policy materials) in foreign courts. And disclosure of inviolable archives and documents of an embassy could likewise have significant foreign policy and national security repercussions flowing from the release of the sensitive diplomatic information of a foreign government. Accordingly, the issue presented by this appeal is effectively unreviewable on postjudgment review. Because Qatar's claim that the order infringes on its Article 24 rights has "at least colorable merit," *Broidy*, 12 F.4th at 796, this Court has appellate jurisdiction over its appeal of the disclosure order.

Consistent with those principles, courts have allowed immediate appeal in similar circumstances. For example, in an unpublished opinion in *Aurelius Capital Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16 (2d Cir. 2014), the Second Circuit ruled that a foreign

---

as the Agreement Establishing the African Development Bank (Art. 53(2): https://perma.cc/TR6V-A7PQ) provide that "[t]he archives of the Bank and, in general, all documents belonging to it or held by it, shall be inviolable, wherever located."

sovereign could immediately appeal a post-judgment discovery order implicating its treaty rights. The court explained that, "[o]rdinarily, a post-judgment discovery order is not immediately appealable because it is not a final decision," but "otherwise non-final orders that present" issues of treaty interpretation are different because of their importance. *Id.* at 16-17. Other courts have also recognized that orders undermining important treaty rights are subject to collateral-order review. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 668-69 (7th Cir. 2012); *Swarna v. Al-Awadi*, 622 F.3d 123, 140-41 (2d Cir. 2010).

In arguing to the contrary, Broidy has relied on the Supreme Court's decision in *Mohawk Industries*. *See* Broidy Stay Opp. 13-15, 23-26. In that case, the Court held that "the collateral order doctrine does not extend to disclosure orders adverse to the attorney-client privilege." 558 U.S. at 114. The Court stated that "postjudgment appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege," because "[a]ppellate courts can remedy the improper disclosure of privileged material . . . by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109. It noted

14

that "deferring review until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel." *Id.* And it concluded that even though "a fraction of orders adverse to the attorney-client privilege may . . . harm individual litigants in ways that are 'only imperfectly reparable,'" that "does not justify making all such orders immediately appealable as of right under § 1291." *Id.* at 112. In any event, the Court stated, "Section 1292(b) appeals, mandamus, and appeals from contempt citations facilitate immediate review of some of the more consequential attorney-client privilege rulings." *Id.*

A post-judgment discovery order implicating treaty rights is different in critical respects from an order denying a claim of attorney-client privilege, as the reasoning in *Mohawk Industries* itself demonstrates. Unlike run-of-the-mill disclosure orders adverse to the attorney-client privilege, post-judgment appeals of orders compelling documents in potential violation of a foreign sovereign's treaty rights may not "generally suffice," *Mohawk Industries*, 558 U.S. at 109, because those important rights are violated the moment the documents' inviolability has been compromised. The possibility of disclosure may

15

also "meaningfully reduce the *ex ante* incentives for full and frank consultations between" a mission and its contractors or consultants if the foreign sovereign faces a credible threat that its archives and documents may be disclosed.  *Id.  Mohawk Industries* also instructed that courts "not engage in an 'individualized jurisdictional inquiry,'" but rather focus on "the entire category to which a claim belongs."  *Id.* at 107.  Foreign sovereigns in "all" cases similar to this one, *id.* at 112, would be harmed if interlocutory review were not available in this category of cases implicating important treaty rights.

A typical foreign state whose treaty rights are implicated is also differently situated from a typical litigant asserting attorney-client privilege.  Qatar is not a party and is not being compelled to disclose documents, so "Section 1292(b) appeals" and "appeals from contempt citations" are not viable options for Qatar to "facilitate immediate review."  *Mohawk Industries*, 558 U.S. at 112; *see EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 206 (2d Cir. 2012) ("[B]ecause the Discovery Order does not direct compliance from Argentina itself, Argentina cannot obtain review through disobedience and contempt."), *aff'd sub*

16

*nom. Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014).

The concerns animating *Mohawk Industries* do not apply here.

