# EXHIBIT 2

```
                    UNITED STATES COURT OF APPEALS
 1              FOR THE DISTRICT OF COLUMBIA CIRCUIT

 2

 3  - - - - - - - - - - - - - - X
                               :
 4  BROIDY CAPITAL MANAGEMENT LLC :
    AND ELLIOTT BROIDY,          :
 5                               :
             Appellees,          :
 6                               :
       v.                        :    No. 22-7082
 7                               :
    NICOLAS D. MUZIN et al.,     :
 8  STATE OF QATAR,              :
                                 :
 9           Appellant.          :
                                 :
10  - - - - - - - - - - - - - - X
                               Friday, October 28, 2022
11
                               Washington, D.C.
12

13
        The above-entitled matter came on for oral
14  argument pursuant to notice.

15      BEFORE:

16          CHIEF JUDGE SRINIVASAN, AND CIRCUIT JUDGES WILKINS
            AND RAO
17
        APPEARANCES:
18
            ON BEHALF OF THE APPELLANT:
19
            DAVID M. ZIONTS, ESQ.
20
            ON BEHALF OF AMICUS CURIAE:
21
            MARTIN TOTARO, ESQ.
22
            ON BEHALF OF THE APPELLEES:
23
            DANIEL A. SAUNDERS, ESQ.
24          DANIEL R. BENSON, ESQ.
25
```

**Deposition Services, Inc.**
P.O. Box 1040
Burtonsville, MD 20886
Tel: (301) 881-3344 Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

C O N T E N T S

ORAL ARGUMENT OF:                                          PAGE

     DAVID M. ZIONTS, Esq.
     On Behalf of the Appellant                           3; 64

     MARTIN TOTARO, Esq.
     On Behalf of Amicus Curiae                             24

     DANIEL A. SAUNDERS, Esq.
     On Behalf of the Appellees,
     Jurisdiction Issues                                    41

     DANIEL R. BENSON, Esq.
     On Behalf of the Appellees,
     Vienna Convention Issues                               51

WC

1               P R O C E E D I N G S

2          THE CLERK:  Case No. 22-7082, Broidy Capital

3    Management LLC and Elliott Broidy versus Nicolas D. Muzin

4    et al., State of Qatar, appellant.  Mr. Zionts for the

5    appellant.  Mr. Totaro, amicus curiae.  Mr. Saunders for the

6    appellees, jurisdiction issues.  Mr. Benson for the

7    appellees, Vienna Convention issues.

8          JUDGE SRINIVASAN:  Good morning, counsel.

9    Mr. Zionts, please proceed when you're ready.

10          ORAL ARGUMENT OF DAVID M. ZIONTS, ESQ.

11               ON BEHALF OF THE APPELLANT

12          MR. ZIONTS:  Thank you, Your Honor.  May it please

13   the Court.  The district court made two important errors

14   that harm Qatar's rights and interests as a sovereign:

15   First, the court held that the Vienna Convention on

16   Diplomatic Relations is categorically inapplicable, the

17   documents, archives, and correspondence, whenever they are

18   freely given to a non-mission party.  Second, the court held

19   that principles of international comity are also

20   categorically inapplicable when discovery is sought from a

21   private party that is a U.S. national.

22          This Court should reverse both rulings and remand

23   with appropriate guidance for the district court to conduct

24   a document-by-document assessment.  In doing so, the Court

25   should reject two arguments that had been advanced to limit

WC

1  Qatar's protections:  First --

2          JUDGE RAO:  Mr. Zionts, first, I mean, assume if

3  we did agree with you that the Vienna Convention is not

4  categorically off the table and we were to remand.  I mean,

5  how do we articulate the standards that the district court

6  should apply since we don't have the documents before us?

7  We don't have any sense of what type of issues are going to

8  arise in that document-by document consideration.

9          MR. ZIONTS:  Sure, Your Honor.  I think -- I think

10  it's unfortunate that the -- you know, frankly, Qatar's

11  request to develop this in a concrete way with a log is not

12  where we are, but we are where we are.  We do think it is in

13  the interest of the sovereign, of the parties to this case,

14  of the district court to at least get into some of these

15  issues.  So, for example, we know that there is this issue

16  of FARA.  There is this issue that's been raised about the

17  contract.  We know that there will be issues about the

18  standard for documents that are generated by the contractors

19  that incorporated --

20          JUDGE RAO:  So, I mean, is it your view it's

21  sufficient for us just simply to reverse and not provide

22  guidance or --

23          MR. ZIONTS:  Your Honor, you know, I think, the,

24  in our view, the district court was wrong as a matter of law

25  and the Court should reverse and hold that the categorical

1  rule it adopted was incorrect and the process needs to

2  start.  Obviously, the documents aren't here.  The documents

3  -- you know, there has been no log.  So we think there's

4  going to be a lot of work to do in the district court.  You

5  know, our request would be that it would be in the interest

6  of all parties and the district court if the Court did go a

7  step beyond reversing that categorical ruling.

8         JUDGE RAO:  And what does that look like, I guess

9  is my question.

10        MR. ZIONTS:  Sure, Your Honor.  So I think we

11  would start, you know, with a point of agreement with the

12  United States about, you know, what documents of the mission

13  means.  They're entitled to inviolability.  We have offered

14  certain factors.  I think those are really, in our view,

15  more granular ways of getting at some of the things that the

16  United States government was talking about in terms of a

17  special relationship, looking to, you know, was the purpose

18  of the engagement and of the work the contractors were doing

19  related to the mission's performance of its -- of its

20  functions, was there -- was there an expectation of

21  confidentiality, was the mission exercising control and the

22  treatment so that -- of those documents and information?  So

23  I think that is -- that is the first step.  That's the

24  standard that we would suggest.

25            And then I think there are these sort of secondary

WC

1   issues that have -- that have risen.  So take one, this

2   argument that Mr. Broidy makes -- the United States does not

3   endorse this argument -- but this idea that because of this

4   existence out there of a possible FARA inspection, right,

5   that means that the expectation of confidentiality vanishes.

6   You know, if that were -- if that were accepted on remand, I

7   think that would -- that would, you know, maybe entirely or

8   pretty close to entirely end this.  So we think that is

9   something that the court should also address as a matter of

10  law.

11          JUDGE RAO:  That seems to me to be a very tricky

12  question, because it seems, at least from the briefing and

13  the records, that the application of FARA is -- you know,

14  it's often worked out between DOJ and, you know, diplomatic

15  missions, and so our stepping into that with some type of

16  standard seems like a difficult place for this Court to be

17  without more knowledge of whether FARA will even come up

18  with respect to the particular documents at issue, but

19  you're saying that we should address that question.  That

20  seems to me to be a very -- a very tough question.

21          MR. ZIONTS:  Your Honor, I think there's two

22  aspects to that question, one of which, I agree, is very

23  difficult and we do not urge the Court to decide, even

24  though, you know, it's raised by Mr. Broidy's arguments, and

25  the other, which I think is a much less fraught path.  You

1    know, our view is that probably the better practice is not

2    to get into this question of if you had a clash between

3    sovereigns where the United States Department of Justice

4    said we want to inspect these records or the contract or of

5    the mission and then the sovereign representing that mission

6    came in and said, no, some of these records are documents of

7    the mission and they're inviolable under the Vienna

8    Conventions.  You know, we think that is a legitimately

9    hard, difficult problem.  I completely agree, Judge Rao,

10   with your point that this tends to be worked out between

11   sovereigns, and I think, unless and until, you know, two

12   sovereigns can't work that out, that that is an issue, you

13   know, better left for another day.

14          You know, our view on how this case -- how this

15   issue should be resolved is to say let's assume for the sake

16   of argument that DOJ does have these inspection rights.  It

17   is -- that does not mean the expectation of confidentiality

18   that the mission has and the documents held by the

19   contractor completely vanish.

20          So we have this, you know, possibility that maybe

21   DOJ will exercise inspection rights and maybe, you know,

22   that -- maybe the sovereign will or won't object, maybe that

23   will be worked out some other way, but you know, we think

24   that, you know, that doesn't change the fact that in this

25   civil case, there is no -- there is still a reasonable

1   expectation of confidentiality that when the mission shares

2   with its contractors for the purposes of assisting in its

3   diplomatic missions, that that's not -- the United States

4   gives the example of stuff getting posted on the Internet --

5   that's not anything close to what we're -- to what we're

6   talking about with this hypothetical possibility of a DOJ

7   inspection.  So that's the path we'd suggest the Court would

8   go down.

9           It does leave for another day --

10          JUDGE SRINIVASAN:  I'm not --

11          JUDGE WILKINS:  I --

12          JUDGE SRINIVASAN:  -- I don't -- go ahead.

13          JUDGE WILKINS:  I'm interested in a whole nother

14   path going down.  Perhaps it's the old district court judge

15   in me, but I want to ask you some questions about the motion

16   to dismiss this appeal.  Do you think, as a general matter,

17   that it should be easier for a nonparty to get interlocutory

18   review than a party in a civil case?

19          MR. ZIONTS:  Your Honor, you know, one of the two

20   grounds for interlocutory review here is the Perlman

21   doctrine, and so under that doctrine, under this Court's

22   precedent applying for it, I think there are cases where an

23   appeal would be available to a nonparty but not to a party.

24   I don't think the Court needs to get into that because this

25   is -- this -- you know, regardless of who is appealing, we

1 think under the collateral order doctrine, this is

2 appealable, but I think the concept of the Perlman doctrine

3 is that there could be cases where, if you were a party, you

4 would essentially have to go the contempt route if you

5 wanted to appeal but a nonparty may have a separate basis to

6 appeal.

7    JUDGE WILKINS:  Well, when has the collateral

8 order doctrine been used with respect to a nonparty?

9    MR. ZIONTS:  Your Honor --

10    JUDGE WILKINS:  Can you cite a case?

11    MR. ZIONTS:  Your Honor, I think, you know, this

12 Court's Sealed Case did rely on the collateral order

13 doctrine.  Now -- and Mohawk may have -- may have undermined

14 the particular collateral order holding in Mohawk, but that

15 was a case, you know, just, you know, zooming out as a

16 conceptual matter, where a -- where a nonparty to the case

17 filed a notice of appeal and this Court entertained that

18 appeal both under collateral order and Perlman grounds.

