# EXHIBIT 3

# YEARBOOK

## OF THE

# INTERNATIONAL

# LAW COMMISSION

# 1958

## *Volume II*

*Documents of the tenth session including the report of the Commission to the General Assembly*

UNITED NATIONS 

immunities, the Commission will mention the "exterritoriality" theory, according to which the premises of the mission represent a sort of extension of the territory of the sending State; and the "representative character" theory, which bases such privileges and immunities on the idea that the diplomatic mission personifies the sending State.

(2) There is now a third theory which appears to be gaining ground in modern times, namely, the "functional necessity" theory, which justifies privileges and immunities as being necessary to enable the mission to perform its functions.

(3) The Commission was guided by this third theory in solving problems on which practice gave no clear pointers, while also bearing in mind the representative character of the head of the mission and of the mission itself.

(4) Privileges and immunities may be divided into the following three groups, although the division is not completely exclusive:

(a) Those relating to the premises of the mission and to its archives;

(b) Those relating to the work of the mission;

(c) Personal privileges and immunities.

SUB-SECTION A. MISSION PREMISES AND ARCHIVES

### Accommodation

### Article 19

The receiving State must either permit the sending State to acquire on its territory the premises necessary for its mission, or ensure adequate accommodation in some other way.

#### Commentary

(1) The laws and regulations of a given country may make it impossible for a mission to acquire the premises necessary to it. For that reason the Commission has inserted in the draft an article which makes it obligatory for the receiving State to ensure the provision of accommodation for the mission if the latter is not permitted to acquire it.

(2) This obligation, because it would impose too heavy a burden on the receiving State, does not apply to the residences of the members of the staff of the mission.

### Inviolability of the mission premises

### Article 20

1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, save with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission and their furnishings shall be immune from any search, requisition, attachment or execution.

#### Commentary

(1) This article (which reproduces unchanged the text of article 16 of the 1957 draft), deals firstly with the inviolability of the premises of the mission.

(2) The expression "premises of the mission" includes the buildings or parts of buildings used for the purposes of the mission, whether they are owned by the sending State or by a third party acting for its account, or are leased or rented. The premises comprise, if they consist of a building, the surrounding land and other appurtenances, including the garden and car park.

(3) From the point of view of the receiving State, this inviolability has two aspects. In the first place, the receiving State is obliged to prevent its agents from entering the premises for any official purpose whatsoever (paragraph 1). Secondly, it is under a special duty to take all appropriate steps to protect the premises from any invasion or damage, and to prevent any disturbance of the peace of the mission or impairment of its dignity (paragraph 2). The receiving State must, in order to fulfil this obligation, take special measures—over and above those it takes to discharge its general duty of ensuring order.

(4) The inviolability of the mission premises is not the consequence of the inviolability of the head of the mission, but is an attribute of the sending State by reason of the fact that the premises are used as the headquarters of the mission.

(5) A special application of this principle is the rule that no writ may be served within the premises of the mission, and that no summons to appear before a court may be served in the premises by a process server. Even if process servers do not enter the premises but carry out their duty at the door, such an act would constitute an infringement of the respect due to the mission. The service of such documents should be effected in some other way. In some countries, the persons concerned may apply to the Ministry for Foreign Affairs of the receiving State. There is nothing to prevent service through the post if it can be effected in that way.

(6) The inviolability concerned confers on the premises, their furnishings and fixtures, immunity from any search, requisition, attachment or execution. The opinion had been expressed that the rule laid down in paragraph 3 of this article was unnecessary, because the acts referred to could not be performed without a contravention of the provisions of paragraph 1. Nevertheless, the rule has a value of its own in that it provides that the premises must not be entered even in pursuance of a judicial order. If the premises are leased or rented, measures of execution may of course be taken against the private owner, provided that it is not necessary to enter the premises of the mission.

(7) While the inviolability of the premises may enable the sending State to prevent the receiving State from using the land on which the premises of the mission are situated, in order to carry out public works (widening of a road, for example), it should on the other hand be remembered that real property is subject to the laws of the country in which it is situated. In these circumstances, therefore, the sending State should co-operate in every way in the implementation of the plan which the receiving State is contemplating; and the receiving State, for its part, is obliged to provide adequate compensation or, if necessary, to place other appropriate premises at the disposal of the sending State. The Commission did not consider it advisable to insert in the article itself a provision on these lines, which had formed paragraph (4) of the commentary on article 16 of the draft adopted by the Commission at its ninth session. To do so would convey the erroneous impression that the commentary was concerned with an exception to the principle of inviol-

ability. The text of the commentary refers solely to the moral duty of the sending State to co-operate.

