REDACTED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

        Plaintiffs,

    v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

        Defendants.

Civil Action No. 1:19-cv-00150-DLF

## STATE OF QATAR'S REPLY IN SUPPORT OF MOTION TO VACATE AND OPPOSITION TO BROIDY'S CROSS-MOTION TO COMPEL

REDACTED

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND............................................................................................. 2

ARGUMENT ....................................................................................................................... 5

I.       This Court Should Vacate Its Prior Order Regarding the Categorical Scope of the
         Vienna Convention and Principles of International Comity................................................. 5

II.      The Vienna Convention Protects the Materials Identified on Qatar's Privilege
         Logs................................................................................................................................. 7

         A.       The Court Should Analyze Article 24 of the Vienna Convention Using the
                  U.S. Government's Proposed Test As Elaborated Upon by Qatar. ....................... 7

         B.       Broidy's Document-Specific Arguments Do Not Detract from the
                  Applicability of Article 24. ............................................................................... 10

         C.       Broidy Has Failed to Rebut the Applicability of Article 27 to Qatar's
                  Logged Documents. .......................................................................................... 19

III.     Principles of International Comity Also Protect from Disclosure Materials on
         Qatar's Privilege Logs. .................................................................................................... 21

IV.      Broidy's Miscellaneous Arguments Are Irrelevant and Unfounded. .............................. 21

CONCLUSION.................................................................................................................... 24

REDACTED

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Black v. Sheraton Corp. of Am.*,
564 F.2d 550 (D.C. Cir. 1977) ..................................................................................15

*Broidy Capital Management, LLC v. Muzin*,
61 F.4th 984 (D.C. Cir. 2023) ..........................................................................2, 7, 10

*Burka v. U.S. Dep't of Health & Hum. Servs.*,
87 F.3d 508 (D.C. Cir. 1996) ....................................................................................10

*Burks v. Islamic Republic of Iran*,
2020 WL 13303322 (D.D.C. Aug. 21, 2020) ...........................................................15

*California Earthquake Auth. v. Metro. W. Sec., LLC*,
712 F. Supp. 2d 1124 (E.D. Cal. 2010) .....................................................................13

*Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*,
2021 WL 1612099 (D. Kan. Apr. 26, 2021) ..............................................................14

*Gonzalez Ramos v. ADR Vantage, Inc.*,
2020 WL 409283 (D.D.C. Jan. 26, 2020) ..................................................................21

*Hill v. Hunt*,
2008 WL 4108120 (N.D. Tex. Sept. 4, 2008)............................................................13

*In re Terrorist Attacks on September 11, 2001*
2019 WL 3296959 (S.D.N.Y. July 22, 2019) ............................................................20

*Kolovrat v. Oregon*,
366 U.S. 187 (1961).................................................................................................6, 12

*Malcak v. Westchester Park Dist.*,
754 F.2d 239 (7th Cir. 1985) .....................................................................................13

*Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*,
512 F.3d 677 (D.C. Cir. 2008).............................................................................10, 13

*Peoples Westchester Sav. Bank v. Ganc*,
705 F. Supp. 164 (S.D.N.Y. 1989) ............................................................................13

*In re Prograf Antitrust Litig.*,
2013 WL 1868227 (D. Mass. May 3, 2013) ..............................................................14

REDACTED

*Ryan v. Dep't of Just.*,
  617 F.2d 781 (D.C. Cir. 1980) ............................................................................10

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961)................................................................................24

*United States v. Nixon*,
  418 U.S. 683 (1974)............................................................................................15

**Treaties**

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500
  U.N.T.S. 95 ................................................................................................ *passim*

**Other Authorities**

Brief for the United States as Amicus Curiae, *Broidy Cap. Mgmt. LLC v. Muzin*,
  61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576 ............................... *passim*

Brief for the United States as Amicus Curiae, *Republic of Argentina v. NML Cap.
  Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994 .........................................................22

Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on
  Diplomatic Relations* (4th ed. 2016)......................................................................9

Gov't Accountability Office, *U.S. Public Diplomacy: State Department Expands
  Efforts But Faces Significant Challenges* (Sept. 4, 2003), ....................................21

*Report of the Attorney General to the Congress of the United States on the
  Administration of the Foreign Agents Registration Act of 1938* (Dec. 2020) .......................19

Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec.
  11, 2002), in *Hearings Before the House Committee on Government Reform*,
  107th Congress, 2d Sess., Serial No. 107-83 ....................................................9, 11

REDACTED

## __INTRODUCTION__

Broidy's consolidated Cross-Motion to Compel and Opposition to Qatar's Motion to Vacate asks the Court to maintain its June 2, 2022 decision that the Vienna Convention and principles of international comity categorically do not apply to materials and information possessed by Qatar's former contractors, arguing that nothing material has changed since that decision was issued.  Broidy ignores, however, that the United States—which is entitled to deference in its interpretation of its treaty obligations—has now had the opportunity to provide its views and has rejected Broidy's position.  The United States agrees with Qatar that the Vienna Convention can protect documents held not only by the mission itself, but also by the mission's contractors.  The Court should adopt this position.

Unable to dispute the United States' authoritative interpretation, Broidy casts the United States' proposed test for Vienna Convention protection in unduly restrictive terms, in an effort to suggest that Qatar's interpretation is different and inconsistent.  Not so.  Qatar agrees with the United States' proposed test, with elaborations addressing specific issues that the United States did not have occasion to discuss when addressing the question of whether the Vienna Convention is categorically inapplicable to materials held by a non-mission party.  Broidy does not grapple with these elaborations on the United States' proposed test, which include the different means through which inviolable work product can be "solicited" and ways in which information from the archives or documents of the mission can be incorporated into other inviolable materials.

