REDACTED

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

              Plaintiffs,

    v.

NICHOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

           Defendants.

Civil Action No. 1:19-cv-00150-DLF

**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF
PLAINTIFFS' CROSS-MOTION TO COMPEL**

KASOWITZ BENSON TORRES LLP
Daniel R. Benson
Sarah Gibbs Leivick
Sarmad M. Khojasteh (*pro hac vice* forthcoming)
Henry B. Brownstein
David Tyler Adams (*pro hac vice* forthcoming)

*Counsel for Plaintiffs Broidy Capital
Management, LLC and Elliott Broidy*

Dated: August 24, 2023

REDACTED

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.     The Allaham Declaration, December 2018 Agreement, And July 2018 Email
Confirm That Qatar's Frivolous Objections Are Intended to Illegally Conceal and
Have Concealed Unprotected, Highly Relevant Evidence ................................. 5

II.    None of the Withheld Materials on Qatar's Privilege Logs Qualify for Article 24
Protection ................................................................................................................ 13

      A.    Qatar Did Not Have a Reasonable Expectation of Privacy in Any of the
Withheld Materials.............................................................................................. 13

      B.    None Of The Withheld Materials Were "Solicited By And Incorporated
Information From Archives Or Documents Of The Mission".......................... 18

III.   Article 27 Of The Convention Also Does Not Protect Any Of The Improperly
Withheld Documents And Communications On Qatar's Privilege Logs ....................... 21

IV.   The Deliberative Process Privilege Does Not Protect Any of the Improperly
Withheld Documents and Communications On Qatar's Privilege Logs ........................ 24

CONCLUSION..................................................................................................................... 25

REDACTED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broidy Cap. Mgmt. LLC v. Muzin,*
  61 F.4th 984 (D.C. Cir. 2023) ........................................................................ *passim*

*Broidy Cap. Mgmt. LLC et al. v. State of Qatar, et al.,*
  Case No. 18-cv-02421-JFW (C.D. Cal.) ........................................................4, 5, 7

*Burka v. U.S. Dep't of Health & Hum. Servs.,*
  87 F.3d 508 (D.C. Cir. 1996) ................................................................................20

*Covad Commc'ns Co. v. Revonet, Inc.,*
  258 F.R.D. 5 (D.D.C. 2009) ...................................................................................11

*Ellis v. Toshiba Am. Info. Sys., Inc.,*
  218 Cal. App. 4th 853 (2013), *as modified* (Aug. 14, 2013), *as modified on
  denial of reh'g* (Sept. 10, 2013) ..........................................................................12

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.,*
  81 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................17

*Peskoff v. Faber,*
  244 F.R.D. 54 (D.D.C. 2007) .................................................................................12

*Quinn v. City of Vancouver,*
  No. C17-5969 BHS, 2021 WL 1170375 (W.D. Wash. Mar. 29, 2021) ...................12

*Tingle v. Hebert,*
  No. CV 15-626-JWD-EWD, 2018 WL 1726667 (M.D. La. Apr. 10, 2018) ...........12

*United Mine Workers of America International Union v. Arch Mineral Corp.,*
  145 F.R.D. 3 (D.D.C. 1992) ...................................................................................15

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.,*
  141 S. Ct. 777 (2021) .............................................................................................25

*In re Uranium Antitrust Litig.,*
  32 Fed. R. Serv. 2d 635 (D.D.C. 1980) .................................................................12

**REDACTED**

Plaintiffs respectfully submit this memorandum of law in further support of, and in reply to Qatar's memorandum of law ("Q. Mem.") in opposition to, their cross-motion to compel ("Pls. Mem.").[1]

## PRELIMINARY STATEMENT

Plaintiffs have recently received three shocking documents—a December 20, 2018 putative settlement agreement between Qatar and defendant Joseph Allaham, with whom plaintiffs have now settled, and a July 13, 2018 email from Mr. Allaham's then counsel advocating such a settlement, as well as Mr. Allaham's August 19, 2023 declaration—which negate Qatar's privileges and immunities assertions regarding the documents on its Allaham privilege log and raise serious questions regarding its other assertions.[2]  They also evidence what appears to be an egregiously improper and longstanding effort by Qatar and its agents, including the defendants and nonparty subpoena recipients—and their respective counsel—to frustrate discovery in this and other actions brought by plaintiffs arising from Qatar's hack-and-smear campaign against plaintiffs.

Qatar contends that documents and communications withheld by defendants and certain nonparty subpoena recipients are "inviolable" on the grounds that (1) each of the defendants and nonparties had a "special relationship" with Qatar's diplomatic mission to the United States and (2) each withheld document and communication was specifically "provided by the mission," or

---

[1] Submitted herewith in further support of plaintiffs' cross-motion is the Declaration of Daniel R. Benson, dated August 24, 2023 ("Benson Decl.").

[2] The three documents are referred to herein as the "December 2018 Agreement," the "July 2018 Email" and the "Allaham Declaration," respectively.  The December 2018 agreement and the July 2018 email, which were never produced by any party or included on any privilege log, were provided to plaintiffs by Mr. Allaham.  As set forth below, in view of these documents and other information which has come to light during discovery, plaintiffs respectfully request the opportunity to take further discovery concerning the issues raised herein.

1

**REDACTED**

was "solicited by [the mission] and incorporate[s] information from archives or documents of the mission," and was created "for purposes essential to the functions of the mission and with reasonable expectations of continued confidentiality."  Q. Mem. at 7.

Under Qatar's position, there would effectively be no limit on its right to assert the "inviolability" of documents in the hands of its agents, no matter what those agents did, so long as it was to advance a "mission function"—even if the conduct at issue itself violated the Vienna Conventions.  If, for example, in order to advance what it claims is a "mission function," such as advancing Qatar's reputation in the United States, Qatar hired agents in the United States to bribe, say, U.S. government officials or threaten or murder its critics (or hack their confidential email accounts), Qatar could prevent those agents from disclosing of documents and communications evidencing that illegal conduct.  There is no support in the Vienna Convention or any other authority for Qatar's position.

Here, what plaintiffs allege and will prove is that at Qatar's behest, defendants, together with other parties, illegally used hacked materials to smear plaintiffs.  But what is equally if not more shocking is that it appears that—at the behest of this enormously wealthy foreign country which was paying the fees of all of those parties' attorneys' fees—the lawyers for defendants and nonparties and Qatar itself went to extraordinary lengths to help Qatar cover up that egregious misconduct.

