# EXHIBIT 2

Revised Execution Version 12.20.2018

## CONFIDENTIAL SETTLEMENT AGREEMENT AND
## RELEASE OF CLAIMS

This Confidential Settlement Agreement and Release of Claims (this "**Agreement**") is entered into as of December 20, 2018 (the "**Effective Date**"), by and among:

(1) THE EMBASSY OF THE STATE OF QATAR, in its capacity as the representative of the State of Qatar ("**Qatar**") and BLUEFORT PUBLIC RELATIONS ("**BlueFort**" and together with Qatar, the "**Qatar Parties**"), on the one hand; and

(2) JOSEPH ALLAHAM, also sometimes known as "Jocy" Allaham ("**Mr. Allaham**"), LAUREN ALLAHAM, who is married to Mr. Allaham ("**Ms. Allaham**"), and LEXINGTON STRATEGIES, LLC, a limited liability company wholly owned and controlled by Mr. Allaham ("**Lexington**," and together with Mr. Allaham and Ms. Allaham, the "**Allaham Parties**"), on the other hand.

The Qatar Parties and Allaham Parties are sometimes referred to collectively herein as the "**Parties**," and any of the Parties may be referred to as a "**Party**."

### RECITALS

WHEREAS, Mr. Allaham alleges that, in or around 2017, he entered an independent contractor relationship with the Qatar Parties to advance the interests of the Qatar Parties and of Qatar's instrumentalities, by promoting the 2022 World Cup in Qatar, fostering better international relations within the Gulf region with the leadership in the Jewish community in the United States, and providing real estate investment and other public relations and messaging services (the "**Consulting Arrangements**," as further defined below);

WHEREAS, Mr. Allaham, through his business Lexington Strategies LLC, submitted a FARA registration statement on June 15, 2018 alleging a registrable business relationship with Qatar pursuant to some of the work undertaken pursuant to the Consulting Arrangements;

WHEREAS, Mr. Allaham alleges that certain of Mr. Allaham's activities in furtherance of Qatar's interests under the Consulting Arrangements were managed and/or compensated by or through BlueFort;

WHEREAS, Mr. Allaham has received certain payments made by or on behalf of BlueFort, about which there has been a dispute between the parties (the "**Disputed Payments**");

WHEREAS, Mr. Allaham contends that additional payments, in addition to the Disputed Payments, were due to Allaham pursuant to the terms of the Consulting Arrangements;

WHEREAS, Mr. Allaham incurred expenses in his performance under the Consulting Arrangements ("**Consulting Expenses**"), of which not more than US$278,364.18 and not less than US$225,000 remains unpaid and outstanding (such portion of the Consulting Expenses as remains unpaid as of the date hereof, the "**Outstanding Expenses**");

WHEREAS, certain of Mr. Allaham's activities under the alleged Consulting Arrangements involved working with other consulting firms and individuals in the United States and the State of Qatar,

AR  JL
HM

including Stonington Strategies LLC and Nicolas D. Muzin (together, "**Stonington**"), and other Affiliated Qatar Parties (as defined below);

WHEREAS, Stonington was a FARA-registered agent of the State of Qatar from September 2017 to June 2018;

WHEREAS, on May 24, 2018, Broidy Capital Management LLC and Elliott Broidy (together, "**BCM**") filed an Amended Complaint (the "**Complaint**") in *Broidy Capital Management LLC, et al. v. State of Qatar, et al.*, Case No. 18-cv-02421-JFW, in the Central District of California (the "**California Action**");

WHEREAS, the Complaint alleged that registered and unregistered agents of the State of Qatar conspired to hack the electronic systems of BCM and to disseminate BCM's information publicly, in violation of federal and state statutory law and California State common law. *Id.*, Dkt. 47;

WHEREAS, no Qatar Party or Affiliated Qatar Party has ever instructed any Allaham Party or, to the best knowledge of any Allaham Party, any other person to hack, conduct cyberwarfare against, or otherwise intrude or infiltrate BCM's electronic systems;

WHEREAS, no Qatar Party or Affiliated Qatar Party has ever instructed any Allaham Party or, to the best knowledge of any Allaham Party, any other person to disseminate, distribute, or cause to be made public BCM's electronic systems or information;

WHEREAS, no Qatar party or Affiliated Qatar Party has ever instructed any Allaham Party or, to the best knowledge of any Allaham Party, any other person to engage in any activities that would constitute a violation of the laws of the United States (federal or state), or of international law;

WHEREAS, Mr. Allaham states that no Allaham Party has ever engaged in any hacking, cyberwarfare, intrusion, infiltration, dissemination, distribution, or publication of BCM's electronic systems or information, nor engaged in any other of the activities described in the prior four recitals immediately above;

WHEREAS, Mr. Allaham incurred legal expenses and related costs in his capacity as a third-party witness in the California Action;

WHEREAS, without prejudice to the position of the Qatar Parties that there were no legally binding obligations imposed on any Qatar Party implementing the Consulting Arrangements, and without prejudice to the position of Mr. Allaham that a consulting agreement effectuating the Consulting Arrangements was extant between or among Mr. Allaham and certain of the Qatar Parties, it is agreed by all Parties that any such agreement or other binding obligation on any of them in respect of the Consulting Arrangements that may have existed has been fully terminated;

WHEREAS, Qatar has previously paid to Arent Fox LLP, as counsel to Mr. Allaham, the sum of US$400,000 (four hundred thousand U.S. dollars) in satisfaction of legal fees and expenses incurred by Mr. Allaham in connection with the California Action and the Related Actions (as such term is defined below) and Arent Fox LLP has acknowledged receipt of such sum on behalf of Mr. Allaham; and

WHEREAS, the Parties wish to enter into this Agreement in full and final settlement of the disputes between or among them (and including any disputes that any Allaham Party may conceivably have with any Qatar Party or any of its Released Persons) and to provide for certain ongoing covenants in their mutual best interests.

