# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

                    Plaintiffs,

      v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

                 Defendants.

Civil Action No. 1:19-cv-00150-DLF

## STATE OF QATAR'S SUR-REPLY IN OPPOSITION TO
## BROIDY'S CROSS-MOTION TO COMPEL

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ............................................................................................................................. 3

I.      The Three Exhibits Broidy Attaches Do Not Undercut Qatar's Special Relationship
        With, and Expectation of Confidentiality as to, Mr. Allaham. ......................................... 3

        A.      Mr. Allaham's August 2023 Declaration Contradicts His Sworn and
                Unsworn Prior Statements and Contains Demonstrable Falsehoods. ..................... 4

        B.      Mr. Allaham's August 2023 Declaration Further Supports Qatar's Privilege
                Assertions ............................................................................................................... 11

        C.      Qatar Had a Reasonable Expectation of Confidentiality in Mr. Allaham's
                Communications. .................................................................................................... 15

II.     Mr. Benomar's Referral Agreement Does Not Undercut Qatar's Reasonable
        Expectation of Privacy in Three Communications. ......................................................... 19

CONCLUSION ........................................................................................................................ 21

## INTRODUCTION

Broidy's response seeks, through a variety of unfounded and inflammatory allegations designed to spark outrage, to transform this proceeding into what it is not and cannot be—a forum to adjudicate the merits of his claims against a foreign sovereign that is immune from the jurisdiction of U.S. courts.  The State of Qatar has intervened for a limited purpose in this action: to protect its sovereign privileges and immunities.  While there may be room for disagreement concerning the scope of those privileges and immunities, Broidy should not be allowed to transform a dispute over privilege into a vehicle for conducting a plenary trial of his claims against Qatar—claims that already have been properly dismissed on the grounds of sovereign immunity. Qatar accordingly confines this response to the subject of its limited intervention: protecting its privileges and immunities as a foreign state.

Nothing in the exhibits Broidy attaches to his Reply undermines the privileges and immunities which Qatar has asserted.  To the contrary, while Broidy casts these documents as "shocking," Pls.' Reply ("Reply"), ECF No. 197 at 1, they in fact reinforce Qatar's privilege claims by corroborating that Mr. Allaham, despite his recent declaration suggesting the contrary, was actively assisting Qatar in its public diplomacy efforts in 2017–2018 to build goodwill in the United States, at a time when Qatar faced existential geopolitical threats posed by the regional blockade launched by the United Arab Emirates and other Gulf countries in June 2017.

Though Mr. Allaham now disclaims any involvement in Qatar's public diplomacy efforts, Mr. Allaham himself acknowledged his role in these efforts in his contemporaneous 2018 Settlement Agreement with the Embassy of Qatar, describing his work as "fostering better international relations within the Gulf region with the leadership in the Jewish community in the United States."  ECF No. 197-3 at 1.  Indeed, months before the Settlement Agreement, Mr. Allaham himself stated in a sworn FARA filing submitted under penalty of perjury—a copy of

1

which is attached hereto as **Exhibit A**—that his work for Qatar included not just commercial work, but "***fostering better international relations within the gulf region*** and with the leadership in the Jewish community in the United States," and "***advis[ing] on handling disputes with other countries in Middle East region***."[1]  Mr. Allaham characterized his work in similar terms in several other instances—both sworn and unsworn.  If anything should trouble the Court, it is why Mr. Allaham has now suddenly contradicted his prior sworn statements, after the unexplained dismissal of all claims against him following an apparent settlement agreement the terms of which have not been disclosed to the Court.  Serious questions are also raised by aspects of Mr. Allaham's recent statements that are obviously contradicted by the record.  For example, while he now testifies that "in or around May of this year" his attorneys "were not allowed to search [his] documents and communications from 2017 and 2018," ECF No. 197-2 ¶ 5, Qatar's privilege logs, on their face, plainly confirm that Mr. Allaham did search his documents from 2017–2018.

But even assuming the sincerity of Mr. Allaham's current re-characterization of his work, it at most reflects Mr. Allaham's non-dispositive personal opinion about the types of activity that are and are not related to diplomacy—and it is wrong.  Contrary to Mr. Allaham's apparent belief, a wide range of activity that he ascribes to his role as an agent for Qatar falls well within the scope of international diplomacy.  Modern diplomacy is not limited to government-to-government relations; as the U.S. Department of State explains, "public diplomacy" involves "the achievement of . . . foreign policy goals and objectives" by "informing and influencing foreign publics" and forging relationships between a government and "citizens of the rest of the world."[2]  There is no

---

[1] Exhibit A ¶¶ 8–9(a) (emphasis added) (Lexington Strategies Registration Statement (June 15, 2018), https://efile.fara.gov/docs/6563-Registration-Statement-20180615-2.pdf).

[2] U.S. Dep't of State, *About Us—Under Secretary for Public Diplomacy and Public Affairs*, https://www.state.gov/about-us-under-secretary-for-public-diplomacy-and-public-affairs/ [https://perma.cc/9QWK-SZJH] (last visited August 27, 2023).

question that Mr. Allaham's work for Qatar, even as he tries to re-characterize it, was related to the public diplomacy objectives of the Qatari mission at a particularly sensitive geopolitical moment.

