# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

            Plaintiffs,

     v.

NICHOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

            Defendants.

Civil Action No. 1:19-cv-00150-DLF

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO COMPEL
## FORENSIC EXAMINATIONS

KASOWITZ BENSON TORRES LLP
Daniel R. Benson
Sarah Gibbs Leivick
Sarmad M. Khojasteh (*pro hac vice* forthcoming)
Henry B. Brownstein
David Tyler Adams (*pro hac vice* forthcoming)

*Counsel for Plaintiffs Broidy Capital*
*Management, LLC and Elliott Broidy*

Dated: September 1, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................. 5

     A.     Newly Produced Documents from Mr. Allaham and Others................................ 5

     B.     Plaintiffs' Counsel's Correspondence with Defendants' Counsel........................ 8

ARGUMENT ..................................................................................................................... 11

I.     Forensic Examination is Mandated to Reveal and Remedy Discovery
Noncompliance .......................................................................................................... 11

II.     Forensic Collection and Examination of ESI from Counsel is Warranted ..................... 14

III.     Plaintiffs' Proposed Protocol .......................................................................................... 14

CONCLUSION ................................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advante Int'l Corp. v. Mintel Learning Tech.*,
No. C 05-01022 JW (RS), 2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) ............................ 13

*Ameriwood Indus., Inc. v. Liberman*,
No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) ............................ 13, 15

*Cenveo Corp. v. Slater*,
No. CIV.A.06-CV-2632, 2007 WL 442387 (E.D. Pa. Jan. 31, 2007) ................................... 15

*Covad Commc'ns Co. v. Revonet, Inc.*,
258 F.R.D. 5 (D.D.C. 2009) ............................................................................................... 12

*Delta T, LLC v. Williams*,
337 F.R.D. 395 (S.D. Ohio 2021) ..................................................................................... 13

*Ellis v. Toshiba Am. Info. Sys., Inc.*,
218 Cal. App. 4th 853 (2013), *as modified* (Aug. 14, 2013), *as modified on
denial of reh'g* (Sept. 10, 2013) ...................................................................................... 14

*Ferron v. Search Cactus, L.L. C.*,
No. 2:06–CV–327, 2008 WL 1902499 (S.D. Ohio April 28, 2008) ..................................... 13

*Genworth Fin. Wealth Mgmt., Inc. v. McMullan*,
267 F.R.D. 443 (D. Conn. 2010) ...................................................................................... 12

*Gerritsen v. de la Madrid Hurtado*,
819 F.2d 1511 (9th Cir. 1987) ........................................................................................... 4

*Koosharem Corp. v. Spec Pers., LLC*,
No. CIVA 608-583-HFF-WMC, 2008 WL 4458864 (D.S.C. Sept. 29, 2008) ..................... 12

*Peskoff v. Faber*,
244 F.R.D. 54 (D.D.C. 2007) ............................................................................................ 12

*Tingle v. Hebert*,
No. CV 15-626-JWD-EWD, 2018 WL 1726667 (M.D. La. Apr. 10, 2018) ........................ 12

*In re Uranium Antitrust Litig.*,
32 Fed. R. Serv. 2d 635 (D.D.C. 1980) ............................................................................ 14

*White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc.*,
No. CIV.A. 07-2319-CM, 2009 WL 722056 (D. Kan. Mar. 18, 2009) ................................ 13

**Statutes**

Foreign Agents Registration Act ......................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 26(b)(5)(A) ...........................................................................................................18

Plaintiffs Broidy Capital Management, LLC and Elliott Broidy respectfully submit this memorandum of law in support of their motion, pursuant to Rule 37 of the Federal Rules of Civil Procedure, to compel forensic examinations of defendants and their respective counsel, as well as counsel to limited intervenor State of Qatar and now-dismissed defendant Joseph Allaham.[1]

## PRELIMINARY STATEMENT

As the newly discovered evidence plaintiffs are still reviewing indicates, Qatar, through its U.S. counsel, has gone to extraordinary lengths to frustrate discovery from the defendants and hide the truth in this matter—and a forensic examination by a forensics firm of the type numerous courts have ordered is plainly called for.  If Qatar's lawyers and defendants and their lawyers conducted discovery with due respect for their obligations under U.S. law, they should have no objection to—they should welcome—such a forensic examination, which can be conducted swiftly and with due regard for applicable privileges, to confirm that they have done so.

