# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

               Plaintiffs,

     v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

               Defendants.

Civil Action No. 1:19-cv-00150-DLF

## STATE OF QATAR'S OPPOSITION TO
## BROIDY'S MOTION TO COMPEL FORENSIC EXAMINATIONS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.     Broidy's Original Basis for Requesting a Forensic Examination Has Been
Revealed to Be Non-Credible and Misleading. ................................................ 3

II.    Broidy Fails to Establish Any Discovery Misconduct by Qatar and Its Counsel. .............. 8

     A.     Broidy Fails to Show Any Misconduct in Connection with Qatar's Limited
Intervention in This Proceeding. ............................................................. 9

     B.     Broidy Fails to Show Any Misconduct Outside the Scope of Qatar's
Limited Intervention. ........................................................................... 11

III.    Broidy's Request for a Forensic Examination of Qatar's Counsel Is Equally
Unfounded as a Matter of Law. ...................................................................... 14

IV.    The Forensic Examination Broidy Requests Would Violate Qatar's Sovereign
Immunity. ................................................................................................... 18

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                               **Page(s)**

*Al Qari v. Am. Steamship Co.*,
   No. 21-10650, 2023 WL 5202311 (E.D. Mich. Aug. 14, 2023)..............................................12

*In re: Am. Med. Sys., Inc.*,
   No. 2325, 2016 WL 6666890 (S.D.W. Va. Nov. 10, 2016) ...........................................17, 18

*Basil v. CC Servs., Inc.*,
   116 F. Supp. 3d 880 (N.D. Ill. 2015) ....................................................................................12

*Bethea v. Comcast*,
   218 F.R.D. 328 (D.D.C. 2003)...............................................................................................15

*Broidy Cap. Mgmt. LLC v. Muzin*,
   61 F.4th 984 (D.C. Cir. 2023)..........................................................................................18, 19

*Broidy Cap. Mgmt. LLC v. Muzin (Muzin I)*,
   12 F.4th 789 (D.C. Cir. 2021) ..................................................................................18, 23, 24

*Doe I v. Exxon Mobil Corp.*,
   No. 01-1357, 2021 WL 1910892 (D.D.C. May 12, 2021).......................................................6

*Ellis v. Toshiba Am. Info. Sys. Inc.*,
   218 Cal. App. 4th 853 (2013) ................................................................................................14

*Exec. Air Taxi Corp. v. City of Bismarck, N.D.*,
   518 F.3d 562 (8th Cir. 2008) ................................................................................................17

*Ferron v. Search Cactus, L.L.C.*,
   No. 06–327, 2008 WL 1902499 (S.D. Ohio April 28, 2008) .................................................15

*John B. v. Goetz*,
   531 F.3d 448 (6th Cir. 2008) ................................................................................................16

*Li v. Li*,
   No. 20-2008, 2023 WL 2784872 (D.D.C. Apr. 5, 2023), *appeal docketed*, No.
   23-7052 (May 3, 2023) ..........................................................................................................20

*Mare Shipping Inc. v. Squire Sanders (US) LLP*,
   574 F. App'x 6 (2d Cir. 2014) ...............................................................................................21

*Mohammadi v. Islamic Republic of Iran*,
   947 F. Supp. 2d 48 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015)..................................20

*Odhiambo v. Republic of Kenya*,
  930 F. Supp. 2d 17 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014),
  *abrogated on other grounds by OBB Personenverkehr AG v. Sachs*, 577 U.S.
  27 (2015) ................................................................................................................20

*Peskoff v. Faber*,
  244 F.R.D. 54 (D.D.C. 2007) ...............................................................................15

*Quinn v. City of Vancouver*,
  No. C17-5969, 2021 WL 1170375 (W.D. Wash. Mar. 29, 2021) ..........................15

*Republic of Argentina v. NML Cap., Ltd.*,
  573 U.S. 134 (2014), 2014 WL 827994 ................................................................24

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*,
  376 F.3d 79 (2d Cir. 2004).....................................................................................21

*Sears Authorized Hometown Stores, LLC v. Lynn Retail, Inc.*,
  2023 WL 317625 (S.D. Ind. Jan. 19, 2023) .............................................................4

*Strange v. Islamic Republic of Iran*,
  No. 14-0435, 2016 WL 10770678 (D.D.C. May 6, 2016).....................................20

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264, 2022 WL 17725732 ........................................................................22

*In re Uranium Antitrust Litig.*,
  No. 79-0525, 1980 WL 324452 (D.D.C. Dec. 17, 1980)..................................14, 15

*Weixum v. Xilai*,
  568 F. Supp. 2d 35 (D.D.C. 2008) .........................................................................22

*XTO Energy, Inc. v. ATD, LLC*,
  No. 14-1021, 2016 WL 1730171 (D.N.M. Apr. 1, 2016) ......................................18

*Ye v. Zemin*,
  383 F.3d 620 (7th Cir. 2004) .................................................................................22

**Statutes**

28 U.S.C. § 1604...........................................................................................................18

**Other Authorities**

7A Corpus Juris Secundum Attorney & Client § 346 ....................................................23

D.C. Bar Ethics Opinion 333 (Dec. 2005) ....................................................................23

Fed. R. Civ. P. 19(a)(1)(B) ...........................................................................................22

Fed. R. Civ. P. 37.................................................................................................................15

Hazel Fox, QC & Philippa Webb, The Law of State Immunity (3d ed. 2015).................22, 23

Ingrid Delupis, International Law and the Independent State (1974) ...........................23

## INTRODUCTION

Broidy's initial extraordinary request to conduct a forensic examination relied extensively on Mr. Allaham's August 19, 2023 declaration to justify the unprecedented relief Broidy seeks. The credibility of that dubious declaration is now in tatters — its assertions contradicted by ***three*** previous sworn statements made by Mr. Allaham under penalty of perjury.  Instead of attempting to rehabilitate Mr. Allaham's August 2023 declaration or to explain the glaring inconsistencies between it and his past statements in his recent filing, Broidy barely mentions the declaration, all but abandoning the original justification for his unusual request.  Instead, he now pivots to asserting that a variety of different discovery grievances and privileged communications between Mr. Allaham and his former counsel justify the intrusive relief Broidy seeks: a forensic examination of "Qatar's counsel."  They do not.

