**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BROIDY CAPITAL MANAGEMENT, LLC and ELLIOTT BROIDY<br><br>                              Plaintiffs,<br><br>        v.<br><br>NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, and STONINGTON STRATEGIES LLC<br>                                   Defendants. | Civil Action No.  1:19-cv-00150-DLF |

**STONINGTON DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION TO COMPEL FORENSIC EXAMINATIONS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 5

    I.     JOSEPH ALLAHAM'S DECLARATION HAS NO BEARING ON STONINGTON................ 5

    II.    STONINGTON HAS CONDUCTED DISCOVERY IN GOOD FAITH. ............................... 7

          A.     The Parties Are Mid-Correspondence About Stonington's
              Objections ................................................................................ 8

          B.     Broidy Has Not Shown That Stonington Has Improperly Withheld
              Anything ................................................................................... 9

    III.   BROIDY HAS NO GROUNDS FOR FORENSIC EXAMINATION. ................................. 12

          A.     Forensic Investigation Is Unwarranted ..................................... 12

          B.     Broidy's Investigation Proposal Is Unreasonable and Unsupported
              by Relevant Authorities ........................................................... 16

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig*.,
2020 WL 6140469 (N.D. Fla. Oct. 15, 2020) ...........................................................................4

*Advante Int'l Corp. v. Mintel Learning Tech*.,
2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) ..............................................................14, 15

*Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum &
Bailey Circus*, 2008 WL 11388433 (D.D.C. Aug. 5, 2008) ....................................................12

*Ameriwood Indus., Inc. v. Liberman*,
2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) ........................................................................18

*Bethea v. Comcast*,
218 F.R.D. 328 (D.D.C. 2003)......................................................................................4, 11, 13

*Campbell v. Microsoft Corp*.,
2006 WL 463263 (D.D.C. Feb. 24, 2006) ..............................................................................9

*Cenveo Corp. v. Slater*,
2007 WL 442387 (E.D. Pa. Jan. 31, 2007) ...........................................................................18

*Covad Commc'ns Co. v. Revonet, Inc.*,
258 F.R.D. 5 (D.D.C. 2009)................................................................................... *passim*

*Delta T, LLC v. Williams*,
337 F.R.D. 395 (S.D. Ohio 2021) ..........................................................................................14

*In re Denture Cream Prods. Liab. Litig*.,
292 F.R.D. 120 (D.D.C. 2013)...............................................................................................13

*DIRECTV, Inc. v. Puccinelli*,
224 F.R.D. 677 (D. Kan. 2004)...............................................................................................10

*Ellis v. Toshiba Am. Info. Sys., Inc.*,
218 Cal. App. 4th 853 (2013) .................................................................................................16

*Equal Rts. Ctr. v. Post Props., Inc.*,
246 F.R.D. 29 (D.D.C. 2007).................................................................................................10

*Exec. Air Taxi Corp. v. City of Bismarck*,
2006 WL 8440377 (D.N.D. Apr. 11, 2006) .....................................................................14, 15

*John B. v. Goetz*,
   531 F.3d 448 (6th Cir. 2008) .......................................................................5, 13, 17

*Koosharem Corp. v. Spec Pers., LLC*,
   2008 WL 4458864 (D.S.C. Sept. 29, 2008).........................................................13

*Minnis v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*,
   2013 WL 6271940 (M.D. La. Dec. 4, 2013)........................................................10

*Peskoff v. Faber*,
   244 F.R.D. 54 (D.D.C. 2007)..........................................................................13, 15

*Stewart v. First Transit, Inc.*,
   2019 WL 13027112 (E.D. Pa. Sept. 3, 2019) .....................................................15

*Superior Prod. P'ship v. Gordon Auto Body Parts Co.*,
   2009 WL 690603 (S.D. Ohio Mar. 12, 2009)......................................................14

*Thompson v. Workmen's Circle Multicare Ctr.*,
   2015 WL 4591907 (S.D.N.Y. June 9, 2015) .......................................................17

*Tingle v. Hebert*,
   2018 WL 1726667 (M.D. La. Apr. 10, 2018)................................................13, 15

*In re Uranium Antitrust Litig.*,
   32 Fed. R. Serv. 2d 635 (D.D.C. 1980) ..............................................................16

*Wall v. Reliance Standard Life Ins. Co.*,
   341 F.R.D. 1 (D.D.C. 2022)................................................................................11

*White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc.*,
   2009 WL 722056 (D. Kan. Mar. 18, 2009) ........................................................13

**Rules**

Fed. R. Civ. P. 37...........................................................................................................5, 9

Local Civ. R. 7(m) ..............................................................................................................9

Defendants Nicolas D. Muzin and Stonington Strategies, LLC (together "Stonington"), by counsel, submit their Opposition to Plaintiffs Broidy Capital Management, LLC's and Elliott Broidy's (together "Broidy") Motion to Compel Forensic Examinations, ECF No. 207-1 ("Mot.").[1]

## **INTRODUCTION**

Broidy's request for a forensic examination—or any judicial intervention—is unfounded and improper.  Discovery is ongoing.  There is no evidence, or even coherent allegation, that Stonington's productions to date are incomplete.   Broidy and Stonington are currently corresponding for the first time about Stonington's objections, which Stonington served on Broidy between December 2021 and May 2022.  And the parties have never discussed those objections because Broidy a month ago declined Stonington's offer to meet and confer.

