**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

               Plaintiffs,

     v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

               Defendants.

Civil Action No. 1:19-cv-00150-DLF

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION TO COMPEL FORENSIC EXAMINATIONS**

KASOWITZ BENSON TORRES LLP
Daniel R. Benson
Sarah Gibbs Leivick
Sarmad M. Khojasteh (*pro hac vice* forthcoming)
Henry B. Brownstein
David Tyler Adams (*pro hac vice* forthcoming)

*Counsel for Plaintiffs Broidy Capital
Management, LLC and Elliott Broidy*

Dated: September 15, 2023

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................... 1

I.    Plaintiffs' Evidence Indisputably Establishes the Concealing Parties' Wrongful
      Scheme to Circumvent Discovery and Actual Suppression of Responsive
      Documents ................................................... 13

      A.    The December 2018 Agreement, By Itself, Warrants Plaintiffs' Requested
            Forensic Examinations into the Withholding Parties' Discovery
            Misconduct ................................................... 13

      B.    Plaintiffs' Evidence Reflects Discovery Misconduct Perpetrated as Part of
            a Scheme Implicating All of the Withholding Parties ......................................... 18

II.   Plaintiffs' Requested Forensic Examinations Are Appropriate and Necessary
      Given the Concealing Parties' Egregious Discovery Misconduct ................................... 20

III.  Qatar's Sovereign Immunity Does Not Insulate Qatar's Counsel from the
      Consequences of Their Own Discovery Misconduct ........................................ 23

IV.   Plaintiffs' Proposed Protocol for Conducting the Requested Forensic
      Examinations is Reasonable ......................................................... 24

CONCLUSION ................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re: Am. Med. Sys., Inc.*,
   No. 2325, 2016 WL 6666890 (S.D.W. Va. Nov. 10, 2016) ....................................................23

*Ameriwood Indus., Inc. v. Liberman*,
   No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) ............................20, 24

*Antioch Co. v. Scrapbook Borders, Inc.*,
   210 F.R.D. 645 (D. Minn. 2002)........................................................................................25

*Bethea v. Comcast*,
   218 F.R.D. 328 (D.D.C. 2003)...........................................................................................22

*Cenveo Corp. v. Slater*,
   No. CIV.A.06-CV-2632, 2007 WL 442387 (E.D. Pa. Jan. 31, 2007) ....................................24

*Covad Commc'ns Co. v. Revonet, Inc.*,
   258 F.R.D. 5 (D.D.C. 2009)...............................................................................................20

*Ellis v. Toshiba Am. Info. Sys. Inc.*,
   218 Cal. App. 4th 853 (2013) ............................................................................................21

*Exec. Air Taxi Corp. v. City of Bismarck, N.D.*,
   518 F.3d 562 (8th Cir. 2008) .............................................................................................23

*Genworth Fin. Wealth Mgmt., Inc. v. McMullan*,
   267 F.R.D. 443 (D. Conn. 2010).........................................................................................20

*John B. v. Goetz*,
   531 F.3d 448 (6th Cir. 2008) .............................................................................................22

*Peskoff v. Faber*,
   244 F.R.D. 54 (D.D.C. 2007).............................................................................................22

*Playboy Enterprises, Inc. v. Welles*,
   60 F. Supp. 2d 1050 (S.D. Cal. 1999)..................................................................................25

*Richardson v. Union Oil Co. of California*,
   167 F.R.D. 1 (D.D.C.)........................................................................................................21

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
   194 F.R.D. 639 (S.D. Ind. 2000).........................................................................................25

**Statutes**

Foreign Sovereign Immunities Act.................................................................................2

**Other Authorities**

Federal Rule of Civil Procedure 24(b).......................................................................3, 16

Federal Rule of Civil Procedure 26 ...........................................................................18

Plaintiffs respectfully submit this reply memorandum of law in further support of their motion to compel forensic examinations of defendants and their respective counsel, counsel to limited intervenor State of Qatar and counsel to now-dismissed defendant Joseph Allaham (collectively, the "Concealing Parties").[1]

## PRELIMINARY STATEMENT

Qatar and its lawyers at Covington have for years claimed that Qatar had nothing to do with the unlawful hack-and-smear at issue in this action.  But the newly discovered documents plaintiffs have submitted to the Court and the additional ones submitted herewith demonstrate that Qatar's lawyers at Covington have been conducting a years-long campaign to cover up the truth by, among other things: concealing documents—not Qatar's own documents in its mission, but documents in the hands of U.S. citizens; paying lawyers millions of dollars to defend U.S. citizens against claims they conspired in the hack-and-smear Qatar says it had nothing to do with and had no knowledge of; paying off at least one witness, settling-defendant Joseph Allaham—in exchange not just for his silence, but for an affidavit Covington drafted reciting Qatar's false versions of the facts; and reviewing and revising responses to plaintiffs' discovery requests—including by changing answers regarding the hack-and-smear itself from "admitted" to "denied." Qatar, based on sovereign immunity assertions, has itself been able to get away with violating U.S. law and violating the rules of discovery in U.S. courts—but its lawyers and U.S. citizens and their lawyers who have participated in the cover-up scheme can and must be held accountable.

---

[1] Submitted herewith in further support of plaintiffs' motion is the Reply Declaration of Daniel R. Benson, dated September 15, 2023 ("Benson Reply Decl.").

Despite the Concealing Parties' gaslighting efforts to change the subject, this motion therefore is not about sovereign immunity or about the Foreign Sovereign Immunities Act.  It is not about whether it is "logical" that the Vienna Conventions mean that every single document in the hands of Qatar's U.S. agents (and even in the hands of those, such as Mr. Allaham, it refuses to acknowledge are its agents) is "of the mission."[2]  Nor is it about whether Mr. Allaham's latest declaration (for which he was paid no money and received only a dismissal from this lawsuit) is less or more credible than his earlier sworn statements and discovery responses (which *were* bought and paid for by Qatar and, as shown below, even drafted by Covington).

This motion is about whether—given the evidence that continues to be uncovered demonstrating a brazen coverup by U.S. lawyers who appear to have violated the rules of discovery, violated an Order of this Court and falsified verified discovery responses, and who are entitled to no protection under the Vienna Convention or the FSIA when they violate U.S. law— forensic examinations are warranted.  But for plaintiffs' settlement with Mr. Allaham, this evidence would still be concealed.  And the full nature and extent of the concealment—and the lawyers who participated in it—are still unknown.  That in and of itself justifies the forensic examinations plaintiffs request, overseen, if the Court deems it appropriate, by a Special Master.

