# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BROIDY CAPITAL MANAGEMENT LLC and
ELLIOTT BROIDY,

        Plaintiffs,

   v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM,
GREGORY HOWARD, and STONINGTON
STRATEGIES LLC,

        Defendants.

Civil Action No. 1:19-cv-00150-DLF

## STATE OF QATAR'S SUR-REPLY IN OPPOSITION TO BROIDY'S MOTION TO COMPEL FORENSIC EXAMINATIONS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

I.      Broidy Remains Unable to Defend His Original Bases for Requesting a Forensic
        Examination of Qatar's Counsel. ................................................................................... 3

II.     Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel. ................... 5

        A.      Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel
                Related to its Limited Intervention. ...................................................................... 5

        B.      Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel
                Outside the Scope of its Limited Intervention....................................................... 6

                1.      Mr. Allaham's December 2021 Draft Discovery Responses. .................... 7

                2.      The Court Did Not Enjoin Defendants from Communicating with
                        Qatar on the Same Terms as any Other Non-Party. ................................16

        CONCLUSION....................................................................................................................19

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Qari v. Am. Steamship Co.*,
  No. 21-10650, 2023 WL 5202311 (E.D. Mich. Aug. 14, 2023)...............................................4

*Alexander v. United States*,
  509 U.S. 544 (1993) ..........................................................................................................19

*AMEC Civil, LLC v. DMJM Harris, Inc.*,
  No. 06-064, 2008 WL 8171059 (D.N.J. July 11, 2008) ..........................................................8

*Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kansas, Inc.*,
  No. 18-2515, 2021 WL 843235 (D. Kan. Mar. 5, 2021).........................................................8

*Black v. Friedrichsen*,
  No. 19-cv-307, 2022 WL 374502 (N.D. Ind. Feb. 8, 2022)...........................................18, 19

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
  No. 18-cv-2421, 2018 WL 1517182 (C.D. Cal. Mar. 26, 2018)...............................................8

*Bullock v. Hana Sec. Servs.*,
  No. 22-cv-2608, 2022 WL 17976507 (D.D.C. Oct. 15, 2022) ..............................................19

*Holland v. Island Creek Corp.*,
  885 F. Supp. 4 (D.D.C. 1995)..........................................................................................8, 9

*Mosafer Inc. v. Broidy*,
  No. 21-cv-06320, 2022 WL 793029 (C.D. Cal. Feb. 4, 2022), *appeal
  docketed*, No. 22-55265 (Mar. 15, 2022) ..............................................................................8

*N.L.R.B. v. Jackson Hosp. Corp.*,
  257 F.R.D. 302 (D.D.C. 2009).........................................................................................11

*Ohio-Sealy Mattress Mfg. Co. v. Kaplan*,
  90 F.R.D. 21 (N.D. Ill. 1980)...........................................................................................9

*Payne v. Pauley*,
  337 F.3d 767 (7th Cir. 2003) ...........................................................................................12

*Psak v. Bernhardt*,
  No. 14-116, 2020 WL 2849985 (D.D.C. June 1, 2020) .................................................12, 15

*In re Rafferty*,
  864 F.2d 151 (D.C. Cir. 1988)...................................................................................18, 19

*In re Sealed Case*,
    381 F.3d 1205 (D.C. Cir. 2004) ............................................................................ 17

*Seattle Times Co. v. Rhinehart*,
    467 U.S. 20 (1984) ............................................................................................... 18

*U.S. EEOC v. George Washington Univ.*,
    502 F. Supp. 3d 62 (D.D.C. 2020) .................................................................. 8, 10

*United States v. Anthem*,
    No. 16-cv-1493, 2016 WL 8461264 (D.D.C. Oct. 6, 2016), *report and
    recommendation adopted*, 2016 WL 11164028 (D.D.C. Oct. 14, 2016) ........................ 7, 8, 9

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ............................................................................................ 19

## Statutes

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 .................................................. 11

## Other Authorities

D.C. Bar Ethics Opinion 318 ....................................................................................... 9, 10

D.C. Rules of Professional Conduct Rule 4.4(a) ................................................................ 9

D.C. Rules of Professional Conduct Rule 8.4(c) ............................................................. 10

Fed. R. Civ. P. 24(b) ................................................................................................ 17

Fed. R. Civ. P. 33(b)(5) ............................................................................................ 16

Fed. R. Civ. P. 36(a)(3) ............................................................................................ 16

Fed. R. Civ. P. 37 ...................................................................................................... 1

U.S. Dep't of Just., Justice Manual § 9.28-730 ............................................................. 10

## INTRODUCTION

Broidy's arguments for a forensic examination are a moving target.  As soon as one rationale is shot down, Broidy invents another that is equally baseless and inflammatory.  He first requested a forensic examination in his reply brief on cross-motions regarding Qatar's assertion of privileges, relying primarily on Mr. Allaham's "shocking" August 2023 declaration.  When that initial request foundered on that declaration's multiple contradictions and demonstrable falsehoods, Broidy filed a Motion for a Forensic Examination that largely ignored Mr. Allaham's declaration and instead trumpeted various emails as showing misconduct, even though they did not.  The exhibits attached to Broidy's motion were revealed to show nothing more remarkable than Qatar's counsel producing a draft affidavit consistent with a witness's prior sworn statements for that witness's review.  So now on Reply, Broidy again reinvents his grounds for seeking relief — slinging more mud in the hope that he will be permitted to commence a mini-proceeding against Qatar's counsel.  While Broidy's reasons are ever-changing, his objective remains the same: to pursue Qatar through its counsel for the same "hack and smear" allegations  that the Ninth Circuit ruled he cannot raise against Qatar directly.

