**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BROIDY CAPITAL MANAGEMENT
LLC, *et al.*,

           *Plaintiffs*,

    v.

NICOLAS D. MUZIN, *et al.*,

           *Defendants*,

   and

STATE OF QATAR,

           *Limited-Purpose Intervenor.*

No. 19-cv-150 (DLF)

---

<u>**MEMORANDUM OPINION**</u>

      This is a protracted discovery dispute.  For almost two years, plaintiffs Broidy Capital

Management LLC and Elliott Broidy (together, "Broidy") have sought discovery from defendants

Nicolas Muzin, Stonington Strategies LLC, and Gregory Howard.  Dkt. 109.  Broidy also seeks

discovery from former defendant Joseph Allaham[1] and from third parties IMS Inc., Jeffrey Kleuter,

and Heather Conover.  Dkt. 185.  All have resisted, citing the Vienna Convention on Diplomatic

Relations (VCDR) and principles of international comity.

---

[1] On August 24, 2023, the plaintiffs informed the Court that they had agreed to dismiss their
claims against Allaham.  Dkt. 195.  Consistent with this agreement, the Court dismissed Allaham
from this case.  Minute Order of Aug. 28, 2023.  Nevertheless, Broidy's motion to compel
production from Allaham does not appear to be moot, as it is unclear from the record whether
Allaham has provided Broidy with all the documents Broidy seeks in his motion to compel.
*But cf.* Email from Nicolas Muzin to Joey Allaham & Jamal Benomar (July 27, 2017, 7:11 PM),
Dkt. 215-24 (illustrating that Broidy has acquired at least one such document).

On June 2, 2022, the Court ordered production of the documents Broidy seeks.  Dkt. 150.  The State of Qatar, an intervenor, now moves to vacate the Court's order.  Dkt. 175.  Broidy cross-moves to compel production of the documents over which Qatar claims privilege.  Dkt. 185.  Because the relevant facts have changed since June 2022, the Court will vacate its prior order.  Taking the recent developments into account, however, the Court will grant Broidy's renewed motion to compel.  Qatar's arguments against production are entirely devoid of merit.

## I.     BACKGROUND

This is a lawsuit between Broidy and several U.S. nationals, all foreign agents of Qatar.  *See* First Am. Compl. (Compl.) ¶¶ 11–18, Dkt. 18-2.  Broidy, an outspoken anti-Qatari advocate, contends that the defendants conspired to hack his computers and leak information to the press.  *Id.* ¶¶ 1–2, 5, 199.  His suit alleges violations of the federal Computer Fraud and Abuse Act, the federal Defend Trade Secrets Act, and the California Uniform Trade Secrets Act, along with receipt and possession of stolen property in violation of the California Penal Code and civil conspiracy under California and Federal law.[2]  *Id.* ¶¶ 274–329, 368–375; *see* Mem. Op. of Mar. 31, 2020 at 7–8, Dkt. 51, *aff'd*, *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) (*Broidy I*).

After false starts in the Central District of California and Southern District of New York, Broidy filed his complaint in this action in January 2019.  *Broidy I*, 12 F.4th at 793–94.  In December 2021, after extensive motions practice and an interlocutory appeal to the Circuit, discovery began.  *See generally* Joint Initial Scheduling Conf. Report, Dkt. 91.

---

[2] Broidy also sought relief for various California torts and for violations of the federal Racketeer Influenced and Corrupt Organizations Act, the federal Stored Communications Act, and the California Comprehensive Computer Data Access and Fraud Act.  *See* Mem. Op. of Mar. 31, 2020 at 44.  The Court dismissed those counts for failure to state a claim.  *Id.*

During discovery, the defendants sought to withhold certain documents under the VCDR, principles of international comity, and the deliberative-process privilege. Broidy moved to compel production, Dkt. 109, and the Court granted his motion, Mem. Op. of June 2, 2022 at 25, Dkt. 149. The Court reasoned that the documents Broidy targeted were owned and possessed by U.S. nationals rather than the State of Qatar and that the federal Foreign Agents Registration Act (FARA) made such documents subject to inspection by the Department of Justice. *Id.* at 13, 17–18. Broidy's documents therefore fell outside the ambit of the VCDR, which the Court initially determined protected documents "that either belong to or are possessed by a [diplomatic] mission." *Id.* at 13. The defendants' international-comity and deliberative-process arguments failed for similar reasons. *Id.* at 21–23.