Because the requirements for collateral-order review have been met, Qatar should not be required to seek mandamus to protect its interests. *See Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 582 (D.C. Cir. 2020). But if this Court rules to the contrary, the United States agrees with Qatar that the Court may construe Qatar's notice of appeal as a mandamus petition. Qatar Br. 28-29. Although the soundest course is to allow a foreign state to seek review under the collateral-order doctrine, it is essential that a foreign state can at least obtain review in a mandamus petition in appropriate circumstances. The requirements for mandamus are otherwise satisfied because, as discussed below, Qatar has a clear entitlement to a remand.

## II.   This Court Should Correct the District Court's Erroneous Interpretation of Article 24

Article 24's inviolability protections cover documents in the possession of the mission (including documents that are off the mission premises in the hands of mission personnel) and documents possessed by outside parties with a special relationship to the mission where the document was provided by the mission or, alternatively, was solicited

17

by and incorporated information from archives or documents of the mission for purposes essential to the functions of the mission and with reasonable expectations of continued confidentiality. Although a significant number of the documents likely fall outside Article 24's scope, this Court should remand to allow the district court to apply the correct legal framework and perform the needed analysis.

**A.  Documents Possessed by Third Parties May in Limited Circumstances Be Documents "of the Mission" Under Article 24**

**1.  The Legal Framework**

Article 24 provides that the "archives and documents of the mission shall be inviolable at any time and wherever they may be." The provision's use of the phrase "of the mission" demonstrates that Article 24's protections reach documents in the possession of the mission (either on mission premises or off mission premises in the hands of mission personnel). *See Webster's Third New International Dictionary* 1565 (2002) ("of" can be "used as a function word indicating a possessive relationship"). And there is a general understanding by states and international legal scholars that lost or stolen documents are not stripped of their inviolability merely because they no longer reside at

the mission.  *E.g.*, Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 159 (4th ed. 2016).

In addition, mission documents sent to outside parties may in certain circumstances remain "of the mission" and continue to be subject to the protections of Article 24.  In a variety of contexts, something may continue to be a part "of" one entity when possessed by another.  *See United States v. Kranovich*, 401 F.3d 1107, 1113 (9th Cir. 2005) (funds are "of the United States" for purposes of a criminal statute, even if possessed by an outside party, where the United States had "title to, possession of, or control over" the funds); *United States v. Aubrey*, 800 F.3d 1115, 1125-26 (9th Cir. 2015) (similar); *cf. McKinley v. Board of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) ("When an agency record is submitted by outside consultants as part of the [agency's] deliberative process, and it was solicited by the agency," it is "entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of" Freedom of Information Act Exemption 5).  That principle applies to Article 24's broad protection of materials "wherever they may be," which makes it "clear beyond argument" that archives and documents "not on the premises of

19

the mission and not in the custody of a member of the mission" do not

automatically lose their inviolability.  Denza, *supra*, at 158.

Although Article 24's text does not resolve *when* documents

provided to outside parties retain their inviolability, its clear purpose

provides relevant guideposts.  The "underlying purpose" of inviolability

under Article 24 "is the protection of the confidentiality of [the]

information stored," so "the inviolability given to" archives and

documents "is *entirely* for the protection of the confidentiality of mission

records."  Denza, *supra*, at 161, 168 (emphasis added).  In light of that

purpose, documents in the hands of outside parties with a special

relationship to the mission may retain their status as documents "of the

mission" where the documents were provided with the reasonable

expectation of continued confidentiality and provided for the purpose of

carrying out "the efficient performance of the functions of" the mission,

Vienna Convention on Diplomatic Relations, pmbl. ¶ 5.  And documents

generated by third parties can be subject to Article 24 protections only

in rare circumstances: either when they were solicited by the mission in

the performance of essential functions and incorporate information from

archives or documents of the mission, or where they include a portion of

an inviolable mission document provided by the mission (for example, if a non-mission document quotes an inviolable mission document). *Cf. Taiwan v. U.S. Dist. Court for the N. Dist. of Cal.*, 128 F.3d 712, 718 (9th Cir. 1997) (overturning an order compelling an individual to testify about the contents of an organization's documents because the inviolability protection afforded to the documents "would be practically useless" if compelled testimony about the documents were permissible).

This framework's focus on confidentiality recognizes that, where a mission has no reasonable expectation that its archives and documents provided to outside parties will remain confidential, the documents cease to be inviolable. For example, a document a mission posts on the internet or sends to an outside party for widespread publication or as part of a commercial transaction does not remain inviolable.