19    JUDGE WILKINS:  So I've looked at a bunch of our

20 cases and the Supreme Court cases invoking either the

21 collateral order doctrine or the Perlman doctrine, and I

22 can't find a single one where the appellant wasn't at least

23 a movant of some sort in the district court where they

24 didn't -- where they filed either a motion to quash or they

25 filed a formal objection or they sought some sort of relief

WC

1   and then they were appealing the denial of the specific

2   relief that they sought.  You didn't do that here.

3          MR. ZIONTS:  Your Honor, I think we did.  The case

4   is complicated, you know, because Qatar is a foreign

5   sovereign and because it was essentially facing the threat

6   that if it intervened, you know, the serious concern that

7   Mr. Broidy would contend that that was a waiver --

8          JUDGE WILKINS:  Who cares what he would contend?

9   I mean, we have held since at least 1980 in the U.S. v. AT&T

10  case that a nonparty can intervene for the limited purpose

11  in a civil case to assert a privilege in a discovery

12  dispute, and there's nothing in the text of 1605(a)(1) or

13  1607 that suggests that that limited intervention is going

14  to waive sovereign immunity to be able to assert some sort

15  of claims against Qatar.

16          And the fact of the matter is, is that you could

17  have sought such limited intervention consistent with our

18  practice and what the Supreme Court says is the preferred

19  way of proceeding and then, if that had been -- if your

20  limited intervention had been denied you, then you could

21  seek interlocutory appeal of that denial, along with

22  consideration of the merits of the dispute, and we wouldn't

23  have this situation where we don't know what you are.  Are

24  you fish or foul?  We don't know.  You're an amicus.  You

25  can't preserve arguments as an amicus below.  We even have a

1    rule where, if you're a party and you don't join in a motion

2    or an objection below, you can't assert it on appeal if you

3    didn't join it, and that's if you're a party.

4              So this is all a mess because you didn't pursue

5    the option that was available to you to pursue, and I have a

6    problem with that.

7              MR. ZIONTS:  Your Honor, you know, a couple of

8    responses to that -- one, I do think, you know, when a

9    sovereign is involved, it is something fraught.  You know, I

10   agree with you that it would not in fact have been an

11   implied waiver or trigger the counterclaim exception.  I

12   think a foreign sovereign has a legitimate, reasonable

13   interest to not even being subject to that risk, not even

14   being subject to having to defend that claim.  We know the

15   district court suggested that it viewed that as a complex

16   question.  We could have wound up, you know, with expensive

17   proceedings, both in the district court and the court of

18   appeals.  So I think that's just a factual response with the

19   unique circumstances here.

20             On the broader -- on the broader question of

21   whether you need to be -- you know, intervene or need to be

22   a movant at -- a movant in the district court, you know, I

23   think that's not what happened in this Court's Sealed Case.

24   It's not what happened in the Supreme Court's case in Devlin

25   v. Scardelletti.  The Supreme Court engaged in --

WC

1          JUDGE WILKINS:  But there the party was going to

2   be bound by the order.  Here Qatar isn't bound by the

3   discovery order.

4          MR. ZIONTS:  It's not bound in the sense -- in the

5   sense that it's not directed at Qatar, but it is losing an

6   immunity, an inviolability that Qatar --

7          JUDGE WILKINS:  If bound went that far, then

8   someone who had an attorney-client privilege that they -- or

9   work product privilege -- that they were concerned about

10  losing would be bound by a discovery order, and that's not

11  the way that we -- bound has a term of art that has a

12  particular meaning.  It means that the judgment binds you

13  for contempt or other enforcement purposes or perhaps for

14  res judicata or collateral estoppel/issue-preclusive

15  purposes, and this doesn't do that.  So you're not bound.

16  So you don't fall within Devlin.

17         MR. ZIONTS:  Sure, Your Honor.  You know, I think

18  this Court in the Sealed Case referred to being bound or

19  otherwise having interests affected and undermined.  That

20  certainly was happening, but I think you're certainly -- I'm

21  not saying that Devlin is factually on all fours.  What I do

22  think Devlin stands for is, the court says, first of all,

23  this is not a question of Article III jurisdiction.  That's

24  satisfied by the personal stake.  It's not even an

25  assessment of prudential standing.  It's essentially -- or a

1    prudential rule about who has the right to an appeal.  In

2    the court's analysis where it said there that intervention

3    was not required to get out some class members, it is a very

4    functional analysis, and that's why I think it is

5    appropriate to look to these questions of whether a foreign

6    sovereign should be put into this position.

7              The only other thing I would say is, Your Honor --

8              JUDGE WILKINS:  Well, it's practical -- also, you

9    can say it's a practical analysis on appeal.  It's practical

10   in the district court whether or not you formally intervene

11   or not, at least for this limited purpose, so that you can

12   preserve arguments so that it's clear, like, what arguments

13   you're making and what arguments we can hear on appeal; what

14   record you want to make; what you want to put in the record;

15   what specific procedure you want so that we don't have a

16   situation where we're trying to figure out on appeal is this

17   something that the defendant asserted and did they make

18   Argument X but you, as an amicus, made Argument X Prime; the

19   defendant doesn't appeal but you do.

20             It's -- this is all -- all of that could be solved

21   if you had done what was available to you to do and which

22   would have provided no risk to you, because if you seek

23   limited intervention and it's the -- not -- you're not

24   allowed to intervene on the limited terms and conditions

25   that you set forth, then you can challenge that.

WC

1          MR. ZIONTS:  Your Honor, I'd respectfully push

2    back on the no-risk proposition there.  I think that, you

3    know -- you know, in deciding -- in the State of Qatar

4    deciding how best to assert its interests here, we did look

5    for guidance on this, found this to be, you know, an

6    uncertain playing field.  I think going forward, if this

7    Court were to adopt a rule that said a foreign sovereign

8    that finds itself in this position should intervene, doing

9    so will not be construed as any kind of waiver of sovereign

10   immunity and, if you don't do that, you're out of luck, I

11   think that would be a perfectly reasonable and acceptable

12   rule going forward.

13          I think, as applied to this case, you know, the

14   FSIA provides an exception for sovereign immunity to waivers

15   that are implied.  The district court in this case at least

16   thought it was a complex question whether this would

17   constitute a waiver of sovereign immunity, and we had no,

18   you know, court of appeals authority, any other authority to

19   be able to say, you know, to a sovereign, you are not at any

20   risk here by showing up and intervening for purposes of this

21   discovery dispute.  Certainly, we might have said, we think

22   we would ultimately prevail there, but I really don't think

23   it's no risk.  So I think -- I think you would be

24   probably --

25          JUDGE WILKINS:  I think it's no risk in the sense

WC

1   that the way that I understand intervenor practice -- and

2   you can tell me if I'm wrong about this and direct me to a

3   case -- but when a party seeks limited intervention, like,

4   I've seen cases involving Indian tribes, et cetera, that

5   have -- in the United States -- that have sovereign

6   immunity, they can say, look, we want to intervene on this

7   limited basis, in -- under these conditions, where we are

8   preserving our -- and not waiving our immunity as to a, b,

9   and c and we're only intervening on this limited basis, and

10  if the district court agrees that that's appropriate after

11  hearing from the parties, then it grants that, and if it

12  disagrees and says, no, I think that if you intervene,

13  you're going to waive this particular immunity that you

14  don't want to waive, that doesn't mean that, like, you are

15  forced in under those conditions.  You can challenge that in

16  the court of appeals, and if the court of appeals finds that

17  that's an abuse of discretion, then you can intervene on

18  those terms, and if it disagrees and you don't want to

19  intervene on those terms, then maybe we have a question as

20  to whether or not you should be able to pursue as something

21  -- pursue this as something other than a party.

22          MR. ZIONTS:  Your Honor, I think, you know, in

23  terms of foreign sovereign immunity, I'm just not aware of

24  cases addressing this question.  I think the analysis

25  wouldn't necessarily be the same in the way it works in

1    tribal sovereignty, only because we're talking about a

2    specific statute that has a specific implied waiver

3    exception for sovereign immunity.

4            So I do think that there was risk there and this

5    was a reasonable path under the circumstances and that this

6    question of, you know, who is entitled to appeal as a

7    nonparty is functional and equitable, you know, as Devlin

8    says, of the -- I would suggest, you know, the cases that

9    this Court cites in its footnote in the Sealed Case, when

10   you look at how other circuits address this, it's way an

11   amorphous, you know, set of considerations that go to what's

12   equitable, what's fair in the circumstances for whether a

13   nonparty is able to go.

14           The last thing I would say on this is, you know,

15   there is the possibility of construing this as a mandamus

16   petition.  The United States agrees with us that there was a

17   clear error here, an entitlement to remand, and I think is

18   another option that may avoid some of these problems.

19           JUDGE WILKINS:  The concern I have -- the reason

20   why I think we got to go the first principles here is

21   Mohawk.  I mean, Mohawk seems to say that you got to pick

22   one door, you got to either pick the interlocutory appeal

23   door under the collateral order doctrine or you pick

24   mandamus, because one of the rationales of Mohawk's holding

25   is that, look, as a categorical matter, attorney-client

1  privilege claims, we're going to say, are not subject to

2  this collateral order/interlocutory appeal doctrine because

3  there's a couple of things that you could do, you could --

4  you could perhaps suffer contempt and get direct appeal that

5  way; you could ask for the order to be certified for

6  interlocutory appeal and, if it's a novel question, then

7  that's generally going to happen and you get interlocutory

8  appeal that way; or, if neither of those are really going to

9  be available to you, then mandamus will be available to you

10 and so you don't go through this door.

11       So I think we have to figure out, as a doctrinal

12 matter, which door must you have to go through, and if it's

13 the petition for mandamus door, the reason that that door

14 would be available to you is because there's no other

15 adequate relief that's available.  So we have to, you know,

16 make a decision as to whether in these cases in general

17 that's the way that they're going to be handled, not just

18 we're handling it that way in this case because you didn't

19 seek intervenor status.

20       I think if you could have and were supposed to

21 have sought intervenor status to deal with this, then the

22 mandamus option shouldn't be available to you, because you

23 would -- you should exhaust these other possibilities as

24 seeking collateral review under a party.

25           MR. ZIONTS:  Sure.  Sure.  I understand, Your

1  Honor, and I think, actually, this Court's decision in the

2  prior Broidy v. Muzin appeal is actually a good example of

3  how the Court has addressed something, you know, for

4  purposes of this case but also going beyond, and what it

5  said there was that case was entitled to a collateral order

6  review but, because of what the Court clarified in that

7  decision, you know, other cases might not actually, you

8  know, rise to the level.