### Exemption of mission premises from tax

### Article 21

The sending State and the head of the mission shall be exempt from all national, regional or municipal dues or taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.

#### Commentary

(1)   The text of this article reproduces that of article 17 of the 1957 draft, with slight changes which do not alter the substance. The article now mentions "national, regional or municipal dues or taxes", which is a more comprehensive description and, according to the Commission's interpretation, covers all dues and taxes levied by any local authority. The phrase at the end of the article "for services actually rendered" has been replaced by the corresponding phrase used in article 32 "for specific services rendered". the Commission thought that a reference to *specific* services rendered was preferable to the phrase "for services *actually* rendered".

(2)   The provision does not apply to the case where the owner of leased premises specifies in the lease that such taxes are to be defrayed by the mission. This liability becomes part of the consideration given for the use of the premises and usually involves, in effect, not the payment of taxes as such, but an increase in the rental payable.

### Inviolability of the archives

### Article 22

The archives and documents of the mission shall be inviolable.

#### Commentary

(1)   This article reproduces unchanged the text of the corresponding provision in article 18 of the 1957 draft. As the Commission pointed out in the commentary to its 1957 draft: "The inviolability applies to archives and documents, regardless of the premises in which they may be. As in the case of the premises of the mission, the receiving State is obliged to respect the inviolability itself and to prevent its infringement by other parties."

(2)   It was suggested that the words "and documents" in the text of the article should be deleted, and that the statement in the commentary that the inviolability applies to archives and documents, regardless of the premises in which they may be, was too sweeping. The commission cannot share this view. The mission's documents, even though separated from the archives, and whether belonging to the archives or not, must, like the archives themselves, be inviolable, irrespective of their physical whereabouts (e.g., while carried on the person of a member of a mission). It was for that reason that this extension was provided for in the General Convention on the Privileges and Immunities of the United Nations (article II, section 4).

(3)   Although the inviolability of the mission's archives and documents is at least partly covered by the inviolability of the mission's premises and property, a special provision is desirable because of the importance of this inviolability to the functions of the mission. This inviolability is connected with the protection accorded by

article 25 to the correspondence and communications of the mission.

### Facilities

### Article 23

The receiving State shall accord full facilities for the performance of the mission's functions.

#### Commentary

(1)   This article, which corresponds to article 19 of the 1957 draft, remains unchanged.

(2)   A diplomatic mission may often need the assistance of the Government and authorities of the receiving State, in the first place during the installation of the mission, and to an even greater extent in the performance of its functions, for instance in obtaining information, an activity referred to in article 3 (d). The receiving State (which has an interest in the mission being able to perform its functions satisfactorily) is obliged to furnish all the assistance required, and is under a general duty to make every effort to provide the mission with all facilities for the purpose. It is assumed that requests for assistance will be kept within reasonable limits.

### Free movement

### Article 24

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.

#### Commentary

One of the necessary facilities for the performance of the mission's functions is that its members should enjoy freedom of movement and travel. Without such freedom, the mission would not be able to perform adequately its function of obtaining information under article 3 (d). This freedom of movement is subject to the laws and regulations of the receiving State concerning zones entry into which is prohibited or regulated for reasons of national security. The establishment of prohibited zones must not, on the other hand, be so extensive as to render freedom of movement and travel illusory

### Freedom of communication

### Article 25

1.   The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher.

2.   The official correspondence of the mission shall be inviolable.

3.   The diplomatic bag shall not be opened or detained.

4.   The diplomatic bag, which must bear visible external marks of its character, may only contain diplomatic documents or articles intended for official use.

5.  The diplomatic courier shall be protected by the receiving State. He shall enjoy personal inviolability and shall not be liable to any form of arrest or detention.

*Commentary*

(1)  Apart from paragraph 2, which is new, the article substantially reproduces the text of article 21 of the 1957 draft. Paragraph 2 being new, the succeeding paragraphs have been re-numbered accordingly. In the former paragraph 3 (now paragraph 4) the phrase "which must bear visible external marks of its character" has been added after the words "The diplomatic bag".