Broidy disparages Qatar's arguments as "frivolous," but this empty rhetoric cannot be reconciled with the respectful treatment given to Qatar's position by the D.C. Circuit and the U.S. Government.  Unfounded rhetoric aside, the reality is that the Court and parties are faced with applying the Vienna Convention in a context where there is no court precedent directly on point. The United States and Qatar agree on the basic test to be applied, and precedent from a range of

1

REDACTED

analogous contexts—including the U.S. Government's relationships with its own contractors—supports robust protections under the Vienna Convention. Any other approach would raise serious reciprocity concerns, undermining the United States' ability to invoke the Vienna Convention to safeguard the operation of its missions abroad.

Qatar's privilege logs make clear that the withheld materials satisfy the requirements for Vienna Convention protection, and Broidy's arguments to the contrary are legally flawed for the reasons discussed below. To the extent the Court requires more information to assess Qatar's privilege claims, Qatar respectfully requests that it be provided the opportunity to do so in accordance with the Court's guidance on the applicable legal standard. Otherwise, the Court should vacate its June 2, 2022 ruling and deny Broidy's Cross-Motion to Compel.

## PROCEDURAL BACKGROUND

Qatar's Motion to Vacate and Broidy's Cross-Motion to Compel raise related issues following the D.C. Circuit's decision in *Broidy Capital Management, LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023), and subsequent remand. Qatar's Motion to Vacate asks this Court to revisit its earlier categorical ruling regarding the inapplicability of the Vienna Convention and principles of international comity to materials held by Qatar's former contractors, and Broidy's Cross-Motion to Compel seeks to compel the production of specific materials that are currently being withheld by Defendants and certain non-party subpoena recipients on the basis of Qatar's assertion of its privileges and immunities.

To facilitate the Court's consideration of these related issues following the D.C. Circuit's remand, Broidy and Qatar agreed on a procedure that this Court adopted in its May 3, 2023 Order. First, the Court stayed enforcement of its earlier June 2, 2022 Order compelling production of the materials at issue. Second, the Court held Qatar's Motion to Vacate in abeyance pending Qatar's preparation of privilege logs enumerating the specific materials at issue. Third, the Court granted

REDACTED

Qatar until June 8, 2023 to complete and serve a substantially complete privilege log of the materials then at issue—*i.e.*, those materials "identified by Defendants or non-party subpoena recipients which are subject to production but for an assertion of privilege or immunity by Qatar." ECF No. 177 at ¶ 3.  On June 8, 2023, in accordance with the May 3 Order, Qatar served substantially complete logs asserting its claimed privileges and immunities over documents and information identified by the three Defendants in this action, as well as two non-party subpoena recipients.  *See* ECF Nos. 185-3, 185-4, 185-5, 185-6, 185-7.

Because written discovery in this case remains ongoing, the privilege logging procedure jointly proposed by Broidy and Qatar recognized that Qatar's initial logs would potentially need to be supplemented, "including as the parties resolve their outstanding discovery disputes as between them (which would potentially make more documents and information subject to production but for an assertion of privilege or immunity by Qatar)."  ECF No. 176 at 2–3.  The Court's May 3, 2023 order adopted this proposal, recognizing that Qatar's privilege logs would be subject to supplementation on a rolling basis and directing Qatar to serve supplemental privilege logs on a rolling basis for any additional materials that subsequently become subject to production but for an assertion of privilege or immunity by Qatar.  ECF No. 177 at ¶ 3.  Consistent with this provision of the Order, Qatar timely produced supplemental privilege logs on a rolling basis to address additional documents identified by the Defendants and non-party subpoena recipients as subject to production but for an assertion of privilege or immunity by Qatar after the service of its original logs.  *See id.*; ECF Nos. 185-8 (June 16 log), 185-9 (June 29 log), 185-12 (July 21 log).

On July 28, the Court directed Qatar to file a copy of its privilege logs by August 7, 2023. The Court further instructed that "[t]o the extent that Qatar intends to rely on the United States' proposed test for consular inviolability, the log should provide concrete facts, specific to each

3

REDACTED

document, that are sufficient to establish: (1) that the Qatari mission provided the documents or (2) that the documents (a) were solicited by the mission (b) for reasons essential to the function of the mission and (c) contain information incorporated from inviolable Qatari documents or archives; and (3) that Qatar maintained objectively reasonable expectations of confidentiality with respect to the documents." *See* Minute Order (July 28, 2023) (internal citation omitted). Qatar undertook to supplement its logs in response to the Court's Order, and on August 4, Qatar provided Broidy with advance courtesy copies of the supplemental logs in order to ensure that Broidy had time to review the log entries in advance of his own August 7 filing deadline. *See* ECF Nos. 185-18, 185-19, 185-20, 185-21, 185-22. Then, on August 7, Qatar consolidated the entries from its original and supplemental logs into one document, and filed its combined, supplemental privilege logs with the Court as instructed, accompanied by a motion to file under seal. *See* ECF Nos. 183, 183-1, 184.

The set of privilege logs Qatar served on August 7 represents the entirety of the materials over which it asserts a claim of privilege or immunity as of this date. As these privilege logs reflect, Qatar has been sparing in its assertion of privileges and immunities. *See* ECF No. 183-1 (all logs containing 85 entries in total). Qatar has not asserted privileges or immunities over the vast majority of the documents identified by Defendants and non-party subpoena recipients for production—all of which Qatar understands to have been produced to Broidy.

Because the written discovery process has not concluded, it is possible that the privilege logs produced by Qatar to date may require further supplementation, as additional responsive materials are identified by the Defendants or non-parties. For example, to the extent that Broidy and the Defendants resolve ongoing discovery disputes in a manner that would require additional production by Defendants, as contemplated by the Court's May 3, 2023 Order, ECF No. 177 at ¶

REDACTED

3, it is possible that all or some of those materials will be subject to claims of privilege or immunity by Qatar.  Likewise, to the extent that new discovery requests are served, or that the Defendants identify additional responsive materials through self-initiated audits to ensure the completeness of the electronically stored information ("ESI") that has already been produced, it may be necessary for Qatar to supplement its claims of privilege.[1]

The Defendants and non-party subpoena recipients are not participating in the briefing of this motion, and do not accordingly have an opportunity to provide their perspectives on the status of discovery to the Court or the other issues raised in Broidy's Cross-Motion to Compel.  Should the Court wish to address broader case management issues in connection with this motion, it would be appropriate for those parties and non-parties (to the extent affected) to be permitted to participate.  In all events, to the extent that additional documents become subject to production but for Qatar's assertion of privilege or immunity, Qatar will promptly review those materials and produce a supplemental log in accordance with the Court's May 3 Order.  In the meantime, Qatar's Motion to Vacate and Broidy's Cross-Motion to Compel with respect to Qatar's August 7 logs are ripe for decision.