## <u>ARGUMENT</u>

The Allaham Declaration, December 2018 Agreement, and July 2018 Email directly contradict Qatar's representations concerning "mission function," "special relationships," and "reasonable expectations of confidentiality"—as evidenced by the following statements in those documents:

REDACTED

**The Allaham Declaration**

- "The majority of the work that I did for the State of Qatar and the Qatar Investment Authority (QIA) involved finding investment opportunities in the United States."  Benson Decl. Ex. 1 ¶ 2.  This work obviously was not "special relationship" work to advance "mission functions."

- "I have been informed by my attorneys at ArentFox Schiff that a London-based attorney representing Qatar named Osama Abu-Dehays of Pillsbury Winthrop Shaw Pittman told my attorneys that they could not produce to Broidy any documents and communications that would be embarrassing to Qatar or that would reveal the involvement of Qatar and/or its agents in the hack-and-smear campaign targeting Broidy."  *Id.* ¶ 3.  Qatar's assertions of privileges and immunities over documents, and the defendants and nonparties' withholding the documents, have been designed not to protect legitimate "inviolable" mission activities or information but to cover up crimes and torts.

- "Based on my conversations with my attorneys, it is my understanding that the instruction from Pillsbury is why Covington & Burling, which represents the State of Qatar, has submitted privilege logs designating as 'privileged' numerous of my WhatsApp communications with Ali Al-Thawadi, Chief of Staff to Mohammed bin Hamad Al Thani, the younger brother of the Emir of Qatar."  *Id.* ¶ 4.

- "[M]y attorneys told me in or around May of this year that they were not allowed to search my documents and communications from 2017 and 2018, because Covington told them that my materials from that time frame 'belong' to Qatar."  *Id.* ¶ 5.

- "I reviewed all [27 of] my chat messages with Ali Al-Thawadi [that are listed on Qatar's privilege logs for my materials].  After that review, I can say with certainty that none of my chats discussed "diplomatic strategy" for any country.  For example, some of the messages simply discussed Qatar giving very expensive watches, such as Patek Philippe and Rolex, as gifts to high-profile and influential people in the United States."  *Id.* ¶ 7.

- "Nothing in the contents of [my withheld] documents related to Qatar's foreign policy or diplomacy.  None of [my withheld] documents contain any information that could be considered foreign policy or diplomatic secrets.  Nothing in the text of any [of my withheld] documents relates to what I understand are the essential functions of a diplomatic mission."  *Id.* ¶ 8.

- "During the time I worked for Qatar and the Qatar Investment Authority (QIA): no one ever told me and I never agreed or believed that I was helping Qatar's diplomacy; no one ever told me and I never agreed or believed that the documents were confidential; no one ever told me and I never agreed or believed that the communications and documents in my possession were the property of Qatar; no one ever gave any instructions regarding the handling or sharing of any information or materials relating to Qatar; and no one ever told me and I never agreed or believed that any materials or information that I had sent or received was 'of the mission,' including in the sense that they were confidential or proprietary for the purpose of advancing Qatar's foreign policy."  *Id.* ¶ 9.

3

**REDACTED**

**December 2018 Agreement**

- Far from reflecting what Qatar now claims was a "special relationship" between Mr. Allaham and Qatar, the December 2018 agreement reflects the opposite—Qatar's refusal even to acknowledge that Mr. Allaham ever worked for Qatar.  In the very first "whereas" clause, among numerous other places in the agreement, the December 2018 Agreement states, "WHEREAS, Mr. Allaham alleges that, in or around 2017, he entered an independent contractor relationship with the Qatar Parties to advance the interests of the Qatar Parties and of Qatar's instrumentalities, by promoting the 2022 World Cup in Qatar, fostering better international relations within the Gulf region with the leadership in the Jewish community in the United States, and providing real estate investment and other public relations and messaging services."  Benson Decl. Ex. 2 at 1.  Another WHEREAS clause provides that it was the "position of the Qatar Parties that there were no legally binding obligations imposed on any Qatar Party implementing the [relationship alleged by Allaham]."  *Id.* at 2.

- Section 7(a) of the December 2018 Agreement—titled "Ownership of Records and Confidentiality"—purported to require Mr. Allaham to make available and return to Qatar by December 30, 2018 "all records, notes, data, memoranda, models, and equipment of any nature, and copies thereof, that are in Mr. Allaham's possession or under Mr. Allaham's control and that relate to the Consulting Arrangements or otherwise to the business or affairs of a Qatar Party or its Released Persons," and to "agree and acknowledge that all such returned records are and at all times in the past have been the property of Qatar, and are not and have never been the property of any Allaham Party." *Id.* at§ 7(a) (emphasis added).

- The December 2018 Agreement defines "Consulting Arrangement" to mean, among other things, "any and all activities performed at any time prior to [December 20, 2018] by an Allaham Party or any of its Released Persons in furtherance of or related to the interests of a Qatar Party or its Released Persons, . . . including . . . [Mr. Allaham's] activities relating to, in furtherance of, or arising out of the subject matter of the California Action[, *i.e.*, *Broidy Capital Management et al. v. State of Qatar, et al.*, Case No. 18-cv-02421-JFW (C.D. Cal.),] or Related Actions[, *i.e.*, this case." *Id.* § 1(e).

- The December 2018 Agreement defines Qatar's "Released Persons" to include Qatar, all of its subdivisions and instrumentalities, and "all parties named as Defendants by Plaintiffs Elliott Broidy and Broidy Capital Management LLC."  *Id.* § 1(h).

**July 2018 Email**

- "[Mr. Allaham] did an amazing job of getting through discovery without a scratch on Qatar even though there is no confidentiality agreement in place between he and Qatar - or indemnification agreement or help with immunity."

- "Qatars lawyers thought just keeping discovery 'attorneys eyes' only would be good enough. I said then it wouldn't and I'm proven right from the leaks.  The only good strategy was 'no discovery' but Qatar negotiated that away."

4

REDACTED

- "[T]here are no confidentiality agreements in place between [Mr. Allaham] and anyone." *Id.*

- "You don't hire Abbey Lowell if you've got a parking ticket, right?"

*Id.*, Ex. 3 at 1.