NOW, THEREFORE, in light of the foregoing Recitals, and in consideration of the mutual covenants and promises in this Agreement, and for further good and valuable consideration, including the mutual avoidance of further costs, inconvenience, and uncertainties relating to the matters addressed herein, the Parties agree as follows.

1. **Additional Definitions**. In addition to the terms defined above, the following additional defined terms shall have the meanings set forth in this Section 1.

   (a) "**Affiliated Qatar Party**" or "**Affiliated Qatar Parties**" means, individually or collectively, (i) the Representatives of any Qatar Party engaged in any matters relating to the (A) the formation of the alleged Consulting Arrangements, (B) the payment of monies pursuant to such Consulting Arrangements, or (C) the performance of services thereunder, and (ii) any other individual or entity acting on behalf of any of the Qatar Parties with whom Mr. Allaham, directly or indirectly, consulted or from whom Mr. Allaham, directly or indirectly, took information or instructions, or received payments, reimbursements, or other funds or financial commitments, with respect to the scope, objectives or activities relating to or performed pursuant to the alleged Consulting Arrangements, including Stonington.

   (b) "**Affiliates**" means, with respect to a Party, any individual or organization controlling, controlled by, or under common control with that party, where "control" means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise.

   (c) "**Broidy Litigation**" means the litigation captioned *Broidy Capital Management LLC et al. v. State of Qatar, et al.* (No. 2:18-cv-02421) (C.D. Cal.) or any other action brought by Elliott Broidy or Broidy Capital Management in connection with allegations concerning the hacking and other alleged conduct to the detriment of Broidy or BCM outlined in the recitals hereto, regardless of whether Mr. Allaham is named a defendant in such action.

   (d) "**Claims**" means all claims, counterclaims, counter-counterclaims, actions, causes of action, suits, demands, judgments, debts, expenses (including attorneys' fees and costs), losses, liabilities, and obligations of any kind and of whatever nature or character, worldwide, regardless of whether existing in the past, present or arising in the future, whether currently known or unknown, whether asserted or unasserted, or whether accrued, actual, contingent, latent or otherwise, made or brought for the purpose of recovering any damages or for the purpose of obtaining any equitable relief or any other relief of any kind.

   (e) "**Consulting Arrangements**" means (i) any agreement, arrangement, contract, obligation, promise, understanding or other undertaking (whether written or oral and whether express or implied) that is now (or at any time prior to Effective Date was) legally binding between or among any Qatar Party or any of its Released Persons, on the one hand, and any Allaham Party or any of its Released Persons, in the other hand; and (ii) any and all activities performed at any time prior to the Effective Date by an Allaham Party or any of its Released Persons in furtherance of or related to the interests of a Qatar Party or its Released Persons, whether or not at the direction of Qatar, BlueFort, Stonington, or their respective Released Persons or any other person or entity, including (A) those activities registered by Mr. Allaham on June 15, 2018 with the U.S. Department of Justice pursuant to FARA, Registration No. 6563, (B) activities by any Allaham Party performed prior to the Effective Date with or for Stonington, (C) activities pertaining to real estate investments, and (D) any other activities relating to, in furtherance of, or arising out of the subject matter of the California Action or Related Actions.

   (f) "**FARA**" means the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611, et seq.

(g) **"Related Actions"** means any and all litigation, investigations, or threatened litigation or investigation, whether current or initiated at any time in the future, arising out of or in any way pertaining to the facts and allegations in the Complaint, including the following lawsuits filed in the Southern District of New York: *Broidy Capital Management LLC, et al. v. Jamal Benomar*, Case No. 18-cv-06615-CS (filed July 23, 2018) (the **"New York Action"**), *Broidy Capital Management LLC, et al. v. Allaham*, Case No. 18-mc-00240-KBF (filed June 6, 2018 and transferred to C.D. Cal. as Case No. 18-mc-00095-JFW-E), and *Sport Trinity LLC v. Broidy Capital Management LLC, et al.*, Case No. 18-mc-00355-GHW (filed Aug. 1, 2018 and transferred to C.D. Cal. as Case No. 18-mc-00105-JFW-E).