Broidy's other arguments are equally implausible. For example, despite Broidy's effort to suggest that the documents he has submitted to the Court evidence some conspiracy by lawyers to "help Qatar cover up . . . egregious misconduct," the documents prove the opposite. Reply at 2. Mr. Allaham's Settlement Agreement with Qatar demonstrates on its face that Qatar demanded representations from Mr. Allaham that he had never engaged in any "hacking, cyberwarfare, intrusion, infiltration, dissemination, distribution, or publication" of Broidy's "electronic systems or information." ECF No. 197-3 at 2. These representations ensured that Qatar would not be in the position of paying or indemnifying an agent for the improper behavior that Broidy was alleging.

In short, when the Reply is stripped of its inflammatory rhetoric and conclusory opinions, and the exhibits are read carefully and in context, the submission as a whole lends further support to Qatar's assertion of privileges and immunities, and provides further reason for the Court to grant Qatar's Motion to Vacate and deny Broidy's Cross-Motion to Compel.

## **ARGUMENT**

### I. **The Three Exhibits Broidy Attaches Do Not Undercut Qatar's Special Relationship With, and Expectation of Confidentiality as to, Mr. Allaham.**

The main argument of Broidy's Reply is that "three shocking documents," Reply at 1—an August 19, 2023 declaration from Mr. Allaham, a 2018 Settlement Agreement between Mr. Allaham and the Qatari Embassy, and an email communication between Mr. Allaham's prior counsel and a lawyer working for non-party Jamal Benomar—refute the existence of a special relationship, with expectations of confidentiality, between Qatar and Mr. Allaham. *See* ECF Nos.

197-2, 197-3, 197-4.  These documents support and do not "negate" Qatar's privileges and immunities, as Broidy claims.  Reply at 1.

> **A.** **Mr. Allaham's August 2023 Declaration Contradicts His Sworn and Unsworn Prior Statements and Contains Demonstrable Falsehoods.**

The Court should be deeply skeptical of Mr. Allaham's August 2023 declaration, which contradicts multiple prior statements he has made, both sworn and unsworn, and otherwise contains demonstrable falsehoods.  Mr. Allaham's August 2023 declaration characterizes the "majority" of his work as assisting Qatar and the Qatar Investment Authority (QIA) in identifying investment opportunities in the United States.  ECF No. 197-2 ¶ 2.  Mr. Allaham states that he "also helped them build relationships with Jewish community leaders."  *Id*.  In subsequent paragraphs, Mr. Allaham asserts that "I never agreed or believed that I was helping Qatar's diplomacy," and that none of the documents on Qatar's privilege log that he reviewed "related to Qatar's foreign policy or diplomacy."  *Id.* ¶¶ 8–9.

For many reasons, these statements are not credible.  To begin with, the assertion that Mr. Allaham never believed that he was helping Qatar's diplomacy, or that his work did not extend beyond assisting with investment opportunities and building relationships with Jewish community leaders, is flatly incompatible with numerous sworn and unsworn prior statements by him in a variety of different contexts.  For example:

*2018 Sworn FARA Filing.*  On June 15, 2018—six months before the Settlement Agreement—Mr. Allaham submitted a sworn FARA Registration Statement to the Department of Justice for his company Lexington Strategies, which is attached as **Exhibit A**.  In that statement, he is asked to "describe fully" Lexington Strategies' work for the State of Qatar.  He identifies himself as the individual doing the work on behalf of Lexington Strategies, and then states:  "[t]he registrant began working to promote the 2022 World Cup in Qatar, ***and then expanded its***

*activities to include fostering better international relations within the gulf region* and with the leadership in the Jewish community in the United States." Ex. A ¶¶ 5(h), 8 (emphasis added).[3] Lest there be any doubt that Mr. Allaham saw his work as diplomatic in nature, he further stated in the next section of the same FARA filing that he received $1.45 million from the State because he "developed [a] plan to promote 2022 World Cup in Doha, *advised on handling disputes with other countries in Middle East region*, encouraged dialog with Jewish community abroad and in United States." *Id.* ¶ 9(a) (emphasis added).

     *Mr. Allaham's June 19, 2018 Deposition Testimony*.  On June 19, 2018, Mr. Allaham sat for a deposition taken by Broidy in the California Action that preceded this lawsuit and eventually resulted in claims against Qatar being dismissed on the ground of sovereign immunity.  *See Broidy Cap. Mgmt., LLC v. Qatar*, No. 18-2421, 2018 WL 6074570, at *11 (C.D. Cal. Aug. 8, 2018), *aff'd*, 982 F.3d 582 (9th Cir. 2020).  Mr. Allaham made statements in that deposition that contradict his August 2023 declaration, and which describe his work consistently with his FARA registration as encompassing Qatar's international disputes with other countries.  The relevant portions of the June 2018 deposition transcript were designated by Qatar as Confidential or Highly Confidential as permitted by the Protective Order in the California Action in light of their relationship to diplomatic and foreign relations matters, and subsequent litigation upheld those designations and confirmed that, absent a court order, materials from the California Action could not be filed in this case.[4]  Qatar accordingly refrains from specifically quoting or characterizing the relevant excerpts,

---

[3] This quotation appears both in Lexington Strategies' Registration Statement, as well as Mr. Allaham's own Short Form Registration Statement.  *See* Ex. A (Lexington Strategies Registration Statement ¶ 8; Allaham Short Form Registration Statement ¶ 11 (June 15, 2018), https://efile.fara.gov/docs/6563-Short-Form-20180615-4.pdf).