Set forth below, as the Court requested, is a description of the scope of the requested investigation and the manner in which plaintiffs seek to conduct it, along with supporting authority.

Qatar, in the first paragraph of its sur-reply on plaintiffs' motion to compel, tries to change the subject by asserting that plaintiffs are really trying to "adjudicate the merits," and "transform a dispute over privilege into a vehicle for conducting a plenary trial," of their claims against Qatar.  That plainly is not so.  No one disputes that Qatar, as a foreign sovereign, is entitled to the protection of privileges and immunities to the extent they apply.  And, as this

---

[1] Submitted herewith in further support of plaintiffs' motion is the Declaration of Daniel R. Benson, dated September 1, 2023 ("Benson Decl.").

Court has acknowledged, including in its August 25, 2023 Order, Qatar, as a sovereign nation, is owed "respect."  But so is this Court and so is the U.S. legal system—particularly from U.S. lawyers, no matter whom they represent.

Qatar's so-called "Settlement Agreement" with Mr. Allaham, a (now former) defendant is, as plaintiffs have shown, one way Qatar sought to hide the truth—and in and of itself justifies the forensic examinations plaintiffs seek.  Under that agreement, Qatar—while explicitly disclaiming in the agreement that they ever engaged Mr. Allaham to work for them—made retroactive claims of "ownership" over and the right to the "return" of all documents in Mr. Allaham's hands relating to that nonexistent engagement, inserted conclusory self-serving language in Whereas clauses in the agreement supposedly exonerating themselves and agreed to pay him over a million dollars (with hundreds of thousands more to come) to provide them with an affidavit they drafted.

Qatar's efforts to control and limit discovery went far beyond Mr. Allaham.  Similar such provisions—whereby Qatar claims "ownership" over and requires the "return" of documents—appear in agreements filed under the Foreign Agents Registration Act by defendant Stonington Strategies and numerous other Qatari agents whom plaintiffs have subpoenaed.  Recognizing that the Court will address the subpoenaed nonparties on a separate track, plaintiffs note that they will respond separately to the misleading August 25, 2023 email to the Court from their counsel, David Gringer—who in the past has represented Qatar directly and, like defendants' counsel, is on Qatar's payroll—but note that their responses to the subpoenas have entailed many of the

same Qatar-related problems—delay and obstruction—associated with discovery by the defendants.[2]

Qatar's disingenuous too-cute-by-half efforts in their sur-reply to pass this agreement off as unexceptional are unavailing on their face and only confirm the need for a forensic examination.  The document—which, by its terms, qualifies as one of the documents "owned" by Qatar—was never produced to plaintiffs until Mr. Allaham recently provided it to plaintiffs in connection with his settlement with plaintiffs.  Nor was the July 2018 Email correspondence between Mr. Allaham's counsel and counsel for Jamal Benomar, another of Qatar's agents (an email which confirms, among other things, that Qatar had no legitimate expectation of confidentiality with Mr. Allaham) ever produced to plaintiffs until Mr. Allaham recently provided it.  Nor, for that matter, were any of the other newly disclosed responsive documents discussed *infra* § I.A produced.  Plaintiffs are just beginning their review of never-before produced documents provided by Mr. Allaham, but, as discussed below, have already located documents that further evidence Qatar and its counsel's control over and obstruction of discovery.

Plaintiffs therefore seek, by this motion, an investigation of how and why discoverable documents have been withheld for years through various stratagems—including, among other things, the extent to which the defendants (and third parties) have failed to comply with discovery based on Qatar's manufactured assertions of  "ownership" or rights to the "return" of documents, as well as meritless assertions of Vienna Convention protection over documents Qatar represented it had not even reviewed, resulting not only in months of delay from the stay

---

[2] In one example of the misleading nature of his email, Mr. Gringer brags that his 23 clients have produced over 51,000 pages of documents—but fails to note that 96% of those pages, over 49,000, consist of redacted telephone call records.

Qatar obtained in the Court of Appeals but also in the protracted process by which it has produced a succession of purported privilege logs in this Court.  To take one example, Qatar asserts that documents in the hands of defendants relating to its gifts of Patek Philippe and Rolex watches relate to its "public diplomacy"—a term that itself gives the game away—are "inviolable" under the Vienna Convention.  That assertion with respect to documents whose subject matter is in no way confidential stretches Vienna Convention "inviolability" completely beyond any reasonable bounds.