Despite Broidy's best effort to repackage his motion for a forensic examination, the request continues to fail, both on the facts and on the law.  None of the exhibits he has submitted even addresses, let alone impugns, the conduct of Qatar or its counsel in the limited capacity in which Qatar has appeared before the Court: to assert Qatar's sovereign privileges and immunities.  Nor does Broidy's submission evidence any other imagined misconduct by Qatar or its counsel. Indeed, Broidy does not even attempt to defend the one allegation he previously raised against Qatar's counsel of record in this proceeding: the false assertion in the August 2023 declaration that Mr. Allaham's documents from 2017–2018 were not searched at the direction of Qatar's counsel. If anything is "shocking" here, it is the extent to which Broidy's counsel was willing to make serious allegations of misconduct that have proven completely unfounded without even conducting minimal investigation.

Broidy's motion is not only lacking any factual basis, but is also incoherent and unjustified as a matter of law.  None of the cases cited by Broidy would justify any kind of "forensic

examination" of counsel to a *party* that allegedly violated its discovery obligations—let alone the absurdly unreasonable protocol that Broidy proposes for a *non-party* in any sense relevant to the present motion. Qatar is not a plaintiff or defendant in this case, and it has intervened in a limited capacity for the sole purpose of asserting its privileges and immunities without waiver of its sovereign immunity. Broidy may disagree with Qatar's view of the scope of its privileges and immunities, but taking a good-faith legal position in an unsettled area of law is not misconduct. That is presumably why Broidy's motion focuses on alleged actions by Qatar that have nothing to do with its limited intervention. Indeed, Broidy's lead example — that Qatar purportedly "sought to hide the truth" through "Qatar's so-called 'Settlement Agreement' with Mr. Allaham" (Pls.' Mot. ("Mot."),[1] ECF No. 207-1 at 2) — pre-dates this case itself.

There is also an obvious mismatch between the relief Broidy seeks as to Qatar's counsel and its supposed justification. The whole premise of Broidy's motion is that a forensic examination of counsel is necessary to ensure compliance with discovery obligations owed by the party that counsel represents. That is presumably why Broidy proposes that his examination would hunt for documents "potentially responsive to discovery requests." *Id.* at 14; Pls.' Proposed Order ("Proposed Order"), ECF No. 206-24 at 1. But Broidy does not and could not allege that Qatar has any obligation to produce documents responsive to discovery requests, because Qatar's immunity indisputably includes protection against being subject to discovery. Since Qatar is not and could not be subject to discovery, there is no conceivable basis as a matter of law to subject Qatar's *counsel* to a forensic examination to search for documents that Broidy asserts are responsive to *someone else*'s discovery obligations.

---

[1] Broidy filed a corrected memorandum on September 5, ECF No. 207-1, without accompanying exhibits. This opposition brief accordingly cites the corrected version of Broidy's memorandum (ECF No. 207-1) and the exhibits that accompanied his original memorandum (ECF No. 206).

These myriad factual and legal deficiencies are reason enough to deny Broidy's motion. But there are also significant additional sovereign immunity barriers that preclude Broidy's request.  Foreign countries cannot appear in U.S. courts directly; they require the assistance of U.S. law firms admitted to practice in the relevant jurisdiction to assert and defend their sovereign immunity.  If civil litigants could simply demand a foreign sovereign's client files from their law firm through a motion for forensic examination, the protections of the Foreign Sovereign Immunities Act would be substantially undermined.  These and other sovereign immunity protections provide additional reasons why the Court should reject Broidy's motion, but the Court need not even reach these important issues to conclude that Broidy's motion is utterly without basis and should be denied.

## **ARGUMENT**

### I.  **Broidy's Original Basis for Requesting a Forensic Examination Has Been Revealed to Be Non-Credible and Misleading.**

The original basis for Broidy's request for a forensic examination was the purported "three shocking documents" attached to his Reply Memorandum of Law in Further Support of Plaintiffs' Cross-Motion to Compel ("Pls.' Reply"), ECF No. 197 at 1, filed on August 25, 2023.  In that brief, Broidy claimed that these documents evidenced "egregious misconduct" and justified his request to "forensically investigate the full nature and scope of the discovery conduct of Qatar's counsel, defendants and their counsel and Qatar's subpoena recipient agents and their counsel." *Id.* at 11.  Foremost among these three documents was Mr. Allaham's August 2023 declaration, from which Broidy claimed it was "evident" that Qatar and defendants had engaged in an "intentional scheme to circumvent the basic rules of discovery."  *Id.* at 5.

Broidy's August 25 Reply did not disclose the fact that Mr. Allaham had previously provided contradictory sworn statements on at least two occasions — a fact that was known to

Broidy's counsel at the time.  Mr. Allaham asserted in his August 2023 declaration that he "never agreed or believed that [he] was helping Qatar's diplomacy," and described his role as limited to "finding investment opportunities in the United States" and "help[ing] [Qatar] build relationships with Jewish community leaders."  ECF No. 197-2 ¶¶ 2, 9.  But in Mr. Allaham and his company's June 2018 sworn FARA filings, he himself described his work with Qatar to include "fostering better international relations within the gulf region" and "advis[ing] on handling disputes with other countries in [the] Middle East region."  ECF No. 203-1 at 4, 19 (Lexington Strategies Registration Statement, ¶¶ 8–9(a) (June 15, 2018); Allaham Short Form Registration Statement ¶ 11 (June 15, 2018)).  And, as the Court can now confirm through *in camera* review of Mr. Allaham's deposition transcript, he testified similarly in his June 19, 2018 deposition.

When Broidy filed his August 25 Reply, his counsel knew about both the deposition transcript and the FARA filings (which were used as an exhibit in Mr. Allaham's deposition), but misleadingly did not disclose those prior inconsistent statements to the Court.  *Cf. Sears Authorized Hometown Stores, LLC v. Lynn Retail, Inc.*, 2023 WL 317625, at *3 n.3 (S.D. Ind. Jan. 19, 2023) ("Notably, the Schneiders submitted as evidence Scott's earlier deposition testimony, but not his later, contradictory testimony.  This is a recurring theme throughout this case, as the Schneiders routinely rely on deposition testimony without acknowledging the existence of contradictory testimony from the same individual.  This practice is not helpful, and counsel is cautioned not to allow zealous representation to overshadow his duty of candor to the Court.").  Even if Broidy's counsel felt constrained from filing Mr. Allaham's June 2018 deposition transcript because of its AEO designation in the California action, nothing prevented Broidy's counsel from informing the Court of the existence of a deposition transcript that contradicted testimony Broidy was now sponsoring, and inviting a court order permitting its filing.  Broidy's counsel nevertheless decided

to withhold from the Court contradictory sworn statements that undermine the credibility of the August 2023 Allaham declaration on which Broidy relies in pursuit of his full-court press against Qatar.