The premise for Broidy's motion with regard to Stonington—*i.e.*, that Stonington has withheld one document from production that is unrelated to Broidy or the alleged hack and thus subject to numerous objections—is therefore not only woefully short of grounds for investigation, but not even ripe for disposition.  Indeed, the posture of this manufactured dispute is not a motion to compel any specific aspect of Stonington's discovery responses because they are not deficient. Instead, under the guise of pressure-testing Qatar's diplomatic privileges, Broidy seeks an effectively unlimited investigation into all Defendants *and their counsel* based on false accusations that they are improperly withholding documents.  Broidy's request should be denied.

*       *       *

Well over a year ago, in response to Broidy's document requests seeking, *e.g.*, the entire universe of Stonington's work for Qatar, Stonington asserted ordinary, legitimate objections.  For

---

[1]     This brief cites Broidy's corrected memorandum (ECF No. 207-1), filed on September 5, 2023, without exhibits, and the exhibits that accompanied his original filing (ECF No. 206-1).

example, Stonington objected to producing attorney-privileged materials, materials subject to Qatar's privileges, or irrelevant materials unrelated to Broidy's claims.  Notwithstanding those objections, Stonington has produced 800 non-privileged, responsive documents.[2]  Qatar's privilege log demonstrates that only fifteen more documents (with attachments) have been withheld or redacted on Qatari privilege grounds, none of which support Broidy's allegations.

In late July 2023—after spending months focused only on Qatar's privileges following remand—Broidy apparently realized he had never addressed the discovery responses of the actual parties to this litigation.  Accordingly, Broidy embarked on a letter-writing campaign with each Defendant, raising questions about various objections for the first time since those objections were served over a year before.  The status of those discussions is that Stonington has thoroughly explained the basis for its objections in responsive letters to Broidy and specifically offered to meet and confer on any outstanding questions.  Broidy declined.

Stonington had committed to respond to two more letters from Broidy on August 25, 2023, but the night before, without warning, Broidy abruptly dismissed then-Defendant Joseph Allaham from the litigation with prejudice; proffered a contemporaneous declaration from Mr. Allaham asserting that he is not, in fact, subject to Qatar's privileges and did not cooperate with Broidy's discovery requests at Qatar's instruction; and filed a further brief in his ongoing challenge to Qatar's privilege assertions, arguing that Mr. Allaham's declaration supports an assumption that *every* Defendant is improperly withholding discovery.  Based on that unsubstantiated leap, Broidy now seeks an unbounded investigation into every Defendant and their counsel—including "***all***

---

[2]      Importantly, Broidy alleges that Stonington unlawfully disseminated hacked materials to the press, *see* ECF No. 18-2 ¶ 140, and Stonington has produced all of its communications with the press through February 11, 2019, which show no such conduct (because none occurred).

attorneys, paralegals, administrative staff, professional staff, technical support staff, agents, contractors, etc. at the firms representing defendants and Qatar" involved "in any way in connection with this matter." *See* Mot. at 15–16 & n.6.[3]  For multiple reasons, Broidy's request is inappropriate.

*First*, Stonington is not Mr. Allaham.  Mr. Allaham's declaration—which is contradicted by his every statement preceding settlement with Broidy—represents that his work for Qatar was neither diplomatic nor confidential and that he has not cooperated with Broidy's discovery requests at Qatar's instruction.   But Stonington has never made, and would never make, such representations.  Stonington's work for Qatar was unquestionably diplomatic and confidential, as memorialized in written, FARA-disclosed agreements that predate the litigation.  And Stonington has consistently approached the discovery process in good faith and without interference.  Moreover, as Stonington has now repeatedly explained to Broidy, all relevant materials that were in existence at the time Broidy originally filed suit have been preserved and collected.  Mr. Allaham's declaration thus provides no basis whatsoever to second-guess Qatar's assertion of privileges as to Stonington or Stonington's own conduct in discovery.

*Second*, there are no grounds to compel ***anything*** from Stonington because its discovery responses are not deficient.  To the contrary, Stonington has made fulsome document productions subject only to applicable privileges and objections.  Qatar's privileges are, of course, still being litigated.  But, as its privilege log and *in camera* submission confirm, those privileged documents represent a small subset of Stonington's production and do not support the allegations in Broidy's amended complaint.  As to Stonington's own privileges and objections, the ***one*** document Broidy

---

[3]      Unless otherwise noted, all emphasis in this brief has been added, and all internal quotations, citations, and alterations have been omitted.

identifies as improperly withheld by Stonington was withheld based on the same relevancy and attendant objections that Broidy has refused to address.  Thus, at most, Broidy has teed up an ordinary dispute about the scope of relevant discovery, which is not yet ripe due to his own inaction.  If Broidy eventually can identify some deficiency in Stonington's production, he should notify Stonington accordingly, meet and confer pursuant to Rule 37, notify this Court via joint correspondence, *see* ECF No. 145 at 3, and then move to compel should the process break down.