Plaintiffs continue to uncover shocking evidence from Mr. Allaham further confirming that the Concealing Parties, at the direction of Qatar's counsel, Covington & Burling, carried out a far-reaching conspiracy to control and thwart discovery and conceal the truth.[3]  This evidence

---

[2] State of Qatar's Opp. to Broidy's Mot. to Compel Forensic Examination, ("Cov. Mem. at 13.") at 13, ECF No. 208.

[3] At least one other U.S. law firm, which has not made an appearance in this litigation, has also represented Qatar in the concealment and/or spoliation of evidence.  Plaintiffs have only recently learned that in addition to Covington, the Pillsbury Winthrop Shaw Pittman law firm also has been actively involved on Qatar's behalf in overseeing and preventing discovery to plaintiffs through its London-based attorney, Osama Abu-Dehays—who is not admitted to practice in the United

also reveals that, in doing so, Covington and Mr. Allaham's former counsel, ArentFox, went so far as to violate this Court's December 8, 2021 Order.  In that Order, this Court, in denying defendants' "emergency" motion for a protective order—a motion that in fact sought to "protect" not the defendants themselves, but Qatar—held that "Qatar may not receive or review ongoing discovery in this case, as proposed in the defendants' Emergency Motion, without moving to intervene pursuant to Federal Rule of Civil Procedure 24(b)."

But incontrovertible evidence demonstrates that Covington has done precisely what the Court said it could not do—receive and review ongoing discovery.  Communications plaintiffs have now obtained reveal that within two weeks of the December 8 Order, ArentFox submitted to Covington, and Covington revised, drafts of Mr. Allaham's responses to plaintiffs' discovery requests.[4]  Moreover, while plaintiffs do not have access to similar such communications between Covington and the other defendants, there is no reason to doubt that—and a forensic exam would confirm whether—the other defendants also submitted their draft responses to Covington for review.  In fact—based on documents in which ArentFox notes that it will "show the Joint Defense Group our final drafts before serving"[5] and that accepting Covington's edits would bring Allaham's responses "*in line with the rest of the joint defense group*"[6]—there is every reason to believe that Covington *did* vet all the defendants' responses.

---

and therefore not directly subject to this Court's supervision.  *See* ECF 206.04 at 1-2.  The forensic examinations plaintiffs have requested should reveal whether examination of that firm's computer systems is warranted as well.

[4] Defendants in their "emergency" motion had referred to just such discovery requests—requests for admissions and interrogatories—as justifying the protection they unsuccessfully sought for Qatar.  *See* ECF 90-1 at 7 n.3.

[5] Benson Decl. Ex. 1 at 1.

[6] *Id.* Ex. 2 at 1.

Thus, ArentFox sent Covington draft responses to plaintiffs' First Requests for

Admissions and First Interrogatories that ArentFox intended to serve on Mr. Allaham's behalf.

Covington promptly responded with dramatic changes to those draft responses.[7]  Mr. Allaham

objected, exclaiming in a December 21, 2021 email to ArentFox: "I'm confused with the changes

with [sic] denying everything.  Can we. [sic] Jump on a call . [sic] I don't agree to this."[8]

ArentFox responded to Mr. Allaham the next morning, December 22, 2021.  In an email,

they agreed with their client that Covington's edits were false ("They know their client has been

lying to them or that their coverup won't work."), they noted that Abbe Lowell (Benomar's

lawyer who three years earlier had arranged, on Qatar's behalf, for Qatar to pay Mr. Allaham for

his 2018 affidavit and his cooperation under the December 2018 Agreement) was continuing to

work in lockstep with and on behalf of Qatar and Covington.[9]  ArentFox also indicated that

Allaham's fellow defendants had accepted similar edits from Covington, advising their client to

"play the game with the rest of the team":

> Our draft answers caused a great deal of turmoil at Covington.  They
> made all kinds of threats and allegations.  Good.  They know know
> [sic] their client has been lying to them or that their coverup won't
> hold.  Our draft answers caused Abbe [Lowell] to contact us the day
> before our responses are due.  Not a coincidence.  Covington

---

[7] Describing those changes, ArentFox emailed Mr. Allaham on December 21, 2021 that
"[e]ssentially, they want us edit [sic] to omit mention of Jamal [Benomar] based on sovereign
immunity grounds and on the fact that Jamal was not an agent of Qatar during the relevant time
periods."  Qatar's Vienna Convention assertions are belied by Covington's acknowledgment that Mr.
Benomar "was not an agent of Qatar during the relevant time periods," an acknowledgment that
forecloses any colorable basis to "omit mention of [Mr. Benomar] based on sovereign immunity
grounds."  *Id.* Ex. 3 at 1.  It also directly contradicts Mr. Allaham's contemporaneous recollection:
"But that Conflicts with many of the discovery and texts I have with Ali [Al-Thawadi] and others
where they all instruct Jamal is in charge and Jamal decides everything.  I have many instructions
saying go back to [J]amal, don't do anything without [J]amal approval."  *Id.*

[8] *Id.*

[9] In fact, it appears that Abbe Lowell was representing Qatar itself, not just Benomar.  Apart from the
fact that he was going to extraordinary lengths on Qatar's behalf, he did not correct ArentFox when
in an August 22, 2018 email to Lowell, ArentFox referred to Qatar as "your client."  *Id.* Ex. 16 at 2.

obviously shared protected drafts with him . . . . I have come to realize from more reading last night that Covington is doing the right thing for their client and trying to protect us[,] Joey[,] by saying everything we have is privileged . . . . The bottom line is: Let's play the game with the rest of the team and submit the revised answers today.  So let's see a draft with changes accepted.[10]

Covington's edits to Mr. Allaham's responses to plaintiffs' First Requests for Admission were all adopted in the final served version.[11]  Covington's edits reversed the meaning of critical responses, including as follows:

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] had prior knowledge of the hacking of Plaintiffs' computers, email accounts, and computer systems as described in the First Amended Complaint before the first news article based on Hacked materials was published on March 1, 2018."  Mr. Allaham's draft response stated: "Allaham *admits* that he heard about the alleged hacking efforts before March 1, 2018."  Covington's revised response was: "this RFA is *denied*."[12]

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] ha[s] knowledge of non-Qatari citizen agents or representatives of Qatar who were involved in the hacking of the phones, computers, email accounts, or computer systems of Plaintiffs or any of Plaintiff's Associates, Employees, or Broidy's wife, Robin Rosenzweig."  Mr. Allaham's draft response stated, "Allaham *admits* that he is aware of non-Qatari [citizen] agents or representatives of Qatar who were involved in the alleged hacking."  Covington's revised response was: "Allaham *denies* this RFA."[13]

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] ha[s] knowledge of non-Qatari citizen agents or representatives of Qatar who were involved in disseminating the Hacked materials to the media or anyone else, or who were otherwise working with media outlets who were in possession of the Hacked materials as described in the First Amended Complaint."  Mr. Allaham's draft response stated, "Allaham *admits* that he is aware of non-Qatari [citizen] agents or representatives of Qatar who

---

[10] *Id.* Ex. 6 at 1-2.  As ArentFox acknowledged in a December 22, 2021 email to Mr. Allaham attaching "the latest versions of the RFA and interrogatory responses," "the edits that were requested by Covington, "reflect the strategy of asserting diplomatic and sovereign immunity to the greatest extent possible, in line with the rest of the joint defense group." *Id.* Ex. 2 at 1.