Broidy's request for a forensic examination of Qatar's counsel remains entirely without legal basis and would violate Qatar's sovereign immunity for the reasons Qatar has previously explained.  Broidy remains unable to explain how a forensic examination — a remedy that presupposes a party's production obligation under Rule 37 — is remotely appropriate for a limited intervenor like Qatar that has no such obligations.  Broidy barely responds to these arguments, instead using his Reply to make entirely new allegations of misconduct, drenched in inflammatory rhetoric, namely:  (i) that Qatar's counsel "falsified verified discovery responses"; and (ii) that Qatar's counsel violated this Court's December 8, 2021 order regarding Qatar's status under the Protective Order.  Like Broidy's earlier allegations, these latest allegations are utterly false.

1

*First*, Qatar's comments on Mr. Allaham's draft discovery responses were privileged joint defense communications that should not have been shared with Broidy or used by his counsel under the D.C. ethics rules.  Regardless, they do not represent an effort to "falsify" discovery responses; they reflect nothing more than suggestions that Mr. Allaham (i) assert additional legal objections regarding Qatar's privileges and immunities, (ii) limit his responses to personal knowledge (as opposed to speculation), and (iii) deny requests for admission where doing otherwise would be inconsistent with Mr. Allaham's prior testimony in his June 19, 2018 deposition and in his December 20, 2018 affidavit.  In any event, Qatar's suggestions were just that — suggestions — some of which Mr. Allaham did not accept.  It was ultimately Mr. Allaham who was responsible for the accuracy of his own discovery responses, and he has never said, including in his recent (non-credible) declaration, that the responses he served were false.

*Second*, contrary to Broidy's assertions, the Court's December 8, 2021 Order did not enjoin Defendants from sharing discovery materials with Qatar's counsel on terms that would be permissible for any other non-party.  Instead, the Order simply rejected Defendants' proposed protective order, which would have given Qatar a special status to redact or designate materials as protected under the Order.  Nothing in the Court's Order could have made it a violation for Qatar — at that time not even a limited intervenor — to receive a draft discovery response voluntarily shared with it by a party.  Broidy's contrary interpretation would transform the Court's December 8 Order into a content-based prior restraint on speech, barring Defendants and Qatar from communicating with each other on terms that would be permissible for any other non-party.

Like the first and second iteration of his request, Broidy's third bite at the apple fails to demonstrate any misconduct on the part of Qatar's counsel — let alone a basis to grant Broidy's unprecedented request for a forensic examination.

## I.      Broidy Remains Unable to Defend His Original Bases for Requesting a Forensic Examination of Qatar's Counsel.

Broidy's Reply yet again fails to explain the self-contradictions in Mr. Allaham's August 2023 declaration, including contradictions with Mr. Allaham's June 15, 2018 FARA filing, his June 19, 2018 deposition, his statements reported in a Wall Street Journal article in August 2018, his December 20, 2018 Settlement Agreement, and his December 20, 2018 affidavit.[1]   Though Broidy now claims that this motion is not "about whether Mr. Allaham's latest declaration . . . is less or more credible than his earlier sworn statements and discovery responses," Broidy cannot escape that his original request for a forensic examination was explicitly based on that declaration. Pls.' Reply Memorandum in Support of Motion to Compel Forensic Examinations ("Reply"), ECF No. 215 at 2; Pls.' Reply in Support of Cross-Motion to Compel Production of Documents, ECF No. 197 at 5 (claiming that it was "evident" from Mr. Allaham's August 2023 declaration that Qatar had engaged in an "intentional scheme to circumvent the basic rules of discovery").   Having launched this entire exercise on the basis of Mr. Allaham's "shocking" declaration, it is remarkable that Broidy now asks the Court to disregard the credibility of that declaration.

Nor can Broidy's counsel justify their decision not to inform the Court about Mr. Allaham's earlier contradictory testimony.   Broidy's sole response, buried in a footnote (Reply at 16 n.39), is that (i) the Court should already have known about the contradictory FARA statement because Mr. Allaham's FARA filing was discussed earlier in the case in other contexts; and (ii) Broidy could

---

[1] Broidy half-heartedly tries to defend the demonstrable falsehood in Mr. Allaham's August 2023 declaration that his attorneys "were not allowed to search [his] documents and communications from 2017 and 2018."  ECF No. 197-2 at 2.  Qatar explained that this assertion was clearly untrue in light of Mr. Allaham's document productions and Qatar's privilege log, and Arent Fox has also informed the Court that this statement is false.  Qatar Opposition to Pls.' Motion to Compel Forensic Examination ("Qatar Opp."), ECF No. 208 at 11; Arent Fox Opposition to Pls.' Motion to Compel Forensic Examination ("AF Opp."), ECF No. 212 at 6–7.  Broidy now tries to re-write this statement as allowing that "some" documents from 2017-2018 were searched, but no such qualifier exists in Mr. Allaham's August 2023 declaration.  Reply at 15–16.

not file Mr. Allaham's deposition transcript because of the California Action's Protective Order. As for the former, the fact that the FARA statement was discussed in other contexts earlier in the case did not suffice to fairly inform the Court that the declaration Broidy was now sponsoring had been specifically contradicted by that FARA statement.  As for the latter, the California Protective Order does not explain why Broidy's counsel did not at least inform the Court of the ***existence*** of the contradictory testimony in the deposition and invite a Court order permitting its filing.  And Broidy offers no justification ***at all*** for his brazen eagerness to accuse Qatar's counsel of "egregious misconduct" without taking the minimal investigative step of obtaining and reviewing Mr. Allaham's December 20, 2018 affidavit.  *See* Qatar Opp. at 5−6.