Qatar appealed. Dkt. 153. Before the Circuit, the United States submitted an *amicus* brief rejecting the Court's reading of the VCDR. Br. for the United States as *Amicus Curiae* at 3, *Broidy Cap. Mgmt. LLC v. Muzin* (Aug. 26, 2022), Dkt. 200-1 (U.S. *Amicus* Br.). In the United States' view, the Vienna Convention calls for a "two-part inquiry" when a diplomatic mission sends documents to "outside parties." *Id.* at 30. In the first part, the Court asks whether documents were "ever . . . 'of [a] mission.'" *Id.* at 31 (quoting VCDR art. 24). Documents are "of [a] mission" if a mission "possessed the documents" or "solicited [their] creation . . . and provided information from inviolable [mission] documents or archives that [was] included in" them. *Id.* In the second part, the Court considers whether a mission maintained "objectively reasonable expectations" of confidentiality in its documents after sending them to the outside party. *Id.*

The Circuit dismissed Qatar's appeal without reaching the merits, reasoning that Qatar was not bound by the Court's discovery order and so could not appeal it. *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 999 (D.C. Cir. 2023) (*Broidy II*). But it "instruct[ed]" this Court "to provide

Qatar the opportunity to timely intervene to assert its rights under the Vienna Convention[] and international comity," offering "due respect" to its "coordinate interest in the litigation." *Id.* On remand, the Court did so, and Qatar intervened. Dkt. 173; *see* Minute Order of May 2, 2023.

Qatar promptly moved to vacate the Court's 2022 discovery order. Dkt. 175. It also prepared a privilege log. Dkt. 184-1. Broidy cross-moved to compel production of the documents in the log. Dkt. 185. In addition to the parties' briefs, Dkts. 175, 185, 192, 197, 203; the submission of the United States as *amicus curiae*, Dkt. 200; and Qatar's privilege log, the Court has reviewed the disputed documents *in camera*. For the following reasons, the Court will vacate its prior order and grant Broidy's cross-motion to compel.

## II.  MOTION TO VACATE

The factual and legal posture of this case has changed since June 2022. For one, Broidy seeks different documents in his cross-motion than he did in his original motion to compel. *Compare* Mot. to Compel at 17, Dkt. 109 (seeking a blanket ruling that "the documents and information in the hands of [d]efendants are not immune from discovery"), *with* Cross-Mot. to Compel at 1, Dkt. 185 (seeking production of specific, logged documents from defendants and certain third parties). For another, since the Circuit's decision on appeal, Qatar has intervened for the sole purpose of asserting its privileges. The United States also has provided its position regarding the standard the Court should apply in assessing whether the relevant documents are covered by the VCDR. For these reasons, the Court will vacate its June 2, 2022 discovery order. *See Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("Interlocutory orders . . . may always be reconsidered prior to final judgment" so long as reconsideration "'is consonant with equity.'") (quoting *Schoen v. Wash. Post*, 246 F.2d 670, 673 (D.C. Cir. 1957)).

4

## III.     CROSS-MOTION TO COMPEL

The materials Broidy seeks are relevant, so the Court may grant his motion to compel unless (among other things) it targets privileged documents.  *See* Fed. R. Civ. P. 26(b)(1).  Qatar asserts privileges under the Vienna Convention and principles of international comity.  The Court will reject both claims of privilege.