The framework also acknowledges that a mission's reasonable expectations of confidentiality will be informed by the nature of the relationship between the foreign mission and an outside party. A foreign mission that shares information with an outside party such as an agent or contractors or consultants working for it may have greater expectations of confidentiality compared to information shared with

21

someone who has no relationship with the mission, such as a commercial vendor or service provider.[4]  As the State Department has explained, although an outside contractor working on U.S. embassy construction may possess mission documents that are subject to continued protection under Article 24, a different situation arises for "information passed to third parties" without "any relationship of lender and borrower, bailor and bailee or principal and agent" between the foreign state and the outside party.  Qatar Stay Mot. Ex. E, at 2-3 (2002 Kelly Submission).

Finally, the framework recognizes that the inquiry may be affected by the nature of the archives and documents.  A foreign mission may share routine commercial information with contractors—such as account numbers, account transactions, and phone records maintained by the outside vendor—to facilitate the provision of commercial services.  Such routine commercial information, when maintained by

---

[4] *See* Case C316/19, *European Comm'n v. Slovenia* (2020) (Grand Chamber of the European Court of Justice holding that documents may be "covered by the concept of 'archives of the [European Central Bank]' even if they are held by national central banks and not by the [European Central Bank] itself" based in part on "the particularly close relations between" the two bodies) (https://perma.cc/H4Z3-SCKV).

the outside vendor, is not properly considered to be the archives or

documents of the mission and thus is not inviolable.  By contrast, where

the mission shares information that is directly related to the functions

of the diplomatic mission as defined in Article 3 of the Convention, the

mission may have a greater expectation that its archives and

documents will remain inviolable.

### 2.    The District Court Adopted a Flawed Interpretation of Article 24

The district court concluded that mission documents "freely given

to non-mission parties," JA300, necessarily fall outside of Article 24.

That overly restrictive view could undermine the respect owed to

foreign sovereigns that need to rely on outside contractors to carry out

essential mission functions.  And it could implicate reciprocity concerns

for U.S. embassies relying on, for example, the provision of sensitive

mission documents to architects, building contractors, and security

contractors to safeguard U.S. missions.

As a threshold matter, the district court's interpretation lacks

support in Article 24's text.  To reconcile its approach with Article 24's

broad textual guarantee of inviolability of documents "wherever they

may be," the district court stated that Article 24's reference to

23

"inviolability" indicates a concern with the theft or seizure of diplomatic materials.  JA300.  But the inviolability provided by the Vienna Convention is broader, applies in a variety of circumstances, and is designed to ensure that a foreign mission can perform its diplomatic functions without interference from the host state.  *E.g.*, Arts. 22, 30(1) (inviolability of mission premises); Denza, *supra*, at 158.  And "[t]he risk in creating an exception to mission inviolability in this country is of course that American missions abroad would be exposed to incursions that are legal under a foreign state's law."  *767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to U.N.*, 988 F.2d 295, 300 (2d Cir. 1993).  Further, although the district court defined "inviolable" to mean "safe from violation," disclosure of mission documents during a discovery dispute between private parties would encroach on inviolability afforded by Article 24.

The district court's categorical approach, moreover, overlooks the Vienna Convention's negotiating history that allows for the possibility that documents provided to outside parties may remain inviolable.  *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1646 (2020) ("Our precedents have

looked to the negotiating and drafting history of a treaty as an aid in determining the shared understanding of the treaty." (quotation marks omitted)).  The initial draft article proposed by the U.N. International Law Commission in 1957 stated that "[t]he archives and documents of the mission shall be inviolable."  *Report of the Commission to the General Assembly*, [1957] 2 Y.B. Int'l L. Comm'n 137, U.N. Doc. A/CN.4/SER.A/1957/Add.1.  Though the language "wherever they may be" had not yet been added, the Commentary clarified that inviolability applied to archives and documents "regardless of the premises in which they may be." *Id.*

During the course of negotiations, the United States sought to limit inviolability to "archival material . . . on the premises of the mission, in ordinary transit by courier or sealed pouch, or in the personal custody of duly authorized officers of the mission for use in the performance of their functions." *Comments by Governments on the Draft Articles Concerning Diplomatic Intercourse and Immunities*, [1958] 2 Y.B. Int'l L. Comm'n 136, U.N. Doc. A/CN.4/SER.A/1958/Add.1. That construction was rejected.  As the Special Rapporteur observed, "protection is due to the mission's documents regardless of their

25

whereabouts."  A. Emil. F. Sandström, *Diplomatic Intercourse and Immunities: Summary of Observations Received from Governments and Conclusions of the Special Rapporteur* 43, U.N. Doc. A/CN.4/116 (May 2, 1958).