9         Here I think the Court, you know, could quite

10 reasonably say, you know, going forward, if a foreign

11 sovereign is in this position, it should intervene and doing

12 so will not constitute any possibility of a waiver of

13 sovereign immunity, and if a sovereign is on notice of that

14 going forward and tries to do it another way, then I think

15 that would be a perfectly sensible rule going forward.

16        I think, you know, in terms of, you know, of the

17 (indiscernible), Your Honor, to a foreign sovereign, as the

18 Supreme Court has said, seeking to have its interest heard

19 in U.S. courts, there just wasn't guidance for what to do in

20 this -- in this circumstance.  You know, we think that this

21 was a reasonable way for the State of Qatar, you know, faced

22 with these (indiscernible), faced with these concerns, to

23 proceed.

24        JUDGE SRINIVASAN:  Can I ask one follow-up

25 question to --

1          MR. ZIONTS:  Sure, Your Honor.

2          JUDGE SRINIVASAN:  -- the colloquy earlier?

3          MR. ZIONTS:  Yes.

4          JUDGE SRINIVASAN:  So can you just state concisely

5   what you think we should say about the FARA issue?

6          MR. ZIONTS:  Your Honor, I think that the Court

7   does not have to --

8          JUDGE SRINIVASAN:  If we get to it.

9          MR. ZIONTS:  Sure.  If you get to the FARA issue,

10  I think the Court can say it is a hard question, you know,

11  what would happen if DOJ was seeking to inspect records that

12  a foreign sovereign claimed was -- were inviolable documents

13  of the mission?  I think in this case the Court can say that

14  in this civil discovery dispute, you know, the hypothetical

15  possibility that DOJ may in the future seek to inspect these

16  records does not so undermine the expectation of

17  confidentiality in those mission records, in those mission

18  documents that they cease to become documents of the mission

19  under the standards that United States and Qatar --

20         JUDGE SRINIVASAN:  And why do we -- why would we

21  even say that?  Why not just leave it all open to be worked

22  out on remand the way that the FARA intersects with

23  inviolability principles, and then we can always consider it

24  in a subsequent appeal, if necessary.

25         MR. ZIONTS:  Your Honor, I certainly don't

1  disagree that that's a path that's open to you.  You know,

2  Mr. Broidy has raised, you know, objections to the

3  possibility --

4           JUDGE SRINIVASAN:  In other words, you don't --

5  you don't view the state of things in the district court to

6  be such that if we get to that stage and if we were to send

7  it back, that the issue of the way the FARA intersects with

8  inviolability is already a foregone conclusion in the

9  district court?

10           MR. ZIONTS:  Your Honor, there is a -- there is a,

11  I believe, a paragraph or so of the --

12           JUDGE SRINIVASAN:  Right.

13           MR. ZIONTS:  -- district court's opinion that does

14  address that.  It is sort of confirmatory -- as I read the

15  opinion --

16           JUDGE SRINIVASAN:  Right.

17           MR. ZIONTS:  -- it's sort of confirmatory of the

18  district court's, you know, broader textual --

19           JUDGE SRINIVASAN:  Other conclusions, but by

20  hypothesis, we would have already --

21           MR. ZIONTS:  Correct.

22           JUDGE SRINIVASAN:  -- if we would get to that

23  stage, then the premise would be gone.  So --

24           MR. ZIONTS:  Correct.  Yes.  I think --

25           JUDGE SRINIVASAN:  Okay.

1          MR. ZIONTS:  -- I think it would be open.  You

2    know --

3          JUDGE SRINIVASAN:  Okay.

4          MR. ZIONTS:  -- I think, you know -- you know,

5    we're here as a nonparty wanting to be heard, and if that

6    means, you know -- you know, having this fleshed out in the

7    district court with the possibility of coming back if it

8    results in another categorical ruling that we think is

9    wrong, I think that's okay with us.  I think the parties may

10   have -- may have views about that, and we're not trying to

11   be obstructive in the process.

12         JUDGE SRINIVASAN:  Yes, but the way you read --

13   the way you read the state of things in the district court

14   is that it would all be open?

15         MR. ZIONTS:  Your Honor, I think, by hypothesis,

16   if the Court --

17         JUDGE SRINIVASAN:  Yes.

18         MR. ZIONTS:  -- rejected the district court's

19   overall framework, adopted, you know, another one, perhaps

20   one similar to the United States' and Qatar's, I do think it

21   would be open.  My view personally is that it would be

22   useful, but certainly, you know, I think we could -- we

23   could make that argument.

24         JUDGE WILKINS:  I have a question, another

25   question about Mohawk.  Mohawk, the Supreme Court said,

1   we're not going to look at, like, creating whether this sort

2   of discovery dispute involving attorney-client privilege

3   kind of falls within the third prong by looking at the facts

4   and circumstances of any particular case, we're just going

5   to make a categorical ruling that attorney-client privilege

6   challenges don't meet this third prong of the Cohen

7   standard, right, and they said we're going to do that by

8   looking at how much deferring review or the inapplicability

9   of review, you know, would thaw and harm people who would

10  seek to benefit from the privilege, and the court

11  acknowledged that, you know, part of the argument here is

12  that this type of privileged information should never be

13  disclosed but the court reaches a conclusion that, you know,

14  notwithstanding all of that, we don't think that this is

15  going to essentially have some sort of a serious negative,

16  deleterious effect on people's ability to consult with their

17  attorneys.

18         Don't we have to -- for you to prevail and for us

19  to agree to hear this appeal, don't we have to kind of reach

20  a conclusion contrary to Mohawk's analysis of

21  attorney-client privilege or this particular privilege that

22  you are asserting?

23         MR. ZIONTS:  Your Honor, I agree that the analysis

24  is categorical.  So on the question of the collateral order

25  doctrine, the question is not, you know, is Qatar's specific

1    claim here on the facts of this case, you know, effectively

2    unreviewable?  The question, I think -- I would phrase it

3    as, you know, an objection to disclosure and discovery on

4    the basis that something would violate the Vienna Convention

5    on Diplomatic Relations.  That's the category.  So I think

6    you would go through the Mohawk analysis, and the court gave

7    a number of reasons why for attorney-client privilege, you

8    know, an appeal at the end of -- after a final judgment was

9    enough, and as the -- and what the court said is, as

10   important as the attorney-client privilege rule, the rules

11   of the road are known, this is well settled, not much is

12   going to be gained by all these appeals, there's going to be

13   a lot that's lost by having all those appeals, and the

14   courts of appeals' burden with that.

15            I think, you know, as the United States' brief

16   confirms here, what's at -- what's at issue here is a

17   question of the United States' compliance with its

18   obligations under an international treaty.  You know, as

19   important as the attorney-client privilege is, you know,

20   that's something of a different order.  It's not something,

21   as the court emphasized in Mohawk, where there's sort of a

22   well-tried analysis that the court of appeals have developed

23   so there's not much of a chance of reversal on appeal.  You

24   know, these are -- these are complex and novel issues.

25            So, you know, I think, you know, we have no

WC

1   problem with following the analysis in <u>Mohawk</u>.  We just

2   think it comes out in a different way here, just as, you

3   know, this Court -- this has never reached the Supreme Court

4   -- but this Court routinely holds that a denial of sovereign

5   immunity, because of the particular harms involved of

6   forcing a sovereign who may be immune from facing the

7   burdens of suit, that this Court routinely says that

8   qualifies under the collateral order doctrine.

9           I think when you have the category here of a claim

10  of inviolability under the Vienna Convention on Diplomatic

11  Relations and the possibility that United States will

12  instantaneously be put in violation of its international law

13  obligations the moment of disclosure, then that is a

14  particularly important interest that's at peril and that

15  justifies review under the <u>Mohawk</u> standard.

16          JUDGE SRINIVASAN:  Thank you, counsel.

17          MR. ZIONTS:  Thank you, Your Honor.

18          JUDGE SRINIVASAN:  We'll hear from the Government

19  now, Mr. Totaro.

20              ORAL ARGUMENT OF MARTIN TOTARO, ESQ.

21                  ON BEHALF OF AMICUS CURIAE

22          MR. TOTARO:  Thank you, Your Honors.  Martin

23  Totaro for the United States.  If I could just briefly

24  address the jurisdictional piece before moving to the

25  merits.  I think, unlike evidentiary privileges that can be

1    protected through an appeal with a remedy, if the defendants

2    turn over inviolable documents, Qatar's treaty rights will

3    have been violated at that very moment, and so that's a

4    value of high order, not only because we're talking about

5    Qatar's treaty rights, but we're also talking about the

6    United States' obligation to safeguard those very rights.

7    So I think in that circumstance, coupled with all the other

8    distinctions with Mohawk Industries we discuss in the brief,

9    just a very different case.

10         And then the final brief point I'll make is that

11   this Court the first time this case was up on appeal took a

12   practical, pragmatic approach to appellate jurisdiction and

13   we think it should do so again here in the same way that it

14   does when we're talking about an issue of foreign sovereign

15   immunity where we're talking about a violation, where the

16   harm occurs at the time of the violation that cannot be

17   remedied on appeal.

18         JUDGE SRINIVASAN:  Can I ask you, do reciprocity

19   considerations come into play even with respect to

20   jurisdiction?  So, for example, I could understand that the

21   United States would be concerned that if it were in a

22   similar situation in a foreign jurisdiction, they would also

23   want the ability to get its inviolability assertion heard as

24   soon as possible before the documents would be disclosed.

25         MR. TOTARO:  Hundred percent correct, Your Honor,

1   yes, we agree with that.

2           JUDGE WILKINS:  And should that -- should that be

3   done by mandamus, or should that -- under the mandamus

4   standard, which is different because you have to show kind

5   of a clear right to relief, clear and indisputable, versus a

6   nonparty being able to avail itself of the, I guess, lesser

7   standard of collateral order review?

8           MR. TOTARO:  Judge Wilkins, I think in this

9   specific case, the Government is agnostic, because whether

10  it be through the collateral order doctrine and a lack of an

11  effectively -- an effective remedy on appeal or through

12  mandamus, the district court's categorical approach, which

13  we think was clearly an error, that could be resolved

14  through mandamus as well.

15          So I don't -- I understand -- I take your point

16  that in many cases, party, you're going to have to generally

17  choose collateral order or mandamus.  Here I think,

18  regardless of which path the Court chooses, all of the

19  requirements are satisfied.  So it doesn't really matter to

20  the United States how appellate jurisdiction is established,

21  just the fact that it is established so, as Chief Judge

22  Srinivasan pointed out, the foreign sovereign's treaty

23  rights can be safeguarded.