(2)  This article deals with another generally recognized freedom, which is essential for the performance of the mission's functions, namely freedom of communication. Under paragraph 1, this freedom is to be accorded for all official purposes, whether for communications with the Government of the sending State, with the officials and authorities of that Government or the nationals of the sending State, with missions and consulates of other Governments or with international organizations. Paragraph 1 of this article sets out the general principle, and states specifically that, in communicating with its Government and the other missions and consulates of that Government, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. If a mission wishes to make use of its own wireless transmitter it must, in accordance with the international conventions on telecommunications, apply to the receiving State for special permission. Provided that the regulations applicable to all users of such communications are observed, such permission must not be refused.

(3)  Formerly, the freedom to employ all appropriate means of communications was limited in principle to the diplomatic mission's exchanges, on the one hand with the Government of the sending State and, on the other, with the consulates under its authority within the receiving State. Nowadays, with the extension of air communications, the practice has changed. Communications with embassies and consulates in other countries no longer always pass through the Ministry for Foreign Affairs in the sending State; often use is made of certain intermediate posts from which despatches are carried to the various capitals to which they are addressed. The Commission has therefore not changed the rule laid down in paragraph 1.

(4)  Paragraph 3 (former paragraph 2) states that the diplomatic bag is inviolable. Paragraph 4 (former paragraph 3) indicates what the diplomatic bag may contain. The Commission considered it desirable that the statement of the inviolability of the diplomatic bag should be preceded by the more general statement that the official correspondence of the mission, whether carried in the bag or not, is inviolable. In accordance with paragraph 4, the diplomatic bag may be defined as a bag (sack, pouch, envelope or any type of package whatsoever) containing documents and (or) articles intended for official use. According to the amended text of this paragraph, the bag must bear visible external marks of its character.

(5)  The Commission has noted that the diplomatic bag has on occasion been opened with the permission of the Ministry for Foreign Affairs of the receiving State, and in the presence of a representative of the mission concerned. While recognizing that States have been led to take such measures in exceptional cases where there were serious grounds for suspecting that the diplomatic bag was being used in a manner contrary to paragraph 4 of the article, and with detriment to the interests of the receiving State, the Commission wishes nevertheless to emphasize the overriding importance which it attaches to the observance of the principle of the inviolability of the diplomatic bag.

(6)  Paragraph 5 deals with the inviolability and the protection enjoyed by the diplomatic courier in the receiving State. The diplomatic courier is furnished with a document testifying to his status: normally, a courier's passport. When the diplomatic bag is entrusted to the captain of a commercial aircraft, he is not regarded as a diplomatic courier. This case must be distinguished from the not uncommon case in which a diplomatic courier pilots an aircraft specially intended to be used for the carriage of diplomatic bags. There is no reason for treating such a courier differently from one who carries the bag in a car driven by himself.

(7)  The protection of the diplomatic bag and courier in a third State is dealt with in article 39.

*Article 26*

The fees and charges levied by the mission in the course of its official duties shall be exempt from all dues and taxes.

*Commentary*

This article states a rule which is universally accepted.

SUB-SECTION C.   PERSONAL PRIVILEGES AND IMMUNITIES

This sub-section deals with members of the mission who are foreign nationals (articles 27 to 36), with nationals of the receiving State (article 37), and with certain general matters (articles 38 and 39).

*Personal inviolability*

*Article 27*

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all reasonable steps to prevent any attack on his person, freedom or dignity.

*Commentary*

(1)  This article confirms the principle of the personal inviolability of the diplomatic agent. From the receiving State's point of view, this inviolability implies, as in the case of the mission's premises, the obligation to respect, and to ensure respect for, the person of the diplomatic agent. The receiving State must take all reasonable steps to that end, possibly including the provision of a special guard where circumstances so required. Being inviolable, the diplomatic agent is exempted from measures that would amount to direct coercion. This principle does not exclude in respect of the diplomatic agent either measures of self-defence or, in exceptional circumstances, measures to prevent him from committing crimes or offences.

(2)  The paragraph 2 which formed part of the corresponding article 22 in the 1957 draft has been deleted in consequence of the introduction of article 1 (definitions).