## ARGUMENT

I.     **This Court Should Vacate Its Prior Order Regarding the Categorical Scope of the Vienna Convention and Principles of International Comity.**

In its Motion to Vacate, Qatar demonstrated that the Court should vacate the portions of its June 2, 2022 Order (ECF Nos. 148, 149) that (1) categorically rejected the application of the

---

[1] Counsel for Defendant Joseph Allaham has informed counsel for Qatar that it has identified an additional set of potentially responsive ESI through a self-initiated audit to confirm the completeness of its discovery responses.  To the extent that Allaham's further review identifies additional documents that are subject to production but for Qatar's assertion of a privilege or immunity, Qatar will promptly review those documents and supplement its privilege logs on a rolling basis, in accordance with the Court's May 3, 2023 order.

REDACTED

Vienna Convention and principles of international comity and related privileges to materials held

by Defendants, and (2) narrowed the scope of "Highly Confidential" documents under this case's

protective order.  Qatar explained that it would be appropriate for the Court to revisit its earlier

order in light of the changed circumstances of the case, which included Qatar's limited intervention

and the U.S. Government's statement of its position, as expressed in an amicus brief filed with the

D.C. Circuit.  ECF No. 175-1 at 1–2.

In his opposition, Broidy largely does not respond to the merits of Qatar's Motion to

Vacate.  Pls.' Opp. & Cross-Mot. ("Opp."), ECF No. 185-1 at 23–25.  Instead, Broidy argues

summarily that the Court's "reasoning and ruling in the June 2 Order are equally correct today as

they were when issued." *Id.* at 24.  Broidy contends that Qatar's limited intervention is "irrelevant"

because the Court's holding "did not hinge on, and would not vary based on, the party asserting

the privilege." *Id.* at 25 n.42.  This is not accurate, as Qatar explained in its Motion to Vacate.

ECF No. 175-1 at 7 ("Mot.").  But even if Broidy were correct that Qatar's limited intervention

was not germane to the Court's analysis, Broidy completely ignores the other important changed

circumstance since June 2, 2022: the United States' articulation of its interpretation of the Vienna

Convention in an amicus brief filed with the D.C. Circuit—an interpretation which is entitled to

"great weight." *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).  Broidy's failure to address the

United States' interpretation of the Vienna Convention in his opposition to Qatar's Motion to

Vacate is particularly conspicuous because he relies on the United States' submission elsewhere

in his brief regarding the interpretation of Qatar's contract with the Stonington Defendants.  Opp.

at 14.[2]  This intervening event alone, the significance of which is reinforced by this Court's

---

[2] As discussed below, while the U.S. Government's views on questions of treaty interpretation are
entitled to great weight, its views on the meaning of the language in a contract between private
parties are not.  *See infra* at 12.

invitation to the United States to share its further views on this motion, *see* Minute Order (August 3, 2023), provides reason enough for the Court to vacate its June 2 order and revisit the issue of Qatar's privileges and immunities *de novo*.

## II.    The Vienna Convention Protects the Materials Identified on Qatar's Privilege Logs.

### A.    The Court Should Analyze Article 24 of the Vienna Convention Using the U.S. Government's Proposed Test As Elaborated Upon by Qatar.

In its D.C. Circuit amicus brief, the U.S. Government explained that Article 24 of the Vienna Convention should be interpreted to apply to "documents possessed by outside parties with a special relationship to the mission," provided the documents were either "provided by the mission or, alternatively, [were] solicited by and incorporated information from archives or documents of the mission," and were created "for purposes essential to the functions of the mission and with reasonable expectations of continued confidentiality."  ECF No. 175-3 at 17–18, Brief for the United States as Amicus Curiae, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082) ("U.S. D.C. Cir. Brief"), 2022 WL 3704576.  As first articulated in its D.C. Circuit Reply Brief, Qatar agrees with this proposed test, which it regards as consistent with the principles Qatar had previously identified for applying the Convention.  Reply Brief for Appellant State of Qatar at 14–15, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082); *see also* Mot. at 9–11.

Though Broidy's opposition brief seeks to cast Qatar as proposing a "newly minted five-factor test" of its own creation, *see* Opp. at 13, Qatar does not propose a different test from the U.S. Government; instead, it seeks only to elaborate on the standards contained in the U.S. Government's test, in order to apply the test to concrete circumstances, and in doing so, give full effect to the protections of the Treaty in circumstances where it has not yet been interpreted by a

REDACTED

court.[3]  To this end, Qatar has proposed several additional considerations that should be weighed as part of the U.S. Government's proposed test—considerations which Qatar noted in its reply brief in the D.C. Circuit, and to which the U.S. Government did not suggest any disagreement during oral argument before the D.C. Circuit.  *See* Mot. at 9 n.5 (citing ECF No. 175-4, Oral Arg. Tr., *Broidy Cap. Mgmt. LLC v. Muzin* (No. 22-7082) ( "Oral Arg. Tr.")).  These considerations are consistent with the United States' overarching framework for interpreting the Convention—that is, furthering the Convention's purpose of "carrying out 'the efficient performance of the functions of' the mission," U.S. D.C. Cir. Brief at 20 (quoting Vienna Convention Preamble ¶ 5), and are further informed by the United States' reciprocity concerns for U.S. embassies abroad, *see id.* at 23.