I.      **The Allaham Declaration, December 2018 Agreement, And July 2018 Email Confirm That Qatar's Frivolous Objections Are Intended to Illegally Conceal and Have Concealed Unprotected, Highly Relevant Evidence**

The Allaham Declaration, December 2018 Agreement, and July 2018 Email establish,

among other things, that:

- There was no "special relationship" between Qatar and Mr. Allaham;

- Qatar had no expectation at all, let alone a reasonable expectation, of confidentiality in its dealings with Mr. Allaham;

- Qatar and its counsel—with the assistance of defendants and their respective counsel— have sought to wrongfully conceal discoverable evidence; and

- Qatar has, for years, propped up its baseless Vienna Convention objections by knowingly misrepresenting its purported relationship with Mr. Allaham and the purported strict requirements of confidentiality that it has repeatedly said it imposed upon him.

The Allaham Declaration and December 2018 Agreement unmistakably reflect Qatar's

and defendants' intentional scheme to circumvent the basic rules of discovery.  This is evident

from the Allaham Declaration, in which Mr. Allaham reveals that he was "informed by [his

former] attorneys at ArentFox Schiff that a London-based attorney representing Qatar named

Osama Abu-Dehays of Pillsbury Winthrop Shaw Pittman told [ArentFox Schiff] that they could

not produce to [plaintiffs] any documents and communications that would be embarrassing to

Qatar or that would reveal the involvement of Qatar and/or its agents in the hack-and-smear

campaign targeting plaintiffs."  *Id.*, Ex. 1, ¶ 3.  Mr. Allaham further attests that his lawyers told

him that they were not "allowed to search [Mr. Allaham's] documents and communications from

5

REDACTED

2017 and 2018, because Covington told them that [his] materials from that time frame 'belong' to Qatar."  *Id.* ¶ 5.

Mr. Allaham's attestations are all the more concerning in view of the December 2018 Agreement that Mr. Allaham executed with Qatar.[3]  That agreement not only corroborates his statements, but reveals that Qatar, through its counsel, engaged in extensive efforts designed to retroactively provide Mr. Allaham—and, doubtlessly, other defendants and parties—with contrived cover for his eventual Qatar-mandated non-compliance with plaintiffs' discovery requests in this and related actions.  Moreover, among numerous other unusual aspects of the agreement, it provided that Qatar would pay Mr. Allaham over $1 million as an initial installment—on the "condition precedent" that he first execute a "sworn affidavit" in a "form mutually agreed between Qatar and Mr. Allaham" "truthfully recounting the facts of [his] relationship" with, among others, Qatar and any and all parties sued by plaintiffs.  Qatar's agreement to pay is all the more bizarre given that, as noted, Qatar in the agreement refused even to acknowledge that Mr. Allaham worked for it.[4]

In fact, evidence from the limited discovery that has been produced has confirmed that Qatar engaged in similar conduct with other parties.  For example, Qatar paid public relations firm IMS, Inc. and its president, Jeff Klueter—who were also involved in the dissemination of plaintiffs' hacked materials—$40,000 on May 5, 2018 pursuant to an amendment to their

---

[3] The December 2018 agreement itself, as to which there is no conceivable Vienna Convention or other protection, had never been produced by anyone and instead was withheld in response to plaintiffs' discovery requests for agreements between Qatar and, among others, the defendants—including by Qatar's counsel, Covington & Burling, in response to plaintiffs' June 28, 2023 subpoena.  Covington, which is a notice party on the December 2018 Agreement, doubtless is in possession of a copy of the agreement.

[4] Like the December 2018 Agreement itself, that affidavit and documents reflecting payments by Qatar thereunder have never been produced.

REDACTED

Consulting Services Agreement requiring that "IMS shall compile and index all the records IMS

has assembled/produced in the performance of this Agreement, including all confidential

communications; ***IMS shall purge all duplicates from IMS hard copy or electronic files***; and

IMS shall organize the records (in encrypted form) for delivery to the Embassy, if requested."

*Id.* Ex. 4 at 1 (emphasis added).  Given that plaintiffs sued Qatar and others on March 26,

2018—six weeks before Qatar had IMS execute the amendment—alleging claims arising out the

hack-and-smear campaign against plaintiffs in which IMS was involved, *see Broidy Capital*

*Management et al. v. State of Qatar, et al.*, Case No. 18-cv-02421-JFW (C.D. Cal.), the

requirement that "IMS shall purge all duplicates from IMS hard copy or electronic files"

squarely violated IMS's document preservation obligations.

      The December 2018 Agreement also notably defines "Consulting Arrangement" to mean,

*inter alia*, "any and all activities performed at any time prior to [December 20, 2018] by an

Allaham Party or any of its Released Persons in furtherance of or related to the interests of a

Qatar Party or its Released Persons, . . . including" the work covered in Mr. Allaham's June 15,

2018 FARA filing, his work for and/or with defendant Stonington Strategies LLC on behalf of

Qatar, his investment sourcing and real-estate advisory work for Qatar, and his "activities

relating to, in furtherance of, or arising out of the subject matter of the California Action or

Related Actions." *Id.* Ex. 2 § 1(e).  It likewise defines "California Action" to mean *Broidy*

*Capital Management et al. v. State of Qatar, et al.*, Case No. 18-cv-02421-JFW (C.D. Cal.), *i.e.*,

predecessor litigation concerning the same hack-and-smear campaign at issue in this case, *id.* at

1, "Related Actions" to mean, *inter alia*, this case, *id.* § 1(g), and Qatar's "Released Persons" to

include Qatar, all of its subdivisions and instrumentalities, and—*critically*—"all parties named as

Defendants by Plaintiffs Elliott Broidy and Broidy Capital Management LLC," *id.* § 1(h).

**REDACTED**

In other words, through the December 2018 Agreement, Qatar sought to manufacture purported Vienna Convention protection by retroactively claiming confidentiality and ownership over all documents in Mr. Allaham's possession that conceivably could be relevant in any litigation arising out of Qatar's hack-and-smear attack on plaintiffs.

That appears to be precisely the approach—"no discovery"—Mr. Allaham's former counsel advocated Qatar should take in the July 2018 Email to counsel for Jamal Benomar, a Qatar agent who was also deeply implicated in the hack-and-smear and who, apparently with Qatar's assistance, secured a diplomatic position with Morocco providing him immunity to plaintiffs' lawsuits. *See id.*, Ex. 3 at 1 ("Qatars lawyers thought just keeping discovery 'attorneys eyes' only would be good enough.  I said then [that] it wouldn't . . . . The only good strategy was 'no discovery' . . . .").