(h) **"Released Persons,"** means, with respect to a Party: (i) any and all of such Party's Affiliates, and any or all of the predecessors, successors, divisions, alter egos, and/or other related entities of the foregoing, and (ii) any and all Representatives of such Party. For the avoidance of doubt, when used with respect to a Qatar Party, the term "Released Person(s)" also includes (A) the Government of the State of Qatar, all ministries and other organs of the State of Qatar, any subdivisions or instrumentalities thereof, including departments, boards, bureaus, commissions, agencies, embassies, courts, administrations and panels, and any divisions or subdivisions thereof, whether permanent or ad hoc and whether now or previously constituted or existing, and any of its or their respective current or former Representatives; (B) any and all parties named as Defendants by Plaintiffs Elliott Broidy and Broidy Capital Management LLC in the California Action and in the New York Action; (C) the individuals and entities identified as Does 1-10 in the Complaint; and (D) each and all other Affiliated Qatar Parties.

(i) **"Representative"** means, with respect to a particular person or entity, any past or current director, officer, manager, shareholder, member, employee, insurer, reinsurer, agent, consultant, accountant, financial advisor, legal counsel or other representative of that person or entity. For the avoidance of doubt, when used with respect to a Qatar Party, the term "Representative" also includes any past or current minister, diplomat, ambassador, official, joint venturer or other individual serving in any official leadership, employment, consulting or advisory capacity for the State of Qatar or any subdivision or instrumentality thereof.

(j) **"Supporting Documents"** means materials underlying or relating to Mr. Allaham's claimed Consulting Expenses and Outstanding Expenses, including but not limited to descriptions of legal fees, but *not* including any affidavit(s) by Mr. Allaham regarding his relationship with the Qatar Parties. Supporting Documents are all "Attorney's Eyes Only" and are retained by counsel for the Allaham Parties and the Qatar Parties.

2. **No Admission of Liability.** The Parties enter this Agreement in compromise, settlement and release of disputed claims and contentions. This Agreement shall not be construed in any way as an admission of any kind on the part of any Party regarding the matters that were in dispute. No past or present alleged or actual liability or wrongdoing on the part of any Party may be implied by the Parties' entering this Agreement or by the payment of any amount specified herein. Any and all such admissions of liability or wrongdoing are expressly denied by all Parties to this Agreement.

3. **Releases.**

(a) **Release Granted by the Allaham Parties.** Each Allaham Party, on behalf of himself/herself/itself and each of his/her/its Affiliates and any person or entity claiming by or through them (collectively, the **"Allaham Releasing Parties"**), hereby discharges and releases, unconditionally, absolutely and forever, each Qatar Party and each of its Released Persons from (i) any and all Claims that any Allaham Releasing Party or any of them ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, event, cause or thing whatsoever from the beginning of the world to the Effective Date, including those Claims that arise out of or relate in any way to (A) the Consulting Arrangements or

AK   NA
     HM

any activities purporting to be taken in furtherance of the Consulting Arrangements or otherwise on behalf of any Qatar Party or any of its Released Persons in respect of the subject matter of the Consulting Arrangements; or (B) the California Action or any Related Actions; and (ii) any other Claim, whether asserted by or through an Allaham Releasing Party or a third party, concerning the Consulting Arrangements or any activities purporting to be taken in furtherance of the Consulting Arrangements or otherwise on behalf of any Qatar Party or any of its Released Persons in respect of the subject matter of the Consulting Arrangements; provided however that nothing in this Section 3(a) shall operate to release or discharge any Claim for breach of this Agreement or any claim for repayment arising pursuant to Section 8(c).

(b)     **Release Granted by the Qatar Parties**. Each Qatar Party, on behalf of itself and any person or entity claiming by or through it (collectively, the **"Qatar Releasing Parties"**), hereby discharges and releases, unconditionally, absolutely and forever, each Allaham Party from (i) any and all Claims that any Qatar Releasing Party or any of them ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, event, cause or thing whatsoever from the beginning of the world to the Effective Date, including those Claims that arise out of or relate in any way to (A) the Consulting Arrangements or any activities purporting to be taken in furtherance of the Consulting Arrangements or otherwise on behalf of any Qatar Party or any of its Released Persons in respect of the subject matter of the Consulting Arrangements; or (B) the California Action or any Related Actions; and (ii) any other Claim, whether asserted by or through a Qatar Releasing Party or a third party, concerning the Consulting Arrangements or any activities purporting to be taken in furtherance of the Consulting Arrangements or otherwise on behalf of any Qatar Party or any of its Released Persons in respect of the subject matter of the Consulting Arrangements; provided however that nothing in this Section 3(b) shall operate to release or discharge any Claim for breach of this Agreement or any claim for reimbursement arising pursuant to Section 8(a).

4.     **Unknown Claims and California Civil Code Section 1542**.

(a)     Each Party understands and hereby expressly and voluntarily waives and relinquishes any rights and/or benefits it now has or may have in the future under Section 1542 of the California Civil Code, or any other similar statute, rule or common law provision of any federal, state or foreign jurisdiction. California Civil Code Section 1542 reads as follows:

> SECTION 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

(b)     Without limitation of the foregoing, each Party acknowledges that it may not now know fully the number or the magnitude of the Claims it may have against the Party and each of its Released Persons and that it may suffer some further loss or damage in some way connected with (i) the Consulting Arrangements; or (ii) the California Action or any Related Actions, but which is unknown or unanticipated at this time. Each Party has taken these risks and possibilities into account and accepts that, nevertheless, the settlement contained in this Agreement covers Claims that, although unknown at the time of the execution of this Agreement, may be discovered later.