[4] The confidentiality designations made by Qatar were upheld by the California court against Broidy's challenge.  *See* California Action, ECF No. 242.  The California court concluded that the

which appear at the following locations in the transcript: 96:17–25, 134:21–136:4, and 140:6–23. Now that Broidy has provided to the Court a declaration by Mr. Allaham that contradicts statements he made in that deposition, however, Qatar respectfully requests that this Court enter an order compelling Broidy to produce that deposition transcript for *in camera* review. Under the Protective Order in the California Action, such an order would allow the filing of that transcript under seal in this case. *See* California Action, ECF No. 185-1 ¶ I. The Court can then assess for itself the credibility of Mr. Allaham's August 2023 declaration about the nature of his activities for Qatar in light of the testimony he already provided in the California Action.

**August 2018 Wall Street Journal Article**. Paragraph 7 of Mr. Allaham's August 2023 declaration refers to "a front-page story in the *Wall Street Journal* in 2018." ECF No. 197-2 ¶ 7. Qatar urges the Court to read that article, which is attached hereto as **Exhibit B**, in its entirety. Far from describing Allaham's work as limited to pursuing investment opportunities and building relations with the Jewish community, *see* ECF No. 197-2 ¶ 2, the article touts Mr. Allaham's central role in an extensive public diplomacy initiative to influence President Trump's position regarding the 2017 blockade of Qatar by neighboring countries—a diplomatic incident in which Saudi Arabia, the United Arab Emirates, Bahrain, and Egypt severed diplomatic relations with Qatar and enacted a 43-month air, land, and sea blockade of the country.[5] The article describes at

---

designated documents and testimony "'contain[ed] or comprise[d]' 'information relating to the conduct by Qatar of its foreign policy'" within the meaning of the Protective Order. *Id.*; *see also* California Action Protective Order, ECF No. 185-1 ¶ D.4 (defining "Highly Confidential— Attorneys' Eyes Only" as "information which a Party in good faith reasonably believes contains or comprises . . . (ii) information protected by the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, to the extent such material is produced; or (iii) any other information relating to the conduct by Qatar of its foreign policy"). The California court also held that Broidy could not use protected materials from the California Action in other cases. *See* California Action, ECF No. 246.

[5] Julie Bykowicz, *The New Lobbying: Qatar Targeted 250 Trump 'Influencers' to Change U.S. Policy*, Wall Street Journal (Aug. 29, 2018), https://www.wsj.com/articles/the-new-lobbying-

length how Mr. Allaham and Nicolas Muzin sought to win President Trump's support for Qatar, in the specific context of resolving the blockade against Qatar, by "win[ning] over Mr. Trump's influencers."  Mr. Allaham is quoted as saying, among other things, that he explained to Qatari officials that the objective was "to create a campaign . . . where we are getting into his [President Trump's] head as much as possible."[6]

***December 20, 2018 Settlement Agreement and Accompanying Affidavit***.  Mr. Allaham's statements in his FARA registration and to the *Wall Street Journal* are consistent with his characterization of his work in the 2018 Settlement Agreement—and inconsistent with his August 2023 declaration.  The first recital of the Agreement states that "Mr. Allaham alleges that, in or around 2017, he entered an independent contractor relationship with the Qatar Parties to advance the interests of the Qatar Parties and of Qatar's instrumentalities, by promoting the 2022 World Cup in Qatar, ***fostering better international relations within the Gulf region*** with the leadership in the Jewish community in the United States, and providing real estate investment and other public relations and messaging services."  ECF No. 197-3 at 1 (emphasis added).

In connection with his execution of the Settlement Agreement, Mr. Allaham also provided a sworn affidavit, which Broidy excluded from the materials he provided to the Court.  Qatar

---

qatar-targeted-250-trump-influencers-to-change-u-s-policy-1535554647; *see also* Kristian Coates Ulrichsen, *Saudi Arabia Just Lifted Qatar's 43-Month Blockade.  How Did This Rift End?*, Washington Post: Monkey Cage (Jan. 8, 2021), https://www.washingtonpost.com/politics/2021/01/08/saudi-arabia-just-lifted-qatars-43-month-blockade-how-did-this-rift-end/.

[6] Mr. Allaham's characterization of his work in the *Wall Street Journal* is consistent with how his work was described in August 2018 on the website for Stonington Global—a firm that Mr. Allaham and Mr. Muzin formed following their work for Qatar, *see* Stonington Global, https://web.archive.org/web/20180806131410/https://www.stoningtonglobal.com/.  The front page of that website stated:  "Nick Muzin and Allaham plan to build on their success representing the State of Qatar, which in the course of eight months saw the Gulf Emirate go from isolation, blockade, and criticism from the White House, to a strengthening [of] the US–Qatari security and economic relationship."  *Id.*

believes it would be highly appropriate for the Court to review Mr. Allaham's prior sworn affidavit together with Mr. Allaham's other prior statements, all of which are inconsistent with his recent declaration. While Qatar would submit the affidavit of its own accord, Qatar is obliged to proceed cautiously in light of its limited intervention in this proceeding and immunity from the jurisdiction of U.S. Courts.