In fact, neither the Vienna Convention nor anything else authorizes Qatar or its lawyers or agents to interfere with the internal affairs of the United States by engaging in wrongful acts to suppress criticism of Qatar:

> Wrongful acts committed by an official or employee of a Mexican consulate within the United States to suppress criticism of Mexico within this country constitute an interference with the United States' internal affairs because these acts impair the citizenry's ability to promote self-government through robust discourse concerning issues of public import. Therefore, the acts of the two consuls general and the vice consul alleged in the complaint are not "within the limits permitted by international law" and thus are not consular functions as defined in Article 5(a) [of the Vienna Convention on Consular Relations].

*Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1516-17 (9th Cir. 1987) (observing that "[p]arallel provisions in the Vienna Convention on Diplomatic Relations support this reading of the treaty") (citation omitted).

Nor, of course, does the Vienna Convention authorize Qatar, much less its lawyers, to violate or cause others to violate their discovery obligations under U.S. law in order to cover up wrongful acts to suppress criticism of Qatar.  Plaintiffs respectfully submit that a forensic examination of Qatar's counsel and the defendants and their counsel is necessary here to determine the extent to which they have done so.

## BACKGROUND

**A.   Newly Produced Documents from Mr. Allaham and Others**

In connection with their cross-motion to compel, plaintiffs filed two documents they had recently received from Mr. Allaham—the December 2018 Agreement and the July 2018 Email— as well as Mr. Allaham's declaration.  Contrary to Qatar's insinuation, *see* ECF 203 at 2 ("Qatar Sur-Reply")—and unlike the affidavit they extracted from Mr. Allaham as a condition precedent to paying him over $1 million—this declaration was not a condition of any payment to Mr. Allaham.  In fact, Mr. Allaham is not being paid anything under the settlement; the only consideration for his agreeing to comply with his discovery obligations is his dismissal from this action with prejudice.

Since filing the cross-motion, plaintiffs have reviewed additional documents provided by Mr. Allaham that should long ago have been produced but were not.[3]  These include emails between Mr. Allaham and his former counsel, which provide further evidence that Qatar designed the December 2018 Agreement to manufacture a basis for Mr. Allaham to disregard plaintiffs' discovery requests and substantiate the statements in Mr. Allaham's declaration that Qatar's London counsel, Osama Abu-Dehays of Pillsbury Winthrop Shaw Pittman, was directing defendants to conceal responsive documents embarrassing to Qatar.  In a June 19, 2023 email from Eric Roman, his former counsel, to Mr. Allaham, Mr. Roman states that "Osama contacted me on Friday . . . .  He wanted to know whether these WhatsApp chats had already been produced years ago in the California case.  We checked and while a few had been, most of the WhatsApp chats relevant here had not been produced in that case.  Still confirming with Nick and with Mohammed, but that appears to be correct."  Benson Decl. Ex. 1.  Mr. Allaham

---

[3] Numerous additional documents remain to be reviewed.

responded the same day, asking, "[w]hat's the concern?" *Id.* Ex. 2 at 1.  Mr. Roman then

explained, "[f]rom our perspective, none at all.  I suppose Osama was hoping this would all be

considered a non-issue with Qatar if the materials had already been previously disclosed to

Broidy." *Id.*  In other words, Mr. Abu-Dehays hoped that he could report to Qatar that Mr.

Allaham's 2017 and 2018 WhatsApp chats collected from his phone had already been produced

in the California Action—before Qatar and Mr. Allaham entered into the December 2018

Agreement—such that he would not have to direct them not to produce the documents in this

action as well.  As it happened, however, most of Mr. Allaham's WhatsApp chats had not been

produced in the California Action—though they should have been—meaning their potential

production in this case would not be a "non-issue" to Qatar.  Plainly, Qatar did not want Mr.

Allaham's 2017 and 2018 WhatsApp chat communications—which his former counsel possessed

and had not produced—produced in this or any other action, and was instructing the attorneys

who do Qatar's bidding, including Mr. Allaham's former counsel, to rely on the sham provisions

in the December 2018 Agreement retroactively claiming Qatar ownership of Mr. Allaham's

documents as a basis to withhold production of what they admit are "relevant here." *Id.* Ex. 1.  It

is inconceivable how, "[f]rom [ArentFox Schiff's] perspective," this clear derogation of

professional responsibility caused "no [concern] at all." *Id.* Ex. 2 at 1.