These contradictions and others were pointed out by Qatar in its Sur-Reply in Opposition to Broidy's Cross-Motion to Compel. *See* ECF No. 203 ("Sur-Reply") at 3–11. As Qatar demonstrated in its Sur-Reply, Mr. Allaham's prior contradictory statements include not only the sworn statements withheld by Broidy's counsel but a ***third*** prior sworn statement: Mr. Allaham's affidavit executed in connection with his 2018 Settlement Agreement, which the Court can now review *in camera*. That affidavit described Mr. Allaham's work consistently with his FARA filing, deposition, *Wall Street Journal* article, and 2018 Settlement Agreement — all of which were *inconsistent* with Mr. Allaham's August 2023 declaration. *See id.* at 7.

Broidy's Reply memorandum acknowledged the existence of this affidavit and sought to preemptively impeach its truthfulness based on the settlement payment to Mr. Allaham. Pls.' Reply at 6. Broidy's impeachment efforts fail for the reasons Qatar explained in its Sur-Reply, *see* Sur-Reply at 9–10, but what is most striking about this portion of Broidy's Reply memorandum is that Broidy's counsel has since admitted that they had not even reviewed Mr. Allaham's affidavit at the time they introduced Mr. Allaham's contradictory declaration. In his September 1, 2023 *in camera* submission, Broidy informed the Court that: "The copy of the December 2018 Settlement Agreement plaintiffs submitted with their cross-motion to compel did not include a copy of Mr. Allaham's affidavit. ***We have since received a copy of the affidavit, which we are submitting to the Court***." ECF No. 204-1 (emphasis added).

Taking this statement at face value, it begs the question of Broidy's level of diligence before presenting a declaration to the Court that so manifestly contradicted the witness's prior

sworn statements.  Mr. Allaham's affidavit was clearly available to Broidy, as he had no difficulty

obtaining the document within a week to comply with the Court's order to produce it.  *See* Minute

Order (Aug. 30, 2023); ECF No. 204.  Yet Broidy did not "take th[e] simple step" of obtaining

and analyzing that affidavit "before making serious allegations about another attorney's

professional conduct."  *Doe I v. Exxon Mobil Corp.*, No. 01-1357, 2021 WL 1910892, at *6

(D.D.C. May 12, 2021) ("A reasonable attorney would have reviewed the deposition video before

making serious allegations about another attorney's professional conduct.  Although defense

counsel had access to the video, nothing in the record reflects that defense counsel took that simple

step." (citations omitted)).

 What is even more remarkable is that Broidy's current motion fails to make any effort to

rehabilitate Mr. Allaham's August 2023 declaration in light of these contradictions.  Broidy does

not try to explain or reconcile the many contradictions between that declaration and Mr. Allaham's

prior statements.  Broidy's current motion simply ignores the subject.[2]

 Indeed, Broidy's only effort to defend the 2023 Allaham declaration *at all* are the assertions

in his brief (unsupported by any supporting declaration or other evidence) that the declaration "was

not a condition of any payment to Mr. Allaham," and that "the only consideration for his agreeing

to comply with his discovery obligations is his dismissal from this action with prejudice."  Mot. at

5.  These assertions raise more questions than they answer, however.  For one thing, Broidy does

---

[2] Broidy's apparent inability to defend the truthfulness of Mr. Allaham's August 2023 declaration
cannot be explained by a desire not to retread terrain covered by the cross-briefing on Qatar's
assertion of sovereign privileges and immunities, which has now closed.  While Broidy does not
address Mr. Allaham's self-contradictions, he does not hesitate to re-argue other privilege-related
points.  *See, e.g.,* Mot. at 4 (arguing that Qatar's assertion of privilege "with respect to documents
whose subject matter is in no way confidential stretches Vienna Convention 'inviolability'
completely beyond any reasonable bounds," a point he argued extensively in his Reply).

not deny the existence of any additional agreements or understandings involving Mr. Allaham that were related to his recent change in testimony, including any agreements involving the United Arab Emirates.[3]  Nor does Broidy explain what he means by Mr. Allaham "compl[ying] with his discovery obligations" as consideration for his dismissal from the case.  *Id.* at 5.  Broidy has attached to his motion various communications between Mr. Allaham and his prior counsel — communications that would normally be withheld on privilege grounds.  *See* ECF Nos. 206-3, 206-4, 206-21, 206-22, 206-23.  Mr. Allaham had no discovery obligation to produce privileged communications with his own counsel, so their disclosure cannot be explained by an agreement that was purportedly limited to Mr. Allaham complying with his discovery obligations.  Thus, setting aside any non-privileged documents that Allaham may have provided to Broidy, Broidy also induced Mr. Allaham to take the highly unusual step of appearing to waive privilege and producing materials from his former counsel under circumstances that have not been adequately explained.  Even taken at face value, moreover, Broidy's description of his settlement with Mr. Allaham plainly implies valuable consideration, as Mr. Allaham's dismissal from this action eliminates any possibility of money damages against him.  *See, e.g.*, First Am. Compl., ECF No. 18-2 ¶ 377 (request for monetary relief).  But even if Mr. Allaham was not improperly induced to provide this declaration, it remains utterly lacking in credibility in light of Mr. Allaham's many prior inconsistent statements.

---

[3] Broidy also does not address the relationship between him and the United Arab Emirates that was suggested by U.S. Government statements at his plea hearing.  Sur-Reply at 10 n.10.  As Qatar explained, "Broidy's relationship with a foreign sovereign participating in the blockade against Qatar, and his history of unlawful failure to disclose his work on behalf of foreign principals, provides added reason to question the full context of Broidy apparently persuading Mr. Allaham to contradict prior sworn statements."  *Id.*  Broidy does not attempt to answer these questions.

In short, Broidy's original request for a forensic examination was based on evidence that has been revealed to be non-credible and deeply misleading, and which Broidy is now (a mere week after its original submission) unable to defend.  That alone is reason to deny Broidy the extraordinary relief he seeks.[4]

## II.    Broidy Fails to Establish Any Discovery Misconduct by Qatar and Its Counsel.

Rather than defend the credibility of Mr. Allaham's 2023 declaration, Broidy's current motion asserts new grounds for the unprecedented forensic investigation he seeks.  Broidy does so by peppering his motion with an assortment of exhibits, primarily consisting of (1) communications between Mr. Allaham and his former counsel; and (2) meet-and-confer correspondence between the parties related to their discovery disputes.  Even a cursory review of the exhibits makes clear that they offer no support for Broidy's serious allegations of any sort of discovery misconduct by Qatar or its counsel — whether within the scope of Qatar's limited intervention or otherwise.  The vast majority of these exhibits, in fact, are entirely silent as to Qatar, and those that do reference Qatar show no more than routine settlement negotiations and a query regarding Mr. Allaham's document production in a related California action in which Qatar was a party.  In essence, having been given an opportunity by the Court to substantiate his serious

---

[4] Broidy appears to have also abandoned reliance on another of his purported "three shocking documents":  the July 2018 email sent from Mr. Allaham's then-counsel to counsel for non-party Jamal Benomar.  Broidy's Motion briefly restates  (Mot. at 3) his position that the email exchange shows that Qatar had no expectation of confidentiality with respect to Mr. Allaham, but does not respond to Qatar's Sur-Reply, which not only refuted this argument but also explained why this email did not substantiate Broidy's unfounded allegations of "egregious misconduct" on which his current motion is based.  *See* Sur-Reply at 18 n.21.  In the face of that rebuttal, Broidy's current Motion has quietly dropped any reliance on this email to support his request for a forensic examination.