*Third*, as to the specific relief Broidy requests, there is no cause for forensic examination of the parties, let alone their counsel.  "[A] party's suspicion that another party has failed to respond to document requests fully and completely does not justify compelled inspection of its computer systems." *Bethea v. Comcast*, 218 F.R.D. 328, 330 (D.D.C. 2003) (Facciola, J.); *see also In re 3M Combat Arms Earplug Prods. Liab. Litig*., 2020 WL 6140469, at *5 (N.D. Fla. Oct. 15, 2020) ("[T]he Court cannot order a forensic examination when the sole purpose of that examination is based on mere skepticism, suspicion, or speculation concerning the completeness of a party's discovery production.").  Indeed, even if a production is demonstrably deficient, forensic examination still should not be ordered unless the deficiencies are central to the case and less intrusive alternatives have been employed.  *See, e.g.*, *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 7 (D.D.C. 2009) (Facciola, J.) (permitting limited examination of evidence at the "very heart of this lawsuit").  Furthermore, and in any event, Broidy's proposal to collect "***all*** computers, portable or detachable hard drives, e-discovery systems, and personal devices used by each defendant, and used by counsel for each defendant and Qatar … in any way in connection with this matter" is patently overbroad, impractical, and unsupported under the Federal Rules and the law of this circuit.  *See* Mot. at 15–16.

In short, Broidy has not identified any basis to investigate Stonington—much less to pierce the attorney-client privilege, attorney work-product protection, and joint-defense privilege implicated by investigating Stonington's attorneys.  Broidy's unfounded accusations of discovery misconduct and disregard for the discovery process should be rejected.

## ARGUMENT

Broidy's motion conspicuously omits a discussion of applicable legal standards because he cannot meet them.  "A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if a producing party "fails to produce documents or fails to respond that inspection will be permitted . . . as requested under Rule 34."  Fed. R. Civ. P. 37(a)(3)(B).  Rule 34 "permits a party to copy electronically stored information but is limited by Rule 26, which allows only for discovery of any *non-privileged matter that is relevant*."  *Covad Commc'ns*, 258 F.R.D. at 11.  "The advisory committee note to Rule 34 cautions against making forensic examination the default, however, and encourages courts to guard against undue intrusiveness."  *Id.*  The Sedona Principles similarly "urge general caution with respect to forensic imaging in civil discovery," warning that "[c]ivil litigation should not be approached as if information systems were crime scenes that justify forensic investigation at every opportunity."  *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008).

## I.     Joseph Allaham's Declaration Has No Bearing on Stonington.

This dispute relates to Qatar's assertions of privilege over certain documents in the possession of Defendants, its former agents.  The (simplified) basis for those assertions is that Defendants were engaged by the State of Qatar to perform diplomatic work, Defendants possess Qatari materials that were generated in the course of performing that work, and Qatar imposed strict requirements of confidentiality regarding such materials.  *See generally* ECF No. 175-1 at 10–11.  Throughout the litigation, Defendants have uniformly confirmed those underlying facts.

Five years into Broidy's various lawsuits, Mr. Allaham now says that Qatar's asserted privileges do not apply to him because he was not engaged in diplomatic work for Qatar and was never told that documents related to his work were confidential.  *See* ECF No. 197 at 3.  Mr. Allaham further states that he did not fully cooperate with Broidy's discovery requests, including by withholding documents from 2017–18, because an attorney for Qatar instructed his lawyers not to produce anything "embarrassing to Qatar."  *Id.*  For the reasons Qatar has explained, Mr. Allaham's revisionist history is contradicted by every statement in the record predating his apparent settlement with Broidy, in addition to being demonstrably false.  *See* ECF No. 203 at 4–6, 10–11.  But, for purposes of this submission, the bottom line is that Mr. Allaham's representations have no bearing whatsoever on Stonington.

Stonington was indisputably engaged in diplomatic work for Qatar.  As its public, sworn FARA filings confirm, in August 2017, Stonington entered into a consulting agreement with the Embassy of the State of Qatar for "the development and implementation of a government relations strategy for the State of Qatar, as requested and directed by the Embassy."  *See also* ECF No. 203-2 (describing Stonington's work on "a new type of lobbying campaign Qatar adopted after Mr. Trump sided with its Persian Gulf neighbors who had imposed a blockade on the tiny nation").  Indeed, even Broidy recognizes the diplomatic nature of Stonington's work.  *See* ECF No. 18-2 ¶ 55 ("In late August 2017, the Qatari Embassy in Washington, D.C., officially retained Stonington and Muzin to influence public opinion regarding Qatar.").  Mr. Allaham's declaration does not address Stonington's work for Qatar, much less undermine its diplomatic nature.