[11] *See id.* Ex. 4.  The other defendants' responses to plaintiffs' requests for admissions contain similar denials, including regarding subjects where documents produced in discovery have directly contradicted those denials.

[12] *Id.* Ex. 3 at 12. (emphasis added).

[13] *Id.* at 15-16 (emphasis added).

were involved in providing materials obtained from the alleged hacking to the media."  Covington's revised response was: "Allaham *denies* this RFA"[14]

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] ha[s] previously discussed Broidy with Qatar."  Mr. Allaham's draft response stated: "this RFA is *admitted*."  Covington's revised response was: "this RFA is *denied*."[15]

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] ha[s] communicated with Jamal Benomar about Broidy prior to the filing of this lawsuit."  Mr. Allaham's draft response stated: "this RFA is *admitted*."  Covington's revised response was: "this RFA is *denied*."[16]

- Plaintiffs requested that Mr. Allaham "[a]dmit that [he] ha[s] communicated with [defendant] Muzin about Broidy prior to the filing of this lawsuit."  Mr. Allaham's draft response stated: "this RFA is *admitted*."  Covington's revised response was: "this RFA is *denied*."[17]

Covington's edits to Mr. Allaham's verified responses to plaintiffs' First Interrogatories were equally egregious:

- In response to plaintiffs' interrogatory asking Mr. Allaham to "[d]escribe all meetings [he] ha[s] had with non-Qatari citizen agents or representatives of Qatar, including the dates of the meetings, the names of those present, and the subjects discussed, between March 1, 2017 and December 31, 2019," Mr. Allaham's draft included the following:  "*At one meeting between Allaham and Benomar in February 2018, Allaham learned from Benomar that the alleged hacking of Broidy was underway.*"  Covington *removed* that sentence.[18]

There appears to have been yet another violation of the Court's December 8, 2021 Order that "Qatar may not receive or review ongoing discovery."  Plaintiffs have discovered a December 7, 2022 email from ArentFox to Mr. Allaham attaching a PDF of documents to be

---

[14] *Id.* at 17 (emphasis added).

[15] *Id.* at 18 (emphasis added).

[16] *Id.* at 20 (emphasis added).

[17] *Id. at 22.*

[18] *Id.* at 34 (emphasis added).  Covington's explanation for removing the sentence was that it was "[n]on-responsive because Benomar was not a Qatari agent or representative."  *Id.*  Extensive evidence recently produced to plaintiffs by Mr. Allaham makes unambiguously clear that Mr. Benomar *was* acting on behalf of Qatar.  *See supra* note 7.

produced to plaintiffs—with a note indicating ArentFox's intention to send those documents "to Covington (counsel for Qatar) today for their review."[19]  A week later, on December 14, 2022, ArentFox, on behalf of Mr. Allaham, made a production to plaintiffs which excluded at least three documents that had been included in the PDF sent to Covington.  The removal of two of those documents, emails sent by Mr. Benomar, which were not produced in December 2022, was thus in line with Covington's instruction one year earlier for ArentFox to "edit to omit mention of Jamal [Benomar]."[20]  Whether or not Covington directed the withholding of those three documents in December 2022, Covington's receipt and review of the documents Mr. Allaham intended to produce before the production constituted a direct violation of the Order.[21]

Plaintiffs have discovered additional discoverable documents from Mr. Allaham concerning defendant Muzin whose non-production provide further evidence of the Concealing Parties thwarting discovery.  Those documents reflect, among other things, that defendant Muzin had concocted a scheme with Qatar to evade FARA reporting requirements by arranging for and representing that a "private company," Blue Fort PR, would deliver 97.5% of Qatar's payments to his single member LLC, defendant Stonington Strategies—a scheme DLA Piper had cautioned him against but that Stonington's counsel, Wiley Rein, helped facilitate.  These documents include:

- A July 17, 2017 email from Muzin to Mr. Allaham and Benomar attaching a document titled "Qatar Budget Options," showing that Mr. Muzin sought a $96

---

[19] *Id.* Ex. 7 at 1.

[20] *Id.* Ex. 3 at 1.

[21] Evidence also indicates that Covington—although it represented a non-party to this action— controlled a purported joint defense among the defendants and regularly summoned defendants' counsel to meetings outside the U.S., including meetings attended by Ali Al-Thawadi and HRH Sheikh Mohammed.  *See id.* Ex. 21 at 2.  No joint defense agreement, however, has been produced.

million contract with Qatar based on a proposal that, among other services, called for the retention of "4 private investigators to follow opposition personnel."[22]

- An August 14, 2017 email—two days after the effective date of a "Referral Agreement" (also concealed from plaintiffs) arranging a 25% commission Stonington would pay Benomar from new business with Qatar—in which Muzin told his attorney at DLA Piper that he was in the process of engaging with a "foreign government" (Qatar), and that both he and Qatar were "contemplat[ing]... 2 contracts... a FARA contract with the government [and t]he second, much larger contract, would be a contract with a private company."  He explained that "both the government and I would like to keep as much as possible out of FARA, in order to avoid negative press coverage about the size of the contract, disbursements, etc." and that the "private company... would take on a large portion of the contract, with substantially the same goals as the government," while admitting that the "aims of both contracts are the same, and the private company will no doubt be in contact with the government."[23]

- An August 15, 2017 reply email from the DLA Piper attorney, warning that "Dividing the contract between the government and a private entity would make no difference if the work is ultimately being done, even indirectly, for the government" and that should Muzin want to pursue the arrangement anyway, "you will want to conduct due diligence on the private entity or entities to ensure that they are not serving as an agent of the foreign government, are not being reimbursed for the work by the government or another foreign entity, are not taking any direction or control from the government, etc."[24]

- A February 9, 2018 "Advisory Opinion" from the FARA Unit at the Department of Justice, which reveals that Stonington's counsel, Wiley Rein, in this litigation, evidently far more willing to accommodate Mr. Muzin's scheme to evade FARA requirements, had represented to the FARA Unit in January 5, 2018 correspondence that "Blue Fort does not represent the interests of the State of Qatar or its government and that the services rendered by Stonington are intended to promote the economic and commercial interests of Blue Fort on behalf of its private clients."[25]

Despite overwhelming evidence that BlueFort PR was nothing more than a shell

company to enable defendants Muzin and Stonington to evade FARA requirements, and though

Muzin himself—in a WhatsApp message concealed by Wiley Rein—admitted that this "private

---

[22] *Id.* Ex. 8 at 1, 3.