Broidy also fails to defend the second round of allegations of misconduct he raised in his Motion for Forensic Examination.  Qatar's opposition pointed out that the email exchanges involving Qatar's counsel involved an unremarkable discussion of an attorney producing a draft affidavit for a witness to review.  *See* Qatar Opp. at 12.  In his Reply, Broidy repeatedly refers to the "Covington drafted" affidavit (Reply at 1, 2, 11, 15–16) but is conspicuously unable to articulate how drafting an affidavit amounts to misconduct — because it does not.  *See Al Qari v. Am. Steamship Co.*, No. 21-10650, 2023 WL 5202311, at *6 (E.D. Mich. Aug. 14, 2023) ("It is not uncommon for counsel to prepare affidavits or declarations for a witness and then to have the witness review and sign the statement.").  Further, while Broidy repeatedly attempts to discredit Mr. Allaham's December 20, 2018 affidavit because of its connection with the settlement (Reply at 4, 13–16), the premise of his argument — that Mr. Allaham is willing to provide false sworn statements in exchange for payment — would apply equally to the August 2023 declaration from Mr. Allaham that Broidy has sponsored, since that declaration was provided in exchange for the

valuable consideration of dismissal from this action, if not more.[2]  Broidy's efforts to impeach Mr. Allaham's 2018 affidavit also ignore that Mr. Allaham made numerous sworn statements consistent with that affidavit ***several months before the settlement*** — including in his June 15, 2018 FARA statement and his June 19, 2018 deposition.  Broidy has no theory at all for why the Court should conclude that Mr. Allaham was lying in his sworn FARA filing and deposition.

## II.    Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel.

### A.    Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel Related to its Limited Intervention.

In its opposition brief, Qatar pointed out that Broidy's motion failed to identify any misconduct actually related to the limited capacity in which Qatar is before this Court:  to assert its sovereign privileges and immunities, without waiver of its sovereign immunity.  Qatar Opp. at 9–11.  Broidy's Reply continues to fail to identify any such misconduct.  In fact, the only allegation in Broidy's Reply that even tangentially relates to Qatar's limited intervention is a footnote, which claims that "Qatar's Vienna Convention assertions are belied by Covington's acknowledgement that Mr. Benomar 'was not an agent of Qatar during the relevant time periods.'"  Reply at 4 n.7. Yet Qatar has been consistent that it is not asserting privileges or immunities based on Mr. Benomar's status as an agent of Qatar; rather, as Qatar has previously explained, its assertion of privileges and immunities with respect to three documents involving Mr. Benomar was based on Mr. Benomar's sworn affidavit which indicated that he was an experienced diplomat (first at the UN and then for Morocco) who could be consulted in confidence.  Qatar's Reply in Support of Motion to Vacate and Opposition to Cross-Motion to Compel, ECF No. 193-1 at 14–15; Qatar's

---

[2] Broidy's Reply again fails to deny that there were any additional agreements or understandings relating to Broidy's settlement with Mr. Allaham, including any agreements involving the United Arab Emirates.  Qatar Opp. at 6–7.

Sur-Reply in Opposition to Broidy's Cross-Motion to Compel ("Sur-Reply"), ECF No. 203 at 19–20; *see also* ECF No. 184-1 at PRIV-ALLAHAM-002.  Mr. Benomar's testimony is also consistent with Mr. Allaham's 2018 affidavit, which in paragraph 5 describes Mr. Allaham's consultations with Mr. Benomar, and Mr. Allaham's June 19, 2018 deposition, which described Mr. Benomar in consistent terms (23:7-22; 373:20-23).

> **B.      Broidy Continues to Fail to Identify Any Misconduct by Qatar's Counsel Outside the Scope of its Limited Intervention.**

As with the two prior manifestations of his request, Broidy's allegations of misconduct directed at Qatar's counsel focus on events that occurred months or years before Qatar's limited intervention in this case.  Broidy's Reply reiterates, for example, the same groundless innuendo about Mr. Allaham's 2018 Settlement Agreement, claiming that the Agreement was intended to circumvent Mr. Allaham's discovery obligations in this case.  Yet Broidy again ignores that: (i) the Agreement was entered into before this case was even filed; (ii) the Agreement incorporates an exception to its confidentiality obligation for mandatory discovery requests; and (iii) no documents were ever "returned" under the Agreement, as Arent Fox has now confirmed (and Mr. Allaham has not contradicted).  *See* Qatar Opp. at 2, 12–13; Sur-Reply at 19 & n.22; AF Opp. at 9 ("Nor did Qatar or its counsel at any time instruct Arent Fox to return documents to Qatar, whether from Mr. Allaham's records or otherwise.  This just never happened, and the Plaintiff's argument in this regard is simply wrong.").  Nothing about the 2018 Agreement, in other words, reflects any misconduct on the part of Qatar or its counsel.  To the contrary, it reflects the efforts of a cautious and responsible contracting party that insisted on representations and a sworn affidavit to ensure it was not in the position of indemnifying an agent who had engaged in Broidy's alleged misconduct.