### A.     Vienna Convention on Diplomatic Relations

Article 24 of the Vienna Convention provides: "The archives and documents of [a diplomatic] mission shall be inviolable at any time and wherever they be."  VCDR art. 24, Dec. 13, 1972, 23 U.S.T. 3227.  Article 27(2) adds: "The official correspondence of [a] mission shall be inviolable.  Official correspondence means all correspondence relating to the mission and its functions."  *Id.* art. 27(2).  Consistent with its June 2022 ruling and the position of the United States, the Court analyzes Articles 24 and 27 of the Convention together.[3]  *See* Mem. Op. of June 2, 2022 at 15 ("Qatar has failed to show that Article 27 of the VCDR provides the defendants any greater protection than Article 24."); *accord* Tr. of Oral Arg. at 36:3–20, *Broidy II*, No. 22-7082 (D.C. Cir. Oct. 28, 2022).[4]

---

[3] Although Qatar occasionally analyzes Articles 24 and 27 of the VCDR separately, it does not mount a sustained argument that Article 27 protects documents that Article 24 does not or that the Court's prior ruling to the contrary was erroneous.  *See, e.g.*, Qatar's Mot. to Vacate at 11–20 & n.8 (analyzing Articles 24 and 27 together); Qatar's Opp. & Reply at 20 ("Broidy's argument under Article 27 fails for the same basic reason as Broidy's equivalent argument under Article 24.").  The United States' position at oral argument before the Circuit also adds support for the Court's prior conclusion that, in this context, Article 27 provides Qatar no more protection than Article 24.  Tr. of Oral Arg. at 36:3–20, *Broidy II*, No. 22-7082 (D.C. Cir. Oct. 28, 2022).

[4] The Vienna Convention on Consular Relations and Optional Protocol on Disputes (VCCR), Jan 29, 1970, 21 U.S.T. 77, affords substantively identical protection as the VCDR to the archives and documents of a consulate.  *Id.* arts. 33, 35(2); *see* Mem. Op. of June 2, 2022 at 16–17 & n.7.  Because the documents at issue in this case all relate to the Qatari embassy rather than a consulate, *see* U.S. *Amicus* Br. at 3 n.1, the VCDR rather than the VCCR supplies the applicable legal standard.

Qatar urges the Court to read the VCDR as the United States does, and Broidy all but agrees. *Compare* Qatar's Reply in Supp. of Mot. to Vacate at 7, Dkt. 193-1 ("Qatar agrees with [the United States'] proposed test."), *with* Plaintiffs' Cross-Mot. to Compel at 6–24, Dkt. 185-1 (arguing that Qatar's privilege claim fails under either test, and devoting all but three pages of argument to the United States' proposal).  In addition, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982); *accord Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).  For these reasons, the Court adopts the United States' reading of the Vienna Convention. *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

Because this case involves documents possessed by third parties, the Court asks two questions under the United States' framework.  First, it considers whether the relevant documents were ever "of [a] mission"—that is, whether a diplomatic mission ever possessed them or "solicited [their] creation . . . and provided information from inviolable [mission] documents or archives . . . included in [them]." U.S. *Amicus* Br. at 30–31.  Second, if the documents "were at one time documents of the mission," the Court examines whether a mission retained "objectively reasonable expectations of . . . confidentiality" in those documents. *Id.* at 31.  "If the answer [to either question] is 'no,' the documents are not protected." United States' Statement of Interest in Resp. to the Court's Aug. 3, 2023 Order at 2, Dkt. 200.

Qatar falls short on both steps of the inquiry.  Neither Qatar's conclusory privilege log, nor the representations in its briefs, nor the documents the Court has reviewed show that the documents in Qatar's log contain "information from inviolable [mission] documents or archives" or that Qatar

has an "objectively reasonable expectation[] of those documents' confidentiality." *Id.* Therefore, Qatar's assertions of privilege under the VCDR must fail.

i.   *Documents "of" the Mission*

Article 24 of the VCDR protects the "archives" and "documents of [a diplomatic] mission," and Article 27(2) protects the "official correspondence of [a] mission." VCDR art. 24, 27(2). Documents are "of" a mission when the mission possesses them or, in the United States' view, when the mission "solicit[s] [their] creation . . . and provide[s] information from inviolable documents or archives that is included in [them]." U.S. *Amicus* Br. at 31. The Qatari mission does not possess any of the items at issue in this case. *See* Qatar's Priv. Log, Dkt. 184-1. Thus, the documents Broidy seeks to access are "of" the Qatari mission only if Qatar "both solicited the creation of those particular documents and provided information from inviolable documents or archives" that they incorporate. U.S. *Amicus* Br. at 31.