The 1958 draft article was considered at the United Nations Conference on Diplomatic Intercourse and Immunities in 1961.  The delegates from France and Italy submitted a joint amendment to add language establishing that archives and documents are inviolable "at any time and anywhere they may be" with a second sentence requiring that they "be identified by visible signs" outside of the mission.

The delegate from Pakistan objected to the French-Italian language as overly broad.  He stated that Pakistan would not regard as inviolable documents that a mission had allowed to pass into "unauthorized hands," such as "nationals of the receiving State," and urged that the article be redrafted to "prohibit[] such abuse."  1 *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records* 148, U.N. Doc. A/CONF.20/14, U.N. Sales No. 61.X.2 (1962).  Some delegates also worried that adopting the identification provision of the French-Italian amendment would impose an unwarranted condition on

26

inviolability.  *Id.* at 149-50.  Ultimately, advocates for a broader construction prevailed.  The identification provision of the French-Italian amendment was rejected.  *Id.*  Instead, the Committee adopted the first sentence of the French-Italian amendment, altering Article 24 to read that mission archives and documents are inviolable "at any time and wherever they may be."  *Id.* at 150.

When Article 24 was considered at the Conference's sixth plenary meeting, the delegate from Pakistan once again raised his concerns regarding its "sweeping" language.  *U.N. Conference on Diplomatic Intercourse and Immunities: Official Records*, *supra*, at 16.  Pakistan did not dispute the immunity of mission archives and documents "when ordinarily used, stored or despatched in transit."  *Id.*  But Pakistan would not regard as inviolable documents given by a mission "to persons not entitled to hold them."  *Id.*  Here again, the delegates chose a more expansive construction of inviolability and voted to retain the words "at any time and wherever they may be," adopting what would become the final language of Article 24.  *Id.*

This negotiating history is also consistent with longstanding State Department views and practice with respect to its assertion of

inviolability abroad to protect the archives and documents of U.S. missions.  In 2002, the House Committee on Government Reform invited the State Department to opine on whether the House could compel production of records from contractors for a foreign embassy in the United States.  Although it declined to offer a definitive legal view of the "complex" and "novel" question, JA371, the State Department testimony rejected the view adopted by the district court in this case that mission documents sent to outside parties automatically lose their inviolability.

The State Department explained that "the mere fact that archives have passed to a third party does not resolve the issue."  JA371 (2002 Taft Submission).  For example, if a foreign sovereign were to seek to compel an outside contractor working on U.S. embassy construction to produce information the United States has provided the contractor, "we would want to argue that the information is protected under the Vienna Convention."  Qatar Stay Mot. Ex. E, at 2 (2002 Kelly Submission). These concerns are not hypothetical: "In a number of instances, the Department has in fact asserted that the official information in the possession of the local national working in the embassy is 'archival'

under the Vienna Convention and thus inviolable." JA369.  The United States "would have greater difficulty making this argument persuasively if, in the United States, the information of foreign embassies given to contractors is subject to compulsory process and release." Qatar Stay Mot. Ex. E, at 3.

The district court's contrary approach appeared to stem from its view that the Vienna Convention's safeguards do not "extend protections to private citizens" of the receiving state.  JA301.  It noted, for example, that the Convention does not provide consultants with sovereign immunity or the ability to refuse requests to give evidence as a witness.  JA300, JA301.  And it similarly stated that other provisions in the treaty focus on "protecting diplomatic missions and their members from harassment and interference" but do not "shield non-mission parties."  JA301.  But Article 24's inviolability protections apply by their plain terms to *documents* of the mission "wherever they may be," not to people.  These protections are independent of any separate treaty rights the possessor of the documents—whether a mission or a non-mission party—might have.