24          JUDGE WILKINS:  Just so that I'm clear about the

25  United States' position, what do you think is the clear

1  error -- the Vienna Convention's analysis or the

2  international comity analysis or both?

3          MR. TOTARO:  The clear error, Your Honor -- and I

4  think this can also lead me into the merits -- is the

5  adoption of a categorical rule that whenever documents are

6  freely given to third parties, those documents necessarily

7  fall outside of the Vienna Convention, and I'm happy to talk

8  about why that's irreconcilable with the text purpose --

9          JUDGE SRINIVASAN:  Because you didn't -- you

10 didn't even talk about international comity in your brief,

11 right?  You only --

12         MR. TOTARO:  But -- you're correct -- this

13 Court's --

14         JUDGE SRINIVASAN:  -- your entire brief talked

15 about --

16         MR. TOTARO:  Yes, Your Honor, sorry to interrupt.

17 This Court's order asked us to focus on jurisdiction and the

18 treaties, and so the United States did so, and so the United

19 States hasn't offered an opinion on international comity in

20 this case, in this context.

21         And so on this --

22         JUDGE RAO:  Can you -- oh, sorry.  Yes, go ahead.

23         MR. TOTARO:  So I will address the text of the

24 treaty, the purpose, practice, but at the outset I wanted to

25 be up front that one critical concern to the United States

WC

1    is that the district court's categorical error poses a

2    serious threat to how the United States operates its

3    embassies overseas in terms of reciprocity.

4            So the United States, as a matter -- I don't know

5    if routinely is the proper word -- but it not infrequently

6    uses outside contractors to carry out essential functions as

7    defined under Article 3 of the Vienna Convention.  This is

8    most often seen in terms of, like, embassy construction or

9    security personnel, and as the Government reads the district

10   court's order, none of the very important documents that are

11   provided to those individuals -- including, for example,

12   like, blueprints of an embassy -- would be protected by

13   Article 24; and that, as a matter of reciprocity, is a very

14   serious error and it cannot be reconciled with the text of

15   Article 24, which is talking about the protection of

16   documents wherever they may be.

17           JUDGE RAO:  Can you also speak to the question

18   about the intersection between the Vienna Convention and

19   FARA, because obviously DOJ is the, you know, is the entity

20   that enforces FARA?

21           MR. TOTARO:  So --

22           JUDGE RAO:  I mean, do we need to even -- do we

23   need to say anything about that in this case and -- you

24   know, do we need to, should we, you know, and what would

25   that look like?

WC

1          MR. TOTARO:  So I do not push back against the

2    hypothetical or the question lightly, but I think the Court

3    should be very careful about what it says about the

4    potential intersection between the FARA and the Vienna

5    Convention, because doing so could raise significant

6    domestic and international concerns.

7          There is no need for this Court to address whether

8    there is a potential conflict between the FARA and the

9    treaty, and one potential way to avoid that issue would be

10   through the framework we've adopted, which is to say, look,

11   the text of the treaty does not resolve when documents given

12   to third parties are, quote, of the mission, even though

13   those documents would be subject to FARA inspection.

14          The critical inquiry, instead, as we know from

15   international scholars like Denza, is whether the entity had

16   a reasonable expectation of confidentiality when it handed

17   those documents over to a third party, and on that question

18   our brief provides a framework where we set forth three

19   critical -- or three factors that all point toward that

20   overarching question of confidentiality.  And then to get

21   directly to your point, as applied in this case, we have the

22   text of the contracts between the mission and the particular

23   consultants.  That, in the United States' view, allows this

24   Court to sidestep the direct issue of whether the FARA ever

25   poses a conflict with Article --

WC

1          JUDGE SRINIVASAN:  Well, suppose we disagree with

2    that.  Suppose we don't think that the boilerplate about as

3    required by law -- that's what you're talking about, right?

4          MR. TOTARO:  Yes, Your Honor.

5          JUDGE SRINIVASAN:  Suppose that we don't think

6    that that resolves this issue.  Then -- I mean, I know your

7    argument is that, as required by law, FARA is a law and

8    therefore the contract already presupposes that documents

9    can be turned over under FARA, but suppose we think that

10   there's something to the other side's notion, which is,

11   well, that's just circular because the whole question is

12   whether it's required by law.  Then where are we with

13   respect to FARA, and then where does the United States think

14   we should go in an opinion if all the other predicate

15   steps --

16         MR. TOTARO:  Right.  So --

17         JUDGE SRINIVASAN:  -- get us to that point?

18         MR. TOTARO:  -- on the premise of the question,

19   just to be clear, under Qatar's view, as required by law has

20   no meaning whatsoever in the contract, boilerplate or not,

21   because it, under Qatar's view -- this is in footnote 11 of

22   the brief -- that only applies to documents that are of the

23   mission anyway, and so that phrase need not -- need not be

24   an error at all.  And so those contracts could have very

25   easily said, for example, consultant, while you may under

1    the laws of the United States give those documents to the

2    Department of Justice if inspected, under no circumstances

3    can you give these documents to others in third -- in

4    private litigation, but Qatar chose not to do that.  And so

5    our point is merely that when you hand over documents to a

6    third party against the backdrop of FARA, that diminishes

7    but does not eliminate the expectation of confidentiality.

8              And to get to the point, well --

9              JUDGE SRINIVASAN:  Well, suppose -- I take that

10   point, but suppose we just don't think it's -- that that's

11   definitive with respect to FARA.

12             MR. TOTARO:  Right, and so I think the problem

13   there is that a document either is of the mission or it's

14   not of the mission, and so a document can't be of the

15   mission if it's requested -- not of the mission if it's

16   requested by the United States but, at the same time, being

17   of the mission when requested by a private party in

18   litigation.

19             So our point was merely that once you undermine

20   that confidentiality expectation, it takes it out of the

21   realm of being a document of the mission, but I take the

22   point that -- I don't want to -- I don't want to fight

23   gravity here, and if the Court disagree with that, one

24   option, which I think Qatar laid out on page 22 of its

25   reply, is to say, look, these documents might still be of

1   the mission but the contracts consented or waived any

2   request by the United States, by the Department of Justice

3   when we were in the land of FARA.  So in that circumstance

4   the documents could potentially still be of the mission but

5   the Court would not have to address any potential conflict

6   between FARA and the treaty because it would say regardless

7   of whether those documents are of the mission -- even if

8   those documents are of the mission, the Government -- the

9   Qatar mission has consented to them being turned over by the

10  United States.

11          JUDGE RAO:  So if we were to remand and the

12  district court concluded that a particular document was of

13  the mission and therefore inviolable, is it the Government's

14  view that they could still seek that document under FARA --

15          MR. TOTARO:  So then it would be --

16          JUDGE RAO:  -- like, if there had been a ruling by

17  district court that it was inviolable in private litigation?

18          MR. TOTARO:  I think so, Your Honor, because it

19  wouldn't address this issue of consent or a waiver, and so

20  it would be -- the district court would say, look, this

21  seems like a very important document that satisfies the

22  framework of confidentiality.  It's --

23          JUDGE RAO:  And then it's just a separate question

24  of --

25          MR. TOTARO:  And then it's a separate question,

1   and I think it would be important, if the Court went that

2   route, to make clear that it is a separate question when

3   we're not talking about private party litigation but when

4   we're talking about the United States invoking its

5   inspection rights under the statute.

6           The reason why this hasn't popped up, I suspect,

7   is because, as Your Honor noted, this tends to be done on a

8   sovereign-to-sovereign basis as opposed to this rather

9   unique situation, and so --

10          JUDGE SRINIVASAN:  But then the result would be,

11  though -- there is something intuitively, at least, possible

12  about this result -- is that inviolability prevents the

13  document from being turned over in this kind of litigation

14  but it doesn't prevent the Government from obtaining the

15  document pursuant to FARA.

16          MR. TOTARO:  And I think that would be because of

17  some sort of consent that, again, that Qatar --

18          JUDGE SRINIVASAN:  So you think they'd have to

19  point to something in a contract itself in order to reach

20  that result; but for that, there's no way to reach that

21  result?

22          MR. TOTARO:  I think the contract is the easiest

23  way to duck the potential very thorny issue of whether, if a

24  document on a remand is of the mission, whether the United

25  States can invoke its statutory inspection rights without

1   being in tension with Article 24, but again, I cannot stress

2   enough that I don't think the Court needs to reach that

3   direct issue.

4          I think, rather, the more appropriate course is to

5   say, district court, the categorical approach you adopted is

6   incorrect, here are the proper factors and then, focusing on

7   the language of the contract, either agreeing with the

8   United States' position that this has significantly, under

9   Qatar, diminished the expectation of confidentiality,

10  therefore taking -- probably taking those documents outside

11  of mission status under 24, or the route Qatar has proposed,

12  which is to say, but the documents, at a minimum, consent to

13  inspection by the Government, but that's a separate question

14  entirely from whether in private party litigation they're

15  subject to discovery.

16          JUDGE SRINIVASAN:  Or just leave that off.

17          MR. TOTARO:  I'm sorry?

18          JUDGE SRINIVASAN:  Or just leave that off, to be

19  worked out on remand.  I don't even know that -- why would

20  we even have to do either of those two?  Why would we not

21  just send it back and say the --

22          MR. TOTARO:  It is certainly within the Court's

23  discretion not to do that.  I think this is a situation

24  where more guidance might be better than less, just to

25  provide the proper signposts so we're not here --

1          JUDGE SRINIVASAN:  If we thought we had enough

2    information with which to give signposts and --

3          MR. TOTARO:  Yes, Your Honor.

4          JUDGE SRINIVASAN:  Yes.

5          JUDGE RAO:  Just ask you a factual -- as a factual

6    matter, does DOJ litigate under FARA against foreign

7    sovereigns?  I'm assuming not very often, but I was just

8    wondering, as a factual matter, if those, you know, such

9    cases are --

10          MR. TOTARO:  Unfortunately, I'm by no means a FARA

11    or criminal expert.  I know these issues pop up.  I think

12    they're -- I don't know how many inspections there are a

13    year.  I think it's something like 20 inspections, and I

14    just don't know how often it gets litigated where -- well, I

15    don't think it gets litigated, but I don't know how often a

16    foreign sovereign comes in and says, wait a minute here,

17    we're dealing with very sensitive ground, and I --

18          JUDGE RAO:  I was curious.

19          MR. TOTARO:  -- and I think the lack of cases

20    speaks volumes about, to the extent it's ever addressed, how

21    it's addressed at a more diplomatic level.