*Inviolability of residence and property*

*Article 28*

1.  The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

United States Government would not object to a provision that the receiving State is entitled to decline to receive a particular category of officials to perform a function which may be performed only as a matter of privilege and not as a matter of right. However, once the sending State is granted the right of legation, such State is entitled to staff its mission with all categories of persons necessary to the performance of those functions implicit in the right of legation. Also, the sending State and the receiving State concerned alone are in a position to determine the circumstances and conditions which may affect the size and composition of their respective missions in the territory of the other.

As noted in the observations regarding article 4, although the authority is exercised with restraint, any State may deny entry to any foreign national, including service attachés. The United States Government does not require *agréments* for military, naval, or air attachés except on the basis of reciprocity. Since the Governments of Hungary, Italy, the Philippines, Romania and Spain require *agréments* for the top service officers only, this Government reciprocates and requires a similar *agrément*. Even those Governments do not require *agréments* for assistant military, air or naval attachés. In the event these Governments would eliminate the requirement for any such *agréments* the United States Government would reciprocate.

*Article 8*

Article 8 lays down a rule as to the time when the head of a mission is entitled to take up his functions in relation to the receiving State. This is largely a matter of protocol or local custom. In the United States of America, ambassadors and ministers are received by the President, but a new head of mission first presents to the Secretary of State copies of his letters of credence, the letters of recall of his predecessor, and a copy of the remarks he proposes to make when received by the President. After this presentation to the Secretary of State he may perform all the functions of his office.

*Article 9*

This provides that if the post of head of mission is vacant, or if the head of mission is unable to perform his functions, the affairs of the mission shall be handled by a *chargé d'affaires ad interim*, whose name shall be notified to the Government of the receiving State. The article further provides that in the absence of such notification, the member whose name appears next on the mission's diplomatic list is presumed to be in charge.

The United States Government finds this article unacceptable. In each instance the United States Government would require appropriate notification before recognizing any member of the mission as *chargé d'affaires ad interim*. This is true whether the post is vacant, or whether the head of mission is temporarily away from the capital or is ill. The United States Government would not "presume" that a certain official was empowered to speak for his Government in the capacity of *chargé d'affaires ad interim*. Moreover, it would be particularly objectionable to require States to make such a presumption on the basis of the order in which names might appear on a diplomatic list. Some Governments do not publish such a list and, if they do, the published list may be out of date. Also, it should be noted that the diplomatic list is not intended to be used for the purpose of determining which officer shall be *chargé d'affaires ad interim*. Some Governments, for instance, customarily list, after the name of the head of mission, the name of the highest ranking military, naval or air attaché.

*Article 10*

This article divides heads of mission into three classes. It is suggested that this article might begin with the words "For purposes of precedence and etiquette . . .".

*Article 11*

This article restates the general practice of States, which is to agree on the class to which the heads of their missions are to be assigned. The United States Government observes, however, that the receiving and sending States concerned need not be represented by heads of mission of the same rank. One State may be represented by an ambassador, for instance, while the other prefers to be represented by a minister or a *chargé d'affaires*.

*Article 12*

The rules of precedence of heads of missions prescribed in article 12 deal with matters of practice and protocol in the receiving State, rather than with principles of international law suitable for codification. See, also, observations on article 8 above.

*Article 13*

The United States Government agrees with the provisions of article 13, which would require each State to establish a uniform mode for the reception of heads of mission of each class.

It is suggested that the article further provide that such uniform mode of reception should be applied without discrimination. See, also, comment on article 8, above.

*Article 14*

The United States Government agrees that, except as concerns precedence and etiquette, there should be no differentiation between heads of mission by reason of their class.

*Article 15*

The United States Government agrees with the apparent intent of article 15, that it is the duty of the receiving State to ensure that the sending State has adequate accommodations, but that the receiving State is under no duty to make exceptions from its laws relating to title to or ownership of real property. The United States believes, however, that for added clarity the article should be revised to read somewhat as follows:

"The receiving State shall either permit the sending State to acquire in its territory the premises necessary for its mission, or, in some other way, ensure accommodations, including housing and other facilities, for members of the mission."

*Article 16*

The United States Government agrees that the premises of a diplomatic mission shall be regarded as inviolable and may not be entered by local authorities except with the consent of the head of the mission. However, such consent will be presumed when immediate entry is necessary to protect life and property, as in the case of fire endangering adjacent buildings.