*First*, in the case of documents created by a contractor, such documents can be "solicited," U.S. D.C. Cir. Brief at 17, with specificity (*e.g.,* a request for a particular memorandum), or generally (*e.g.*, because it is material that the contractor would reasonably be expected to generate in fulfilling its mandate from the mission).  This principle recognizes that documents may be solicited even in the absence of a specific request for an individual document.  For example, where an agreement contemplates that certain work product will be "generated" for the mission's purposes, that is strong evidence that documents within the scope of that agreed on work are "solicited," even in the absence of individualized requests for each document created.  *See, e.g.*,

---

[3] One reason it is important to give full effect to the Convention is to address the risk that an opportunistic civil litigant could take advantage of broad American-style discovery to probe information about a sovereign's foreign policy to the advantage of that sovereign's geopolitical rivals.  This case illustrates this risk, given the U.S. Government's statements describing Broidy's relationship with a Middle Eastern country that in context can only be understood as a reference to the United Arab Emirates.  *See* Arraignment and Change of Plea Tr. at 65:21–23, *United States v. Broidy*, Case No. 20-cr-210, ECF No. 13 (filed D.D.C. Oct. 23, 2020) (describing "information relating to [Broidy's] efforts to obtain business from a Middle Eastern country and [his] efforts to influence U.S. policy towards a second Middle Eastern country").

REDACTED

ECF No. 109-17 at 6–7 (Stonington Strategies Agreement for Consulting Services (Aug. 24, 2017)).

*Second*, a document can incorporate information from archives or documents of the mission in different ways.  In its brief, the United States offered the "example" of "quot[ing] an inviolable mission document," but it did not purport to articulate a limit on Article 24's protection for only documents including specific quotations.  *See* U.S. D.C. Cir. Brief at 20–21.  To the contrary, the United States has previously asserted inviolability broadly, based on "official *information* in the possession of a local national."  ECF No. 175-6 at 1673, Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec. 11, 2002), in *Hearings Before the House Committee on Government Reform* 1673, 107th Congress, 2d Sess., Serial No. 107-83 ("Taft Statement")  (emphasis added).  Accordingly, if a contractor is provided information derived from mission documents or archives, including information about the mission's foreign policy objectives, and that information is then reflected in a contractor-generated document, it is protected.  Otherwise, compelled disclosure of the document would necessarily disclose sensitive mission information, contravening the Convention's purpose of "protect[ing] . . . the confidentiality of mission records," U.S. D.C. Cir. Brief at 20 (quoting Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 168 (4th ed. 2016)).

Indeed, in an analogous context, the D.C. Circuit has long treated documents in the possession of a government agency's outside contractors as "agency records," even if "they were neither created by agency employees, nor are . . . currently located on agency property."  *Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).  And it has found such documents to be agency records where those documents pertain to work being done for the agency, even though there is no indication that such documents expressly incorporate information from

agency documents.  *See, e.g.*, *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 512 F.3d 677, 678, 680, 687 (D.C. Cir. 2008) ("records containing the opinions and recommendations of non-governmental lawyers whose advice the United States Department of Defense . . . solicited to promulgate regulations establishing terrorist trial commissions" are agency records); *Ryan v. Dep't of Just.*, 617 F.2d 781, 784, 790 (D.C. Cir. 1980) (United States senators' responses to attorney general's questionnaire "inquiring about their procedures for selecting and recommending potential [judicial] nominees" are agency records).  Broidy fails to address this relevant precedent, which Qatar cited both in its D.C. Circuit brief and Motion to Vacate.  *See* Mot. at 16; Brief for Appellant State of Qatar at 40–41 ("D.C. Cir. Brief"), *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082).

## B.     Broidy's Document-Specific Arguments Do Not Detract from the Applicability of Article 24.

Broidy makes three basic arguments regarding the applicability of Article 24 based on Qatar's privilege logs.  First, Broidy claims that Qatar lacked a reasonable expectation of privacy over the logged documents.  Opp. at 9–13.  Second, Broidy asserts that a minority of the withheld documents cannot be "solicited" by the mission because they do not include a mission official as a sender identified on Qatar's logs.  *Id.* at 7–8.  Finally, Broidy claims that if a mission's contractors can be described as engaging in "lobbying" or "public relations work," any materials in their possession (or correspondence with them) cannot be "of the mission."  *Id.* at 15, 22.  These arguments fail.

***Reasonable Expectation of Confidentiality.***     Broidy raises a series of unavailing arguments for why Qatar lacked a reasonable expectation of privacy over the documents on its privilege logs.

REDACTED

First, Broidy reiterates his categorical argument that Qatar lacked a reasonable expectation of confidentiality in documents exchanged with FARA-registered agents because such documents are "subject to FARA's disclosure obligations." *Id.* at 12–14. This issue was extensively debated before the D.C. Circuit and also addressed in detail in Qatar's Motion to Vacate, to which Broidy does not respond. *Id.* at 12–14; Mot. at 20–24. As Qatar explained in its Motion to Vacate, FARA does not conflict with the Vienna Convention's protections—a principle illustrated by the United States' historic implementation of the Act "in a way that has not caused concerns among foreign governments that their rights under the Vienna Convention are being violated." Mot. at 21 (quoting Taft Statement at 1676).

Even if FARA's inspection provisions were to apply to the materials on Qatar's privilege logs, moreover, such inspection by the U.S. Government would not undermine Qatar's expectation of confidentiality as to all other parties, including Broidy, a private litigant. *Id.* at 22–23. And contrary to Broidy's assertion that the United States endorsed his argument, *see* Opp. at 14, the United States conspicuously avoided suggesting that FARA's audit provision bears on "whether any document subject to inspection under the Act falls outside Article 24." U.S. D.C. Cir. Brief at 32; *see also* Oral Arg. Tr. at 32:3–33:5 (counsel for the United States recognizing the court could properly distinguish between "private party litigation" and "the United States invoking its inspection rights under the statute" so as to find that "the document could potentially still be of the mission" even if a foreign sovereign "consented to them being turned over [to] the United States" for the narrow purpose of FARA inspection rights).