And, Qatar inserted the retroactive confidentiality and ownership provisions in the December 20, 2018 Agreement, plaintiffs had already sued Qatar, Jamal Benomar, and defendants Nicholas Muzin and Stonington, and had successfully moved to compel production of documents from Mr. Allaham himself, so that all parties, including Qatar and its counsel—had long been on notice of his obligation to preserve documents and communications possibly relevant to plaintiffs' hack-and-smear litigation—a legal obligation that Section 7(a) of the December 2018 Agreement quite obviously would cause him to violate.

Nor does it appear that Qatar and Covington have limited their interference in discovery to just Mr. Allaham.  Wiley Rein has failed to produce a document that plaintiffs only learned of recently from Squire Patton Boggs—namely, an email from former SPB partner (and registered Qatari agent) Dean Dilley, sending Mr. Muzin notice that Stonington's consulting agreement had been suspended.  This material change in the status of defendants Stonington and Muzin was

8

apparently transmitted on March 28, 2018, two days after plaintiffs filed their initial Complaint in the California Action.

This was no mere oversight.  On July 21, 2023, Plaintiffs requested confirmation that defendant Stonington has produced all "documents related to any agreements (formal or informal) it negotiated or executed with Qatar or any Qatari agent, representative, or affiliate." On August 3, counsel for Stonington and Defendant Muzin, Wiley Rein, responded: "Any agreements between Stonington and the State of Qatar or on behalf of Qatar were publicly disclosed pursuant to FARA and are available through the following webpage: https://efile.fara.gov/ords/fara/f?p=1235:10."

Further, most of the publicly available contracts of the FARA-registered agents whom Plaintiffs have subpoenaed contain language requiring the agents to "return" to the Embassy all Qatar-related work product and communications "upon termination" and/or "upon request." Although plaintiffs have repeatedly asked counsel for most of the subpoenaed Qatari agents, David Gringer of WilmerHale, whether relevant materials were "returned" to Qatar and/or deleted, Mr. Gringer has pointedly refused to answer.

Plaintiffs have asked counsel for these agents numerous times in recent months for confirmation that relevant materials have been preserved for searching and potential production, but no clear answers have been provided.  In response to plaintiffs' pointing out in the Motion to Compel that the privilege log items for IMS concerning "physical transfer [of work product] to the Qatari mission" were a clear reference to the May 2018 amendment between IMS and Qatar that also called for the "purging" of work product, Qatar notably did not deny that IMS had "returned" and deleted material relevant to the claims in this matter.

REDACTED

The Allaham Declaration and July 2018 Email also confirm that Qatar had neither a special relationship with Mr. Allaham nor any reasonable expectation of privacy in any of the documents and communications exchanged with him.  Mr. Allaham directly refutes in his sworn declaration that he ever assisted Qatar's Embassy or diplomatic mission in the United States "in the performance of [the] diplomatic mission's functions," as Qatar's own test requires.  *See infra* Part II.A.  He states instead that "[t]he majority of the work that [he] did for the State of Qatar and the Qatar Investment Authority (QIA) involved finding investment opportunities in the United States."  Benson Decl. Ex. 1, ¶ 2.  Such run-of-the-mill business dealings are in no way protected by the Vienna Convention and, indeed, constitute precisely the type of commercial activity the Vienna Convention expressly excludes from immunity.[5]  *See* Vienna Convention, Ar. 31 ("A diplomatic agent shall enjoy . . . immunity from [the receiving State's] civil and administrative jurisdiction, except in the case of . . . [a]n action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions); Art. 42 ("A diplomatic agent shall not in the receiving State practice for personal profit any professional or commercial activity."); *see also* Qatar Reply at 18 (discussing "the functions of diplomatic mission").

Furthermore, the Allaham Declaration and July 2018 Email confirm that Qatar never subjected Mr. Allaham to *any* confidentiality requirements concerning communications and documents related to any of the commercial consulting, investment sourcing, or other work that Mr. Allaham performed for Qatar or the Qatar Investment Authority.  Indeed, the July 2018

___

[5] Contrary to Qatar's suggestion, refusing to extend Article 24 protection to activity that is specifically *prohibited* by the Vienna Convention does not raise "serious reciprocity concerns" or "undermin[e] the United States' ability to invoke the Vienna Convention to safeguard the operation of its missions abroad."  Q. Mem. at 2.  Faithful application of the Vienna Convention in the United States ensures faithful application abroad.

**REDACTED**

Email—sent by ArentFox to Jamal Benomar's counsel at Winston Strawn —explicitly states as much multiple times, first noting that "there is no confidentiality agreement in place between [Mr. Allaham] and Qatar," and later adding that "there are no confidentiality agreements in place between [Mr. Allaham] and anyone."  Benson Decl., Ex. 3 at 1.  Were this evidence not conclusive on its own, Mr. Allaham also expressly disclaims that Qatar ever subjected him to *any* confidentiality obligations, much less *strict* ones (as Qatar's own proposed test for Article 24 protection requires, *see infra* Part II.A).  *See* Benson Decl. Ex. 1, ¶ 9 ("[N]o one ever told me and I never agreed or believed that the documents were confidential; no one ever told me and I never agreed or believed that the communications and documents in my possession were the property of Qatar; no one ever gave any instructions regarding the handling or sharing of any information or materials relating to Qatar; and no one ever told me and I never agreed or believed that any materials or information that I had sent or received was 'of the mission,' including in the sense that they were confidential or proprietary for the purpose of advancing Qatar's foreign policy."); *see also id.* ¶ 7 (noting that Mr. Allaham's and Mr. Muzin's dealings with Qatar "were not secret" as they discussed those dealings "in a front-page story in the *Wall Street Journal* in 2018").

The alarming revelations arising from the Allaham Declaration, December 2018 Agreement, and July 2018 Email thus cast significant doubt, to say the least, on the integrity of Qatar's privileges and immunities assertions and the entire discovery process to date.