(c)     Each Party acknowledges the significance and consequence of the waivers and acknowledgements in this Section, and hereby assumes responsibility therefor, and further acknowledges that the waiver and acknowledgements in this Section 4 are an essential and material term of this Agreement.

5. **Consideration.**

(a) In consideration of the releases and covenants granted in this Agreement, and without admission of liability or wrongdoing by the Qatar Parties, Qatar or its designee shall pay to Mr. Allaham (and hereby agrees as indicated in the Payment Schedule attached hereto that Mr. Allaham may retain) the amounts provided in such Payment Schedule (collectively, such new payments and agreed retention, the "**Settlement Amount**"). Mr. Allaham agrees, in consideration of such payments, retention rights and the other covenants set forth herein, to satisfy, within (30) days following the execution hereof, all Outstanding Expenses, and the Parties hereby acknowledge that Mr. Allaham may settle some of such Outstanding Expenses for less than their face amount, but not for less than an aggregate of US$225,000. The initial installment of the Settlement Amount shall be paid by wire transfer not later than January 2, 2019, subject to the prior delivery to counsel for the Qatar Parties of any tax forms required for the processing of payment. The payments of amounts due in respect of the Settlement Amount shall be sent by wire transfer to the account set forth below:

> Lexington Strategies LLC
> Swift # for US$ WFBIUS6S
> Swift # for foreign $ WFBUIUS6WFFX
> Address:
> Wells Fargo Bank NA
> 420 Montgomery Street
> San Francisco, CA 94104
> Act # 2142901665
> Rout # 021200025

(b) **Expenses.** Each Party shall be solely responsible for paying its attorneys' fees and costs, including any fees and costs incurred by any of them in the negotiation, preparation and execution of this Agreement. The Qatar Parties shall have no responsibility or liability for the distribution of the Settlement Amount among the Allaham Parties and his/her/its attorneys, or with respect to any person or entity claiming any part of such Settlement Amount, and the Allaham Parties shall indemnify, defend and hold the Qatar Parties harmless from any Claim from any person or entity purporting to have an interest in the Settlement Amount.

(c) **Amounts Previously Paid.** The Allaham Parties (i) acknowledge receipt of the amounts identified as "Previously paid" in the Payment Schedule attached hereto, and (ii) agree that the release of Claims by the Qatar Parties for refunds of those amounts and for any other Disputed Payment is part of the consideration for the releases and other obligations of the Allaham Parties set forth herein.

(d) **Taxes.** The Allaham Parties shall be solely responsible for any taxes determined to be due and owing by him/her/it to any federal, state, local, or regional taxing authority as a result of the Settlement Amount.

6. **Representations and Warranties.**

(a) **Warranties of the Allaham Parties.** Each of the Allaham Parties hereby represents and warrants to each Qatar Party as follows and acknowledges and agrees that the Qatar Parties have been induced to enter into this Agreement in reliance on the representations and warranties set forth in this Agreement: (i) this Agreement is his/her/its valid, legal and binding obligation, enforceable against him/her/it in accordance with its terms and it/he/she has the full right, power and authority to enter into and perform his/her/its obligations under this Agreement; (ii) the execution, delivery and performance by him/her/it of this Agreement does not conflict with, or result in a breach of, any agreement, written or oral,

Page: 6

to which he/she/it is a party or by which he/she/it or his/her/its properties are bound; (iii) he/she/it has the right to grant the releases and covenants set forth herein on behalf of the Allaham Releasing Parties; (iv) the statements in the Recitals are true, correct and complete; (v) he/she/it has not sold, assigned, pledged, or otherwise transferred or encumbered any Claim released in Section 3(a); (vi) Consulting Expenses, in an aggregate amount of US$687,057, have been actually incurred and paid by Mr. Allaham in each case in furtherance of the Consulting Arrangements; (vii) additional Consulting Expenses, in the form of the Outstanding Expenses, have been actually incurred by Mr. Allaham and remain outstanding (in the amounts set forth in the recitals hereto), in each case in furtherance of the Consulting Arrangements; (viii) such Outstanding Expenses are not subject to any claim for reimbursement or to payment by any third party, and (ix) Mr. Allaham has incurred no expenses other than the Outstanding Expenses for which any of the Qatar Parties remains liable.

(b) **Warranties of the Qatar Parties.** Each of the Qatar Parties hereby represents and warrants to each Allaham Party as follows and acknowledges and agrees that the Allaham Parties have been induced to enter into this Agreement in reliance on the representations and warranties set forth in this Agreement: (i) this Agreement is its valid, legal and binding obligation, enforceable against it in accordance with its terms and it has the full right, power and authority to enter into and perform its obligations under this Agreement; (ii) the execution, delivery and performance by it of this Agreement does not conflict with, or result in a breach of, any agreement, written or oral, to which it is a party or by which it or its properties are bound; (iii) it has the right to grant the releases and covenants set forth herein on behalf of the Qatar Parties; (iv) the statements in the Recitals are true, correct and complete; and (v) it has not sold, assigned pledged, or otherwise transferred or encumbered any Claim released in Section 3(b).