As both the D.C. Circuit and United States government recognized, the State of Qatar refrained initially from intervening in these proceedings because of its reasonable concern that if the State intervened without expressly safeguarding its sovereign immunity, Broidy would likely argue (without merit) that Qatar had waived its sovereign immunity. *See Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 995–98 (D.C. Cir. 2023); ECF No. 175-3 at 8–9, Brief for the United States as Amicus Curiae, *Muzin*, 61 F.4th 984 (D.C. Cir. 2023) (No. 22-7082), 2022 WL 3704576. Qatar faces a similar predicament here. It is concerned that if it voluntarily produces a copy of Mr. Allaham's affidavit, Broidy might claim that Qatar was now participating in discovery and had waived its immunity. Accordingly, consistent with a colloquy with Judge Wilkins during oral argument at the D.C. Circuit,[7] Qatar respectfully requests that the Court enter an order confirming that Qatar may share with the Court a copy of Mr. Allaham's prior sworn affidavit without any waiver of its sovereign immunity.[8] Alternatively, and as a simpler procedure, the Court may wish

---

[7] *See* ECF No. 175-4 at 14:25–15:21, Oral Arg. Tr., *Broidy Cap. Mgmt. LLC v. Muzin* (No. 22-7082) (J. Wilkins analogizing this case to the tribal immunity context in which Indian tribes routinely move to intervene "on [a] limited basis" and "under [specified] conditions," and suggesting Qatar could seek leave from the court that its limited participation would not "waiv[e] [its] immunity as to a, b, and c").

[8] Broidy suggests that the fact that Qatar has a copy of this Settlement Agreement which it has not previously produced represents some form of discovery violation. *See* Reply at 5–6. Broidy overlooks that Qatar is not subject to discovery in this action as a result of its foreign sovereign immunity, whether that discovery is directly propounded upon the State of Qatar or through an attempt to circumvent that immunity by seeking access to Qatar's client files with its counsel— such as through the subpoena that Broidy issued to Covington & Burling LLP on June 28, 2023.

to order Broidy to produce the affidavit, since he presumably has the entire Settlement Agreement in his possession.[9]

Broidy preemptively seeks to impeach the credibility of Mr. Allaham's prior statements in the 2018 Settlement Agreement (and accompanying affidavit), claiming that they are undermined by the settlement payments to Mr. Allaham. Reply at 6. But as explained above, Mr. Allaham's statements in the Settlement Agreement were consistent with multiple statements (sworn and unsworn) he had made by that point, several months before he had entered into the Settlement Agreement. Further, the consideration for Qatar's payments in the Settlement Agreement was not merely Mr. Allaham's truthful testimony memorialized in his sworn affidavit; the Settlement Agreement also resolved Mr. Allaham's commercial claims that he deserved additional compensation for the ambitious public diplomacy campaign he touted in the *Wall Street Journal* article and described in his sworn FARA filing. *See supra* pp. 6–7. If anything, it is the circumstances of Mr. Allaham's August 2023 declaration that invite questions about credibility, given the inconsistencies between that declaration and Mr. Allaham's prior statements and the fact

---

That subpoena was objectionable in its entirety because, among other reasons, it invaded attorney-client privilege by asking a law firm to make a wholesale production of documents reflecting legal advice provided to its client, and because it sought to intrude upon Qatar's sovereign immunity. Covington explained as much in timely objections served on July 13, 2023. As those objections made clear, Qatar is not subject to discovery in this matter based on, *inter alia*, the Foreign Sovereign Immunities Act—separate and apart from the Vienna Convention and international comity protections at issue in this discovery dispute concerning materials in the possession of Qatar's former contractors.

[9] Broidy also presumably has other documents in his possession bearing on the credibility of the August 2023 Allaham declaration, including Broidy's own settlement agreement with Allaham and any other related agreements, which the Court may wish to review to further assess the credibility of Mr. Allaham's change in his testimony.

that the declaration was submitted mere hours after Broidy dismissed his claims against Mr. Allaham for undisclosed consideration.[10]

If these circumstances and Mr. Allaham's prior inconsistent statements were not sufficient to cast significant doubt on Mr. Allaham's August 2023 declaration (they are), the declaration also contains demonstrable falsehoods that further undermine its credibility as a whole. Notably, Mr. Allaham's declaration asserts that "in or around May of this year" his attorneys told him that they "were not allowed to search [his] documents and communications from 2017 and 2018, because Covington told them that [his] materials from that time frame 'belong' to Qatar." ECF No. 197-2 ¶ 5. Qatar is not in a position to know what Mr. Allaham's attorneys told him. But what Mr. Allaham alleges his attorneys told him is demonstrably incorrect. Qatar understands that following the completion of its review for potential privileges and immunities, Mr. Allaham made two document productions to Broidy between May and June 2023, comprised of 216 documents—all of which date from 2017 and 2018.[11] Further, all twenty-nine of Qatar's privilege claims related to Mr. Allaham's documents are for documents dated between August 2017 and March 2018, which his counsel reviewed and identified as subject to production but for a claim of privilege or

---

[10] As previously noted, *see* ECF No. 192 at 8 n.3, the U.S. Government has made statements, in the context of Broidy's guilty plea for violating FARA, describing Broidy's relationship with a Middle Eastern country that in context can only be understood as a reference to a relationship with the United Arab Emirates to influence U.S. policy towards Qatar. *See* Arraignment and Change of Plea Tr. at 65:21–23, *United States v. Broidy*, Case No. 20-cr-210, ECF No. 13 (filed D.D.C. Oct. 23, 2020) (describing "information relating to [Broidy's] efforts to obtain business from a Middle Eastern country and [his] efforts to influence U.S. policy towards a second Middle Eastern country"). Broidy's relationship with a foreign sovereign participating in the blockade against Qatar, and his history of unlawful failure to disclose his work on behalf of foreign principals, provides added reason to question the full context of Broidy apparently persuading Mr. Allaham to contradict prior sworn statements.