Other documents provided by Mr. Allaham evidence the negotiating history of the

December 2018 Agreement—including the fact that Qatar's (now former) lead counsel in this

case, Mitchell Kamin, and Qatar agent Mr. Benomar's counsel, Abbe Lowell, demanded as a

condition precedent to the first payment to Mr. Allaham of over $1 million under the agreement,

that he provide an affidavit drafted by Messrs. Kamin and Lowell.  *See id.* Exs. 18-21.

Just last Friday, August 25, 2023, nonparty subpoena recipient Squire Patton Boggs produced a responsive March 28, 2018 communication from Dean Dilley to Mr. Muzin ("Dilley Letter") instructing him to cease all work under Stonington's consulting agreement with Qatar—which neither Mr. Muzin nor his firm Stonington produced.  *See id.* Ex. 3.  In an August 28, 2023 letter from counsel for Mr. Muzin and Stonington to plaintiffs, counsel denies any obligation to produce the Dilley Letter, stating "the letter from Mr. Dilley to Mr. Muzin was not 'an agreement between Stonington and the State of Qatar,'" but rather "was effectively a pencils-down instruction on a still operational contract," *id*. Ex. 4 at 4, and "the Stonington Defendants had no obligation to produce the Dilley letter at this juncture, which on its face is not a contract with the State of Qatar, is not related to Broidy or the alleged hack, and was written after Broidy filed his initial lawsuit."  *Id.* at 5.

Counsel's after-the-fact rationalization of Mr. Muzin's failure to produce this responsive document, however, cannot be reconciled with the fact that plaintiffs requested from Mr. Muzin "all written proposals, reports, project updates, contracts, agreements, and memoranda of understanding between [Mr. Muzin] and Qatar" and "between Stonington and Qatar." *Id.* Ex. 5, Request Nos. 1-2.  Clearly, even under a hyper-technical reading of the requests, a "pencils-down instruction on a still operational contract," as counsel describes the Dilley Letter, would qualify, if not as a "report," then as a "project update."  Second, counsel's suggestion that the Dilley Letter "is not related to Broidy or the alleged hack" is hardly credible (given that the Dilley Letter was sent to Mr. Muzin two days after plaintiffs filed the California Action) and in any event irrelevant, as Mr. Muzin was obligated and agreed to produce documents responsive to Request Nos. 1-2, regardless of counsel's arbitrary determination of what is and is not "related to Broidy or the alleged hack."  Third, counsel's suggestion that the Dilley Letter was exempted

from production because it "was written after Broidy filed his initial lawsuit" is incorrect.  To be

sure, Mr. Muzin initially objected to producing documents from after March 26, 2018—the date

plaintiffs filed the California Action.  But that objection had long been superseded by all

defendants' agreement to produce responsive documents through at least January 24, 2019.

Indeed, counsel admits as much in the same letter, as he has in prior letters, by reiterating that

"the Stonington Defendants have produced all non-privileged documents in their possession,

custody, or control that relate to Plaintiffs or the alleged hack and are subject to production

through *February 11, 2019*." *Id.* Ex. 4 at 5 (emphasis added).

**B.**     **Plaintiffs' Counsel's Correspondence with Defendants' Counsel**

On July 25, 2023, plaintiffs' counsel asked Mr. Allaham's counsel whether, in view of

the fact that plaintiffs had not seen any documents in Mr. Allaham's production responsive to

their requests for "documents related to any agreements" with Qatar, "Mr. Allaham represent[s]

that no such documents exist."  *Id.* Ex. 6.  Mr. Allaham's counsel responded, on August 4, 2023,

that "Allaham is continuing its review of previously omitted documents and will produce

materials, if any, that are non-privileged and responsive subject to any assertion of privilege or

immunity by Qatar."  *Id.* Ex. 7 at 2.

On July 26, 2023, plaintiffs' counsel asked Mr. Allaham's counsel, among other things,

whether "Mr. Allaham ever sign[ed] an agreement with Qatar or any Qatari interest that

contained contract language requiring or contemplating the return and/or deletion of Qatar-

related work product or communications, including language similar to that in other agreements

with Qatari agents."  *Id.* Ex. 8 at 3.  In an August 4, 2023 communication, Mr. Allaham's

counsel did not respond to that question, instead stating that "we must object to any accusation,

or clear insinuation, that we are engaging in, or have previously engaged in, conduct that clearly

would violate our ethical obligations as admitted attorneys and officers of the Court."  *Id.* at 1.