(but baseless) claims of misconduct, Broidy fails to do so and instead resorts to casting unremarkable correspondence in an implausibly nefarious light.[5]

### A. Broidy Fails to Show Any Misconduct in Connection with Qatar's Limited Intervention in This Proceeding.

As the Court is aware, Qatar has intervened in this case for the limited purpose of asserting its privileges and immunities through the service of a privilege log, without waiver of its sovereign immunity. Though the relief Broidy seeks would be improper regardless, one might have expected Broidy to try to justify that relief by articulating some alleged misconduct by Qatar or its counsel that is actually related to its limited intervention. Instead, he focuses on Qatar's alleged actions *outside* its capacity as a limited intervenor — simply asking the Court to assume jurisdiction over a non-party foreign sovereign through its counsel. Since Qatar's limited intervention is the only capacity in which Qatar (and its counsel of record) are before the Court, Broidy's failure to make any showing with respect to Qatar's actions in that capacity dooms his motion from the outset.

The closest Broidy comes to alleging actions by Qatar relating to its limited intervention are that (1) Qatar's exercise of its appellate rights allegedly caused delay in this case; and (2) Broidy disagrees with Qatar's position on the merits regarding the scope of the Vienna Convention and principles of international comity. Mot. at 3–4. But Qatar's appeal raised substantial issues, as is clear from the D.C. Circuit's and U.S. Government's responses to it. And Broidy himself occasioned the delay by adhering to an absolutist interpretation of the Vienna Convention that the U.S. Government subsequently disagreed with, and asking this Court to rule on that interpretation in the abstract over Qatar's objection and proposal to first proceed to a privilege logging process.

---

[5] Broidy states in his motion that "numerous additional documents remain to be reviewed" from Mr. Allaham. Mot. at 5 n.3. Particularly having given Broidy an additional opportunity to develop his request for a forensic investigation, the Court should not countenance Broidy again substituting new and different grounds for his motion in his forthcoming reply.

Defs.' Mem. in Opp'n to Pls.' Mot. for Recons., ECF No. 105 at 14–15 (proposing a privilege log for materials withheld based on Qatar's privileges); Statement of Interest, ECF No. 114 at 1–2 (same); Pls.' Reply Mem. in Support of Mot. to Compel, ECF No. 117 at 8–9 (refusing proposal for privilege log).

As for Broidy's suggestion that Qatar has maintained its privilege assertions in bad faith, there is absolutely no support for this allegation.  The sole basis for this serious allegation was Mr. Allaham's August 2023 declaration, in which Mr. Allaham asserted that he "never agreed or believed that [he] was helping Qatar's diplomacy."  ECF No. 197-2 ¶ 9.  As discussed above, however, Broidy no longer is willing to defend that declaration in the face of its multiple contradictions of Mr. Allaham's prior sworn statements.  *See supra* 6–8; *see also* Sur-Reply at 4–11 (cataloguing prior inconsistent statements).

All Broidy is left with now is bluster about Qatar's use of the term "public diplomacy," which supposedly "gives the game away."  Mot. at 4.  But Broidy does not explain what in particular this term "gives away."  Nor does he explain why, if the very concept of "public diplomacy" is so absurd, the United States has an Under Secretary of State for *Public Diplomacy* and Public Affairs.[6]  *See also* Sur-Reply at 12.  Broidy may be entitled to his inapposite personal opinions about what real diplomacy looks like, but he is not entitled to make casual accusations of misconduct against anyone who disagrees with his views.  The reality is that this case has implicated unsettled questions on the scope of the Vienna Convention and principles of international comity.  The fact that Qatar has taken a position on these issues that Broidy disagrees

---

[6] U.S. Dep't of State, *About Us—Under Secretary for Public Diplomacy and Public Affairs*, https://www.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/ [https://perma.cc/9QWK-SZJH] (last visited September 8, 2023).

with — a position with substantial support, both as a matter of law and in the diplomatic practices of the U.S. government — is no basis for ordering a forensic examination. Qatar continues to believe that its assertion of privileges and immunities is correct, but even if the Court were to agree with Broidy on the law, a forensic examination of Qatar's counsel would not be an appropriate response.

**B.      Broidy Fails to Show Any Misconduct Outside the Scope of Qatar's Limited Intervention.**

Unable to identify any purported misconduct in relation to the subject matter of Qatar's limited intervention — the assertion of its sovereign privileges and immunities — Broidy instead points to allegations of misconduct that fall outside the scope of Qatar's limited intervention in this case. These allegations are not only irrelevant, but indefensible and unsupported.

For example, Broidy initially claimed, on the basis of Mr. Allaham's 2023 Declaration, that Qatar's counsel had directed Mr. Allaham not to review and produce documents from 2017 and 2018. *See* Pls.' Reply at 5–6. As Qatar explained in its Sur-Reply, Mr. Allaham's assertion was plainly false or misleading in light of Qatar's privilege logs and Mr. Allaham's prior document productions, both of which covered documents from 2017–2018. *See* Sur-Reply at 10–11. Broidy's motion offers no defense or response to this demonstrated falsehood — let alone any explanation of how Broidy's counsel could have submitted that testimony to the Court without noting its obvious inconsistency with the record.

Instead, Broidy sweeps this false allegation under the rug and pivots to mischaracterizing new exhibits, but these exhibits also do not come close to establishing any misconduct by Qatar or its counsel. Most have nothing to do with Qatar at all. Indeed, of the twenty-one exhibits that Broidy attached to his motion, only three reference any action by Qatar's counsel. All three of

those exhibits relate to the 2018 Settlement Agreement, which predates the commencement of this suit.  *See* ECF Nos. 206-21, 206-22, 206-23.