Stonington was also indisputably subject to strict confidentiality.  As its FARA filings likewise confirm, Stonington's consulting agreement specifically provided that "***all documents***, information or communications (whether verbal or recorded) exchanged between you and the

Embassy (including the Embassy's diplomats, employees, contractors, or attorneys), and any information generated or received by you in the course of your performance of this Agreement, ***are confidential***, and will not be disclosed to any person except as instructed by the Embassy or as required by law."  Mr. Allaham's contention that he "never agreed or believed that [his] documents were confidential" is thus also irrelevant.  *See* ECF No. 197-2 ¶ 9.

Finally, as discussed below, Stonington has cooperated fully in discovery and has not been instructed by Qatar to do anything else.  Indeed, Broidy could not possibly accuse Qatar of "retroactive[ly]" claiming ownership over Stonington's documents to shield them from production in the litigation.  *See* Mot. at 2, 5.  Stonington's August 2017 consulting agreement with Qatar— which has been public for years—predated both Broidy's initial lawsuit and the formation of the alleged hacking conspiracy by several months.  *See id*. at 8 (noting Broidy's initial lawsuit was filed on March 26, 2018); ECF No. 185-1 at 21–22 (arguing the alleged hacking conspiracy began around December 1, 2017).

Thus, even if Mr. Allaham's post-dismissal representations regarding his own discovery misconduct were credible (they are not), and even if his opinions regarding the diplomatic nature of his work were dispositive as to Qatar's privileges (they are not), they have no bearing at all on Stonington.

## II.   <u>Stonington Has Conducted Discovery In Good Faith.</u>

Nor does Broidy's submission otherwise support a motion to compel anything further from Stonington.  The only purported issue Broidy can identify with Stonington's productions is a single irrelevant document withheld from production on the basis of multiple objections.  Specifically, Broidy represents that a nonparty recently produced a letter from Dean Dilley (an attorney) to Mr. Muzin instructing him to cease work under Stonington's consulting agreement with Qatar as of March 28, 2018.  Mot. at 7.  Broidy contends Stonington should have produced the letter pursuant

to a request for "all written proposals, reports, project updates, contracts, agreements, and memoranda of understanding between [Stonington/Mr. Muzin] and Qatar"—regardless of subject matter or date—and that Stonington's failure to do so warrants immediate judicial intervention. *See id.* Broidy is wrong. Assuming for the sake of argument that the Dilley letter even falls within the scope of the request, it is not relevant and thus Stonington did not produce it pursuant to the objections that Broidy has not addressed. Because Stonington has engaged in discovery in good faith, any motion to compel is premature and substantively unfounded.

A.      The Parties Are Mid-Correspondence About Stonington's Objections

A detailed history of the current state of discovery is outlined in Stonington's letter to Broidy dated August 28, 2023. *See* ECF No. 206-6. The bottom line is that, after sitting on nearly all of Stonington's objections for fourteen months,[4] Broidy reached out to Stonington about them for the first time just weeks ago. Stonington and Broidy were in the middle of corresponding about those objections—including the objections under which the Dilley letter was withheld—when Broidy filed his reply brief in the dispute over Qatar's privileges just after midnight on August 25. *See* ECF No. 197. At the time, Broidy had refused to substantively address any of Stonington's objections and neglected even to notify Stonington about either the Allaham declaration or any purported issue relating to the Dilley letter. Furthermore, Stonington had committed to respond to

---

[4]      Broidy has made two decisions that have resulted in delays to discovery. *First*, in early 2022, Stonington offered to facilitate a log of Qatari-privileged documents, consistent with the December 8, 2021 Protective Order. *See* ECF No. 96 at 8. Broidy refused Stonington's proposal and instead moved to compel production of all Qatari-privileged documents, which resulted in protracted litigation and a resulting stay of discovery potentially subject to Qatar's privileges. *Second*, after the mandate issued following Qatar's appeal to the D.C. Circuit and the corresponding stay was lifted, Broidy demanded an expedited privilege log from Qatar, which remains the subject of the current dispute, rather than addressing the parties' discovery responses and objections.

two further letters from Broidy on August 25.  That is, Stonington had committed to respond to Broidy's outstanding discovery inquiries in advance of Broidy's brief-filing deadline, but was not given the opportunity due to Broidy's midnight filing.

After filing his brief, Broidy resumed his letter-writing campaign.  Stonington sent the letter it had intended to send on August 25 on August 28, now addressing Broidy's false allegations in addition to the previous issues raised by Broidy.  On August 29, Broidy responded, still ignoring Stonington's objections and effectively issuing a new interrogatory related to the allegations in Broidy's filing.  Ex. 1.  In other words, Broidy opted first to accuse Defendants of discovery misconduct and then to ask them about the bases for his accusations.  *Cf. Campbell v. Microsoft Corp.*, 2006 WL 463263, at *3 (D.D.C. Feb. 24, 2006) (denying motion to compel; "Defendant's response to plaintiff's revised discovery requests was met not with plaintiff's effort to confer, but rather with a premature motion to compel hastily filed containing misrepresentations.").  Stonington responded on August 31 and requested that Broidy include its letter in Broidy's September 1 filing, but Broidy did not.  Among other assertions, and in light of Broidy's unfounded accusations, Stonington's August 31 letter made clear (again) that Stonington has preserved, and remains in possession of, its documents since the date of Broidy's initial lawsuit.  Ex. 2.