[23] *Id.* Ex. 9 at 3.

[24] *Id.* at 1-2.

[25] *Id.* Ex. 10 at 1-2.

company" is controlled by MBH, the younger brother of the Qatari Emir, Wiley Rein has not produced any documents pertaining to Blue Fort PR, including the August 29, 2017 contract.

Other new documents evidence negotiations concerning the December 2018 Agreement:

- April 2018 emails reflecting Abbe Lowell's extensive efforts on behalf of Qatar to arrange agreements among Muzin, Allaham and Qatar (even while Lowell's nominal client, Benomar, had not yet been sued or subpoenaed).[26]

- A May 24, 2018 email from ArentFox to an associate of Abbe Lowell, who also worked consistently on Qatar's behalf, concerning Qatar's failure to agree to indemnify Mr. Allaham notwithstanding his faithfulness to Qatar: "Frankly, I don't think we have done anything wrong to derail these negotiations.  The very first thing Abbe said to me in response to my letter was to tell your client to stop working.  And that is what we did.  No activity since then, no income since then, either . . . . Another highlight was opening our kimono and showing you all our books and records.  Anybody else do that ?  Would you even believe them if they did ?  *Oh and we plan to give you all our materials when we wrap this up.*  Then I get the pleasure of working with the featherweights at Wiley Rein who, as Abbe once said, may have a criminal [Muzin] as a client.  Yet I did exactly what was asked of me: bring him into reality."[27]

- A June 6, 2018 email from ArentFox to Abbe Lowell, stating that Joey "[b]eing left to fend for himself in the Broidy litigation was the last straw.  And Joey stopped deluding himself that we were capable of reaching a settlement of prior grievances *or cooperating or protecting documents* – as the settlement agreement provided for.  He is spending a fortune on this stupid subpoena in a stupid case where he isn't a defendant, trying to help a country that just kicked his face.  I'm wondering who of all the sketchy people I've met recently would do that for Joey."[28]

- A June 6, 2018 email from Abbe Lowell responding to ArentFox—sent a few hours after Judge Forrest in the Southern District of New York had granted plaintiffs' motion to compel Mr. Allaham's deposition and document production pursuant to a subpoena in the California Action—stating, "Please ask [Mr. Allaham] not to act in anger or emotion.  There is nothing lost for him to let me see if there is a pursuit we can do as a common interest.  What does he gain throwing himself to the wolves?

---

[26] *See, e.g.*, *id.* Exs. 11-18.

[27] *Id.* Ex. 12 at 1 (emphasis added).  At the time of this email, Allaham was the only Qatar-affiliated party subject to a discovery request (a subpoena in the California action).

[28] *Id.* Ex. 13 at 2-3 (emphasis added).

And if he does that, he lessens any incentive for others to work out a settlement with him.  At the least, his costs to litigate are well within what I am working on."[29]

- A June 7, 2018 email from Lowell to ArentFox proposing terms of what apparently would become the December 2018 Agreement, including a term providing that "yet another $XX shall be paid to Allaham . . . in the absence of any substantive discovery by the Broidy Plaintiffs of Allaham, reflecting some value to maintaining confidentiality consistent with his former principal's sovereign prerogatives," followed by a June 7, 2018 email from ArentFox to Mr. Allaham summarizing Lowell's email including that "[Qatar] will agree to indemnify [Mr. Allaham] for all his legal expenses and pay [Mr. Allaham] a settlement fee of X and a bonus of X if he is on the winning side of the Broidy litigation and another X if he does not turn over sovereign documents."[30]

That same day, an ArentFox attorney noted the impropriety of Lowell's proposed

agreement:

> I am a little concerned about Joey being paid if he is in the winning side of Broidy.  If that got out he could be accused of being bribed as a witness.  Also I think it's strange they would pay him to essentially not turn over documents.  That is out of our hands unless the court changes its mind.  They can't be saying we defy the court and withhold documents ?   [Abbe Lowell] would not tell me the $ figures unless we agreed to the concept of the settlement.  I frankly look at payment 1 as free money and the other two as being a little sketchy.[31]

Only five months later, when it appeared that Mr. Lowell's client Benomar might be

unsuccessful in asserting diplomatic immunity in a related action brought by plaintiffs, did

Lowell and Covington become interested again in reaching an agreement with Mr. Allaham.  On

November 7, 2018, Mr. Allaham's counsel informed Mr. Allaham, "I think we have an

agreement[.] You sign an indemnification agreement for arent fox to be paid.  You transmit to

Eric [Bloom, Abbe Lowell's colleague at Winston & Strawn,] the documents that I sent you[.]

They review the documents and as long as there are no problems, we resume the settlement

---

[29] *Id.* at 2.

[30] *Id.* Ex. 14 at 2.

[31] *Id.* at 1.

discussions right where we left off before Stephen sent them over to Dean [Dilley] at the [Qatar] Embassy."[32]

And, the following month, Qatar and Mr. Allaham signed the December 2018 Agreement containing the essential terms Lowell had proposed, but, at Lowell and Covington's insistence, the additional term that Mr. Allaham's initial $1.15 million payment would be conditioned on his first signing and providing Covington with a declaration drafted by Lowell and Covington—the selfsame declaration Covington now claims impeaches Mr. Allaham and renders his new declaration, for which no one paid him anything, unreliable.

When, in May 2023, Mr. Allaham consulted his former attorneys at ArentFox about the possibility of settling with plaintiffs and producing the documents that had been withheld and concealed at Covington's direction, he was advised not to do so:

> Giving out documents would violate your cooperation agreement . . . . The cooperation agreement says your materials are actually the property of Qatar; that you have to keep them strictly confidential[.] . . . There is a Breach provision in the Agreement that means Qatar could sue you for the 1.5 million they paid you and the 2 m they have paid Arent Fox to represent you.[33]

Mr. Allaham evidently did not follow his then-attorneys' apparent advice not to settle with plaintiffs. He produced the concealed documents.