Setting aside its rhetoric regarding the 2018 Settlement Agreement, Broidy's Reply raises two new allegations of misconduct directed at Qatar's counsel, both of which predate Qatar's limited intervention.  The first allegation is that Qatar's counsel "falsified verified discovery responses" with respect to Mr. Allaham's written discovery responses in December 2021.  Reply at 2.  The second allegation is that Qatar's counsel violated the Court's December 8, 2021 Order regarding the Protective Order in this case by receiving draft discovery responses and other documents from Mr. Allaham.  Reply at 3, 6.  Both allegations are simply untrue.

### 1.    Mr. Allaham's December 2021 Draft Discovery Responses.

As an initial matter of serious concern to the integrity of these proceedings, Broidy's counsel has attached a number of exhibits to his public filing that reflect protected common interest and joint defense privileged communications.  Several of these exhibits include Qatar's counsel and are expressly marked as a "Joint Defense Communication," (Exs. 21, 31), entitling them to a privilege that Mr. Allaham — who apparently provided the documents to Broidy's counsel — was not unilaterally at liberty to waive.  One of these joint defense communications contains Qatar's counsel's comments on Mr. Allaham's draft discovery responses (Ex. 3), on which Broidy bases his false allegations of misconduct.  Before responding to the substance of Broidy's allegation, it is first necessary to address the implications of Broidy's review and use of such facially privileged materials.

### a)    Broidy's Improper Review and Use of Joint Defense Communications.

The joint defense privilege "permits represented parties who share a common legal interest to exchange privileged information in a confidential manner for the purpose of obtaining legal advice without waiving the attorney-client [or work product] privilege." *United States v. Anthem*, No. 16-cv-1493, 2016 WL 8461264, at *2 (D.D.C. Oct. 6, 2016), *report and recommendation*

*adopted*, 2016 WL 11164028 (D.D.C. Oct. 14, 2016) (alteration in original) (citation and quotation marks omitted).  Critically, "voluntary disclosure waives the privilege, but one party to the common interest cannot waive it unilaterally."  *Id.* at *3; *see also Holland v. Island Creek Corp.*, 885 F. Supp. 4, 7 (D.D.C. 1995) ("Although the trustees disclosed the June 3 document to parties who did not share a "common interest" — the UMWA agent, the Massey companies, and ultimately defendants — the trustees' unilateral disclosure of privileged information without the consent of the joint privilege-holder, the BCOA, cannot waive the privilege for the document.").  Qatar's common interest with Defendants stems not just from this case, but also from Broidy's continuing efforts to sue Qatar directly for the same alleged misconduct, which date back to 2018 and remain ongoing.  *See* Complaint, *Broidy Cap. Mgmt., LLC v. State of Qatar*, No. 18-cv-2421, 2018 WL 1517182 (C.D. Cal. Mar. 26, 2018); *Mosafer Inc. v. Broidy*, No. 21-cv-06320, 2022 WL 793029, at *14 (C.D. Cal. Feb. 4, 2022), *appeal docketed*, No. 22-55265 (Mar. 15, 2022).[3]

As a Court in this District recently recognized, the D.C. ethics rules impose obligations on attorneys who come into possession of materials that might be privileged.  *See U.S. EEOC v. George Washington Univ.*, 502 F. Supp. 3d 62, 75 (D.D.C. 2020).  *EEOC* involved a complainant who, "without authorization from the University," shared "certain work-related emails from her University email account" with the EEOC, including two email chains containing attorney-client privileged communications.  *Id.* at 68.  The Court discussed the governing D.C. professional

---

[3] Broidy complains that no Joint Defense Agreement has been produced by the Defendants (Reply at 7 n.21), but joint defense agreements are themselves privileged and can also be oral.  *See Bedivere Ins. Co. v. Blue Cross & Blue Shield of Kansas, Inc.*, No. 18-2515, 2021 WL 843235, at *5 (D. Kan. Mar. 5, 2021) ("[C]ase law is clear that [a] joint-defense agreement is privileged."); *AMEC Civil, LLC v. DMJM Harris, Inc.*, No. 06-064, 2008 WL 8171059, at *4 (D.N.J. July 11, 2008) ("Generally, joint defense agreements are protected by work product privilege."); *Anthem*, 2016 WL 8461264, at *3 (joint defense agreements may also be oral).  The parties have also not yet exchanged privilege logs, so any joint defense communications that would be required to be logged by the Defendants have not yet needed to be identified.  ECF No. 206-6, at 6, 95.

responsibility rules and ethics opinions, including the rules applicable to the situation where "(1) the materials are 'privileged on their face' and (2) the attorney has 'a reasonable basis to conclude' both that (a) 'the privilege has not been waived," and (b) the materials 'have been obtained without authorization.'" *Id.* at 77–78 (quoting D.C. Bar Ethics Opinion 318).  As the Court explained, "Ethics Opinion 318 expressly reaffirms that an attorney who reviews material known to be privileged may be 'engaging in a dishonest act' in violation of the Rules of Professional Conduct." *Id.*[4]