The Court is highly skeptical that Qatar "solicited the creation" of the "*particular* documents" in its log. *See id.* (emphasis added). Many of these documents are email or chat messages among Qatar's third-party advisors that contain no work or even draft work product that was ultimately shared with Qatar.[5] *See, e.g.*, PRIV-MUZIN-001; PRIV-MUZIN-002; PRIV-CONOVER-001; PRIV-CONOVER-002; PRIV-CONOVER-003. Although Qatar may have anticipated that its advisors would communicate with each other about their work, it does not follow that Qatar "solicited" those "particular" communications. U.S. *Amicus* Br. at 31; *see Solicit*, Merriam Webster's Collegiate Dictionary (10th ed. 1997) ("solicit" means "try to obtain"); *accord*

---

[5] The Court identifies documents in Qatar's privilege log by their "Privilege Identifier (Production Bates)." *See* Dkt. 184-1. To the extent that the Court quotes or describes portions of the record that have been filed under seal, those portions are hereby deemed unsealed.

*Solicitation*, Black's Law Dictionary (10th ed. 2014) ("The act or an instance of requesting or seeking to obtain something.").

More importantly, however, Qatar has not shown that *any* of the logged documents contain "information from inviolable [Qatari] documents or archives." U.S. *Amicus* Br. at 31. Most of the documents are emails, chat messages, and reports from Qatar's consultants. *See, e.g.*, PRIV-KLUETER-001; PRIV-KLUETER-003; PRIV-KLUETER-004; PRIV-MUZIN-0014; PRIV-MUZIN-0015; PRIV-MUZIN-0016; PRIV-MUZIN-0017. These documents appear to draw on press reports, public information, and the consultants' own expertise. As best the Court can tell, they contain no information from any Qatari source at all.

A few documents incorporate general information that their authors obtained or may have obtained from Qatari officials. *See, e.g.*, PRIV-MUZIN-0001 (referencing one of Qatar's diplomatic priorities); PRIV-HOWARD-001 (describing a meeting with embassy attendees). But the Vienna Convention protects documents containing information from "inviolable *documents or archives*," not information from mission sources of any kind. U.S. *Amicus* Br. at 31 (emphasis added). Because Qatar has not tied any of these logged items to its documents or archives, it has not established that the Vienna Convention protects them. *Cf.* VCCR art. 1(1)(k) (defining "consular archives" to include "all the papers, documents, correspondence, books, films, tapes and registers of [a] consular post," rather than consular sources generally); Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 160 (4th ed. 2016) (noting that "[i]n practice th[e] [VCCR's] extensive definition has been applied by analogy to" the VCDR's definition).

Still fewer logged documents reference the existence—but not the contents, except at a high level of generality—of certain documents held by the Qatari embassy. *E.g.*, PRIV-

HOWARD-026.  But that is not enough either.  The Vienna Convention protects items with "*information from* inviolable documents or archives," not assertions that inviolable documents exist.  U.S. *Amicus* Br. at 31 (emphasis added).

Finally, some logged documents include text messages or other communications from representatives of the Qatari mission.  *See, e.g.*, PRIV-HOWARD-0015.  But those messages also are not "documents or archives of the mission" within the meaning of VCDR Article 24 because they are not in Qatar's possession or derived from inviolable documents or archives.  Nor are they mission "correspondence" within the meaning of Article 27.  Mem. Op. of June 2, 2022 at 15; Tr. of Oral Arg. 36:5–7, *Broidy II*, No. 22-7082 (D.C. Cir. Oct. 28, 2022) ("[T]he clear thrust of Article 27 is talking about correspondence between the sending state and the embassy itself.").

The Court recognizes that an item can contain information "from" an inviolable document without direct quotations or even close paraphrases.  *See* Qatar's Reply in Supp. of Mot. to Vacate at 9.  Still, the path from a mission's inviolable document to an outside contractor's papers must be reasonably direct, lest the VCDR "assum[e] near-infinite breadth."  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016).  Here, on any plausible construction of the phrase "information from," Qatar's logged items do not contain information from the inviolable documents or archives of its mission.