29

**B.  On Remand, the District Court Should Examine Whether the Documents at Issue Are Documents "of the Mission"**

Remand is warranted because the district court adopted an overbroad rule and did not consider individual documents or categories of documents pursuant to the analyses set forth above.  *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570, 2019 WL 3296959, at *4 (S.D.N.Y. July 22, 2019) (analyzing inviolability under Article 24 according to particular documents); *cf. Rojas v. Federal Aviation Admin.*, 989 F.3d 666, 675 (9th Cir. 2021) ("Because the scope of Exemption 5 turns on the character of the document at issue—it is the memorandum or letter that must be 'intra-agency'—these principles should be applied on a document-by-document basis."), *cert. denied*, 142 S. Ct. 753 (2022).  Although the court erred in adopting a categorical approach that documents sent to outside parties automatically lose their inviolability status, it is likewise not correct that every mission document provided to an outside party retains that status.

In light of the limited factual development below, it is unclear whether any of the documents fall under Article 24.  To resolve this discovery dispute, the district court should conduct a two-part inquiry

30

that asks whether a document ever was "of the mission" and, if so, whether it continues to be so even when possessed by another party.

At step one, a significant number of the documents do not appear to ever have been documents "of the mission" because the Qatari mission never possessed the documents (meaning that it also did not provide them to defendants), nor is there any indication that it both solicited the creation of those particular documents and provided information from inviolable documents or archives that is included in the documents. *E.g.*, Dkt. No. 109-3, at 18-19 (defendant's correspondence with private parties); *id.* at 13-14 (documents showing payments to Qatar).

At step two, materials in this case that were at one time documents of the mission may fall outside Article 24's scope because Qatar may have lacked sufficient objectively reasonable expectations of those documents' confidentiality. The court should look at the mission's expectations of confidentiality by examining the nature of the relationship between the mission and a defendant, the nature of the documents, and any other relevant indicia of confidentiality. Relevant to that inquiry, when a foreign government hires outside parties to

31

perform non-mission functions under circumstances in which its communications are not being provided any reasonable expectation of confidentiality, such documents are not inviolable within the meaning of Article 24.

In this case, the defendants are all registered agents of Qatar who must comply with the requirements of the Foreign Agents Registration Act. That Act requires registered agents to keep "such . . . records" as the Attorney General may prescribe, and to make those records available for "inspection." 22 U.S.C. §§ 612(a), 615. For records that fall within this provision of the Act, the expectation of confidentiality is diminished because the documents are provided with the prospect that they could be subject to further disclosure. This case does not require this Court to determine whether any document subject to inspection under the Act falls outside Article 24, *see* Qatar Br. 50-51, because Qatar's consulting agreement with the defendants in this case specifically acknowledged that the documents may be disclosed "as required by law," JA225; Qatar Br. 7-8 & nn.4-5.[5] Given that language,

---

[5] *See also, e.g.*, Agreement for defendant Howard's former employer Conover + Gould to provide IMS, Inc. with communications

*Continued on next page.*

which contemplates disclosures required by law regardless of any

protections provided by Article 24, and the specific requirements of the

Act, Qatar did not have a reasonable expectation that the documents

that are in fact subject to inspection under the Act would remain

protected from disclosure.

## CONCLUSION

The district court's discovery order should be reversed.

---

services in support of Qatar (https://perma.cc/95H3-BMAZ); Consulting
Services Agreement Between IMS and Qatar ¶ 5 (documents
confidential "and will not be disclosed by Consultant to any person
except as authorized by the Embassy, or as required by law")
(https://perma.cc/TE2G-E79Q); Agreement Between Howard employer
Mercury Public Affairs and Qatar Schedule 1 ("Consultant will comply
with the provisions of all federal state and local laws, regulations, and
requirements pertaining to the performance of services under this
contract.") (https://perma.cc/5MV9-HGMF).

33

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

RICHARD C. VISEK
   *Acting Legal Adviser*
   *Department of State*
   *Washington, DC 20520*

SHARON SWINGLE
   */s/ Martin Totaro*

MARTIN TOTARO
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-5048*
   *martin.v.totaro@usdoj.gov*

August 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6394 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Martin Totaro*
Martin Totaro