22          JUDGE SRINIVASAN:  Can I ask you, does -- the

23    Government didn't reference Article 27 in its brief, I

24    think.

25          MR. TOTARO:  We did not, Your Honor.

WC

1            JUDGE SRINIVASAN:  And is there a reason for that?

2   Is --

3            MR. TOTARO:  We're not sure that Article 27.2

4   gives anything more that Article 24 otherwise wouldn't

5   provide, and it seems like the clear thrust of Article 27 is

6   talking about correspondence between the sending state and

7   the embassy itself.  I don't want to sort of put forth a

8   categorical position that the United States' view, that

9   that's the only circumstance --

10           JUDGE SRINIVASAN:  The only -- yes.

11           MR. TOTARO:  -- in which Article 27 applies, but

12  here, as I think the (indiscernible) Denza said it best, it

13  seems that Article 27's protections are duplicative.  So I

14  just don't think it does --

15           JUDGE SRINIVASAN:  It doesn't add anything.

16           MR. TOTARO:  -- I don't think it does any work

17  that Article 24 doesn't already provide, just like I'm not

18  sure that the Perlman doctrine on jurisdiction would do any

19  more work than the collateral order doctrine or the

20  mandamus --

21           JUDGE SRINIVASAN:  And you don't think if Article

22  27 is narrower, that then Article -- that narrowness gets

23  read back into Article 24?

24           MR. TOTARO:  No, I don't think Article 27 takes

25  away anything provided --

1              JUDGE SRINIVASAN:  Okay.

2              JUDGE WILKINS:  One last FARA question -- what

3    triggers the inspection power or rights of the Government?

4    Is there -- is it just because they want to, or do they have

5    to have some sort of cause or justification?  Do they have

6    to seek leave of court?  What enables the Government to

7    inspect the records that are required to be kept under FARA?

8              MR. TOTARO:  Well, I'm not exactly sure what

9    triggers the exception right except I know you are subject

10   to the regulations that can trigger when you have to

11   register as an agent under the Foreign Agents Registration

12   Act.  So I'm not sure if there -- and I apologize -- if

13   there's not a second further step.  I would be surprised if

14   there were.  The critical question, I think, is that

15   question in the first instance of whether you need to

16   register, and all of these defendants have.

17             JUDGE WILKINS:  So we don't know whether you'd

18   have to get a warrant or whether the FBI can just show up

19   and say, you're registered under FARA, there's all these

20   records you're required to keep, we're here to see them,

21   hand them over?

22             MR. TOTARO:  It's my understanding, as a matter of

23   practice, this isn't something where federal agents are

24   banging down your door.  It's a collaborative process where

25   there's an inspection that occurs, I think, either on

1   premises or even, you know, through a server or whatever,

2   where the documents are put, and then the Government can

3   look at the documents.

4           JUDGE SRINIVASAN:  I have -- oh, I'm sorry.

5           JUDGE WILKINS:  So at least you don't have any

6   reason to believe that a warrant or subpoena or some sort of

7   court authorization is required for that inspection to

8   occur?

9           MR. TOTARO:  I could be very wrong, but I don't --

10  I don't think so, Your Honor.

11          JUDGE SRINIVASAN:  I have one other question, and

12  this goes back to international comity.  So I know you

13  didn't address it in your brief.  You didn't have to, but

14  you could have, and -- because I don't think the order

15  cabined the grounds, just pointed to particular grounds as a

16  possibility, and I'm just wondering, do you have a view on

17  that on behalf of the United States?  Does the United States

18  think that comity adds anything when you've got something

19  specific that deals with the terrain like Article 24 does?

20          MR. TOTARO:  So the United States did not opine on

21  that question, but the United States does not want the Court

22  to read into anything -- like, it's not that we, the

23  Government, thinks that comity plays no role here or can

24  play a role on remand.  We just have taken no position, and

25  instead, we, you know, focused on the text of the Court's

WC

 1  order in a rather compressed --

 2          JUDGE SRINIVASAN:  And what is -- I know you

 3  didn't do it in your brief, but are you -- are you prepared

 4  to say anything about the Government's view about comity in

 5  the abstract here or the role that comity may or may not

 6  have vis-à-vis the particular provisions in the Conventions?

 7          MR. TOTARO:  No, Your Honor.  We think this case

 8  can be resolved -- this appeal can be resolved clearly on

 9  the Court's interpretation of Article 24.

10          JUDGE SRINIVASAN:  But I don't -- I don't know

11  about that because if the -- if under the Conventions what

12  the Government wants is us -- for us to remand and to have a

13  document-by-document run-through to see if the factors are

14  satisfied with respect to each document, which is where I

15  think you are --

16          MR. TOTARO:  Yes, Your Honor.

17          JUDGE SRINIVASAN:  -- then there's a -- there's,

18  at least conceptually, a broader question, which is, would

19  comity come in and come across the board and say you don't

20  even have to do document-by-document, it's more wholesale

21  than that?

22          MR. TOTARO:  I'm not sure I understand how it

23  would be more wholesale by, like, category-by- -- I think

24  the factors we set forth in the brief could go a long way

25  toward the type of document-by-document or

WC

1  category-of-document-by-category-of-document review, why

2  Your Honor is suggesting on remand --

3          JUDGE SRINIVASAN:  And --

4          MR. TOTARO:  -- but we're not -- I'm not saying

5  that comity should be foreclosed on remand.  The Government

6  has merely -- hasn't taken a position on the issue

7  altogether, one way or the other.

8          JUDGE SRINIVASAN:  And comity would not give Qatar

9  any more than that, I assume, because otherwise -- and we do

10 more than remand and just set out the factors -- because

11 there'd be the potential that there'd be a greater grounds

12 for what we'll call inviolability pursuant to an overhanging

13 comity doctrine.

14         MR. TOTARO:  I could imagine Qatar arguing

15 something along the lines of apply the factors as set forth

16 in the United States' brief but, if there are close calls,

17 then comity could play a role in the district court's

18 decision of whether a document is in or out, and on that

19 issue, again, we're not taking any --

20         JUDGE SRINIVASAN:  You don't have any view on

21 that.

22         MR. TOTARO:  -- position, but I could imagine it

23 playing a role.

24         JUDGE SRINIVASAN:  All right.  Thank you.

25         MR. TOTARO:  And, again, thank you for giving us

WC

1    the opportunity to participate in oral argument.

2            JUDGE SRINIVASAN:  Thank you, counsel.

3    Mr. Saunders.

4            ORAL ARGUMENT OF DANIEL A. SAUNDERS, ESQ.

5                ON BEHALF OF THE APPELLEES,

6                    JURISDICTION ISSUES

7            MR. SAUNDERS:  Your Honors, may it please the

8    Court, and I will be addressing the jurisdictional issues,

9    turning it over to my partner, Mr. Benson, to address the

10   issues regarding the Conventions and the comity.

11           So the two questions, separate questions, that

12   really need to be addressed at the outset, two separate

13   hurdles that Qatar needs to overcome are, one, is the

14   district court's discovery order granting the motion to

15   compel appealable at this stage and, two, does the State of

16   Qatar, a nonparty, who has not intervened, sought to

17   intervene, have standing to appeal it, and unless both of

18   those preliminary questions are answered affirmatively, you

19   don't even need to reach any of the other issues that we've

20   been discussing here today.

21           Mr. Zionts suggested, essentially, that this Court

22   should issue an advisory opinion regarding what would have

23   happened if Qatar had sought to intervene for a limited

24   purpose and what effect that would have had on its sovereign

25   immunity.  We're not looking at advisory opinions here, I

WC

1    submit.  Let's look at where we are based on what has

2    happened in the district court and where Qatar stands now.

3              With respect to standing, we know that allowing

4    nonparties to appeal even a final judgment is a rare

5    exception to the general rule that only parties to a lawsuit

6    or those that properly become parties can appeal an adverse

7    judgment.

8              Qatar talks about the In re Sealed Case decision

9    from this Court, specifically a footnote that talks about

10   standing.  It's actually dictum because the footnote itself

11   makes clear that standing wasn't even challenged in that

12   case, and of course, In re Sealed Case, which relied on this

13   Court's decision in U.S. v. Philip Morris, was itself

14   overruled by Mohawk.  So we're talking about their main

15   authority for standing being dictum in a footnote in a since

16   overruled case.

17             That footnote states that if the decree affects a

18   third party's interests, he is often allowed to appeal, and

19   that was actually quoted language from the Fifth Circuit's

20   decision in Castillo v. Cameron County, which was a case

21   where a state that was itself a former party to the

22   litigation was bound by an injunction that related to jail

23   overcrowding and it risked being found in contempt if it

24   violated that injunction.

25             The only other cases that Qatar relies on for

1   standing are similarly cases where, such as <u>Devlin</u>, where

2   the nonparty was an unnamed member of a certified class that

3   was bound by a settlement, or the <u>Karaha Bodas</u> case from the

4   Second Circuit, where the nonparty was required to surrender

5   property pursuant to an order of attachment --

6           JUDGE SRINIVASAN:  Can I ask you, do you agree

7   that if there would have been an intervention, that there

8   would not have been a waiver of foreign sovereign immunity?

9           MR. SAUNDERS:  I agree with Judge Wilkins that

10  there's clear precedent for intervening for a limited

11  purpose, and that --

12          JUDGE SRINIVASAN:  Do you agree that there's a way

13  that Qatar could have intervened, you can call, for a

14  limited purpose, such that they would not have waived their

15  sovereign immunity but still would have been able to assert

16  the arguments that they're making now?

17          MR. SAUNDERS:  You know, I think it's an open

18  question that would have to be resolved based on the

19  specific arguments that they made in connection with the

20  intervention.

21          JUDGE SRINIVASAN:  So the more it's an open

22  question -- I mean, if you're not able to agree to that,

23  then it seems difficult to reach the conclusion that they

24  should have intervened and not worried about waiving foreign

25  sovereign immunity.

1           MR. SAUNDERS:  Well, again, that would have

2    been --

3           JUDGE SRINIVASAN:  Maybe I misunderstood.

4           MR. SAUNDERS:  -- something that would have been

5    addressed by the district court, and as Judge Wilkins

6    pointed out, it could have been taken up to this Court if

7    the district court had denied it and that could have been

8    resolved, but they didn't even attempt to do any of that.