Paragraph 3 of the article, considered in the light of the commentary thereon, presents special problems. This paragraph provides that the premises and furnishings of the mission shall be immune from search, requisition, attachment or execution. It would appear that paragraph 1 of the article covers "search" of a mission, as used in paragraph 3. If there is agreement to this, then the word "search" should be deleted from paragraph 3. If not, the United States Government would appreciate an explanation of what sort of search is intended. Second, while fortunately Governments have rarely been forced to requisition property used for foreign diplomatic missions, the United States Government is of the view that international law does not absolutely preclude the requisition of such property or its taking by exercise of right of eminent domain. This right, of course, could only be exercised under very limited circumstances, such as the happening of a disaster of great magnitude, or the necessity of making important improvements to the city which require the taking of all or some of the land on which the premises of the mission are located. In such case, the receiving State is obligated to make prompt and adequate compensation for the property taken and, if necessary, to use its good offices to assist the sending State in obtaining other suitable accommodations. Last, as to attachments and executions, in the case of rented or leased property international law requires only that the premises of the mission not be invaded to enforce an order of the court. The situation is different, of course, where the property is owned by the foreign Government and used for diplomatic purposes. In such case, the claim of sovereign immunity would preclude attachment or execution.

The United States Government does not agree with the last sentence of paragraph (2) of the commentary. It is not.

clear what sort of judicial notices are referred to. The United States Government agrees that a process server may not serve a summons or process on the premises of the mission. However, this Government does not agree that judicial notices of any nature whatsoever need be delivered through the Minister for Foreign Affairs of the receiving State. If the person to whom the *subpoena* or process is addressed does not enjoy diplomatic immunity, the document should be served on him at his home or other appropriate place away from the premises of the mission. If the person concerned enjoys diplomatic immunity, he is not subject to the jurisdiction of the local courts in the absence of a waiver by his Government. The Foreign Office need become involved only where such a document has been erroneously served, and the head of mission requests the Foreign Office to return the process to the court with an appropriate suggestion of immunity.

The United States Government could not approve the language used in paragraph (4) of the commentary. It is suggested that the substance of this paragraph be restated as a rule of international law worded somewhat as follows:

"Notwithstanding the inviolability of the premises of the mission, real property is subject to the laws of the country in which it is situated. The sending State is obligated to permit the land on which the premises of the mission are situated to be used for carrying out public works, such as the widening of a road, for example. The receiving State, for its part, is obliged to provide prompt and adequate compensation and, if necessary, to place other appropriate premises at the disposal of the sending State."

*Article 17*

The United States Government agrees with this article, if it is intended to grant an exemption from taxes in respect of the premises of a diplomatic mission for which the foreign Government concerned would be liable either as owner or lessee. This Government does not agree, however, if the article is intended to grant an exemption from taxes levied against rented or leased property for which the landlord, rather than the sending State, is liable, or for taxes due with respect to real property owned by the head of the mission personally. Moreover, the article fails to clarify the particular categories of property which shall be considered as constituting the premises of the mission. The article might be revised to read as follows:

"The sending State shall be exempt from all national or local dues or taxes in respect of the premises of the mission owned by or on behalf of the sending State and used for legation purposes, other than, on a basis of reciprocity, such charges as represent payment for services actually rendered. For the purposes of this article, property used for legation purposes shall be deemed to include the land and buildings used for the embassy or legation, the chancery and all annexes thereto, and residence for officers and employees of the mission."

The commentary might explain that property used for legation purposes should be deemed to include the land on which the buildings are situated, including gardens, parking lots and vacant or unimproved land, provided such lands are adjacent to the land on which the buildings are situated.

*Article 18*

The United States Government agrees that the archives of the mission are inviolable, but suggests that the words "and documents" should be omitted, as the phrase is confusing and unnecessary.

The United States Government cannot agree with the statement in the commentary that the inviolability applies to "archives and documents, regardless of the premises in which they may be". The inviolability which properly attaches to the archives of the mission presupposes that archival material will be on the premises of the mission, in ordinary transit by courier or sealed pouch, or in the personal custody of duly authorized officers of the mission for use in the performance of their functions.

*Article 19*

The United States Government agrees that the receiving State should accord appropriate facilities for the performance

of the mission's functions. However, there should be some indication as to the meaning and scope of the words "full facilities".