Second, Broidy argues that Qatar's expectation of confidentiality with respect to its contractors is categorically defeated by a provision of Qatar's contract with one of those contractors, Stonington, specifying that disclosures of confidential materials prepared pursuant to

11

the engagement could be made as "required by law."  Opp. at 2–3, 13–14.  Broidy's argument echoes a similar argument made by the United States at the end of its amicus brief.  *See* U.S. D.C. Cir. Brief at 32–33.  But while the views of the United States are entitled to "great weight" in the interpretation of treaties, *Kolovrat*, 366 U.S. at 194, there is no basis to defer to the United States' interpretation of a contract between private parties.  In any event, the notion that an "as required by law" clause could defeat Qatar's expectation of privacy is manifestly circular, as suggested in a question posed by Chief Judge Srinivasan at oral argument.  Oral Arg. Tr. at 30:9–12 (Chief Judge Srinivasan asking whether "that's just circular because the whole question is whether it's required by law"); *see also* Mot. at 24.  In other words, disclosure is not "required by law" where inviolability or another legal authority supplies a basis for non-disclosure.  *See id.*

Broidy also ignores that the Stonington agreement he relies upon states expressly that "[n]othing in this Agreement shall waive or otherwise alter the privileges and immunities to which the Embassy is entitled under the laws of the United States *or any treaty to which the United States is a party*."  ECF No. 109-17 at 7 (emphasis added); Mot. at 24.  The agreement thus reinforces, rather than undermines, Qatar's expectation of confidentiality: the specific reservation of all privileges and immunities underscores that a boilerplate provision for disclosure "as required by law" cannot be read as intending disclosure irrespective of a privilege or immunity claim.

Third, Broidy argues that Qatar "could not have had" an expectation of confidentiality in twenty-seven specific entries on Qatar's privilege logs involving communications with Defendant Joseph Allaham, because "Qatar had no written contract with" him.  Opp. at 9.  But while a written agreement is one indicator of a contractor's special relationship with the mission sufficient to inform the mission's reasonable expectations of confidentiality, it is not the only such indicator. The D.C. Circuit has recognized in the analogous agency records context that "compensation or

[a] formal contract" is not necessary for the establishment of a consulting relationship, where the agency has "sought these individuals out and solicited their counsel based on their undisputed experience and qualifications." *Nat'l Inst. of Mil. Just.*, 512 F.3d at 683–84, 687 ("[W]hat matters is the nature of the relationship between the consultant and the agency, not the formalities observed."). The same principle also applies in other legal contexts, such as regarding the formation of attorney-client and principal-agent relationships. *See, e.g.*, *California Earthquake Auth. v. Metro. W. Sec., LLC,* 712 F. Supp. 2d 1124, 1130–31 (E.D. Cal. 2010) ("[T]he relationship between a client and his retained . . . counsel arises from a contract, whether written or oral, implied or expressed." (citation omitted)); *Hill v. Hunt*, 2008 WL 4108120, at *8 (N.D. Tex. Sept. 4, 2008) ("A signed engagement letter is not required for the formation of an attorney-client relationship." (citation omitted)); *see also Peoples Westchester Sav. Bank v. Ganc*, 705 F. Supp. 164, 168 (S.D.N.Y. 1989) ("[A]n actual agency is created by express verbal or oral agreement, [while] an implied agency may be found where the circumstances suggest that the principal and agent intended to create such a relationship."); *Malcak v. Westchester Park Dist.*, 754 F.2d 239, 244–45 (7th Cir. 1985) (similar). Broidy does not explain why inviolability under the Vienna Convention should be read to include an atextual requirement for a written agreement that has no analogy in any similar context.[4]

---

[4] In a footnote, Broidy makes the similarly flawed argument that because certain communications on Qatar's privilege logs were sent to more than thirty people, they cannot be confidential. *See* Opp. at 9 n.8. The number of recipients is immaterial to an expectation of confidentiality. *See In re Prograf Antitrust Litig.*, 2013 WL 1868227, at *2 (D. Mass. May 3, 2013) ("There is no presumption that the privilege . . . is waived merely as a result of the number of people involved in a communication."); *Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, 2021 WL 1612099, at *10 (D. Kan. Apr. 26, 2021) ("The sheer number of people involved in the discussion does not invalidate the privilege.").

**REDACTED**

Here, Qatar received Allaham's assistance with the performance of mission functions and for that purpose formed a special relationship, even if that relationship was not reduced to a written services contract.  And even if some written record of a special relationship were required, there is ample written documentation reflecting the existence of Qatar's relationship with Allaham, including his FARA registration that addresses work performed as early as Fall 2017 to "better international relations within the gulf region and with the leadership in the Jewish community in the United States."  Joseph Allaham Short Form Registration Statement ¶¶ 11, 14 (June 15, 2018), https://efile.fara.gov/docs/6563-Short-Form-20180615-4.pdf; Lexington Strategies, LLC Registration Statement ¶¶ 8, 9(a) (June 15, 2018), https://efile.fara.gov/docs/6563-Registration-Statement-20180615-2.pdf.  Qatar has also identified other documents for Broidy corroborating the existence of Qatar's special relationship with Allaham.  *See* ECF No. 185-23.  Broidy dismisses these documents on the basis that none explicitly characterizes Allaham's relationship with Qatar (*e.g.*, by spelling out the terms of his confidentiality obligation), Opp. at 9–10, but this misses the point: the materials Qatar identified for Broidy illustrate the scope of his work and corroborate his description of his engagement by Qatar in his FARA registration.  *See, e.g.*, ECF Nos. 185-26, 185-27, 185-28 ██████████████████████████████████████████.