Accordingly, plaintiffs respectfully request that, in view of the egregious misconduct evidenced in these documents and detailed above, they be permitted to forensically investigate the full nature and scope of the discovery conduct of Qatar's counsel, defendants and their counsel and Qatar's subpoena recipient agents and their counsel.  *See Covad Commc'ns Co. v.*

*Revonet, Inc.*, 258 F.R.D. 5, 13 (D.D.C. 2009) ("There is certainly authority for the proposition that if a party's e-mail production suggests that she is intentionally hiding things, or failing to take appropriate steps to respond to discovery, a forensic examination may be appropriate."); *Peskoff v. Faber*, 244 F.R.D. 54, 63 (D.D.C. 2007) (ordering court supervision of process to obtain proposals from qualified forensic computer technicians where many questions were raised as to the completion and sufficiency of the searches performed); *Tingle v. Hebert*, No. CV 15-626-JWD-EWD, 2018 WL 1726667, at *6 (M.D. La. Apr. 10, 2018) ("[C]ourts have permitted restrained and orderly computer forensic examinations where the moving party has demonstrated that its opponent has defaulted in its discovery obligations by unwillingness or failure to produce relevant information by more conventional means.").

Plaintiffs do not make this request lightly, but given their central role here, it is imperative that a forensic examination of the lawyers be conducted. *See In re Uranium Antitrust Litig.*, 32 Fed. R. Serv. 2d 635 (D.D.C. 1980) (granting plaintiffs' request for discovery in antitrust case from subpoenaed law firm that represented the "offspring of the alleged conspiracy or cartel" where "law firm [w]as a potential depository of documents relevant to this action which are otherwise unavailable to [plaintiff] because of the restrictive attitudes taken toward discovery by certain foreign governments and certain defendants, their officers and employees and their counsel"); *Ellis v. Toshiba Am. Info. Sys., Inc.*, 218 Cal. App. 4th 853 (2013), *as modified* (Aug. 14, 2013), *as modified on denial of reh'g* (Sept. 10, 2013) (ordering forensic inspection of plaintiffs' attorney's computer and hard drive where attorney "was not credible" and where there was evidence that she had "concealed or destroyed evidence");  *Quinn v. City of Vancouver*, No. C17-5969 BHS, 2021 WL 1170375, at *1 (W.D. Wash. Mar. 29, 2021)

(ordering forensic examination of attorney's electronic devices where attorney, as a party to litigation, engaged in "dilatory and evasive discovery conduct").

## II.     None of the Withheld Materials on Qatar's Privilege Logs Qualify for Article 24 Protection

Even absent the revelations discussed above, none of the withheld materials on Qatar's privilege logs qualify for Article 24 protection under either the Government's proposed test or Qatar's own test because Qatar fails to carry its burden of establishing (i) that it at all times has had a reasonable expectation of confidentiality in each withheld document and communication, and (ii) that each withheld document and communication was solicited by Qatar and incorporates information from archives or documents of the mission.

### A.     Qatar Did Not Have a Reasonable Expectation of Privacy in Any of the Withheld Materials

Qatar fails to establish that it, at all times, has had a reasonable expectation of confidentiality in each document and communication on its privilege logs—an essential element of both the Government's[6] and Qatar's[7] proposed tests to determine whether a document or communication qualifies for Vienna Convention protection.  *See* Gov't Br. at 31 ("[M]aterials in this case that were at one time documents of the mission may fall outside Article 24's scope because Qatar may have lacked sufficient objectively reasonable expectations of those documents' confidentiality."); Qatar Br. at 34 (extending Article 24 protection to a document in the possession of a third party only where "the third party . . . is restricted from using those materials for any [] purpose [other than aiding the mission in essential mission functions] . . . and

---

[6] Brief for the United States as Amicus Curiae, Broidy Cap. Mgmt. LLC v. Muzin, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082, Doc. No. 1961136) ("Gov't Br.")

[7] Brief for Appellant State of Qatar, Broidy Cap. Mgmt. LLC v. Muzin, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082, Doc. No. 1959204) ("Qatar Br.")

is subject to strict requirements of confidentiality regarding those materials").  Qatar's inability to satisfy that basic requirement, by itself, forecloses Article 24 protection for all 85 withheld documents and communications on its privilege logs.

First, as already discussed, *see supra* Sec. I, Allaham's declaration confirms plaintiffs' contention that Qatar's Embassy and/or diplomatic mission in the United States did not have a special relationship with Mr. Allaham and certainly did not have a reasonable expectation of privacy in any of the documents and communications exchanged with him.  Qatar again offers only conclusory assertions—but no evidence—that "Qatar . . . formed a special relationship [with Mr. Allaham], even if that relationship was not reduced to a written services contract."  Q. Mem. at 14.  Rather, Qatar once again suggests that Mr. Allaham's inapposite communications about *other individuals'* work for Qatar supposedly "corrobora[es] the existence of Qatar's special relationship with Allaham."  Not only does this evidence fail to provide any such corroboration, *see* Pls. Mem. at 9-10, but, here again, Mr. Allaham denies under oath that he ever assisted Qatar's Embassy or diplomatic mission in the United States "in the performance of [the] diplomatic mission's functions," as Qatar's own test requires.

None of the documents cited by Qatar even remotely evidence the "strict requirements of confidentiality" necessary to qualify for Article 24 protection under Qatar's own test.  Qatar Br. at 34.  Nor could they, as Mr. Allaham expressly disclaims under oath that Qatar ever subjected him to *any* confidentiality obligations, much less strict ones.  *See supra* Sec. I (quoting Benson Decl. Ex. Ex. 1 ¶ 9 ("[N]o one ever told me and I never agreed or believed that the documents were confidential; no one ever told me and I never agreed or believed that the communications and documents in my possession were the property of Qatar; no one ever gave any instructions regarding the handling or sharing of any information or materials relating to Qatar; and no one

REDACTED

ever told me and I never agreed or believed that any materials or information that I had sent or received was 'of the mission,' including in the sense that they were confidential or proprietary for the purpose of advancing Qatar's foreign policy."); *id* ¶ 7 (noting that Mr. Allaham's and Mr. Muzin's dealings with Qatar "were not secret" as they discussed those dealings "in a front-page story in the *Wall Street Journal* in 2018")).