7. **Ownership of Records and Confidentiality.**

(a) Within ten (10) business days following the Effective Date, Mr. Allaham shall, through his counsel, make available to Qatar for its review all records, notes, data, memoranda, models, and equipment of any nature, and copies thereof, that are in Mr. Allaham's possession or under Mr. Allaham's control and that relate to the Consulting Arrangements or otherwise to the business or affairs of a Qatar Party or its Released Persons. The Parties mutually agree and acknowledge that all such returned records are and at all times in the past have been the property of Qatar, and are not and have never been the property of any Allaham Party.

(b) The term **"Confidential Information"** means (i) terms of this Agreement, including the fact of payment and the amounts to be paid hereunder; (ii) the alleged terms of the Consulting Arrangements and all work product developed by or for an Allaham Party pursuant to such Consulting Arrangements; (iii) all correspondence, information and materials, including all negotiations and discussions relating thereto, (whether or not specifically marked or designated as "confidential") relating to (A) this Agreement and (B) the Consulting Arrangements, (C) the activities taken in furtherance of the Consulting Arrangements, and (D) the business and affairs of the Qatar Parties and their Released Persons; (iv) correspondence and consultations between or among the Parties and any Released Persons concerning the Consulting Arrangements, the Complaint, the California Actions, the Related Actions, and any related claims.

(c) The Allaham Parties shall keep the Confidential Information strictly confidential and no Allaham Party shall now or hereafter disclose such Confidential Information to any third party except: (i) with the prior written consent of Qatar or as may be required by an Allaham Party to enforce the terms of this Agreement; (ii) as may be required by applicable law, regulation or order of a governmental authority of competent jurisdiction pursuant to advice of reputable outside counsel where such advice relates to compliance with applicable laws or regulations, and in the event of a party's reliance on this clause (ii) that the disclosing party shall have provided to the other party reasonable advance notice of such

required disclosure (to the greatest extent permitted by law) and an opportunity to (A) object to such disclosure and (B) to review the terms of such disclosure and to make edits thereto consistent with the requirements of the laws or regulations requiring such disclosure; (iii) during the course of litigation so long as the disclosure of such Confidential Information is subject to the most highly confidential restrictions available to the litigating parties, such restrictions are embodied in a court-entered protective order (or equivalent) limiting such disclosure to outside counsel for the applicable Allaham Party and such Allaham Party provides Qatar written notice at least ten (10) business days prior to such disclosure and Qatar does not formally object to such disclosure in a pleading filed with a court or administrative agency during that ten (10) business day period; and (iv) in confidence to the professional legal counsel representing such Allaham Party.

(d) Each Allaham Party acknowledges and agrees that the restrictions set forth in this Section 7 are reasonable and necessary to protect the legitimate interests of the Qatar Parties and that the Qatar Parties would not have entered into this Agreement in the absence of such restrictions, and that any breach or threatened breach of any provision of this Section 7 will result in irreparable injury to the Qatar Parties for which there will be no adequate remedy at law. In the event of a breach or threatened breach of any provision of this Section 7 by an Allaham Party, the Qatar Parties (or either of them) shall be authorized and entitled to obtain from any court of competent jurisdiction equitable relief, whether preliminary or permanent, specific performance, which rights shall be cumulative and in addition to any other rights or remedies to which a Qatar Party may be entitled in law or equity. Each Allaham Party agrees to waive any requirement that a Qatar Party (i) post a bond or other security as a condition for obtaining any such relief and (ii) show irreparable harm, balancing of harms, consideration of the public interest or inadequacy of monetary damages as a remedy. Nothing in this Section 7 is intended, or shall be construed, to limit a Qatar Party's rights to equitable relief or any other remedy for a breach of any provision of this Agreement.

8. **Reimbursement of Certain Litigation Expenses**

(a) Qatar agrees that if Mr. Allaham incurs, at any time after the Effective Date, any additional attorneys' fees or expenses (over and above the expenses reimbursed previously by Qatar as described in the Recitals above) as a party to or as a witness or other participant in any Broidy Litigation, then Qatar shall, subject to the provisions of Sections 8(b), 8(c) and 8(d) below, reimburse Mr. Allaham in full for all such additional attorneys' fees or expenses actually and reasonably incurred by Mr. Allaham (such amounts, the "**Reimbursable Amount**").

(b) The obligations of Qatar in Section 8(a) are expressly conditioned on the continuing compliance by the Allaham Parties with their obligations in this Agreement and are subject to any limitations on the reimbursement of expenses for witnesses in applicable law. Payments by Qatar under Section 8(a) are limited to the amount of any attorneys' fees or expenses that remain after deducting therefrom any insurance proceeds actually received by Mr. Allaham in respect of any such attorneys' fees or expenses. Mr. Allaham agrees to diligently pursue any insurance providers for any Reimbursable Amounts and enforce any right that he or an Allaham Party may have to receive insurance proceeds from any insurance provider. Mr. Allaham shall not enter into any settlement or other agreement in any Broidy Litigation that would obligate him to pay or incur any Reimbursable Amount without first obtaining Qatar's prior written consent.