[11] Qatar understands that the Bates ranges for these materials is Allaham0000275–Allaham0001108.

immunity by Qatar.  Mr. Allaham therefore must have known that his counsel did in fact "search," and produce, his "documents and communications from 2017 and 2018."  ECF No. 197-2 ¶ 5.  Mr. Allaham's statement to the contrary is accordingly demonstrably false, or at a minimum extremely misleading.  This false or misleading statement, together with the declaration's inconsistencies with prior sworn and unsworn statements by Mr. Allaham, are further reason for the Court to doubt the credibility of the recent declaration, and to give it no weight.[12]

### B.    Mr. Allaham's August 2023 Declaration Further Supports Qatar's Privilege Assertions.

Even if Mr. Allaham's August 2023 declaration were taken at face value, it reinforces that Mr. Allaham was assisting Qatar in the performance of essential mission functions.

Mr. Allaham states that "[t]he *majority* of the work that I did for the State of Qatar and the Qatar Investment Authority (QIA) involved finding investment opportunities in the United States." ECF No. 197-2 ¶ 2 (emphasis added).  Even if credited, Mr. Allaham's qualification of this statement—"majority"—confirms that some of his work did *not* involve such commercial issues. Indeed, Mr. Allaham goes on to state that he "also helped them build relationships with Jewish community leaders," which he does not include as part of this "majority" commercial work.  *Id.* This work with Jewish community leaders is also mentioned in Mr. Allaham's prior statements describing his work done to assist Qatar's diplomatic efforts, though as noted above, *see supra* pp. 4–8, Mr. Allaham's prior statements described his work in far broader terms, and in light of a

---

[12] In light of the apparent settlement and stipulated dismissal of Mr. Allaham from the case, Qatar understands any pending discovery requests to Mr. Allaham to be moot.  In an abundance of caution, Qatar intends to construe the Court's August 25, 2023 Minute Order directing Qatar to produce the withheld materials for *in camera* review to include the withheld Allaham documents. That is, Qatar will interpret the Court's order to encompass all documents reflected on its privilege log, including the documents previously identified by Mr. Allaham as responsive but for a claim of privilege.  As a matter of law, however, it does not appear necessary for the Court to make any ruling as to whether Mr. Allaham's documents are protected, because there is no longer a live dispute regarding the production of those documents.

broader context of "fostering better international relations" for Qatar, *see* Exhibit A ¶ 8; ECF No. 197-3 at 1, that are inconsistent with this narrower characterization.

Even considered by itself, Mr. Allaham's statement that he was helping to "build relationships with Jewish community leaders," ECF No. 197-2 ¶ 2, was plainly related to public diplomacy. As Mr. Allaham's prior statements further reflect, his relationship-building did not happen in a vacuum—they were, in Mr. Allaham's own view, part of a response to a blockade imposed on Qatar by neighboring countries. *See supra* pp. 6–7. The U.S. Department of State explains that "public diplomacy" involves "the achievement of . . . foreign policy goals and objectives" by "informing and influencing foreign publics" and forging relationships between a government and "citizens of the rest of the world."[13] Or as the Oxford Research Encyclopedia on International Studies describes it, "[p]ublic diplomacy" involves "the process and practice by which nation-states and other international actors engage global publics to serve their interests."[14] Mr. Allaham may think of diplomacy as limited to traditional state-to-state meetings, but that is neither the reality nor the law.[15]

The same is true of the paragraph in Mr. Allaham's 2023 declaration where he describes correspondence with a Qatari government official discussing "Qatar giving very expensive watches . . . as gifts to high-profile and influential people in the United States." ECF No. 197-2 ¶

---

[13] U.S. Dep't of State, *About Us—Under Secretary for Public Diplomacy and Public Affairs*, *supra* note 2.

[14] Nancy Snow, *Public Diplomacy*, Oxford Research Encyclopedias: International Studies (July 30, 2020), https://doi.org/10.1093/acrefore/9780190846626.013.518.

[15] Nat'l Museum of American Diplomacy, *What is Public Diplomacy?*, https://diplomacy.state.gov/teacher-resources/what-is-public-diplomacy-video/#:~:text=Public %20diplomacy%20is%20outreach%20and,people%20and%20the%20United%20States [https://perma.cc/7FBX-AUQQ] (last visited Aug. 29, 2023) ("While diplomacy is often thought of as formal meetings with foreign officials, diplomacy is also meeting, talking, and working with the citizens of other countries. Public diplomacy is outreach and engagement that strengthens the relationships between the people of the United States and citizens of other countries.").

7.   As an initial matter, Qatar objects to Broidy's public filing of statements purporting to characterize the very communications over which Qatar has claimed privilege.  But even setting that aside, Mr. Allaham is not correct in suggesting that a discussion of gifts by a foreign government to "high-profile and influential people" from the United States is unrelated to diplomacy.

If that is his belief, he is mistaken.  The United States' former Chief of Protocol has described gift giving as "a huge component" of diplomacy, the deliberations around which are "an extremely delicate and sensitive matter."[16]  As the National Museum of American Diplomacy explains, a "gift of state often captures the essence of a nation."[17]  Indeed, federal law recognizes the important role of diplomatic gift giving in foreign affairs, by incorporating an exception permitting gifts "of more than minimal value" to be accepted "when . . . to refuse the gift would likely cause offense or embarrassment or otherwise adversely affect the foreign relations of the United States."   5 U.S.C. § 7342(c)(1)(B).   And, as with public diplomacy more broadly, diplomatic gift giving is not limited to foreign government officials, but can also include community leaders in another nation with whom the sovereign seeks to foster relationships.  *See, e.g.,* U.S. Dep't of State, *Annual Report on International Religious Freedom 2004* (Joint Committee Print 108-59), https://www.govinfo.gov/content/pkg/CPRT-108JPRT20429/html/CPRT-108JPRT20429.htm (describing "particular efforts" by a U.S.