On August 11, 2023, plaintiffs' counsel, noting that Mr. Allaham's counsel had failed to

respond, asked the question again.  *Id.*  Mr. Allaham's counsel replied on August 16, 2023 that

counsel for Mr. Allaham had received the August 11, 2023 email and "will respond substantively

soon."  *Id.* Ex. 9 at 1.  Plaintiffs never received the promised response.

     Similarly, in a July 26, 2023 letter, plaintiffs' counsel noted to Mr. Allaham's counsel,

that "Mr. Allaham's productions largely are devoid of documents relating to, and

communications with or about, Jamal Benomar," and that "[d]espite receiving millions of dollars

from BlueFort for his work for Qatar, Mr. Allaham's productions do not include any agreements

with BlueFort and contain virtually no communications with or concerning BlueFort or any of its

executives, officers, employees, consultants, or representatives."  *Id.* Ex. 10 at 1.  Mr. Allaham's

counsel  responded on August 4, 2023 that "[Mr.] Allaham is continuing its review of previously

omitted documents and to the extent that we identify any additional responsive, non-privileged

documents, they will be produced subject to [Mr.] Allaham's Objections and Responses to

Plaintiffs' First Requests for Production of Documents to Defendant Joseph Allaham, dated

December 22, 2021; non-party Lexington Strategies' Objections and Responses to Plaintiffs'

Subpoena for Production of Documents, dated February 23, 2022; the Amended Protective Order

so-ordered by the Court on June 2, 2022 (ECF No. 150); and after Qatar's review, pursuant to

Court's May 3, 2023 Order."  *Id.* Ex. 7 at 2.

     Plaintiffs asked similar questions of counsel for defendants Nicholas Muzin and

Stonington.  In a July 20, 2023 letter, plaintiffs' counsel asked Muzin/Stonington's counsel

whether, in view of the fact that plaintiffs had not seen any documents in their production

responsive to their requests for "documents related to any agreements" with Qatar, they

"represent that no such documents exist." *Id. Ex.* 11 at 2.  Counsel did not directly answer,

instead stating on August 3, 2023 that "[a]ny agreements between Stonington [and/or Mr.

Muzin] and the State of Qatar or on behalf of Qatar were publicly disclosed pursuant to FARA

and are available through the following webpage: https://efile.fara.gov/ords/fara/f?p=1235:10,"

adding that "copies of these agreements were produced to Plaintiffs at SSLLC_00000009,

SSLLC_000000023, SSLLC_00000211, SSLLC_00000213, and SSLLC_00000222." *Id.* Ex. 12

at 2.

In response to plaintiffs' counsel's July 26, 2023 questions to Muzin/Stonington's

counsel concerning documents relating to Mr. Benomar or BlueFort, *id.* Ex. 13 at 1, counsel

responded that "Stonington [and Mr. Muzin] ha[ve] produced *all* documents in [their]

possession, custody, or control that relate to Plaintiff or the alleged hack through February 11,

2019," and "[t]o the extent that [plaintiffs] are seeking documents (i) 'relating to, and

communications with or about, Jamal Benomar,' [or] (ii) 'relating to, or communications about,

BlueFort Public Relations' . . . that do *not* relate to Plaintiffs or the alleged hack, that request

is . . . unduly burdensome . . . [and] highly irrelevant." *Id.* Ex. 12 at 3.

Plaintiffs raised these questions with counsel for defendant Gregory Howard.  In a July

21, 2023 letter to Mr. Howard's counsel, plaintiffs' counsel asked whether, in view of the fact

that plaintiffs had not seen any documents in Mr. Howard's production responsive to their

requests for "documents related to any agreements" with Qatar, "Mr. Howard represent[s] that

no such documents exist." *Id.* Ex. 14 at 1.  In response, in a July 28, 2023 letter, Mr. Howard's

counsel did not respond other than by stating that Mr. Howard "possesses" no such documents.

*Id.* Ex. 15 at 2.