Far from evidencing any misconduct in this proceeding, these emails show unremarkable negotiations between counsel involved in drafting Mr. Allaham's 2018 Settlement Agreement and accompanying affidavit.  *See* ECF No. 206-21 (Mr. Allaham's former counsel writing to Mr. Allaham to inform him that Qatar's counsel would participate in "draft[ing] that [affidavit] for us to review"); ECF No. 206-22 (Mr. Allaham's former counsel writing to Mr. Allaham and stating that language he purportedly received from Qatar's counsel is "a DRAFT" and "not what they are proposing, just what they are thinking"); ECF No. 206-23 (Mr. Allaham's former counsel writing to Mr. Allaham in 2021 requesting a copy of the affidavit signed in 2018 as part of the settlement agreement).  There is nothing unusual or untoward about an attorney drafting an affidavit for a witness's review, particularly where, as here, statements in the affidavit are substantiated through other sources, including FARA filings, a deposition transcript, and contractual representations, and must ultimately be adopted by the witness under oath.  *See Al Qari v. Am. Steamship Co.*, No. 21-10650, 2023 WL 5202311, at *6 (E.D. Mich. Aug. 14, 2023) ("It is not uncommon for counsel to prepare affidavits or declarations for a witness and then to have the witness review and sign the statement."); *Basil v. CC Servs., Inc.*, 116 F. Supp. 3d 880, 885 n.2 (N.D. Ill. 2015) ("It is common knowledge that declarations are drafted by attorneys . . . .").

Nor does the Settlement Agreement itself — the very first example Broidy's motion offers as justification for a forensic examination — support Broidy's unfounded assertion that Qatar has used the agreement to "hide the truth in this matter."  Mot. at 1.  The Agreement does not give Qatar the power to direct Mr. Allaham and his counsel to disregard their discovery obligations.  To the contrary, as Qatar explained in its Sur-Reply, the Agreement expressly acknowledges that

its confidentiality provisions do not apply where disclosure is legally required.  Sur-Reply at 19

n.22.  Qatar has also already explained why the confidentiality obligations memorialized in the

Agreement are not "retroactive."  Pls.' Reply at 8; *see* Sur-Reply at 17–19.  Even more strained is

Broidy's suggestion that Qatar interfered with discovery by "claim[ing] ownership" over its

contractors' work product — in contracts that pre-date not just this case but *any* of Broidy's

litigation.  Mot. at 2 (referencing "agreements filed under [FARA] by defendant Stonington

Strategies"); *see, e.g.*, ECF No. 109-17 (Stonington Strategies Ex. A to Registration Statement

(Sept. 3, 2017)).  The logical explanation for the language in the Qatari Embassy's contracts is not

that Qatar was trying to interfere with hypothetical future discovery obligations, but that the

Embassy considered the documents created by its contractors in the performance of their work to

be documents of the mission.

Equally unremarkable is the single email exchange between Mr. Allaham and his former

counsel regarding a phone call about documents that had previously been produced in the

California action.   *See*  ECF Nos. 206-3, 206-4 (duplicates of a single email chain).

Notwithstanding Broidy's strained efforts to cast this exchange in nefarious terms, the exchange

merely recounts an open-ended question about what had been produced and speculation by Mr.

Allaham's counsel about the reason that question was asked.  Nothing in this exchange states, or

even suggests, that Mr. Allaham's counsel had been asked to withhold the referenced documents

(with or without a legal justification).  It is striking that this non-event is what Broidy is now

reduced to relying on, after initially trumpeting "shocking" evidence of misconduct.  *See* Pls.'

Reply at 1.

In short, none of the email communications that Broidy attaches to his Motion establish any misconduct whatsoever on the part of Qatar or its counsel.  Broidy's request for a forensic examination of Qatar's counsel is accordingly without any factual basis.

## III.   Broidy's Request for a Forensic Examination of Qatar's Counsel Is Equally Unfounded as a Matter of Law.

Even setting aside that Broidy's exhibits provide no factual evidence of misconduct, Broidy's Motion is in any event lacking any legal support.  None of the cases cited by Broidy involved a forensic examination of a *non-party*, let alone its *counsel*.

Tellingly, the only case Broidy cites ordering a forensic examination of a party's attorney — *Ellis v. Toshiba Am. Info. Sys. Inc.*, 218 Cal. App. 4th 853 (2013) — bears no resemblance to Broidy's allegations in his Motion.  *Ellis* is a California state-court case in which an attorney sought over $24 million in fees following class action litigation, based on records stating that she had worked "nearly all day (sometimes as much as 16.75 hours), every day, seven days a week, including holidays, for some 22 months." *Id.* at 858.  After the defendant served discovery requests for the attorney's original timesheets, the attorney provided a "shifting series of explanations" as to why she couldn't produce them, including that she had used a program that "wipe[d] and delete[d]" them. *Id.* at 861–62.  Even under these facts, the court ordered a forensic examination only of the "backups of the original Word time record files" — nothing close to the extraordinarily broad examination sought by Broidy.  *Id.* at 860.

The other cases Broidy cites do not actually involve discovery from counsel in the sense contemplated by Broidy's motion.  Broidy claims that *In re Uranium Antitrust Litig.*, No. 79-0525, 1980 WL 324452 (D.D.C. Dec. 17, 1980), demonstrates that "forensic collection and examination of ESI from counsel is warranted."  Mot. at 14.  But in that case, no forensic examination was requested, let alone ordered.  The court simply held that a third-party law firm was subject to

discovery regarding its *non-legal work* relevant to the claims at issue that was unavailable from other sources, including foreign governments. *In re Uranium*, 1980 WL 324452, at *1, *3 (law firm not only rendered professional advice but "also engaged in recruiting activities" that "[c]ertainly . . . cannot be regarded as the performance of classical professional functions by an attorney for his or her client"). In *Peskoff v. Faber*, 244 F.R.D. 54 (D.D.C. 2007), the court ordered a forensic examination of the defendant (not his counsel), but the defendant's data was stored on the law firm's server as part of its normal business operations and had to be imaged there. *Id.* at 55 n.1, 66. Finally, in *Quinn v. City of Vancouver,* No. C17-5969, 2021 WL 1170375 (W.D. Wash. Mar. 29, 2021)[7] and *Ferron v. Search Cactus, L.L.C.*, No. 06–327, 2008 WL 1902499 (S.D. Ohio April 28, 2008), the court ordered forensic examinations of parties to the litigation who also happened to be attorneys.