### B.    Broidy Has Not Shown That Stonington Has Improperly Withheld Anything

As the above timeline demonstrates, discussions regarding Stonington's productions and objections were very much ongoing and short-circuited by Broidy's August 25 filing.  More importantly, nothing in those discussions or in Broidy's submissions to the Court supports the proposition that any motion to compel is warranted.

As an initial matter, Broidy never notified Stonington about its receipt of the Dilley letter or of Broidy's belief that Stonington should have produced it before rushing to accuse Defendants of misconduct and seek forensic examination.  *See* Fed. R. Civ. P. 37(a)(1); LCvR 7(m); *Equal*

*Rts. Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007) ("Local Rule 7(m) requires something more than an exchange of written correspondence."); *see also* ECF No. 145 at 3 ("If the parties are unable to resolve the dispute informally, they shall jointly email the Court … providing a clear, concise description of the issues in dispute and proposing dates and times for a teleconference to discuss those issues. **Counsel shall not file any discovery-related motion without a prior telephone conference with the Court and opposing counsel**." (emphasis in original)). Had Broidy followed the process mandated by this Court, the Local Rules, and the Federal Rules of Civil Procedure, Stonington would have explained that the one purported issue Broidy has identified with its productions stems from ordinary objections that Stonington is more than willing to discuss further.

Regardless, Broidy has not demonstrated that Stonington's productions were deficient. "The party moving to compel discovery has the burden of proving that the opposing party's answers were incomplete." *Equal Rts. Ctr.*, 246 F.R.D. at 32. A production cannot be deficient if it is subject to outstanding, unconferred objections. *See, e.g.*, *DIRECTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 691 (D. Kan. 2004) (denying motions to compel; "Defendants did not address the various objections asserted by Plaintiff in its responses to the interrogatories and request for production."). And, in any event, a single irrelevant document withheld for cause—in the middle of ongoing discovery—is not grounds for compulsion. *Cf. Minnis v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*, 2013 WL 6271940, at *4 (M.D. La. Dec. 4, 2013) ("Despite Plaintiff's contentions, Defendant's discovery responses are not deficient to the extent alleged. . . . Discovery is still open and the Court will not assume a party's future noncompliance with the Federal Rules of Civil Procedure."), *objections overruled*, 2014 WL 12811456 (M.D. La. Aug. 15, 2014).

Finally, Broidy has not even tried to explain how any information that Stonington has allegedly withheld is "relevant and proportional." *See Wall v. Reliance Standard Life Ins. Co*., 341 F.R.D. 1, 6 (D.D.C. 2022) (denying motion to compel). Broidy contends Stonington was obligated to produce the Dilley letter because Broidy requested *every* document related to *any* of Stonington's work for Qatar. *See* Mot. at 7. But Stonington appropriately objected to Broidy's request as disproportionate, overbroad, and seeking irrelevant information. Indeed, the Dilley letter is a useful illustration.

On March 28, 2018—after Broidy had filed his initial lawsuit—an attorney for Qatar sent Mr. Muzin a pencils-down instruction related to his contract with Qatar. The letter on its face is not an agreement with Qatar and expressly states that it is not a termination thereof, which is consistent with Stonington's FARA filings. Nor does the letter remotely implicate Broidy or the alleged hack. Thus, the Dilley letter sheds no light on Broidy's allegations. Indeed, the fact that Broidy has already received all relevant, non-privileged discovery—including all of Stonington's communications with the press through February 11, 2019—found nothing to support his claims, and is thus now transparently fishing, is the very nature of Stonington's continued objections. *Cf. Bethea*, 218 F.R.D. at 330 ("[P]laintiff fails to demonstrate what relevance any information still contained on the defendants' hard drives may have to the pending lawsuit. Rather, plaintiff is speculating, and such conjecture does not warrant the compelled inspection of a computer system that contains voluminous information relating to many topics other than plaintiff's . . . claim.").

At bottom, Broidy has turned the case on its head. This is not a motion to compel the production of missing, relevant, non-privileged documents because there are none. Instead, it is a motion to compel everything else—relevant or not, in anyone's possession—for the purpose of testing Qatar's privilege assertions and Defendants' discovery process in the abstract. It is

definitionally discovery about discovery.  But Broidy may not use a privilege dispute with a non-party to blow a gaping hole through bedrock principles of relevancy, privilege, and proportionality. *See Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 2008 WL 11388433, at *2 (D.D.C. Aug. 5, 2008) (denying motion to compel; "[I]t is not necessary to reach the privilege question for the questions founder on a more fundamental basis: they are irrelevant").  His motion should be denied as to Stonington.