But the documents described in this memorandum and plaintiff's opening memorandum that reveal such shocking conduct represent merely snippets of what plaintiffs have so far been able to uncover and review from only one defendant. Contrary to their protestations, defendants plainly have also concealed discovery. As discussed *infra* at I.B, Howard and his counsel failed to preserve three of his email accounts he was using when he was served with plaintiffs'

---

[32] *Id.* Ex. 19 at 1.

[33] *Id.* Ex. 20 at 1.

discovery requests—which productions by others have confirmed must have contained numerous responsive documents.  Muzin and Stonington have failed to produce highly relevant documents concerning, among other things, Muzin's dealings with Abbe Lowell, Benomar and Allaham and the manner in which Qatar paid him, as discussed *infra* at I.B.

The forensic examinations plaintiffs request of all the Concealing Parties—only one of whom has now come clean—is thus plainly necessary to discover the extent of Covington's control over discovery by the Concealing Parties, the extent of Covington's and the other Concealing Parties' apparent violation of the Court's December 8, 2021 Order, and the full extent to which they have concealed discoverable documents and evidence.

Qatar is one of the wealthiest countries in the world.  It has paid its agents and their lawyers huge sums of money—and its attorneys have gone to extraordinary unheard-of lengths—to cover up something Qatar and Covington have steadfastly claimed Qatar never had anything to do with.  It brings the undersigned no pleasure, to say the least, to raise these issues regarding fellow attorneys.  But their apparent misconduct over many years at the service of this foreign country leaves little choice.  An attorney's ethical obligations, duty to obey the laws of this country and duty of candor to this Court do not and should not vary according to how wealthy the client is or, for that matter, whether the client is a foreign sovereign claiming (erroneously) protection under the Vienna Convention.  Plaintiffs are, at a minimum, entitled to the requested forensic investigations into the extent of defendants' and counsel's misconduct and the scope of discovery to which plaintiffs have been wrongfully denied.

# ARGUMENT

I.  **Plaintiffs' Evidence Indisputably Establishes the Concealing Parties' Wrongful Scheme to Circumvent Discovery and Actual Suppression of Responsive Documents**

Plaintiffs have supplied incontrovertible evidence of the Concealing Parties' years-long efforts to conceal defendants' responsive documents by, among other things, manufacturing purported Vienna Convention protection through claims of retroactive ownership over documents in the hands of defendants. The December 2018 Agreement—which Covington virtually ignores—by itself conclusively establishes as much as to Mr. Allaham's and Qatar's counsel, which is further confirmed by the Mr. Allaham's declaration. And notwithstanding the protestations by defendants Muzin and Stonington (together, "Stonington") and defendant Howard, and their respective counsel, even the limited documentary evidence from Mr. Allaham as to them, *see infra* I.B, confirms the need for forensic examinations.

A.  **The December 2018 Agreement, By Itself, Warrants Plaintiffs' Requested Forensic Examinations into the Withholding Parties' Discovery Misconduct**

As shown in plaintiffs' opening memorandum in support of their motion, the December 2018 Agreement in and of itself justifies the forensic examinations plaintiffs seek. But the discovery misconduct contemplated by that Agreement is corroborated by numerous other documents. That plaintiffs have put forth such corroborating evidence—which had been withheld and they are only now locating—in no way reflects, as Qatar's counsel suggests, a "pivot" from plaintiffs' foremost basis for seeking forensic examinations.

The December 2018 Agreement—under which Qatar paid Mr. Allaham $1.5 million to provide an affidavit and compile all of *his* documents and communications (including copies) related to the events underlying this litigation and the California Action (which was filed nine months before the December 2018 Agreement was signed), "return[]" them to the Embassy of Qatar via Qatar's counsel (Covington & Burling), and retroactively transfer ownership of those

documents to Qatar (so that Covington could then conceal them entirely, as it did with the December 2018 Agreement itself, or at minimum attempt to shield them behind sham assertions of Qatar's purported privileges and immunities)—requires, and was expressly designed to facilitate, the wrongful concealment of Mr. Allaham's discoverable responsive documents.  Any suggestion to the contrary belies common sense—what *other* conceivable purpose could Section 7(a) of the December 2018 Agreement, which compels the return and retroactive-ownership-transfer of all discoverable documents from a US citizen to a foreign sovereign, possibly have?[34]

That wrongful intent is precisely what Mr. Allaham's recently disclosed documents show and, indeed, how the lawyers who negotiated the December 2018 Agreement described Section 7(a).  Mr. Allaham's former counsel at ArentFox reminded Mr. Allaham on May 10, 2023 of precisely that: "Giving out documents would violate your cooperation agreement . . . . *The cooperation agreement says your materials are actually the property of Qatar;* that you have to keep them strictly confidential[.] . . . There is a Breach provision in the Agreement that means Qatar could sue you for the 1.5 million they paid you and the 2 m they have paid Arent Fox to represent you."[35]  Abbe Lowell, who worked on behalf of Qatar with Covington's Mitchell Kamin to draft the December 2018 Agreement, likewise articulated the same conception of the term that would become Section 7(a) in yet another responsive, but not produced, email from June 7, 2018 to Mr. Allaham's counsel at ArentFox.  Mr. Lowell's email to ArentFox proposes

---

[34] Section 7(a) of the December 2018 Agreement—titled "Ownership of Records and Confidentiality"—purported to require Mr. Allaham to make available and return to Qatar by December 30, 2018 "all records, notes, data, memoranda, models, and equipment of any nature, and copies thereof, that are in Mr. Allaham's possession or under Mr. Allaham's control and that relate to the Consulting Arrangements or otherwise to the business or affairs of a Qatar Party or its Released Persons," and to "agree and acknowledge that all such returned records are and at all times in the past have been the property of Qatar, and are not and have never been the property of any Allaham Party."  ECF 197-3 § 7(a).

[35] Benson Decl. Ex. 20 at 1 (emphasis added).

terms of what would become the December 2018 Agreement, including a term providing that "yet another $XX shall be paid to Allaham . . . in the absence of any substantive discovery by the Broidy Plaintiffs of Allaham, reflecting some value to maintaining confidentiality consistent with his former principal's sovereign prerogatives."[36]  Summarizing those proposed terms, Mr. Allaham's counsel at ArentFox explained, "[Qatar] will agree to indemnify [Mr. Allaham] for all his legal expenses and pay [Mr. Allaham] a settlement fee of X and a bonus of X if he is on the winning side of the Broidy litigation and another X if he does not turn over sovereign documents."[37]

In the face of all this, Covington resorts to falsely suggesting that plaintiffs' motion for forensic examinations is based principally on Mr. Allaham's declaration.[38]  In fact, if Mr. Allaham's declaration were removed, the case for forensic examinations would be equally as strong—given the incontrovertible fact that the December 2018 Agreement, Covington's editing of verified discovery responses, and numerous other documents evidence egregious discovery misconduct.