Here, the privileged status of the documents attached to Broidy's Reply is readily apparent (*i.e.*, several are expressly marked as joint defense communications), and Broidy's counsel had a reasonable basis to conclude that the materials had been obtained without the authorization of the joint-privilege holders, whose agreement is necessary to waive the privilege.  *See Anthem*, 2016 WL 8461264, at *3; *Holland,* 885 F. Supp. at 7.  If there were any doubt about the application of this rule when Broidy first filed his Motion for Forensic Examinations, moreover, it was removed with Arent Fox's submission on September 8, 2023, which confirmed that Mr. Allaham did "not have the unilateral right to waive" joint defense communications.  AF Opp. at 1.  *See also Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980) ("That these documents included communications from settling defendants to their individual attorneys does not alter the fact that the documents reflect the joint defense effort engaged in by defendants.  For this reason,

---

[4] In addition, Rule 4.4(a) of the D.C. Rules of Professional Conduct provides that "a lawyer shall not . . . knowingly use methods of obtaining evidence that violate the legal rights of such a [third] person."  Comment 1 to the Rule makes clear that lawyers cannot "disregard the rights of third persons … includ[ing] legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships."

the settling defendants cannot unilaterally waive the attorney client privilege that attaches thereto.").[5]

The appropriate course for Broidy's counsel would have been to instruct Mr. Allaham, in the first instance, to withhold any documents subject to joint defense privilege and if such documents were nonetheless provided, to "return [the] privileged documents without reviewing them if they learn about their privileged nature before reviewing the documents." *See EEOC*, 502 F. Supp. 3d at 78 (quoting Ethics Opinion 318). At a minimum, Broidy's counsel should not have reviewed the documents and should have conferred with counsel for the joint-privilege holder(s) to determine what course of action to take. *Id.* at 75–76; Ethics Opinion 318 ("Receiving counsel may violate the provisions of Rule 8.4(c) by reviewing and using the document in an adversary proceeding under such circumstances and should either return the document to opposing counsel or make inquiry of opposing counsel about its status prior to determining what course of action to take."). Broidy's counsel did none of those things and instead rushed to make their latest filing, thereby precipitating a *fait accompli* where Qatar is forced to respond to inflammatory allegations of misconduct based on the cherry-picked disclosure of privileged documents without an orderly opportunity to first address the privilege issues involved.[6]

---

[5] In the criminal context, the Justice Manual (previously known as the U.S. Attorneys' Manual) similarly recognizes that a party's ability to cooperate with a government investigation may be constrained by virtue of a joint defense agreement. *See* U.S. Dep't of Just., Justice Manual § 9.28-730 ("Of course, the corporation may wish to avoid putting itself in the position of being disabled, by virtue of a particular joint defense or similar agreement, from providing some relevant facts to the government and thereby limiting its ability to seek such cooperation credit. Such might be the case if the corporation gathers facts from employees who have entered into a joint defense agreement with the corporation, and who may later seek to prevent the corporation from disclosing the facts it has acquired.").

[6] Qatar and its counsel expressly preserve, and do not waive, any and all privileges and immunities applicable to the materials filed by Broidy, including Qatar's sovereign privileges and immunities. Nothing in this submission should be construed as a request by Qatar to broaden the scope of its limited intervention, and Qatar does not waive any rights or immunities through this submission, (continued…)

b)      **Qatar's Comments on Mr. Allaham's Draft Discovery Responses.**

Setting aside the improper manner in which these materials have been presented to the Court, Broidy's accusation that Qatar "falsified verified discovery responses" does not withstand even a cursory review of the document on which Broidy relies.  That document (Ex. 3) is an email chain between Mr. Allaham and Arent Fox discussing suggestions from Qatar, conveyed by its counsel, relating to Mr. Allaham's *draft* discovery responses.  There is no support for Broidy's outrageous allegation that Qatar's counsel edited, let alone "falsified," discovery responses that Mr. Allaham had already "verified."  To the contrary, as Broidy's Reply and exhibits make clear, Mr. Allaham's responses were finalized *after* Qatar provided suggestions and Mr. Allaham further discussed the responses with his lawyers at Arent Fox.  *See* Reply at 3–7; Exs. 1–6.

Despite Broidy's insinuations, there is nothing nefarious about members of a joint defense group providing comments on draft discovery responses — indeed, that it is precisely the type of cooperation that serves to substantiate the existence of a common interest.  *See N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 312–13 (D.D.C. 2009) ("There is no evidence in the record to suggest that the NLRB and the Union have any sort of written agreement that governs their relationship, but they seem to have been working together in this litigation toward [a] common goal . . . .  To that end, Union counsel and NLRB counsel seem to have collaborated on things such as responding to discovery requests, drafting motions, pleadings, and communications with opposing counsel.").