For these reasons, the documents Broidy seeks are not "of the mission," meaning they are not privileged under the VCDR.

### ii.    *Qatar's Expectations of Confidentiality*

Although the Court need not proceed to the next step of the inquiry and assess whether Qatar possessed "objectively reasonable expectations of . . . confidentiality" in the documents it logged, U.S. *Amicus* Br. at 31, Qatar falls short at this step, too.  The confidentiality inquiry turns

on (1) the nature of the relationship between Qatar and its contractors, (2) the nature of the logged documents, and (3) "any other relevant indicia of confidentiality."  *Id.*  For this third prong, consistent with the position of the United States, the Court considers "whether any [logged] documents [are] subject to inspection under [FARA]" and whether Qatar's agreements with its contractors "contemplate[d] disclosure[]" of their papers if "required by law."  *Id.* at 32–33. Weighing these three factors together, the Court concludes that Qatar lacks a reasonable expectation of confidentiality in the logged documents.

The first two factors offer modest support for Qatar's asserted expectations of confidentiality.  As to the first factor, Qatar retained its contractors to further its foreign-policy objectives and to "build [a] positive perception of Qatar" in the United States.  Qatar's Priv. Log at 3 (describing PRIV-MUZIN-014).  It gave each contractor information about its diplomatic priorities and bound most of them, but not all of them, with formal confidentiality agreements.[6] Thus, Qatar had some expectation that its contractors' work product would remain confidential. *See* U.S. *Amicus* Br. at 21–22 ("A foreign mission that shares information with . . . an agent or contractors or consultants working for it may have greater expectations of confidentiality compared to information shared with someone who has no relationship with the mission, such as

---

[6] Qatar did not enter into a written confidentiality agreement with defendant Allaham.  Its contracts with defendants Nicolas Muzin and Stonington Strategies, LLC contained a clause providing "that all documents, information or communications . . . exchanged between [the defendants] and the Embassy (including the Embassy's diplomats, employees, contractors, or attorneys), and any information generated or received by [the defendants] in the course of [their] performance" would remain confidential.  Agreement for Consulting Servs. at 1, Dkt. 109-17. Its contract with non-party IMS, Inc., which employed non-party Jeffrey Kleueter, contained a parallel provision.  IMS, Inc. Consulting Servs. Agreement at 1–2, https://perma.cc/4Q9M-NDNF.  IMS subcontracted certain work to Conover + Gould Strategy Group, which employed non-party Heather Conover and defendant Gregory Howard; IMS's contract with Conover + Gould also contained a confidentiality provision.  *See* Conover + Gould Engagement Letter at 3–4, https://perma.cc/49XD-VXFC.

a commercial vendor or service provider."). Similarly, as to the second factor, the documents in Qatar's log reflect a sovereign State's efforts to "[p]rotect[]" its "interests" within the United States. VCDR art. 3(b). That makes them more sensitive than documents dealing with "routine commercial" matters, like those containing "account numbers, account transactions, [or] phone records." U.S. *Amicus* Br. at 22.[7]

As to the third factor, however, Qatar falls conclusively short. To start, all but one of Qatar's contractors—Allaham—was a FARA-registered agent or an employee of one.[8] That made those contractors' documents subject to inspection by the United States. 28 C.F.R. § 5.500(a) (requiring FARA-registered agents to "keep and preserve" for inspection "[a]ll correspondence, memoranda . . . and other written communications (1) to and from all foreign principals . . . relating to the registrant's activities on behalf of . . . [such] principals, and . . . (2) to and from all persons, other than foreign principals, relating to the registrant's political activity."). And as the United States explains, records "that fall within" FARA's inspection provisions carry "diminished . . .

---

[7] That said, the logged documents do not pertain to embassy security or other particularly sensitive issues. *Cf.* Tr. of Oral Arg. at 28:10–12, *Broidy II*, No. 22-7082 (D.C. Cir. Oct. 28, 2022) (emphasizing that the United States invokes the VCDR to protect "documents . . . like blueprints of an embassy").