9    So that never ended up coming before the district court or

10   this Court.

11          But as Judge Wilkins pointed out, the language

12   from Devlin that Qatar relies on talks about nonparties

13   being able to appeal if they are bound by the order that

14   they are seeking to appeal.  So what does it mean to be

15   bound by the order?  Again, we have cases where nonparties

16   were bound by an injunction, nonparties were bound by an

17   order of attachment.  Qatar isn't bound by anything because

18   the district court's order doesn't require it to do

19   anything.

20          Much more on point is this Court's decision in

21   Moten, which held that a party that had filed papers in the

22   district court but had not sought to intervene and stood in

23   the position of an amicus was not entitled to appeal and

24   that this Court had no jurisdiction.  That's exactly what we

25   have here.  Just like the nonparty in Moten, Qatar never

WC

1  sought to intervene.

2          The district court ruled in its minute order of

3  December 8th, 2021, that Qatar would be allowed to submit

4  statements of interest in the posture of an amicus, and

5  Qatar did not appeal from that order, the order that said it

6  only had amicus standing.  It did not seek to intervene in

7  response to that order.  It accepted its limited role as an

8  amicus curiae, and in fact, in its statement of interest

9  that was submitted in connection with the motion to compel,

10 Qatar stated, quote, pursuant to the court's order of

11 December 8th, 2021, Qatar files this statement of interest

12 as the equivalent of an amicus brief.  That's at Joint

13 Appendix 227.  So when they accepted their status as an

14 amicus, in doing so they accepted the consequences of that

15 status, which is, they don't get to appeal.

16          JUDGE WILKINS:  Let me follow up on Chief Judge

17 Srinivasan's question.  Do you agree that if Qatar had filed

18 a motion for intervention that says we want to intervene on

19 the condition that we don't waive our sovereign immunity by

20 this limited intervention and if you, District Court, are

21 you not willing to essentially rule that that will be the

22 terms of our intervention, then we withdraw our request to

23 intervene, so they make clear that, like, we are requesting

24 to intervene only if we get a ruling from you that says that

25 this will not result in a waiver, District Court, do you

1   agree that they could have filed a motion to that effect?

2        MR. SAUNDERS:  I agree they could have a filed a

3   motion to intervene under specific conditions, and if that

4   motion was denied, then that motion would itself, I believe,

5   be appealable to this Court.

6        JUDGE WILKINS:  And do you agree that they

7   couldn't be kind of like forced to intervene on conditions

8   other than what they requested?

9        MR. SAUNDERS:  I would agree, either they

10  intervene as requested in the motion or, if the district

11  court finds that is not possible, they're not going to

12  compel them to intervene if Qatar is not seeking to

13  intervene, and Qatar would not be seeking to intervene for

14  those --

15       JUDGE WILKINS:  In other words, they can't be

16  compelled to intervene and waive if they say we only want to

17  intervene if we're not waiving?

18       MR. SAUNDERS:  I think that's correct, Your Honor,

19  and if the court denies that, they can then make a decision

20  and they either accept that status of (a) we're not going to

21  intervene or we're going to intervene under the conditions

22  that the district court allows --

23       JUDGE SRINIVASAN:  And --

24       MR. SAUNDERS:  -- or we're going to take up the

25  decision to the court of appeals.

1          JUDGE SRINIVASAN:  And then if they do that and

2    the district court says in response, well, I don't know that

3    you need to do that because all -- maybe we can just proceed

4    so that you participate in the way that Qatar did, then your

5    review would be that, no, Qatar shouldn't accept that

6    because they can get an up or down on the motion so that

7    they can make sure that they preserve their status as an

8    intervenor with the party able to appeal and they could say,

9    no, we need you to resolve our motion and, if you don't,

10   we're going to take that up, because we want to make sure

11   that we get -- we get a definitive resolution on whether we

12   can intervene so that we can protect ourselves from the

13   counterargument that we should have intervened.  That's what

14   should have happened?

15          MR. SAUNDERS:  I think that's correct.

16          JUDGE SRINIVASAN:  I see.  That's quite -- that's

17   quite intricate, but I take the point.

18          MR. SAUNDERS:  But, you know, again, we're talking

19   about a hypothetical scenario that just doesn't apply here.

20   We're looking at where we are today --

21          JUDGE SRINIVASAN:  Yes.

22          MR. SAUNDERS:  -- with a party that accepted its

23   status as an amicus, did not seek to intervene, and is now

24   seeking to claim standing under dictum in a footnote in an

25   overruled case.

```
 1              I see I'm out of time.  With the Court's
 2   indulgence, I'd like to say a few things about the
 3   collateral order doctrine.
 4              JUDGE SRINIVASAN:  Yes, if you could keep it
 5   brief, though, please do.
 6              MR. SAUNDERS:  That's okay.  I'll try to keep it
 7   very focused.
 8              JUDGE SRINIVASAN:  Yes.  Thank you.
 9              MR. SAUNDERS:  So I agree, Judge Wilkins.  You
10   said you haven't found a case under either collateral order
11   or Perlman where the appellant wasn't at least a movant in
12   the district court.  We're not aware of one either, and
13   clearly, we know that under Mohawk this is a discovery
14   order.  Discovery orders, including those rejecting claims
15   of privilege, are not subject to the collateral order
16   doctrine, even though the Supreme Court recognized there may
17   be some collateral damage, there may be some harm that is
18   only imperfectly reparable.
19              Now, Qatar tries to distinguish Mohawk by saying
20   that the privilege here is on an entirely different level
21   from the attorney-client privilege, but I'd point the Court
22   to pages 22 and 23 of Qatar's reply where Qatar expressly
23   analogizes the claimed Convention protections to a series of
24   attorney-client privilege cases, and this Court itself has
25   recognized the attorney-client privilege as inviolable.
```

1            The Government talked about once the documents are

2    turned over, the Convention is violated at that very moment,

3    but once attorney-client privilege documents are turned

4    over, the privilege is violated at that very moment too, and

5    yet under Mohawk that itself is not enough to invoke the

6    collateral order doctrine.

7            And we'll submit on the Perlman doctrine on the

8    briefs.  We don't have a disinterested third party here.  I

9    mean, everything in the record shows that.

10           Mandamus, we don't have a clear abuse of

11   discretion.  We don't have a clear and indisputable right to

12   relief.  The district court relied on all available

13   precedent in its reading of the Conventions, and even should

14   this Court disagree -- which we certainly don't think the

15   Court should; we think the district court's order was sound

16   -- it's not the type of rampant district court decision that

17   is some type of usurpation of power, as discussed in Mohawk,

18   that allows for mandamus.

19           And the last point I'd make before turning it over

20   is this:  I'd quote from this Court's own opinion in the

21   first appeal in this case on the immunity issue.  Court

22   said, quote, immediate appealability is strong medicine that

23   is harmful when misused.  We are now in this case that was

24   filed nearly four years ago.  This is the second

25   interlocutory appeal.  Discovery has still not even begun in

1    earnest.   Defendants have produced virtually no documents.

2              If this Court were to find that Qatar has

3    standing, that this is an appealable order and further

4    remand to the district court for a document-by-document

5    review, I promise you -- I don't need a crystal ball for

6    this -- we're going to be back here on document-by-document

7    appeals, because Qatar's interest here is delay.   Judge

8    Forrest, in the Southern District of New York, when this

9    same issue came up with (indiscernible) Allaham's documents

10   and, at Joint Appendix 281, about Qatar's tactics, it just

11   smells like gamesmanship.

12             So every determination that the district court

13   makes regarding production of particular documents -- not

14   just discovery directed to the defendants, but there are

15   third-party subpoenas that are out to other FARA-registered

16   agents -- as to all of those, Qatar is going to appeal

17   those, every determination of turning over documents, as

18   implicating its privilege as immunities and implicating

19   international comity.   We will have piecemeal prejudgment

20   appeals that will be subject to tremendous delay and abuse.

21   It'll be five more years before anything happens in this

22   case, clearly undermining efficient judicial administration

23   and all of the other very real problems that the final

24   judgment rule of section 1291 was intended to alleviate.

25             So with that I'll turn it over to Mr. Benson.

1    Thank you.

2            JUDGE SRINIVASAN:   Thank you, Mr. Saunders.

3    Mr. Benson, good morning.

4            ORAL ARGUMENT OF DANIEL R. BENSON, ESQ.

5                ON BEHALF OF THE APPELLEES,

6                VIENNA CONVENTION ISSUES

7            MR. BENSON:   Good morning and may it please the

8    Court, Daniel Benson for appellees.   Fortunately, that

9    parade of horribles does not need to and should not take

10   place.   There is -- the Government and Qatar's position that

11   the order -- the decision below is categorical is not really

12   true.   The judge made clear that she wasn't ruling on, for

13   example, bailee -- bail or bailee situations or construction

14   contractors or the like, that she was -- that she was -- the

15   order applies to these defendants with respect to these

16   documents, and this Court can confirm on that basis.   It

17   doesn't need to issue an affirmance saying, you know, if any

18   document is turned over to a third party, it's no longer

19   inviolable under the Vienna Conventions.   It can do a more

20   limited ruling.

21            I'm not saying, by the way, that that is wrong.

22   It may very well be right.   There's a cogent and potentially

23   correct argument that if the Government turns over documents

24   to a third party, then by definition they're no long

25   inviolable, but here we have a situation where Qatar put

1  documents in the -- that contained highly confidential trade

2  secrets, according to Qatar -- in the hands of public

3  relations flacks and lobbyists, even though it knew that

4  those documents would be subject to inspection at any time,

5  on reasonable notice, by the U.S. government.

6          JUDGE RAO:  Mr. Benson, isn't the district court's

7  decision categorical as to -- I mean, you agree that it's

8  categorical as to these defendants?

9          MR. BENSON:  Yes, it is categorical as to these

10 defendants.

11         JUDGE RAO:  So how does that fit with the text of

12 Article 24 of the Vienna Convention, which speaks of

13 documents of the mission?  It doesn't seem to speak to who

14 holds them but, rather, what the documents are.

15         MR. BENSON:  Well, the -- if -- the Vienna

16 Convention was adopted after FARA had been in existence for

17 probably 30 years.