*Article 20*

Article 20 is so broadly phrased as to sanction the present practice of certain Governments of restricting so extensively the travel of members of a diplomatic mission as to render the right of freedom and movement illusory. The latter part of the article would require that travel controls be applied without discrimination to diplomatic representatives of all States, including those which do not restrict the movements of representatives of the receiving State. The principle of reciprocity, however, is an integral factor in matters of this nature. It is believed that it would be preferable to have no article on the subject, rather than one so subject to arbitrary abuse.

*Article 21*

The United States Government concurs generally with paragraphs 1 and 3 of article 21. This Government recommends, however, that a new sentence be added to paragraph 2 of article 21, which would read as follows:

"Any article which is radio-active may not be considered as an article intended for official use of a diplomatic mission, and any diplomatic bag containing such an article may be rejected."

The United States Government further suggests that paragraph 4 be revised to read as follows:

"The diplomatic courier shall be protected while in transit in the receiving State or in the territory of a third State which he entered with proper documentation."

This Government is of the view that in a number of respects the commentary on this article does not reflect existing rules of international law.

*Article 22*

This provides that the persons of diplomatic agents, defined as the head of the mission, and members of the diplomatic staff of the mission, shall be inviolable, and that they shall not be subject to arrest or detention, be it administrative or judicial. As stated in the observations regarding article 4, above, the composition of the diplomatic staff requires more precise definition.

*Article 23*

The United States Government agrees with paragraph 1 of article 23, to the effect that the private residence of a diplomatic agent is inviolable. However, this Government is of the opinion that paragraph 2 requires further consideration. For instance, no inviolability would attach to the property, papers, and correspondence of a diplomatic agent pertaining to a commercial venture in the receiving State.

*Article 24*

This article undertakes to lay down a new rule of international law. While providing complete immunity from criminal jurisdiction, the article would make the exemption from civil jurisdiction subject to certain exceptions not presently recognized under international law. Moreover, paragraph 4 of the article undertakes to prescribe which court in the sending State is competent to exercise jurisdiction over its own diplomatic agents.

The United States Government is of the opinion that the article should be revised to restate existing principles of international law on the subject. This, it is submitted, requires complete exemption of persons entitled to diplomatic immunity from criminal and civil process, in the absence of a waiver by the sending State, except with respect to real property owned by such person in his private capacity. In the latter case, court proceedings are usually *in rem* rather than *in personam*. The United States Government also suggests that the last sentence of paragraph 4 of the article be deleted.

*Article 25*

The United States Government agrees with the principles expressed in paragraphs 1 and 2 of article 25, which provide that the immunity of diplomatic agents may be waived by the sending State, and that in criminal proceedings, the waiver must always be expressly made by the Government.

Paragraphs 3 and 4, however, recognize implied waivers of immunity in certain civil proceedings. This is inconsistent with the accepted theory that the immunity is for the benefit of the Government concerned, not the individual. For various reasons, the sending State may object to one of the members of its mission becoming involved in judicial proceedings in the receiving State. Accordingly, the United States Government is of the opinion that, in each case, there should be an express waiver of immunity by the sending State.

### Article 26

Article 26 cannot be considered as a statement of the tax exemptions to which diplomatic agents are presently entitled under existing principles of international law. While some of the provisions thereof may conform with requirements of international law, others do not.

### Article 27

Paragraph 1 of the article provides that customs duties shall not be levied on articles for the use of the mission or for the personal use of a diplomatic agent or members of his family belonging to his household. Assuming that the term "diplomatic agent" refers only to an individual recognized in an officer status, this paragraph conforms with United States practice in the matter.

Paragraph 2 of the article further provides that the personal baggage of a diplomatic agent may not be inspected except under limited circumstances and in the presence of such agent or his authorized representative. It is the view of the United States Government that the customary exemption from inspection by customs authorities of the personal baggage of a diplomatic officer is accorded as a matter of courtesy, and not because it is a requirement of international law.

### Article 28

This article provides that, in addition to diplomatic agents, the privileges and immunities mentioned in articles 22 to 27 shall also be enjoyed by members of the family of the diplomatic agent, and likewise the "administrative and technical staff" of the mission, and their families, provided such persons are not nationals of the receiving State. Members of the "service staff", however, are to enjoy immunity only in respect of acts performed in the course of their duties and, if not nationals of the receiving State, are to be exempt only from dues and taxes on their salaries. The last two paragraphs of the article apply to private servants.