Finally, Broidy argues that Qatar could not have had a reasonable expectation of privacy in three communications involving Jamal Benomar that occurred during the four-month period when Benomar, according to his testimony, was working for neither the United Nations nor the Kingdom of Morocco, Opp. at 11–12; ECF No. 185-35, Decl. of Jamal Benomar ¶¶ 8, 30, 31, 34, *Broidy Cap. Mgmt. LLC v. Benomar*, No. 18-6615, ECF No. 39 (S.D.N.Y. filed Oct. 31, 2018).  But irrespective of the exact timing of Benomar's change in credentials, Qatar understood that its contractors could communicate with him in confidence—a reasonable expectation particularly in

REDACTED

light of Benomar's testimony regarding his career with the United Nations and established record mediating diplomatic crises in the region. *See, e.g.*, *id.* ¶¶ 11–21.  The content of the specific documents involving Benomar also evidence their privileged nature.  While *in camera* review should not be the Court's first resort for the reasons Qatar has previously explained, ECF Nos. 180 at 3–5, 185-17 at 5–6, in this instance, given that further supplementation of its privilege logs without disclosing privileged information would not be feasible, Qatar respectfully submits that *in camera* review would be appropriate to assess the privileged substance of the Benomar-related documents.[5]

***Involvement of a Mission Official.***  Broidy claims that "[a]t least 35" entries on Qatar's privilege logs should be rejected because, based on the "to" and "from" information on the privilege logs, the communications were not sent directly to or from "officials of the Qatar Embassy or Qatari government."  Opp. at 7–8 (citing U.S. D.C. Cir. Brief at 31).[6]  However, as

---

[5] Broidy's opposition brief reiterates his position that that the Court should conduct *in camera* review of all of the documents on Qatar's privilege logs.  Opp. at 16–17.  As Qatar previously explained, the Court should reject this overbroad approach.  *See* ECF Nos. 180 at 3–5, 185-17 at 5–6.  The cases Broidy cites regarding *in camera* review are inapt, *see, e.g.*, *Black v. Sheraton Corp. of Am.*, 564 F.2d 550, 553 (D.C. Cir. 1977) (rejecting plaintiffs' claim of error that the trial court should have granted his motion to compel production of documents related to the identity of a confidential informant, rather than denied that motion after *in camera* review), or actually support Qatar's position that *in camera* review should be used sparingly and only as necessary.  *See Burks v. Islamic Republic of Iran*, 2020 WL 13303322, at *9 (D.D.C. Aug. 21, 2020) (recognizing that the necessity of *in camera* review should be evaluated on a "sliding scale," so as to be "careful not to force a disclosure of the very thing the privilege is designed to protect" (internal quotation marks and alteration omitted)); *United States v. Nixon*, 418 U.S. 683, 713–14 (1974) (concerning executive privilege and affirming use of *in camera* review only after the district court "treated the material as presumptively privileged" and, based on its initial evaluation, found that the party seeking production "made a sufficient showing to rebut the presumption").

[6] Broidy asserts in passing that "at least four of the communications involving Qatari officials included at least one individual who was not FARA-registered to represent Qatar . . . and Qatar has not provided any evidence to suggest that those unregistered agents had a 'special relationship' with Qatar."  Opp. at 12 n.19.  Even presuming Plaintiffs are correct that no FARA registration existed for some individuals, FARA registration is not dispositive of the requisite special relationship for purposes of the Vienna Convention.  While FARA registration is one means by

**REDACTED**

discussed *supra* pp. 8–9, there are various means through which a mission may "solicit" work product, as well as numerous ways in which resulting documents and communications may "incorporate" the mission's information.[7]

Here, twenty-one of these thirty-five entries involve communications between contractors

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

which to illustrate such a special relationship, FARA cannot be the exclusive means of establishing the scope of a multilateral treaty that applies in many countries where FARA does not exist.  In this case, the special relationship is shown not only by the nature of the withheld documents,  but also through produced documents involving this same chat group, which show that it was ████████  ████████████████████████████  Qatar has claimed privilege only over the subset of chat communications by this group that includes content that meets the standard for Article 24 protection.

[7] Broidy also claims that the "Government explicitly rejected any supposed inviolability of such communications" when discussing Broidy's discovery requests to Defendant Howard.  Opp. at 8 (citing U.S. D.C. Cir. Brief at 31).  This is not accurate.  The Government's brief merely stated that insofar as Broidy's expansive requests sought information relating to "[j]ournalists, reporters, other members of the media, and media companies" with whom Qatar had no special relationship, ECF No. 109-3 at 18, there was no "indication" that Qatar had "both solicited" and "provided information" included in such documents, U.S. D.C. Cir. Brief at 31.  This is entirely consistent with Qatar's position, as illustrated by the documents over which Qatar has not asserted privilege. *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████ .

**REDACTED**



***Performance of Allegedly "Nondiplomatic" Work***.  Broidy argues that documents on Qatar's privilege logs are not protected because certain of them relate to the performance of "unprotected" and "nondiplomatic" public relations and lobbying work.  Opp. at 15, 22.  Broidy cites no authority for the proposition that work that can be characterized as "public relations" or "lobbying" is irrelevant to the functions of a diplomatic mission, however, and the argument is clearly incorrect.

---

8   *See also*  PRIV-ALLAHAM-001,  PRIV-HOWARD-003,  PRIV-HOWARD-004,  PRIV-HOWARD-008, PRIV-HOWARD-013, PRIV-HOWARD-018, PRIV-HOWARD-020, PRIV-HOWARD-021, PRIV-HOWARD-024, PRIV-HOWARD-025, PRIV-HOWARD-027, PRIV-HOWARD-028, PRIV-HOWARD-032, PRIV-KLUETER-002, PRIV-KLUETER-003, PRIV-MUZIN-015, PRIV-MUZIN-016, PRIV-MUZIN-017, PRIV-MUZIN-019.

9   *See also*  PRIV-MUZIN-002,  PRIV-CONOVER-001,  PRIV-CONOVER-002,  PRIV-CONOVER-003, PRIV-HOWARD-007, PRIV-HOWARD-026, PRIV-HOWARD-031, PRIV-KLUETER-001, PRIV-KLUETER-004. ███████████████████████████ As discussed *supra*, Qatar intends to offer *in camera* review of these documents.