Moreover, that Qatar thought it necessary to include in the December 2018 Agreement *retroactive* confidentiality and "ownership" provisions only confirms what Mr. Allaham says in his declaration—that when he was working for Qatar and the Qatar Investment Authority, neither Qatar nor anyone else told him anything was confidential. Indeed, Qatar as much as acknowledges its inability to show that Mr. Allaham was subject to any confidentiality requirements, claiming that plaintiffs "miss[] the point" by "dismiss[ing] these documents on the basis that none explicitly . . . spell[] out the terms of [Mr. Allaham's] confidentiality obligation." Q. Mem. at 14. But plaintiffs' insistence that Qatar produce evidence of the "terms of [Mr. Allaham's] confidentiality obligation" demands no more than that Qatar satisfy a basic element of the test that Qatar *itself* designed. *See, e.g.*, *United Mine Workers of America International Union v. Arch Mineral Corp.*, 145 F.R.D. 3, 6 (D.D.C. 1992) ("As proponent of the claim of privilege, therefore, it is Arch's burden to show not only that it intended these documents to be confidential, but that it took all possible precautions to maintain their confidentiality.").

Even if Qatar's argument that it had a reasonable expectation of confidentiality even in documents and communications subject to *disclosure* under FARA made any sense, and it does not, the Government explicitly rejected that argument under the facts of this case. The Government—whose views Qatar says are entitled to "deference as a matter of law" (Mot. to

**REDACTED**

Vacate at 8 n.4)—confirmed in its *amicus* brief on Qatar's appeal[8] that, because the contracts between Qatar and defendants (and the nonparty-subpoena recipients) provide for disclosure "as required by law," including the disclosure required under FARA, Qatar had no reasonable expectation of confidentiality in documents and communications exchanged with FARA-registered agents:

> For records that fall within this provision of [FARA], the expectation of confidentiality is diminished because the documents are provided with the prospect that they could be subject to further disclosure. This case does not require this Court to determine whether any document subject to inspection under [FARA] falls outside Article 24, *see* Qatar Br. 50-51, because Qatar's consulting agreement with the defendants in this case specifically acknowledged that the documents may be disclosed "as required by law," JA225; Qatar Br. 7-8 & nn.4-5. Given that language, which contemplates disclosures required by law regardless of any protections provided by Article 24, and the specific requirements of the Act, *Qatar did not have a reasonable expectation that the documents that are in fact subject to inspection under the Act would remain protected from disclosure.*

Gov't Br. at 32-33 (emphasis added).

Qatar cannot overcome the Government's analysis—which, by itself, fatally undermines Qatar's privilege assertions over the remaining withheld materials not exchanged with Mr. Allaham—with its erroneous suggestion that the contract term permitting disclosure "as required by law" is superseded by the provision stating that "[n]othing in this Agreement shall waive or otherwise alter the privileges and immunities to which the Embassy is entitled under the laws of the United States or any treaty to which the United States is a party." ECF No. 109-17 at 7. The Government explicitly rejected that argument, stating that the language permitting disclosure "as required by law" "contemplates disclosures required by law regardless of any protections

---

[8] Brief for the United States as Amicus Curiae, *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082, Doc. No. 1961136) ("Gov't Br.").

REDACTED

provided by [the Convention]." Gov't Br. at 32. And that makes sense, because Qatar's erroneous interpretation would negate entirely the provision permitting disclosure "as required by law" by rendering inviolable every document conceivably subject to that disclosure provision. That flawed interpretation cannot prevail over the Government's sound rationale under the basic legal principle that contracts should not be interpreted in a manner that creates surplusage. *See Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 15 (D.D.C. 2015) ("[C]ontract interpretation that would render any part of the contract surplusage or nugatory must be avoided.") quoting *Russell v. Harman Int'l Indus., Inc.*, 945 F.Supp.2d 68, 77–78 (D.D.C. 2013).

Third, although the three communications involving Jamal Benomar also involve Mr. Allaham and Mr. Muzin and therefore are already disqualified from Article 24 protection for the reasons stated above, Qatar's arbitrary, conclusory, and circular supposed justifications for its privilege assertions over Mr. Benomar's communications further illustrate the blank check Qatar is demanding from the Court. Qatar's suggestion that its purported privileges extend to communications involving Mr. Benomar based on no more than its self-serving statement that "[it] understood that its contractors could communicate with him in confidence," and notwithstanding Mr. Benomar's sworn declaration that he did no work for Qatar at the time of the communications in question, asks the Court to take Qatar at its word in the face of sworn testimony contradicting Qatar's word. Further corroborating Mr. Benomar's sworn statement that he did not become a Moroccan diplomat until November 2017 is his August 13, 2017 agreement with defendant Stonington Strategies LLC, in which Mr. Benomar agrees to refer Stonington to the Kingdom of Morocco and Qatar for consulting work in exchange for a 25% referral fee of any amounts paid to Stonington by Morocco and Qatar. *See* Benson Decl. Ex. 5 at 1. Had Mr.

REDACTED

Benomar been a diplomat for Morocco at the time of this agreement, the Vienna Convention would have prohibited his involvement in commercial activity of this kind.[9]

In short, what Qatar seeks from the Court is far exceeds the "due respect" afforded to any foreign sovereign, much less one that shows no respect for the rule of law under which it demands protection.

### B. None Of The Withheld Materials Were "Solicited By And Incorporated Information From Archives Or Documents Of The Mission"

Qatar also fails to establish that any of the logged materials satisfy the first prong of the Government's test (*i.e.*, to be "of the mission"), which extends Article 24 protection to materials possessed by third parties only where the Qatari mission *both* "solicited the creation" of the particular document and "provided information from inviolable documents or archives that is included in the document[]."  Gov't Br. at 31.  In an effort to do so, Qatar asks the Court to adopt its wholesale rewrite of the Government's test, couching its newly minted five-factor test as an "elaborat[ion] on the standards contained in the U.S. Government's test."  But contrary to Qatar's suggestion, the "additional considerations" proposed by Qatar are not remotely "consistent with the [Government's] overarching framework for interpreting the Convention."  Qatar has the burden of establishing that each withheld document and communication satisfies that Government-proposed framework but has not come close to meeting it.

First, Qatar promotes an unworkably expansive reading of the term "solicit" that ignores the Government's "apposite guidance" and would encompass literally every relevant document and communication generated by any contractor or third party with a special relationship to the mission.  According to Qatar, "where an agreement contemplates that certain work product be

---

[9] Absent discovery, plaintiffs do not know whether Qatar was aware of the August 2017 agreement at the time it now claims it believed it could rely on him as a diplomat.