(c) Qatar agrees to pay all Reimbursable Amounts on a quarterly basis subject to receipt by Qatar of (i) a written request for reimbursement signed by Mr. Allaham and his litigation counsel; and (ii) invoices and such other supporting documentation and taxpayer forms as may be reasonably required by Qatar in order to process payment; provided, however, that Mr. Allaham agrees to repay to Qatar any amounts so advanced only if, and to the extent that, it shall ultimately be determined by a court of competent jurisdiction or an arbitral tribunal that Mr. Allaham is not entitled to be reimbursed by Qatar

AK   AA
     HM

as authorized by this Agreement due to (i) fraudulent, reckless or willful misconduct, or (ii) conduct outside the scope of the alleged Consulting Arrangements. Mr. Allaham acknowledges and agrees that the reimbursement obligations of Qatar in this Section 8 do not include fees or expenses incurred in connection with any investigations or proceedings, actual or threatened, relating to regulatory, criminal, bankruptcy or governmental proceedings in the U.S. or elsewhere, including any concerning the payment or non-payment of taxes, lobbying registration or disclosure statutes (including FARA or the Lobbying Disclosure Act), business licenses, or any proceeding before any legislative body. If Mr. Allaham fails to make a request for reimbursement of a Reimbursable Amount within ninety (90) days of the date that such amount was incurred, his right to reimbursement under this Section 8 shall be deemed to be waived.

(d)     Notwithstanding anything else in this Agreement to the contrary, the aggregate liability of Qatar to Mr. Allaham for any and all Claims for Reimbursable Amounts shall not exceed, in the aggregate, US$1,000,000, excluding, for purposes of this Section 8(d) only, the US$400,000 that Qatar has previously paid to Arent Fox LLP, as counsel to Mr. Allaham.

(e)     Qatar and Mr. Allaham each agree that (i) Qatar's reimbursement of expenses incurred prior to the Effective Date as described in the Recitals and in Section 8(d) does not entitle Mr. Allaham to reimbursement of any other amount; and (ii) if Qatar advances any Reimbursable Amount as described in this Section 8, that reimbursement shall not commit Qatar to pay any other amount. Instead, notwithstanding any other provision set forth herein, both Qatar and Mr. Allaham expressly reserve all rights in connection with any future reimbursement and no reimbursement shall be deemed to be an acknowledgement by Qatar or any other Qatar Party or its Released Persons that any further or future payment is due to Mr. Allaham, by course of conduct or otherwise.

(f)     Mr. Allaham agrees, within 15 days following the execution of this Agreement, to provide to Qatar detailed invoices and supporting documentation and such other documentation as Qatar may reasonably require in order to reconcile the US$400,000 amount previously advanced by Qatar as a goodwill gesture to Mr. Allaham in respect of his legal fees and expenses incurred in respect of the Broidy Litigation to date.

9.     **Cooperation**. Each Allaham Party agrees that he/she/it will cooperate with each of the Qatar Parties, and each and all of the individuals and entities described in clauses (B) and (C) of the definition of the term Released Parties (collectively with the Qatar Parties, the "**Qatar Litigation Interested Parties**") to the extent permitted by law in the California Action or in any Related Actions. As used herein, the term "cooperate" includes: (a) making himself/herself/itself immediately available for telephonic and in-person meetings with counsel and representatives for the Qatar Litigation Interested Parties; (b) providing full and truthful information, including any and all documents, to the Qatar Litigation Interested Parties relating to his/her/its factual knowledge of the allegations in the Complaint or of the allegations in any of the Related Actions; (c) not communicating with individuals and entities known to be adverse to the Qatar Litigation Interested Parties in pending or anticipated litigation (including but not limited to Elliott Broidy and Broidy Capital Management), except to the extent required by law; (d) executing and delivering those documents and truthful affidavits requested from time to time by counsel to the Qatar Litigation Interested Parties; and (e) with respect to Mr. Allaham: (i) executing a sworn affidavit(s) truthfully recounting the facts of Mr. Allaham's relationship with the Qatar Litigation Interested Parties on or prior to the date on which the Initial Settlement Payment is made as provided hereunder (and the Parties hereby agree that the execution of such affidavit in a form mutually agreed between Qatar and Mr. Allaham shall be a condition precedent to such Initial Settlement Payment); (ii) upon the request of counsel to Qatar, executing such further sworn affidavits as counsel to the Qatar Litigation Interested Parties may reasonably request from time to time truthfully recounting such other related facts as may be reasonably required by the Qatar Litigation Interested Parties from time to time hereafter; and (iii) otherwise

AK   JA
     HM

making himself available for deposition and trial testimony upon instruction of counsel for the Qatar Litigation Interested Parties.

10. **No Assistance to Adverse Parties.** Each Allaham Party agrees that he/she/it will not, except as required by applicable law, voluntarily assist, support, or cooperate with, directly or indirectly, any person or entity in alleging or pursuing a legal or other adverse action against Qatar or its Released Persons or enter into any agreement with any third party to so cooperate in any legal or other adverse action against Qatar or its Released Persons, including by providing testimony, information or documents, except under compulsion of law, in which case the applicable Allaham Party will give Qatar and the applicable Released Party(ies) immediate written notice thereof. No Allaham Party will suggest, foment, fund or encourage litigation or other adverse action against a Qatar Party or any of its Released Persons. Nothing in this Agreement is intended to or shall prohibit an Allaham Party from satisfying any legal obligation to comply with a properly-served subpoena for testimony or documents, and is not intended to prohibit an Allaham Party from cooperating with any investigation by any federal, state or local government agency.