---

[16] Desireee Adib & Neal Carter, *From Komodo Dragons to Olive Oil:  The Art of Diplomatic Gift Giving*, NBC News (Mar. 14, 2012), https://www.nbcnews.com/news/world/komodo-dragons-olive-oil-art-diplomatic-gift-giving-flna445126.

[17] Nat'l Museum of American Diplomacy, *FAQs:  Why Do Diplomats Give Gifts?*, https://diplomacy.state.gov/why-do-diplomats-give-gifts/  [https://perma.cc/U3EV-PVFB]  (last visited Aug. 27, 2023).

Embassy "during the Muslim holy month of Ramadan to host Iftar dinners and deliver traditional gifts to religious leaders in recognition of their daily fasts").

Thus, even by his own characterization, Mr. Allaham's messages with the relevant Qatari government official relate to recognized diplomatic functions.  There is nothing improper about asserting diplomatic privileges and immunities with respect to communications concerning such functions.  Nor is there any basis to credit Mr. Allaham's hearsay assertions that Qatar's privileges and immunities have been asserted based on purported instructions from Qatar's counsel to withhold documents "that would be embarrassing to Qatar or that would reveal the involvement of Qatar and/or its agents in the hack-and-smear campaign targeting Broidy."  ECF No. 197-2 at ¶¶ 3–4.  Qatar had, at minimum, a good-faith basis for its privilege claims, and they do not reflect any purported conspiracy between or among Qatar's counsel to hide evidence.[18]

In short, Mr. Allaham has previously made sworn and unsworn statements that his work for Qatar involved "fostering better international relations within the Gulf region" and "advis[ing] on handling disputes with other countries in [the] Middle East region."  Ex. A ¶¶ 8, 9(a); ECF No. 197-3 at 1.  It is hard to see how this can be reconciled with Mr. Allaham's current testimony that he did not "believe[] that [he] was helping Qatar's diplomacy."  ECF No. 197-2 ¶ 9.  The most charitable, if strained, interpretation of that statement is that Mr. Allaham is merely expressing a personal opinion on what he considers "diplomacy"—an understanding that is at odds with the views of the United States government on the subject.  Mr. Allaham's newfound personal opinion on what constitutes "diplomacy," sincerely held or otherwise, has no bearing on the legal issues before the Court concerning Qatar's privileges and immunities.

---

[18] Consistent with the Court's August 25, 2023 Minute Order, Qatar will address in due course Broidy's unfounded request to subject Qatar to a "forensic investigation," notwithstanding that this request would violate Qatar's sovereign immunity.  Reply at 11–13.

### C.     Qatar Had a Reasonable Expectation of Confidentiality in Mr. Allaham's Communications.

Broidy relies on the same three exhibits to argue that Qatar did not have a reasonable expectation of confidentiality in communications to and from Mr. Allaham, because (i) Mr. Allaham's August 2023 affidavit now states that "no one ever told [him]" that his communications should be maintained confidentially, (ii) the 2018 Settlement Agreement purportedly includes language in which Qatar disclaimed a prior contract with Mr. Allaham, and (iii) the email from Mr. Allaham's former counsel asserts the belief that there was no confidentiality agreement.  Reply at 3–5.  Read and understood in context, however, none of these exhibits undermines—let alone defeats—Qatar's reasonable expectation of confidentiality.

As a preliminary matter, Qatar has been transparent that Mr. Allaham's agreement to work for Qatar was not memorialized in a written services contract signed by Mr. Allaham and the mission, and it has explained why that fact is not dispositive.  *See* ECF No. 193-1 at 12–14.  Mr. Allaham has likewise previously made sworn statements that he had an "agreement or understanding" with Qatar that was not memorialized in "a formal written contract []or an exchange of correspondence between the parties."[19]  The absence of a written agreement does not mean that no expectation of confidentiality attached to Mr. Allaham's work.  To the contrary, Mr. Allaham's work was done in partnership with Stonington Strategies and its principal, Nicolas Muzin.  Mr. Allaham has confirmed this point in prior public statements, such as the 2018 *Wall*

---

[19] Exhibit A (Exhibit B to Lexington Strategies Registration Statement, ¶ 6 (June 15, 2018), https://efile.fara.gov/docs/6563-Exhibit-AB-20180615-2.pdf).

*Street Journal* article profiling the work he did with Mr. Muzin, as well as in his 2023 declaration, where he calls Mr. Muzin "my former business partner."  ECF No. 197-2 ¶ 7.[20]

Qatar had a signed contract with Stonington Strategies that included express confidentiality provisions.  *See* ECF No. 109-17 at 6.  This contract required Stonington Strategies to maintain confidentiality over its communications and work product.  *Id.*  The contract further stated that Stonington Strategies was "responsible for assuring that your employees, agents or subcontractors have executed written confidentiality agreements reflecting the substance of this provision, and you shall guarantee their adherence to these terms."  *Id.*  Accordingly, Qatar reasonably understood that any individual partnering with Stonington Strategies and Mr. Muzin in their efforts to assist the mission would be subject to the same confidentiality obligations.