Also on August 11, 2023, plaintiffs' counsel asked Mr. Howard's counsel to "confirm that Mr. Howard has produced all documents and communications concerning any payment by any then-current or former Qatari agent, whether directly or indirectly, or whether proposed, contemplated, mentioned, requested, or transmitted, from June 1, 2017 through January 24, 2019, and will produce all such documents and communications through December 31, 2019." *Id.* Ex. 16 at 2.  Mr. Howard's counsel replied on August 21, 2023 that "[t]his request is improper since it goes beyond the document requests made to Howard in Plaintiffs' RFPs," and added that "[w]e nonetheless can confirm for you that Howard has produced all non-privileged documents in his possession, custody, or control through the evening of February 11, 2019, that are responsive to Plaintiffs' RFPs."  *Id.* Ex. 17 at 3.[4]

Again, among other things, counsel's responses beg the question whether documents exist that had been within the defendants' "possession, custody or control," but are no longer— because, say, they were transferred to Qatar or Qatar's counsel or otherwise withheld pursuant to a claim of ownership by Qatar.

## **ARGUMENT**

## I.     **Forensic Examination is Mandated to Reveal and Remedy Discovery Noncompliance**

It is apparent that Qatar and its counsel have orchestrated a widespread and longstanding scheme to frustrate discovery and conceal evidence.  It is also apparent that Qatar and its counsel

---

[4] Moreover, Defendant Howard never preserved, let alone produced, any documents from his three work email accounts—even though he had access to all three accounts as of July 20, 2018, when he was first subpoenaed, and had access to two of those accounts as of Feb 11, 2019, when his counsel supposedly did the full forensic collection.  Plaintiffs subpoenaed all three of his former employers, two of whom produced no emails and the other produced only a modest amount.

have instructed defendants and their counsel to do so—and with one very recent exception, they all have followed Qatar's instructions.  It is difficult to conceive of a situation more warranting a forensic examination than this one to uncover the nature and extent of the concealment.

Thus, courts, including in this District, regularly grant motions to compel forensic collection and examination of electronically stored information ("ESI") where, as here, there is evidence that parties are "intentionally hiding things or failing to take appropriate steps to respond to discovery."  *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 13 (D.D.C. 2009) ("There is certainly authority for the proposition that if a party's e-mail production suggests that she is intentionally hiding things, or failing to take appropriate steps to respond to discovery, a forensic examination may be appropriate."); *see also Peskoff v. Faber*, 244 F.R.D. 54, 63 (D.D.C. 2007) (ordering court supervision of process to obtain proposals from qualified forensic computer technicians where moving party raised questions as to the completion and sufficiency of the searches performed); *Tingle v. Hebert*, No. CV 15-626-JWD-EWD, 2018 WL 1726667, at *6 (M.D. La. Apr. 10, 2018) (noting that courts allow forensic examinations "where the moving party has demonstrated that its opponent has defaulted in its discovery obligations by unwillingness or failure to produce relevant information by more conventional means"); *Koosharem Corp. v. Spec Pers., LLC*, No. CIVA 608-583-HFF-WMC, 2008 WL 4458864, at *1 (D.S.C. Sept. 29, 2008) (ordering forensic examination of defendant's business computers).

In particular, where, as here, the moving party produces responsive documents that the opposing parties have failed to produce—such as the December 2018 Agreement—courts have held that forensic examinations are warranted.  *See, e.g.*, *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443 (D. Conn. 2010) (ordering forensic "inspection, copying, and imaging" of defendant's computer equipment and personal devices where third-party subpoena

recipient produced a responsive email that defendant failed to produce and defendant's discovery conduct "suggests an end run in furtherance of efforts by the defendant to deny the discovery to which the Plaintiff is entitled"); *Ameriwood Indus., Inc. v. Liberman*, No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) (where third-party subpoena recipient produced a responsive email that defendants failed to produce, court found "that other deleted or active versions of emails may yet exist on defendants' computers" and therefore ordered plaintiff to select a computer forensics expert of its choice to undertake a three-step imaging, recovery, and disclosure process).

Indeed, courts grant motions for forensic examination even absent clear evidence of intentional suppression of evidence, as plaintiffs have provided here, where the moving party merely points to "discrepancies or inconsistencies in a response to a discovery request or the responding party's unwillingness or failure to produce relevant information." *White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc.*, No. CIV.A. 07-2319-CM, 2009 WL 722056 (D. Kan. Mar. 18, 2009) (allowing forensic examination where plaintiff's expert "noted discrepancies as to the creation date of [an] email attachment . . . and defendants have not adequately explained the discrepancies"); *see also Advante Int'l Corp. v. Mintel Learning Tech.*, No. C 05-01022 JW (RS), 2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) (ordering forensic examination of defendant where "serious questions exist both as to the reliability and the completeness of materials produced in discovery by [defendant]"); *Delta T, LLC v. Williams*, 337 F.R.D. 395 (S.D. Ohio 2021) (ordering forensic inspection because "Defendants' own representations contradicted their position that they have nothing left to produce" where Defendants admitted the existence of "cease and desist letters" and a "distribution agreement" but "they have failed to produce these documents"); *Ferron v. Search Cactus, L.L. C.,* No. 2:06–