Broidy's request for a forensic examination of counsel to a *party* in this case is accordingly without any legal support. And Qatar is not a party in the sense that it is a plaintiff or defendant with discovery obligations attendant to its participation in the litigation. The goal of a forensic investigation in all of the cases cited by Broidy is to identify and collect documents subject to production by the entity that is subject to the forensic examination. Indeed, the very first sentence of Broidy's motion cites Rule 37 of the Federal Rules of Civil Procedure, which applies to required disclosures and discovery. *See also Bethea v. Comcast*, 218 F.R.D. 328, 329–30 (D.D.C. 2003) ("In the context of computer systems and computer records, inspection or seizure is not permitted unless the moving party can demonstrate that the documents they seek to compel do, in fact, exist and are being unlawfully withheld." (internal quotation marks omitted)). But Qatar has intervened in this case in a limited capacity solely to assert its privileges and immunities. *See* Minute Order

---

[7] Cited in Pls.' Reply at 12–13.

(May 2, 2023).   Qatar is not subject to, and is indeed immune from, any discovery requests.
Because Qatar is not obligated to produce any documents, it cannot have violated any production
obligation — and all of the cases on which Broidy relies are fundamentally inapposite.

More analogous than Broidy's cases is *John B. v. Goetz*, 531 F.3d 448 (6th Cir. 2008),[8]
where the Sixth Circuit granted mandamus relief from a discovery order compelling the forensic
imaging and production of various state- and privately-owned devices.   *Id.* at 458.   The court's
ruling was based in part on "federalism and comity concerns" implicated by the orders that are
analogous to the sovereign immunity and comity issues implicated here.   *Id.* at 458, 461.   But the
court also noted that the order "extend[ed] not only to computers and devices in the personal
custody of defendants, but also to computers and devices in the custody of individuals that are not
party to th[e] litigation."   *Id.* at 458.[9]

The text of Broidy's proposed order also reinforces the inapplicability of his Motion to
Qatar's counsel.   Broidy proposes, for example, that a forensic expert search the devices of Qatar's
counsel to "identify[] evidence indicating data being deleted, modified, or not included in
collection despite being *potentially responsive to discovery requests*."   Mot. at 14 (emphasis
added); Proposed Order at 1.   But it is the documents in the possession, custody, or control of

---

[8] Two courts citing the relevant discussion of *Goetz* have concluded that the decision was
abrogated on other grounds by *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).   The relevant
portion of the decision continues to be cited, *see, e.g., Tireboots by Universal Canvas, Inc. v.
Tiresocks, Inc.*, No. 20-7404, 2022 WL 2316228 (N.D. Ill. June 28, 2022).

[9] *Goetz* contains a detailed discussion regarding the propriety of forensic imaging more broadly,
noting that case law and the Sedona principles, a leading e-discovery resource, have urged caution
with respect to forensic imaging in civil discovery.   *See* 531 F.3d at 459–60 ("[C]ourts have been
cautious in requiring the mirror imaging of computers where the request is extremely broad in
nature and the connection between the computers and the claims in the lawsuit are unduly vague
or unsubstantiated in nature.   As the Tenth Circuit has noted, albeit in an unpublished opinion,
mere skepticism that an opposing party has not produced all relevant information is not sufficient
to warrant drastic electronic discovery measures.   And the Sedona Principles urge general caution
with respect to forensic imaging in civil discovery." (citations and quotations omitted)).

*Defendants* — not Qatar or its counsel — that are "potentially responsive to discovery requests." Even if Broidy had some factual basis for his allegations of misconduct directed at Qatar (as discussed above, there is none), there would still be a basic mismatch between the conduct he has alleged (*e.g.*, making assertions of privileges and immunities that Broidy considers legally unsupported) and the relief he is seeking (*e.g.*, forensic collection and imaging of devices to identify documents "potentially responsive to discovery requests"). Broidy's request is thus best understood as a generalized request for leave to conduct a wide-ranging and intrusive fishing expedition in hopes of supporting his unfounded but oft-repeated claims that Qatar was somehow engaged in misconduct.

Finally, even if there were support for ordering a forensic examination against a limited intervenor with no production obligations (there is none), and even if that forensic examination was tailored to the alleged misconduct (it is not), the relief requested by Broidy would still be manifestly unreasonable. While Broidy describes his proposed examination as "focused," his proposed order is absurdly broad, permitting a deputized forensic firm to enter the homes and offices of Qatar's "counsel" — which he defines to include "attorneys, paralegals, administrative staff, professional staff, technical support staff, agents, contractors, etc." — to collect and image their devices, defined broadly to include a range of business and personal devices on which work may have been done. Mot. at 15–16, 16 n.6; Proposed Order at 1–2, 2 n.1.[10] Broidy has identified no legal support for the breadth of his proposed order vis-a-vis Qatar's counsel, which would necessarily involve the collection of vast amounts of privileged material pertaining to other clients and completely unrelated matters. *See Exec. Air Taxi Corp. v. City of Bismarck, N.D.*, 518 F.3d

---

[10] Moreover, Broidy's proposed order is unclear as to whether this applies to all individuals at any law firm "representing . . . Qatar" in any capacity, or only counsel of record in this case.

562, 569 (8th Cir. 2008) (affirming district court's decision not to order forensic analysis given that it "could expose confidential or privileged materials"); *In re: Am. Med. Sys., Inc.*, No. 2325, 2016 WL 6666890, at *6 (S.D.W. Va. Nov. 10, 2016) (denying forensic examination of non-parties in light of "privacy and confidentiality concerns," including that devices contained "attorney/client communications and attorney work product"); *see also XTO Energy, Inc. v. ATD, LLC*, No. 14-1021, 2016 WL 1730171, at *24 (D.N.M. Apr. 1, 2016) ("It is inconceivable that [an attorney] should be compelled to produce the document belonging to another client because the adversary of one of his clients demands it.").

## IV.    The Forensic Examination Broidy Requests Would Violate Qatar's Sovereign Immunity.

The reasons described above provide more than sufficient grounds to deny Broidy's request for an intrusive investigation into alleged conduct by the State of Qatar through a "forensic examination" of its counsel. But the relief Broidy requests would also violate Qatar's sovereign immunity. Given the extraordinary and unusual nature of Broidy's requests, some of the sovereign immunity issues it raises are novel, and for that reason the Court may wish to avoid reaching the immunity issues by denying the motion on the grounds discussed above. But novelty does not mean difficulty. Should the Court reach the issue, straightforward application of sovereign immunity principles demonstrates the impropriety of Broidy's request for a forensic investigation of a foreign sovereign via its counsel.