## III.   <u>Broidy Has No Grounds for Forensic Examination.</u>

To recap, Broidy has not shown that Stonington has withheld relevant and non-privileged discovery, tied Stonington in any way to Mr. Allaham's supposed discovery communications with Qatar, or demonstrated that Qatar's privilege assertions over Stonington are false.  The suggestion that Stonington should nevertheless be subject to forensic investigation—let alone its counsel—is thus wholly unfounded.

### A.   **Forensic Investigation Is Unwarranted**

Forensic examination is not an investigative tool for probing suspected discovery violations.  It is a last resort, after less intrusive means have been exhausted, for identifying and preserving critical evidence.  Accordingly, relevant authorities—included those cited by Broidy—unanimously foreclose Broidy's requested relief.

*First*, a proponent of forensic investigation must show, unlike here, that relevant discovery is actually missing.  As the Court has previously explained:

> In the context of computer systems and computer records, ***inspection or seizure is not permitted*** unless the moving party can demonstrate that the documents they seek to compel do, in fact, exist and are being unlawfully withheld.  As indicated by this court and other courts, ***a party's suspicion that another party has failed to respond to document requests fully and completely does not justify compelled inspection of its computer systems***.

*Bethea*, 218 F.R.D. at 329–30; *accord Goetz*, 531 F.3d at 460 ("[M]ere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures."); *Tingle v. Hebert*, 2018 WL 1726667, at *7 (M.D. La. Apr. 10, 2018) (cited by Broidy at 12) ("Defendants' argument that additional responsive documents must exist based upon [other documents in plaintiff's production] is the kind of mere skepticism that an opposing party has not produced all relevant information that is insufficient to warrant a forensic examination . . . ."). After all, "[i]t is the rare case that a litigant does not allege some deficiency in the production of electronically stored information," and allowing "allegations of deficiencies in themselves [to] automatically require a forensic search . . . would result in forensic examinations in virtually every case." *Covad Commc'ns*, 258 F.R.D. at 13–14 (cited by Broidy at 12).

In the rare cases where forensic examination has been permitted, the movant has identified concrete "discrepancies or inconsistencies in the responding party's discovery responses"—*i.e.*, spoliation or alteration. *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 128 (D.D.C. 2013); *see, e.g.*, *Peskoff v. Faber*, 244 F.R.D. 54, 55 (D.D.C. 2007) (Facciola, J.) (cited by Broidy at 12) (production "***did not include any emails that [defendant] received or authored between mid-2001 and mid-2003***, nor did [defendant] explain why two years of emails were not produced"); *White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc.*, 2009 WL 722056, at *4 (D. Kan. Mar. 18, 2009) (cited by Broidy at 13) (forensic expert "found ***discrepancies between the creation and sent dates*** of [] emails and attachments"—where plaintiff's claim turned on the timing of relevant emails); *Koosharem Corp. v. Spec Pers., LLC*, 2008 WL 4458864, at *1 (D.S.C. Sept. 29, 2008) (cited by Broidy at 12) ("[N]ot a single email produced by the defendants is an accurate copy of the original email, as the date and time stamp on ***every email has been modified*** . . . ."); *Advante Int'l Corp. v. Mintel Learning Tech.*, 2006 WL

13

3371576, at *1 (N.D. Cal. Nov. 21, 2006) (cited by Broidy at 13) ("[T]here is evidence that copies of *emails were altered* . . . ."). Stonington has told Broidy multiple times that it has preserved relevant documents and that the documents remain in its possession, and there is no allegation of alteration (because none has occurred).

*Second*, even if documents are demonstrably missing, forensic examination is not appropriate unless those documents are central to the case. *See Covad Commc'ns*, 258 F.R.D. at 7 ("[T]here is no dispute that the content of the Federated Database and the evidence within that database itself and elsewhere *are the very heart of this lawsuit.* Thus, I have expressed my view . . . that *the database itself*, and not just the data that it holds, *should be considered an exhibit in this case* . . . ."); *Delta T, LLC v. Williams*, 337 F.R.D. 395, 399 (S.D. Ohio 2021) (cited by Broidy at 13) (ordering forensic investigation where email withheld by defendants arguably went to the "*heart of th[e] case*"); *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 2009 WL 690603, at *1, *2 (S.D. Ohio Mar. 12, 2009) (denying forensic investigation; "[R]elevant and responsive documents have now been destroyed. . . . Nevertheless, the record . . . does not support PBSI's claim that any *significant* documents, or any *significant number* of documents, have been destroyed"). Broidy has not identified any missing documents, let alone a document that is critical to the case.

*Third*, before resorting to forensic examination, less intrusive alternatives should be exhausted. *See, e.g.*, *Exec. Air Taxi Corp. v. City of Bismarck*, 2006 WL 8440377, at *2 (D.N.D. Apr. 11, 2006) ("[Plaintiff] has not shown . . . that further information is unavailable through *depositions or other means of discovery*. Plaintiff simply assumes that because access to the information is technically possible, that access must be afforded."), *aff'd*, 518 F.3d 562 (8th Cir. 2008); *Peskoff*, 244 F.R.D. at 55–56 ("In an earlier opinion, I provided detailed analysis of several

possible locations where emails and other electronic information could remain in the Defendant's system . . . . I therefore ordered Faber to **conduct an additional search** . . . ."); *cf. Covad Commc'ns*, 258 F.R.D. at 12 ("[T]here is simply **no other way** in which to seek this information."). Broidy and Stonington have not even completed their discussions about Stonington's objections, let alone has Broidy proposed some other less-intrusive means of addressing his concerns.