First, Covington's focus on attacking Mr. Allaham's declaration is not only misguided— it is far more credible than the affidavit Covington purchased and drafted—but also concedes that Covington cannot rebut the clear inference of discovery misconduct from the face of the December 2018 Agreement, not to mention the other responsive documents never produced. Covington's attempt to impeach the declaration based on prior inconsistent statements is

---

[36] *Id.* Ex. 14 at 2.

[37] *Id.*

[38] *See* Cov. Mem. at 3 (falsely suggesting that "Mr. Allaham's August 2023 declaration" served as the "foremost" basis "from which Broidy claimed it was 'evident' that Qatar and defendants had engaged in an "intentional scheme to circumvent the basic rules of discovery").

unavailing.[39]   The key prior statements in the affidavit were drafted by Covington itself,[40] together with Lowell, and made a condition precedent by Covington (and Lowell) to the first huge payment to Allaham by Qatar pursuant to a transaction engineered and agreement drafted by Covington and Lowell.[41]   By contrast, the recent declaration, for which no one paid, is corroborated by numerous documents.[42]   Allusions by Covington and ArentFox to Mr. Allaham's document productions also do not undermine his declaration that he was told that his attorneys "were not allowed to search [his] documents and communications from 2017 and 2018, because Covington told them that [his] materials from that time frame 'belong' to Qatar."[43]   That Mr. Allaham produced *some* emails and other materials from 2017-2018 does not render "false" or "disprove" Mr. Allaham's assertion that he was told that Covington prevented ArentFox from reviewing and producing *other* of his documents and communications from 2017 and 2018.

---

[39] Covington's comment that "[plaintiffs'] counsel knew about [Mr. Allaham's statements that supposedly contradict assertions in his declaration] in both his deposition transcript and the FARA filings (which were used as an exhibit in Mr. Allaham's deposition), but misleadingly did not disclose those prior inconsistent statements to the Court," Cov. Mem. at 4, is itself misleading, not to mention disingenuous in light of the coverup campaign Covington spearheaded.  Mr. Allaham's FARA filings have been thoroughly covered in more than nine rounds of briefing (six before this Court) on Qatar's purported privileges and immunities.  And the California Action's Protective Order contains a use restriction applicable to Mr. Allaham's deposition—a use restriction Covington has insisted be enforced.

[40] *See* ECF 206.21 (noting that Mitchell Kamin and Abbe Lowell drafted the Allaham Affidavit).

[41] *See* ECF 197-3 at 14 (paying Allaham $1.15 million to, *inter alia*, sign declaration drafted by Covington).

[42]  Plaintiffs continue to discover evidence of Covington's discovery misconduct.  Most recently, as noted *supra,* plaintiffs discovered a December 7, 2022 email from counsel at ArentFox to Mr. Allaham containing a PDF of responsive documents and a note indicating ArentFox's intention to send those documents "to Covington (counsel for Qatar) today for their review."  Benson Decl. Ex. 7 at 1.  That, of course, constituted a direct violation of the Court's December 8, 2021 Order explicitly stating that "Qatar may not receive or review ongoing discovery in this case, as proposed in the defendants' [90] Emergency Motion, without moving to intervene pursuant to Federal Rule of Civil Procedure 24(b)."

[43] *See* ECF 197-2 ¶ 5.

Indeed, Covington's carefully worded purported refutations but non-denials of Mr. Allaham's assertion only further evidence its truth.

Second, Covington's effort to downplay the December 2018 Agreement—which it barely mentions—by falsely suggesting that Mr. Allaham's declaration alone formed the basis for plaintiffs' requested forensic examinations could only reflect Covington's acknowledgement that discovery misconduct is obvious from the face of the December 2018 Agreement. Covington's one attempt to explain away the "Ownership of Records and Confidentiality" provision—*i.e.*, Section 7(a)—in the December 2018 Agreement is unavailing. Covington asserts that the "confidentiality obligations memorialized in the [December 2018] Agreement are not 'retroactive'" because "the Embassy considered the documents created by its contractors in the performance of their work to be documents of the mission."[44] But, of course, that retroactive is meritless. Apart from the fact that nowhere do the words "of the mission" appear in the agreement (or any other document), Section 7(c) of the agreement provides that documents must be produced as required by law. As the Government agreed in its *amicus* brief on the appeal, that negates any expectation of confidentiality and therefore of the inviolability accorded documents "of the mission" under the Vienna Convention.[45]

In short, contrary to Covington's contention, the only "logical" explanation" of Section 7(a) is that it is a product of Abbe Lowell's dreamed-up theory, finding no support in any authority, that Qatar could conceal evidence by retroactively claiming "ownership" over it.

---

[44] Cov. Mem. at 13; *see also* ECF 197-3 § 7(a).

[45] Covington also misrepresents the scope of documents subject to Section 7(a) of the Agreement. That scope is not limited to "documents created by its contractors in the performance of their work"; it instead extends to all of Mr. Allaham's documents and communications "that relate to . . . a Qatar Party or its Released Persons," and Qatar Party and Released Persons are defined so broadly as to include anyone with whom Mr. Allaham conceivably could have had communications relevant to the matters at issue in this litigation. *See* ECF 197-3 §§ 1(g), 7(a).

**B.     Plaintiffs' Evidence Reflects Discovery Misconduct Perpetrated as Part of a Scheme Implicating All of the Withholding Parties**

The manufactured pretext that each defendant's "materials are actually the property of Qatar" is the intended product of the December 2018 Agreement, and presumably similar agreements with Mr. Muzin and Mr. Howard, and the meritless basis on which all of the Concealing Parties have hidden—and continue to hide—to justify defendants' non-compliance with their discovery obligations.  Far from reflecting a "good-faith legal position in an unsettled area of law,"[46] the Concealing Parties' scheme had—until recently—successfully concealed responsive evidence.

Withholding and concealing all these documents certainly does not reflect "the mundane workings of litigation discovery work in progress" recognizable to any litigator.[47]  The wrongfully concealed responsive documents plainly evidence discovery misconduct and reflect a coordinated, ongoing effort carried out by U.S. lawyers to use the Vienna Convention and the doctrine of sovereign immunity as a tool to immunize and conceal tortious conduct perpetrated by U.S. citizens, against a U.S. citizen, on U.S. soil.[48]

Stonington's and ArentFox's decision not to produce Mr. Muzin's August 15, 2017 email to Mr. Benomar and Mr. Allaham is yet another egregious example of the discovery misconduct.