Nor was there anything improper with the substance of Qatar's suggestions.  Broidy quotes selectively from Qatar's suggestions for Mr. Allaham's Requests for Admission, omitting

including its immunity from the jurisdiction of the courts of the United States pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611.

suggested language that clarified that Mr. Allaham's responses would be limited to personal knowledge (as opposed to speculation).  Ex. 3 at 13–18 (suggesting language that "Allaham will define 'knowledge' to mean direct, personal, or first-hand knowledge"); *see also Psak v. Bernhardt*, No. 14-116, 2020 WL 2849985, at *7 (D.D.C. June 1, 2020) (contrasting "personal knowledge" with "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that [first-hand personal] experience" (quoting *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003))).  Broidy also omits Qatar's suggested language clarifying the aspects of the response to which Mr. Allaham would object in light of Qatar's sovereign privileges and immunities. Ex. 3 at 11–24, 32–34 (suggesting language that "Allaham will not disclose information regarding his authorized activity for Qatar between August 2017 and July 2018.").  Broidy fully understood these limitations on the responses Mr. Allaham provided, quoting them in his 2022 Motion to Compel.  ECF No. 109-1 at 9 ("All Defendants also invoked the Vienna Conventions and principles of international comity in refusing to answer large numbers of specific requests.  For example, in response to 23 of the 28 requests for admission that Plaintiffs' served on Allaham, he responded that he 'will not disclose information regarding his authorized activity for Qatar between August 2017 to July 2018.'").

For those portions of the Requests for Admission that Mr. Allaham did answer, Qatar's suggested denials were also entirely appropriate.  Mr. Allaham had previously represented in his 2018 Agreement that he did not participate in the alleged hack, and Mr. Allaham's affidavit accompanying the 2018 Agreement also stated unequivocally that he did not have knowledge of the alleged hack.  *See* ECF No. 197-3 at 2; ECF No. 205.  Though Broidy casually refers to the 2018 affidavit as "reciting Qatar's false versions of the facts" (Reply at 1), Broidy provides no substantiation for this assertion.  Mr. Allaham's August 2023 declaration did not assert that Mr.

Allaham had personal knowledge of the alleged hack, and Broidy has not submitted any additional declaration from Mr. Allaham to this effect (even though Broidy is clearly able to obtain sworn statements from Mr. Allaham).  In any event, even if Mr. Allaham were today to contradict his earlier sworn statements regarding his lack of personal knowledge of the hack, that would not render Qatar's suggestions, based on the record at that time, inappropriate.

It was not misconduct for Qatar to rely on the record of Mr. Allaham's prior testimony in making suggestions regarding Mr. Allaham's draft discovery responses, which included not just his December 20, 2018 affidavit, but also his June 19, 2018 deposition.  Here again, Broidy completely ignores Mr. Allaham's deposition testimony, and the fact that Mr. Allaham provided it months before the Agreement was signed — meaning that Broidy's grounds for criticizing the later affidavit could not apply to the deposition testimony.  Qatar again refrains from specifically quoting the relevant excerpts given the Protective Order in the California Action, but would direct the Court's attention to the following excerpts (46:17–47:5, 84:17–85:4), which are consistent with Mr. Allaham's subsequent affidavit that he had no personal knowledge of the hack.

Broidy also quotes from one of Mr. Allaham's draft interrogatory responses, which asked Mr. Allaham to "[d]escribe all meetings you have had with non-Qatari citizen agents or representatives of Qatar, including the dates of the meetings, the names of those present, and the subjects discussed, between March 1, 2017 and December 31, 2019."  Reply at 6.  Qatar suggested removing a paragraph describing several conversations between Mr. Allaham and Jamal Benomar as "non-responsive because Benomar was not a Qatari agent or representative."  Ex. 3 at 36.  As discussed above, Qatar has not asserted that Mr. Benomar was a Qatari agent or representative, and Qatar's comment to this effect was consistent with Mr. Benomar's affidavit, Mr. Allaham's affidavit, and the testimony in Mr. Allaham's deposition (at 373:16-23).  *See* supra 5–6.

13

Broidy now asserts that Mr. Benomar *was* a Qatari agent, relying on an email from Mr. Allaham to his counsel containing a hearsay statement that he was required to obtain approval from Mr. Benomar.  Reply at 6 n.18.  Yet Broidy himself has taken the position, likewise relying on Mr. Benomar's affidavit, that no special relationship, including one of agency, existed between Mr. Benomar and Qatar.  *See* ECF No. 185-1 at 11 (Broidy asserting that "Mr. Benomar by his own admission had no such relationship [with Qatar].").  That inconsistency aside, Mr. Allaham's statements in the email do not establish an agency relationship between Mr. Benomar and Qatar. And regardless, the existence of this email (which was not sent to Qatar's counsel) does not establish that it was misconduct for Qatar's counsel to rely on the record of Mr. Benomar's and Mr. Allaham's sworn statements in commenting in December 2021 that Mr. Benomar was not a Qatari agent or representative.

If Mr. Allaham believed that Mr. Benomar *was* a Qatari agent, he was free to reject Qatar's suggestions on this interrogatory.  Qatar's suggestions were just that — suggestions — which Mr. Allaham in some instances did not incorporate.[7]  Mr. Allaham's Settlement Agreement made clear that its confidentiality obligations did not apply to binding discovery requests, and the exhibits accompanying Broidy's Reply make clear that Mr. Allaham was actively engaged in discussing his discovery responses with his counsel.  *See* Ex. 3 at 2–4; *see also* Exs. 1, 2, 6.  To be sure, the statements in Mr. Allaham's initial draft responses regarding the alleged hack were concerning to Qatar, given the potential tension between those statements and the totality of Mr. Allaham's contractual representations, affidavit, and deposition testimony.  At the same time, it was not clear

---

[7] For Interrogatory 7, for example, Qatar suggested adding a defined term for "knowledge" to mean "direct, personal, or first-hand knowledge" and to use this defined term elsewhere in the response.  Mr. Allaham accepted the suggested defined term, but continued to use the full phrase "direct, personal, or first-hand knowledge" in the response.  Ex. 3 at 33; Ex. 4 at 39–40.

the extent to which the initial draft responses reflected Mr. Allaham's actual personal knowledge, as opposed to "speculations, hunches, intuitions, or rumors."  *See Psak*, 2020 WL 2849985, at *7.[8] Qatar accordingly suggested clarifying that Mr. Allaham's responses were based on personal knowledge and revising the responses for consistency with the record of Mr. Allaham's testimony available to Qatar's counsel.  It was ultimately Mr. Allaham's decision whether to accept those suggestions.