[8] Defendant Stonington Strategies LLC, which employed defendant Muzin, registered under FARA in 2017. Stonington Strategies LLC, FARA Registration Statement Ex. A, Dkt. 109-17. Non-party Conover + Gould, which employed non-party Conover and defendant Howard, also registered in 2017. Conover + Gould FARA Registration Statement Ex. A, https://perma.cc/8QKA-7974. So did non-party IMS, which employed non-party Kleuter. Information Mgmt. Servs., Inc. FARA Registration Statement, https://perma.cc/4ZJV-H3LM. Unlike the other individual defendants, Allaham was not an employee of a FARA-registered contractor at the time he worked with Qatar, although he appears to have registered under FARA retroactively. Joseph Allaham, FARA Registration Statement, https://perma.cc/PGA6-8CPK.

expectation[s] of confidentiality," for they "are provided with the prospect that they could be subject to further disclosure."  U.S. *Amicus* Br. at 32.[9]

In addition, although Qatar's contracts with IMS, Stonington Strategies, and Muzin did not "waive or alter" Qatar's "privileges and immunities," they authorized each contractor to disclose information "as required by law"—an open-ended phrase that reasonably includes the FARA inspection regulations and arguably more.  Muzin Agreement for Consulting Servs. at 16–17 (Muzin & Stonington Strategies); IMS Consulting Servs. Agreement at 3 (Conover, Klueter, and IMS); *see also* Conover + Gould Engagement Ltr. at 1 (so providing with respect to IMS's subcontractor).  Given this language, as the United States explains, "Qatar did not have a reasonable expectation that [the] documents" held by every contractor save Allaham "would remain protected from disclosure."  U.S. *Amicus* Br. at 32–33.[10]

Finally, with respect to Allaham—the only non-employee of a FARA-registered contractor—Qatar has not established a reasonable expectation of confidentiality either.  Qatar had

---

[9] The Court recognizes that there is a difference between the U.S. government's invoking its inspection rights under FARA and a private party's subpoenaing those documents in civil litigation.  *See* Qatar's Mot to Vacate at 22.  Still, as the United States explains, the fact that the United States retained the right to inspect Qatar's contractors' documents in at least one context diminished Qatar's reasonable expectations of confidentiality in those documents elsewhere too. *Cf. United States v. Miller*, 425 U.S. 435, 443 (1976) (explaining that individuals have reduced expectations of privacy in information they share with third parties, "even if the information is revealed on the assumption that it will be used only for a limited purpose"); *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018) (acknowledging that "an individual has a reduced expectation of privacy in information knowingly shared with another").

[10] Qatar's observation that the Court need not defer to the United States in "its interpretation of a contract between two other parties," Qatar's Mot. to Vacate at 24, is true but not dispositive. The United States has not opined on the meaning of Qatar's contracts with its U.S. agents.  It has opined on whether, in view of those contracts, Qatar's relationship with its agents created reasonable expectations of confidentiality under the VCDR—a question of treaty interpretation.

no written confidentiality agreement with Allaham.[11]  Qatar's Reply in Support of Mot. to Vacate at 12–13, Dkt. 192.  And it offers no evidence that it reached an informal agreement, or even a tacit expectation, that Allaham would keep his materials confidential.  To the contrary, after related litigation began,[12] Qatar *retrospectively* sought to require Allaham to keep all documents relating to his business with Qatar private by entering a settlement agreement in 2018.  *See* Confidential Settlement Agreement and Release of Claims § 7(b)–(c), Dkt. 197-3.  Such an agreement would hardly have been necessary had Qatar and Allaham agreed to specific confidentiality requirements all along.[13]

---

[11] Qatar contends that its agreement with Stonington Strategies, which made Stonington "responsible for assuring that [its] employees, agents, [and] subcontractors" would execute "written confidentiality agreements" for Qatar's benefit, gave it a reasonable expectation of confidentiality in Allaham's papers.  Qatar's Sur-Reply at 16, Dkt. 203 (quoting Stonington Agreement for Consulting Servs. at 6).  But Qatar has not established that Allaham acted as Stonington's "agent" or "subcontractor" within the meaning of that agreement.  At any rate, even if Qatar's agreement with Stonington did bind Allaham, Qatar would lack a reasonable expectation of confidentiality in Allaham's documents for the same reasons it lacks a reasonable expectation of confidentiality in Muzin and Stonington's documents.