18         JUDGE RAO:  Well, just put aside FARA for a second

19 and just focus on the text of Article 24.  I mean, under --

20         MR. BENSON:  Professor Denza, whom the Government

21 and Qatar recognize as the leading expert, has opined to

22 Congress, and in her treatise -- she's the leading expert,

23 about the only expert on the Vienna Conventions, and she's

24 explained what that -- of the mission is -- you know, that

25 these -- in fact, before Congress she testified, and I

WC

1   recommend reading her testimony, but -- in full -- but she

2   testified and opined that documents that a country -- that

3   Saudi Arabia gave to public relations consultants were not

4   of the mission and were not protected under the Vienna

5   Convention.

6           If the Vienna Convention had meant to protect

7   those kinds of documents, it would have said wherever they

8   may be and whoever might be in possession of them or, you

9   know, more to the point, wherever they may be and whoever

10  may be in possession of them, even if those people who are

11  in possession of them are subject to a host country

12  disclosure requirement.  It doesn't say that.

13          JUDGE RAO:  But it also doesn't say mission

14  documents.  It says documents of the mission, which suggests

15  that they could be held by somebody other than the mission

16  itself.

17          MR. BENSON:  That is, I think, overbroad, and

18  there was no intention to protect all documents of the

19  mission.  As Professor Denza explains, it really meant

20  documents that were, in effect, on the premises of the

21  mission or diplomatic pouches or, you know, or the like.

22          JUDGE SRINIVASAN:  So what is -- what's your view

23  as to when of the mission stops, that once the documents

24  leave the premises, they're no longer of the mission?

25          MR. BENSON:  Well, if they go to third parties, I

1   think there's a very strong argument that they're no longer

2   of the -- they're no longer inviolable and no longer of the

3   mission, but --

4           JUDGE SRINIVASAN:  Period, whenever they're given

5   to a third party?

6           MR. BENSON:  -- you don't have to reach that

7   issue.

8           JUDGE SRINIVASAN:  And what's the narrower way to

9   do it, then, if they're --

10          MR. BENSON:  Pardon me?

11          JUDGE SRINIVASAN:  What's the narrower way, that

12  you say don't have to reach, because that ground means --

13          MR. BENSON:  If they're given to -- if they're

14  given to individuals in the host country who are subject to

15  a disclosure requirement to the host country's government,

16  those --

17          JUDGE SRINIVASAN:  So that's the fair argument?

18          MR. BENSON:  Yes.

19          JUDGE SRINIVASAN:  So the broader argument would

20  be, once documents are given to a third party, they're no

21  longer of the mission, period.  The narrower argument would

22  be, once documents are given to a third party and they're

23  something like FARA, they're no longer of the mission.

24          MR. BENSON:  Correct, with an addition that once

25  the -- once -- I mean, the reason for the first argument is

1  that the country is, Qatar -- in this case, Qatar -- is

2  treating them as not inviolable by giving them to third

3  parties.

4          JUDGE SRINIVASAN:  So can I ask you this?  If

5  Qatar invites a third party onto the, excuse me, onto the

6  embassy's premises and says you're my contractor, I need you

7  to do some work, in order for you to be able to do the work,

8  I need you to look at some documents but I'm really

9  concerned about these documents, so I'd like you to come on

10 my premises and look at the documents, I'm going to put you

11 in a separate room, here's the documents, and the contractor

12 looks at the documents and leaves without the documents but

13 now knows what the documents say and can use that to the

14 benefit of the contracting enterprise, whatever that may be,

15 you don't think in that situation the documents cease to be

16 -- to be subject to the inviolability --

17         MR. BENSON:  That's correct.

18         JUDGE SRINIVASAN:  And then if that's true, then

19 does it make all the difference if a country then says,

20 instead of having you come over here, here's what I'm going

21 to do, I'm going to give you these documents but here's all

22 the conditions, it's exactly the same conditions that I

23 would have imposed on you if you came onto my premises, I'm

24 going to take them to you in an armored truck, my security

25 guard is going to be standing right next to you while you

 1   look at the documents, I'm going to take them from you and

 2   then I'm going to take them back, is it no longer of the

 3   mission because they were allowed to leave the premises?

 4            MR. BENSON:  If they're in the hands of couriers

 5   of the -- in effect, of couriers with protection like that,

 6   then I think there's an argument that they're still of the

 7   mission.

 8            JUDGE SRINIVASAN:  I see.  Okay.  So it's not a

 9   premises-specific.  It's --

10            MR. BENSON:  Once in the hands of couriers or in

11   diplomatic pouches or on the premises of the embassy, but

12   again, this Court doesn't need to reach those kinds of

13   issues.  There's no question that even under Qatar's

14   framework, which is a made-up framework, but that, you know,

15   that it depends on the expectation of confidentiality,

16   there's no way that a country could have an expectation of

17   privacy when it turns over documents to FARA-registered

18   agents, and --

19            JUDGE RAO:  Well, that might be why, you know, why

20   they lose on a document-by-document review, but it doesn't

21   suggest why there should be a categorical --

22            MR. BENSON:  But if the documents are open to the

23   inspection by the Government at any time for three years

24   after the end of the agency -- of the relationship, how can

25   they have an expectation of privacy with respect -- or

1  confidentiality --

2          JUDGE RAO:  Why --

3          MR. BENSON:  -- with respect to any of those

4  documents?

5          JUDGE WILKINS:  Can you just clarify what the

6  document request that's at issue says?  What does it

7  request?

8          MR. BENSON:  There are a -- they're assorted

9  categories of documents, communications between Qatar and

10  the defendants, payments by Qatar to the defendants, a whole

11  series of questions like that.  And, by the way, Qatar

12  professes ignorance as to what these documents are.  These

13  documents are three categories:  documents they sent to the

14  defendants, documents they received from the defendants, and

15  what they claim are documents between the -- between and

16  among the defendants.  They know the vast -- what those

17  documents are.  They certainly know what the information is

18  that they claim is so sensitive and inviolable.  They could

19  have made a showing to the district court.

20          JUDGE WILKINS:  But do we know that all of the

21  documents that -- all within the document requests would be

22  subject to the record keeping and inspection requirements of

23  FARA?

24          MR. BENSON:  And I believe that the inspection

25  requirements of -- I think that a FARA-registered agent is

1  required to keep all -- pretty much, all documents.  If you

2  look at FARA, it's a very broad requirement, and they have

3  to keep the documents open for inspection at any time for --

4           JUDGE WILKINS:  So it's your position -- I'm just

5  trying to understand your position -- that every document

6  that would be responsive to the document request would fall

7  within FARA's record keeping and inspection requirement?

8           MR. BENSON:  Certainly the document -- at a

9  minimum, all documents that Qatar professes to be now

10  concerned about would be.

11          JUDGE WILKINS:  Okay.

12          JUDGE RAO:  So -- but, Mr. Benson, wouldn't that

13  require a quite broad ruling from us, though, to determine

14  that any documents that were available potentially in the

15  future to inspection by the U.S. government trumps any

16  Article 24 protection that the documents might have --

17          MR. BENSON:  It doesn't trump --

18          JUDGE RAO:  -- for Qatar?

19          MR. BENSON:  -- the Article 24 protection.  The

20  Vienna Conventions provide -- just like Qatar's contracts

21  provide that they're subject to the law, the Vienna

22  Conventions in Article 41 say that the laws of the host

23  country must be respected.  So the countries who adopted the

24  Vienna Convention, including Qatar, I believe in 1961, knew

25  about FARA.  They knew about -- they obviously adopted

WC

1   Article 41, which said that they agreed to respect laws of

2   the host country.  So there's no -- I don't think that

3   there's an argument that -- we're not arguing that FARA

4   trumps --

5           JUDGE RAO:  It's effectively -- it's --

6           MR. BENSON:  -- the Vienna Convention.  We're

7   arguing that it's perfectly consistent with the Vienna

8   Convention.

9           JUDGE RAO:  Well, but that to the extent something

10  is covered by FARA, it is --

11          MR. BENSON:  Pardon?

12          JUDGE RAO:  That to the extent that a document is

13  covered by FARA, that it cannot receive the protections of

14  the Vienna Convention.

15          MR. BENSON:  Not inviolable.  It's no longer

16  inviolable --

17          JUDGE RAO:  I mean --

18          MR. BENSON:  -- by the actions of the country

19  itself.

20          JUDGE RAO:  I mean, the Department of Justice

21  doesn't take that view.  I mean, they are charged with

22  enforcing both -- I mean, the U.S. government is charged

23  with enforcing both its treaty obligations and its statutory

24  obligations, and they think that they are, in most

25  instances, compatible.

WC

1          MR. BENSON:  I think the Government is wrong.  I

2    think they're plainly wrong.  I think every authority that

3    has addressed this issue has come down the way -- the way

4    Professor Denza has come down, which is, documents delivered

5    to people subject to FARA are not inviolable under the

6    Vienna Conventions.

7          JUDGE WILKINS:  Well, I think you kind of can't

8    have it both ways.  I mean, you say that inviolable under

9    the Vienna Conventions is, you know, is the same as the

10   attorney-client privilege is considered to be inviolable,

11   but there are limited exceptions where privileged documents

12   might be able to be reviewed for some purposes but not

13   disclosed for other purposes, and so why can't it be under

14   the Vienna Conventions that it's still considered

15   inviolable?

16         Maybe under U.S. domestic law there's some limited

17   availability for the Justice Department to inspect documents

18   for its compliance purposes, for its counterespionage or

19   national security purposes, but that doesn't mean that any

20   -- you know, every Tom, Dick, and Harry that files a civil

21   lawsuit can have access to the documents.

22         MR. BENSON:  There's no authority or support in

23   the Vienna Conventions or in FARA or any other law that

24   would support that, but even more importantly, what Qatar is

25   arguing for and what the Government is arguing for is an

1    analysis of what the reasonable expectations of Qatar were,

2    and attorney-client privilege is the long-standing doctrine

3    that's asserted every day.

4            This inviolability for FARA documents that are

5    exposed to the public -- I mean, that are exposed -- that

6    are available for inspection, every authority that's ruled

7    on it has agreed with our position, and so when Qatar signed

8    those contracts with their -- with these defendants, they

9    knew that Congress said that those documents would be not

10   inviolable.  They knew that Professor Denza said that those

11   documents would not be inviolable.  They knew that the House

12   of Lords had ruled that those kind -- those -- you know,

13   documents given to a certain -- a broad array of third

14   parties would not be inviolable.  They knew -- they didn't

15   have any reasonable expectation of confidentiality or of

16   inviolability.  They couldn't have.  So under their own

17   analysis, these documents are not inviolable.