The United States Government considers that a careful and precise statement by the International Law Commission as to the privileges, immunities and exemptions to which the various categories of officers and employees of a mission should be considered entitled would materially contribute to the betterment of relations between Governments.

It is well known that few Governments are as generous as the United States Government in extending privileges and immunities to all members of the staff of a diplomatic mission. The United States, just as most Governments, does not extend immunity to families of employees of diplomatic missions in Washington whose names are not included in the Diplomatic List. Also, except on first arrival and for a reasonable period thereafter, such employees and their families do not, in the absence of reciprocal arrangements, enjoy free importation privileges and certain other tax exemptions enjoyed by officer personnel. Also, the United States Government, on request, suggests to American courts the immunity from jurisdiction of all officers and employees of a diplomatic mission in Washington, regardless of nationality, who have been duly notified to and accepted by the United States in such capacity, as well as the immunity of families of officers included on the Diplomatic List.

Other Governments may be of the opinion that the granting of diplomatic immunities to subordinate employees of a mission for other than official acts is not required under international law. The United States Government is hopeful that the International Law Commission will be able to restate the international law rule on the subject with sufficient clarity that it will serve as a firm guide to what immunities Governments must accord to members of foreign diplomatic missions.

### Article 29

This article provides that, as regards the acquisition of nationality of the receiving State, no person enjoying diplomatic privileges and immunities in that State, other than the child of one of its nationals, shall be subject to the laws of the receiving State. This represents existing United States law on the subject and is in conformity with international law as the United States Government interprets it.

### Article 30

This article provides that a diplomatic agent who is a national of the receiving State shall enjoy immunity from the jurisdiction only in respect of official acts performed by him in the exercise of his functions. The last paragraph of the commentary states that the proposed rule implies that members of the administrative and service staff of a mission who are nationals of the receiving State shall enjoy only such privileges and immunities as may be granted them by the receiving State.

The United States Government is of the opinion that all officers and employees of a diplomatic mission, regardless of nationality, should enjoy immunity from jurisdiction in respect of official acts. Such immunity is for the benefit of the Government, and not the individual (see observations regarding articles 6 and 28, above).

### Article 31

The United States Government agrees with the provisions of article 31 specifying that entitlement of an individual to diplomatic privileges and immunities commences on the moment of his entry into the territory to take up his post, and continues until his departure on expiry of his appointment or a reasonable time thereafter in which to depart and have his effects removed. The United States Government submits, however, that where the person is already in the territory of the receiving State, his privileges and immunities begin only when his appointment is notified to *and accepted* by the Ministry for Foreign Affairs.

### Article 32

The United States Government agrees with article 32, if it is intended to apply only to the duties of a third State with respect to a diplomatic agent passing through or in its territory in immediate and continuous transit proceeding on official business to or from a post to which he is regularly assigned. However, a third State is not obligated to accord inviolability to a diplomatic agent while in transit for other purposes or during a sojourn in such third State. The United States Government further observes that this article should be revised to cover other members of the staff of the mission.

It is of course a condition precedent to the claiming of any rights by persons in transit through a third State, whether as a diplomatic courier, a diplomatic agent, or any other person connected with a diplomatic mission, that the individual concerned be properly documented, and that the third State has authorized his transit, or that his presence in the third State is inadvertent and unplanned, being due to a unforeseen circumstance, as in the case of shipwreck or forced landing of an airplane.

### Article 33

The United States Government agrees with the statement that persons entitled to diplomatic immunity should nonetheless respect the laws and regulations of the receiving State, and should refrain from interfering in the internal affairs of that State. Also, the United States Government further agrees that, in the absence of special agreement, the mission should conduct its business through the Foreign Office, and that the premises of the mission should not be used for purposes incompatible with the functions of the mission. However, see United States observations on article 2, regarding the functions of a mission.

### Article 34

This article appears correctly to describe, *inter alia*, the various modes of termination of appointment, except that paragraph (c) should be reworded. A notification that an individual has become *persona non grata*, or a request that he be recalled, is customarily given by the receiving State to the head of the mission concerned, rather than to the individual.