**REDACTED**

As the United States recognizes and Broidy appears not to dispute, the scope of Article 24 should be guided by the Treaty's purpose of facilitating "'the efficient performance of the functions of' the mission." U.S. D.C. Cir. Brief at 20 (quoting Vienna Convention Preamble ¶ 5). Under Article 3(1) of the Convention, the functions of diplomatic mission are broadly defined, and extend to: (i) "[p]rotecting in the receiving State the interests of the sending State"; (ii) "[n]egotiating with the Government of the receiving State"; (iii) "[a]scertaining by all lawful means conditions and developments in the receiving State"; and (iv) "[p]romoting friendly relations."[10]

Applying Article 24 consistent with the Treaty's object and purpose requires considering whether the Qatari mission has sought the contractor's *assistance* with these functions. The engagement of government relations and public relations professionals such as Defendants and non-party subpoena recipients plainly assisted the Qatari mission with these functions, including by helping to monitor "conditions and developments" in the United States; by "protecting" Qatar's interests in the United States; and by "promoting" friendly relationships between Qatar and the United States. Indeed, numerous countries contract with political consultants, public relations experts, and lobbyists to assist in the diplomatic functions listed above. *See Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938*, at 12, 50, 75, 85, 142 (Dec. 2020) (detailing contractor work examples including conducting "outreach to U.S. Government officials" focused on "influenc[ing] [the

---

[10] Qatar strongly disagrees with Broidy's undeveloped arguments that Qatar has violated the Vienna Convention by "interfering in the internal affairs" of a host state and otherwise using its mission for purposes incompatible with the Convention. Opp. at 19, 21. Aside from lacking any factual basis, Broidy's allegations are entirely irrelevant, since the specified provisions of the Vienna Convention, including its prohibition on internal interference, are enforced state-to-state. *See* Vienna Convention, art. 9 ("The receiving State may . . . notify the sending State that the head of the mission or any member of the diplomatic staff of the mission is persona non grata or that any other member of the staff of the mission is not acceptable."). Any such state-to-state enforcement does not affect the immunities and inviolabilities that the Convention separately protects.

REDACTED

Embassy's] interests," assisting with "general bilateral relations with the United States," and promoting the country's role "as a longstanding strategic partner of the United States"). Moreover, as the U.S. Government also pointed out in its amicus brief when rejecting the "overly restrictive view" that mission documents given to non-mission parties "fall outside of Article 24," if U.S. courts can question whether foreign missions really need the assistance of lobbyists and public relations consultants, foreign courts can question whether U.S. missions really need the assistance of "architects, building contractors, and security contractors." *See* U.S. D.C. Cir. Brief at 23.

This Court should accordingly reject Broidy's arguments that Qatar lacked a reasonable expectation of privacy over documents on its privilege logs, that documents cannot be "solicited" by the mission where they do not include a mission official, and that documents cannot be deemed "of the mission" where the mission's contractors engage in what can be described as "lobbying" or "public relations work."

### C.   Broidy Has Failed to Rebut the Applicability of Article 27 to Qatar's Logged Documents.

As Qatar has previously demonstrated, Article 27 protects correspondence between and among the Qatari mission and contractors with whom Qatar shares a special relationship and expectations of confidentiality, where the correspondence is made for the sole purpose of assisting in the mission's performance of its functions and is confidential. *See* Mot. at 16 n.8; Vienna Convention, art. 27 ("The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions."). Broidy argues that the documents on Qatar's privilege logs are not protected by Article 27 because certain correspondence does not involve mission officials, and again asserts that certain documents relate to performing "nondiplomatic lobbying and public relations work." Opp. at 15.

REDACTED

With respect to the absence of mission officials from certain of the communications at issue, Broidy's argument under Article 27 fails for the same basic reason as Broidy's equivalent argument under Article 24: neither is faithful to the text of the Treaty, which protects correspondence "of the mission."  As Qatar has previously explained, "official correspondence of the mission," defined by the Treaty to mean "all correspondence relating to the mission and its functions," should be interpreted to recognize that communications among contractors may be subject to inviolability when they are exchanged "for the sole purpose of assisting in the mission's performance of its functions and [are] subject to confidentiality requirements."  D.C. Cir. Brief at 53.  Broidy's assertion that the documents fail Qatar's own test is accordingly baseless.[11]

Broidy fares no better with his argument that Qatar's logged communications are not protected by Article 27 because they do not relate to the mission and its functions.  As discussed with respect to Article 24, *supra* pp. 18–19, the question is whether the mission seeks the contractor's *assistance* with its own functions, and for that purpose forms a special relationship requiring confidential information-sharing.  A contractor skilled at "lobbying"—persuading governments—may be able to assist a sovereign's pursuit of foreign policy interests *vis-à-vis* another sovereign.  Likewise, a contractor skilled in "public relations" may be able to assist activities that, when performed by a sovereign, are called "public diplomacy."  *See* Gov't Accountability Office, *U.S. Public Diplomacy: State Department Expands Efforts But Faces Significant Challenges*, GAO-03-951 (Sept. 4, 2003), https://www.gao.gov/products/gao-03-951 (State Department followed recommendation to "consider[] the techniques of private sector public relations firms in integrating all of State's public diplomacy efforts").  The Court should

---

[11] Broidy's reliance on *In re Terrorist Attacks on September 11, 2001* ignores that that court qualified that documents received, collected, and produced by the Embassy could also be protected under Article 27.  *See* 2019 WL 3296959, at *4 n.3 (S.D.N.Y. July 22, 2019).

accordingly reject Broidy's argument that foreign governments may not rely on government relations and public relations professionals to assist their missions in the performance of their Article 3 functions.