'generated' for the mission's purposes, that is strong evidence that documents within the scope of that agreed on work are 'solicited,' even in the absence of individualized requests for each document created."  Under that reading, any document or communication arguably "within the scope of agreed on work"—*i.e.*, every single document and communication requested by plaintiffs and produced or withheld by any defendant or third party—would qualify as having been "solicited" for purposes of the Government's test.

The Government's proposed test clearly does not contemplate such an expansive understanding of what it means for materials to have been solicited by the Embassy.  This is most obviously evidenced by the Government's explicit rejection of any supposed inviolability of precisely the communications Qatar seeks to protect under its improperly expanded reading of "solicit"—namely, "defendants' correspondence with private parties."  *See* Q. Mem. at 15-17.[10] The Government stated in no uncertain terms that "defendants' correspondence with private parties" does not qualify for Article 24 protection because "there [is no] indication that [Qatar] both solicited the creation of those particular documents and provided information from inviolable documents or archives that is included in the documents."  Gov't Br. at 31.  Qatar

---

[10] Qatar mischaracterizes the Government's reference to "defendants' correspondence with private parties," suggesting that that statement referred to Broidy's requests for defendants' communications with only "'[j]ournalists, reporters, other members of the media, and media companies' with whom Qatar had no special relationship."  Qatar Br. at 16 n.7.  Qatar's suggestion is incorrect, as it excludes 25 other individuals and entities encompassed in the Government's reference, with most of whom Qatar has (or conveniently claims it has, as in the case of Allaham) a special relationship.  As shown, *see* Pls. Mem.. at 14 n.5, "'defendants' correspondence with private parties' was the Government's characterization of materials responsive to Request No. 13 in Plaintiffs' First Requests for Production of Documents to Gregory Howard, which sought documents and communications 'relating to Broidy that [Howard] sent to or received from the following: Journalists, reporters, other members of the media, and media companies; [*and*] Allaham; Muzin; Stonington; GRA; Conover & Gould; Mercury; Jamal Benomar; Lexington; BlueFort; Ahmad Nimeh; Patrick Theros; IMS; Avenue; Levick; SGR; CREW; Tucker Eskew; Tigercomm; Turner4D; APCO; Carol Lund; Grant Harris; Alex Sens; Steve Arnoff; and Patricia Rosen.'"  Gov't Br. at 31.

REDACTED

therefore cannot carry its burden to establish the requisite indication of solicitation with only

conclusory and vague statements that materials were "completed at the request of the mission"

without ever even identifying the supposed requestor.

Second, Qatar promotes a seemingly limitless conception of what it means for a

document to "incorporate information from archives or documents of the mission."  Although

Qatar suggests that Article 24 protection is not limited to documents that "quote an inviolable

mission document," it offers no guidance on any of the supposed "different ways" a document

can incorporate information from mission documents or archives.  Indeed, Qatar seems to urge

the Court to dispense with that requirement altogether, citing a supposedly analogous D.C.

Circuit case finding that documents in the possession of a government agency's outside

contractors constitute "agency records" "where those documents pertain to work being done for

the agency, even though there is no indication that such documents expressly incorporate

information from agency documents."  Q. Mem. at 9 (citing *Burka v. U.S. Dep't of Health &*

*Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996)).

Contrary to Qatar's characterization of *Burka* as "analogous," Qatar's concession that the

records at issue in that case did not "expressly incorporate information from agency documents"

renders the case fundamentally inapposite, given the Government's explicit instruction here that

Article 24 protection extends *only* to documents that do, in fact, "incorporate information from

archives of documents of the mission."  Moreover, the court in *Burka* held that the records at

issue—*i.e.*, extensive data compilations unlike any of the documents and communications

withheld at Qatar's instruction—qualified as "agency records" only because of the agency's

"extensive supervision and control over collection and analysis of the data."  *Burka*, 87 F.3d at

515.  Qatar, by contrast, could not possibly exercise such extensive supervision or control over

REDACTED

any of the withheld documents and communications, most of which are impromptu text messages and emails between defendants and third parties.

In any event, Qatar again falls well short of satisfying its burden to establish that all of the documents on its privilege logs do, in fact, "incorporate information from archives or documents of the mission."  Qatar conspicuously fails to offer *any* explanation on this point in its brief or any of its privilege logs, none of which even vaguely refer to, much less specifically identify, any supposed mission document or archive from which each withheld document or communication purportedly incorporates information.  At most, Qatar's privilege logs state in conclusory fashion that particular documents and communications are ███████████████ ███████████████████████████ ECF 185-19, ████████████████████████ ████████████ ECF 185-20, █████████████████████████████████ *id*., or █████████████████████████████ *id.*.  None of these conclusory descriptions specify the document or archive supposedly serving as the source of the information ██████████ in the withheld material.  The requirement that a withheld document or communication "incorporate information from archives or documents of the mission" is, however, an indispensable element of the Government's proposed test.  Qatar's failure to even engage with that requirement, much less specify how any of the withheld materials satisfy it, also forecloses Article 24 protection for any of the documents and communications on Qatar's privilege logs.

## III.    Article 27 Of The Convention Also Does Not Protect Any Of The Improperly Withheld Documents And Communications On Qatar's Privilege Logs

Qatar's contention that plaintiffs "ha[v]e failed to rebut the applicability of Article 27 to Qatar's logged documents" misses the mark, as Qatar has yet to carry its burden of establishing the applicability of Article 27 in the first place.  To be sure, Qatar correctly notes that this Court

already soundly rejected Qatar's previous attempt to extend Article 27's protections to the same

withheld documents and communications at issue here.  *See* June 2 Order at 15, ECF 149 ("Qatar

has failed to show that Article 27 of the VCDR provides the defendants any greater protection

than Article 24.").  As this Court explained:

> Article 27 provides that "[t]he official correspondence of the
> mission shall be inviolable" and defines "[o]fficial correspondence
> [to] mean[] all correspondence relating to the mission and its
> functions." . . . Because [Article 27] defines "official" to mean
> "relating to the mission and its functions," the same meaning cannot
> attach to its phrase "of the mission," at risk of surplusage.  In that
> respect, the definition precludes reading "of the mission" to mean
> "relating to the mission," as the defendants suggested in the context
> of Article 24.