11. **Non-Compete and Non-Disparagement.**

(a) In consideration of the payments of the Settlement Amount and other consideration described herein, for a period beginning on the Effective Date and ending on 31 December 2022 (which the Parties acknowledge to be a period of reasonable duration given the nature and purpose of the Consulting Arrangements), neither the Allaham Parties, nor any Affiliate of an Allaham Party (now existing or hereafter formed or acquired), shall, directly or indirectly: (i) take any action that is adverse to the interests of the State of Qatar; (ii) enter into any agreement, or accept payment or other compensation to provide lobbying, public affairs efforts, or any other advisory or consulting services or activities if any of those efforts, services or activities are, or could reasonably be deemed to be, adverse to the interests of the State of Qatar; or (iii) make any disparaging statements or representations, whether orally or in writing, by word or gesture, to any person or entity whatsoever, about any Qatar Party or its Released Persons.

(b) For purposes of this Agreement, (i) the phrase "adverse to the interests of the State of Qatar" refers to the diplomatic, economic and security interests of the State of Qatar as such interests exist as of the Effective Date or as they may exist at any other relevant time, and (ii) a disparaging statement or representation is any communication which is intended to cause, or tends to cause, the recipient of the communication to question the integrity, competence, good character or quality of the Qatar Party or the Qatar Released Person to whom the communication relates.

(c) Without limitation of the foregoing, it is specifically acknowledged and agreed that (i) any efforts, services or activities for or in connection with (A) Elliott Broidy, Broidy Capital Management or any Affiliate of either of them, (B) plans to move or relocate the 2022 World Cup from Qatar, and (C) in support of any boycott of the State of Qatar, are in each case, adverse to the interests of the State of Qatar; and (ii) any statements (A) critical of or opposed to the hosting of 2022 World Cup by Qatar or the award to Qatar of such hosting rights, or (B) supporting or encouraging the boycott of Qatar, are disparaging statements of the type prohibited by Section 11(a)(iii).

12. **Dispute Resolution.**

(a) Governing Law. This Agreement shall be governed by and construed and interpreted in accordance with, and all disputes hereunder or relating hereto, whether of a contractual or non-contractual nature, shall be resolved in accordance with, the laws of England and Wales, without regard to any conflicts of laws rules that may otherwise require the application of the laws of any other state or jurisdiction.



(b) **Arbitration**. Any dispute, whether contractual or otherwise, arising out of or in connection with this Agreement or these dispute resolution procedures, including their existence, validity, applicability, or termination, shall be referred to and finally resolved by arbitration pursuant to the London Court of International Arbitration Rules, administered by the London Court of International Arbitration.

1. The number of arbitrators shall be three.
2. The legal seat of the arbitration shall be London.
3. The language to be used in the arbitral proceedings shall be English.
4. The law governing the validity, existence, applicability, or termination of this arbitration agreement shall be that of England and Wales.
5. Judgment upon the award may be entered by any court having jurisdiction of the award or having jurisdiction over the relevant party or its assets.

13. **General Terms**.

(a) **Severability**. If any provision of this Agreement is determined to be invalid or unenforceable, all other provisions hereof shall remain valid and enforceable notwithstanding, unless the provision found to be unenforceable is of such material effect that this Agreement cannot be performed in accordance with the intent of the Parties in the absence of such provision. In the event a provision is determined to be invalid or unenforceable, both parties shall negotiate in good faith an equitable adjustment to this Agreement so as to give effect to the intent so expressed and the benefits so provided in such invalid or unenforceable provision.

(b) **Waiver and Amendment**. This Agreement may not be modified or amended, and no provision of this Agreement may be waived, except in writing executed by the Party whose rights are being waived. No failure to exercise, or delay in the exercise of, a Party's rights under this Agreement will constitute a waiver of such rights. No waiver of a provision of this Agreement will constitute a waiver of the same or any other provision of this Agreement other than as specifically set forth in such waiver.

(c) **Execution**. This Agreement may be executed in counterparts, each of which (once executed) is an original and all of which together (once executed) constitute one and the same agreement. For purposes of this Agreement, a signature on a counterpart sent as a Portable Document Format (PDF) attachment to an email shall be fully binding as though it was an original signature.

(d) **Headings; Construction**. Each Party to this Agreement has been advised and represented by counsel in connection with the negotiation and preparation of this Agreement. No provision of this Agreement may be interpreted against any Party because such Party or its counsel drafted the provision. Headings used in this Agreement are provided for convenience only, and will not be interpreted to have independent meaning or to modify any provision of this Agreement. The word "including" and its derivatives are used in an illustrative sense and not in a limiting sense. As used herein, except as the context otherwise indicates, the singular shall include the plural and vice versa and words of any gender shall include any other gender. The conjunction "or" shall be understood in its inclusive sense (and/or).

(e) **Limitations on Transfer**. This Agreement may not be assigned, delegated or otherwise transferred, in whole or in part, by any Party, by operation of law or otherwise, without the prior written consent of the non-transferring Party. Subject to the foregoing, this Agreement shall be binding

upon and shall inure to the benefit of all Parties and their respective, heirs, legatees, administrators, permitted successors and permitted assigns.