Against this backdrop, nothing in Mr. Allaham's August 2023 declaration credibly detracts from Qatar's reasonable expectation that Mr. Allaham would treat his work as confidential.  Even setting aside the broader reasons to question the credibility of Mr. Allaham's August 2023 declaration, it strains credulity that Mr. Allaham could believe that he was working to advise on "handling disputes with other countries in [the] Middle East region," Ex. A ¶ 9(a), but was not expected to perform such work in a confidential manner.  The content of memoranda shared with Mr. Allaham, which the Court can review *in camera*, is also indicative of the sort of sensitive communications that an individual who claimed to be "[p]roficient in . . . the international affairs between gulf nations," *id.* ¶ 5(i), would understand as manifestly confidential.  *See* PRIV-MUZIN-013 through -015.  Mr. Allaham states that aspects of his work were "not secret" and discussed in

---

[20] Stonington Strategies' FARA Registration Statement for its commercial work with Mr. Allaham also indicates payments from Stonington to Mr. Allaham's company Lexington Strategies, reinforcing that Mr. Allaham was working with Stonington.  *See* Stonington Strategies LLC Registration Statement at 3 (Oct. 26, 2018), https://efile.fara.gov/docs/6458-Exhibit-AB-20181026-3.pdf.

his *Wall Street Journal* article, ECF No. 197-2 ¶ 7, but the fact that *some* of Mr. Allaham's blockade-related work was public plainly does not imply that *all* of his services were non-confidential.  Many diplomatic initiatives have both public and non-public facets.  When the United States publicly announces a foreign policy initiative, it certainly does not regard all of its details, and governmental discussions about whether and how to pursue that initiative, as non-confidential.

The statements in an apparent July 2018 email sent between Mr. Allaham's then-counsel and counsel for non-party Jamal Benomar also do not undermine Qatar's reasonable expectation of confidentiality in Mr. Allaham's work.  As an initial matter, assuming the authenticity of the message, it appears to be an incomplete excerpt, not a true and correct copy of the full email communication.  Mr. Benson testified in his declaration that he received the email from Mr. Allaham under circumstances he does not further describe.  ECF No. 197-1 ¶ 4.  But the email excerpt produced to the Court omits any subsequent communication in which the email is sent to Mr. Allaham—who must have presumably received it in order to provide it to Mr. Benson in conjunction with his dismissal from the case.

Setting aside the apparent incompleteness of this exhibit, Broidy points to a statement in the email that "there is no confidentiality agreement in place between he and Qatar."  Reply at 4 (quoting ECF No. 197-4).  Yet in context, it is clear that this assertion was related to Mr. Allaham's desire for an "indemnification agreement" from Qatar.  In other words, it was in the interest of Mr. Allaham's then-counsel at the time to emphasize the lack of a formal written "confidentiality agreement in place between he and Qatar" as a means to urge the resolution of Mr. Allaham's commercial claims against Qatar—claims that were later settled in the 2018 Settlement Agreement.  *See* ECF No. 197-3.  But again, Qatar has never argued that there was a written

"confidentiality agreement in place between [Mr. Allaham] and Qatar." ECF No. 197-4. Rather, Qatar's reasonable expectation of privacy derived from Mr. Allaham's partnership with Stonington Strategies and its principal Nicolas Muzin; the terms of the Stonington Strategies contract under which their shared work was performed; and the reasonable expectation that any diplomatic mission would have that an individual who bills himself as an expert on Middle East politics, and is providing advice on the handling of a sensitive dispute with foreign countries, would understand that communications related to that subject are confidential.[21]

The December 2018 Settlement Agreement is also not in tension with Qatar's reasonable expectation of confidentiality. Broidy points to a recital of Qatar's position (disputed by Allaham) "that there were no legally binding obligations imposed on any Qatar Party implementing the Consulting Agreements." Reply at 4 (quoting ECF No. 197-3 at 2). This language is fully consistent with Qatar's previously articulated position—*i.e.*, that there was no written services contract directly between the mission and Mr. Allaham, and that his obligations derived instead from his work with Stonington.

Broidy's reliance on the December 2018 Settlement Agreement's confidentiality provisions fails for the same reason: there is no dispute that the Embassy did not have a written

---

[21] Broidy also points to the subsequent paragraph of the email, which states: "Qatars lawyers thought just keeping discovery 'attorneys eyes' only would be good enough. I said then it wouldn't and I'm proven right from the leaks. The only good strategy was 'no discovery' but Qatar negotiated that away." ECF No. 197-4. Broidy asserts (Reply at 8) this statement is indicative of conspiratorial misconduct, but this paragraph is a clear and unremarkable reference to the then-status of discovery in the California Action, where the parties sought to negotiate the terms of discovery while Qatar's motion to dismiss on the basis of sovereign immunity was pending (and then later granted). Mr. Allaham's then-counsel appears to have believed that Qatar should have sought to stay all discovery while the motion was pending, as opposed to stipulating to allow third-party discovery pursuant to a protective order, which is what happened. *See* California Action, ECF Nos. 45 ¶ 4, 46 ¶ 3. It was as part of this third-party discovery that Mr. Allaham was deposed. *See supra* pp. 5–6. It is not apparent how Broidy can insinuate that there was some misconduct by Qatar from the fact that Mr. Allaham's former counsel criticized Qatar for being *too permissive* with respect to Broidy's discovery requests.

agreement with Mr. Allaham prior to this time, but rather reasonably expected Mr. Allaham to maintain materials confidentially in light of the nature of his working relationship with the mission through his partnership with Stonington Strategies, the express confidentiality obligations imposed on Stonington, and the geopolitically sensitive subject-matter of the work.  As shown by his then-counsel's July 2018 email, however, Mr. Allaham used the lack of a formal written confidentiality agreement, directly between him and Qatar, as a negotiation tactic in seeking to reach an agreement with Qatar for the payment of additional funds that Mr. Allaham felt he was owed.  Understood in that context, the confidentiality terms in the Settlement Agreement simply formalized Qatar's reasonable understanding of Mr. Allaham's preexisting confidentiality obligations.[22]

## II.    Mr. Benomar's Referral Agreement Does Not Undercut Qatar's Reasonable Expectation of Privacy in Three Communications.