13

CV–327, 2008 WL 1902499, at *2 (S.D. Ohio April 28, 2008) (allowing plaintiff's forensic computer expert to mirror image plaintiff's computer systems' hard drives based upon plaintiff's failure to place sufficient litigation hold and otherwise to produce relevant information).

## II.      Forensic Collection and Examination of ESI from Counsel is Warranted

Forensic examination of counsel is imperative here given counsel's role in designing and implementing the scheme to circumvent discovery.  Under such circumstances, courts authorize requests for discovery from attorneys.  *See, e.g.*, *In re Uranium Antitrust Litig.*, 32 Fed. R. Serv. 2d 635 (D.D.C. 1980) (granting plaintiffs' request for discovery in antitrust case from subpoenaed law firm that represented the "offspring of the alleged conspiracy or cartel" where "law firm [w]as a potential depository of documents relevant to this action which are otherwise unavailable to [plaintiff] because of the restrictive attitudes taken toward discovery by certain foreign governments and certain defendants, their officers and employees and their counsel"); *Ellis v. Toshiba Am. Info. Sys., Inc.*, 218 Cal. App. 4th 853 (2013), *as modified* (Aug. 14, 2013), *as modified on denial of reh'g* (Sept. 10, 2013) (ordering forensic inspection of plaintiffs' attorney's computer and hard drive where attorney "was not credible" and where there was evidence that she had "concealed or destroyed evidence");

## III.     Plaintiffs' Proposed Protocol

Plaintiffs propose a focused digital forensic investigation by a forensics firm selected by plaintiffs and monitored by a forensics firm appointed by the Court, with the primary objective of identifying evidence indicating data being deleted, modified, or not included in collection despite being potentially responsive to discovery requests.  Digital forensic experts would independently inspect the following:

• Machine images and other forensic collections, as well as the contents stored on the e-discovery systems, for any signs of intentional file removal or modification within scope of this specific action.

• Audit records and access logs for the systems used for data collection, storage, and review, as well as in-depth analysis of specific files where metadata indicates potential improper handling or tampering.

• Audit records and access logs for the e-discovery systems used by Qatar's counsel and counsel for Defendants to determine if potentially responsive materials were withheld from production, segregated, or removed from production after being reviewed and/or deleted from a given e-discovery system.

Any findings that suggest or indicate irregularities or improprieties, such as deletion or modification of documents, will be identified and detailed for the Court.

The forensics experts would proceed with their forensic examination in accordance with the following "imaging, recovery, and disclosure" protocol, which mirrors and builds upon similar protocols adopted by a number of courts[5]:

**Imaging Step:** The computer forensics expert will execute a confidentiality agreement agreed to by the parties and sign a copy of and abide by the protective order in place in this action.  The computer forensics expert then will produce mirror images of all computers, portable or detachable hard drives, e-discovery systems, and personal devices used by each

---

[5] *See, e.g.*, *Ameriwood Indus., Inc. v. Liberman*, No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) (granting plaintiff's motion to have computer forensics expert of its choice undertake a three-step imaging, recovery, and disclosure process); *see also Cenveo Corp. v. Slater*, No. CIV.A.06-CV-2632, 2007 WL 442387 (E.D. Pa. Jan. 31, 2007) (ordering parties to use forensic examination protocol described in *Ameriwood*).

defendant, and used by counsel[6] for each defendant and Qatar (each a "Forensic Exam Subject") in any way in connection with this matter, including but not limited to any computer, portable or detachable hard drives, or personal devices in their homes and offices.

The Forensic Exam Subjects will make available to the computer forensics expert, at their places of business or residences, and at mutually agreeable times, all of the computer equipment/systems described above.  The computer forensics expert will use its best efforts to avoid unnecessarily disrupting the normal activities or business operations of the Forensic Exam Subjects while inspecting, copying, and imaging each Forensic Exam Subject's computer equipment/systems.  The computer forensics expert may not remove any Forensic Exam Subject's computer equipment/systems from any Forensic Exam Subject's premises.  Moreover, only the computer forensics expert and its employees assigned to this project would be authorized to inspect, or otherwise handle such equipment.  No other employee, agent, or representative of Plaintiffs, or their counsel, will inspect or otherwise handle the equipment/systems produced.  The computer forensics expert also will maintain all information in the strictest confidence.