*First*, the Foreign Sovereign Immunities Act ("FSIA") provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States." 28 U.S.C. § 1604. That immunity has full force in this case. When the D.C. Circuit declined Defendants' request to treat them as immune, it emphasized that Qatar's immunity could and should be protected as this Court "has the appropriate tools to protect Qatar's absolute FSIA 'immunity from trial and the attendant

burdens of litigation.'" *Broidy Cap. Mgmt. LLC v. Muzin (Muzin I)*, 12 F.4th 789, 804 (D.C. Cir. 2021) (citation omitted).  The D.C. Circuit later confirmed that Qatar was entitled to intervene for the limited purpose of asserting its privileges and immunities "without forfeiting its foreign sovereign immunity." *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 998 (D.C. Cir. 2023).

Broidy's present motion unmistakably seeks to subject Qatar to the jurisdiction of a U.S. court — without identifying any exception to sovereign immunity that could conceivably apply. The very first page of Broidy's motion contains an allegation directed against Qatar itself: "***Qatar***, through its U.S. counsel, has gone to extraordinary lengths to frustrate discovery from the defendants and hide the truth in this matter."  Mot. at 1 (emphasis added).  Broidy's principal examples of how "***Qatar*** sought to hide the truth" is "***Qatar's*** so-called 'Settlement Agreement' with Mr. Allaham," and a contract between ***the Qatari Embassy*** and Stonington Strategies. *Id.* at 2 (emphases added).  Broidy charges that Defendants have allegedly "failed to comply with discovery based on ***Qatar's*** manufactured assertions of 'ownership' or rights to the 'return' of documents." *Id.* at 3 (emphasis added).  And though Broidy is not clear as to what specific legal obligations he believes Qatar's counsel has violated, the closest he comes is a charge that ***Qatar*** itself has sought "to interfere with the internal affairs of the United States" in violation of the Vienna Convention on Diplomatic Relations. *Id.* at 4.  These allegations against Qatar are the justification Broidy offers for conducting a "forensic examination."  These charges cannot possibly be adjudicated without subjecting Qatar to the jurisdiction of U.S. courts, in violation of the FSIA.

*Second*, Broidy cannot avoid the obvious immunity problems his request poses by specifying "Qatar's counsel" as the target of his requested court-ordered examination. *Id.* at 4. Broidy's express theory is that ***Qatar*** — the State — has committed alleged misconduct, and that ***Qatar's*** alleged influence over Defendants' discovery responses should be investigated.  And the

way Broidy wishes this court-ordered investigation of a sovereign to take place is through a search of its counsel's files — that is, files possessed by counsel only because of its attorney-client relationship with the sovereign.

Under the Supreme Court's decision in *Samantar v. Yousuf*, Broidy cannot evade application of the FSIA to this request.  560 U.S. 305 (2010).  *Samantar* recognized that even where a foreign state is not itself named as a defendant, "it may be the case that some actions . . . should be treated as actions against the foreign state itself, as the state is the real party in interest." *Id.* at 325.  Courts in this Circuit have found the state to be the "real party in interest" where "plaintiffs' theory of th[e] case is that any actions taken by" the subject defendants were actions of the state, *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 72 (D.D.C. 2013), *aff'd*, 782 F.3d 9 (D.C. Cir. 2015), or where plaintiffs' claims "are in effect no more than claims against the foreign state itself," *Strange v. Islamic Republic of Iran*, No. 14-0435, 2016 WL 10770678, at *5 (D.D.C. May 6, 2016).

Here, even if the nominal target of Broidy's invasive forensic searches would be "Qatar's counsel," the unmistakable real target of this investigation is Qatar.  *See Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 34–35 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014), *abrogated on other grounds by OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) (contract breach suit against foreign officials "is in all respects a suit against the Kenyan government" where "the only contract at issue is between [plaintiff] and the Kenyan government"); *Li v. Li*, No. 20-2008, 2023 WL 2784872, at *4 (D.D.C. Apr. 5, 2023), *appeal docketed*, No. 23-7052 (May 3, 2023) (Chinese state is the "real party in interest" where "each official is discussed solely in his capacity as the representative of the government department they oversaw").  Broidy seeks to launch a mini-proceeding within this action that is overtly based on allegations that **Qatar** has acted in violation

of the Vienna Convention — an international treaty under which Qatar, not its counsel, has rights and obligations.  And through this investigation, he seeks to uncover evidence about what ***Qatar*** has allegedly done, and seeks to do so by looking for ***Qatar's*** files in the hands of its counsel.  It would be pure fiction to say that Qatar is not the real party in interest in this exercise.

The point is confirmed by other contexts in which discovery is nominally sought from a law firm.  In *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, plaintiffs in a Dutch action against Royal Dutch Shell filed a petition to subpoena documents from Shell's U.S. counsel.  895 F.3d 238, 240 (2d Cir. 2018).  The law firm was "holding the documents because it represented Shell in prior litigation brought by Kiobel against Shell" in the U.S.  *Id.*  In holding that the district court abused its discretion in granting the plaintiffs' petition, the Second Circuit relied on the fact that Shell, not its law firm, was "the ***real party*** from whom documents are sought."  *Id.* at 245 (emphasis added); *see also Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 85 (2d Cir. 2004) ("Although technically the respondent in the district court was Cravath, for all intents and purposes petitioners are seeking discovery from [German corporation] DT, their opponent in the German litigation.").[11]  Here as well, even if the direct target of Broidy's requested court-ordered examination is Qatar's counsel, Qatar is the real party whose documents Broidy seeks to find and whose alleged conduct Broidy seeks to investigate.  Under *Samantar*, an assertion of

---

[11] Qatar has identified an unpublished Summary Order of the Second Circuit affirming the denial of a § 1782 petition against counsel for a foreign sovereign.  *See Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6 (2d Cir. 2014) (summary order).  Although the court denied the requested discovery of the law firm, it briefly concluded that the FSIA did not apply because counsel did not qualify as a "foreign state."  *Id.* at 9.  The court did not address whether the FSIA could nonetheless be applicable under *Samantar* on the grounds that the real party in interest was a foreign state.  In any event, the context of a routine § 1782 petition is quite different from the invasive "forensic examination" Broidy seeks, for the express purpose of investigating alleged misconduct by the sovereign itself.

jurisdiction where the real party in interest is a foreign sovereign is governed by the FSIA, and is barred absent application of a valid exception to immunity.  560 U.S. at 324–25.

Separate from situations where the sovereign is the "real party in interest," *Samantar* recognizes that "it may be the case that the foreign state itself, its political subdivision, or an agency or instrumentality is a required party, because that party has 'an interest relating to the subject of the action' and 'disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest.'"  *Samantar*, 560 U.S. at 324 (quoting Fed. R. Civ. P. 19(a)(1)(B)).  "If this is the case, and the entity is immune from suit under the FSIA, the district court may have to dismiss the suit, regardless of whether the [defendant] is immune or not under the common law."  *Id.* (citation omitted).  Here, Qatar has an obvious interest in Broidy's allegations that it has committed some misconduct, and that its own files in the hands of its counsel could be turned over to Broidy for purposes of "forensic examination."  Even if Broidy could maintain the fiction that such an order would not be directed on its face against Qatar as the real party in interest, Qatar's obvious interest in such an order would still require rejection of the request under *Samantar* because Qatar would be an indispensable party to such an exercise.  *See* 560 U.S. at 324–25.