*Fourth*, a motion for forensic investigation is "subject to the proportionality limitations applicable to all discovery under Rule 26(b)(2)(C)." *Tingle*, 2018 WL 1726667, at *6. Thus, "the importance of the discovery" must outweigh its "burden or expense"—including attendant privacy, privilege, or confidentiality concerns. *See id*. at *7, *8 ("Defendants have not addressed the **inherent privacy concerns** raised by the request for a forensic examination of Plaintiff's personal cell phone and personal email accounts . . . As such . . . Defendants have not met their burden of showing that a forensic investigation is warranted in this case."); *see also Advante*, 2006 WL 3371576, at *1 ("[E]ven in a case where imaging of an opposing party's hard drives might be warranted, such an inspection would not be permitted absent an examination protocol that would protect the other party's **legitimate privacy and other interests**."); *Stewart v. First Transit, Inc*., 2019 WL 13027112, at *2 (E.D. Pa. Sept. 3, 2019) ("[F]orensic examination is not yet warranted. Defendants can obtain the relevant information . . . without conducting such a **deeply intrusive search** that will likely disclose irrelevant and **confidential information**."); *Exec. Air Taxi*, 2006 WL 8440377, at *2 ("The access plaintiff seeks through the retrieval service provider is highly invasive and would expose **confidential or privileged materials** without adequate protection or a sufficient showing of need for the information."). It should go without saying that Broidy's proposal to examine the personal and professional devices of every Defendant and defense attorney

poses an indefensible intrusion on their privacy—which is to say nothing of the intrusion on the attorney-client, work product, and common-interest privileges and protections.

*Finally*, putting aside for a moment the impropriety of a forensic search of Stonington's records, Broidy has offered no support justifying a forensic search of its counsel's records. Indeed, Broidy offers a single paragraph in defense of his proposal to investigate defense counsel, supported by two very off-base and outdated[5] authorities. *See* Mot. at 14; *see also In re Uranium Antitrust Litig.*, 32 Fed. R. Serv. 2d 635 (D.D.C. 1980) (allowing discovery from counsel where law firm's conduct could not be "regarded as the performance of classical professional functions by an attorney for his or her client"—*i.e.*, lawyers were not operating in their legal capacities— and documents were "otherwise unavailable to [movant]"); *Ellis v. Toshiba Am. Info. Sys., Inc.*, 218 Cal. App. 4th 853 (2013), *as modified on denial of reh'g* (Sept. 10, 2013) (allowing discovery from counsel who put her own legal fees at issue in a request for $24 million in attorneys' fees, and then failed to comply with discovery regarding her time logs, admitted to destroying original time records, and violated court-ordered inspection and meet-and-confer obligations). Such an extreme step is plainly unwarranted here.

**B.      Broidy's Investigation Proposal Is Unreasonable and Unsupported by Relevant Authorities**

Finally, Broidy's proposed protocol cannot be accepted for multiple reasons.

*First*, Broidy purports to request a "focused digital forensic investigation," Mot. at 14, but he sets forth a protocol outlining exactly the opposite. As a first step, Broidy proposes collection of "***all*** computers, portable or detachable hard drives, e-discovery systems, and personal devices used by each defendant, and used by counsel for each defendant and Qatar . . . in any way in

---

[5]      *In re Uranium* was decided in 1980, before the advent of modern e-discovery.

connection with this matter," including but not limited to such devices "***in their homes***."  Mot. at 15–16.  In other words, Broidy is requesting access to over five years' worth of the privileged and confidential files of countless lawyers and legal staff on top of a complete collection of the (multiple) Defendants' files.

Setting aside for the moment the glaring issues relating to privilege and confidentiality that Broidy's protocol completely fails to address, the sheer volume of material Broidy asks to collect is astonishing; Broidy's purportedly "focused" investigation will yield millions of documents, potentially including the entire contents of several large law firms' document and file management systems.  "Courts have been cautious in requiring the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims in the lawsuit are unduly vague or unsubstantiated in nature."  *Goetz*, 531 F.3d at 459–60.  That is certainly the case here, where Broidy's proposal is not only impossibly far-reaching but also completely untethered from his allegations.  *See, e.g.*, Mot. at 16 (proposing search for "any signs of intentional file removal or modification" without any allegation or evidence of such behavior).