---

[46] Cov. Mem. at 2.  Covington cannot explain what is "unsettled" about Fed. R. Civ. P. 26, and there can be no "good faith" basis for a legal position devised to evade the Rule's requirements.  Nor does or can Covington explain why, if the Concealing Parties in fact believed that the terms of the December 2018 Agreement reflected a "good-faith legal position," they did not produce it.

[47] ArentFox Mem. at 2.

[48] Contrary to Mr. Howard's suggestion, he and his counsel have "spoliated evidence, suppressed discovery, and engaged in [] wrongdoing."  Walden Mem. at 1.  In particular, Mr. Howard and his counsel failed to preserve *any* ESI from the three professional email accounts Mr. Howard used to transact business for Qatar during, and related to, the hack-and-smear attack on plaintiffs.  Mr. Howard's failure to ensure the preservation of all ESI from all three accounts is inexcusable given that he had access to, and was still using, all three accounts at the time plaintiffs served him with a subpoena in July 2018.

To avoid FARA's reporting requirements and conceal his work for Qatar from public exposure, Mr. Muzin purported to conduct work, which was in fact directed by and performed on behalf of Qatar, for a nominally private entity called BlueFort Public Relations, through which he received millions of dollars in payments from Qatar.  Understanding that Mr. Muzin and Stonington engaged in this scheme to circumvent FARA, plaintiffs have consistently demanded in correspondence with Stonington's counsel that Mr. Muzin and Stonington produce all documents and communications related to BlueFort and work purportedly performed for BlueFort.  For instance, plaintiffs wrote to Stonington on July 26, 2023 that "Stonington has produced almost no documents relating to, or communications with or about, BlueFort Public Relations" and that "[d]espite receiving millions of dollars from BlueFort for its work for Qatar, Stonington's productions do not include its initial August 29, 2017 contract with BlueFort and contain virtually no communications with or concerning BlueFort or any of its executives, officers, employees, consultants, or representatives."[49]  Despite plaintiffs' many requests for BlueFort-related documents, Stonington's counsel, Wiley Rein, has repeatedly offered disingenuous denials that BlueFort is in any way related to Mr. Muzin's or Stonington's work for Qatar or the events at issue in this lawsuit.[50]  This is obviously not so—all documents related to BlueFort necessarily are related to the hack and highly relevant to plaintiffs' claims.  Wiley Rein cannot reasonably review the August 15, 2017 email from Mr. Muzin to Mr. Benomar and Mr. Allaham and view it to be irrelevant—that they nevertheless continue to do so is yet another reason plaintiffs' requested forensic examinations are necessary.

---

[49] ECF 206.15 at 1.

[50] *See* ECF 206.14 at 3.

And, contrary to Mr. Howard's suggestion, he and his counsel also have "spoliated evidence, suppressed discovery, and engaged in [] wrongdoing."[51]  In particular, Mr. Howard and his counsel failed to preserve *any* ESI from the three professional email accounts Mr. Howard used to transact business for Qatar during, and related to, the hack-and-smear attack on plaintiffs.  Mr. Howard's failure to ensure the preservation of all ESI from all three accounts is inexcusable given that he had access to, and was still using, all three accounts at the time plaintiffs served him with a subpoena in July 2018.

## II.    Plaintiffs' Requested Forensic Examinations Are Appropriate and Necessary Given the Concealing Parties' Egregious Discovery Misconduct

Plaintiffs have more than justified the need for the requested forensic examinations of each defendant and their counsel by putting forth evidence establishing that the defendants, through counsel, are "intentionally hiding things [and] failing to take appropriate steps to respond to discovery."  *Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 13 (D.D.C. 2009). Plaintiffs have identified for the Court numerous responsive and discoverable documents, including the December 2018 Agreement, that evidence their concealment efforts and that defendants have failed to produce, notwithstanding their obligation to do so.  *See, e.g.*, *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443 (D. Conn. 2010); *Ameriwood Indus., Inc. v. Liberman*, No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D. Mo. Dec. 27, 2006).

Defendants' disingenuous protestations that "discovery is ongoing"[52] cannot be reconciled with this Court's May 3, 2023 Order providing for a prompt resolution of disputes concerning Qatar's privilege assertions and requiring that Qatar produce a *substantially complete* privilege log by June 8, 2023—necessarily requiring defendants to have substantially completed

---

[51] Walden Mem. at 1.

[52] Stonington Mem. at 1,

their document reviews before that date.  The Order did not contemplate multiple iterations of the May 3, 2023 Order's procedure over an indefinite time period.  ArentFox contends that, when Mr. Allaham terminated the firm's representation two weeks ago, ArentFox was in the "process of substantially completing its review and production of documents."[53]  It has been more than two months since plaintiffs, on July 10, 2023, raised questions as to ArentFox's production on behalf of Mr. Allaham.  Not only did ArentFox fail to respond until July 21, 2023, when it claimed it had "inadvertently" misplaced documents, but until it filed its memorandum a week ago, on September 7, it had not been heard from again, let alone produced any documents.  Such belated and patent pretexts only underscore the need for and appropriateness of plaintiffs' requested forensic examinations.

Forensic examinations are the least of the remedies courts routinely impose where, as here, counsel has intentionally withheld responsive materials.  *See, e.g.*, *Richardson v. Union Oil Co. of California*, 167 F.R.D. 1 (D.D.C.), *adhered to on reconsideration in part*, 170 F.R.D. 333 (D.D.C. 1996) (awarding fees and costs to the plaintiff, precluding the defendant from presenting certain evidence, and potentially referring counsel to the bar).  While plaintiffs reserve the right to seek such other sanctions, there is no basis for the Concealing Parties to oppose forensic examinations to test their claims—already refuted by the incontrovertible evidence—that they have done nothing wrong.

Thus, the efforts by the Concealing Parties to distinguish the cases plaintiffs cite completely miss the mark.  Covington's attempt to diminish the relevance of *Ellis v. Toshiba Am. Info. Sys. Inc.,* 218 Cal. App. 4th 853 (2013), fails—the forensic examination there was more limited than the scope of the forensic examinations requested by plaintiffs only because the

---

[53] ArentFox Mem. at 7.

attorney's misconduct in *Ellis*, unlike here, involved only a particular category of records. Here, however, defendants' counsel and Qatar's counsel have engaged in a scheme designed to conceal *all* documents and communications related to the events underlying this litigation.[54] The supposedly "extraordinary" breadth of the forensic examinations requested is a function only of the extraordinary breadth of the discovery abuse necessitating those examinations. Covington attempts to distinguish *Peskoff v. Faber,* 244 F.R.D. 54 (D.D.C. 2007) on the ground that the court there ordered a forensic examination of the defendant's counsel only as a means of obtaining files belonging to the defendant that were stored on counsel's server. But here the case is even stronger—forensic examination is necessary to expose the nature and extent of Covington's scheme to circumvent discovery and to locate and recover responsive documents of the defendants.