Broidy's claim that Qatar's suggestions "reversed" (Reply at 5) admissions to denials is also at odds with another aspect of Exhibit 3:  the initial email on December 16 from Arent Fox to Mr. Allaham containing what appears to be the first draft of his responses based on a call with him. Those responses suggest that Mr. Allaham originally planned on denying RFAs 5, 13, and 15 to the extent that they sought admissions of his "prior knowledge" (RFA 5) or his "direct personal knowledge" (RFAs 13, 15).  Ex. 3 at 5–6.  For the aspects of the requests that Mr. Allaham was planning to admit, meanwhile, the email suggests that he did not have such "prior knowledge" or "direct personal knowledge."[9]  Mr. Allaham's original draft responses thus indicate that he did not have personal knowledge (consistent with Qatar's later comments and Mr. Allaham's prior sworn

---

[8] For example, the initial draft response of Interrogatory 7 stated:  "Subject to these objections, Allaham responds *that he has no direct, personal, or first-hand knowledge* about how the media purportedly obtained any allegedly hacked materials during the time frame specified.  *Any knowledge he has of such subject matter he obtained from information he received from Nick Muzin, news reports, or articles, and other publicly available sources*."  Ex. 3 at 33 (emphasis added).

[9] Ex. 3 at 5–6 ("RFA 5: ADMIT, to the extent Allaham had heard of the alleged hacking efforts but DENY to the extent that Allaham had any prior knowledge of the alleged hacking efforts. . . . RFA 13: ADMIT to the extent Allaham knew the phones of the Plaintiff were hacked but DENY to the extent that Allaham had any direct personal knowledge of any citizen agents who were personally involved in the actual hacking of the phones. . . . RFA 15: ADMIT to the extent Allaham knew the hacked materials were disseminated to the media but DENY to the extent that Allaham had any direct personal knowledge of any citizen agents who were personally involved in the actually disseminating the Hacked materials to the media.").

statements), and Broidy's characterization of Qatar's suggestions as "reversing" Mr. Allaham's initial draft is accordingly misleading.  Broidy's allegations also cannot be reconciled with the fact that Mr. Allaham consistently denied RFA 6 — which asked him to admit that "[Y]ou have non-public knowledge of the hacking of Plaintiff's computers" — throughout each draft reflected in Exhibit 3.  Ex. 3 at 5, 13.

In sum, Broidy's allegation that Qatar's counsel "falsified verified discovery responses" is baseless as a matter of fact.  It also fails as a matter of law.  Given that it is the obligation of each party to sign its own discovery responses, *see* Fed. R. Civ. P. 33(b)(5); 36(a)(3), it is unsurprising that Broidy identifies no legal requirement that Qatar's suggestions allegedly violated, let alone a legal obligation for which a forensic examination would be an appropriate remedy.  In any case, the fact that Qatar's counsel offered suggestions for Mr. Allaham's review, consistent with Mr. Allaham's prior sworn statements, and for Mr. Allaham's ultimate decision in consultation with his counsel, does not reflect any form of misconduct.

### 2. The Court Did Not Enjoin Defendants from Communicating with Qatar on the Same Terms as any Other Non-Party.

Broidy also argues that Qatar was barred from receiving Mr. Allaham's draft responses.  But that claim fundamentally misreads this Court's December 8, 2021 order, which did not enjoin the Defendants from communicating with Qatar on the same terms as any other non-party.

The Court issued two relevant orders on December 8, 2021.[10]  The first Order granted Defendants' Emergency Motion for a Protective Order, which largely tracked the Protective Order in the California Action.  ECF No. 96.  The Court did "not see good cause, however, for adopting the defendants' additional Immunity Protocol, which would allow the State of Qatar to review and

---

[10] The Court also entered a third order on December 8, 2021 regarding the discovery schedule.

redact documents produced by third parties before the plaintiffs can even access them."  As referenced by the Court, the proposed Immunity Protocol would have given Qatar a special status under the Protective Order as an "interested non-party," with the ability to redact third-party productions and make confidentiality designations under the Order.  ECF No. 90-2 at 3–4, 15–16.

The second Order issued on December 8, 2021 addressed a motion to strike Qatar's notice of appearance.  The Court ruled that "Qatar may not receive or review ongoing discovery in this case, *as proposed in the defendants' Emergency Motion*, without moving to intervene pursuant to Federal Rule of Civil Procedure 24(b)."  (Emphasis added.)  The Court then cross-cited to its Order on the Protective Order rejecting Defendants' Proposed Immunity Protocol,[11] and to the D.C. Circuit decision in *In re Sealed Case*, 381 F.3d 1205, 1211 n.4 (D.C. Cir. 2004), for the proposition that several "courts of appeals have construed a district court's decision to permit a non-party to participate in a discovery dispute as the equivalent of authorizing intervention."