The Court also recognizes that reasonable expectations of confidentiality can develop without a written agreement.  *Cf.* Qatar's Reply in Support of Mot. to Vacate at 12–13.  Even so, they cannot emerge out of thin air, and Qatar has not met its burden to show that its relationship with Allaham gave it a reasonable expectation of confidentiality in Allaham's documents.

[12]  In 2018, Broidy filed an action in the Central District of California alleging similar claims, *see Broidy Capital Management et al. v. State of Qatar, et al.*, Case No. 18-cv-02421-JFW (C.D. Cal.).

[13] The settlement agreement also required Allaham to "agree and acknowledge" that all his "records . . . relat[ing] to . . . the business or affairs of [Qatar] . . . are and at all times in the past have been the property of Qatar."  Settlement Agreement & Release § 7(a).  In view of the circumstances under which the settlement agreement was executed and the record as a whole, the Court finds that § 7(a) does not credibly show that Qatar maintained a reasonable expectation of confidentiality in Allaham's documents.  *Cf.* Benson Decl. ¶ 9, Dkt. 197-2 ("During the time I worked for Qatar . . . no one ever told me and I never believed that [my] documents were confidential.").

That Qatar did not have an objectively reasonable expectation of confidentiality in the logged documents provides an independent basis for the Court's conclusion that the documents Broidy seeks are not privileged under the VCDR.

**B.     International Comity**

Although Qatar also asserts a privilege based on "[p]rinciples derived from international comity," Qatar's Mot. to Vacate at 25, the Court held otherwise in its 2022 opinion, *see* Mem. Op. of June 2, 2022 at 21–24, and Qatar fails to demonstrate that the Court should change its mind.  As in 2022, the five factors "relevant to any comity analysis" cut sharply in favor of allowing discovery.  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987).  Qatar's logged documents are potentially "central to [this] litigation"; Broidy has specifically requested them; the information they contain appears to have "originated in the United States" and cannot be obtained through alternative means; and "[s]hielding [the documents] from discovery would frustrate the vindication of interests that Congress and the State of California have specifically protected by statute."  Mem. Op. of June 2, 2022 at 22; *see Aerospatiale*, 482 U.S. at 544 n.28.

In a similar vein, Qatar contends that a comity-inflected version of the deliberative process privilege protects the documents it logged.  But the deliberative-process privilege "is limited to documents that are 'predecisional' and 'deliberative,' meaning 'they reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 875 (D.C. Cir. 2010)).  Having reviewed Qatar's briefing and the relevant documents *in camera*, the Court concludes that Qatar has failed to meet its burden to show that the materials it logged are predecisional and

deliberative.  *Arthur Andersen & Co. v. IRS*, 692 F.2d 254, 258 (D.C. Cir. 1982) (explaining that the burden of establishing deliberative-process privilege falls on the entity asserting it).[14]

## CONCLUSION

For the foregoing reasons, the State of Qatar's Motion to Vacate, Dkt. 175, is granted insofar as it seeks vacatur of this Court's June 2, 2022, order and is denied otherwise.  The plaintiffs' Cross-Motion to Compel, Dkt. 185, is granted.  A separate order consistent with this decision accompanies this memorandum opinion.

October 13, 2023

_____
DABNEY L. FRIEDRICH
United States District Judge

---

[14] Qatar requests that, "[t]o the extent the Court requires more information to assess [its] privilege claims . . . [it] be provided the opportunity to do so in accordance with the Court's guidance on the applicable legal standard."  Qatar's Opp. & Reply at 2.  At this stage in the litigation, however, Qatar has been given ample opportunities to buttress its claims of privilege, both through its briefing and through its privilege logs. Dkt. 184.  Allowing further litigation over Qatar's privilege claims would not assist in "the just, speedy, and inexpensive determination" of this action.  Fed. R. Civ. P. 1.