18           JUDGE SRINIVASAN:  Because of FARA?

19           MR. BENSON:  Because of FARA --

20           JUDGE SRINIVASAN:  Can I ask -- can I just ask --

21           MR. BENSON:  -- and because of -- and because of

22   all the authorities, before they signed the contract --

23   contracts -- that agreed with that analysis.

24           JUDGE SRINIVASAN:  About FARA?

25           MR. BENSON:  About FARA.

1          JUDGE SRINIVASAN:  Yes.  Can I just ask a basic

2    factual question?  Is it the case that every third party

3    that contracts with an -- with a foreign sovereign has to

4    register as a -- I take it there's some contractors that

5    don't have to be subject to FARA, or is that wrong?

6          MR. BENSON:  I think that's correct.  I think it's

7    directed toward contractors that are -- I mean, a lot of

8    times people, I think, register out of excessive caution,

9    just, you know, on it's a criminal -- it's a criminal

10   offense, but I don't believe that, for example, if a plumber

11   who does work for --

12         JUDGE SRINIVASAN:  Yes.

13         MR. BENSON:  -- Qatar would have to register.  I

14   think it's these kinds of activities, propaganda activities,

15   and the purpose of FARA, of course, is to make sure that

16   those clandestine activities are subject to exposure and

17   subject to the Government finding out about them.

18         JUDGE SRINIVASAN:  So can I ask this question,

19   then?  If it's true that not everybody who contracts with a

20   foreign sovereign is subject to FARA, then if we go to a

21   foreign country -- and let's just hypothesize a foreign

22   country that's a surveillance state, that wants to surveil

23   everything -- and they pass something that's much more

24   robust than FARA and just say every time an embassy within

25   our borders does any business with any third party, any

1  documents they share are subject to surveillance by the

2  government, subject to read by the government, then would

3  the FARA argument mean that in that country that the Vienna

4  Convention basically just doesn't apply, the inviolability

5  principle just doesn't apply to any document, period,

6  because there's this law, this hypothetical law that just

7  allows for robust, you know --

8              MR. BENSON:  No.  No --

9              JUDGE SRINIVASAN:  It wouldn't?

10             MR. BENSON:  -- and because they're changing the

11  expectations of the countries -- of the parties, the Vienna

12  Convention.  The Vienna --

13             JUDGE SRINIVASAN:  Right.  So would --

14             MR. BENSON:  -- the Vienna Convention was signed

15  on to by these countries knowing that FARA existed.  In your

16  hypothetical --

17             JUDGE SRINIVASAN:  Oh, I see.  So it's temporally.

18  The --

19             MR. BENSON:  Right.

20             JUDGE SRINIVASAN:  -- answer from your perspective

21  is that that law postdates --

22             MR. BENSON:  Right.

23             JUDGE SRINIVASAN:  -- whereas FARA predated --

24             MR. BENSON:  Right.

25             JUDGE SRINIVASAN:  -- and that's --

WC

1          MR. BENSON:  So there, I think, there would be an

2   argument that, no, it does not override or, you know --

3          JUDGE SRINIVASAN:  So if there were a country that

4   had that law beforehand, then --

5          MR. BENSON:  Then there would be an argument --

6          JUDGE SRINIVASAN:  Then there would -- then that

7   would be the situation.

8          MR. BENSON:  -- for non-inviolability.

9          JUDGE SRINIVASAN:  Yes, across the board, even

10  though it would -- it would be -- it would be very robust

11  non-inviolability?

12         MR. BENSON:  Right.

13         JUDGE SRINIVASAN:  Okay.  If there's no further

14  questions.

15         MR. BENSON:  Thank you.

16         JUDGE SRINIVASAN:  Thank you.  Mr. Benson, thank

17  you.  Mr. Zionts, we'll give you three minutes for rebuttal.

18              ORAL REBUTTAL OF DAVID M. ZIONTS, ESQ.

19                   ON BEHALF OF THE APPELLANT

20         MR. ZIONTS:  Thank you, Your Honor.  Just a few

21  quick points, one on the comity question, going back to

22  Chief Judge Srinivasan's colloquy with Mr. Totaro -- I agree

23  that comity does matter.  Right now, you know, the question

24  before about, you know, there's a limited remand, what is

25  still open in the district court, there is a categorical

WC

1  ruling right now that comity is not available that the

2  district court reached without looking at anything, without

3  developing a record.

4          You know, the United States hasn't commented in

5  this proceeding.  It read the Court's order as not

6  requesting it.  In the NML case in the Supreme Court, we

7  think that what the United States said about comity and, in

8  particular, comity in the context of discovery targeted at

9  third parties, it is entirely inconsistent with the district

10 court's categorical order.  So, in our view, you know, that

11 is a separate and important issue in this appeal that should

12 be resolved.

13         And I endorse what Mr. Totaro said, that, you

14 know, document of the mission is a particular phrase,

15 particular construct.  We think that will be quite

16 protective on remand, but international comity is a

17 different way of getting at the protection in appropriate

18 circumstances of sensitive governmental information, and it

19 very well may be that there could be some close questions

20 under the Vienna Convention where there is an easier answer

21 once you get into the documents on comity.  So we think that

22 the Court -- that is an issue that is presented for the

23 Court and, you know, having the Court send it back on that

24 issue would be helpful for remand proceedings.

25         On jurisdiction, I don't want to, you know, unless

1   the Court has question, I don't want to belabor that point.

2   I do just want to, you know, create a factual point that I

3   believe Mr. Saunders said.  He referred to the minute order

4   of December 8th, 2021, as deciding that Qatar had amicus

5   status.  The court said that Qatar could file the equivalent

6   amicus briefs but no pending motion requires addressing

7   Qatar's exact status in this case.  I don't think the

8   district court ever, you know, changed that until it

9   retroactively said in its final decisions here that,

10  actually, Qatar really was just an amicus all along.  So I

11  think, you know, Qatar really was proceeding through this

12  minefield without a compass and it would be -- it would be

13  troubling for a foreign sovereign, you know, to basically be

14  deemed to have given up its rights under a treaty for not

15  doing it one particular way.

16          Finally, on the FARA points, going to the last

17  point that was addressed about reciprocity concerns, this is

18  not hypothetical.  Russia has a FARA-type law that has

19  government audit inspection provisions, and so I think, you

20  know, I would -- I would, you know, take seriously that the

21  United States has not endorsed Mr. Broidy's position that

22  FARA just vitiates any inviolability under the Conventions.

23  I think there is, you know -- I think we would -- that we --

24  our view is that the best view is that inviolability could

25  be argued in the case if DOJ came knocking but the Court

1    really doesn't need to get into that.

2            I think this consent concept exists in the treaty,

3    in Article 22; you know, inviolability of mission premises

4    is rejected.  The next sentence talks about the possibility

5    of consent.  You know, it is possible that you could view

6    sort of the decision to engage a contractor under FARA's

7    regime, understanding that it is only law enforcement

8    officers not concerned with snooping around in the

9    sovereign's secrets but focused on enforcement of FARA, that

10   that could be a way forward, that that could at least be

11   assumed to be correct in a way that doesn't undermine

12   inviolability in this proceeding.

13           JUDGE WILKINS:  Let's suppose we find that the

14   only path available to you is mandamus.  Ordinarily, we deny

15   mandamus unless there is some clear precedent that

16   demonstrates that the district court's position was error,

17   not for something where -- or the district court, you know,

18   clearly used, like, the -- there's a standard that's been

19   articulated in the case law, and the district court did not

20   use that standard.  How do you meet that standard here?

21           MR. ZIONTS:  Your Honor, you know, a couple

22   responses -- one, I think this Court and others,

23   particularly in the context of foreign sovereigns, has taken

24   a more pragmatic view of the threshold for mandamus review.

25   This Court's decision in Papandreou, I think, makes that

 1  point, that when you talk about, you know, potential injury

 2  to a foreign sovereign, the court is going to be a little

 3  bit more forward-leaning in recognizing those types of

 4  arguments.

 5         You know, this comes up also in the context of

 6  executive branch privileges.  We cited the Karnoski case in

 7  the Ninth Circuit, where I don't think it was sort of clear

 8  error that normally might have triggered but, because of the

 9  broad issues raised by the deliberative process issue in

10  that case, was reviewed by mandamus.

11         That said, I think, you know, the normal standard

12  is met.  Here we don't have -- you know, this is a complex

13  and novel issue.  It's also one that at least now we have

14  the United States government saying that this treaty

15  interpretation by the district court was wrong.  We had

16  asked the district court, you know, we think that you should

17  defer decision until you go through a document-by-document

18  process.  We asked the district court, if you are inclined

19  not to do that, this is really sensitive stuff and we think

20  you should ask the Government --

21         JUDGE WILKINS:  Did the defendants ask to do that?

22         MR. ZIONTS:  Pardon?

23         JUDGE WILKINS:  Did the defendants make that

24  request?

25         MR. ZIONTS:  Your Honor, I don't recall that they

1   did.  I know that Qatar, in its --

2           JUDGE WILKINS:  But see, that gets me back to my

3   problem, I guess, maybe as an old district -- former

4   district court judge and trial court litigator, is that,

5   like, now you're wanting us to say that the district court

6   erred because they didn't take an approach that wasn't put

7   to it by a party --

8           MR. ZIONTS:  Your Honor --

9           JUDGE WILKINS:  -- and an amicus can't preserve

10  issues.

11          MR. ZIONTS:  Your Honor, I think I go back, you

12  know, to where I started a few minutes ago.  The district

13  court didn't tell us that we were an amicus at that point.

14  It said that I'm not -- I don't need to resolve your exact

15  status yet.  So I think we were just operating without

16  guidance about what the best way to do this was.

17          The issue is, there -- I really made that point

18  only for the very limited purpose that, you know, we know

19  now that the United States government, which is entitled to

20  great deference in treaty interpretation, you know, agrees

21  with us that the district court was wrong.  We had suggested

22  that there was a way to find out the United States' position

23  earlier in the day.  That was my limited point on that.

24          JUDGE SRINIVASAN:  Thank you, counsel.  Thank you

25  to all counsel.  We'll take this case under submission.

WC

1                    (Whereupon, the proceedings were concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WC

## DIGITALLY SIGNED CERTIFICATE

I certify that the foregoing is a correct
transcription of the electronic sound recording of the
proceedings in the above-entitled matter.


_____                    _January 27, 2023_
WENDY CAMPOS

DEPOSITION SERVICES, INC.