## III. Principles of International Comity Also Protect from Disclosure Materials on Qatar's Privilege Logs.

Broidy largely does not respond to Qatar's arguments in its Motion to Vacate that under principles of international comity, Qatar may claim the deliberative process privilege over documents held by its former contractors.  Mot. at 28.  Rather, Broidy's sole response is to reiterate an argument that the deliberative process privilege does not extend to "documents held by a private, non-governmental entity" or "a chat conversation in the possession of an American citizen . . . [that] reflect[s] a foreign sovereign's deliberative process."  Opp. at 16 (citations omitted).  But as Qatar already explained in its Motion to Vacate, Broidy's argument in this regard is without foundation.  Ample case law confirms that the deliberative process privilege remains available for documents involving private consultants.  *See, e.g.*, *Gonzalez Ramos v. ADR Vantage, Inc.*, 2020 WL 409283, at *1 (D.D.C. Jan. 26, 2020) (upholding U.S. Department of Agriculture's claim of privilege over "drafts of a workplace Climate Assessment report" created by private consultant). Under principles of international comity, Qatar may likewise claim the privilege over documents held and created by its contractors, as it has done here.  *See* Mot. at 27–28.  Broidy does not respond to the United States' position, cited in Qatar's Motion to Vacate, that comity considerations apply with equal force for materials held by non-parties as for materials possessed by the foreign state. *See* Mot. at 26 (citing U.S. Amicus Brief, *Republic of Argentina v. NML Cap. Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994, at *32–33).

## IV. Broidy's Miscellaneous Arguments Are Irrelevant and Unfounded.

**REDACTED**

In Section Five of his brief, Broidy makes a number of miscellaneous arguments, several of which incorporate inflammatory and inaccurate characterizations of the Defendants and non-party subpoena recipients.  The Court should not credit these gratuitous allegations in the context of a motion where the relevant Defendants and non-parties have no opportunity to be heard.  Nor is there any justification for doing so, because Broidy's statements are flawed on their face.  Consistent with its limited intervention, Qatar responds to Broidy's allegations for the sole purpose of demonstrating that they offer no support to Broidy's Cross-Motion to Compel, whether that is because they are legally irrelevant, factually unfounded, or both.

For example, Broidy claims that Qatar's ███████████████████████████ ███████████████████████████████  Opp. at 23.  This claim of spoliation is wrong on its face, because the purportedly destroyed documents████████████ have been preserved and in fact are listed as the second and third items on the Klueter/IMS privilege log.  *See* ECF No. 184-1.  Broidy also insinuates that other "highly responsive documents and communications" were not preserved, Opp. at 23, but offers no basis for this serious accusation.  Meanwhile, the privilege log entry describes ████████████████████████ ██████████████  not transferring or destroying unique versions of documents.  ██████ ████████████████████████████████████████ ██████████████████.

As another example, Broidy's brief includes a screenshot of a non-privileged document and claims it reveals ████████████████████████████ ██████  Opp. at 18, 21–22.  The Court can review the image for itself and see this inflammatory description is inaccurate.  The March 13, 2018 chat references ████████████████ ████████████████████████████████████████

**REDACTED**

███████████████████████████████████████████████████████

██████████ ; *see also* Emails Show UAE Linked Effort Against Tillerson, BBC News, https://www.bbc.com/news/world-us-canada-43281519 (article published on March 5, 2018 stating that Broidy "urged [President Trump] to sack Mr Tillerson"). This discussion of information already in the public domain thus does not support Broidy's inflammatory characterization.

To the extent that Broidy's miscellaneous arguments touch on the actual privilege dispute at issue, they are equally flawed. Broidy complains that Qatar's privilege log entries are too vague, but he never raised particularized concerns with the log's narrative descriptions before filing his motion, and his complaint of vagueness cannot be reconciled with his self-proclaimed ability to ascertain with "no doubt" what the subject of the underlying privileged communications must be. Opp. at 21. Broidy also argues that communications are categorically unprotected if they concern Qatar's "efforts to build [a] positive public perception" in the United States, *see id.* at 22, but this argument again ignores that such activity is a standard function of a diplomatic mission. *See supra* pp. 18–19. Finally, Broidy asserts that one of the logged documents cannot be protected because

███████████████████████████████████████████████████████

██ The privilege was not broken simply because Allaham relied on an agent to conduct a clerical task. That act does not waive privilege, just as attorneys' daily and unremarkable use of third-party vendors—including eDiscovery vendors, printing shops, and document messengers—does not waive the attorney-client privilege. *Cf. United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) ("[F]ew lawyers could now practice without the assistance of secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts. The assistance of these agents being indispensable to his work and the communications of the client

REDACTED

being often necessarily committed to them by the attorney or by the client himself, the privilege

must include all the persons who act as the attorney's agents.").

## **CONCLUSION**

For the foregoing reasons, this Court should grant Qatar's Motion to Vacate and deny

Broidy's Cross-Motion to Compel the production of the documents on Qatar's privilege logs,

which are protected from disclosure on the basis of Qatar's right to inviolability of mission

documents pursuant to the Vienna Convention and applicable principles of international comity.


Dated: August 18, 2023                    Respectfully submitted,

                                          */s/ Alexander A. Berengaut*
                                          Alexander A. Berengaut (D.C. Bar No. 989222)
                                          David M. Zionts (D.C. Bar No. 995170)
                                          Amber M. Charles (D.C. Bar No. 1035226)
                                          COVINGTON & BURLING LLP
                                          One CityCenter
                                          850 Tenth St., N.W.
                                          Washington, DC 20001-4956
                                          (202) 662-6000
                                          aberengaut@cov.com
                                          dzionts@cov.com
                                          acharles@cov.com

                                          Mark P. Gimbel
                                          (*pro hac vice* application pending)
                                          COVINGTON & BURLING LLP
                                          The New York Times Building
                                          620 Eighth Avenue
                                          New York, NY 10018-1405
                                          (212) 841-1000
                                          mgimbel@cov.com

                                          *Counsel for State of Qatar*

**REDACTED**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2023, I caused a true and correct copy of the foregoing State of Qatar's Reply in Support of Qatar's Motion to Vacate and Opposition to Broidy's Cross-Motion to Compel to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: August 18, 2023

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*