*Id.* at 15-16 (citations omitted).  Article 27 therefore extends only to correspondence "that

belongs to or is possessed by a mission" and that "relat[es] to the mission and its functions."  *Id.*

Qatar now presents a slightly revised argument for Article 27 applicability that

nevertheless fails to escape this Court's prior holding that the documents in question are not "of

the mission."  Whereas Qatar previously argued—and the Court rejected—that "documents of

the mission" means "documents [relating to or about] the mission," *id*. at 15 (quoting Defs.'

Opp'n to Pls.' Mot. to Compel at 15), Qatar now contends that "correspondence between and

among a mission and its outside contractors can be 'of the mission,' and thus subject to

inviolability, if it is made for the sole purpose of assisting in the mission's performance of its

functions, and is subject to confidentiality requirements."  *See* Mot. to Vacate at 16 n.8; *see also*

Q. Mem. at 19.

That argument in support of Article 27's application, of course, fails for the same reasons

Qatar's arguments for the application of Article 24 fail—*i.e.*, because Qatar has altogether failed

to carry its burden of establishing that it, at all times—or, for that matter, at *any* time—has had a

REDACTED

reasonable expectation of confidentiality in each withheld document and communication.  *See supra* at Part II.A.

It also fails because Qatar cannot satisfy its burden of showing that the withheld communications were "exchanged 'for the sole purpose of assisting in the mission's performance of its functions.'"  Q. Mem. at 20.  Here again, Mr. Allaham expressly denies under oath that he was engaged for any such purpose (much less that it was the "*sole* purpose").  He attests that "nothing in the contents of the [withheld] documents related to Qatar's foreign policy or diplomacy[,] [n]one of the documents contain any information that could be considered foreign policy or diplomatic secrets[, and n]othing in the text of any of the documents relates to what I understand are the essential functions of a diplomatic mission."  Benson Decl. Ex. 1 ¶ 8.  And as for Qatar's suggestions that communications of third-party FARA-registered lobbyists and public relations flacks are inviolable under the Vienna Convention simply because a lobbyist "*may* be able to assist a sovereign's pursuit of foreign policy interests *vis-à-vis* another sovereign" and a public relations flack "*may* be able to assist activities that, when performed by a sovereign, are called 'public diplomacy,'" Q. Mem. at 20, the United States Congress has already firmly rejected that notion, stating:

> [FARA] makes clear that the activities of such "propagandists," including the documents they generate, send and receive in the course of those activities, are to be subject to the "spotlight of pitiless publicity" so that the American people may be fully informed of both the identity of the propagandists and the nature of the activities they undertake on behalf of their foreign masters. It is ludicrous to suggest, as you and your lawyers do, that when the United States ratified the Vienna Convention some 25 years after the enactment of FARA, it intended to shroud in absolute secrecy the very same activities of these propagandists.

*U.S. House Committee on Government Reform, Letter from Dan Burton, Chairman to Prince Bandar bin Sultan bin Abdulaziz*, November 21, 2002 ("Congressional Letter"), ECF 109-14

REDACTED

(quoting H.R. REP. No. 1381, 75th Cong., 1st Sess. 1-2 (1937)).  The United States Department of Justice has echoed that sentiment recently in an effort to combat precisely the type of foreign influence, shadow lobbying, and outright criminal attacks that Qatar has thus far sponsored with impunity.  *See* Statement of Asst. Atty. Gen. Matthew G. Olsen, U.S. Dep't of Justice Nat'l Sec. Div., *Justice Department Sues to Compel a U.S. Businessperson to Register Under the Foreign Agents Registration Act*, U.S. DOJ (May 17, 2022), https://www.justice.gov/opa/pr/justice-department-sues-compel-us-businessperson-register-under-foreign-agents-registration (discussing the Justice Department's "commitment to ensuring transparency in our democratic system" and stressing that "[w]here a foreign government uses an American as its agent to influence policy decisions in the United States, FARA gives the American people a right to know").

Qatar's demand to expand the Convention's application to communications of U.S. lobbyists and public relations flacks asks the Court to turn on its head FARA, an 85-year-old legislative scheme aimed as exposing the very conduct Qatar stops at nothing to conceal.

Because Qatar cannot establish that it, at all or any times, has had a reasonable expectation of confidentiality in any of the withheld communications, and also fails to show that any of the withheld communications are "of the mission," Qatar has not carried its burden of establishing the applicability of Article 27.

## IV.   The Deliberative Process Privilege Does Not Protect Any of the Improperly Withheld Documents and Communications On Qatar's Privilege Logs

Qatar cannot carry its burden of establishing the applicability of the deliberative process privilege as to any of the 29 documents for which it has raised that objection.  As shown, *see* Pls. Mem. at 16, and as this Court already held, there is no authority permitting the application of "the deliberative process privilege to shield documents held by a private, non-governmental

REDACTED

entity." June 2 Order at 23, ECF 149 (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)). In any event, however, even if the privilege could apply, and it does not, all but one of those 29 documents involve Mr. Allaham, who—as the evidence detailed above conclusively establishes, *see supra* Sec. I—had no special relationship with Qatar's Embassy or diplomatic mission in the United States and, thus, no role in the Embassy's or mission's deliberations as to anything. The one remaining document— █████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ███████████████—does not qualify for the privilege because it is neither predecisional nor deliberative, as Qatar's description makes clear that the ████████████ and ████████ ████████ discussed were already "settled." *See United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021) (holding that document is not predecisional or deliberative and, thus, not privileged where "it communicates a policy on which the agency has settled").

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs' cross-motion to compel and their request to take discovery of concerning discovery compliance.

Dated: August 24, 2023

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: */s/ Daniel R. Benson*
Daniel R. Benson (*pro hac vice*)
Sarah G. Leivick (*pro hac vice*)
Sarmad M. Khojasteh (*pro hac vice* forthcoming)
David Tyler Adams (*pro hac vice* forthcoming)
1633 Broadway

**REDACTED**

New York, New York 10019
Tel.: (212) 506-1700
dbenson@kasowitz.com
sleivick@kasowitz.com
skhojasteh@kasowitz.com
dadams@kasowitz.com

Henry B. Brownstein
D.C. Bar No. 1026042
1401 New York Avenue, Suite 401
Washington, D.C. 20005
Tel.: (202) 760-3400
hbrownstein@kasowitz.com

*Counsel for Plaintiffs Broidy Capital
Management and Elliott Broidy*