    (f) <u>Third Party Rights</u>. A person who is not a Party to this Agreement shall not have any rights under or in connection with it by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise except where such rights are expressly granted under this Agreement. The rights of the Parties to terminate, rescind or agree to any variation, waiver or settlement under this Agreement is not subject to the consent of any person or entity that is not a Party to this Agreement.

    (g) <u>Binding Effect</u>. This Agreement is binding upon and shall inure to the benefit of the Parties and each of their Released Persons.

  14. <u>Notices</u>. All notices given under this Agreement shall be in writing, and shall be delivered by personal delivery or overnight courier at the addresses listed below. If notice is given by personal delivery, notice shall be deemed given on delivery; if notice is sent by an express courier service, notice shall be deemed given on the third day following delivery of notice to the express courier service with instructions for express delivery. If any notice is delivered to any party in a manner that does not comply with this Section 14, such notice will be deemed delivered on the date, if any, such notice is received by the other party. Any Party may change its address by giving notice to the other Parties in any manner set forth above.

    (a) if to Qatar, then to:

      Embassy of Qatar
      2555 M Street, NW
      Washington, DC 20037

      With a copy to:

      Bruce S. Wilson, Esq.
      Covington & Burling LLP
      850 Tenth Street, NW
      Washington, DC 20001

    (b) if to Allaham, then to:

      Craig Engle, Esq.
      Arent Fox LLP
      1717 K Street, NW
      Washington, DC 20006

  15. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement between the Parties regarding the subject matter of this Agreement and supersedes all other prior and contemporaneous oral and written agreements, discussions, and understandings of the parties pertaining to the subject matter hereof. Each of the Parties acknowledges and agrees that it has not entered into this Agreement in reliance on any statement or representation of any person (whether a party to this Agreement or not) other than as expressly incorporated in this Agreement.

*[Signatures Appear on the Following Page]*

IN WITNESS WHEREOF, the Parties have caused this Confidential Settlement Agreement and Release of Claims to be duly executed as of the Effective Date.

**THE EMBASSY OF THE STATE OF QATAR**

By: _[signature]_
Name: Hamad Al Muftah
Title: DCM

**BLUEFORT PUBLIC RELATIONS**

By: _[signature]_
Name: _____
Title: _____

**JOSEPH ALLAHAM**

_[signature]_

Subscribed and Sworn before me this 20th day of December, 2018 at New York, NY

_[signature]_
Notary Public

My commission expires 09/26/2020

[Notary stamp: MONICA LYNN HOWARD, Notary Public - State of New York, NO. 01HO6348491, Qualified in Queens County, My Commission Expires Sep 26, 2020]

**LAUREN ALLAHAM**

_Lauren Allaham_ [signature]

Subscribed and Sworn before me this 20th day of December, 2018 at New York

_[signature]_
Notary Public

My commission expires 09/26/2020

[Notary stamp: MONICA LYNN HOWARD, Notary Public - State of New York, NO. 01HO6348491, Qualified in Queens County, My Commission Expires Sep 26, 2020]

**LEXINGTON STRATEGIES, LLC**

By: _[signature]_
Name: Joseph Allaham
Title: _____

Page 13

Subject to the continuing compliance by the Allaham Parties with their obligations in this Agreement and any limitations on the reimbursement of expenses for witnesses in applicable law, the Parties have agreed the schedule of payments and retention of amounts previously paid, as set forth below in respect of the Settlement Amount.

Mr. Allaham shall submit an invoice to Qatar on or before November 30th in each year in which an installment payment is due (see Nos. 2, 3, 4 and 5 in the table below). Qatar shall send the installment amount to its counsel not less than 30 days in advance of each such payment due date (see Nos. 2, 3, 4 and 5 in the table below).

| | | |
|---|---|---|
| 1. | Initial Settlement Payment, to be paid to Mr. Allaham not later than five (5) business days following the execution of this Settlement Agreement, subject to the prior satisfaction of the condition precedent set forth in clause 9(c)(i) hereof | USD$1,150,000 (one million one hundred fifty thousand dollars even) |
| 2. | To be paid to Mr. Allaham on or before December 31, 2019 | USD$100,000 (one hundred thousand dollars even) |
| 3. | To be paid to Mr. Allaham on or before December 31, 2020 | USD$100,000 (one hundred thousand dollars even) |
| 4. | To be paid to Mr. Allaham on or before December 31, 2021 | USD$100,000 (one hundred thousand dollars even) |
| 5. | To be paid to Mr. Allaham on or before December 31, 2022 | USD$100,000 (one hundred thousand dollars even) |
| 6. | Previously paid; receipt acknowledged by Mr. Allaham and all claims for refunds released | USD$1,200,000 (one million two hundred thousand dollars even) |
| 7. | Previously paid; receipt acknowledged by Mr. Allaham and all claims for refunds released, subject to payment by Mr. Allaham within ten (10) days following the date hereof the Outstanding Expenses as contemplated in Section 5(a) hereof | USD$1,450,000 (one million four hundred fifty thousand dollars even) |
| | **TOTAL SETTLEMENT CONSIDERATION** | **USD$4,200,000 (four million two hundred thousand dollars even)** |

\* \* \*