As the foregoing makes clear, the purported "three shocking documents" (Reply at 1) submitted by Broidy do not detract from Qatar's targeted assertions of privileges and immunities with respect to documents involving Mr. Allaham.  Broidy has also submitted one other document with his Reply, which Mr. Benson testified that he also received from Mr. Allaham and which pertains to Mr. Benomar:  a "Referral Agreement" between Jamal Benomar and Stonington Strategies, in which Mr. Benomar agrees to refer Defendant Stonington Strategies to Qatar as a potential consultant based on his "contacts within the diplomatic community."  See ECF No. 197-6.  Broidy asserts (Reply at 17–18) that this Referral Agreement undercuts Qatar's reasonable

---

[22] Broidy suggests (Reply at 8) that the confidentiality provisions of the Settlement Agreement somehow indicate that Qatar induced Mr. Allaham to violate his discovery obligations, but the Settlement Agreement clearly states, as is customary for confidentiality agreements, that disclosure may nevertheless be appropriate "as may be required by applicable law, regulation or order of a governmental authority of competent jurisdiction."  ECF No. 197-3 ¶ 7(c).  As Qatar has previously explained, see ECF Nos. 175-1 at 24, 193-1 at 12, and contrary to Broidy's arguments, such a reference to disclosure "required by law" cannot properly be construed as a waiver of a foreign sovereign's privileges and immunities.

expectation of confidentiality in the three documents it has logged that include Mr. Benomar as a recipient.  Yet the Referral Agreement on its face required Mr. Benomar to assist Stonington Strategies to "maintain its relationships with referred clients" and to treat any information he received during the course of that continued work as confidential.  ECF No. 197-6 ¶¶ 1, 8.

The documents on Qatar's privilege logs pertaining to Mr. Benomar do not, moreover, pertain to any work pursued by him and Mr. Muzin that was commercial in nature (whether performed under this Referral Agreement or otherwise).  Rather, the three documents involving Mr. Benomar that Qatar has included on its privilege logs address issues which are non-commercial and relate to the provision of assistance to Qatar for purposes of achieving its diplomatic objectives.  As Qatar previously proposed, *see* ECF No. 193-1 at 15, the Court may further assess the substance of these documents through *in camera* review and confirm that they are non-commercial in nature.  *See* PRIV-ALLAHAM-002, PRIV-MUZIN-013, PRIV-MUZIN-0014.[23]

---

[23] Qatar understands that Defendants and non-party subpoena recipients will have an opportunity to respond to Broidy's inflammatory accusations of discovery misconduct.  Accordingly, Qatar briefly responds here to certain allegations only insofar as they relate to its assertion of privileges.  First, Broidy's repeated claim that Qatar's privilege log entries somehow establish that IMS "deleted material relevant to the claims in this matter" is demonstrably false.  ECF No. 197 at 9.  Qatar has logged the very documents that Broidy inexplicably continues to insist were destroyed.  *See* ECF No. 193-1 at 22.  The Court has now directed the submission of these documents for *in camera* review, and can confirm as much.  Second, Broidy claims that Squire Patton Boggs informed Broidy that it had identified a responsive document that hadn't been logged or otherwise produced.  ECF No. 197 at 8–9.  Qatar first received a copy of this document from Squire Patton Boggs on August 18, 2023.  Consistent with the Court's order under which Qatar can provide any supplemental privilege logs on a "rolling basis," ECF No. 177 ¶ 3, Qatar was in the midst of reviewing the document at the time Broidy filed his Reply.  On August 25, one week after receiving the document from Squire Patton Boggs, Qatar informed Squire Patton Boggs that it did not intend to assert any privilege over the document, which Squire Patton Boggs then promptly produced to Broidy.  Accordingly, there is no dispute regarding this document in need of resolution.

## CONCLUSION

For the foregoing reasons, this Court should deny Broidy's Cross-Motion to Compel.  In connection with its consideration of the motion, moreover, the Court should (i) order Broidy to file his June 19, 2018 deposition of Mr. Allaham under seal for *in camera* review; and (ii) order Broidy to produce Mr. Allaham's affidavit accompanying his 2018 Settlement Agreement, or in the alternative, confirm that Qatar may share the affidavit with the Court without waiving its sovereign immunity.

Dated: August 30, 2023      Respectfully submitted,

            */s/ Alexander A. Berengaut*
            Alexander A. Berengaut (D.C. Bar No. 989222)
            David M. Zionts (D.C. Bar No. 995170)
            Amber M. Charles (D.C. Bar No. 1035226)
            COVINGTON & BURLING LLP
            One CityCenter
            850 Tenth St., N.W.
            Washington, DC 20001-4956
            (202) 662-6000
            aberengaut@cov.com
            dzionts@cov.com
            acharles@cov.com

            Mark P. Gimbel
            (*pro hac vice* application pending)
            COVINGTON & BURLING LLP
            The New York Times Building
            620 Eighth Avenue
            New York, NY 10018-1405
            (212) 841-1000
            mgimbel@cov.com

            *Counsel for State of Qatar*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I caused a true and correct copy of the foregoing Sur-Reply in Opposition to Broidy's Cross-Motion to Compel to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: August 30, 2023

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*