*Recovery Step:*  Once the computer forensics expert has created copies and images of each Forensic Exam Subject's computer equipment/systems, it shall independently (i) evaluate computer equipment/systems produced by each Forensic Exam Subject for any signs of intentional file removal or modification within the scope of this specific case; (ii) audit records and access logs for the systems used for data collection, storage, and review, as analyze specific files where metadata indicates potential improper handling or tampering; and (iii) audit records

---

[6] "Counsel" shall include all attorneys, paralegals, administrative staff, professional staff, technical support staff, agents, contractors, etc. at the firms representing defendants and Qatar.

and access logs for the e-discovery systems used by each defendant and counsel for each defendant and Qatar to determine if potentially responsive materials were withheld from production, segregated or removed from production after being reviewed, and/or deleted from a given e-discovery system.

The computer forensics expert shall also use agreed upon search terms to isolate communications related to potentially responsive data, recover from the mirror images relevant documents and electronic communications between and among persons involved in the matter during the time in question.  The computer forensics expert shall provide the recovered documents in a reasonably convenient and searchable form to each Forensic Exam Subject's counsel, along with, to the extent possible, the information showing when any files were created, accessed, copied, or deleted, and the information about the deletion and the contents of deleted files that could not be recovered. The computer forensics expert shall also provide Plaintiffs notice of when the documents and data were provided to each Forensic Exam Subject's counsel.

Within ten days of the computer forensics expert's inspection, copying, imaging, auditing, and analyzing of each item of computer equipment/systems produced by each Forensic Exam Subject, the computer forensics expert shall provide the Court and the parties with a report describing the computer equipment/systems each Forensic Exam Subject produced and the computer forensics expert's actions with respect to each piece of the equipment/system[7], and

---

[7] This report shall include a detailed description of each piece of computer equipment/system inspected, copied, or imaged by the computer forensics expert, including the name of the manufacturer of the equipment and its model number and serial number; the name of the hard drive manufacturer and its model number and serial number; and the name of any network card manufacturer and its model number, serial number, and the media access control address wherever possible.

detailing any findings that suggest or indicate the existence of irregularities or improprieties, such as deletion or modification of documents.

*Disclosure Step:*  Within twenty days of the receipt of the recovered documents and data, each Forensic Exam Subject's counsel shall review the records for privilege and responsiveness, and send to Plaintiffs' counsel all responsive and non-privileged documents and information, in addition to a privilege log, which claims each privilege expressly and describes "the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."  Fed. R. Civ. P. 26(b)(5)(A).  Thereafter, each Forensic Exam Subject shall then produce to Plaintiffs all properly discoverable documents and data, as well as a privilege log, as described above.  Once Plaintiffs have reviewed the documents produced by each Forensic Exam Subject, as well as the privilege log, if Plaintiffs raise a dispute as to any claim of privilege, or believe that there are further relevant documents, the parties shall submit the disputed documents and logs for the Court to view *in camera* and determine whether the documents must be produced.

If the initial production and analysis determines that additional searches are necessary, any party may petition the Court to revisit the scope of the examination.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant plaintiffs' motion to compel forensic examinations of Qatar's counsel, defendants and their respective counsel, as well as former counsel to Joseph Allaham.

Dated: September 1, 2023

Respectfully submitted,

18

KASOWITZ BENSON TORRES LLP

By: */s/ Daniel R. Benson*
Daniel R. Benson (*pro hac vice*)
Sarah G. Leivick (*pro hac vice*)
Sarmad M. Khojasteh (*pro hac vice*
forthcoming)
David Tyler Adams (*pro hac vice* forthcoming)
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
dbenson@kasowitz.com
sleivick@kasowitz.com
skhojasteh@kasowitz.com
dadams@kasowitz.com

Henry B. Brownstein
D.C. Bar No. 1026042
1401 New York Avenue, Suite 401
Washington, D.C. 20005
Tel.: (202) 760-3400
hbrownstein@kasowitz.com

*Counsel for Plaintiffs Broidy Capital
Management and Elliott Broidy*