*Third*, even where the FSIA does not apply, an action "may still be barred by foreign sovereign immunity under the common law."  *Samantar*, 560 U.S. at 324.  Courts have historically deferred to the U.S. Executive Branch with respect to common-law immunity principles.  *See Ye v. Zemin*, 383 F.3d 620, 624–27 (7th Cir. 2004); *see also Weixum v. Xilai*, 568 F. Supp. 2d 35, 38 (D.D.C. 2008).  As the United States recently noted to the Supreme Court, common-law sovereign immunity protects "a government's public property."  Brief for the United States at *19, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 2022 WL 17725732.  The United States'

recognition that a sovereign's property itself is entitled to sovereign immunity is consistent with longstanding international law.  *See* HAZEL FOX, QC & PHILIPPA WEBB, THE LAW OF STATE IMMUNITY 487, 503 (3d ed. 2015) (sovereign immunity precludes "forcible measures against the property of a foreign State"); INGRID DELUPIS, INTERNATIONAL LAW AND THE INDEPENDENT STATE 107–09 (1974) ("[P]roperty intimately linked with [sovereign functions] is immune from jurisdiction.").

Broidy's request would violate this aspect of sovereign immunity as well.  As a general matter, and "[a]ccording to the weight of authority, client files are the property of the client and not the attorney."  7A Corpus Juris Secundum Attorney & Client § 346.  D.C. bar rules are consistent with this approach, subject to exceptions not relevant here.  *See* D.C. Bar Ethics Opinion 333, Inquiry No. 05-10-05 (Dec. 2005), https://www.dcbar.org/for-lawyers/legal-ethics/ethics-opinions-210-present/ethics-opinion-333 [https://perma.cc/8UME-MH4P] (addressing lawyer's obligation to turn over entire file to client or former client).  Thus, even if Broidy could successfully characterize the target of his requested examination as "Qatar's counsel" and not Qatar itself, it remains the case that Qatar has property rights in the actual materials Broidy wishes to make the target of a court-ordered inspection.  Such an inspection would violate Qatar's sovereign immunity in its property.

*Fourth*, to the extent Broidy's request can be characterized as targeted at "Qatar's counsel" in any sense that is distinct from Qatar itself, it would also still violate other common-law sovereign immunity principles, including derivative sovereign immunity.  In *Muzin I*, the D.C. Circuit decided that Defendants lacked such immunity on the basis of the allegations in Broidy's complaint (which the Defendants treated as true for purposes of asserting their immunity defense at that stage).  *See Muzin I*, 12 F.4th at 801–03.  While the D.C. Circuit denied immunity under

23

those circumstances, it identified critical considerations that compel the opposite result with respect to Broidy's current request:

- The D.C. Circuit emphasized that "Broidy's complaint does not . . . allege that Qatar hired the defendants to act as its agents to carry out any sovereign functions." *Id.* at 800.  Here, Qatar hired counsel to act as its agent to carry out sovereign functions—defending its sovereign interests in litigation in U.S. courts, including asserting its sovereign immunity and other privileges and immunities.

- The D.C. Circuit emphasized that the complaint does not allege "that Qatar requested, approved, or even knew of the unlawful conduct at the heart of Broidy's claim." *Id.*  Here, Broidy squarely and repeatedly accuses Qatar itself of committing the alleged misconduct. *See supra* at 18–19.

- The D.C. Circuit emphasized that "the defendants do not contend that Qatar sought immunity on their behalf," noting that "State Department practice suggests that the State of Qatar's apparent silence on this case weighs heavily against immunity."  *Muzin I*, 12 F.4th at 800.  Here, the State of Qatar is not silent: it is asserting immunity with respect to Broidy's request for a forensic examination of its counsel.

*Finally*, in addition to principles of sovereign immunity under both the FSIA and the common law, Broidy's request contravenes principles of international comity.   The U.S. Government has recognized that "[t]hird-party discovery requests concerning a foreign state's property . . . implicate the same comity and reciprocity concerns that are raised by discovery sought directly from the foreign state." U.S. Amicus Brief at *32–33, *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014), 2014 WL 827994.  Thus, in the context of discovery directed at financial institutions, the United States explained that "[t]he disclosure of potentially sensitive financial information" concerning a foreign state "is legitimately of significant concern to a foreign state regardless of who is required to make the disclosure." *Id.* at *32.  The Supreme Court concluded that such comity considerations "ordinarily will bear on the propriety of discovery requests." *NML Cap., Ltd.*, 573 U.S. at 146 n.6.  *A fortiori*, comity considerations should be carefully weighed before ordering an extraordinary and unprecedented forensic examination of a foreign sovereign's

files held by its counsel, which implicate the same comity and reciprocity concerns that would be raised by a similar request directly targeting the foreign state.[12]

## **CONCLUSION**

For the foregoing reasons, Broidy's motion for a forensic examination of Qatar's counsel should be denied.

Dated: September 8, 2023
        Respectfully submitted,

        */s/ Alexander A. Berengaut*
        Alexander A. Berengaut (D.C. Bar No. 989222)
        David M. Zionts (D.C. Bar No. 995170)
        Amber M. Charles (D.C. Bar No. 1035226)
        COVINGTON & BURLING LLP
        One CityCenter
        850 Tenth St., N.W.
        Washington, DC 20001-4956
        (202) 662-6000
        aberengaut@cov.com
        dzionts@cov.com
        acharles@cov.com

        Mark P. Gimbel
        (*pro hac vice* application pending)
        COVINGTON & BURLING LLP
        The New York Times Building
        620 Eighth Avenue
        New York, NY 10018-1405
        (212) 841-1000
        mgimbel@cov.com

        *Counsel for State of Qatar*

---

[12] Broidy's request also implicates the inviolability of documents of the Qatari Embassy under Vienna Convention on Diplomatic Relations.  For example, in connection with the process of asserting Qatar's privileges and immunities, Qatar's counsel possesses copies of documents over which Qatar has claimed inviolability under the Vienna Convention.  Broidy's proposed forensic examination would infringe these documents' inviolability.

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, I caused a true and correct copy of the foregoing Opposition to Broidy's Motion to Compel Forensic Examinations to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: September 8, 2023

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*