Compounding this issue is the fact that Broidy's proposal for analyzing the data collected is completely lacking in specificity.  Without giving any details, Broidy states that forensic experts will "independently . . . evaluate computer equipment/systems . . . for any signs of intentional file removal or modification within the scope of this specific case."  *Id.*  How the expert is to determine the scope of the case is unexplained, as is the process for determining whether a file was manipulated and whether such manipulation was intentional.  *Cf. Thompson v. Workmen's Circle Multicare Ctr.*, 2015 WL 4591907, at * 2 (S.D.N.Y. June 9, 2015) (denying forensic examination; "[P]laintiff has not provided a statement of what tests the expert would perform in the event her application is granted.").  Indeed, "the scope of this specific case" is precisely the issue teed up by

Stonington's underlying objections.  Similarly, Broidy indicates that the expert will audit records and access logs but does not specify the focus of the audit or limit the logs to those related to the issues or timeframe in the case.  Mot. at 16.  These vague and open-ended proposals confirm that Broidy's true intent is to engage in a fishing expedition to support his baseless claims against Defendants.

Nor does Broidy ground his proposal in relevant authorities, as the Court required.  *See* Minute Order (Aug. 25, 2023).  Broidy's proposal seems to have been copied from cases Broidy cites in a footnote, neither of which involved justification remotely similar to Broidy's.  *See* Mot. at 15 n.5.  That is, Broidy's request for an investigation is based on his false contention that Defendants have withheld responsive documents in the middle of discovery.  In *Ameriwood* and *Cenveo*, by contrast, plaintiffs presented evidence that defendants (former employees) attempted to delete the evidence of their misuse of misappropriated data.  *See, e.g.*, *Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, at *3 (E.D. Mo. Dec. 27, 2006).  Thus, due to the "close relationship between plaintiff's claims and defendants' computer equipment," the contents of the defendants' computers were independently relevant.  *Cenveo Corp. v. Slater*, 2007 WL 442387, at *2 (E.D. Pa. Jan. 31, 2007); *see also Ameriwood*, 2006 WL 3825291, at *1.  Broidy's proposal is thus not even tailored to his allegations.  And there is no need to undertake a burdensome effort to restore and search materials that have already been collected and preserved—much less to collect and inspect attorney materials that could not possibly bear on Broidy's underlying claims.

*Second*, despite being aimed primarily at materials held by counsel, Broidy's proposal fails to ensure that the vast quantity of privileged and confidential information he seeks to image is properly protected.  His **only** proposal to ensure that no privileges will be waived nor confidential information improperly shared is to say that the expert "will execute a confidentiality agreement

18

agreed to by the parties" and the operative protective order.  Mot. at 15.  Broidy clearly has not

grappled with the gravity of his request, displays a disregard for the need to protect confidential

and privileged information, and ignores the realities of law firm practice.

At Wiley alone, the team of "counsel" that has worked on this case over the last five-and-

a-half years includes counsel of record who also work on matters that are:

- Subject to protective orders, requiring them to make various efforts to avoid disclosure
  of covered information and notify producing parties if such information must be shared,
  allowing time for the producing parties to seek court intervention;
- Confidential in total, such as various arbitration matters; and/or
- Subject to ITAR, EAR, and other export control provisions that carry heavy penalties
  for any party responsible for unauthorized disclosures.

Counsel at Wiley also handle sensitive matters involving trade secrets, personal medical

information covered by HIPAA, whistleblower actions, and criminal matters.  Furthermore, as

Broidy's request seeks copies of all systems used by counsel in handling this case, without any

limitations, Broidy is effectively asking to image the law firms' servers, which contain multitudes

of sensitive and restricted materials.  The suggestion that these issues can be addressed via agreed-

upon protective order is absurd.

*Finally*, Broidy's proposal is unrealistic and will result in further substantial delays to the

litigation.  Broidy fails, for example, to explain how the parties will agree on search terms for a

forensic expert when they disagree about the scope of discovery and are still conferring on search

terms for their own discovery purposes.  Broidy likewise fails to explain why, following forensic

examination, Defendants should be required to re-review materials they have already produced,

determined to be irrelevant, or logged as privileged, simply because they come up again following

a forensic expert's searches.  Given the breadth of data he intends to collect, Broidy also fails to

show how or why Defendants should complete that exercise in twenty days.  In reality, such an

exercise would take months at a minimum.  The Court should reject Broidy's poorly conceived, unfounded, and unprecedented proposal.

## **CONCLUSION**

For the foregoing reasons, Broidy's motion to forensically examine Stonington should be denied.[6]

Dated: September 8, 2023

/s/ Stephen J. Obermeier

Stephen J. Obermeier (D.C. Bar # 979667)
sobermeier@wiley.law
Rebecca Fiebig (D.C. Bar # 976854)
rfiebig@wiley.law
Enbar Toledano (D.C. Bar # 1030939)
etoledano@wiley.law
Krystal B. Swendsboe (D.C. Bar # 1552259)
kswendsboe@wiley.law
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Facsimile: (202) 719-7049

*Attorneys for Defendants Stonington Strategies LLC and Nicolas D. Muzin*

---

[6]    To the extent Broidy attempts to include new information about Stonington in his reply brief, as he did in his August 25 brief, Stonington respectfully requests that the Court grant leave for Stonington to file a sur-reply.