None of the cases cited by the Concealing Parties are apposite. Covington's reliance on *Bethea v. Comcast*, 218 F.R.D. 328, 329-30 (D.D.C. 2003), is particularly misguided. Whereas plaintiffs have submitted numerous wrongfully withheld responsive documents (including the December 2018 Agreement), the plaintiff in *Bethea* sought to "enter defendants' premises and inspect their computer systems" based on no more than a "vague assertion" that the defendants' computer systems "are 'believed to contain appropriate discovery information'" and without making any "showing that the documents she seeks actually exist or that the defendants have unlawfully failed to produce them." 218 F.R.D. 328, 329-30 (D.D.C. 2003). In *John B. v. Goetz*, 531 F.3d 448 (6th Cir. 2008), the court set aside the district court's order compelling

---

[54] ECF 197-3 § 7(a) [December 2018 Agreement] (reflecting scheme to prevent production of "all records, notes, data, memoranda, models, and equipment of any nature, and copies thereof, that are in Mr. Allaham's possession or under Mr. Allaham's control and that relate to the Consulting Arrangements or otherwise to the business or affairs of a Qatar Party or its Released Persons").

forensic examination only because, unlike here, "nothing in the record indicates that defendants are unwilling, or will refuse, to preserve and produce all relevant ESI in the future."  *Id.* at 460.

Finally, counsel's citation to cases denying requests for forensic examinations of attorneys based on confidentiality, privacy, or privilege concerns is also unavailing.[55]  First, the cases cited as supposedly denying forensic examination requests based on confidentiality, privacy, or privilege concerns *in fact* hinged on different factors not applicable here.  *See Exec. Air Taxi Corp. v. City of Bismarck, N.D.,* 518 F.3d 562, 569 (8th Cir. 2008) (rejecting request to forensically examine defendant-owned computers for relevant emails where the defendant "had provided all relevant e-mails to [the plaintiff] in hard copy"); *In re: Am. Med. Sys., Inc.,* No. 2325, 2016 WL 6666890, at *6 (S.D.W. Va. Nov. 10, 2016) (denying motion for forensic examination of electronic devices where "materials [the defendant] expect[ed] to recover from a forensic examination of [the] hard drives [were] not critical to the case").  Second, Plaintiffs' proposed protocol accounts for confidentiality, privacy, and privilege concerns by providing that the neutral, third-party computer forensics expert must "sign a copy of and abide by the protective order in place in this action" and "maintain all information in the strictest confidence."[56]  Of course, the Court also may appoint a special master to oversee the forensic examinations and address any privilege or confidentiality issues that may arise.

## III.    Qatar's Sovereign Immunity Does Not Insulate Qatar's Counsel from the Consequences of Their Own Discovery Misconduct

Plaintiffs do not contend that Qatar itself has "committed alleged misconduct" or that "Qatar's alleged influence over [d]efendants' discovery responses should be investigated" and do

---

[55] *See* Cov. Mem. at 17-18.

[56] Mem. at 15-16.

not seek to "subject Qatar to the jurisdiction of a U.S. court."[57]  Plaintiffs seek a forensic examination of Covington to remedy the discovery misconduct perpetrated by Covington and Qatar's other lawyers.  That Qatar benefitted from and funded the misconduct does not in any way insulate its counsel or prevent this Court from enforcing U.S. law on U.S. lawyers who violate U.S. law even if they are acting on behalf of a foreign sovereign.[58]

Covington's statement that "the unmistakable real target of [plaintiffs' requested forensic examination] is Qatar" is nothing more than another meritless attempt to hide behind Qatar's rights as a sovereign.  Qatar already has asserted whatever privileges it believes it is entitled to assert, and this Court is reviewing those assertions *in camera.*  The requested forensic examinations are aimed solely at identifying and obtaining all of *defendants'* other responsive documents and exposing and remedying all efforts by defendants and counsel to conceal discoverable documents.  That is unquestionably necessary and appropriate here.

## IV.   Plaintiffs' Proposed Protocol for Conducting the Requested Forensic Examinations is Reasonable

The objections to plaintiffs' proposed forensic examination protocol raised by the Concealing Parties are meritless.  Multiple courts have granted motions for forensic examinations like plaintiffs' motion here and specifically ordered that the forensic examinations proceed in accordance with protocols almost identical to the three-step procedure set forth in plaintiffs' memorandum precisely because it "does not place an undue burden on the responding party."  *Ameriwood Indus., Inc. v. Liberman*, No. 4:06-CV-524-DJS, 2006 WL 3825291 (E.D.

---

[57] Cov. Mem. at 18-19.

[58] Covington's suggestion otherwise, if implemented, would effectively immunize all manner of tortious or criminal activity on U.S. soil perpetrated by state-sponsored foreign agents—including, say, state-sponsored terrorists, who would merely have to agree that all documents pertaining to their activities are owned by that state and thereby frustrate discovery.

Mo. Dec. 27, 2006) (requiring forensic examinations to proceed pursuant to "three-step imaging, recovery, and disclosure process" adopted "by courts addressing similar problems"); *Cenveo Corp. v. Slater*, No. CIV.A.06-CV-2632, 2007 WL 442387 (E.D. Pa. Jan. 31, 2007) (adopting three-step protocol); *see also Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 654 (D. Minn. 2002); *Playboy Enterprises, Inc. v. Welles*, 60 F. Supp. 2d 1050, 1055 (S.D. Cal. 1999); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 643 (S.D. Ind. 2000).

## **CONCLUSION**

For the foregoing reasons and those in their opening memorandum, plaintiffs respectfully request that the Court grant plaintiffs' motion to compel forensic examinations of Qatar's counsel, defendants and their respective counsel, and former counsel to Joseph Allaham.

Dated: September 15, 2023

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: */s/ Daniel R. Benson*
Daniel R. Benson (*pro hac vice*)
Sarah G. Leivick (*pro hac vice*)
Sarmad M. Khojasteh (*pro hac vice* forthcoming)
David Tyler Adams (*pro hac vice* forthcoming)
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
dbenson@kasowitz.com
sleivick@kasowitz.com
skhojasteh@kasowitz.com
dadams@kasowitz.com

Henry B. Brownstein (D.C. Bar No. 1026042)
1401 New York Avenue, Suite 401
Washington, D.C. 20005
Tel.: (202) 760-3400
hbrownstein@kasowitz.com

*Counsel for Plaintiffs Broidy Capital Management and Elliott Broidy*