The Court's ruling, in other words, refused to grant Qatar the *special treatment* requested by Defendants' proposed Protective Order and the opportunity to "participate in [] discovery dispute[s]" without moving to intervene.  *See id.*  The Order did not single out Qatar for *special disfavor* by enjoining Defendants from communicating with Qatar on the same terms as any other non-party.  This interpretation is reinforced by the Court's later comments in its June 15, 2022 ruling on Qatar's motion to confirm divestment of jurisdiction, where the Court ruled that it would not permit Qatar to assert its privileges and immunities through a privilege log or otherwise "screen a private party's discovery" without intervening.  ECF No. 158 at 8 n.3.  Again, however, the Court

---

[11] The Court's Order actually cites to a Minute Order of December 6, 2021.  There was no Minute Order issued on December 6, 2021, and it appears in context that this was a reference to the Order issued earlier the same day regarding the Protective Order.

did *not* rule that Defendants were forbidden from communicating with Qatar, including by sharing their own discovery materials, on the same terms as any other non-party.

Broidy's interpretation of the Order as imposing such an injunction would lead to absurd results. Broidy and the Defendants would be permitted to share discovery materials (other than those designated as Confidential or AEO) with all non-parties **except** for Qatar. Broidy would continue to be free to discuss produced discovery materials in the New York Times, for example, as he has done previously,[12] or to share his discovery responses with the United Arab Emirates. Broidy and Defendants would likewise be free to share their own pre-existing business documents and communications, which also happen to be responsive to discovery requests, with any non-party **except** for Qatar. Mr. Allaham could host a public workshop to draft and edit his discovery responses, and he would be free to invite all members of the general public **except** for Qatar. There is no indication the Court intended its Order to create such an absurd outcome.

Broidy's proposed interpretation of the Order would also raise serious First Amendment concerns. In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), the Supreme Court explained that a protective order was not a "classic prior restraint" because it would "prevent[] a party from disseminating only that information obtained through use of the discovery process." *Id.* at 33–34. The same party could still "disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." *Id.*; *see also In re Rafferty*, 864 F.2d 151, 155 (D.C. Cir. 1988) (vacating order that limited litigant's ability to disclose information obtained before litigation began). Broidy's interpretation would collapse this distinction. *See also Black v. Friedrichsen*, No. 19-cv-307, 2022 WL 374502, at *3 (N.D. Ind.

---

[12] David D. Kirkpatrick, *Hackers Went After a Now-Disgraced G.O.P. Fund-Raiser. Now He Is After Them.*, N.Y. Times (Sept. 20, 2018), https://www.nytimes.com/2018/09/20/world/middleeast/broidy-trump-hackers-qatar.html.

Feb. 8, 2022) ("The Defendants seek to restrict the Plaintiff from disseminating her own deposition testimony . . . . That kind of order is untethered from what the Supreme Court has said the First Amendment allows.").  Indeed, Broidy's interpretation would be even more constitutionally problematic than the orders in *Rafferty* and *Black*, since Broidy's interpretation would permit Defendants to share their discovery materials with any non-party ***except*** for Qatar — a content-based prior restraint under the First Amendment.  *See, e.g., United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826–27 (2000); *Alexander v. United States*, 509 U.S. 544, 550 (1993).  Lastly, even if the Order were read as Broidy says, it could have only imposed an injunction on the parties then before the Court, not a non-party like Qatar.  *See Bullock v. Hana Sec. Servs.,* No. 22-cv-2608, 2022 WL 17976507, at *1 n.1 (D.D.C. Oct. 15, 2022) (Court "is powerless to issue an injunction against non-parties" (internal citation and quotation marks omitted))*.*

In short, the Court's December 8, 2021 Order denied Qatar an opportunity to formally participate in discovery in this action without intervening, such as by screening discovery under the proposed Immunity Protocol or asserting privileges through a privilege log.  The Order did not enjoin Defendants from communicating with Qatar on the same terms as would be permitted for any other non-party.  Since the Order did not prohibit Mr. Allaham from voluntarily sharing with Qatar his own draft discovery responses and document productions, accordingly, Qatar's receipt of these materials prior to its limited intervention could not constitute any form of misconduct, by Mr. Allaham's counsel, Qatar's counsel, or otherwise.

## <u>CONCLUSION</u>

For the reasons set forth above and in Qatar's opposition brief, Broidy's Motion for a Forensic Examination of Qatar's counsel should be denied.

Dated: September 22, 2023                          Respectfully submitted,

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
David M. Zionts (D.C. Bar No. 995170)
Amber M. Charles (D.C. Bar No. 1035226)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com
dzionts@cov.com
acharles@cov.com

Mark P. Gimbel
(*pro hac vice* application pending)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
mgimbel@cov.com

*Counsel for State of Qatar*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023, I caused a true and correct copy of the foregoing Sur-Reply in Opposition to Broidy's Motion to Compel Forensic Examinations to be filed through the Court's e-file and serve system, which will serve notice electronically on all counsel of record, as more fully reflected on the Notice of Electronic Filing.

Dated: September 22, 2023

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut (D.C. Bar No. 989222)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
aberengaut@cov.com

*Counsel for State of Qatar*